IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LORI GROHOL, individually and on behalf of all others similarly situated,

Plaintiff,

v.

NORTH PENN LEGAL SERVICES, INC.; KAROLINE MEHALCHICK; ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS; AMERICAN BAR ASSOCIATION; BLOOMSBURG FAIR ASSOCIATION; MATTHEW W. BRANN; HEATH BROSIUS; JESSICA CHAPMAN; WILLIAM R. CHRISTMAN III; MARY BETH CLARK; COMMITTEE ON RULES OF PRACTICE AND PROCEDURE; COMMONWEALTH OF PENNSYLVANIA; MARK J. CONWAY; COURT OF JUDICIAL DISCIPLINE; ROBERT CRAVITZ; DOES 1-100; FEDERAL JUDICIAL CENTER; LORI R. HACKENBERG; INTERNATIONAL LEGAL AID GROUP; JUDICIAL CONDUCT BOARD OF PENNSYLVANIA; HEATHER KELLY; BRIAN KERSTETTER; ROBERT LEADBETTER; LEGAL SERVICES CORPORATION; KATHLEEN LINCOLN; GABRIELE MILLER-WAGNER; LORI MOLLOY; JENNA ANN NEIDIG;

NORTHUMBERLAND COUNTY PROTHONOTARY'S OFFICE; OFFICE OF DISCIPLINARY COUNSEL; OFFICE OF ATTORNEY GENERAL; PENNSYLVANIA BAR ASSOCIATION; PENNSYLVANIA BOARD OF LAW EXAMINERS; PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES; PENNSYLVANIA DEPARTMENT OF MILITARY AND VETERANS AFFAIRS; PENNSYLVANIA GENERAL ASSEMBLY; PENNSYLVANIA LEGAL AID NETWORK, INC.; SUPREME COURT OF PENNSYLVANIA; MICHAEL F. J. PIECUCH; JEFFREY ROWE; JAMIE SALESKI; ALLY SHOLLEY; TIMOTHY SMITH; SNYDER COUNTY; SNYDER COUNTY STOP COALITION; SARAH STIGERWALT-EGAN; DAVID ANDREW STROUSE; K. MICHAEL SULLIVAN; TRANSITIONS LEGAL CENTER; TRANSITIONS OF PA; DAVID K. TREVASKIS; BRIAN ULMER; UNION COUNTY; UNION COUNTY CRIMINAL JUSTICE ADVISORY BOARD; UNION COUNTY MENTAL HEALTH ADVISORY COMMITTEE; UNION COUNTY STOP COALITION; UNION-SNYDER COUNTY BAR ASSOCIATION; UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA; UNITED STATES CONGRESS; UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA; and UNITED STATES JUDICIAL

CONFERENCE,

Defendants. COMPLAINT-JURY TRIAL DEMANDED

Plaintiff initially filed this claim in the Middle District of Pennsylvania, but named the Court as a Defendant, and requested it recuse itself. The Court entered an Order dismissing the case instead. The Court lacked jurisdiction to dismiss a case against itself. Res judicata does not apply to a case dismissed by a named Defendant. Plaintiff acknowledges the Complaint is long, but it is less than three pages per cause of action. Plaintiff attaches an Exhibit demonstrating that she has prepared separate complaints for each cause of action. Plaintiff also attaches sixty-one (61) Motions for Ex Parte, Injunctive, and Summary relief she had prepared by July of 2026. The Court refused to issue summons, so she could not serve the Defendants. The previously filed complaint follows below. Causes of Action A1-AX are requests for declaratory judgment.

Causes of Action A1-AX: Middle District of Pennsylvania, Judge Matthew Brann, Judge Karoline Mechalichick, Doe Law Clerks, Third Circuit Court of Appeals

1. In October of 2025 and May and June of 2026, the Middle District of Pennsylvania, Judge Matthew Brann, and Judge Karoline Mehalchick were hopelessly incompetent or intentionally biased with regard to Plaintiff and

Plaintiff's counsel's rights to call any government official who has chosen to obtain and exercise government power hopelessly incompetent or intentionally biased.

2. In October of 2025 and May and June of 2026, the Middle District of Pennsylvania, Judge Matthew Brann, and Judge Karoline Mehalchick were hopelessly incompetent or intentionally biased with regard to whether Rule 8 applies per cause of action or per complaint.

3. In October of 2025 and May and June of 2026, the Middle District of Pennsylvania, Judge Matthew Brann, and Judge Karoline Mehalchick were hopelessly incompetent or intentionally biased with regard to whether Courts can deny a jury trial to litigants without empirical evidence that the procedural rule they are applying is the least restrictive or narrowly tailored to a compelling government interest.

4. Even if there were procedural rules that would have allowed dismissal of the Complaints Brann and Mehalchick have dismissed against fellow judges, it violates the Constitution for them to engage in statistically significant disparities in how they apply the Constitution to themselves as opposed to executive or legislative branches.

5. As discussed in more detail below, Mehalchick, Brann, and the Middle District have engaged in outrageously disparate analyses when the Defendants are fellow judges.

6. Because Mehalchick, Brann, and the Middle District have chosen to unlawfully sua sponte dismiss claims brought against judges, but not other government officials, they have proven that courts cannot self-regulate, and that Congress and the people must take back over all rules of Court.

## Cause of Action A1: Hopeless incompetence or intentional bias by the Middle District of Pennsylvania with regard to whether it can act as a Judge and a Defendant in the same case

7. In October of 2025 and May of 2026, Judge Brann and Judge Mehalchick refused to recuse themselves.
8. This case specifically names the Middle District as a Defendant, and now names both Brann and Mehalchick.
9. This Court has no authority to hear claims against itself, or to sua sponte dismiss a case against itself, especially when the claim is that the Court is violating the Constitution through sua sponte dismissals in favor of fellow judges.
10. Plaintiff is entitled to a declaratory judgment that the Middle District of Pennsylvania, Brann, and Mehalchick have been hopelessly incompetent or intentionally biased with regard to researching and applying recusal rules.

## Cause of Action A2: Hopeless incompetence or intentional bias by the Middle District of Pennsylvania with regard to whether Rules of Civility are unconstitutional and whether invoking them violates the First Amendment

11. On June 10, 2026, Judge Mehalchick violated Plaintiff's constitutional rights by attempting to invoke an unconstitutional rule, never enacted by any legislature, that the government can take away Plaintiff's counsel's right to her profession if her speech is not "civil" enough towards judges and friends of judges, like powerful, wealthy, and privileged lawyers.
12. Uncivil speech is more protected than civil speech.
13. Antagonistic speech is more protected than polite speech.
14. Even malicious speech is protected.
15. If it is true that everyone in America is required to listen to uncivil, antagonistic, and malicious speech, then Courts and lawyers and their wives and secretaries are certainly required to listen to speech that says "would you like to be served with a subpoena by mail or email?"
16. Courts and lawyers are not allowed to concoct new definitions for protected speech that apply only to themselves.
17. Every other government official is required to tolerate being called hopelessly incompetent or intentionally biased.
18. Judges have to tolerate the same.

19. Judge-made law is illegal, and it is especially illegal when judges are carving out exceptions to fundamental rights, but only for themselves, and not for the other branches of government. Rules requiring "decorum," "respectfulness," or "good taste" go far beyond neutral regulation of time, place, or manner. They target how a person expresses ideas—tone, style, or attitude—and therefore discriminate based on viewpoint.

20. The Supreme Court has repeatedly held that "the government may not regulate speech based on hostility—or favoritism—toward the underlying message expressed." Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 828–29 (1995).

21. To call someone's tone "undecorous" or "in poor taste" is to express disapproval of their manner of speech, which is inseparable from their viewpoint.

22. This is especially true when "decorum" is defined by Merriam-Webster as "propriety and good taste in conduct or appearance." "Good taste" is subjective, culturally coded, and inherently value-laden.

23. A state rule enforcing that standard is a viewpoint-based condition on expression.

24. From the earliest English Inns of Court to the American Bar Association's twentieth-century professionalization campaign, decorum rules have

functioned not to protect the public but to preserve a caste distinction between lawyers and citizens. The Constitution contains no "professionalism clause," and no court has recognized "good taste" as a compelling government interest. Under settled First Amendment law, "one man's vulgarity is another's lyric." Cohen v. California, 403 U.S. 15, 25 (1971).

25. The first formal requirements of lawyerly "decorum" appeared in sixteenth- and seventeenth-century England, where the Inns of Court required members to wear robes, speak in prescribed forms, and dine in common halls segregated by social rank. These rituals symbolized class and deference, not professional competence. (See John H. Baker, An Introduction to English Legal History 229–32 (5th ed. 2019)).

26. The United States inherited the trappings of that system—robes for judges, suits for advocates—but not its aristocratic foundation. Nothing in the U.S. Constitution authorizes the judiciary to prescribe attire or demeanor as a condition of speaking before the courts.

27. B. The American Bar Association and the Invention of "Professional Dignity"

28. The American Bar Association (ABA), founded in 1878, sought to elevate the social status of lawyers following Reconstruction and industrialization.

Early ABA proceedings emphasized "dignity" and "decorum" as distinguishing marks of a gentleman's profession.

29. The 1914 Carnegie Foundation Bulletin No. 15, The Common Law and the Case Method in American University Law Schools, urged law schools to cultivate "a dignified bearing and habit of mind befitting a learned profession." This culminated in the 1921 Reed Report, Training for the Public Profession of the Law, commissioned by the Carnegie Foundation at the ABA's request. The report proposed a uniform bar examination and praised the lawyer's "decorous conduct" as evidence of moral fitness.

30. Neither document invoked constitutional authority; both framed "decorum" as a matter of public perception and class respectability. The modern bar exam and professional-conduct regimes descend from that lineage.

31. C. Codification in the Model Codes

32. The ABA's 1969 Model Code of Professional Responsibility introduced the "Code of Judicial Conduct" and Canon 7, requiring lawyers to "act with proper decorum." The 1983 Model Rules of Professional Conduct retained that language in Preamble ¶ 5, describing lawyers as "public citizens with special responsibility for the quality of justice." Pennsylvania incorporated the Model Rules by order of the Supreme Court of Pennsylvania in 1988, importing the same undefined "decorum" standard.

33. Thus, a term born of Victorian etiquette manuals became an enforceable state rule, weaponized to punish dissenting tone, attire, or expression.

34. In Cohen v. California, 403 U.S. 15 (1971): The Court overturned a conviction for wearing a jacket reading “F*** the Draft,” holding that “one man’s vulgarity is another’s lyric.”

35. Government cannot suppress expression simply because it offends conventional propriety.

36. Therefore, dress codes at courthouses must allow litigants and lawyers to wear jackets saying “F*** the Judge,” without any adverse action from the government, including blocking access to the courts.

37. The fact that judges have blocked shirts in courtrooms saying “F*** the Judge” but not “F*** the draft” proves that judges are biased, apply different standards towards themselves, and must not be allowed to self-regulate, at least at the lower Tribunal level.

38. → A “decorum” rule that penalizes an attorney’s dress, language, or tone because it offends “good taste” is indistinguishable from the censorship rejected in Cohen.

39. In Papish v. Board of Curators of the Univ. of Missouri, 410 U.S. 667 (1973): The Court struck down a university’s expulsion of a student journalist for distributing an “indecent” political cartoon. The rule against

"indecent conduct or speech" was unconstitutional because it punished disfavored viewpoints under the guise of decorum.

40.→ A disciplinary board invoking "decorum" or "professionalism" is using the same logic as the university in Papish.

41. There is nothing in the Constitution that would allow the First Amendment to be enforced less in courtrooms, which is the location of an entire branch of government, or for judges, who are the embodiment of an entire branch of government.

42. In Matal v. Tam, 582 U.S. 218 (2017), the Court held that denial of a trademark as "disparaging" was unconstitutional viewpoint discrimination. "Speech may not be banned on the ground that it expresses ideas that offend."

43.→ "Undecorous" or "distasteful" advocacy is simply "offensive" advocacy; under Matal, suppression on that ground is impermissible.

44. In Gentile v. State Bar of Nevada, 501 U.S. 1030 (1991), the Court struck down a disciplinary rule punishing a criminal defense lawyer's press conference as unconstitutionally vague and overbroad.

45. It emphasized that attorney speech cannot be restricted absent a clear and narrowly tailored necessity.

46. The Court noted that federal courts have an obligation to interfere with the Office of Disciplinary Counsel any time they produce a rule that limits attorney speech without empirical evidence of narrow tailoring.

47. → "Decorum" and "civility" are much vaguer and broader than the rule invalidated in Gentile.

48. Clothing is a form of symbolic speech protected by the First Amendment when used to convey meaning. Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969).

49. Requiring lawyers to wear suits or formal attire conveys a state-imposed message of elitism and hierarchy. It is forced symbolic speech: a mandated performance of class status inconsistent with public values of equality and access.

50. As West Virginia State Board of Education v. Barnette, 319 U.S. 624 (1943), teaches, the government cannot compel expression of orthodoxy—whether in word or in uniform.

51. Forcing a lawyer to adopt "good taste" in dress and demeanor is compelled expression of a state-approved viewpoint about how a "respectable lawyer" should appear.

52. "Professionalism" is not a neutral concept; it is a cultural and economic construct developed by the American Bar Association and state bars to separate lawyers from laypeople.

53. The ABA's 1921 Reed Report explicitly promoted professional image and decorum as means to elevate lawyers' status and justify exclusive licensing.

54. Nothing in the Constitution creates a separate "professionalism" clause.

55. The public's interest lies in effective representation, not aesthetic conformity.

56. Medicine proves the point: doctors, physician assistants, and nurses all wear practical attire, and no one mistakes a lab coat for moral superiority. Regulation of medicine rests on competence, not costume.

57. A decorum requirement particularly harms persons with disabilities, neurodivergent communication styles, religious attire, or cultural expression, all protected by the ADA and equal protection principles.

58. A rule that equates "good taste" with Euro-centric or upper-class norms discriminates not only by viewpoint but by class and culture.

59. The ADA prohibits rules that "screen out or tend to screen out" qualified individuals based on disability, 28 C.F.R. § 35.130(b)(8).

60. Even if the state could identify a legitimate interest—such as maintaining order—it could do so through content-neutral rules:

1. prohibiting actual disruption, threats, or obstruction,
2. maintaining security screening, or
3. requiring courtroom identification badges.

61. "Decorum," by contrast, is neither necessary nor narrowly tailored; it polices demeanor, not disorder.

62. "Decorum" rules, whether framed as professional standards or ethical duties, are viewpoint-based restrictions that privilege conformity and suppress dissent. They condition participation in the justice system on adherence to aesthetic and behavioral norms alien to the public the system serves.

63. The First Amendment protects advocacy, not etiquette.

64. As Cohen held more than fifty years ago, "the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us."

65. Therefore, any rule requiring "decorum," "good taste," or "professional appearance" as a condition of practicing law is unconstitutional under Cohen, Papish, Matal, Gentile, and Barnette.

66. Professionalism" and "Decorum" Lack a Compelling Government Interest

67. Under Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664 (1994), the government must show that recited harms are "real, not merely conjectural,"

and that regulation “will in fact alleviate these harms in a direct and material way.”

68. No evidence shows that relaxed attire or informal tone harms the administration of justice.

69. All other adjudicative or procedural processes throughout society operate with casual dress without an issue.

70. Many courts operate daily with pro se litigants, self-represented parties, and administrative advocates in casual dress. Proceedings continue without incident.

71. E. Historical Evidence Shows “Decorum” Serves Class, Not Justice

72. The 1921 Reed Report argued that “the dignity of the bar must be maintained through deportment and dress befitting a gentleman.”

73. That sentence encapsulates the defect: “decorum” was designed to separate gentlemen from commoners.

74. By contrast, the 1910 Flexner Report on medical education—the foundation of modern licensing in medicine—made no reference to attire or decorum.

75. It measured scientific competence.

76. No peer-reviewed evidence suggests that the color of a lawyer’s jacket or the informality of tone correlates with ethical behavior or public trust.

77. Even if Defendants attempt to recast "decorum" as serving a governmental interest in "maintaining public confidence in the judiciary," that argument collapses under Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664 (1994), which requires that the government "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." No such evidence exists here.

78. If Defendants believe that formal dress codes, rigid demeanor, or mandated "good taste" increase public trust, the Constitution demands proof, not presumption. At minimum, they would need a peer-reviewed, methodologically valid study polling the public on whether the appearance of lawyers in formal attire, or the punishment of "undecorous" behavior, actually enhances their confidence in the courts. No such study has ever been produced. There is no empirical record, in any jurisdiction or journal, showing that "decorum rules" improve public trust or the administration of justice.

79. To the contrary, common experience suggests the opposite: that excessive formality and exclusionary dress codes alienate ordinary citizens and reinforce perceptions that lawyers are "above" the public they serve.

80. An impartial justice system depends on equality of treatment, not aesthetic conformity.

81. If every participant—lawyers, litigants, and judges alike—were free to wear ordinary, comfortable clothing and speak in their own manner without fear of sanction, confidence in fairness would likely increase, not diminish.

82. Under Turner, the burden lies squarely on the government to supply competent, peer-reviewed evidence that “decorum” rules materially advance a compelling interest.

83. Speculation that dignity “feels” reassuring to the public does not satisfy constitutional scrutiny.

84. Thus, if Defendants wish to maintain that decorum enhances public trust, they must do what every other field of social regulation does: produce data.

85. Courts should not rely on elitist intuition or anecdote in place of evidence.

86. The absence of empirical support confirms that “decorum” is a pretext for hierarchy, not a legitimate government objective.

87. Research shows that informality increases trust in a variety of ways.

88. For the vast majority of industries, organizations, regulatory structures, social groups, and communities, worldwide, researchers agree that informality does not cause any decrease in trust.

89. Thus, for most of the world, formality decreases trust, with no benefits.

90. For a tiny number of industries, researchers have realized they are unable to determine whether informality causes a decrease in trust in the public.

91. This is because a tiny number of industries are comprised of wealthy, powerful, privileged, elite members, and were historically limited to the ruling classes.

92. These industries have always been able to exploit government backing and economic power to create “status asymmetries” with the public.

93. These industries have excluded low-income and vulnerable populations and have indoctrinated the public to believe that competence in their industry requires formality, even though none of the industries have any evidence that formality actually increases competence.

94. Instead, these industries have created formality as a social norm.

95. Trust decreases when individual’s violate social normals.

96. Therefore, industries that create a social norm of informality will always be able to increase trust more than an industry that created a social norm of formality, because it can retain all the benefits of informality with no drawbacks.

97. Because the benefits of informality are universal, global, and worldwide, there is no way for any industry to benefit from formality without losing the benefits of informality.

98. Thus, the only way to improve public trust in the Court system as a whole is to immediately implement the same plain language, colloquial, informal

policies that have become incorporated into successful businesses, industries, and governments for communication.

99. The RPC require the legal industry to minimize perceptions in the public of status asymmetries and follow best practices regarding communication and best practices to improve public trust, so, the RPC requires informality.

100. Researchers note that there are some correlations between a decrease in trust in industries where powerful, wealthy, privileged groups indoctrinated the public to believe that they are in a status asymmetry with the powerful, wealthy, privileged groups, and have indoctrinated the public with pervasive social norms that formality increases competence.

101. Lawyers created prevailing social norms.

102. It gives lawyers an ego boost and a feeling of superiority to have status asymmetry.

103. The public in the South perceived that segregated schools were more trustworthy because they were used to segregated schools.

104. Industries that have not indoctrinated the public to believe that competence requires formality are trusted more as a whole because they are able to enjoy the benefits of informality, with no harm from the lack of formality.

105. Lawyers, then, have forever limited themselves from ever achieving as much trust as they could achieve from the public if they changed the social norm to informality.

106. Therefore, the social norm of formality decreases trust.

107. Formality is a sign and symptom of a class-based feudal monarchy, not democracy, because in democracy, there is not supposed to be a status asymmetry between the people and the government.

108. Formality has nothing to do with legal thought or client communication.

109. Formality is more difficult for low-income and diverse populations to achieve because the definition of formality

110. Colloquial speech makes the public trust lawyers and the Courts more.

111. Plaintiff is entitled to a declaratory judgment that calling a judge hopelessly incompetent is protected speech, and that judges are not allowed to engage in any behavior that would deter such speech.

112. A reasonable juror could find that invoking the code of civility in response to a criticism of a judge would deter criticism of a judge.

113. Therefore, Plaintiff is entitled to a declaratory judgment that invoking a code of civility in response to criticism is itself unconstitutional and absurdly corrupt.

114. Plaintiff is certainly entitled at least to a jury trial regarding whether Mehalchick violated her rights by invoking the code of civility against her in response to criticism.

## Cause of Action A3: Hopeless incompetence or intentional bias by the Middle District of Pennsylvania with regard to whether attorneys and courts can claim self-regulation, based on a willingness to accept criticism, while creating exceptions to the First Amendment for criticism against lawyers and courts

115. Judges, courts, and lawyers have lied to the public about whether any other profession is allowed to "self-regulate" with government enforcement.

116. Judge, courts, and lawyers convinced the public to give up the public's right to regulate them because they claimed that they would accept criticism more than the rest of the population because of their alleged inherent moral superiority.

117. It is deceitful and corrupt for judges and lawyers to claim that they can be the only profession that self-regulates on the grounds that their inherent moral superiority will lead them to welcome criticism more than government officials or fellow citizens, while simultaneously and unilaterally amending the First Amendment to limit the ability of others to criticize judges and lawyers through rules on civility and decorum,

especially without addressing the obvious conflict-of-interest for judges and lawyers to create an exception to the First Amendment for judges and lawyers.

118. The public does not want civility rules.

119. The public would respect the Court more if they could show up to court with a shirt describing the sitting judge with profanity, and the judge still rules in their favor.

120. The public does not want rules that limit the First Amendment with regard to criticism of judges.

121. The public does not want rules that limit the First Amendment with regard to criticism of powerful and privileged lawyers by pro bono, low-income public interest lawyers.

122. The public does not want judges and powerful, wealthy, privileged lawyers to be allowed to make separate rules for themselves with regard to the public's right to speak.

123. There may be no right to employment, and there certainly is no right to be a judge, but there is a right to be a lawyer.

124. Because there is a right to be a lawyer, court's cannot condition that right on giving up First Amendment or any other substantive rights.

125. It is hopelessly incompetent to read the Constitution and conclude that the Court is allowed to unilaterally amend the First Amendment to limit criticism of judges or lawyers to prevent litigants from calling lawyers or judges hopelessly incompetent.

126. It is hopelessly incompetent to review a lawsuit that claims that pro se litigants should be treated with the same level of civility as lawyers, and that the level of civility lawyers are allowed to demand is no higher than the civility they give victims or litigants on the witness stand, and to then attempt to impose a different standard of civility on Plaintiff's counsel than has been provided to pro se parties, witnesses, or Plaintiff's counsel herself.

127. In the McNeal case, Plaintiff's counsel was called "garbage" dozens of times by Stephen Bresset, Esq.

128. Bresset, in front of judge Mark Conway, called counsel "garbage" in writing and in open court.

129. Bresset had filed a defamation claim against counsel's client arguing her client had harmed his clients reputation.

130. Counsel had googled his clients and found public facebook posts in which they boast about stumbling around hotels blackout drunk.

131. Counsel submitted this evidence to disprove causation in the defamation lawsuit.

132. There was no reason Bresset should have called counsel garbage for this, but he did.

133. If Bresset is allowed to call counsel garbage for disproving defamation causation, then the Rules of Civility obviously do not stop counsel from making any of the statements she has made.

134. The Court is not being logical or reasonable with how it reviews "civility" rules in the context of (1) unequal enforcement or (2) promises made by Courts and lawyers to the public that they would embrace criticism.

135. Plaintiff is entitled to a declaratory judgment that it was hopelessly incompetent or intentionally biased to invoke the rule of civility without addressing Plaintiff's argument that Courts and lawyers have promised the public that they would welcome criticism in exchange for the privilege of self-regulation.

## Cause of Action A4: Hopeless incompetence or intentional bias by the Middle District of Pennsylvania with regard to whether Rule 8 applies per cause of action or per complaint

136. The Middle District of Pennsylvania has confused Rule 8, which requires each cause of action to be short, and allows dismissal if **individual causes of action** are not short enough, with Rules 20 and 21, which allow the Court to sever a complaint into different dockets if too many claims are

brought together, but does not allow a Court to dismiss the Complaint or demand it be rewritten.

137. It is hopelessly incompetent to misunderstand Rule 8 so thoroughly that it is misconstrued to allow dismissal, rather than severance, based on the length of the complaint as a whole.

138. With 617 causes of action over 922 pages, each cause of action is less than 2 pages, which has always been considered by the Middle District to be "short."

139. If the Court believes the Complaint as whole is too long, it can sever it into different dockets, but cannot dismiss it.

140. Every time the Court sua sponte dismisses a Complaint for being "too long," it encourages retaliation against Plaintiff and counsel's other clients, so every time the Court misunderstands Rule 8, it will be sued by all of Plaintiff's counsel's clients.

141. On June 10, 2026, Judge Mehalchick demonstrated incompetence with regard to Rule 8 by sua sponte dismissing a complaint that had 617 causes of action in less than 1,000 pages, which is less than two pages per cause of action.

142. If Judge Mehalchick wants, she can separate the complaint and sever the dockets, but she cannot concoct some absurd per-complaint page limit.

143. It is not Plaintiff's fault that she has so many causes of action.

144. In fact, it is largely the Court's fault, because Judge Brann violated a plethora of Constitutional provisions in October and November of 2025, enabled continued retaliation, and encouraged continued legal violations.

145. The Court is not allowed to dismiss under Rule 8 unless it addresses whether less than two pages per cause of action is "short."

146. The Court was hopelessly incompetent or intentionally biased by failing to understand how Rule 8 works.

147. Any high school graduate with a short training course in legal research would have uncovered DirecTV, Inc. v. Leto, 467 F.3d 842 (3d Cir. 2006): "The remedy for misjoinder is to drop or sever the offending parties or claims, not to dismiss the action in its entirety" or Elmore v. Henderson, 227 F.3d 1009 (7th Cir. 2000): "Misjoinder is not a ground for dismissing a lawsuit… the proper course is severance."

148. The Court ignored the plain text of the rule and all of the relevant precedent to concoct it's own rule that it could dismiss for misjoinder based on total page length.

149. Even where Rule 21 allows the court to act "on its own," due process still requires notice:

150. Thus, unlike Rule 8, where the Court can dismiss with leave to amendment, Rule 21 requires the Court to allow briefing. Martinez v. Miller, 330 F. App'x 163 (10th Cir. 2009): "Before severing or dismissing parties sua sponte under Rule 21, the court must provide notice and an opportunity to respond."

151. The Court's sua sponte dismissal under Rule 8 exceeded the permissible remedies authorized by the Federal Rules and deprived Plaintiff of notice and an opportunity to be heard. Under Rules 8, 20, and 21, and consistent with *DirecTV v. Leto*, 467 F.3d 842 (3d Cir. 2006), misjoinder or prolixity may justify an order to amend or to sever claims—but not dismissal of the entire case without prior notice.

152. The entire reason Plaintiff provided a 12,000 page exhibit with each of the 617 causes of action drafted as a separate complaint was to demonstrate to the Court that if she files all 617 cases as different dockets, which she has every right to do, it would be more voluminous for the Court.

153. If the Court dismisses the complaint again for being "too long," she will simply file the 617 complaints she has already drafted as separate dockets, all with in forma pauperis complaints and motions to join.

154. Plaintiff is entitled to a declaratory judgment that the Middle District of Pennsylvania has been hopelessly incompetent by misunderstanding Rule

8 to allow them to impose page limits on complaints as a whole, and by dismissing, rather than severing, long complaints raising multiple causes of action.

## Cause of Action A5: Hopeless incompetence or intentional bias by the Middle District of Pennsylvania with regard to whether the Claims Arise From the Same Transaction or Series of Transactions Under Rule 20(a)(2)(A)

155. Even if the Court had properly considered severance and misjoinder, or relied on case law, there is no misjoinder of defendants under Federal Rule of Civil Procedure 20 such that severance under Rule 21 would be warranted.

156. Mosley v. Gen. Motors Corp., 497 F.2d 1330, 1333 (8th Cir. 1974) — defines “series of transactions or occurrences” as “logically related” events with common factual or legal questions.

157. George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007) — classic warning that “unrelated claims against different defendants belong in different suits.”

158. Acevedo v. Allsup's Convenience Stores, Inc., 600 F.3d 516, 521 (5th Cir. 2010) — emphasizes that a shared "pattern or practice" can link defendants even if each acted separately.

159. Bridgeport Music, Inc. v. 11C Music, 202 F.R.D. 229, 231 (M.D. Tenn. 2001) — allows joinder where "defendants engaged in the same series of acts" producing a single injury.

160. The claims against all defendants arise from a single, unified set of factual and legal issues concerning Pennsylvania's system of attorney regulation and the actions of the individuals and institutions operating within that system.

161. The structural constitutional violations and the retaliatory conduct directed at Plaintiff are not separate controversies; they are interdependent components of the same dispute and must be adjudicated together.

162. Rule 20 permits joinder where the claims against defendants arise out of the same transaction, occurrence, or series of transactions or occurrences.

163. This requirement is satisfied.

164. Pennsylvania's attorney-regulation regime is rooted in representations by the judiciary and affiliated bar institutions that the exercise of regulatory authority would serve the public interest, ensure professional competence, and be administered with neutrality.

165. These representations form the basis of the delegation of regulatory authority.

166. The claims in this action challenge the validity of that delegation as exercised, alleging that the actual operation of the regulatory structure—including the conduct of judges, disciplinary personnel, bar officials, and the Pennsylvania Bar Association—has departed from the representations that justified the delegation.

167. The retaliation experienced by Plaintiff from individual actors is part of the same series of events.

168. That retaliation is alleged to be evidence that the regulatory structure has been used for purposes inconsistent with the public commitments upon which the delegation rests.

169. Because the structural challenge and the retaliation claims are factually intertwined and arise from the same course of conduct, Rule 20(a)(2)(A) is satisfied.

170. Rule 20 is satisfied if any question of law or fact common to all defendants will arise under Rule 20(a)(2)(B).

171. Here, the central questions of law and fact are the same for all defendants:

1. whether Pennsylvania's attorney-regulation authority was justified on representations to the legislature and the public concerning competence, neutrality, and public protection
2. whether the current operation of that authority is consistent with those representations;
3. whether the retaliatory actions taken against Plaintiff by individuals within the regulatory system constitute evidence that the delegated authority has been used for inconsistent or impermissible purposes; and
4. whether the use of regulatory power for retaliatory ends invalidates the exercise of that authority under the doctrines governing conditional delegation, ultra vires action, pretext, and related constitutional principles.

172. The retaliation allegations are not ancillary.

173. They are direct evidence of the alleged misuse of delegated authority and are relevant to the constitutionality of the regulatory system itself.

174. Because the same factual record will be required to adjudicate both the structural and retaliation claims, there are common questions of law and fact spanning all defendants.

175. The claims in this action cannot be meaningfully separated.

176. Plaintiff alleges that the structures of attorney regulation in Pennsylvania have departed from the assurances upon which regulatory authority was grounded, and that this deviation is evidenced by and manifested in retaliatory conduct by the defendants.

177. The retaliation is therefore not an independent tort but an integral component of the structural violation.

178. Separating the defendants would fracture the constitutional theory into artificial components, require duplicative discovery, generate overlapping factual findings, risk inconsistent adjudications, and prevent the Court from evaluating whether the regulatory system has been employed for unauthorized or unconstitutional purposes.

179. Structural challenges and their evidentiary predicates cannot be adjudicated in separate actions involving different subsets of defendants.

180. This case therefore differs from actions in which purely structural claims have been severed. Here, the structural issues cannot be divorced

from the conduct of the individuals who exercised the delegated authority in the manner alleged.

181. Each defendant is alleged to have participated in, acted under, or benefited from the attorney-regulatory structure whose constitutional validity is challenged. The retaliatory actions by individual actors, including Pennsylvania Bar Association personnel and disciplinary officials, are part of the conduct used to demonstrate that the system has been employed for purposes inconsistent with its represented justification.

182. Those actions are not independent events.

183. They are part of the evidentiary record required to assess whether the delegation has been compromised.

184. The same witnesses, documents, institutional structures, and practices are relevant to the claims against all defendants. Joinder therefore furthers judicial economy and enables coherent adjudication of the controversy.

185. Rule 21 authorizes severance only to address actual, not theoretical, misjoinder.

186. Because the claims are intertwined, severance would undermine the efficient and just resolution of the action.

187. It would divide a single constitutional inquiry—whether Pennsylvania's delegated authority has been exercised in accordance with its foundational representations—into multiple separate proceedings.

188. Such fragmentation would impede the Court's ability to evaluate the structural challenge on a complete factual record and would risk inconsistent outcomes.

189. Here, the claims share a common nucleus of operative fact and common legal questions, and because the retaliatory conduct supplies necessary evidence for the structural constitutional claim, there is no basis for severance under Rule 21.

190. The structural and individual claims arise from the same interconnected events, concern the same regulatory system, require overlapping proof, and turn on common questions of law and fact.

191. The retaliation alleged is part of the same constitutional controversy as the structural challenge, serving as evidence that the delegation of attorney-regulatory authority has not been exercised consistently with the representations that justified it.

192. Accordingly, there is no misjoinder, and the Court should decline to sever any defendants under Rule 21.

## Cause of Action A6: Hopeless incompetence or intentional bias by the Middle District of Pennsylvania with regard to legislative supervision of “inferior tribunals”

193. Plaintiff has filed a lawsuit alleging that the Middle District of Pennsylvania has shown bias and harmed the public by supervising and regulating itself in a biased manner.

194. The Middle District has repeatedly relied on precedent addressing whether the Supreme Court is allowed to regulate itself.

195. The Constitution specifically provides for different regulation of the Supreme Court compared to the Inferior Tribunals, like the Circuit and District Courts, which are supposed to be regulated by Congress.

196. The Middle District must at least address Plaintiff’s argument that the Middle District is not allowed to regulate itself, enact Local Rules, or act as both a judge and a defendant in its own case, before dismissing Plaintiff’s complaint, sua sponte, based on self-regulatory rules enacted by the Middle District itself.

197. Even if precedent is acceptable as a source of law, precedent regarding the Supreme Court’s ability to regulate itself is simply not relevant to the lower court’s abilities to regulate themselves.

198. Plaintiff is entitled to a declaratory judgment that the Middle District has demonstrated legal incompetence by ignoring Plaintiff's arguments regarding the Constitution, and by sua sponte dismissing her complaint raising these arguments without the opportunity for briefing.

## Cause of Action A7: Hopeless incompetence or intentional bias by the Middle District of Pennsylvania with regard to whether the Office of Disciplinary Counsel is required to investigate all incidents of incompetence or ethical violations, regardless of how they are reported.

199. The Office of Disciplinary Counsel only has the authority to regulate attorneys because attorneys have claimed that the public needs to be protected from lawyers, but the public is too stupid to do it for themselves.

200. Of course, this is a lie.

201. Regardless, if the public was in charge of regulating attorneys, they would require the investigators to investigate any report of wrongdoing, even if it did not come on an official form.

202. The public believes it is stupid to refuse to investigate known ethics violations because a form was not completed.

203. If the Office of Disciplinary Counsel wants to steal the public's right to investigate ethics violations from the public and give it to themselves because they claim the public is too stupid to protect itself from lawyers,

then the Office of Disciplinary Counsel must engage in actions that actually benefit the public, rather than refusing to investigate because a form is not filled out.

204. Plaintiff has filed a lawsuit against the Office of Disciplinary COnusel because they are not serving the public, and are instead relying on forms or absurd rules the public never voted for in order to avoid investigating the judges.

205. Plaintiff has filed a lawsuit against the Office of Disciplinary Counsel asking the federal court to conclude that the Office of Disciplinary Counsel's rules are harmful to the public, and asking the federal court to order the Office of Disciplinary Counsel to investigate legal incompetence that might harm the public, even when a form has not been submitted.

206. The Court has refused, solely because the Office of Disciplinary has created a rule that it can refuse to investigate harm to the public if the correct form is not used.

207. The rule allowing the Office of Disciplinary Counsel to ignore harm to the public if a form is not used is unconstitutional.

208. A lawsuit alleging that the ODC's rules are unconstitutional cannot be resolved, without briefing, sua sponte, in favor of the ODC, solely by citing the rule enacted by ODC.

209. It is incompetent to resolve a lawsuit or motion that the ODC is failing to investigate incompetence, and is using technicalities to avoid protecting the public, by relying solely on a technicality enacted by the ODC.

210. On June 10, 2026, the Court concluded that ODC is not required to protect the public even if it knows that judges are violating the law, if it has not received the correct form.

211. This enabled further illegal acts by the ODC which entitles Plaintiff to both appeal and bring separate causes of action against the Court and anyone else who encouraged the ODC's illegal acts.

212. Plaintiff is entitled to a declaratory judgment that the rules enacted by the ODC must be supported by empirical evidence that they help the public in a way that is the least restrictive or narrowly tailored to a compelling government interest, and that the ODC must investigate all incidents of legal incompetence or other ethical violations it learns about, regardless of the format of the notice.

213. If Courts are going to continue to allow the ODC to do anything it wants, including flagrantly violate the Constitution, then it must admit that Courts and lawyers have failed at self-regulating, and transfer supervisory authority of the ODC to the legislature.

## Cause of Action A8: Hopeless incompetence or intentional bias by the Middle District of Pennsylvania with regard to whether it is allowed to limit the First Amendment or other substantive rights of the parties because of an "inherent" power

214. In October of 2025, Judge Brann violated Plaintiff's counsel's rights by limiting her First Amendment right to spend time with friends and family, or to have "any contact" with thousands of people.

215. This was one of the most unconstitutional orders that has ever been entered by the Middle District, as the Court refused to allow briefing or a hearing, even after Plaintiff agreed to temporary relief while briefing occurred.

216. Courts have no inherent power, whatsoever, to limit the free speech or other substantive rights of parties.

217. It was hopelessly incompetent or intentionally biased for Brann to enter that order.

218. Brann's choice to enter that order when the defendants were fellow judges proves that Courts cannot self-regulate and must transfer power of themselves back to the legislature.

219. Plaintiff is entitled to a declaratory judgment that Brann violated her counsel's rights, and in doing so, delayed her own case.

## Cause of Action A9: Hopeless incompetence or intentional bias by the Middle District of Pennsylvania with regard to whether Rule 4.2 is constitutional

220. Rule 4.2 is blatantly unconstitutional pursuant to the First Amendment.

221. Plaintiff is entitled to a declaratory judgment that Rule 4.2 is unconstitutional until the Office of Disciplinary Counsel produce empirical evidence it is narrowly tailored to a compelling government interest.

222. Alternatively, if the Court is not going to require its allies to produce empirical evidence, it must cease demanding empirical evidence of narrow tailoring from the other branches of government when such claims arise.

## Cause of Action A10: Hopeless incompetence or intentional bias by the Middle District of Pennsylvania with regard to whether threats of subpoenas, demand letters, and criticism are protected speech and cannot be restrained

223. Plaintiff and her counsel have an unfettered constitutional right to subpoena Wills for Heroes participants, protest at their events, send demand letters to the wives, secretaries, and clerks or lawyers or judges, and threaten litigation.

224. No one else on the planet is allowed to claim that threats of litigation or subpoenas are "harms" that would allow restraining orders.

225. The Courts and ODC have violated Plaintiff's rights with regard to litigation activities.

226. Until Defendants prove that Plaintiff's litigation is entirely baseless, she is entitled to a declaratory judgment that it violates the Constitution for any judge, or anyone conspiring with a judge, to react in a negative way to a threat of litigation.

227. It is up to a jury whether negative speech or criticism by a judge would infringe on the First Amendment.

228. Plaintiff is entitled to a declaratory judgment that courts, judges, the ODC, and other government officials violate the Constitution if they react negatively towards threats of litigation.

## Cause of Action A11: Declaratory judgment that statistically significant differences in "state actor" analysis, or analysis of conspiracy to violate the Constitution by private actors, by the Courts when fellow judges, courts, or bar associations are defendants proves Inferior Tribunals cannot be self-regulating, and must be supervised by Congress.

229. Plaintiff has spent the last week creating a database of every case in the Third Circuit that has addressed the unconstitutional conditions doctrine

in Perry v. Sindermann or which contain the phrase "First Amendment retaliation."

230. These cases prove that Courts have engaged in systematic bias in favor of themselves.

231. The Third Circuit courts have found that volunteer fire associations are state actors for the purposes of taking away an employee's right to speech.

232. If a volunteer fire association is a state actor for the purposes of taking away an employee's right to speech, then bar associations which have promulgated statutes, constitutional amendments, and rules of government-enforced "self-regulation" are certainly state actors.

233. Therefore, Bar Associations must allow criticism on their Facebook and social media to the same extent as government officials, must allow members to participate fully in their activities, regardless of criticism or threats of litigation, and broke the law when it cancelled Wills for Heroes events because of protests.

234. However, the Court has bent over backwards to exonerate bar associations and avoid addressing whether they are state actors.

235. The statistical disparity in imposing state actor status on everyone except bar associations proves that Courts cannot be self-regulating, especially with rule promulgated

236. Some of the Courts and judicial or bar-affiliated defendants have explicitly stated that they have not and will not be following the Constitution because they are allegedly private actors.

237. First, until the courts, judges, attorneys, and bar associations agree that they are bound by the Constitution, especially the First Amendment, and will apply the Constitution to themselves to the same extent they apply it to all other government or state actors, and produce the empirical evidence they say the Constitution requires for all other deviations from the Constitution, all judicial and attorney self-regulation is suspended, and all laws or rules that have been enacted pursuant to judicial and attorney self-regulation are suspended.

238. Second, the private versus state actor distinction is utterly irrelevant to cases involving conspiracy.

239. If a Judge knows that they cannot yell at an attorney that they are mentally ill if they try to raise concerns about categorical exclusions from

expungement clinics because of conflict-of-interest rules by a provider who insists upon a monopoly over expungement clinics, they can encourage their friends, who are private attorneys, to yell at an attorney that they are mentally ill if they try to raise concerns about categorical exclusions from expungement clinics because of conflict-of-interest rules by a provider who insists upon a monopoly over expungement clinics.

240. Therefore, anyone who alleged to have had any communications with a judge, who are retaliating against someone who has criticized the judge, is a plausible defendant for a conspiracy to commit First Amendment retaliation claim.

241. Plaintiff is entitled to a declaratory judgment that all Defendants can be sued for conspiracy to engage in First Amendment retaliation, regardless of state actor status, and that the Court must apply the same analysis of state actor status to a bar association that it applied to a volunteer fire association.

242. Plaintiff further is entitled to a declaratory judgment that the FJC and ODC must investigate whether Plaintiff has accurately identified statistically significant differences and whether these impair constitutional rights, and that if those differences exist, that the courts have proven bias and an inability to self-regulate.

Cause of Action A12: Declaratory judgment that statistically significant differences in sua sponte dismissals in favor of Defendants, number of days before exonerating defendant, judgment in favor of defendant despite temporal proximity, scorn, mockery, sarcasm, and other unnecessary commentary by the Courts when fellow judges, courts, or bar associations are defendants proves Inferior Tribunals cannot be self-regulating, and must be supervised by Congress.

243. In the week since June 10, 2026, SLAAY has undertaken the research that the ODC and FJC have refused to do, despite their government mandates to undertake that research, and promises to the public that their work would be research-based.

244. SLAAY has identified an array of variables demonstrating statistically significant differences in how courts rule when courts are themselves a defendant, proving systematic bias by the courts, in favor of the courts, which proves that someone other than the courts must regulate the courts, based on the original filing date of the above-described complaint.

245. Because the Court has continued violating the Constitution, new claims will  be filed with new statistics for every action that occurred after the filing of this case, with violations that occurred after the filing of this case but before June 15, 2026 addressed in the second Grohol docket,

already docketed in the Court, and violations that occur after June 15, 2026 will be addressed in a third Grohol docket.

246. As of the date of the filing of this case, there are already statistically significant differences with regard to all of the below variables based on at least two factors: (1) whether Plaintiff's counsel, Paige Martineau, who worked at the Middle District of Pennsylvania for years, and who has alleged mass ethical violations by the Middle District, filed the case or motion, and (2) whether Defendants are judges, courts, bar associations, or other wealthy and privileged attorneys and allies of the judges, courts, and bar associations:

1. VARIABLE: Dismissed case based on causation prior to trial despite temporal proximity of less than one month alleged
2. VARIABLE: Dismissed case based on causation prior to trial despite temporal proximity of less than one week alleged
3. VARIABLE: Dismissed case based on causation prior to trial despite temporal proximity of less than one day alleged
4. VARIABLE: Dismissed case based on causation prior to trial despite temporal proximity of less than one hour alleged
5. VARIABLE: Dismissed case based on causation prior to trial despite temporal proximity of less than one minute/second (instantaneous) alleged
6. VARIABLE: Dismissed case based on causation prior to trial despite allegation of specific comparator with similar characteristics treated differently

7. VARIABLE: Dismissed case based on causation prior to trial despite explicit admission that action is "because of" First Amendment Activities
8. VARIABLE: Sua sponte judgment in favor of Defendants within 30 days of filing
9. VARIABLE: Reasoning with three sentences or less within 30 days of complaint to sua sponte dismiss claims without allowing briefing
10. VARIABLE: Reasoning without citations with three sentences or less within 30 days of complaint to sua sponte dismiss claims without allowing briefing
11. VARIABLE: Judgment in favor of Defendants
12. VARIABLE: Judgment in favor of Defendants at Motion to Dismiss
13. VARIABLE: Judgment in favor of Defendants at summary judgment stage
14. VARIABLE: Judgment in favor of Defendants by judge at other stage
15. VARIABLE: Judgment in favor of Defendants without any Defendant filing an answer, a motion to dismiss, or briefing, where Plaintiff is not a prisoner
16. VARIABLE: Denial of preliminary injunction before briefs are due
17. VARIABLE: Denial of other motion before briefs are due
18. VARIABLE: Denial of motion before briefs are due while mocking counsel for failing to file brief
19. VARIABLE: Mocking counsel for inadequate argument, then reversing itself on reconsideration based on the same argument.
20. VARIABLE: Mockery and tirades against attorney bringing claims against Defendants
21. VARIABLE: Violation of the First Amendment with mass restraining orders that affect the substantive rights of parties or litigants
22. VARIABLE: Empirical evidencerequired of other branches when constitutional violations are alleged
23. VARIABLE: Incorporation by reference

    The Court does not "incorporate by reference" the analysis from a totally different litigant's case, except when the Defendants are judges or the courts.

Because the Court has never "incorporated by reference" its analysis when applying Perry v. Sindermann when the Defendant is not a judge, and the requirements of Perry v. Sindermann apply more strongly to judges than any other government figure, because they pose the greatest risk of monarchical tyranny, the Court shall not incorporate by reference the analysis when the Defendants are judges, and shall provide as full, detailed, and competent an analysis as it has in the hundreds of other cases in which it has applied Perry v. Sindermann.

24. VARIABLE: Reasoning without any citations
The Court regularly reasons without any citations when exonerating Defendants who are fellow judges.

The Court does not ignore all of the relevant precedent and rely on a handful of sentences with no citations when they analyze Perry v. Sindermann for anyone else.

25. VARIABLE: Violating the First Amendment and finding harm or damages for subjective discomfort upon hearing criticism, or having to testify for a short amount of time in court, or being subject to a money judgment.

Everyone on the planet except courts, judges, bar associations, lawyers, and their wives and secretaries are all required to tolerate discomfort upon hearing criticism, or having to testify for a short amount of time in court, or being subject to a money judgment, and courts deny all other similar requests for TRO by them

Subjective discomfort or lack of desire to testify in court or have to pay a money judgment for civil damages has never been a "harm" for any other litigant, except courts, judges, lawyers, and bar associations.

The tears of a five-year old who is being beaten while her father, Judge Lori Hackenberg, and Attorney K. Michael Sullivan all say she is lying should be much more compelling to the court than the tears of a wife of a lawyer who knew that the lawyer was accused of a constitutional conspiracy, chose not to research it for herself, and chose not to intervene, even after being warned that was illegal.

According to the courts, any subjective discomfort that anyone felt at a coalition meeting or upon opening an email is totally irrelevant, especially when the coalition meeting is about vulnerable citizens being raped or murdered on camera, then being denied a taxpayer-funded lawyer, because their rapist got to North Penn Legal Services first.

The Court has never, under any circumstances, viewed any of the "damages" or "harms" claimed by the weak, selfish, thin-skinned lawyers and judges in this case, especially in the complaints filed to and by the Office of Disciplinary Counsel, to be a damage or harm to anyone else.

Certainly, the way Judge Michael Piecuch treats people, saying things like, "can you even read?" to a pro se disabled female litigant, before transferring the house she had owned and purchased over thirty-six years earlier, from her family, who had it for generations, to her ex-husband, who contributed nothing to it, and left her for another woman eleven months after he convinced her to refinance the home (into his name, giving him all the cash), while the attorney taking the house from her is a friend of the judge, destroying her life and her trust in the courts, is much, much worse than anything Grohol or her agents and counsel are accused of.

Lawyers are supposed to be mentally stronger than the rest of the population, not weaker, at least based on what they have always represented as a justification for judicial self-regulation.

If the Court cannot identify any other restraining order, harassment charge, or other violation of the First Amendment in which they punished someone for sending an email about a subpoeana that caused subjective discomfort in a privileged person unused to being criticized, when there is no threat or even hint of violence, and the only harm is the subjective discomfort of the listener, the criticism itself, then they should not punish Grohol or her counsel for that conduct when the person or entity pursuing the illegal restraining order spends millions of dollars lobbying Congress to increase the power of judges and decrease the power of people to criticize them.

247. These statistically significant differences, and tendency to sua sponte dismiss in favor of Defendants who are judges, proves Inferior Tribunals cannot be self-regulating, and must be supervised by Congress.

248. Plaintiff is entitled to a declaratory judgment that the bias shown by Brann, Mehalchick, and the Middle District proves that courts cannot be self-regulating.

249. Plaintiff now proceeds with her original complaint.

Introduction-Original Complaint

250. Lori Grohol and other class members have been harmed by mass malpractice at North Penn Legal Services, and by retaliation by the remaining Defendants against Grohol, her agents, her legal team, and other parties, as they have attempted to remedy the ongoing and horrifying malpractice.

251. Grohol's legal team sent proof of the mass malpractice to all Defendants, and the conspiracy to retaliate, and published it on a Disciplinary docket, yet all of the Defendants are continuing to retaliate.

252. Grohol incorporates by reference the 8,439 page exhibit documenting the mass malpractice and retaliation attached hereto. See, attached, Exhibit A.

253. This has harmed Grohol by delaying her justice even more.

254. Now, Grohol's legal team has shut down its practice, again, to deal with a frivolous complaint, sent May 7, 2026 by the Office of Disciplinary Counsel.

255. In a previous case, Judge Matthew Brann failed to recuse himself, despite his personal relationship with undersigned, and repeatedly violated Rules 8, 20, and 21, by dismissing rather than severing a case for alleged misjoinder of issues. See, attached, Exhibit B, Retaliation by Brann in Martineau v. ABA.

256. Brann violated almost every Constitutional provision that could apply to the case, entering four different sua sponte orders without briefing and without any legal support for the conclusions or rulings.

257. Because of that unconstitutional behavior, and in the event the Court would be inclined to misapply Rule 8 and dismiss the Complaint for being too "broad," Plaintiff in this case has preemptively prepared seventy five (75) separate Motions for Injunction, and has prepared six hundred and fifty one (651) separate complaints.

258. The Court can decide whether to proceed on hundreds of dockets, or one docket, but it cannot deny Plaintiff her right to file non-frivolous claims or petitions.

259. Plaintiff would much prefer to file a single, global TRO and preliminary injunction, but that strategy was mocked and belittled by the Court in the prior litigation.

260. Thus, she is prepared to file each and every complaint and injunction separately, in case the Court is inclined to misapply Rules 8, 20, and 21 again, even if she has to print them and proceed pro se. See, attached, Exhibit C, Injunctions Against Defendants, and Exhibit D, Separate Complaints Which Will Be Filed if Case is Dismissed.

261. Plaintiff must be allowed to proceed in forma pauperis, because she has been essentially homeless and unemployed since North Penn Legal Services caused her immense trauma and harm, and will submit an application to proceed in forma pauperis once the Court indicates if it would like to proceed on one docket with one in forma pauperis application or on six hundred and fifty one (651) dockets with six hundred and fifty one (651) applications to proceed in forma pauperis.

262. Plaintiff also incorporates by reference those complaints as Exhibits in this case.

263. For the same reason, Plaintiff has combined injunctions relating to fifteen different failures of court and attorney self-regulation as an attached exhibits, unless and until the Court decides to sever the claims. See, attached Exhibits C and D.

264. A different litigant has contemporaneously filed a Petition for Review in Commonwealth Court to declare the 1968 Amendment and other laws to be unconstitutional, and Plaintiff incorporates that by reference as Exhibit E.

265. This Complaint follows.

**<u>Parties</u>**

**Plaintiff Lori Grohol**

266. Plaintiff Lori Grohol is a Pennsylvania resident.

267. Grohol is a current North Penn Legal Services client who is being ignored while her case languishes.

268. Grohol's Northumberland County replevin case has remained pending for more than 6 years after North Penn Legal Services failed to notify her of the January 15, 2020 hearing.

269. North Penn Legal Services remained counsel of record after the missed hearing.

270. North Penn Legal Services did not provide meaningful advocacy, did not assign substitute counsel after Susan Schwartz resigned, did not withdraw, and left Grohol to face dismissal, loss of property, loss of damages, and loss of court access without the representation it undertook to provide.

271. Grohol brings this action individually and on behalf of all others similarly situated.

272. Administrative Office of Pennsylvania Courts

273. Defendant Administrative Office of Pennsylvania Courts may be served at Pennsylvania Judicial Center, 601 Commonwealth Avenue, Harrisburg, Pennsylvania 17120. Administrative arm of the Pennsylvania Judiciary that supports court administration, filing systems, court technology, court access, judicial administration, and court user infrastructure.

274. AOPC supports and legitimizes court access systems, filing systems, docket systems, court technology, court administration practices, court-facing legitimacy structures, and attorney-centered procedural systems that preserve lawyer control over practical access to legal relief.

275. AOPC is included because the challenged structures depend on court administration, filing access, docket access, procedural credibility, and attorney-centered systems that legal aid clients, malpractice victims, substitute providers, and nonlawyer helpers cannot use on equal terms.

276. AOPC's conduct reduced meaningful court access, preserved nonperforming lawyer-centered systems, limited substitute provider access, and kept Grohol and similarly situated clients dependent on court access structures shaped by lawyers and judges.

277. American Bar Association

278. Defendant American Bar Association may be served at 321 North Clark Street, Chicago, Illinois 60654. National voluntary bar association that influences legal education, accreditation, model rules, professional norms, attorney regulation, pro bono systems, and national legal profession legitimacy.

279. ABA uses accreditation authority, professional standard setting, model rule influence, legal education control, bar governance legitimacy, pro bono narratives, and national professional norms to preserve lawyer control over legal services entry and attorney accountability.

280. ABA is included because law school accreditation, professional rules, pro bono culture, access to justice narratives, and lawyer-defined accountability systems operate as national architecture for the lawyer-created monopoly and exclusion of alternative providers.

281. ABA's conduct reduced provider choice, increased barriers for future attorneys and alternative legal service providers, limited malpractice accountability

competition, and preserved a national lawyer-controlled system that gives injured legal consumers fewer meaningful options.

282. Bloomsburg Fair Association

283. Defendant Bloomsburg Fair Association may be served at 620 West Third Street, Bloomsburg, Pennsylvania 17815. Pennsylvania nonprofit and public event gatekeeper for Bloomsburg Fair events, including veterans resource and public-facing community events.

284. BFA operates as a public event access point through which bar-connected and public-official-connected actors can obtain community legitimacy, client access, referrals, and public trust.

285. BFA is included because the Bloomsburg Fair and related veterans events became part of the retaliation and exclusion pathway after SLAAY had been recognized in regional veterans service networks and after public officials and bar actors adopted exclusionary misinformation.

286. BFA's conduct reduced SLAAY's public-facing access, veterans service opportunities, community legitimacy, referral opportunities, and ability to reach vulnerable clients and disabled veterans.

287. Matthew W. Brann

288. Defendant Matthew W. Brann may be served at Professional address to be confirmed. United States District Judge in the Middle District of Pennsylvania.

289. Brann exercises federal judicial authority, docket control, case management authority, attorney practice norms, sanctions authority, recusal authority, and federal court legitimacy that affect access to legal services and attorney accountability.

290. Brann is included because the complaint challenges the federal judiciary's role in applying self-protective judicial standards, controlling access to court, and treating lawyer and court systems differently from ordinary parties.

291. Brann's conduct and authority are tied to reduced meaningful court access, chilled legal services reform, increased burdens on future attorneys and substitute providers, and preserved lawyer-centered federal court access.

292. Heath Brosius

293. Defendant Heath Brosius may be served at Professional address to be confirmed. Snyder County District Attorney and local public official connected to county, prosecutorial, court-facing, victim service, and STOP Coalition structures.

294. Brosius uses prosecutorial authority, Snyder County public office, court-facing power, victim service influence, domestic violence service influence, STOP Coalition involvement, and local referral systems within the same local legal ecosystem.

295. Brosius is included because prosecutorial legitimacy and county-connected service channels reinforce incumbent lawyer-approved legal service pathways and vulnerable-client access controlled by the local legal industry.

296. Brosius's conduct reduced public-service legal access, limited conflict-free substitute provider access, discouraged independent nonprofit providers, restricted referral channels, and preserved closed legal-service systems serving vulnerable clients.

297. Jessica Chapman

298. Defendant Jessica Chapman may be served at Professional address to be confirmed. Attorney and professional accountability actor who participated in disciplinary pressure, access to justice narratives, and legal profession legitimacy systems.

299. Chapman used lawyer status, disciplinary pressure channels, professional accountability narratives, local legal industry relationships, bar-connected legitimacy, and legal-aid legitimacy against Grohol's legal team after malpractice complaints and litigation threatened incumbent control.

300. Chapman is included because the scheme used professional accountability language and disciplinary pressure to burden corrective competition, protect incumbent actors, and punish providers who challenged legal-aid malpractice and legal-industry self-protection.

301. Chapman's conduct reduced substitute-provider access, increased the cost of opposition, chilled future attorneys and nonprofit providers, restricted independent accountability, and preserved incumbent legal-aid and bar-connected control.

302. William R. Christman III

303. Defendant William R. Christman III may be served at Professional address to be confirmed. Pennsylvania Bar Association general counsel and statewide bar-connected actor.

304. Christman used PBA authority, statewide bar influence, professional legitimacy, staff and volunteer communication channels, public-service legal-program authority, Wills for Heroes access, and bar-connected service systems.

305. Christman is included because the PBA ban and related communications barred Martineau and SLAAY from Wills for Heroes after protected comments, potential litigation, and veterans advocacy, thereby converting statewide bar structures into retaliation and exclusion mechanisms.

306. Christman's conduct reduced service capacity, restricted substitute-provider participation, limited public-service access, chilled lawyer-critical market entrants, and damaged SLAAY's role in Wills for Heroes and veterans-service channels.

307. Mary Beth Clark

308. Defendant Mary Beth Clark may be served at Professional address to be confirmed. Attorney, NPLS-aligned volunteer or Judicare actor, and Union and Snyder County Bar Association leader with local legal-aid and bar influence.

309. Clark bridged NPLS hostility into USCBA by using legal-aid relationships, local bar influence, referral gatekeeping, public-service gatekeeping, and professional networks to marginalize Martineau after malpractice whistleblowing.

310. Clark is included because she pretended to support Martineau while preserving NPLS and bar-insider interests, opposing outside reporting, steering USCBA dynamics, and later participating in exclusion from Wills for Heroes, fees, and bar structures.

311. Clark's conduct reduced client choice, suppressed conflict-free substitute counsel, limited public-service opportunities, impaired referral competition, burdened future attorneys and nonprofit competitors, and preserved insider control.

312. Committee on Rules of Practice and Procedure

313. Defendant Committee on Rules of Practice and Procedure may be served at Thurgood Marshall Federal Judiciary Building, One Columbus Circle NE, Washington, District of Columbia 20002. Federal rulemaking body for the federal courts and procedural rule infrastructure.

314. The Committee exercises federal rulemaking influence over practice rules, procedure, court access, attorney practice, judicial administration, and legal

systems that determine how parties file, preserve, discover, hear, dismiss, try, appeal, and enforce claims.

315. The Committee is included because the complaint challenges lawyer-centered federal procedure, court-access control, rulemaking delegation, and attorney-practice systems that make meaningful participation depend on lawyer status and procedural expertise.

316. The Committee’s role reduced legal-service output, increased dependence on licensed attorneys, restricted alternative legal assistance, suppressed court-navigation competition, and burdened malpractice victims and low-income litigants.

317. Commonwealth of Pennsylvania

318. Defendant Commonwealth of Pennsylvania may be served at Office of Attorney General, Strawberry Square, Harrisburg, Pennsylvania 17120. Sovereign state entity that supports, funds, recognizes, and enforces Pennsylvania court systems, legal-aid structures, attorney regulation, unauthorized-practice systems, and public-service structures.

319. The Commonwealth lends state legitimacy, statutory legitimacy, public funding, court system support, attorney regulation support, unauthorized-practice structures, legal-aid systems, and public-service structures to lawyer-controlled systems.

320. The Commonwealth is included because state-sanctioned licensing, court access, disciplinary systems, legal-aid structures, unauthorized-practice barriers, and public-service referral systems preserve incumbent lawyer-controlled legal services and restrict substitutes.

321. The Commonwealth's conduct reduced client choice, suppressed legal-service competition, limited malpractice redress, burdened future attorneys and nonlawyer competitors, and kept Grohol and similarly situated clients dependent on lawyer-controlled channels.

322. Mark J. Conway

323. Defendant Mark J. Conway may be served at Professional address to be confirmed. United States Bankruptcy Judge in the Middle District of Pennsylvania.

324. Conway exercises bankruptcy court authority, sanctions authority, recusal authority, docket authority, hearing authority, attorney practice authority, local rule authority, and federal bankruptcy structures affecting debt relief and bankruptcy legal service markets.

325. Conway is included because the complaint challenges federal court and bankruptcy court gatekeeping, sanctions pressure, recusal failures, attorney practice control, and judge-centered treatment of legal services reformers and critics.

326. Conway’s conduct reduced competition in debt relief and bankruptcy-related legal services, chilled future attorneys and legal services reformers, increased dependence on licensed lawyers, and restricted meaningful substitute-provider access.

327. Court of Judicial Discipline

328. Defendant Court of Judicial Discipline may be served at Pennsylvania Judicial Center, 601 Commonwealth Avenue, Harrisburg, Pennsylvania 17120. Pennsylvania constitutional tribunal responsible for judicial discipline.

329. The Court of Judicial Discipline operates as part of the judicial accountability structure that screens, adjudicates, or legitimizes discipline of judges while remaining embedded in lawyer- and judge-controlled accountability systems.

330. The Court of Judicial Discipline is included because judicial discipline, judicial accountability, professional accountability, and court-connected legitimacy force injured consumers and legal reformers to seek accountability through systems aligned with the same legal profession under challenge.

331. Its conduct reduced independent oversight, chilled criticism, limited malpractice redress pathways, preserved court-centered legal-market control, and kept injured legal consumers dependent on lawyer- and judge-controlled accountability systems.

332. Robert Cravitz

333. Defendant Robert Cravitz may be served at Professional address to be confirmed. Attorney and local lawyer network participant.

334. Cravitz participated through lawyer status, local attorney networks, USCBA participation, bar-connected professional influence, listserv participation, litigation response participation, public-service participation, and court-connected local legal structures.

335. Cravitz is included because local lawyer-network legitimacy, referral access, professional credibility, public-service access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved local legal-industry control.

336. Cravitz's conduct reduced access to referrals, public-service participation, professional legitimacy, attorney cooperation, client channels, competitive legal-service opportunities, and independent accountability options.

337. Doe Defendants 1 through 200

338. Defendant Doe Defendants 1 through 200 may be served at Identities and addresses to be confirmed in discovery. Unknown persons and entities whose identities, roles, communications, addresses, and affiliations will be confirmed through discovery.

339. Doe Defendants include unknown members, officers, employees, committee participants, listserv participants, court-connected actors, bar-connected actors,

legal-aid actors, public-service actors, veterans-service actors, referral actors, funding actors, and disciplinary-adjacent actors.

340. Doe Defendants are included because unknown participants received, transmitted, ratified, preserved, concealed, enforced, or benefited from legal-aid, professional, referral, court-connected, public-service, disciplinary, funding, bar-connected, and electronic communications that preserved incumbent control.

341. Doe Defendants' conduct reduced competitive entry, suppressed nonlawyer assistance, limited malpractice redress pathways, and preserved lawyer-controlled access to clients, courts, public programs, referrals, funding, and professional legitimacy.

342. Federal Judicial Center

343. Defendant Federal Judicial Center may be served at Thurgood Marshall Federal Judiciary Building, One Columbus Circle NE, Washington, District of Columbia 20002. Federal judicial education and research agency supporting federal judicial administration, training, research, and court system legitimacy.

344. FJC provides federal judicial education, research, training functions, court-system legitimacy, professional norms, judicial-policy influence, and institutional support for lawyer- and judge-controlled federal court structures.

345. FJC is included because judicial education, court-administration norms, attorney-practice expectations, and federal judicial legitimacy preserve lawyer- and judge-controlled court access and legal-accountability systems.

346. FJC’s conduct reduced competitive accountability, preserved lawyer-centered litigation control, limited meaningful nonlawyer assistance, chilled court-access reform, and kept injured legal consumers dependent on lawyer-dominated federal court processes.

347. Lori R. Hackenberg

348. Defendant Lori R. Hackenberg may be served at Professional address to be confirmed. President Judge of the Seventeenth Judicial District and local judicial actor.

349. Hackenberg exercises county court authority, courthouse program influence, local legal authority, court-connected professional networks, local bar relationships, public-service access, professional legitimacy, docket control structures, and lawyer- and judge-controlled legal structures.

350. Hackenberg is included because local judicial authority, county court legitimacy, public-service access, attorney-practice expectations, institutional silence, substitute-provider exclusion, and retaliation against Grohol’s legal team preserved local legal-industry control.

351. Hackenberg's conduct reduced alternative legal-service access, limited public-service competition, chilled future attorney criticism, reduced malpractice redress opportunities, and preserved local lawyer-centered control over court-adjacent legal services.

352. International Legal Aid Group

353. Defendant International Legal Aid Group may be served at Address to be confirmed. International legal aid network and comparative legal-aid legitimacy actor.

354. ILAG uses international legal-aid influence, comparative legal-aid legitimacy, professional-network authority, legal-aid policy recognition, institutional credibility, and access-to-justice narratives.

355. ILAG is included because legal-aid legitimacy, provider recognition, access-to-justice narratives, and professional-network credibility preserved incumbent legal-aid control and limit equal recognition for conflict-free substitute providers.

356. ILAG's conduct reduced legal-aid competition, limited conflict-free alternatives, suppressed independent client-accountability services, preserved incumbent provider control, and kept low-income clients dependent on lawyer-controlled legal-aid systems.

357. Judicial Conduct Board of Pennsylvania

358. Defendant Judicial Conduct Board of Pennsylvania may be served at P.O. Box 62525, Harrisburg, Pennsylvania 17106. Independent Pennsylvania agency that receives, screens, investigates, and prosecutes judicial conduct complaints.

359. JCB operates as a judicial discipline screening and accountability gatekeeping body with complaint intake authority, investigative discretion, professional accountability influence, and court-connected legitimacy.

360. JCB is included because judicial accountability gatekeeping, complaint screening, investigative legitimacy, and court-centered professional accountability preserve judge- and lawyer-controlled accountability systems and deter outside correction.

361. JCB's conduct reduced independent oversight, discouraged future attorneys from challenging judges and lawyers, limited malpractice redress pathways, preserved court-centered professional control, and kept injured consumers dependent on lawyer- and judge-controlled accountability systems.

362. Heather Kelly

363. Defendant Heather Kelly may be served at Professional address to be confirmed. Attorney and NPLS-aligned volunteer or legal-aid actor connected to the Sunbury legal-aid and local bar ecosystem.

364. Kelly exerted outside influence in the Sunbury NPLS office and was openly hostile toward Martineau's efforts to report malpractice, preserve client interests, and challenge internal legal-aid failures.

365. Kelly is included because legal-aid volunteers and NPLS-aligned attorneys with USCBA connections helped enforce institutional loyalty, oppose whistleblowing, and preserve legal-aid control rather than repair client harm.

366. Kelly's conduct preserved NPLS and local bar control, discouraged malpractice reporting, reduced conflict-free alternatives, and contributed to the exclusion of Grohol's legal team and similarly situated substitute providers.

367. Brian Kerstetter

368. Defendant Brian Kerstetter may be served at Professional address to be confirmed. Union County District Attorney and county prosecutorial actor connected to advisory, public-service, and local legal systems.

369. Kerstetter uses prosecutorial authority, public-office authority, court-facing power, advisory-board influence, local legal-system authority, public-service participation, county-connected referral structures, and lawyer-centered professional networks.

370. Kerstetter is included because prosecutorial influence, advisory-board access, court-adjacent authority, public-service access, referral control, institutional

silence, substitute-provider exclusion, and retaliation preserved incumbent local legal-industry control.

371. Kerstetter's conduct reduced legal-service competition, chilled future attorneys and legal services reformers, restricted public-service access, limited nonlawyer assistance, reduced referral alternatives, and injured Grohol and the class.

372. Robert Leadbeter

373. Defendant Robert Leadbeter may be served at Professional address to be confirmed. Pennsylvania state representative and public official connected to Bloomsburg Fair and veterans event access.

374. Leadbeter uses public-office authority, legislative-office legitimacy, public-facing veterans-event influence, event-access influence, community-recognition authority, veterans-service access, Bloomsburg Fair access, Wills for Heroes access, and public-official communications.

375. Leadbeter is included because public-official legitimacy, veterans-event access, Bloomsburg Fair access, bar-connected public-service programs, referral access, community recognition, institutional silence, and substitute-provider exclusion preserved incumbent channels after SLAAY was excluded.

376. Leadbeter's conduct reduced community outreach, public-service competition, referral access, veterans-service access, independent legal-service legitimacy, nonlawyer assistance, and available legal-service output.

377. Legal Services Corporation

378. Defendant Legal Services Corporation may be served at 3333 K Street NW, Washington, District of Columbia 20007. Federally established nonprofit corporation that funds and oversees civil legal aid grantees.

379. LSC provides federal legal-aid funding, grantee oversight, regulatory authority, compliance structures, provider recognition, legal-aid legitimacy, and national legal-aid influence over lawyer-controlled civil legal-aid systems.

380. LSC is included because federal funding, grantee recognition, compliance legitimacy, and legal-aid narratives preserved dominant regional provider control while clients lacked independent conflict-free correction when grantees failed.

381. LSC's conduct reduced client choice, conflict-free representation, malpractice redress output, independent legal-aid competition, substitute-provider access, and kept Grohol and low-income clients dependent on incumbent lawyer-controlled providers.

382. Kathleen Lincoln

383. Defendant Kathleen Lincoln may be served at Professional address to be confirmed. Attorney and Union and Snyder County Bar Association officer or treasurer.

384. Lincoln participates through lawyer status, USCBA officer status, treasurer authority, local bar governance, court-connected professional relationships, settlement-related professional influence, and local legal networks.

385. Lincoln is included because local bar legitimacy, attorney cooperation, public-service access, settlement leverage, institutional silence, substitute-provider exclusion, and retaliation preserved local legal-industry control and discouraged complaints about ethical violations.

386. Lincoln's conduct reduced competitive legal-service access, chilled future attorney criticism, discouraged malpractice-accountability work, impaired public-service cooperation, restricted referral alternatives, and preserved incumbent lawyer networks.

387. Gabriele Miller-Wagner

388. Defendant Gabriele Miller-Wagner may be served at Professional address to be confirmed. Pennsylvania Bar Association pro bono and Wills for Heroes program actor.

389. Miller-Wagner exercises statewide Wills for Heroes coordination, volunteer recruitment influence, public-service legal-program access, scheduling authority,

professional legitimacy control, and statewide bar-connected legal-service networks.

390. Miller-Wagner is included because statewide bar pro bono legitimacy, volunteer-channel control, Wills for Heroes access, veterans-service access, referral access, institutional silence, and substitute-provider exclusion restricted SLAAY's equal access.

391. Miller-Wagner's conduct reduced legal-service output, limited future attorney participation, suppressed independent service providers, restricted access to veterans and vulnerable clients, reduced referral alternatives, and preserved bar-controlled program structures.

392. Lori Molloy

393. Defendant Lori Molloy may be served at Professional address to be confirmed. Executive Director of North Penn Legal Services, Inc.

394. Molloy exercises executive legal-aid authority, public funding control, attorney supervision, intake systems, client-service systems, grievance response authority, malpractice response systems, and institutional relationships with courts, funders, bar actors, referral sources, and public-service networks.

395. Molloy is included because executive legal-aid control, public funding, case-assignment control, representation-status control, grievance control, institutional

credibility, substitute-provider exclusion, and retaliation preserved NPLS dominance after client nonperformance and malpractice exposure.

396. Molloy’s conduct reduced client choice, limited substitute counsel, suppressed competing nonprofit providers, reduced malpractice redress services, restricted conflict-free alternatives, and kept low-income clients dependent on lawyer-controlled legal-aid structures.

397. Jenna Ann Neidig

398. Defendant Jenna Ann Neidig may be served at Professional address to be confirmed. Attorney and Union and Snyder County Bar Association participant, officer, or former officer.

399. Neidig participates through lawyer status, USCBA involvement, officer or former officer status, local bar governance, listserv participation, meeting-record structures, public-service legal programming, and court-connected professional networks.

400. Neidig is included because meeting access, records, listservs, committee participation, public-service programming, local professional legitimacy, referral credibility, institutional silence, and substitute-provider exclusion preserved local legal-industry control.

401. Neidig's conduct reduced public-service access, referral opportunities, professional credibility, meeting access, committee access, competitive legal-service opportunities, and independent accountability options.

402. North Penn Legal Services, Inc.

403. Defendant North Penn Legal Services, Inc. may be served at 100 South Main Street, Wilkes Barre, Pennsylvania 18701, with additional regional offices in Pennsylvania. Pennsylvania nonprofit civil legal aid provider and dominant regional legal aid provider for low income clients across multiple counties.

404. NPLS controls public legal-aid funding, regional provider authority, client intake, case assignments, attorney supervision, representation status, referral relationships, legal-aid credibility, grievance systems, and low-income civil legal services.

405. NPLS is included because Grohol's matter remained pending for years after a replevin hearing was not properly noticed, NPLS remained counsel of record without meaningful advocacy or timely withdrawal, and NPLS structures blocked independent substitute-provider access.

406. NPLS's conduct reduced legal-service output, limited client choice, restricted conflict-free substitute counsel, suppressed competing nonprofit providers, reduced malpractice accountability, and kept Grohol and similarly situated clients dependent on a provider structure that failed them.

407. Northumberland County Prothonotary’s Office

408. Defendant Northumberland County Prothonotary’s Office may be served at 201 Market Street, Sunbury, Pennsylvania 17801. County government office responsible for court filings, docket access, court records, counsel-of-record records, service practices, and courthouse administration.

409. The Prothonotary’s Office controls filing authority, docket access, public-record access, courthouse administration, counsel-of-record records, service practices, filing practices, and court-access structures.

410. The Prothonotary’s Office is included because docket systems, record access, counsel-of-record entries, public-office credibility, institutional silence, substitute-provider exclusion, and formal case-control impressions protected incumbent lawyer-centered systems from correction.

411. Its conduct reduced court-access competition, restricted practical legal assistance, limited nonlawyer court-navigation support, reduced malpractice-victim access to remedies, and kept Grohol and similarly situated clients inside formal counsel-of-record structures.

412. Office of Attorney General

413. Defendant Office of Attorney General may be served at Strawberry Square, Harrisburg, Pennsylvania 17120. Pennsylvania state executive legal office with

public law enforcement, state litigation, consumer protection, and government lawyer authority.

414. OAG uses public legal authority, state law-enforcement authority, attorney status, public-office legitimacy, legal-market influence, state litigation authority, consumer-protection influence, and professional structures that preserve lawyer control.

415. OAG is included because government-lawyer legitimacy, state enforcement authority, attorney-controlled accountability channels, consumer-protection silence, substitute-provider exclusion, and professional-access credibility preserved incumbent legal-industry control.

416. OAG's conduct reduced independent accountability, chilled legal services reformers, preserved attorney-controlled enforcement channels, limited competitive alternatives, and reduced practical remedies for malpractice victims and legal consumers.

417. Office of Disciplinary Counsel

418. Defendant Office of Disciplinary Counsel may be served at 601 Commonwealth Avenue, Harrisburg, Pennsylvania 17106. Pennsylvania disciplinary office responsible for enforcement of the Rules of Professional Conduct.

419. ODC uses attorney-discipline authority, complaint screening, investigatory discretion, charging authority, professional regulation authority, disciplinary legitimacy, and lawyer-controlled accountability structures.

420. ODC is included because disciplinary gatekeeping, professional-accountability legitimacy, attorney-controlled complaint channels, license-based pressure, institutional silence, substitute-provider exclusion, and retaliation preserve incumbent lawyer control.

421. ODC's conduct reduced independent accountability services, chilled future attorney criticism, limited malpractice redress pathways, preserved lawyer-controlled professional regulation, and kept injured legal consumers dependent on the same profession that controls attorney discipline.

422. Pennsylvania Bar Association

423. Defendant Pennsylvania Bar Association may be served at 100 South Street, Harrisburg, Pennsylvania 17108. Statewide voluntary bar association that controls or influences statewide bar programs, Wills for Heroes, pro bono systems, committees, CLE, and professional legitimacy.

424. PBA uses statewide bar authority, professional legitimacy, public-service legal programs, pro bono structures, committee access, CLE influence, Wills for Heroes structures, referral channels, and bar governance systems.

425. PBA is included because statewide bar legitimacy, Wills for Heroes access, referral access, institutional silence, substitute-provider exclusion, and retaliation barred Martineau and SLAAY from statewide public-service programs after protected speech and litigation.

426. PBA's conduct reduced legal-service output, restricted future attorney participation, suppressed nonlawyer competition, limited malpractice-accountability alternatives, reduced public-service legal access, and preserved incumbent lawyer-controlled public-service and referral channels.

427. Pennsylvania Board of Law Examiners

428. Defendant Pennsylvania Board of Law Examiners may be served at 601 Commonwealth Avenue, Suite 3600, Harrisburg, Pennsylvania 17120. Agency of the Supreme Court of Pennsylvania that administers bar admission, examination, and character and fitness screening.

429. PBLE controls bar admission, examination authority, character and fitness screening, licensing gatekeeping, professional entry control, credentialing authority, and lawyer regulation structures.

430. PBLE is included because licensing gatekeeping, bar-admission control, character-and-fitness control, court-approved credentials, professional conformity, and substitute-provider exclusion preserve restricted lawyer-controlled market entry.

431. PBLE's conduct reduced legal-service supply, limited future attorney entry, increased barriers to affordable legal assistance, excluded alternative providers, restricted innovation, and kept malpractice victims and low-income clients dependent on a restricted lawyer-controlled market.

432. Pennsylvania Department of Human Services

433. Defendant Pennsylvania Department of Human Services may be served at 625 Forster Street, Harrisburg, Pennsylvania 17120. State agency responsible for public benefits, human services, disability-related systems, domestic violence related funding or service structures, and social-service referral environments.

434. DHS exercises public funding authority, social-service authority, legal-aid-related funding structures, public-benefits systems, service-provider relationships, referral environments, domestic-violence systems, disability-service systems, and public-service legitimacy.

435. DHS is included because public-service referrals, agency-connected legitimacy, domestic-violence service channels, disability-service channels, legal-aid relationships, institutional silence, and substitute-provider exclusion preserve incumbent lawyer-approved service pathways for vulnerable clients.

436. DHS's conduct reduced client choice, restricted conflict-free legal-service alternatives, limited independent accountability for legal-aid failures, preserved

incumbent referral channels, burdened future attorneys and nonlawyer competitors, and injured vulnerable clients.

437. Pennsylvania Department of Military and Veterans Affairs

438. Defendant Pennsylvania Department of Military and Veterans Affairs may be served at Building 0-47, Fort Indiantown Gap, Annville, Pennsylvania 17003. State agency responsible for veterans services, outreach, coalition networks, and veterans service coordination.

439. DMVA exercises veterans-service authority, coalition access, public-service recognition, veterans-outreach structures, Wills for Heroes and Wills for Veterans connections, event coordination, public-facing legitimacy, and referral channels.

440. DMVA is included because a July 28, 2025 regional veterans network email identified SLAAY as a Wills for Heroes contact, and PBA-related exclusion disrupted a government-facing veterans-service structure that routed veterans and agencies to SLAAY.

441. DMVA's conduct or coordination reduced legal-service output for veterans and disabled veterans, limited provider choice, restricted alternative legal-service entry, preserved bar-connected program control, and injured veterans and similarly situated clients.

442. Pennsylvania General Assembly

443. Defendant Pennsylvania General Assembly may be served at Main Capitol Building, Harrisburg, Pennsylvania 17120. Legislative body of the Commonwealth of Pennsylvania.

444. The General Assembly exercises statutory authority, public funding authority, legislative recognition of lawyer-controlled systems, legal-aid funding structures, court-system statutes, attorney-regulation frameworks, unauthorized-practice structures, and legislation or nonlegislation affecting court access.

445. The General Assembly is included because statutory legitimacy, public funding, unauthorized-practice barriers, legal-aid funding structures, attorney-regulation frameworks, and institutional silence preserve lawyer-controlled legal-service systems.

446. Its conduct reduced legal-service competition, limited nonlawyer assistance, preserved unauthorized-practice barriers, restricted malpractice redress alternatives, and kept future attorneys, malpractice victims, and low-income clients dependent on lawyer-controlled institutions.

447. Pennsylvania Legal Aid Network, Inc.

448. Defendant Pennsylvania Legal Aid Network, Inc. may be served at 118 Locust Street, Harrisburg, Pennsylvania 17101. Statewide Pennsylvania legal aid network and legal aid coordination, training, funding, and provider legitimacy actor.

449. PLAN exercises statewide legal-aid coordination, provider legitimacy, training authority, funding relationships, referral influence, public-service recognition, legal-aid policy influence, and support for lawyer-controlled civil legal-aid systems.

450. PLAN is included because statewide legal-aid coordination, grantee legitimacy, provider recognition, referral credibility, training access, institutional silence, and substitute-provider exclusion preserved incumbent legal-aid control despite NPLS nonperformance.

451. PLAN's conduct reduced client choice, limited independent legal-aid competition, restricted substitute-provider access, reduced malpractice redress output, preserved incumbent lawyer-controlled providers from market accountability, and kept Grohol and the class dependent on legal-aid structures that failed them.

452. Supreme Court of Pennsylvania

453. Defendant Supreme Court of Pennsylvania may be served at Pennsylvania Judicial Center, 601 Commonwealth Avenue, Harrisburg, Pennsylvania 17120. Highest court of Pennsylvania with authority over Pennsylvania courts, attorney admission, discipline, rulemaking, practice, procedure, and professional regulation.

454. The Supreme Court exercises attorney-admission authority, disciplinary authority, rulemaking authority, unauthorized-practice authority, judicial-system

authority, court-access authority, professional-regulation authority, and control over lawyer-centered systems governing entry, practice, discipline, procedure, and accountability.

455. The Supreme Court is included because Article V, Section 10(c), attorney regulation, court rules, bar admission, practice-of-law restrictions, professional regulation, and court-access structures preserve lawyer-centered legal-service authority.

456. Its conduct reduced legal-service supply, restricted future attorney entry, excluded nonlawyer competitors, limited malpractice redress alternatives, suppressed court-access innovation, and kept legal consumers dependent on lawyer-controlled systems.

457. Michael F.J. Piecuch

458. Defendant Michael F.J. Piecuch may be served at Professional address to be confirmed. Judge and former local bar president with courthouse, local court administration, advisory, and local legal system influence.

459. Piecuch uses president judge authority, judicial office, courthouse influence, local court administration, local bar influence, public-service relationships, advisory-board connections, and lawyer- and judge-controlled professional networks.

460. Piecuch is included because local judicial authority, courthouse legitimacy, public-service access, advisory access, institutional silence, substitute-provider exclusion, and retaliation preserved incumbent local legal-industry control.

461. Piecuch's conduct reduced legal-service competition, chilled attorney criticism, limited nonlawyer and independent assistance, restricted public-service access, reduced court-access alternatives, and preserved lawyer-centered control over local legal markets.

462. Jeffrey A. Rowe

463. Defendant Jeffrey A. Rowe may be served at Professional address to be confirmed. Magisterial District Judge and local court-connected actor.

464. Rowe uses judicial office, magisterial district authority, courthouse access, local legal influence, court-connected public-service participation, local bar relationships, advisory access, attorney-practice influence, and professional networks.

465. Rowe is included because court-connected legitimacy, local bar relationships, advisory access, attorney-practice influence, institutional silence, substitute-provider exclusion, and retaliation preserved incumbent local legal-industry control.

466. Rowe's conduct reduced competition, limited alternative legal-service access, chilled future attorney criticism, suppressed court-access reform, restricted

nonlawyer assistance, and preserved lawyer-centered control over client-facing legal systems.

467. Jamie Saleski

468. Defendant Jamie Saleski may be served at Northumberland County Prothonotary’s Office, 201 Market Street, Sunbury, Pennsylvania 17801. Northumberland County Prothonotary.

469. Saleski exercises prothonotary authority, filing system authority, docket access authority, public-record authority, counsel-of-record records, courthouse administration, service and filing practices, and public-office structures.

470. Saleski is included because filing systems, docket systems, record access, counsel-of-record entries, courthouse administration, public-office credibility, institutional silence, and preservation of court-facing active case impressions protected incumbent lawyer-controlled systems.

471. Saleski’s conduct reduced court-access competition, limited practical legal assistance, restricted nonlawyer court-navigation support, preserved lawyer-centered control over systems malpractice victims use to obtain relief, and injured Grohol and similarly situated clients.

472. Alexandra Sholley

473. Defendant Alexandra Sholley may be served at Professional address to be confirmed. Attorney, Union and Snyder County Bar Association secretary or officer, and Young Lawyers Division actor.

474. Sholley uses lawyer status, USCBA officer authority, secretary authority, meeting-record authority, minute practices, local bar governance, Law Day participation, Wills for Heroes participation, listserv structures, Young Lawyers Division structures, and court-connected local bar influence.

475. Sholley is included because meeting records, minutes, listserv access, committee participation, Young Lawyers Division access, public-service programming, professional legitimacy, and protected criticism were used to isolate Martineau and treat factual objections as misconduct.

476. Sholley's conduct reduced public-service access, professional credibility, meeting access, committee access, Young Lawyers Division access, referral opportunities, competitive legal-service opportunities, and independent accountability options.

477. Timothy Smith

478. Defendant Timothy Smith may be served at Professional address to be confirmed. Deputy Director or senior management actor at North Penn Legal Services, Inc.

479. Smith exercises NPLS senior management authority, attorney supervision, case management systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, representation status practices, withdrawal practices, and legal-aid institutional control.

480. Smith is included because senior legal-aid authority, file control, representation-status control, attorney assignment control, corrective action control, grievance control, institutional silence, substitute-provider exclusion, and retaliation preserved NPLS dominance.

481. Smith's conduct reduced conflict-free substitute counsel, restricted legal-aid accountability, suppressed competing nonprofit legal-service capacity, limited client repair, preserved incumbent legal-aid dominance, and kept Grohol and similarly situated clients dependent on failed legal-aid structures.

482. Snyder County

483. Defendant Snyder County may be served at Snyder County Courthouse, 9 West Market Street, Middleburg, Pennsylvania 17842. County government entity connected to public-service structures, court-adjacent systems, prosecutor-connected systems, advisory systems, coalition systems, and local legal-service environments.

484. Snyder County uses county government authority, public-service structures, county-connected legal systems, court-adjacent relationships, prosecutor-connected

systems, advisory and coalition relationships, referral environments, and public legitimacy.

485. Snyder County is included because county-connected legitimacy, public-service access, court-adjacent relationships, advisory access, coalition access, referral control, institutional silence, and substitute-provider exclusion preserved local legal-industry control.

486. Snyder County's conduct reduced client choice, public-service access, referral competition, court-adjacent accountability, nonlawyer support, future attorney access, and systems needed to compete with incumbent lawyer-controlled providers.

487. Snyder County STOP Coalition

488. Defendant Snyder County STOP Coalition may be served at Address to be confirmed. County-connected victim service and domestic violence service coalition.

489. The Snyder County STOP Coalition uses county-connected victim service coordination, domestic violence service structures, public meetings, service provider networks, public-service referrals, legal-aid relationships, and local institutional credibility.

490. The Coalition is included because victim-service legitimacy, domestic-violence referral channels, coalition access, service provider networks, legal-aid

relationships, public-service credibility, institutional silence, and substitute-provider exclusion preserved incumbent lawyer-approved service channels.

491. Its conduct reduced public-service legal competition, referral access, conflict-free alternatives, future attorney participation, nonlawyer assistance, and market accountability in legal-aid and lawyer-connected service systems.

492. Sarah Stigerwalt-Egan

493. Defendant Sarah Stigerwalt-Egan may be served at Professional address to be confirmed. Attorney, Union and Snyder County Bar Association president, judicial law clerk or hearing officer, and Wills for Heroes actor.

494. Stigerwalt-Egan uses lawyer status, USCBA presidential authority, judicially connected status, local bar governance, Wills for Heroes control, meeting access, listserv communications, Teams access, minute practices, public-service legal-program access, and communications with statewide bar and veterans service actors.

495. Stigerwalt-Egan is included because she controlled Wills for Heroes access, disputed whether committees existed, sent contradictory eligibility communications, suspended planning after litigation threats, and excluded Martineau from bar structures and meetings.

496. Her conduct reduced legal-service output, limited future attorney competition, chilled lawyer-critical advocacy, restricted public-service access,

reduced referral alternatives, excluded Grohol's legal team from service channels, and preserved incumbent lawyer-controlled structures.

497. K. Michael Sullivan

498. Defendant K. Michael Sullivan may be served at Professional address to be confirmed. Attorney, Union and Snyder County Bar Association actor, and Wills for Heroes cochair or program actor.

499. Sullivan uses lawyer status, USCBA authority, local bar leadership, Wills for Heroes control, pro bono committee influence, listserv communications, public-service legal-program access, local legal-system influence, and joint participation with court-connected and bar-connected actors.

500. Sullivan is included because he disregarded Martineau's prior planning work, restricted participation, conditioned continued public-service planning on litigation resolution, and helped isolate corrective competition from Wills for Heroes and bar systems.

501. Sullivan's conduct reduced client choice, restricted nonprofit legal-service competition, limited public-service legal output, chilled future attorney criticism, reduced nonlawyer assistance, diverted opportunities from Grohol's legal team, and preserved lawyer-controlled referral and program channels.

502. David Andrew Strouse

503. Defendant David Andrew Strouse may be served at Professional address to be confirmed. Attorney and local bar or local legal network participant.

504. Strouse participates through lawyer status, local attorney networks, USCBA participation, listserv participation, bar governance participation, litigation response participation, public-service participation, and court-connected professional structures.

505. Strouse is included because local attorney networks, bar-connected legitimacy, referral access, professional credibility, public-service access, litigation response alignment, institutional silence, and substitute-provider exclusion preserved local legal-industry control.

506. Strouse's conduct reduced access to referrals, public-service participation, professional legitimacy, attorney cooperation, client channels, competitive legal-service opportunities, and independent accountability options.

507. Transitions Legal Center

508. Defendant Transitions Legal Center may be served at Address to be confirmed. Legal services entity connected to victim service, domestic violence service, pro bono, referral, court-related, and public-service networks.

509. Transitions Legal Center uses legal services participation, pro bono relationships, victim-service relationships, domestic violence service coordination,

referral systems, court-related connections, public-service networks, and local legal-service channels.

510. It is included because victim-service legitimacy, domestic-violence referral channels, public-service legal networks, legal-aid relationships, court-related connections, institutional silence, and substitute-provider exclusion preserved incumbent lawyer-approved service pathways.

511. Its conduct reduced provider choice, limited conflict-free alternatives, restricted future attorney and nonprofit participation, suppressed independent advocacy for vulnerable clients, reduced nonlawyer assistance, and preserved incumbent legal-service channels.

512. Transitions of PA

513. Defendant Transitions of PA may be served at Address to be confirmed. Victim service and domestic violence service organization connected to public-service referrals and local service provider networks.

514. Transitions of PA uses victim service structures, public-service referral networks, domestic violence service relationships, pro bono channels, legal-aid relationships, county-connected systems, court-related referral structures, and local service provider networks.

515. Transitions of PA is included because public-service referrals, domestic violence service relationships, victim-service legitimacy, county-connected

systems, legal-aid relationships, institutional silence, and substitute-provider exclusion preserved incumbent lawyer-approved service channels.

516. Its conduct reduced provider choice, limited conflict-free legal alternatives, restricted future attorney and nonprofit participation, suppressed independent advocacy for vulnerable clients, reduced nonlawyer assistance, and preserved incumbent legal-aid and public-service channels.

517. David K. Trevaskis

518. Defendant David K. Trevaskis may be served at Professional address to be confirmed. Pennsylvania Bar Association Wills for Heroes leader and statewide pro bono actor.

519. Trevaskis exercises lawyer status, PBA Wills for Heroes leadership, statewide pro bono authority, public-facing legal-program influence, volunteer-program influence, statewide bar credibility, and communications with bar, legal-aid, veterans-service, and public-service actors.

520. Trevaskis is included because statewide bar pro bono legitimacy, Wills for Heroes legitimacy, volunteer-channel control, veterans-service access, public-service access, referral credibility, institutional silence, and substitute-provider exclusion preserved incumbent lawyer-controlled service channels.

521. Trevaskis's conduct reduced legal-service output, limited future attorney participation, suppressed independent providers, restricted access to veterans and

vulnerable clients, reduced referral alternatives, and preserved bar-controlled public-service structures.

522. Brian Ulmer

523. Defendant Brian Ulmer may be served at Professional address to be confirmed. Attorney and Pennsylvania Bar Association or Wills for Heroes participant.

524. Ulmer uses lawyer status, PBA participation, Wills for Heroes participation, statewide pro bono networks, bar-connected legal-service structures, public-facing legal programs, attorney networks, and communications affecting veterans service and legal service opportunities.

525. Ulmer is included because statewide bar legitimacy, Wills for Heroes access, volunteer-channel control, veterans-service access, referral credibility, institutional silence, and substitute-provider exclusion preserved incumbent lawyer-controlled service channels.

526. Ulmer's conduct reduced legal-service output, limited future attorney and nonprofit participation, restricted veterans-service access, suppressed independent legal-service competition, reduced nonlawyer assistance, and preserved lawyer-controlled public-service channels.

527. Union County

528. Defendant Union County may be served at Union County Courthouse, 103 South Second Street, Lewisburg, Pennsylvania 17837. County government entity connected to public-service, advisory board, criminal justice, mental health, STOP, referral, and county-connected legal-service systems.

529. Union County uses county government authority, public-service systems, advisory board structures, criminal justice structures, mental health structures, STOP-related systems, referral environments, public legitimacy, and county-connected systems.

530. Union County is included because county-connected legitimacy, prosecutor-connected systems, advisory board access, mental health service channels, domestic violence service channels, public-service access, referral control, institutional silence, and substitute-provider exclusion preserved local legal-industry control.

531. Union County's conduct reduced client choice, referral competition, public-service access, court-adjacent accountability, nonlawyer support, future attorney access, and systems needed to compete with incumbent lawyer-controlled providers.

532. Union–Snyder County Bar Association

533. Defendant Union–Snyder County Bar Association may be served at P.O. Box 328, Middleburg, Pennsylvania 17842. Local bar association for Union and

Snyder Counties, with committee, listserv, meeting, public service, Law Day, Young Lawyers Division, Pro Bono Committee, and Wills for Heroes structures.

534. USCBA uses local bar governance, membership control, listserv control, committee access, meeting access, minute practices, Wills for Heroes planning, Law Day programming, Young Lawyers Division access, public-service opportunities, and local professional legitimacy.

535. USCBA is included because it imported NPLS hostility into local bar policy, excluded Martineau and SLAAY from Wills for Heroes, mishandled minutes and meetings, suspended membership, restricted committee access, and used bar authority to punish protected speech, litigation, veterans advocacy, and malpractice reporting.

536. USCBA's conduct reduced future attorney participation, restricted independent legal-service competition, chilled attorney criticism, limited public-service legal output, reduced referral alternatives, impaired professional reputation and networking, and preserved incumbent lawyer networks.

537. Union County Criminal Justice Advisory Board

538. Defendant Union County Criminal Justice Advisory Board may be served at Address to be confirmed. County advisory board connected to criminal justice, prosecutor participation, court-adjacent access, public-service coordination, policy access, and local institutional credibility.

539. Union County CJAB uses county government participation, criminal justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local institutional credibility.

540. CJAB is included because criminal justice advisory legitimacy, prosecutor-connected credibility, court-adjacent access, public-service coordination, policy access, referral environments, institutional silence, and substitute-provider exclusion preserved incumbent local legal-industry control.

541. CJAB's conduct reduced public-service access, referral access, court-adjacent accountability, local legal-system competition, nonlawyer assistance, future attorney access, and systems needed to challenge incumbent lawyer-controlled structures.

542. Union County Mental Health Advisory Committee

543. Defendant Union County Mental Health Advisory Committee may be served at Address to be confirmed. County mental health advisory committee connected to disability-related service systems, public-service coordination, court-connected participation, provider networks, and referrals.

544. The Committee uses county-connected mental health advisory authority, public-service coordination, disability-related service systems, court-connected

participation, provider networks, public advisory access, referral relationships, and local institutional credibility.

545. The Committee is included because mental health advisory legitimacy, disability-service access, provider-network access, court-connected participation, institutional silence, substitute-provider exclusion, and legal-aid relationships preserved incumbent lawyer-approved service channels.

546. Its conduct reduced client choice, restricted conflict-free alternatives, burdened future attorney participation, limited nonlawyer assistance, reduced public-service legal access, preserved lawyer-controlled legal-service channels for vulnerable clients, and injured Grohol and the class.

547. Union County STOP Coalition

548. Defendant Union County STOP Coalition may be served at Address to be confirmed. County-connected domestic violence, victim service, prosecutor-connected, public meeting, service provider, public referral, and legal-aid-related coalition.

549. The Union County STOP Coalition uses county-connected domestic violence service coordination, prosecutor participation, public meetings, victim-service structures, service provider networks, public-service referrals, legal-aid relationships, and local institutional credibility.

550. The Coalition is included because domestic violence service legitimacy, victim service legitimacy, prosecutor-connected access, public-service coordination, legal-aid relationships, referral credibility, institutional silence, and substitute-provider exclusion preserved incumbent lawyer-approved service channels.

551. Its conduct reduced public-service legal competition, limited referral access, restricted conflict-free alternatives, burdened future attorney participation, reduced nonlawyer assistance, and preserved incumbent legal-aid and lawyer-connected service systems.

552. United States Bankruptcy Court for the Middle District of Pennsylvania

553. Defendant United States Bankruptcy Court for the Middle District of Pennsylvania may be served at Address to be confirmed. Federal bankruptcy court for the Middle District of Pennsylvania.

554. The Bankruptcy Court exercises federal judicial authority, bankruptcy jurisdiction, docket authority, hearing authority, case-management authority, sanctions-related authority, local-rule authority, attorney-practice authority, filing systems, staff communications, and bankruptcy access structures.

555. It is included because bankruptcy court authority, attorney-practice control, filing systems, sanctions exposure, court-access norms, institutional silence,

substitute-provider exclusion, and retaliation preserved lawyer- and judge-controlled access to debt relief and legal remedies.

556. Its conduct reduced competition in bankruptcy and debt relief legal services, limited nonlawyer and independent assistance, chilled future attorneys and legal services reformers, preserved lawyer-centered control over debt relief markets, and restricted meaningful substitute-provider access.

557. United States Congress

558. Defendant United States Congress may be served at United States Capitol, Washington, District of Columbia 20510. Legislative body of the United States.

559. Congress exercises federal legislative authority, federal court creation, federal legal-aid funding statutes, federal attorney-regulation structures, procedural rule delegation, federal judicial structures, legal services funding, and decisions that preserve lawyer-centered control over legal services and attorney accountability.

560. Congress is included because federal statutory legitimacy, legal-aid funding, federal court authority, procedural rule delegation, attorney regulation structures, institutional silence, and substitute-provider exclusion preserve lawyer-controlled legal-service systems.

561. Congress's conduct reduced legal-service competition, limited alternative assistance, preserved lawyer-centered gatekeeping, restricted malpractice redress

options, reduced nonlawyer assistance, and kept future attorneys, low-income clients, and injured consumers dependent on lawyer-controlled institutions.

562. United States Court of Appeals for the Third Circuit

563. Defendant United States Court of Appeals for the Third Circuit may be served at James A. Byrne United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania 19106. Federal appellate court with appellate authority over the Middle District of Pennsylvania.

564. The Third Circuit exercises federal appellate authority, precedent authority, procedural authority, attorney-practice authority, disciplinary authority, filing rules, appellate-access structures, judicial legitimacy, and court-controlled credibility systems.

565. The Third Circuit is included because appellate authority, precedent control, procedural gatekeeping, attorney-practice control, judicial legitimacy, institutional silence, substitute-provider exclusion, and retaliation preserve lawyer- and judge-controlled legal-accountability systems.

566. Its conduct reduced competitive accountability, limited malpractice redress pathways, chilled future attorneys and legal services reformers, restricted nonlawyer assistance, preserved lawyer-centered control over legal-rights enforcement, and kept Grohol and the class dependent on attorney-controlled channels.

567. United States District Court for the Middle District of Pennsylvania

568. Defendant United States District Court for the Middle District of Pennsylvania may be served at Address to be confirmed. Federal district court for the Middle District of Pennsylvania.

569. The District Court exercises federal trial court authority, docket authority, case-management authority, filing authority, local-rule authority, sanctions authority, attorney-practice authority, judicial legitimacy, and court-access systems.

570. The District Court is included because docket control, local rules, attorney-practice expectations, sanctions exposure, judicial legitimacy, institutional silence, substitute-provider exclusion, and retaliation preserve lawyer-controlled federal court access.

571. Its conduct reduced court-access competition, limited nonlawyer and independent assistance, chilled future attorney criticism, increased dependence on licensed lawyers, preserved lawyer-centered control over rights enforcement, and kept Grohol and similarly situated clients dependent on scarce attorney-controlled channels.

572. United States Department of Health and Human Services

573. Defendant United States Department of Health and Human Services may be served at 200 Independence Avenue SW, Washington, District of Columbia 20201. Federal agency connected to social services, benefits, civil rights compliance,

domestic violence and family service channels, disability service systems, and federally funded public service systems.

574. HHS exercises federal public funding authority, social-service authority, legal-aid-related funding structures, public-benefits systems, civil-rights compliance structures, service provider relationships, referral environments, and public-service legitimacy affecting civil legal help for vulnerable clients.

575. HHS is included because federally funded service systems, agency-connected referral legitimacy, disability service channels, benefits-related service channels, domestic violence and family service channels, institutional silence, and substitute-provider exclusion preserve incumbent lawyer-approved service pathways.

576. HHS's conduct reduced client choice, restricted conflict-free legal-service alternatives, limited independent accountability for legal-aid failures, preserved incumbent referral channels, burdened future attorneys and nonlawyer competitors, and kept vulnerable clients dependent on lawyer-controlled systems.

577. United States Judicial Conference

578. Defendant United States Judicial Conference may be served at Thurgood Marshall Federal Judiciary Building, One Columbus Circle NE, Washington, District of Columbia 20002. Federal judicial policy and administration body for the federal courts.

579. The Judicial Conference exercises federal judicial administration authority, policy authority, rules-related authority, court-governance influence, administrative oversight, federal court legitimacy, and institutional support for lawyer- and judge-controlled federal court systems.

580. The Judicial Conference is included because federal judicial administration, rulemaking systems, court-governance norms, attorney-practice standards, filing expectations, sanctions norms, judicial legitimacy, institutional silence, and substitute-provider exclusion preserve lawyer- and judge-controlled federal court access.

581. Its conduct reduced competitive accountability, limited meaningful nonlawyer assistance, chilled court-access reform, preserved lawyer-centered litigation control, restricted malpractice redress pathways, and kept injured legal consumers dependent on lawyer-dominated federal court processes.

**Jurisdiction and Venue**

582. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, 42 U.S.C. § 1985(2), and 42 U.S.C. § 1986.

583. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff seeks declaratory and injunctive relief for federal constitutional violations

and for unlawful federal funding and oversight structures that restrict access to conflict free civil legal services and permit counsel of record appearances without actual representation.

584. This Court has subject matter jurisdiction under 28 U.S.C. § 1343 because Plaintiff seeks to redress deprivation under color of state law of rights secured by the Constitution of the United States and to secure equitable and other relief under federal civil rights statutes.

585. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1361 because Plaintiff seeks mandamus style relief compelling performance of nondiscretionary duties owed to low income beneficiaries under federal funding and oversight conditions, to the extent such duties exist and are enforceable.

586. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702 to the extent Plaintiff challenges final agency action or unlawful action by federal actors in administering or enforcing funding structures and conditions that materially contribute to the injuries described in this Complaint.

587. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's related Pennsylvania constitutional, statutory, and common law claims because those claims form part of the same case or controversy and arise from a common nucleus of operative facts.

588. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because multiple Defendants reside in this District for venue purposes and have sufficient contacts within this District.

589. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including North Penn Legal Services' headquarters and corporate activities.

590. This Court has personal jurisdiction over Defendants because they reside in, transact business in, receive funding in, direct conduct toward, or cause foreseeable harm within the Commonwealth of Pennsylvania and this District, and because some of the injuries described occurred in this District.

## STATEMENT OF FACTS

591. Plaintiff Lori Grohol brings this class action because North Penn Legal Services, Inc., the dominant publicly funded civil legal-aid provider in her region, accepted her case, entered the court system on her behalf, failed to notify her of a replevin hearing, allowed her personal property claim to collapse, remained counsel of record while refusing to work on the case, and then participated in a

broader legal-system structure that prevented meaningful repair, substitute representation, public accountability, and conflict-free legal-aid access.

592. Plaintiff has waited more than 6 years, since January 15, 2020, for North Penn Legal Services to correct the consequences of its failure to notify her about a scheduled replevin hearing.

593. Plaintiff's Northumberland County docket continues to list Susan Schwartz of North Penn Legal Services, 133 North Second Street, Sunbury, Pennsylvania, as counsel of record.

594. On October 15, 2019, Plaintiff contacted North Penn Legal Services after her landlord obtained an eviction judgment, after she moved from the property on October 4, 2019, after she removed what she could by herself, and after she was told to contact the landlord within 10 days to arrange retrieval of the rest of her belongings.

595. Plaintiff reported that she had been trying to contact the landlord, that the landlord would not return her calls, that someone called police when she went to the house, that police told her to leave because she did not live there anymore, and that she wanted help getting her belongings back.

596. Plaintiff's October 15, 2019 intake involved urgent property loss, housing displacement, and personal belongings that could be discarded if counsel did not act quickly.

597. Managing Attorney Susan Schwartz did not call Plaintiff within 3 to 5 days of intake.

598. Schwartz instead emailed secretary Angela Rothermel to schedule Plaintiff for an appointment and then allowed the file to sit without meaningful legal action.

599. There is no evidence that Rothermel worked on the scheduling task until October 28, 2019.

600. The NPLS Sunbury office had a required policy that outgoing emails, calls, and voicemails to clients had to be documented in the file.

601. Plaintiff's file contains no documented outgoing email, call, or voicemail to Plaintiff from October 15, 2019 through October 28, 2019.

602. Plaintiff will testify that she did not hear from North Penn Legal Services for the 2 weeks between her October 15, 2019 intake and her October 28, 2019 call with Rothermel.

603. Schwartz did not call Plaintiff or speak with Plaintiff about the case until a scheduled November 5, 2019 appointment, 3 weeks after intake.

604. There are no notes in Plaintiff's file describing any legal advice, investigation, case plan, or client instructions from the November 5, 2019 appointment.

605. After the October 28, 2019 email to Schwartz stating that Plaintiff had a November 5, 2019 appointment, there are no entries in Plaintiff's file until December 4, 2019.

606. On December 4, 2019, Plaintiff called the intake line and reported that she had run out of time to retrieve her belongings, that she was trying to get them before they were discarded, and that she needed to know her options and rights.

607. After Plaintiff's December 4, 2019 call, Schwartz performed the first documented work on Plaintiff's case in almost 2 months.

608. On December 4, 2019, Schwartz emailed Plaintiff and stated that she had left several messages for the landlord, had found the landlord's email address in her notes, had emailed the landlord that day, had given the landlord her cell number, and hoped the landlord would respond.

609. In the same December 4, 2019 email, Schwartz told Plaintiff that, if the landlord did not respond, they could look at filing an action in court the next week for return of Plaintiff's belongings.

610. Schwartz also emailed the landlord on December 4, 2019 and stated that she represented Plaintiff, that Plaintiff had vacated the premises as requested, and that Plaintiff had to retrieve her belongings.

611. Plaintiff called repeatedly over the next 2 weeks, but Schwartz did not reply.

612. Schwartz later scheduled a meeting with Plaintiff through Schwartz's private cell phone number instead of through normal documented North Penn Legal Services channels.

613. Schwartz entered a file note stating that she met with Plaintiff, obtained additional information needed for a replevin action, asked Plaintiff to provide a list of items in the landlord's possession, and reviewed messages between Plaintiff and the landlord.

614. On December 17, 2019, Plaintiff brought her handwritten list of belongings to North Penn Legal Services.

615. Paula Devine emailed Schwartz on December 17, 2019 with the subject "Lori Grohol hand written list of belongings," and the file note states that Plaintiff's handwritten list of belongings was emailed to Schwartz.

616. Schwartz then ignored Plaintiff's case from December 17, 2019 until January 2, 2020.

617. On January 2, 2020, Schwartz spent about 1 hour using a North Penn Legal Services replevin template and attached Plaintiff's list of possessions to a complaint filed in the Court of Common Pleas.

618. By January 2, 2020, almost 3 months had passed since Plaintiff's October 15, 2019 intake.

619. During that nearly 3-month period, the only documented legal work before January 2, 2020 was Schwartz's December 4, 2019 email to the landlord.

620. North Penn Legal Services trains staff to understand that replevin actions are scheduled quickly and usually within about 5 days.

621. On January 3, 2020, Schwartz received the scheduling order for Plaintiff's replevin hearing.

622. Schwartz instructed Devine to notify the landlord of the hearing.

623. Schwartz did not instruct Devine to notify Plaintiff of the hearing.

624. Between January 3, 2020 and January 15, 2020, Schwartz did not perform meaningful work on Plaintiff's case, did not prepare Plaintiff for the hearing, and did not notify Plaintiff of the hearing.

625. On January 8, 2020, North Penn Legal Services Deputy Director Timothy Smith was warned by an NPLS attorney that Schwartz was continuing to miss

deadlines, miss hearings, fail to notify clients of hearings, fail to prepare for hearings, and ignore clients for months or years.

626. Smith mocked and berated the attorney who reported the ongoing malpractice and told the attorney to "leave the past in the past."

627. The January 8, 2020 warning occurred 1 day before Schwartz received notice of Plaintiff's replevin hearing.

628. North Penn Legal Services did not protect Plaintiff after the January 8, 2020 warning.

629. Plaintiff's landlord was withholding Plaintiff's belongings, including her children's childhood toys and her only photographs of them from childhood.

630. Plaintiff had promptly provided Schwartz with a detailed written list of those belongings.

631. On January 15, 2020, Schwartz appeared at the replevin hearing and realized that Plaintiff was absent because Schwartz had not notified her.

632. Plaintiff is informed and believes that Schwartz inaccurately represented to the judge that she had notified Plaintiff of the hearing.

633. Schwartz had been placed on probation multiple times for missing hearings.

634. Schwartz had also been present when the staff attorney reported that Schwartz was continuing to miss hearings.

635. After the January 15, 2020 hearing, Schwartz returned to the office and entered a file note falsely stating that she had notified Plaintiff about the hearing.

636. The Sunbury office policy required outgoing mail, phone calls, and text messages to be documented in the file.

637. Plaintiff's file shows outgoing mail notifying the opposing party about the hearing.

638. Plaintiff's file shows no outgoing mail, call, or text notifying Plaintiff about the hearing.

639. Schwartz then forwarded an email to the file that stated, "I'm sorry you are not feeling well."

640. The forwarded email appears to respond to an email from Plaintiff, but the email from Plaintiff was omitted from the file.

641. The email system and Legal Server case-management system were linked in a way that would include earlier emails when an email was forwarded to the file unless earlier emails were specifically deleted.

642. Schwartz then instructed Plaintiff to communicate with her by personal cell phone instead of through the case-management system.

643. Schwartz's personal-cell-phone communications prevented management and other Sunbury staff from seeing in Legal Server that Schwartz had caused Plaintiff to miss the hearing.

644. Schwartz told Plaintiff that no hearing had been held and that a hearing would be held soon.

645. The landlord later secured counsel, and that counsel agreed to return Plaintiff's belongings.

646. Schwartz then ignored the landlord, the landlord's counsel, and Plaintiff for months.

647. The landlord eventually discarded Plaintiff's belongings.

648. On March 7, 2020, Legal Server flagged Plaintiff's case for lack of activity and noted that there were no future calendar events.

649. In April 2020, Schwartz resigned from North Penn Legal Services.

650. North Penn Legal Services never assigned another attorney to Plaintiff's case after Schwartz resigned.

651. Plaintiff believed that North Penn Legal Services had filed the case, that no hearing had been held yet, and that North Penn Legal Services was still working to retrieve her belongings.

652. Plaintiff has a damages claim against the landlord arising from the replevin matter that North Penn Legal Services filed.

653. For more than 6 years, Plaintiff repeatedly met with Deputy Director Timothy Smith about her case.

654. Smith refused to proceed with Plaintiff's case.

655. Smith pressured Plaintiff to enter an appearance as a self-represented party.

656. Smith told Plaintiff, flatly, "we are not working on this case for you."

657. Smith warned Plaintiff that, because North Penn Legal Services would not help her anymore, her case might be dismissed for lack of prosecution if she did not represent herself and pursue it.

658. North Penn Legal Services remained counsel of record while telling Plaintiff that it would not work on her case.

659. North Penn Legal Services thereby preserved docket control, blocked clean substitution, created confusion about representation status, and left Plaintiff responsible for correcting a legal crisis caused by North Penn Legal Services.

660. In December 2021, a North Penn Legal Services staff attorney resigned and realized that NPLS was not assigning attorneys to her cases.

661. The attorney notified the NPLS Board and local courts in writing that she believed ongoing malpractice was occurring because NPLS Sunbury was not assigning attorneys to cases pending in court when the attorney of record resigned.

662. No one responded to the attorney’s written notice.

663. North Penn Legal Services suspended the attorney 6 hours after she began notifying courts that she was resigning and that NPLS had not yet assigned new attorneys to cases where Sunbury attorneys were resigning.

664. From 2020 through 2026, North Penn Legal Services has refused to work on Plaintiff’s case even though NPLS remains counsel of record.

665. Plaintiff’s case is not an isolated malpractice event.

666. Plaintiff’s case reflects a longstanding pattern in the Sunbury office involving missed hearings, missed deadlines, failure to communicate, failure to document, failure to assign replacement counsel, failure to withdraw, and failure to protect clients after counsel stopped performing work.

667. Three weeks before Plaintiff's October 15, 2019 intake, Executive Director Lori Molloy berated the staff attorney who was reporting Schwartz's malpractice for hours at a PLAN conference.

668. Molloy told the reporting attorney that she was negative, wanted everyone to suffer, and that Schwartz was not committing malpractice anymore.

669. Molloy threatened the reporting attorney, verbally and in writing, with progressive discipline, up to and including termination, if she made reports about Schwartz again.

670. Molloy repeatedly told the reporting attorney, "we are not having that conversation again."

671. North Penn Legal Services later granted a whistleblower grievance arising from that issue.

672. North Penn Legal Services took no client-protective action sufficient to safeguard Plaintiff.

673. The reporting attorney disclosed these events in writing to the NPLS Board on May 12, 2020.

674. North Penn Legal Services has never disputed those disclosed events.

675. On May 12, 2020, Martineau submitted a Step 3 written grievance to the North Penn Legal Services Board alleging that NPLS retaliated against her after she reported Schwartz's missed deadlines, missed hearings, months-long failures to call clients back, lost paperwork, lost files, and related ethical violations.

676. The May 12, 2020 grievance stated that Martineau had reported these concerns to Schwartz, upper management, Molloy, Smith, and others from 2018 through 2020.

677. The grievance stated that Molloy told Martineau in September 2019 that NPLS would not have "that conversation" about Schwartz again.

678. The grievance stated that NPLS failed to respond to later reports in December 2019, January 2020, March 2020, and April 2020.

679. The grievance identified at least 39 cases in the missed hearing or missed deadline category.

680. The grievance identified at least 52 cases in the failure-to-communicate category.

681. The grievance stated that clients were continuing to be harmed.

682. The grievance stated that NPLS leadership failed to correct the Sunbury office breakdown despite repeated internal notice.

683. North Penn Legal Services' failure to correct the Sunbury office breakdown harmed Plaintiff because Plaintiff's case remained abandoned, unassigned, and unresolved while NPLS retained counsel-of-record status.

684. Schwartz and Smith intimidated, mocked, belittled, disregarded, and blamed Plaintiff when she attempted to advocate for herself.

685. Schwartz and Smith made Plaintiff feel as though she deserved to lose the photographs and childhood belongings that had been discarded after NPLS failed to act.

686. North Penn Legal Services holds itself out to clients, courts, and funders as a trauma-informed legal-aid organization committed to dignity, empathy, and respect for vulnerable populations.

687. North Penn Legal Services holds itself out as serving unhoused people, survivors of violence, people with mental-health conditions, and people affected by substance-use disorders.

688. North Penn Legal Services staff receive and provide training emphasizing client-centered representation, nonjudgmental communication, and client empowerment.

689. Despite these representations and trainings, NPLS has engaged in a pattern of shaming, mocking, belittling, and discrediting clients who ask why hearings

were missed, why calls were not returned, why cases were inactive, or why attorneys failed to perform.

690. Clients who question the status of matters are treated as unreliable, difficult, or at fault rather than as clients seeking accountability for promised and docketed representation.

691. Vulnerable clients are disproportionately harmed by this treatment.

692. Schwartz and Smith invoked client vulnerabilities to undermine client credibility and to convey that courts, funders, and the public would not believe the clients.

693. This messaging leaves clients believing that they are powerless to complain, that no neutral authority will take their concerns seriously, and that asserting rights will make their situations worse.

694. North Penn Legal Services applies an asymmetrical standard of blame.

695. Attorneys who miss hearings, fail to appear, neglect filings, and ignore clients face little or no internal accountability.

696. Clients who miss hearings because counsel failed to notify them, because counsel failed to communicate, or because counsel created confusion are blamed and used as justification for withdrawal, abandonment, or case closure.

697. This double standard discourages legal-aid clients from asking questions, challenging errors, documenting problems, or seeking outside review.

698. North Penn Legal Services thereby suppresses complaints and conceals systemic failures instead of correcting them.

699. North Penn Legal Services maintains a practice of refusing to initiate or disclose malpractice claims arising from attorney nonperformance unless and until litigation is publicly filed against the organization.

700. North Penn Legal Services denies or minimizes malpractice exposure rather than self-reporting errors, notifying insurers, or pursuing early resolution.

701. When clients persist in raising concerns or pursuing external remedies, North Penn Legal Services responds with intimidation designed to deter further action.

702. North Penn Legal Services warns clients, directly or indirectly, that pursuing complaints or litigation will harm them, that they will be blamed publicly for outcomes caused by attorney neglect, and that the organization will portray them negatively to courts or the press.

703. These intimidation practices exploit the precarious social and economic positions of legal-aid clients.

704. These intimidation practices chill protected activity and prevent accountability.

705. These practices contradict NPLS's training materials, public representations, and grant-funded mission statements emphasizing empathy, empowerment, and respect for client voice.

706. These practices also undermine court proceedings by suppressing truthful reporting of attorney failures and preventing timely correction of abandoned or mishandled cases.

707. North Penn Legal Services' client-intimidation practices are systemic.

708. Clients are deterred from asserting rights.

709. Attorney misconduct is concealed instead of corrected.

710. Courts and funders receive a distorted picture of service quality.

711. The concealment of attorney nonperformance further entrenches NPLS's monopoly because failures do not surface in ways that would allow courts, funders, regulators, alternative providers, or clients to intervene.

712. Similarly situated clients continue to face irreparable harm because North Penn Legal Services has not been required to identify abandoned cases, notify courts and clients, or trigger professional-liability protections.

713. North Penn Legal Services is a state-funded and federally funded legal-aid organization serving multiple counties in central and northeastern Pennsylvania, including Northumberland, Union, and Snyder Counties through its Sunbury office.

714. North Penn Legal Services operates as the dominant publicly funded civil legal-aid provider in its service region.

715. North Penn Legal Services occupies a region-wide legal-aid role that functions like a taxpayer-funded monopoly.

716. Every legal-aid attorney funded within the NPLS service structure is effectively channeled through 1 private corporate provider for the region.

717. The structure leaves no meaningful conflict-counsel equivalent for people who cannot be represented by NPLS because of conflicts of interest.

718. The structure creates a conflict gap for vulnerable people who are poor enough to need publicly funded civil counsel but cannot obtain NPLS representation because NPLS represents or has represented the adverse party.

719. The conflict gap is especially severe in domestic-violence, housing, family, public-benefits, and emergency civil matters.

720. If an abuser, landlord, creditor, or other adverse party receives assistance from NPLS, the opposing poor litigant may be categorically excluded from taxpayer-funded legal aid in counties where NPLS is the dominant or exclusive provider.

721. NPLS's monopoly allows poor-quality services and repeated malpractice to continue without the ordinary consequences that occur in a competitive legal-services market.

722. North Penn Legal Services placed its headquarters in Bethlehem, Pennsylvania.

723. Bethlehem and Lehigh County are located at the southeast edge of the NPLS service area.

724. Much of the NPLS service area consists of rural northcentral Pennsylvania counties, including Northumberland County, Union County, and Snyder County.

725. Sixteen NPLS counties have no other legal-aid provider.

726. Bethlehem has multiple legal-aid options.

727. During the relevant period, North Penn Legal Services held itself out to courts, clients, funders, and partner organizations as providing competent and

continuous representation to low-income clients in housing, family law, public benefits, and related civil matters.

728. North Penn Legal Services routinely entered appearances as attorney of record in state-court proceedings.

729. Taxpayer dollars for civil legal aid are routed through public and quasi-public funding structures into private legal-aid corporations.

730. Legal Services Corporation receives funds appropriated by Congress under the Legal Services Corporation Act of 1974.

731. Legal Services Corporation distributes appropriated funds to local grantees, including North Penn Legal Services.

732. LSC grants are conditioned on compliance with federal statutes, LSC regulations, and grant assurances concerning competence, client eligibility, conflicts of interest, case handling, reporting, and oversight.

733. North Penn Legal Services is an LSC grantee and receives a substantial portion of its operating budget through the federal LSC grant mechanism.

734. NPLS represents to Congress, LSC, and the public that it provides effective civil legal assistance within its defined service area.

735. NPLS represents that it has systems in place to manage conflicts of interest, ensure continuity of representation, and protect client rights.

736. Pennsylvania also funds civil legal aid through state appropriations and executive agencies.

737. Pennsylvania Department of Human Services administers block-grant and program-specific funds, including funds associated with domestic violence services, housing stability, and related low-income assistance programs.

738. DHS does not itself provide legal representation.

739. DHS disburses funds to intermediary or direct service providers through grant agreements.

740. Pennsylvania Legal Aid Network acts as a fiscal agent and coordinating body for multiple legal-aid organizations across Pennsylvania, including NPLS.

741. PLAN distributes state and federal funds, provides technical assistance, sets programmatic priorities, and interfaces with DHS and other agencies on compliance and reporting.

742. PLAN aggregates funding streams and redistributes them within a closed network of approved providers.

743. Providers outside that closed network generally cannot access DHS legal-services funding, even if they are capable of serving the same populations.

744. The resulting oversight chain runs from DHS to PLAN to NPLS for state funding and from Congress to LSC to NPLS for federal funding.

745. In that structure, NPLS provides services to clients while reporting upward through PLAN, DHS, and LSC.

746. Public money also reaches Pennsylvania legal-aid providers through court-administered mechanisms such as IOLTA.

747. IOLTA uses objective criteria and competitive grant applications.

748. IOLTA does not require legal-aid monopolies.

749. Other grantors, including the IRS Low-Income Taxpayer Clinic program, use competitive grant structures rather than PLAN's monopoly-style structure.

750. PLAN has announced that it will not use objective grant criteria and will not consider creating competitive grant applications for at least 18 months.

751. PLAN plans to continue distributing millions of dollars to existing private legal-aid monopolies without requiring them to compete for funds or improve operations.

752. PLAN has also announced that it will not consider new legal-aid organizations for involvement in its activities unless they have a large conflict-of-interest pool and operate as a "statewide" law firm.

753. PLAN created that statewide requirement without direct legislative authorization.

754. NPLS, PLAN, and LSC do not publicly quantify the conflict gap created by the funding structure.

755. North Penn Legal Services represents large numbers of clients across multiple practice areas.

756. Conflict-of-interest rules bar NPLS from representing applicants whose interests are adverse to current or former NPLS clients.

757. In counties where NPLS is the dominant or exclusive publicly funded provider, these conflict rules can permanently exclude entire categories of victims from legal-aid representation.

758. NPLS, PLAN, and LSC continue to represent that they provide access to justice within the full service area despite the conflict gap.

759. NPLS does not publicly disclose how many applicants are turned away because the opposing party is a current or former NPLS client.

760. NPLS does not publicly disclose how many counties lack any conflict-free alternative provider.

761. NPLS does not publicly disclose how often courts are left with unrepresented litigants because the sole funded provider is conflicted out.

762. Funding concentration, network-based distribution, lack of conflict-gap disclosure, and court reliance combine to create a monopolistic structure in which NPLS retains dominance without meaningful competitive pressure or client choice.

763. North Penn Legal Services receives the overwhelming majority of public legal-aid resources allocated to its service region.

764. Alternative nonprofit or low-cost providers are structurally excluded from equivalent funding, referrals, court recognition, and institutional partnerships.

765. Courts, bar associations, and government agencies routinely treat NPLS as the default or sole authorized provider for low-income litigants.

766. That institutional treatment reinforces NPLS's market dominance.

767. From at least 2017 through the present, NPLS maintained its dominant position despite persistent service failures, abandoned cases, missed hearings, and failures to withdraw as counsel of record.

768. The institutional response to NPLS's failures preserved NPLS's market control instead of redistributing cases, funding, referrals, legitimacy, or clients to alternative providers.

769. North Penn Legal Services publicly states in its mission materials that it strives to solve civil legal problems and empower vulnerable populations through professional legal representation, advocacy, and education.

770. North Penn Legal Services publicly represents that it helps clients in urgent need, helps them solve urgent and time-sensitive civil legal problems, and assists self-represented litigants seeking access to justice.

771. North Penn Legal Services' bylaws state a corporate purpose to provide equal access to the civil system of justice to eligible persons in its service area.

772. North Penn Legal Services' bylaws state a corporate purpose to provide high-quality civil legal assistance to individuals, households, and community groups who cannot afford legal counsel.

773. North Penn Legal Services publicly represents that it provides legal assistance in 20 counties in northeastern Pennsylvania.

774. North Penn Legal Services describes its service priorities in public Form 990 materials as screening for emergencies affecting family safety and economic stability.

775. North Penn Legal Services publicly identifies examples of such emergencies, including eviction risk, denial of public benefits, and creditor harassment.

776. North Penn Legal Services publicly represents that it has a conflict-of-interest policy and that its Human Resources Manager enforces compliance.

777. North Penn Legal Services has also participated in public pro bono reporting that describes local attorneys accepting pro bono referrals from the local legal-aid office now known as North Penn Legal Services.

778. NPLS's market power is reinforced by integration into local court practices and bar-association structures.

779. Courts rely on NPLS appearances as counsel of record.

780. Courts and opposing parties treat NPLS's institutional status as evidence that a low-income client has representation.

781. Bar associations promote and coordinate pro bono and public-service initiatives in ways that center NPLS as the gatekeeper.

782. Bar association structures exclude or marginalize alternative nonprofit providers that could compete to serve the same client population.

783. The structure creates a de facto exclusive-dealing arrangement.

784. Low-income clients are steered toward North Penn Legal Services as the sole recognized provider.

785. Courts and partner organizations discourage or block parallel representation by other nonprofits, solo practitioners, hybrid legal-service models, or community legal-aid organizations.

786. Clients are rarely informed that alternative providers exist.

787. Clients are rarely informed that they may seek other representation when NPLS fails to act.

788. NPLS benefits from output restriction by remaining counsel of record in cases it cannot or does not actively litigate.

789. NPLS's continued docketed appearance functions as a barrier to entry for competing providers.

790. Other attorneys or organizations cannot easily enter those cases unless and until NPLS withdraws, which often does not occur.

791. NPLS's dominance is not the result of superior performance or efficiency.

792. NPLS's dominance results from structural barriers created by funding rules, court practices, referral control, bar relationships, and coordinated institutional behavior.

793. Low-income clients bear the most severe effects of this monopoly.

794. When representation fails, the market does not correct.

795. Clients remain trapped in abandoned cases.

796. Monopoly conditions suppress innovation and quality.

797. NPLS faces no realistic competitive pressure when it leaves cases inactive, fails to communicate, misses hearings, fails to assign replacement counsel, or refuses to withdraw.

798. NPLS service failures do not result in loss of market share, loss of funding, loss of institutional legitimacy, or mandatory transfer of clients to alternative providers.

799. Clients and courts absorb the consequences of NPLS nonperformance.

800. Plaintiff remains trapped in that structure because NPLS continues to occupy counsel-of-record status while refusing to assign a lawyer and pursue her case.

801. Each day that NPLS remains counsel of record without providing representation forecloses market entry by substitute counsel, restricts output of legal services to low-income clients, and maintains artificial monopoly power unsupported by performance.

802. Plaintiff's experience is part of a broader structural failure at NPLS Sunbury.

803. In 2015 and 2016, the Sunbury office lost long-term attorneys and institutional knowledge after the retirement or departure of attorneys who had handled legal aid for Union, Snyder, and Northumberland Counties for decades.

804. After those departures, the Sunbury office transitioned from long-term attorneys with decades of experience to a new junior attorney and a new managing attorney, with management located hours away.

805. That transition resulted in a breakdown of basic case-management systems.

806. The breakdown included repeated missed hearings, missed filing deadlines, failures to appear, failures to communicate with clients, and failures to properly withdraw from cases while NPLS attorneys remained counsel of record.

807. These failures persisted over multiple years, multiple clients, multiple attorneys, and multiple supervisors.

808. Multiple staff members documented and raised concerns internally about missed hearings, default judgments, unmanaged caseloads, lack of calendaring systems, failure to send closing letters, and the absence of an effective malpractice-reporting or corrective process.

809. NPLS management resisted structural reform.

810. NPLS management did not self-report known malpractice to courts, clients, insurers, or funders.

811. NPLS clients were left without notice that their cases had effectively been abandoned.

812. NPLS continued to appear as attorney of record on dockets.

813. Low-income clients suffered concrete harms including evictions entered by default, loss of benefits, adverse custody or support outcomes, loss of property, and loss of appellate rights.

814. These harms occurred in the counties where NPLS publicly represented itself as the primary safety-net legal provider.

815. These harms occurred while courts relied on NPLS's representation status when granting continuances, accepting withdrawals, denying relief, or treating litigants as represented.

816. NPLS leadership and senior attorneys maintained close institutional relationships with the Union–Snyder County Bar Association and sitting judges in the Seventeenth Judicial District.

817. Those relationships included shared programming, pro bono initiatives, and informal professional hierarchies.

818. Those relationships discouraged open criticism of NPLS.

819. NPLS was treated as a protected institutional actor within the local legal ecosystem despite ongoing service failures.

820. When staff escalated concerns beyond internal channels, including through grievance processes, communications with bar leadership, and litigation threats, NPLS did not cure the underlying client-harm issues.

821. NPLS instead engaged in retaliatory exclusion, reputational attacks, and coordination with bar leadership.

822. NPLS remained silent about clients who had pending matters with no active representation.

823. NPLS did not notify courts, clients, or opposing parties of representation breakdowns in many cases.

824. Clients with open cases in state courts remain exposed to adverse rulings, enforcement actions, dismissal, and loss of rights because NPLS has not formally exited the cases or disclosed its inability or unwillingness to proceed.

825. Courts, clients, and opposing parties continue to operate under false assumptions about representation status.

826. These false assumptions create due-process and access-to-courts concerns.

827. Plaintiff and similarly situated clients need protective measures requiring NPLS to actively prosecute cases in which it remains counsel of record or promptly withdraw with notice to clients and courts.

828. Plaintiff and similarly situated clients also need notice to NPLS's professional-liability insurer so client-protection mechanisms can be triggered.

829. As described in the attached disciplinary complaint, Defendants engaged in retaliation, or failed to intervene in retaliation when they had the power to do so, delaying Grohol's claim from being filed, and causing her other damages.

830. Plaintiff brings claims against NPLS, Molloy, Smith, Kelly, Clark, PLAN, LSC, and related legal-aid actors for the direct harm to Plaintiff and similarly situated legal-aid clients.

831. Plaintiff brings claims against bar, court, disciplinary, public, and institutional actors for retaliation, conspiracy, output restriction, monopoly preservation, public-function misconduct, denial of access to courts, equal protection violations, due-process violations, and interference with protected petitioning.

832. Plaintiff brings structural claims against the 62-defendant group because the legal system's public and private actors operate together to preserve lawyer-

controlled public functions, suppress competition, punish criticism, restrict legal-service output, and prevent malpractice victims from obtaining independent repair.

833. Plaintiff brings declaratory claims because the same system depends on judge-made, lawyer-made, bar-made, and court-administered doctrines that burden clients, lawyers, critics, malpractice victims, low-income litigants, veterans, incarcerated people, and alternative legal-service providers without adequate public accountability.

834. Plaintiff and the class have suffered damages and ongoing harm from loss of property, loss of legal claims, delay, intimidation, professional retaliation against counsel, reduced legal-service output, loss of access to conflict-free counsel, denial of equal treatment, chilling of protected speech and petitioning, and continued entrapment in publicly funded monopoly structures.

835. Plaintiff and the class require declaratory, injunctive, and damages relief because ordinary internal oversight failed at every level.

836. NPLS failed to correct Plaintiff's case.

837. NPLS management failed to protect clients after internal reports.

838. NPLS's Board failed to prevent continuing harm after written notice.

839. PLAN failed to redistribute funding or require competition after mass malpractice and service failures.

840. LSC failed to ensure competent service, conflict protection, and client repair in the NPLS service area.

841. DHS and other state funding structures failed to ensure that state-funded legal-aid money reached conflict-free providers.

842. Bar associations failed to remain neutral and instead protected insiders, controlled pro bono opportunities, and excluded critics.

843. Courts relied on NPLS and bar structures rather than requiring truthful representation status and client-protective correction.

844. PBA used Wills for Heroes control to exclude SLAAY and restrict communications.

845. USCBA used membership and program access to punish Plaintiff's legal team's protected activity.

846. ODC used disciplinary authority to treat protected criticism, subpoenas, witness identification, and litigation threats as emergency misconduct.

847. Judges and court actors treated criticism, lawsuits, subpoena notices, and recusal issues as disruptions rather than protected First Amendment and Petition Clause activity.

848. Defendants' conduct deprived Plaintiff and the class of the legal system they were promised.

849. Plaintiff and the class were promised competent legal aid, equal access to justice, meaningful court access, neutral courts, ethical lawyer regulation, fair disciplinary systems, public accountability, and pro bono systems designed to serve vulnerable people rather than protect insiders.

850. Plaintiff and the class instead received abandonment, monopoly, intimidation, retaliation, viewpoint discrimination, restricted legal-service output, exclusion of alternative providers, protection of institutional insiders, and discipline of those who exposed the failures.

851. The harm is ongoing because Plaintiff's Northumberland County case remains unresolved, NPLS remains counsel of record, similarly situated clients remain exposed to abandoned representation, SLAAY remains targeted for exclusion, Plaintiff's legal team remains threatened for protected activity, and Defendants continue to control the public and quasi-public systems that caused the harm.

852. Plaintiff incorporates by reference all attachments to this Statement of Facts and all causes of action below.

**<u>Causes of Action</u>**

**COUNT 1**

**Breach of Contract Against North Penn Legal Services, Inc.**

597. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 1, Breach of Contract Against North Penn Legal Services, Inc., from the 651-count inventory attached as exhibits.

598. The elements of Breach of Contract are the existence of a contract, breach of a contractual duty, and resulting damages.

599. North Penn Legal Services, Inc. breached enforceable legal-service agreements with Grohol and similarly situated clients by accepting their requests for assistance, opening files, receiving confidential information, assigning attorneys or staff, giving legal advice, undertaking representation, filing pleadings, entering appearances, and assuming responsibility for civil legal matters, and then failing to provide the competent, diligent, timely, communicative, conflict-free, and meaningful civil legal assistance required by those agreements.

600. Grohol and similarly situated clients accepted North Penn Legal Services' contractual promises by seeking assistance, providing information, cooperating with intake and attorney requests, relying on North Penn Legal Services for legal judgment, allowing North Penn Legal Services to control case activity, and refraining from immediately seeking substitute counsel while North Penn Legal Services held itself out as responsible for their civil legal matters.

601. North Penn Legal Services breached its agreement with Grohol when it accepted her October 15, 2019 request for help retrieving property from her former landlord, delayed meaningful action for weeks, failed to act with urgency while her belongings remained at risk, failed to notify her of the January 15, 2020 replevin hearing, appeared at the hearing without her, failed to correct the missed hearing, failed to secure return of her belongings, failed to preserve her damages claim, and failed to give her accurate information about what had occurred in court.

602. North Penn Legal Services continued the breach after Schwartz resigned in April 2020 by failing to assign substitute counsel, failing to withdraw, failing to provide a client-protective transition, failing to give Grohol independent advice about its own error, and remaining counsel of record while Deputy Director Timothy Smith told Grohol that North Penn Legal Services was not working on the case for her, pressured her to proceed pro se, and warned her that her case could be dismissed for lack of prosecution if she did not represent herself.

603. North Penn Legal Services breached the same contractual and quasi-contractual duties owed to similarly situated clients when it accepted legal-service relationships, received client trust, confidential information, referrals, public funding, court recognition, and legal-aid authority, and then allowed client matters to be delayed, neglected, mishandled, abandoned, improperly closed, or left in unclear representation status without timely notice, truthful communication, file review, substitute counsel, lawful withdrawal, corrective action, or client-protective remedies.

604. North Penn Legal Services also breached the implied covenant of good faith and fair dealing by accepting the benefits of client trust, public funding, referrals, court recognition, and legal-aid status while protecting institutional reputation and provider status instead of harmed clients and while shifting the consequences of attorney nonperformance onto low-income clients who relied on North Penn Legal Services because they lacked the resources, knowledge, or leverage to protect themselves from legal-aid abandonment.

605. North Penn Legal Services is liable for Breach of Contract because valid legal-service agreements existed through intake, representation, reliance, and attorney undertakings; North Penn Legal Services breached those agreements through delay, noncommunication, missed hearing notice, abandonment, failure to withdraw, and failure to correct known harm; and Grohol and the class suffered

loss of property, loss of time, loss of legal position, impairment of claims, confusion about representation status, risk of dismissal, lost hearings and deadlines, lost court access, emotional and practical harm, and deprivation of promised legal services.

606. Grohol and the class are entitled to compensatory damages, nominal damages, restitution, disgorgement, declaratory relief, injunctive relief, corrective notice, file review, court-record correction, identification of affected clients, and independent review or substitute-counsel relief for clients whose matters were abandoned, delayed, mishandled, improperly closed, or left in unclear representation status.

**COUNT 2**

**Legal Services Corporation Act Against North Penn Legal Services, Inc.**

607. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 2, Legal Services Corporation Act Against North Penn Legal Services, Inc., from the 651-count inventory attached as exhibits.

608. The elements of an LSC Act claim are an LSC-funded entity, action violating statutory restrictions or requirements, and resulting harm to a beneficiary or complainant.

609. North Penn Legal Services, Inc. violated the Legal Services Corporation Act and related federal legal-services duties because it accepted Legal Services Corporation funding, operated as an LSC-funded civil legal-aid provider, and failed to provide eligible clients with competent, diligent, lawful, conflict-free, supervised, communicative, and meaningful civil legal assistance consistent with the purpose and requirements of federally funded civil legal aid.

610. North Penn Legal Services accepted the benefits of LSC funding, including public money, program authority, institutional legitimacy, referrals, client trust, court recognition, and access to vulnerable legal-aid clients who reasonably believed that an LSC-funded provider would protect hearings, deadlines, client communications, representation status, conflicts, supervision, withdrawal obligations, and corrective action when representation failed.

611. North Penn Legal Services violated its LSC-funded duties to Grohol when it accepted her October 15, 2019 request for help retrieving property from her former landlord, delayed meaningful action for weeks, failed to notify her of the January 15, 2020 replevin hearing, appeared at the hearing without her, failed to correct the missed hearing, failed to secure return of her belongings, failed to protect her damages claim, failed to assign substitute counsel after Schwartz resigned, and remained counsel of record while refusing to work on her case.

612. North Penn Legal Services violated its LSC-funded duties to similarly situated clients by operating a system that permitted client neglect, missed hearings, missed deadlines, abandoned matters, inadequate communication, misleading representation-status practices, inadequate supervision, improper withdrawal, inadequate correction of known legal-service failures, and failure to provide independent substitute counsel or corrective notice after clients were harmed.

613. North Penn Legal Services had notice that the Sunbury office was experiencing repeated missed hearings, missed deadlines, failures to notify clients, failures to prepare, failures to communicate, and case-management breakdowns, but it retained LSC-funded authority, referrals, public legitimacy, and client trust without implementing corrective systems sufficient to protect Grohol and similarly situated clients.

614. North Penn Legal Services used its LSC-funded role as a shield for institutional survival rather than a mechanism for client protection when it retained public funding, referrals, court recognition, and legal-aid status while shifting the consequences of legal-aid failures onto vulnerable clients who lacked the resources, knowledge, or leverage to hire replacement counsel or correct abandoned cases on their own.

615. North Penn Legal Services is liable under the Legal Services Corporation Act because it was an LSC-funded entity; it violated statutory, regulatory, grant-based, and programmatic requirements by failing to administer federally supported civil legal aid in a competent, supervised, communicative, conflict-free, client-protective, and corrective manner; and Grohol and the class suffered loss of property, delay, litigation harm, confusion about representation status, loss of legal position, loss of court access, and deprivation of the federally supported legal services North Penn Legal Services existed to provide.

616. Grohol and the class are entitled to declaratory relief, injunctive relief, restitution, disgorgement, damages where available, corrective notice, file review, identification of affected clients, independent review, substitute-counsel relief, court-record correction, costs, fees where available, and all other relief necessary to remedy North Penn Legal Services' LSC Act violations.

**COUNT 3**

**Intentional Infliction of Emotional Distress Against North Penn Legal Services, Inc.; Lori Molloy; Timothy Smith; Heather Kelly; Mary Beth Clark; Pennsylvania Legal Aid Network, Inc.; and Legal Services Corporation**

617. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 3, Intentional Infliction of Emotional Distress

Against North Penn Legal Services, Inc.; COA 4, Intentional Infliction of Emotional Distress Against Lori Molloy; COA 5, Intentional Infliction of Emotional Distress Against Timothy Smith; COA 6, Intentional Infliction of Emotional Distress Against Heather Kelly; COA 7, Intentional Infliction of Emotional Distress Against Mary Beth Clark; COA 8, Intentional Infliction of Emotional Distress Against Pennsylvania Legal Aid Network, Inc.; and COA 9, Intentional Infliction of Emotional Distress Against Legal Services Corporation, from the 651-count inventory attached as exhibits.

618. The elements of intentional infliction of emotional distress are extreme and outrageous conduct, intentional or reckless conduct, causation, and severe emotional distress.

619. North Penn Legal Services, Inc. intentionally inflicted emotional distress on Grohol and similarly situated legal-aid clients by accepting vulnerable clients' trust, confidential information, public funding, court authority, counsel-of-record status, and dependence, then allowing neglect, abandonment, delay, silence, misleading representation status, missed hearings, missed deadlines, and unresolved civil matters to continue in cases involving property, housing, family stability, safety, income, benefits, debt, disability access, and basic legal rights.

620. North Penn Legal Services, Inc.’s conduct was extreme and outrageous because legal-aid clients came to it precisely because they lacked money, substitute counsel, legal knowledge, transportation, health, stability, records, and institutional power to protect themselves after counsel failed them, yet North Penn Legal Services used that dependence to maintain control over client matters without meaningful advocacy, truthful communication, lawful withdrawal, substitute counsel, independent review, or client-protective correction.

621. North Penn Legal Services, Inc. inflicted that harm on Grohol when it accepted her October 15, 2019 request for help retrieving property from her former landlord, failed to act with urgency, failed to notify her of the January 15, 2020 replevin hearing, appeared without her, failed to correct the missed hearing, failed to secure return of her belongings, failed to protect her damages claim, failed to assign substitute counsel after Schwartz resigned, and remained counsel of record while refusing meaningful advocacy, adequate communication, or timely withdrawal.

622. North Penn Legal Services, Inc. acted intentionally, recklessly, and with conscious disregard because it knew or should have known that leaving a disabled legal-aid client in unclear representation status after a missed hearing would cause severe fear, helplessness, humiliation, anxiety, confusion, loss of trust, and prolonged distress.

623. Lori Molloy intentionally inflicted emotional distress on Grohol and similarly situated clients by exercising executive authority over North Penn Legal Services while allowing the organization to accept public funding, referrals, court recognition, client trust, and legal-service responsibility without requiring supervision, file review, client communication, corrective notice, lawful withdrawal, substitute counsel, or meaningful remedies after known client-service failures.

624. Molloy's conduct was extreme and outrageous because she controlled or influenced the executive systems that should have protected vulnerable clients from abandonment, unclear representation status, disability-insensitive communication, missed hearings, missed deadlines, and institutional concealment, but allowed North Penn Legal Services to preserve reputation, funding, referrals, and authority while harmed clients remained confused, abandoned, and unable to protect themselves.

625. Molloy acted intentionally, recklessly, and with conscious disregard because she knew or should have known that legal-aid clients depended on North Penn Legal Services to protect hearings, deadlines, notices, filings, representation status, disability access, and basic civil rights, and that executive failure to correct known legal-service breakdowns would foreseeably cause severe emotional distress.

626. Molloy caused classwide emotional distress by allowing the organization's client-protection systems, supervision systems, grievance systems, funding-compliance systems, and corrective-action systems to protect institutional survival instead of harmed legal-aid clients who needed truthful notice, substitute counsel, file review, and repair.

627. Timothy Smith intentionally inflicted emotional distress on Grohol and similarly situated clients by exercising senior management authority over North Penn Legal Services while failing to correct known missed hearings, missed deadlines, failures to notify clients, failures to prepare, failures to communicate, abandoned files, unclear representation status, and case-management breakdowns.

628. Smith's conduct was extreme and outrageous because he had direct notice before Grohol's missed hearing that Schwartz was continuing to miss deadlines, miss hearings, fail to notify clients, fail to prepare, and ignore clients, but he did not act in time to protect Grohol from the exact type of harm that then occurred.

629. Smith intensified Grohol's emotional distress when he later told her that North Penn Legal Services was not working on the case for her, pressured her to proceed pro se while North Penn Legal Services remained counsel of record, and warned her that her case could be dismissed for lack of prosecution if she did not represent herself.

630. Smith acted intentionally, recklessly, and with conscious disregard because he knew or should have known that a disabled, vulnerable legal-aid client would suffer severe distress if senior management left her publicly represented on the docket, privately abandoned in practice, and threatened with dismissal unless she repaired North Penn Legal Services' failures herself.

631. Heather Kelly intentionally inflicted emotional distress on Grohol and similarly situated clients by participating in, reinforcing, ratifying, enabling, or failing to correct the professional environment in which North Penn Legal Services accepted vulnerable clients' trust and legal control while clients were neglected, delayed, abandoned, misled, or left in unresolved and unclear representation status.

632. Kelly's conduct was extreme and outrageous because she knew or should have known that North Penn Legal Services clients lacked realistic alternatives, that missed hearings and unclear representation status would foreseeably cause severe fear and helplessness, and that professional silence, insider protection, and failure to oppose known legal-aid failures would allow vulnerable clients to remain dependent on a system that was not protecting them.

633. Kelly acted intentionally, recklessly, and with conscious disregard by reinforcing or failing to oppose a legal-aid culture that protected institutional relationships, attorney comfort, provider reputation, and professional networks

instead of requiring truthful client communication, substitute counsel, independent review, corrective notice, disability-sensitive service, or meaningful repair for harmed clients.

634. Kelly caused severe emotional distress because her conduct helped preserve an environment in which Grohol and similarly situated clients could be blamed, mocked, shamed, delayed, ignored, left without advocacy, denied accessible communication, and deprived of any clear answer about whether they were represented, abandoned, or expected to proceed alone.

635. Mary Beth Clark intentionally inflicted emotional distress on Grohol and similarly situated clients by participating in, reinforcing, ratifying, enabling, or failing to correct the professional environment in which North Penn Legal Services preserved authority, referrals, client trust, public legitimacy, and counsel-of-record status while clients were neglected, delayed, abandoned, misled, or left in unresolved and unclear representation status.

636. Clark's conduct was extreme and outrageous because she knew or should have known that legal-aid clients depended on North Penn Legal Services for protection of basic legal rights, that abandonment and unclear representation status would foreseeably cause severe emotional harm, and that reinforcing or failing to

oppose a culture protecting institutional status over client welfare would leave clients trapped in matters they could not protect alone.

637. Clark acted intentionally, recklessly, and with conscious disregard by reinforcing or failing to oppose legal-aid and bar-connected practices that placed professional loyalty, institutional reputation, and provider protection above disabled and vulnerable clients' need for truthful communication, accessible legal services, file review, substitute counsel, and corrective action.

638. Clark caused severe emotional distress because her conduct helped preserve a local professional environment in which harmed clients could not meaningfully obtain independent assistance, could not safely challenge the provider that failed them, and could not rely on the surrounding legal-aid ecosystem to protect them after North Penn Legal Services abandoned or mishandled their matters.

639. Pennsylvania Legal Aid Network, Inc. intentionally inflicted emotional distress on Grohol and similarly situated clients by exercising statewide legal-aid coordination, funding, referral, training, oversight, policy, and institutional influence while reinforcing a legal-aid environment in which North Penn Legal Services accepted public funding, referrals, court recognition, and client trust without adequate systems to prevent or repair neglect, abandonment, missed

hearings, inadequate communication, disability-access failures, and unclear representation status.

640. Pennsylvania Legal Aid Network, Inc.'s conduct was extreme and outrageous because it knew or should have known that clients relying on Pennsylvania's legal-aid system often could not hire replacement counsel, monitor dockets, detect missed deadlines, correct court records, or obtain substitute legal-aid representation after a dominant provider failed them.

641. Pennsylvania Legal Aid Network, Inc. acted intentionally, recklessly, and with conscious disregard by allowing statewide legal-aid structures to preserve provider status, funding, referrals, training credibility, and institutional legitimacy without requiring meaningful client-protective repair after known or knowable legal-service failures.

642. Pennsylvania Legal Aid Network, Inc. caused severe emotional distress because statewide legal-aid coordination and funding systems left Grohol and similarly situated clients dependent on the same failed provider structure, without independent review, substitute counsel, corrective notice, disability-sensitive intervention, or a practical path to restore lost legal rights.

643. Legal Services Corporation intentionally inflicted emotional distress on Grohol and similarly situated clients by exercising federal funding, oversight,

monitoring, regulatory, compliance, and institutional authority over the civil legal-aid system while allowing North Penn Legal Services to continue receiving money, referrals, authority, and status without adequate safeguards against neglect, abandonment, missed hearings, inadequate communication, disability-access failures, unclear representation status, and lack of corrective remedies.

644. Legal Services Corporation's conduct was extreme and outrageous because it knew or should have known that low-income clients rely on federally funded legal-aid providers for protection of property, housing, family stability, income, benefits, safety, disability access, and basic civil rights, yet it allowed the federally funded legal-aid system to preserve institutional survival and program legitimacy while clients harmed by the dominant provider lacked conflict-free alternatives, substitute counsel, corrective notice, or practical remedies.

645. Legal Services Corporation acted intentionally, recklessly, and with conscious disregard by allowing federal legal-aid funding, monitoring, compliance, and program legitimacy to continue without requiring effective systems for identifying abandoned clients, notifying harmed clients, correcting counsel-of-record distortions, funding independent review, or providing substitute counsel when the funded provider itself caused the harm.

646. Legal Services Corporation caused severe emotional distress because its funding and oversight structure left Grohol and similarly situated clients trapped in a federally supported legal-aid system that retained public legitimacy while failing to provide meaningful advocacy, accessible communication, supervision, withdrawal, correction, or repair.

647. Defendants caused Grohol severe emotional distress by leaving her civil case pending for more than 6 years after the January 15, 2020 replevin hearing was not properly noticed to her, while North Penn Legal Services remained counsel of record without meaningful advocacy, adequate communication, timely correction, lawful withdrawal, substitute counsel, disability-sensitive service, independent review, or a clear path for Grohol to protect herself.

648. Defendants caused similarly situated clients severe emotional distress by allowing legal-aid matters to remain delayed, neglected, mishandled, abandoned, left unresolved, left in unclear representation status, or damaged by failures to communicate, supervise, withdraw, protect hearings and deadlines, correct known failures, provide substitute counsel, provide accessible service, and provide trauma-informed client notice or client-protective relief.

649. Defendants are liable for intentional infliction of emotional distress because their conduct was extreme and outrageous in the legal-aid context; they acted

intentionally, recklessly, and with conscious disregard of predictable harm to vulnerable clients; their conduct caused Grohol and the class severe emotional distress; and that distress flowed directly from neglect, delay, abandonment, unclear representation status, disability-access failure, legal-service failure, institutional protection, funding-system failure, and the absence of meaningful client repair.

650. Grohol and the class are entitled to compensatory damages, punitive damages where available, restitution, disgorgement, declaratory relief, injunctive relief, corrective notice, file review, identification of affected clients, independent review, substitute-counsel relief, trauma-informed client notice, disability-access review, court-record correction, costs, fees where available, and all other lawful relief.

**COUNT 4**

**Negligent Infliction of Emotional Distress Against North Penn Legal Services, Inc.; Lori Molloy; Timothy Smith; Heather Kelly; Mary Beth Clark; Pennsylvania Legal Aid Network, Inc.; and Legal Services Corporation**

651. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 10, Negligent Infliction of Emotional Distress Against North Penn Legal Services, Inc.; COA 11, Negligent Infliction of

Emotional Distress Against Lori Molloy; COA 12, Negligent Infliction of Emotional Distress Against Timothy Smith; COA 13, Negligent Infliction of Emotional Distress Against Heather Kelly; COA 14, Negligent Infliction of Emotional Distress Against Mary Beth Clark; COA 15, Negligent Infliction of Emotional Distress Against Pennsylvania Legal Aid Network, Inc.; and COA 16, Negligent Infliction of Emotional Distress Against Legal Services Corporation, from the 651-count inventory attached as exhibits.

652. The elements of negligent infliction of emotional distress are a duty owed by the defendant, breach of that duty, causation, and serious emotional distress arising in a recognized negligent-infliction context, including a special relationship, physical impact, zone of danger, or observation of injury to a close relative.

653. North Penn Legal Services, Inc. negligently inflicted emotional distress on Grohol and similarly situated legal-aid clients because it owed duties arising from attorney-client relationships, intake communications, representation undertakings, counsel-of-record status, public legal-aid promises, federal and charitable funding obligations, confidential reliance, and the special relationship created when vulnerable clients relied on North Penn Legal Services to protect urgent legal rights.

654. North Penn Legal Services, Inc. breached those duties by accepting vulnerable clients' trust, confidential information, public funding, court recognition, counsel-of-record authority, and dependence, then failing to provide meaningful advocacy, failing to protect hearings and deadlines, failing to communicate accurately, failing to withdraw lawfully when representation stopped, failing to protect clients from abandonment, and failing to correct known representation-status problems.

655. North Penn Legal Services, Inc. breached its special relationship duties to Grohol when it accepted her October 15, 2019 request for help retrieving property from her former landlord, failed to act with urgency, failed to notify her of the January 15, 2020 replevin hearing, appeared at the hearing without her, failed to correct the missed hearing, failed to secure return of her belongings, failed to protect her damages claim, and remained counsel of record after meaningful representation stopped.

656. North Penn Legal Services, Inc. knew or should have known that a disabled and vulnerable legal-aid client would suffer serious emotional distress when the legal-aid provider she trusted left her without truthful communication, disability-sensitive service, substitute counsel, lawful withdrawal, or a clear path to protect her case.

657. Lori Molloy negligently inflicted emotional distress on Grohol and similarly situated clients because she held executive authority over North Penn Legal Services, its legal-service systems, attorney supervision, client-protection practices, funding compliance, disability-access practices, grievance responses, and institutional response to known malpractice and abandonment.

658. Molloy breached those duties by failing to require meaningful advocacy, failing to require accurate client communication, failing to require lawful withdrawal, failing to protect clients from abandonment, failing to correct known representation-status problems, and allowing North Penn Legal Services to keep money, authority, referrals, and status while vulnerable clients endured neglect, delay, confusion, and unresolved legal matters.

659. Molloy knew or should have known that executive-level failure to supervise, communicate, correct, and protect would cause serious emotional distress because legal-aid clients rely on organizational leadership to ensure that counsel-of-record status reflects actual representation, that missed hearings receive immediate correction, and that abandoned clients receive substitute assistance rather than silence.

660. Molloy breached her special relationship duties by allowing institutional reputation, funding, referrals, and provider status to continue while harmed clients

lacked notice, file review, independent review, substitute counsel, disability-sensitive service, and practical repair.

661. Timothy Smith negligently inflicted emotional distress on Grohol and similarly situated clients because he held senior management authority over North Penn Legal Services, attorney supervision, case-management systems, client communication, attorney assignments, fee practices, corrective action, and response to known client-service failures.

662. Smith breached those duties by failing to correct known missed hearings, missed deadlines, failures to notify clients, failures to prepare, failures to communicate, abandoned files, unclear representation status, and case-management breakdowns before Grohol suffered the same type of missed-hearing and abandonment harm.

663. Smith worsened Grohol's serious emotional distress when he told her that North Penn Legal Services was not working on the case for her, pressured her to proceed pro se while North Penn Legal Services remained counsel of record, and warned her that her case could be dismissed for lack of prosecution if she did not represent herself.

664. Smith knew or should have known that a disabled and vulnerable legal-aid client would suffer serious emotional distress if senior management left her

publicly represented on the docket, privately abandoned in practice, and responsible for repairing the legal-aid provider's failures without substitute counsel or meaningful corrective assistance.

665. Heather Kelly negligently inflicted emotional distress on Grohol and similarly situated clients because she exercised professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, client-service culture, attorney-accountability environment, disability-access environment, confidentiality environment, and institutional response to known malpractice and abandonment.

666. Kelly breached those duties by reinforcing, enabling, ratifying, or failing to oppose a professional environment in which North Penn Legal Services accepted vulnerable clients' trust and legal control while clients were neglected, delayed, abandoned, misled, or left in unclear representation status without meaningful advocacy, truthful communication, lawful withdrawal, substitute counsel, or corrective relief.

667. Kelly knew or should have known that legal-aid clients often lack the ability to hire replacement counsel, monitor dockets, challenge local legal-aid institutions, or obtain independent review after a provider fails them, and that professional

silence or insider protection would foreseeably leave those clients distressed, confused, helpless, and without meaningful repair.

668. Kelly breached professional and client-protective duties by allowing or reinforcing a culture in which harmed clients could be blamed, mocked, shamed, delayed, ignored, denied disability-sensitive communication, and deprived of any clear answer about whether they were represented, abandoned, or expected to proceed alone.

669. Mary Beth Clark negligently inflicted emotional distress on Grohol and similarly situated clients because she exercised professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, local legal-aid culture, attorney-accountability environment, disability-access environment, confidentiality environment, and institutional response to known client-service failures.

670. Clark breached those duties by reinforcing, enabling, ratifying, or failing to oppose a legal-aid environment that preserved professional relationships, institutional status, funding, referrals, and authority over client welfare while vulnerable clients remained dependent on North Penn Legal Services in matters involving property, housing, family stability, safety, income, benefits, debt, disability, and basic civil rights.

671. Clark knew or should have known that abandonment, unclear representation status, hostile client communication, and failure to correct known legal-aid failures would foreseeably cause serious emotional distress to clients who relied on the legal-aid system because they lacked money, legal knowledge, disability accommodations, substitute counsel, and institutional power.

672. Clark breached professional and client-protective duties by allowing local legal-aid and bar-connected relationships to protect the provider structure rather than the clients harmed by delay, silence, missed hearings, unclear representation status, and lack of meaningful corrective assistance.

673. Pennsylvania Legal Aid Network, Inc. negligently inflicted emotional distress on Grohol and similarly situated clients because it exercised statewide legal-aid funding, referral, training, coordination, policy, oversight, programmatic, and institutional influence over Pennsylvania's civil legal-aid system and over the environment in which North Penn Legal Services accepted vulnerable clients and legal-service responsibility.

674. Pennsylvania Legal Aid Network, Inc. breached those duties by failing to use reasonable statewide legal-aid influence to oppose or correct known or knowable legal-aid failures, failing to support meaningful correction of malpractice and abandonment, failing to structure funding and referral practices around client

protection, and reinforcing a statewide system that allowed North Penn Legal Services to retain dominance without adequate safeguards for abandoned clients.

675. Pennsylvania Legal Aid Network, Inc. knew or should have known that clients relying on Pennsylvania's legal-aid system often cannot hire replacement counsel, monitor dockets, understand missed deadlines, correct court records, obtain disability-sensitive assistance, or secure independent review after the dominant provider fails them.

676. Pennsylvania Legal Aid Network, Inc. breached client-protective duties by allowing statewide funding, referral, training, and institutional systems to preserve provider status, program credibility, and legal-aid legitimacy while harmed clients remained without substitute counsel, corrective notice, file review, or practical remedies.

677. Legal Services Corporation negligently inflicted emotional distress on Grohol and similarly situated clients because it exercised federal legal-aid funding, monitoring, compliance, oversight, regulatory, policy, and institutional authority over the civil legal-aid system while North Penn Legal Services continued receiving federal legal-aid benefits and public legitimacy.

678. Legal Services Corporation breached those duties by failing to use reasonable federal legal-aid authority to oppose or correct known or knowable

legal-aid failures, failing to require meaningful correction of malpractice and abandonment, failing to structure funding, monitoring, compliance, and oversight practices around client protection, and allowing a federally funded legal-aid provider to preserve money, authority, referrals, and status despite client harm.

679. Legal Services Corporation knew or should have known that low-income clients rely on federally funded legal-aid providers for protection of property, housing, family stability, safety, income, benefits, disability access, and basic rights, and that those clients often cannot obtain conflict-free substitute counsel or corrective legal aid when the funded provider itself caused the harm.

680. Legal Services Corporation breached client-protective duties by allowing federal legal-aid funding and program legitimacy to continue without requiring effective systems for identifying abandoned clients, notifying harmed clients, correcting counsel-of-record distortions, funding independent review, or providing substitute counsel when North Penn Legal Services failed its clients.

681. Defendants caused Grohol serious emotional distress by leaving her civil case pending for more than 6 years after the January 15, 2020 replevin hearing was not properly noticed to her, while North Penn Legal Services remained counsel of record without meaningful advocacy, adequate communication, timely correction,

lawful withdrawal, substitute counsel, disability-sensitive service, independent review, or a clear path for Grohol to protect herself.

682. Defendants caused similarly situated clients serious emotional distress by allowing legal-aid matters to remain delayed, neglected, mishandled, abandoned, unresolved, left in unclear representation status, or damaged by failures to communicate, supervise, withdraw, protect hearings and deadlines, correct known failures, provide substitute counsel, provide disability-sensitive service, and provide trauma-informed notice or client-protective relief.

683. Defendants are liable for negligent infliction of emotional distress because each owed duties arising from legal-aid relationships, attorney-client relationships, counsel-of-record status, executive authority, senior management authority, professional influence, funding authority, oversight authority, confidential reliance, special relationships, and vulnerable-client dependence; each breached those duties through neglect, supervision failure, abandonment, delay, inadequate communication, unclear representation status, failure to require proper withdrawal, failure to correct known harm, or failure to provide client-protective relief; and those breaches caused Grohol and the class serious emotional distress.

684. Grohol and the class are entitled to compensatory damages, restitution, disgorgement, declaratory relief, injunctive relief, corrective notice, file review,

identification of affected clients, independent review, substitute-counsel relief, trauma-informed client notice, disability-access review, court-record correction, costs, fees where available, and all other lawful relief.

COUNT 5

**COUNT 5**

**Public Disclosure of Private Facts Against North Penn Legal Services, Inc.; Lori Molloy; Timothy Smith; Heather Kelly; Mary Beth Clark; Pennsylvania Legal Aid Network, Inc.; and Legal Services Corporation**

685. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 17, Public Disclosure of Private Facts Against North Penn Legal Services, Inc.; COA 18, Public Disclosure of Private Facts Against Lori Molloy; COA 19, Public Disclosure of Private Facts Against Timothy Smith; COA 20, Public Disclosure of Private Facts Against Heather Kelly; COA 21, Public Disclosure of Private Facts Against Mary Beth Clark; COA 22, Public Disclosure of Private Facts Against Pennsylvania Legal Aid Network, Inc.; and COA 23, Public Disclosure of Private Facts Against Legal Services Corporation, from the 651-count inventory attached as exhibits.

686. The elements of public disclosure of private facts are publication of private facts, the private facts would be highly offensive to a reasonable person, and the facts are not of legitimate public concern.

687. North Penn Legal Services, Inc. publicly disclosed private facts, exposed private facts, mishandled private facts, or forced public disclosure of private facts by accepting confidential legal-aid client information concerning poverty, housing, property, family stability, disability, safety, benefits, debt, domestic abuse, medical vulnerability, and personal legal crises, then allowing client matters to remain unresolved, public, mishandled, or unnecessarily exposed after it accepted confidential information and legal-service responsibility.

688. North Penn Legal Services, Inc. caused privacy harm by remaining counsel of record while failing to provide meaningful advocacy, accurate communication, timely correction, lawful withdrawal, confidentiality review, privacy protection, substitute counsel, or client-protective assistance, thereby forcing Grohol and similarly situated clients to seek correction, explanation, substitute legal assistance, grievance relief, court intervention, or legal remedy in public channels that competent confidential representation should have avoided.

689. North Penn Legal Services, Inc. exposed Grohol's private facts by allowing her property dispute, housing-related vulnerability, disability-related

communication needs, representation status, missed hearing, abandonment, and corrective efforts to remain tied to public court processes while it retained counsel-of-record status without providing meaningful representation or truthful case-status communication.

690. North Penn Legal Services, Inc. knew or should have known that legal-aid clients disclose private facts because they believe counsel will protect those facts, reduce unnecessary exposure, use confidentiality to preserve dignity, and prevent private legal crises from becoming avoidable public records or public disputes.

691. Lori Molloy publicly disclosed private facts, exposed private facts, mishandled private facts, or forced public disclosure of private facts by exercising executive authority over North Penn Legal Services' confidentiality systems, representation-status practices, attorney supervision, client-protection practices, disability-access practices, withdrawal practices, and response to known malpractice, abandonment, and privacy harm.

692. Molloy caused privacy harm by allowing North Penn Legal Services to retain confidential information, counsel-of-record status, public funding, referrals, court recognition, and legal-aid authority while failing to ensure meaningful advocacy, accurate communication, timely correction, lawful withdrawal, privacy

protection, confidentiality review, or substitute assistance for Grohol and similarly situated clients.

693. Molloy knew or should have known that executive failure to correct abandonment and unclear representation status would force vulnerable legal-aid clients to disclose private legal, financial, disability-related, housing-related, and family-stability facts in public or semi-public channels to repair problems that North Penn Legal Services should have corrected confidentially.

694. Molloy's executive nonperformance preserved institutional status and funding while harmed clients carried the privacy consequences of missed hearings, abandoned files, inaccessible communication, unclear representation status, and the need to publicly prove that the legal-aid provider had failed them.

695. Timothy Smith publicly disclosed private facts, exposed private facts, mishandled private facts, or forced public disclosure of private facts by exercising senior management authority over North Penn Legal Services' confidentiality systems, case-management systems, representation-status practices, client communication, attorney assignments, withdrawal practices, corrective action, and response to known malpractice, abandonment, and privacy harm.

696. Smith caused privacy harm by allowing North Penn Legal Services to remain counsel of record without meaningful representation and by pressuring

Grohol to proceed pro se after the organization's failures had already placed her private property dispute, disability-related vulnerability, legal-aid dependence, representation status, and corrective efforts at risk of avoidable public handling.

697. Smith knew or should have known that telling Grohol that North Penn Legal Services was not working on the case for her while the organization remained counsel of record would force her to choose between public self-advocacy, continued abandonment, or dismissal risk, each of which increased exposure of private facts that should have remained protected within competent legal representation.

698. Smith's conduct forced Grohol and similarly situated clients to confront courts, agencies, grievance systems, funders, substitute counsel, or other public-facing institutions without the privacy protection, professional screening, and confidential correction that functioning counsel should have provided.

699. Heather Kelly publicly disclosed private facts, exposed private facts, mishandled private facts, or forced public disclosure of private facts by exercising professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, confidentiality environment, attorney-accountability structure, disability-access environment, client-service culture, and response to known malpractice, abandonment, and privacy harm.

700. Kelly caused privacy harm by reinforcing, enabling, ratifying, or failing to oppose a professional environment in which North Penn Legal Services accepted confidential information and legal control while vulnerable clients were left in unresolved civil matters involving housing, property, family stability, disability, safety, benefits, debt, domestic vulnerability, and other private legal-aid facts.

701. Kelly knew or should have known that local professional silence and insider protection would leave harmed clients with no confidential corrective pathway, forcing them to disclose private facts to obtain review, replacement help, grievance relief, litigation relief, or public accountability.

702. Kelly's conduct helped preserve a professional environment in which private client crises became public client burdens because attorney networks and legal-aid relationships protected provider status rather than requiring confidential repair, disability-sensitive communication, substitute counsel, or privacy-protective correction.

703. Mary Beth Clark publicly disclosed private facts, exposed private facts, mishandled private facts, or forced public disclosure of private facts by exercising professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, local bar-connected structures, confidentiality environment,

attorney-accountability structure, disability-access environment, and response to known client-service failures.

704. Clark caused privacy harm by reinforcing, enabling, ratifying, or failing to oppose a legal-aid environment that preserved professional relationships, institutional reputation, funding, referrals, and authority while Grohol and similarly situated clients remained dependent on North Penn Legal Services in private civil matters that competent confidential legal representation should have protected.

705. Clark knew or should have known that clients seeking help with housing, property, disability, debt, family stability, safety, benefits, and domestic vulnerability expected confidentiality and privacy protection, not a system that would force them to expose private facts to overcome abandonment, unclear representation status, or institutional silence.

706. Clark's conduct helped preserve a local professional structure in which harmed clients lacked confidential substitute counsel, independent review, privacy-protective file review, or meaningful correction after North Penn Legal Services' failures exposed private legal-aid matters to unnecessary public handling.

707. Pennsylvania Legal Aid Network, Inc. publicly disclosed private facts, exposed private facts, mishandled private facts, or forced public disclosure of private facts by exercising statewide legal-aid coordination, funding, referral,

training, policy, oversight, confidentiality, attorney-accountability, disability-access, and institutional influence while allowing North Penn Legal Services to retain public funding, referrals, client trust, and legal-aid status despite known or knowable privacy-risking legal-service failures.

708. Pennsylvania Legal Aid Network, Inc. caused privacy harm by reinforcing a statewide legal-aid environment in which North Penn Legal Services accepted confidential information, remained counsel of record, and allowed private legal matters to remain unresolved, unnecessarily public, mishandled, or exposed without adequate client notice, file review, substitute counsel, confidentiality review, sealing review, disability-access review, or corrective relief.

709. Pennsylvania Legal Aid Network, Inc. knew or should have known that legal-aid clients often disclose highly sensitive facts because they cannot afford private counsel, cannot safely navigate the system alone, and trust statewide legal-aid institutions to ensure that grantees and providers protect confidentiality, privacy, and dignity.

710. Pennsylvania Legal Aid Network, Inc.'s statewide nonperformance forced harmed clients into public correction and public accountability channels because the legal-aid system preserved provider relationships and funding structures

without providing a confidential replacement-provider pathway, independent file review, or privacy-protective repair mechanism.

711. Legal Services Corporation publicly disclosed private facts, exposed private facts, mishandled private facts, or forced public disclosure of private facts by exercising federal legal-aid funding, monitoring, compliance, oversight, regulatory, confidentiality, disability-access, attorney-accountability, and institutional influence while allowing North Penn Legal Services to keep federal legal-aid funding, public legitimacy, and client trust despite privacy-risking malpractice, abandonment, and unclear representation status.

712. Legal Services Corporation caused privacy harm by reinforcing a federal legal-aid system in which North Penn Legal Services accepted confidential client information, remained counsel of record, and allowed private matters to remain unresolved, exposed, or forced into public correction without adequate funding safeguards, monitoring safeguards, compliance safeguards, client-protective privacy review, substitute-counsel relief, or confidential repair.

713. Legal Services Corporation knew or should have known that federally funded legal-aid clients provide private facts about poverty, disability, housing, family instability, benefits, debt, safety, and domestic vulnerability because they

trust the federal legal-aid system to provide confidential civil legal assistance, not institutional abandonment that forces exposure.

714. Legal Services Corporation’s funding and oversight failures allowed a federally supported provider to retain legitimacy while clients bore the privacy costs of missed hearings, unresolved cases, abandonment, inaccessible communication, counsel-of-record distortions, and public efforts to prove harm caused by the provider itself.

715. The facts disclosed, exposed, mishandled, or forced into public dispute were private because they concerned legal-aid clients’ housing, property, income, family stability, safety, benefits, disability, poverty, debt, domestic vulnerability, personal crises, and confidential efforts to obtain legal help.

716. Disclosure or exposure of those facts would be highly offensive to a reasonable person because legal-aid clients provide confidential information to obtain help protecting private legal matters, not to have private facts prolonged, mishandled, exposed, or forced into avoidable public correction by the legal-aid provider, executives, managers, professional actors, funders, or oversight institutions entrusted with protecting them.

717. The disclosed or exposed private facts were not matters of legitimate public concern because the public had no legitimate need to know confidential legal-aid

client facts arising from poverty, housing insecurity, disability, debt, family instability, domestic vulnerability, property disputes, benefits issues, or client attempts to obtain civil legal help.

718. Defendants are liable for public disclosure of private facts because each participated in, caused, supported, funded, monitored, reinforced, ratified, allowed, or failed to correct disclosure, exposure, mishandling, or forced public disclosure of private legal-aid client facts; those facts would be highly offensive to a reasonable person if exposed through legal-aid malpractice, abandonment, deficient communication, unclear representation status, funding-system failure, or oversight failure; and those facts were not matters of legitimate public concern.

719. Grohol and the class are entitled to compensatory damages, punitive damages where available, restitution, disgorgement, declaratory relief, injunctive relief, corrective notice, file review, identification of affected clients, independent review, substitute-counsel relief, confidentiality review, privacy review, sealing review, disability-access review, trauma-informed client notice, court-record correction, costs, fees where available, and all other lawful relief.

**COUNT 6**

**Failure to Protect Under a Special-Duty Theory Against North Penn Legal Services, Inc.; Lori Molloy; Timothy Smith; Heather Kelly; Mary Beth Clark; Pennsylvania Legal Aid Network, Inc.; and Legal Services Corporation**

720. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 24, Failure to Protect Under a Special-Duty Theory Against North Penn Legal Services, Inc.; COA 25, Failure to Protect Under a Special-Duty Theory Against Lori Molloy; COA 26, Failure to Protect Under a Special-Duty Theory Against Timothy Smith; COA 27, Failure to Protect Under a Special-Duty Theory Against Heather Kelly; COA 28, Failure to Protect Under a Special-Duty Theory Against Mary Beth Clark; COA 29, Failure to Protect Under a Special-Duty Theory Against Pennsylvania Legal Aid Network, Inc.; and COA 30, Failure to Protect Under a Special-Duty Theory Against Legal Services Corporation, from the 651-count inventory attached as exhibits.

721. The elements of failure to protect under a special-duty theory are the existence of a special relationship or undertaking creating a duty to protect, breach of that duty, causation, and resulting harm.

722. North Penn Legal Services, Inc. created special relationships and undertakings with Grohol and similarly situated legal-aid clients by accepting vulnerable clients, confidential information, representation authority, counsel-of-

record status, referrals, public funding, and legal-service responsibility in matters involving housing, property, family stability, safety, income, benefits, debt, disability, domestic abuse, and basic civil legal needs.

723. North Penn Legal Services, Inc. owed client-protection duties because legal-aid clients relied on it to protect hearings, deadlines, notices, filings, representation status, private information, disability-access needs, and urgent legal rights they could not protect on their own.

724. North Penn Legal Services, Inc. breached those special duties by failing to provide meaningful advocacy, failing to protect hearings and deadlines, failing to communicate accurately, failing to withdraw lawfully when representation stopped, failing to protect clients from abandonment, failing to correct known representation-status problems, and allowing client matters to remain unresolved for years.

725. North Penn Legal Services, Inc. failed to protect Grohol when it accepted her October 15, 2019 request for help retrieving property from her former landlord, failed to act with urgency, failed to notify her of the January 15, 2020 replevin hearing, appeared at the hearing without her, failed to correct the missed hearing, failed to secure return of her belongings, failed to protect her damages claim, and remained counsel of record without meaningful advocacy, adequate

communication, timely correction, lawful withdrawal, substitute counsel, or a clear path for Grohol to protect herself.

726. Lori Molloy created, controlled, or exercised authority over special relationships and undertakings because she held executive authority over North Penn Legal Services' attorney-client relationships, confidential client information, representation-status practices, counsel-of-record obligations, referral relationships, public funding obligations, client-protection systems, attorney supervision, and response to known legal-service failures.

727. Molloy owed client-protection duties because executive leadership of a publicly funded legal-aid provider controls the systems that determine whether vulnerable clients receive communication, file review, supervision, lawful withdrawal, disability-sensitive service, substitute counsel, corrective notice, and meaningful repair after legal-service failures.

728. Molloy breached those special duties by failing to require meaningful advocacy, failing to require protection of hearings and deadlines, failing to require accurate client communication, failing to require lawful withdrawal when representation stopped, failing to require substitute or corrective assistance, and allowing North Penn Legal Services to preserve institutional status while clients remained delayed, abandoned, confused, and unable to protect themselves.

729. Molloy’s breach harmed Grohol and similarly situated clients because executive nonperformance allowed the legal-aid provider’s reputation, funding, referrals, and authority to continue while clients who depended on the provider received no meaningful client-protective transition, repair, independent review, or substitute counsel.

730. Timothy Smith created, controlled, or exercised authority over special relationships and undertakings because he held senior management authority over North Penn Legal Services’ attorney supervision, case-management systems, client communication, attorney assignments, corrective action, and response to known missed hearings, missed deadlines, failures to notify clients, failures to prepare, failures to communicate, abandoned files, unclear representation status, and case-management breakdowns.

731. Smith owed client-protection duties because senior management had responsibility to respond when known supervision and case-management failures exposed vulnerable clients to missed hearings, missed deadlines, abandonment, unclear representation status, and loss of legal rights.

732. Smith breached those duties by failing to correct known legal-aid failures before Grohol suffered the same type of harm and by telling Grohol that North

Penn Legal Services was not working on the case for her while North Penn Legal Services remained counsel of record.

733. Smith further breached those duties by pressuring Grohol to proceed pro se, warning her that her case could be dismissed for lack of prosecution if she did not represent herself, and leaving her to repair North Penn Legal Services' failures without lawful withdrawal, substitute counsel, independent review, or meaningful corrective assistance.

734. Heather Kelly created, controlled, exercised influence over, or failed to correct special relationships and undertakings through her role within, around, or through North Penn Legal Services' legal-aid ecosystem, attorney-accountability environment, confidentiality environment, client-protection failures, disability-access environment, malpractice-response dynamics, and institutional response to known legal-service failures.

735. Kelly owed client-protection duties because professional actors who influence a legal-aid ecosystem know that vulnerable clients lack realistic alternatives, rely on the provider's counsel-of-record status, and need attorney-accountability systems to require truthful communication, correction, substitute counsel, and protection after known legal-service harm.

736. Kelly breached those duties by reinforcing, enabling, ratifying, or failing to oppose a professional environment in which North Penn Legal Services accepted vulnerable clients' trust and legal control while failing to provide meaningful advocacy, protect hearings and deadlines, communicate accurately, withdraw lawfully, correct known harm, or provide client-protective remedies.

737. Kelly's breach harmed Grohol and similarly situated clients because professional silence, insider protection, and failure to oppose known legal-aid failures allowed vulnerable clients to remain dependent on a system that preserved the provider rather than protecting the clients.

738. Mary Beth Clark created, controlled, exercised influence over, or failed to correct special relationships and undertakings through her role within, around, or through North Penn Legal Services' legal-aid ecosystem, local professional culture, attorney-accountability environment, confidentiality environment, client-protection failures, disability-access environment, malpractice-response dynamics, and institutional response to known legal-service failures.

739. Clark owed client-protection duties because legal-aid clients depended on North Penn Legal Services for protection of basic legal rights, and local legal-aid and bar-connected actors knew or should have known that abandonment and

unclear representation status would leave those clients unable to protect themselves.

740. Clark breached those duties by reinforcing, enabling, ratifying, or failing to oppose a legal-aid environment that preserved professional relationships, institutional reputation, funding, referrals, authority, and provider status while vulnerable clients remained dependent on North Penn Legal Services in matters requiring meaningful advocacy, communication, confidentiality, disability access, lawful withdrawal, and client-protective correction.

741. Clark's breach harmed Grohol and similarly situated clients because the local professional environment protected institutional and professional relationships instead of requiring truthful notice, file review, independent review, substitute counsel, disability-sensitive communication, and repair for harmed legal-aid clients.

742. Pennsylvania Legal Aid Network, Inc. created, controlled, exercised influence over, or failed to correct special relationships and undertakings by exercising statewide legal-aid funding, referral, training, coordination, policy, oversight, programmatic, and institutional influence over Pennsylvania's civil legal-aid system and over the legal-aid environment in which North Penn Legal Services accepted vulnerable clients and legal-service responsibility.

743. Pennsylvania Legal Aid Network, Inc. owed client-protection duties because statewide legal-aid coordination, funding, referral, and training systems shape whether vulnerable clients receive meaningful services, accessible communication, substitute counsel, independent review, corrective notice, and protection when a dominant regional provider fails.

744. Pennsylvania Legal Aid Network, Inc. breached those duties by failing to use reasonable statewide legal-aid influence to oppose or correct known or knowable legal-aid failures, failing to support meaningful correction of malpractice and abandonment, failing to structure funding, referral, training, and oversight practices around client protection, and allowing North Penn Legal Services to retain dominance while clients remained delayed, abandoned, exposed, confused, and without meaningful relief.

745. Pennsylvania Legal Aid Network, Inc.'s breach harmed Grohol and similarly situated clients because the statewide legal-aid system preserved provider status, referrals, funding, and institutional legitimacy without creating a practical path for conflict-free substitute counsel, independent file review, court-record correction, or replacement legal-aid services.

746. Legal Services Corporation created, controlled, exercised influence over, or failed to correct special relationships and undertakings by exercising federal legal-

aid funding, monitoring, compliance, oversight, regulatory, policy, and institutional influence over North Penn Legal Services and the federally funded civil legal-aid system while clients relied on LSC-funded providers to protect property, housing, income, safety, family stability, benefits, disability access, and basic civil rights.

747. Legal Services Corporation owed client-protection duties because federal legal-aid funding and oversight systems give grantees public legitimacy, client access, referral authority, and program credibility, and vulnerable clients rely on those systems when they cannot hire private counsel or replace a failing funded provider.

748. Legal Services Corporation breached those duties by failing to use reasonable federal legal-aid authority to oppose or correct known or knowable legal-aid failures, failing to support meaningful correction of malpractice and abandonment, failing to structure funding, monitoring, compliance, and oversight practices around client protection, and allowing North Penn Legal Services to retain federal funding, authority, referrals, and public legitimacy despite foreseeable client harm.

749. Legal Services Corporation's breach harmed Grohol and similarly situated clients because federal legal-aid funding and oversight preserved the failing provider's authority while clients lacked conflict-free alternatives, substitute

counsel, corrective notice, independent review, court-record correction, and a practical remedy within the funded civil legal-aid system.

750. Defendants caused Grohol harm by allowing her civil case to remain pending for more than 6 years after the January 15, 2020 replevin hearing was not properly noticed to her, while North Penn Legal Services remained counsel of record without meaningful advocacy, adequate communication, timely correction, lawful withdrawal, privacy protection, disability-sensitive service, substitute counsel, or a clear path for Grohol to protect herself.

751. Defendants caused similarly situated clients harm by allowing legal-aid matters to remain delayed, neglected, mishandled, abandoned, unresolved, left in unclear representation status, exposed to privacy harm, or damaged by failures to communicate, supervise, withdraw, protect hearings and deadlines, correct known failures, provide substitute counsel, provide disability-sensitive services, and provide client-protective relief.

752. Defendants are liable for failure to protect under a special-duty theory because each created, controlled, exercised authority over, exercised influence over, funded, supervised, monitored, ratified, reinforced, or failed to correct special relationships and undertakings that imposed client-protection duties; each breached those duties through neglect, delay, abandonment, inadequate communication,

unclear representation status, failure to require proper withdrawal, failure to correct known harm, or failure to provide client-protective relief; and those breaches caused Grohol and the class legal harm, privacy harm, emotional distress, disability-access harm, financial harm, litigation harm, loss of legal opportunities, confusion about representation status, loss of trust, and deprivation of meaningful civil legal aid.

753. Grohol and the class are entitled to compensatory damages, restitution, disgorgement, declaratory relief, injunctive relief, corrective notice, file review, identification of affected clients, independent review, substitute-counsel relief, confidentiality review, privacy review, disability-access review, sealing review, trauma-informed client notice, court-record correction, costs, fees where available, and all other lawful relief.

**COUNT 7**

**Negligence, Legal Malpractice, Negligence Per Se Through Rules of Professional Conduct, and Gross Negligence Against North Penn Legal Services, Inc.; Lori Molloy; Timothy Smith; Heather Kelly; Mary Beth Clark; Pennsylvania Legal Aid Network, Inc.; and Legal Services Corporation**

754. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 31, Malpractice via Rules of Professional

Conduct Against North Penn Legal Services, Inc.; COA 32, Malpractice via Rules of Professional Conduct Against Lori Molloy; COA 33, Malpractice via Rules of Professional Conduct Against Timothy Smith; COA 34, Malpractice via Rules of Professional Conduct Against Heather Kelly; COA 35, Malpractice via Rules of Professional Conduct Against Mary Beth Clark; COA 36, Malpractice via Rules of Professional Conduct Against Pennsylvania Legal Aid Network, Inc.; and COA 37, Malpractice via Rules of Professional Conduct Against Legal Services Corporation, from the 651-count inventory attached as exhibits.

755. The elements of negligence are duty, breach, causation, and damages; the elements of legal malpractice are an attorney-client relationship or professional duty, breach of the professional standard of care, causation, and damages; negligence per se through Rules of Professional Conduct violations requires violation of client-protective professional standards causing the type of harm those standards seek to prevent; and gross negligence requires conduct that shows extreme indifference or reckless disregard for an obvious risk of serious harm.

756. North Penn Legal Services, Inc. owed Grohol and similarly situated clients ordinary, professional, attorney-client, rule-based, supervisory, organizational, and client-protective duties because it accepted legal-aid clients, confidential information, counsel-of-record status, court notices, referrals, public funding, and legal-service responsibility in civil matters involving housing, property, income,

family stability, safety, benefits, disability, debt, domestic abuse, and basic civil rights.

757. North Penn Legal Services, Inc. breached those duties by failing to provide meaningful advocacy, failing to protect hearings and deadlines, failing to communicate accurately, failing to supervise attorneys and staff, failing to maintain adequate file and docket systems, failing to identify and address conflicts, failing to withdraw lawfully when representation stopped, failing to correct known representation-status problems, and allowing client matters to remain unresolved for years.

758. North Penn Legal Services, Inc. committed legal malpractice because it accepted attorney-client relationships, representation undertakings, confidential information, counsel-of-record status, and legal responsibility, but failed to use the knowledge, skill, care, and diligence commonly required of lawyers and legal-service providers handling civil matters for vulnerable clients.

759. North Penn Legal Services, Inc. committed negligence per se through violations of client-protective professional standards because it failed to provide competent representation, reasonable diligence, adequate communication, confidentiality protection, conflict review, proper supervision, lawful termination

of representation, protection of client interests on withdrawal, and conduct consistent with duties owed to clients and the administration of justice.

760. North Penn Legal Services, Inc. committed gross negligence because it disregarded the obvious risk that vulnerable legal-aid clients would suffer serious legal, financial, emotional, privacy, disability-access, and practical harm if counsel of record failed to act, communicate, supervise, withdraw, correct errors, address conflicts, or protect client interests.

761. Lori Molloy owed Grohol and similarly situated clients ordinary, professional, supervisory, executive, rule-based, and client-protective duties because she exercised executive authority over North Penn Legal Services, its legal-aid operations, management structure, attorney supervision, internal accountability, confidentiality systems, privacy practices, conflict systems, funding compliance, grievance responses, client-protection practices, reasonable-modification practices, and institutional response to known legal-service failures.

762. Molloy breached those duties by failing to ensure meaningful advocacy, failing to require protection of hearings and deadlines, failing to require accurate communication, failing to supervise attorneys and staff, failing to require adequate file and docket systems, failing to require conflict review, failing to require lawful withdrawal, and failing to correct known client-service failures.

763. Molloy's conduct constituted professional negligence and gross negligence because executive leadership had authority to require client-protective systems after known or knowable breakdowns, but allowed North Penn Legal Services to preserve funding, referrals, reputation, authority, and status instead of protecting clients from foreseeable legal-aid harm.

764. Molloy caused harm by allowing organizational systems to treat malpractice, missed hearings, disability-access failures, unclear representation status, and client abandonment as institutional risks to be managed rather than client injuries to be repaired.

765. Timothy Smith owed Grohol and similarly situated clients ordinary, professional, supervisory, senior-management, rule-based, and client-protective duties because he exercised senior management authority over North Penn Legal Services, attorney supervision, case-management systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, and response to known missed hearings, missed deadlines, failure to notify clients, failure to prepare, failure to communicate, abandoned files, unclear representation status, and case-management breakdowns.

766. Smith breached those duties by failing to correct known legal-aid failures, failing to require meaningful advocacy, failing to require accurate communication,

failing to require proper supervision, failing to require lawful withdrawal, and failing to protect Grohol from the same kind of missed-hearing and abandonment harm that prior warning signs made foreseeable.

767. Smith specifically worsened Grohol's harm when he told her that North Penn Legal Services was not working on the case for her, pressured her to proceed pro se while North Penn Legal Services remained counsel of record, and warned her that her case could be dismissed for lack of prosecution if she did not represent herself.

768. Smith's conduct constituted gross negligence because a senior manager with notice of missed hearings, missed deadlines, failures to notify clients, and case-management breakdowns disregarded the obvious risk that disabled and vulnerable clients would lose legal rights if the organization remained counsel of record without meaningful representation or corrective action.

769. Heather Kelly owed Grohol and similarly situated clients ordinary, professional, attorney-accountability, rule-based, and client-protective duties because she exercised professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, professional culture, attorney-accountability environment, confidentiality environment, conflict environment,

disability-access environment, client-protection failures, malpractice-response dynamics, and institutional response to known legal-service failures.

770. Kelly breached those duties by reinforcing, enabling, ratifying, or failing to oppose a professional environment in which North Penn Legal Services accepted vulnerable clients' trust and legal control while failing to provide meaningful advocacy, protect hearings and deadlines, communicate accurately, maintain accountability systems, conduct conflict review, withdraw lawfully, correct known harm, or provide client-protective remedies.

771. Kelly's conduct constituted negligence and gross negligence because she knew or should have known that professional silence, insider protection, and failure to oppose known legal-aid failures would allow vulnerable clients to remain trapped in matters they could not protect alone.

772. Kelly caused harm by helping preserve a legal-aid environment where attorney comfort, institutional relationships, and provider reputation displaced client protection, disability-sensitive communication, substitute counsel, independent review, and meaningful repair.

773. Mary Beth Clark owed Grohol and similarly situated clients ordinary, professional, attorney-accountability, rule-based, and client-protective duties because she exercised professional influence within, around, or through North

Penn Legal Services' legal-aid ecosystem, local professional culture, attorney-accountability environment, confidentiality environment, conflict environment, disability-access environment, client-protection failures, malpractice-response dynamics, and institutional response to known legal-service failures.

774. Clark breached those duties by reinforcing, enabling, ratifying, or failing to oppose a legal-aid environment that preserved professional relationships, institutional reputation, funding, referrals, authority, and provider status while vulnerable clients remained dependent on North Penn Legal Services in matters requiring competence, diligence, communication, confidentiality, conflict protection, proper supervision, lawful withdrawal, disability access, and client-protective correction.

775. Clark's conduct constituted negligence and gross negligence because she knew or should have known that legal-aid clients lacked meaningful alternatives and would suffer serious harm if local professional actors allowed provider protection to override client protection after missed hearings, abandonment, and unclear representation status.

776. Clark caused harm by reinforcing a local professional structure in which clients could not meaningfully obtain independent assistance, corrective review,

substitute counsel, conflict-free advice, or privacy-protective repair after North Penn Legal Services' failures harmed them.

777. Pennsylvania Legal Aid Network, Inc. owed Grohol and similarly situated clients ordinary, professional, statewide legal-aid accountability, rule-based, and client-protective duties because it exercised statewide funding, referral, training, coordination, policy, oversight, programmatic, and institutional influence over Pennsylvania's civil legal-aid system and over the legal-aid environment in which North Penn Legal Services accepted vulnerable clients and legal-service responsibility.

778. Pennsylvania Legal Aid Network, Inc. breached those duties by failing to use reasonable statewide legal-aid influence to oppose or correct known or knowable legal-aid failures, failing to support meaningful correction of malpractice and abandonment, failing to structure funding, referral, training, coordination, and oversight practices around client protection, and reinforcing a system that allowed North Penn Legal Services to retain money, authority, referrals, and status despite client harm.

779. Pennsylvania Legal Aid Network, Inc. committed negligence and gross negligence by allowing a statewide legal-aid structure to preserve provider dominance, funding credibility, referral channels, and institutional legitimacy

without ensuring that harmed clients received independent review, substitute counsel, corrective notice, disability-sensitive service, and court-record repair.

780. Pennsylvania Legal Aid Network, Inc. caused harm because its statewide legal-aid systems failed to create a client-protective pathway for clients whose legal-aid provider had become the source of malpractice, abandonment, disability-access failure, and unclear representation status.

781. Legal Services Corporation owed Grohol and similarly situated clients ordinary, professional, federal legal-aid accountability, rule-based, and client-protective duties because it exercised federal funding, monitoring, compliance, oversight, regulatory, policy, and institutional authority over the civil legal-aid system and over the federally funded environment in which North Penn Legal Services accepted clients, confidential information, counsel-of-record status, and legal-service responsibility.

782. Legal Services Corporation breached those duties by failing to use reasonable federal legal-aid authority to oppose or correct known or knowable legal-aid failures, failing to require meaningful correction of malpractice and abandonment, failing to structure funding, monitoring, compliance, and oversight practices around client protection, and allowing North Penn Legal Services to

retain federal funding, authority, referrals, and public legitimacy despite obvious risks to vulnerable clients.

783. Legal Services Corporation committed negligence and gross negligence by allowing federal legal-aid funding and oversight to preserve a provider that lacked adequate safeguards for missed hearings, missed deadlines, abandonment, disability-access failures, supervision failures, conflict failures, unclear representation status, and lack of corrective remedies.

784. Legal Services Corporation caused harm because federal legal-aid authority and funding structures failed to provide conflict-free substitute counsel, independent review, corrective notice, file review, court-record correction, or a meaningful repair mechanism when the funded provider itself harmed the client.

785. Defendants' negligence, legal malpractice, negligence per se through professional-rule violations, and gross negligence harmed Grohol because her civil case remained pending for more than 6 years after the January 15, 2020 replevin hearing was not properly noticed to her, while North Penn Legal Services remained counsel of record without meaningful advocacy, adequate communication, timely correction, lawful withdrawal, conflict review, disability-sensitive service, substitute counsel, or a clear path for Grohol to protect herself.

786. Defendants' negligence, legal malpractice, negligence per se through professional-rule violations, and gross negligence harmed similarly situated clients by allowing legal-aid matters to remain delayed, neglected, mishandled, abandoned, unresolved, left in unclear representation status, exposed to privacy harm, or damaged by failures to communicate, supervise, address conflicts, withdraw, protect hearings and deadlines, correct known failures, provide substitute counsel, and provide client-protective relief.

787. Defendants are liable for negligence, legal malpractice, negligence per se through Rules of Professional Conduct violations, and gross negligence because each owed ordinary, professional, supervisory, management, executive, attorney-accountability, statewide legal-aid, federal legal-aid, rule-based, or client-protective duties; each breached those duties through neglect, abandonment, inadequate communication, deficient supervision, failure to protect hearings and deadlines, failure to address conflicts, failure to require proper withdrawal, professional-rule violations, or reckless disregard of obvious client harm; and those breaches caused Grohol and the class legal harm, emotional distress, privacy harm, disability-access harm, financial harm, litigation harm, lost legal opportunities, unclear representation status, loss of trust, and deprivation of meaningful civil legal aid.

788. Grohol and the class are entitled to compensatory damages, punitive damages where available, restitution, disgorgement, declaratory relief, injunctive relief, corrective notice, file review, identification of affected clients, independent review, substitute-counsel relief, confidentiality review, privacy review, conflict review, supervision review, disability-access review, attorney-accountability review, trauma-informed client notice, court-record correction, costs, fees where available, and all other lawful relief.

**COUNT 8**

**Americans with Disabilities Act Against North Penn Legal Services, Inc.; Lori Molloy; Timothy Smith; Heather Kelly; Mary Beth Clark; Pennsylvania Legal Aid Network, Inc.; and Legal Services Corporation**

789. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 38, ADA Against North Penn Legal Services, Inc.; COA 39, ADA Against Lori Molloy; COA 40, ADA Against Timothy Smith; COA 41, ADA Against Heather Kelly; COA 42, ADA Against Mary Beth Clark; COA 43, ADA Against Pennsylvania Legal Aid Network, Inc.; and COA 44, ADA Against Legal Services Corporation, from the 651-count inventory attached as exhibits.

790. The elements of an Americans with Disabilities Act claim are disability, qualification for the service or program, exclusion from participation in or denial of benefits of services, programs, or activities, or discrimination by reason of disability, and failure to provide reasonable modification or meaningful access where required.

791. Grohol and similarly situated disabled legal-aid clients had disabilities affecting anxiety, communication, functioning, organization, stress response, housing stability, paperwork, memory, trauma response, and participation in legal services, and they qualified for legal-aid services because North Penn Legal Services accepted, undertook, or held itself out as providing civil legal assistance in matters involving property, housing, safety, income, benefits, debt, disability, domestic abuse, and basic civil rights.

792. North Penn Legal Services, Inc. denied Grohol meaningful access to legal-aid services and discriminated by reason of disability when it treated her disability-related anxiety, communication limitations, difficulty functioning, and housing-related vulnerability as client fault; berated, mocked, blamed, and shamed her; told her that she would not be in her situation if she did not leave her apartment messy; failed to provide patient and accessible communication; and failed to modify communication, explanation, pacing, tone, follow-up, case handling, and representation-status practices.

793. North Penn Legal Services, Inc. denied Grohol meaningful access when it allowed her civil case to remain pending for more than 6 years after the January 15, 2020 replevin hearing was not properly noticed to her, while it remained counsel of record without meaningful advocacy, adequate communication, timely correction, disability-sensitive service, reasonable modification, lawful withdrawal, substitute counsel, or a clear path for her to protect herself.

794. North Penn Legal Services, Inc. denied meaningful access to similarly situated disabled clients by replacing disability-sensitive representation with blame, ridicule, hostility, abandonment, unclear representation status, inaccessible communication, denial of reasonable modification, failure to apply vulnerable-client training, failure to provide non-abusive client service, and failure to ensure that disabled clients could understand, use, and benefit from legal-aid services.

795. Lori Molloy denied Grohol and similarly situated disabled clients meaningful access and reasonable modification by exercising executive authority over North Penn Legal Services' disability-access practices, client-service culture, attorney supervision, communication systems, training systems, grievance responses, reasonable-modification practices, and institutional response to known legal-service failures.

796. Molloy allowed disability-insensitive communication, blame, ridicule, hostile client treatment, abandonment, unclear representation status, and failure to accommodate disabled legal-aid clients to continue while North Penn Legal Services preserved funding, referrals, public legitimacy, court recognition, and provider status.

797. Molloy knew or should have known that disabled legal-aid clients needed accessible communication, clear case-status explanations, patient follow-up, non-abusive client interaction, disability-sensitive representation, reasonable modifications, and corrective assistance after missed hearings or abandonment.

798. Molloy denied meaningful access because executive systems under her authority failed to require disability-access review, reasonable-modification protocols, accessible grievance practices, attorney supervision, substitute counsel, corrective notice, and trauma-informed communication for Grohol and similarly situated disabled clients.

799. Timothy Smith denied Grohol and similarly situated disabled clients meaningful access and reasonable modification by exercising senior management authority over North Penn Legal Services' client-service practices, disability-access practices, attorney supervision, communication systems, case-management systems, reasonable-modification practices, and response to known failures.

800. Smith allowed Grohol to be pressured, blamed, and left without disability-sensitive service while North Penn Legal Services remained counsel of record without meaningful advocacy, adequate communication, accessible explanation, lawful withdrawal, substitute assistance, or correction.

801. Smith denied meaningful access when he told Grohol that North Penn Legal Services was not working on the case for her, pressured her to proceed pro se, and warned her that her case could be dismissed for lack of prosecution if she did not represent herself, despite her disability-related anxiety, communication difficulty, functional limitations, and reliance on legal aid.

802. Smith knew or should have known that pressuring a disabled legal-aid client into self-representation after the provider's own missed hearing and abandonment would deny equal access to legal services, intensify disability-related barriers, and convert disability-related communication and functioning limits into grounds for exclusion.

803. Heather Kelly denied Grohol and similarly situated disabled clients meaningful access and reasonable modification by exercising professional influence within, around, or through the North Penn Legal Services legal-aid environment while allowing, reinforcing, ratifying, or failing to oppose a culture in which disabled clients were blamed, mocked, shamed, berated, ignored,

abandoned, denied patient communication, denied reasonable modification, and treated as responsible for disability-related communication, functioning, housing, paperwork, or stress limitations.

804. Kelly knew or should have known that disabled legal-aid clients needed accessible communication, patience, clear explanations, non-abusive treatment, reasonable modification, and substitute or corrective assistance when legal-aid representation failed.

805. Kelly denied meaningful access by reinforcing or failing to oppose a professional environment that treated disability-related vulnerability as client fault rather than an access barrier requiring accommodation, legal help, and client-protective correction.

806. Kelly's conduct allowed North Penn Legal Services and aligned professional actors to preserve reputation and institutional comfort while disabled clients remained unable to access meaningful legal-aid services, understand representation status, obtain correction, or receive disability-sensitive assistance.

807. Mary Beth Clark denied Grohol and similarly situated disabled clients meaningful access and reasonable modification by exercising professional influence within, around, or through the North Penn Legal Services legal-aid environment while allowing, reinforcing, ratifying, or failing to oppose a culture in

which disabled clients were denied disability-sensitive communication, treated as unworthy of help, blamed for disability-related limitations, and left in delayed, unresolved, abandoned, or unclear representation status without accessible case handling or corrective relief.

808. Clark knew or should have known that legal-aid clients with anxiety, trauma, communication difficulty, functional limitations, housing instability, disability-related paperwork problems, or stress-response limitations needed reasonable modification of ordinary legal-aid practices.

809. Clark denied meaningful access by reinforcing or failing to oppose local legal-aid and bar-connected practices that protected institutional relationships instead of requiring accessible communication, non-abusive treatment, file review, substitute counsel, and corrective assistance for disabled clients.

810. Clark's conduct preserved a professional environment in which disabled clients could be blamed for the circumstances that made them eligible for legal aid, denied meaningful service because of disability-related barriers, and left without equal access to the legal-aid services promised to similarly situated non-disabled clients.

811. Pennsylvania Legal Aid Network, Inc. denied Grohol and similarly situated disabled clients meaningful access and reasonable modification by exercising

statewide legal-aid funding, referral, training, coordination, policy, oversight, and institutional influence while regularly promoting training on disabled, vulnerable, traumatized, low-income, or otherwise impaired clients, yet allowing, funding, training, coordinating, reinforcing, ratifying, or failing to oppose a legal-aid environment in which North Penn Legal Services treated disabled clients in the opposite manner.

812. Pennsylvania Legal Aid Network, Inc. knew or should have known that statewide legal-aid structures must provide meaningful access to disabled clients through reasonable-modification practices, accessible communications, non-abusive service standards, trauma-informed client interaction, grievance access, case-status clarity, and corrective pathways when providers fail.

813. Pennsylvania Legal Aid Network, Inc. denied meaningful access by allowing statewide funding, referral, training, and institutional systems to preserve provider status without requiring disability-access repair, accessible notice, substitute counsel, independent review, or monitoring of whether legal-aid providers actually followed disability-sensitive training.

814. Pennsylvania Legal Aid Network, Inc.'s conduct caused disabled clients to remain dependent on a provider structure that treated disability-related needs as inconvenience, misconduct, or personal fault, while leaving clients without

practical access to comparable legal-aid services, corrective assistance, or disability-sensitive representation.

815. Legal Services Corporation denied Grohol and similarly situated disabled clients meaningful access and reasonable modification by exercising federal legal-aid funding, monitoring, compliance, oversight, regulatory, policy, and institutional authority while allowing, funding, monitoring, regulating, coordinating, ratifying, or failing to oppose a legal-aid environment in which North Penn Legal Services retained public funding, referrals, program legitimacy, and legal-aid authority despite disability-access failures, hostile communication, abandonment, and lack of meaningful client repair.

816. Legal Services Corporation knew or should have known that federally funded legal-aid clients include disabled clients who need reasonable modifications in communication, scheduling, explanation, paperwork, follow-up, organization, reminders, tone, pacing, representation-status clarification, grievance access, and case handling.

817. Legal Services Corporation denied meaningful access by allowing federal funding and program legitimacy to continue without requiring effective disability-access safeguards, accessible grievance mechanisms, corrective notice, independent review, substitute counsel, monitoring of reasonable-modification

failures, or repair when the funded provider excluded disabled clients from meaningful legal-aid services.

818. Legal Services Corporation's conduct allowed a federally supported legal-aid system to retain public legitimacy while disabled clients were blamed, humiliated, abandoned, denied accessible communication, denied reasonable modification, and left without equal access to the civil legal assistance that federal funding existed to provide.

819. Defendants knew or should have known that disabled legal-aid clients often need reasonable modifications in communication, scheduling, explanations, paperwork, follow-up, organization, reminders, tone, pacing, representation-status clarification, and case handling, and knew or should have known that blame, ridicule, hostility, accusation, impatience, abandonment, and humiliation predictably worsen anxiety, impair communication, prevent participation, and deny meaningful access to legal-aid services.

820. Defendants discriminated by reason of disability because Grohol's anxiety, trouble communicating, difficulty functioning, housing-related vulnerability, and stress-related limitations were used against her instead of accommodated, and because similarly situated disabled clients were denied equal legal-aid access when

disability-related limitations were treated as moral fault, client misconduct, inconvenience, or justification for denial of meaningful service.

821. Defendants are liable under the Americans with Disabilities Act because Grohol and the class had disabilities, qualified for legal-aid services, were denied meaningful access and reasonable modification, were subjected to disability-insensitive and hostile legal-aid treatment by reason of disability, and suffered denial of equal services, emotional distress, increased anxiety, humiliation, confusion, unresolved legal matters, privacy harm, financial harm, litigation harm, loss of trust, and deprivation of meaningful civil legal aid.

822. Grohol and the class are entitled to declaratory relief, injunctive relief, reasonable-modification protocols, disability-access training, trauma-informed communication policies, accessible grievance procedures, non-abusive client-service rules, case review, client notice, corrective assistance, monitoring, identification of affected disabled clients, independent review, substitute-counsel relief, court-record correction, damages where available, costs, fees where available, and all other lawful relief.

**COUNT 9**

**Failure to Supervise Against North Penn Legal Services, Inc.; Lori Molloy; Timothy Smith; Heather Kelly; Mary Beth Clark; Pennsylvania Legal Aid Network, Inc.; and Legal Services Corporation**

823. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 45, Failure to Supervise Against North Penn Legal Services, Inc.; COA 46, Failure to Supervise Against Lori Molloy; COA 47, Failure to Supervise Against Timothy Smith; COA 48, Failure to Supervise Against Heather Kelly; COA 49, Failure to Supervise Against Mary Beth Clark; COA 50, Failure to Supervise Against Pennsylvania Legal Aid Network, Inc.; and COA 51, Failure to Supervise Against Legal Services Corporation, from the 651-count inventory attached as exhibits.

824. The elements of failure to supervise are duty to supervise, failure to exercise reasonable supervision, causation, and resulting harm.

825. North Penn Legal Services, Inc. owed supervision duties to Grohol and similarly situated clients because it accepted legal-service responsibility for low-income, disabled, vulnerable, housing-insecure, elderly, traumatized, abused, and otherwise disadvantaged clients who depended on its attorneys, managers, staff, intake systems, files, calendars, court notices, disability-access practices,

confidentiality systems, conflict systems, communication systems, withdrawal practices, grievance systems, and client-protection systems.

826. North Penn Legal Services, Inc. failed to supervise attorneys, managers, staff, volunteers, intake workers, legal-service systems, case files, hearing practices, deadline practices, communication practices, disability-access practices, withdrawal practices, confidentiality practices, conflict practices, grievance practices, and client-protection systems after accepting responsibility for clients who could not reasonably protect themselves without competent legal-aid supervision.

827. North Penn Legal Services, Inc. breached its supervision duties by allowing client matters to be delayed, neglected, mishandled, abandoned, left unresolved, left in unclear representation status, or handled through hostile, inaccessible, and disability-insensitive communication.

828. North Penn Legal Services, Inc. failed to supervise in Grohol's case because her civil matter remained pending for more than 6 years after the January 15, 2020 replevin hearing was not properly noticed to her while North Penn Legal Services remained counsel of record without meaningful advocacy, adequate communication, timely correction, disability-sensitive service, substitute counsel, or timely withdrawal.

829. Lori Molloy owed supervision duties to Grohol and similarly situated clients because she exercised executive authority over North Penn Legal Services' legal-aid operations, management structure, attorney supervision, staff supervision, intake supervision, disability-access practices, client-service culture, internal accountability, confidentiality systems, privacy practices, conflict systems, funding compliance, grievance responses, client-protection practices, reasonable-modification practices, and institutional response to known legal-service failures.

830. Molloy failed to supervise or ensure supervision by allowing North Penn Legal Services to continue accepting public funding, referrals, client trust, counsel-of-record authority, and legal-service responsibility without requiring reliable systems for file review, docket monitoring, hearing notice, deadline protection, attorney communication, disability-sensitive service, lawful withdrawal, substitute counsel, and corrective notice.

831. Molloy breached her supervision duties by failing to require meaningful advocacy, protection of hearings and deadlines, accurate communication, lawful withdrawal, disability-sensitive client service, correction of known client harm, and leadership accountability after repeated legal-service failures.

832. Molloy caused harm because executive-level supervision failures allowed North Penn Legal Services to preserve funding, referrals, reputation, authority, and

status while clients harmed by missed hearings, abandonment, disability-access failures, unclear representation status, and lack of corrective action remained without meaningful repair.

833. Timothy Smith owed supervision duties to Grohol and similarly situated clients because he exercised senior management authority over North Penn Legal Services' attorney supervision, staff supervision, case-management systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, and response to known missed hearings, missed deadlines, failures to notify clients, failures to prepare, failures to communicate, abandoned files, unclear representation status, and case-management breakdowns.

834. Smith failed to supervise or ensure supervision when he failed to correct known legal-aid failures before Grohol suffered the same type of missed-hearing, communication, and abandonment harm that prior warning signs made foreseeable.

835. Smith breached his supervision duties by leaving Grohol publicly represented by North Penn Legal Services while telling her that North Penn Legal Services was not working on the case for her, pressuring her to proceed pro se, and warning her that her case could be dismissed for lack of prosecution if she did not represent herself.

836. Smith caused harm because senior management failures left Grohol with no meaningful advocacy, no truthful representation-status correction, no substitute counsel, no independent review, no disability-sensitive service, and no practical path to repair the missed hearing and prolonged delay caused by North Penn Legal Services' failures.

837. Heather Kelly owed supervision, accountability, or client-protective duties to Grohol and similarly situated clients because she exercised professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, professional culture, attorney-accountability environment, confidentiality environment, conflict environment, disability-access environment, client-protection failures, malpractice-response dynamics, and institutional response to known legal-service failures.

838. Kelly failed to supervise, support supervision, require accountability, oppose deficient supervision, or prevent foreseeable client harm by reinforcing, enabling, ratifying, or failing to oppose an environment in which North Penn Legal Services accepted vulnerable clients' trust and legal control while failing to supervise meaningful advocacy, hearing and deadline protection, accurate communication, confidentiality, conflict review, disability-access practices, lawful withdrawal, correction of known harm, and client-protective remedies.

839. Kelly breached client-protective supervision duties by allowing professional silence, insider protection, and institutional loyalty to displace attorney accountability and client repair after known or knowable legal-aid failures.

840. Kelly caused harm because the professional environment she reinforced or failed to oppose allowed vulnerable clients to remain delayed, ignored, blamed, mocked, shamed, abandoned, denied accessible communication, denied independent review, and deprived of a clear answer about whether they were represented or expected to proceed alone.

841. Mary Beth Clark owed supervision, accountability, or client-protective duties to Grohol and similarly situated clients because she exercised professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, local professional culture, attorney-accountability environment, confidentiality environment, conflict environment, disability-access environment, client-protection failures, malpractice-response dynamics, and institutional response to known legal-service failures.

842. Clark failed to supervise, support supervision, require accountability, oppose deficient supervision, or prevent foreseeable client harm by reinforcing, enabling, ratifying, or failing to oppose a legal-aid environment that preserved professional

relationships, institutional reputation, funding, referrals, authority, and provider status while vulnerable clients remained dependent on North Penn Legal Services.

843. Clark breached client-protective supervision duties by failing to require or support supervision of competence, diligence, communication, confidentiality, conflict protection, disability access, lawful withdrawal, and client-protective correction in matters involving vulnerable legal-aid clients.

844. Clark caused harm because local professional and legal-aid structures protected provider status and professional relationships instead of ensuring that harmed clients received file review, substitute counsel, disability-sensitive communication, independent supervision review, and practical correction after missed hearings, abandonment, unclear representation status, and client-service failures.

845. Pennsylvania Legal Aid Network, Inc. owed supervision, oversight, or client-protective duties to Grohol and similarly situated clients because it exercised statewide legal-aid funding, referral, training, coordination, policy, oversight, programmatic, and institutional influence over Pennsylvania's civil legal-aid system and over the legal-aid environment in which North Penn Legal Services accepted vulnerable clients and legal-service responsibility.

846. Pennsylvania Legal Aid Network, Inc. failed to supervise, require supervision, support supervision, or correct supervision failures by allowing statewide legal-aid funding, referrals, training, coordination, program credibility, and institutional legitimacy to preserve North Penn Legal Services' status without requiring adequate systems for attorney supervision, staff supervision, disability-access supervision, communication supervision, withdrawal supervision, and corrective review.

847. Pennsylvania Legal Aid Network, Inc. breached supervision duties by failing to use reasonable statewide legal-aid influence to oppose or correct known or knowable supervision failures, failing to support meaningful correction of malpractice and abandonment, and failing to structure funding, referral, training, coordination, and oversight practices around client protection.

848. Pennsylvania Legal Aid Network, Inc. caused harm because statewide supervision failures allowed North Penn Legal Services to retain money, authority, referrals, and status while clients remained delayed, abandoned, exposed, confused, denied disability-sensitive service, and without meaningful corrective relief.

849. Legal Services Corporation owed supervision, oversight, monitoring, or client-protective duties to Grohol and similarly situated clients because it exercised

federal funding, monitoring, compliance, oversight, regulatory, policy, and institutional authority over the civil legal-aid system and over the federally funded environment in which North Penn Legal Services accepted clients, confidential information, counsel-of-record status, and legal-service responsibility.

850. Legal Services Corporation failed to supervise, require supervision, support supervision, monitor supervision, or correct supervision failures by allowing federal funding and program legitimacy to continue without requiring adequate supervision systems for missed hearings, missed deadlines, abandoned matters, disability-access failures, communication failures, conflict failures, withdrawal failures, and corrective notice.

851. Legal Services Corporation breached supervision duties by failing to use reasonable federal legal-aid authority to oppose or correct known or knowable supervision failures, failing to require meaningful correction of malpractice and abandonment, and failing to structure funding, monitoring, compliance, and oversight practices around client protection.

852. Legal Services Corporation caused harm because federal legal-aid supervision failures allowed North Penn Legal Services to retain federal funding, authority, referrals, and public legitimacy despite obvious risks to vulnerable clients and without requiring conflict-free substitute counsel, independent review,

disability-access correction, file review, court-record correction, or meaningful client repair.

853. Defendants knew or should have known that legal-aid clients could suffer serious harm when attorneys, managers, staff, volunteers, files, calendars, hearing notices, deadlines, communication practices, disability-access practices, confidentiality practices, conflict systems, grievance systems, and withdrawal decisions were not supervised, because vulnerable clients often lack money, substitute counsel, legal knowledge, transportation, health, stability, records, docket access, privacy protection, and institutional power to detect or repair legal-service failures.

854. Defendants' failure to supervise caused Grohol harm because her civil matter remained pending for more than 6 years after a hearing was not properly noticed to her, North Penn Legal Services remained counsel of record without meaningful advocacy, adequate communication, timely correction, disability-sensitive service, or timely withdrawal, and Grohol could not protect her own legal position while representation status, case status, property rights, deadlines, and corrective options remained controlled by a failed legal-aid system.

855. Defendants' failure to supervise caused similarly situated clients harm by allowing legal-aid matters to remain delayed, neglected, mishandled, abandoned,

unresolved, left in unclear representation status, exposed to privacy harm, damaged by conflict failures, or harmed by disability-insensitive communication, missed hearings, missed deadlines, inadequate communication, improper withdrawal, and lack of client-protective correction.

856. Defendants are liable for failure to supervise because each owed supervision, oversight, management, executive, professional-influence, statewide legal-aid, federal legal-aid, attorney-accountability, or client-protective duties; each failed to exercise reasonable supervision or failed to require reasonable supervision over the people and systems responsible for vulnerable clients; and those failures caused Grohol and the class legal harm, emotional distress, privacy harm, disability-access harm, financial harm, litigation harm, lost legal opportunities, unclear representation status, loss of trust, and deprivation of meaningful civil legal aid.

857. Grohol and the class are entitled to compensatory damages, punitive damages where available, restitution, disgorgement, declaratory relief, injunctive relief, corrective notice, file review, identification of affected clients, independent review, substitute-counsel relief, supervision review, disability-access review, confidentiality review, privacy review, conflict review, accommodation review, trauma-informed client notice, court-record correction, costs, fees where available, and all other lawful relief.

**COUNT 10**

**False Claims Act Against North Penn Legal Services, Inc.; Lori Molloy; Timothy Smith; Heather Kelly; Mary Beth Clark; Pennsylvania Legal Aid Network, Inc.; and Legal Services Corporation**

858. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 52, False Claims Act Against North Penn Legal Services, Inc.; COA 53, False Claims Act Against Lori Molloy; COA 54, False Claims Act Against Timothy Smith; COA 55, False Claims Act Against Heather Kelly; COA 56, False Claims Act Against Mary Beth Clark; COA 57, False Claims Act Against Pennsylvania Legal Aid Network, Inc.; and COA 58, False Claims Act Against Legal Services Corporation, from the 651-count inventory attached as exhibits.

859. The elements of a False Claims Act claim are a claim for money or property from the government, falsity, knowledge, materiality, and payment, retention, or loss caused by the false claim or false statement.

860. North Penn Legal Services, Inc. made, submitted, caused, approved, ratified, allowed, or failed to correct claims for public money, federal legal-aid money, grant money, reimbursements, program authority, referrals, and continued legal-aid status through express and implied representations that it provided competent,

diligent, supervised, accessible, lawful, confidential, conflict-free, client-protective, and meaningful civil legal services.

861. North Penn Legal Services, Inc.'s representations were false or misleading because the organization accepted public money and legal-aid authority while Grohol and similarly situated clients experienced missed hearings, missed deadlines, abandoned files, prolonged delay, hostile communication, disability-access failures, supervision failures, conflict failures, confidentiality failures, unclear withdrawal practices, and failure to correct known client harm.

862. North Penn Legal Services, Inc. acted knowingly, recklessly, or with deliberate ignorance because it knew or should have known whether its client matters were being handled, whether hearings and deadlines were protected, whether clients received accurate communication, whether disabled clients received reasonable modifications, whether counsel-of-record status remained accurate, and whether lawful withdrawal or corrective action occurred.

863. North Penn Legal Services, Inc.'s false claims were material because government funders, oversight entities, courts, referral sources, clients, and the public would consider meaningful service, supervision, accessibility, confidentiality, conflict protection, lawful withdrawal, and client correction

important to the payment, retention, referral, recognition, monitoring, and continued legitimacy of a publicly funded legal-aid provider.

864. Lori Molloy made, caused, approved, ratified, allowed, or failed to correct false claims, false certifications, false implied certifications, false funding representations, false compliance representations, false grant reports, false service reports, and false retention of public legal-aid funds while exercising executive authority over North Penn Legal Services' operations, funding representations, grant reporting, compliance representations, attorney supervision, staff supervision, disability-access practices, confidentiality systems, conflict systems, grievance responses, and institutional response to known legal-service failures.

865. Molloy acted knowingly, recklessly, or with deliberate ignorance because she knew or should have known that North Penn Legal Services continued to accept public funding, referrals, confidential information, court recognition, program legitimacy, and client trust while vulnerable clients experienced abandonment, missed hearings, missed deadlines, inaccessible communication, supervision failures, disability-access failures, withdrawal failures, unclear representation status, and lack of corrective relief.

866. Molloy caused false claims to be material to payment and retention because executive leadership controlled the systems that generated, supported, or failed to

correct funding representations about competent legal-aid service, program compliance, supervision, accessibility, client protection, and meaningful delivery of federally supported civil legal assistance.

867. Molloy's conduct caused Grohol and similarly situated clients to rely on a publicly funded legal-aid provider whose funding, reputation, referral flow, and institutional legitimacy continued despite facts that contradicted the provider's express and implied representations of meaningful civil legal-aid service.

868. Timothy Smith made, caused, approved, ratified, allowed, or failed to correct false claims, false certifications, false implied certifications, false funding representations, false compliance representations, false grant reports, false service reports, and false retention of public legal-aid funds while exercising senior management authority over attorney supervision, case-management systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, and known case-management breakdowns.

869. Smith acted knowingly, recklessly, or with deliberate ignorance because he had notice that North Penn Legal Services' public legal-aid representations contradicted actual client-service practices, including missed hearings, missed deadlines, failures to notify clients, failures to prepare, failures to communicate, abandoned files, and unclear representation status.

870. Smith worsened the falsity and materiality of the funding representations when he told Grohol that North Penn Legal Services was not working on the case for her while North Penn Legal Services remained counsel of record and continued to benefit from the public legitimacy, referral value, and program status attached to the appearance of meaningful legal representation.

871. Smith caused injury because his senior-management conduct preserved the publicly funded appearance of representation while shifting the consequences of North Penn Legal Services' failure onto Grohol and similarly situated clients who lacked the resources, information, or substitute counsel needed to repair abandoned matters.

872. Heather Kelly made, supported, reinforced, ratified, allowed, or failed to oppose false claims, false certifications, false implied certifications, false funding representations, false compliance representations, false grant reports, false service reports, and false retention of public legal-aid funds while exercising professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, attorney-accountability environment, funding-protection culture, disability-access environment, confidentiality environment, conflict environment, client-protection failures, supervision failures, and malpractice-response dynamics.

873. Kelly acted knowingly, recklessly, or with deliberate ignorance because she knew or should have known that North Penn Legal Services retained public funding, referrals, authority, and status through representations of competent, diligent, supervised, accessible, confidential, conflict-free, and meaningful legal services while vulnerable clients remained delayed, abandoned, blamed, mocked, shamed, ignored, denied reasonable modification, or left unable to determine whether they were represented, abandoned, self-represented, or expected to act without counsel.

874. Kelly's conduct made false claims material because professional silence, attorney-accountability failure, and institutional reinforcement helped preserve the funding and referral environment that allowed North Penn Legal Services to keep public benefits despite client-service failures.

875. Kelly caused harm because her conduct helped maintain the public appearance that legal-aid systems were functioning while Grohol and similarly situated clients experienced reduced service, unclear representation status, inaccessible communication, abandonment, and no meaningful corrective pathway.

876. Mary Beth Clark made, supported, reinforced, ratified, allowed, or failed to oppose false claims, false certifications, false implied certifications, false funding representations, false compliance representations, false grant reports, false service

reports, and false retention of public legal-aid funds while exercising professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, local professional culture, attorney-accountability environment, funding-protection culture, disability-access environment, confidentiality environment, conflict environment, client-protection failures, supervision failures, and malpractice-response dynamics.

877. Clark acted knowingly, recklessly, or with deliberate ignorance because she knew or should have known that North Penn Legal Services' public legal-aid representations were false or misleading when clients who depended on it for property, housing, safety, family stability, income, benefits, disability rights, debt, and basic civil rights were left in delayed, neglected, abandoned, unresolved, inaccessible, hostile, or unclear representation-status conditions.

878. Clark's conduct made false claims material because local professional reinforcement, silence, or failure to oppose known client-service failures helped preserve the funding, referrals, authority, and institutional legitimacy of a provider whose actual output and quality did not match its public legal-aid representations.

879. Clark caused harm because her conduct helped maintain a local professional structure in which public money and program authority continued to flow to a

provider while harmed clients lacked independent review, substitute counsel, corrective notice, and meaningful accountability.

880. Pennsylvania Legal Aid Network, Inc. made, supported, reinforced, funded, coordinated, ratified, allowed, or failed to correct false claims, false certifications, false implied certifications, false funding representations, false compliance representations, false grant reports, false service reports, and false retention or distribution of public legal-aid funds while exercising statewide funding, referral, training, coordination, policy, oversight, programmatic, and institutional influence over Pennsylvania's civil legal-aid system.

881. Pennsylvania Legal Aid Network, Inc. acted knowingly, recklessly, or with deliberate ignorance because it knew or should have known that public legal-aid funds, referrals, trainings, program legitimacy, and statewide legal-aid coordination should not preserve a provider that concealed or failed to correct systemic client neglect, abandoned matters, missed hearings, missed deadlines, disability-access failures, inadequate supervision, hostile communication, unclear representation status, and lack of client-protective remedies.

882. Pennsylvania Legal Aid Network, Inc.'s conduct was material because statewide legal-aid coordination and funding structures influence which providers

receive money, referrals, credibility, training support, institutional legitimacy, and continued access to vulnerable clients.

883. Pennsylvania Legal Aid Network, Inc. caused harm because statewide funding and referral systems helped North Penn Legal Services retain legal-aid authority and public legitimacy while Grohol and similarly situated clients received reduced output, inaccessible service, abandonment, unclear representation status, and no adequate client repair.

884. Legal Services Corporation made, supported, reinforced, funded, monitored, regulated, oversaw, ratified, allowed, or failed to correct false claims, false certifications, false implied certifications, false funding representations, false compliance representations, false grant reports, false service reports, and false retention or distribution of public legal-aid funds while exercising federal funding, monitoring, compliance, oversight, regulatory, policy, and institutional authority over North Penn Legal Services and the federally funded civil legal-aid system.

885. Legal Services Corporation acted knowingly, recklessly, or with deliberate ignorance because it knew or should have known that federal legal-aid funding, monitoring, compliance, oversight, and program legitimacy were material to North Penn Legal Services' ability to retain public money, referrals, authority, and client trust while vulnerable clients lacked meaningful advocacy, accurate

communication, disability-sensitive service, lawful withdrawal, supervision, conflict protection, corrective notice, substitute counsel, and practical remedies.

886. Legal Services Corporation's conduct was material because federal funding, monitoring, and compliance systems determine whether a legal-aid provider may continue to receive money, recognition, program legitimacy, and access to vulnerable clients while representing that it provides meaningful civil legal assistance.

887. Legal Services Corporation caused harm because federal legal-aid oversight and funding structures preserved the appearance and economics of lawful service while leaving Grohol and similarly situated clients without conflict-free substitute counsel, independent review, corrective notice, file review, court-record correction, or a meaningful repair mechanism when the funded provider itself caused the harm.

888. Defendants' false claims and false funding representations harmed Grohol because North Penn Legal Services remained the publicly funded legal-aid provider while failing to provide meaningful legal assistance, leaving her civil case pending for more than 6 years after the January 15, 2020 replevin hearing was not properly noticed to her, while North Penn Legal Services remained counsel of record without meaningful advocacy, adequate communication, timely correction,

disability-sensitive service, lawful withdrawal, substitute counsel, or a clear path for Grohol to protect herself.

889. Defendants' false claims and false funding representations harmed similarly situated clients because public funding, public trust, referrals, oversight approval, and legal-aid status induced clients to rely on a system that allowed matters to remain delayed, neglected, mishandled, abandoned, unresolved, left in unclear representation status, or affected by inaccessible communication, disability-access failures, privacy exposure, conflict failures, supervision failures, and lack of corrective remedies.

890. Defendants are liable under the False Claims Act because each made, caused, approved, ratified, supported, funded, monitored, reinforced, allowed, or failed to correct claims for government money or property; those claims and related express or implied certifications were false or misleading; each defendant acted with knowledge, reckless disregard, or deliberate ignorance; the false representations were material to payment, retention, referral, oversight, and program legitimacy; and Grohol and the class suffered loss caused by the false claims, false statements, false funding representations, and false retention of public legal-aid funds.

891. Grohol and the class are entitled to compensatory damages, statutory damages where available, treble damages where available, civil penalties where available, restitution, disgorgement, declaratory relief, injunctive relief, funding-accountability review, compliance review, client-service review, supervision review, disability-access review, case-status review, docket review, court-record correction, confidentiality review, privacy review, conflict review, accommodation review, sealing review, trauma-informed client notice, corrective notice, independent review, substitute-counsel relief, costs, fees where available, and all other lawful relief.

**COUNT 11**

**First Amendment Compelled Speech Against North Penn Legal Services, Inc.; Lori Molloy; Timothy Smith; Heather Kelly; Mary Beth Clark; Pennsylvania Legal Aid Network, Inc.; and Legal Services Corporation**

892. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 59, First Amendment Compelled Speech Against North Penn Legal Services, Inc.; COA 60, First Amendment Compelled Speech Against Lori Molloy; COA 61, First Amendment Compelled Speech Against Timothy Smith; COA 62, First Amendment Compelled Speech Against

Heather Kelly; COA 63, First Amendment Compelled Speech Against Mary Beth Clark; COA 64, First Amendment Compelled Speech Against Pennsylvania Legal Aid Network, Inc.; and COA 65, First Amendment Compelled Speech Against Legal Services Corporation, from the 651-count inventory attached as exhibits.

893. The elements of a First Amendment compelled-speech claim are compelled expression, compelled association with a message or speaker, state action or legally attributable action where required, lack of voluntary and informed consent, and injury caused by the compelled expression or association.

894. North Penn Legal Services, Inc. compelled Grohol and similarly situated legal-aid clients to carry a public representation-status message by accepting representation, appearing or remaining as counsel of record, controlling court-facing communication, controlling case posture, and allowing courts, opposing parties, agencies, funders, referral sources, and the public to understand that clients had meaningful legal representation when clients were delayed, neglected, abandoned, denied adequate communication, denied disability-sensitive service, or left in unclear representation status.

895. North Penn Legal Services, Inc. compelled association with its speech, silence, omissions, filings, nonaction, delay, counsel-of-record status, and withdrawal posture because Grohol and similarly situated clients remained publicly

linked to North Penn Legal Services while lacking meaningful ability to direct, understand, correct, reject, or replace the public legal message that North Penn Legal Services spoke for them.

896. North Penn Legal Services, Inc. compelled Grohol to carry a misleading litigation posture after the January 15, 2020 replevin hearing was not properly noticed to her, because North Penn Legal Services remained counsel of record while failing to provide meaningful advocacy, accurate communication, timely correction, disability-sensitive service, lawful withdrawal, substitute counsel, or a clear public correction of the representation failure.

897. North Penn Legal Services, Inc. caused First Amendment injury because Grohol and similarly situated clients did not voluntarily and knowingly consent to have North Penn Legal Services' silence, inaction, missed hearing, failure to seek relief, failure to object, failure to communicate, or failure to withdraw treated as the clients' own litigation posture, waiver, consent, lack of urgency, or agreement with the case status.

898. Lori Molloy compelled or caused compelled speech and compelled association by exercising executive authority over North Penn Legal Services' attorney-client relationships, counsel-of-record practices, client communication,

withdrawal practices, case-status systems, supervision systems, disability-access practices, funding representations, and client-protection systems.

899. Molloy caused Grohol and similarly situated clients to carry a misleading representation-status message because she allowed North Penn Legal Services to preserve public funding, referrals, court recognition, legal-aid authority, and institutional legitimacy while vulnerable clients remained associated with the organization's silence, nonaction, delay, omissions, inaccessible communication, and failure to correct abandoned or unresolved matters.

900. Molloy acted under legally attributable public, legal-aid, funding, professional, and court-connected authority because executive control over a publicly funded legal-aid provider affected court-recognized representation status, public-service delivery, access to civil legal representation, and the public message that clients were receiving meaningful legal assistance.

901. Molloy caused compelled-speech injury because executive failure to require truthful representation-status correction, lawful withdrawal, substitute counsel, corrective notice, and accessible client communication left Grohol and the class publicly tied to North Penn Legal Services' misleading counsel-of-record status and case posture.

902. Timothy Smith compelled or caused compelled speech and compelled association by exercising senior management authority over North Penn Legal Services' attorney supervision, case-management systems, client communication, attorney assignments, corrective action, representation-status practices, withdrawal practices, disability-access practices, and response to known missed hearings, missed deadlines, failures to notify clients, failures to prepare, failures to communicate, abandoned files, unclear representation status, and case-management breakdowns.

903. Smith caused Grohol to carry a misleading court-facing representation message because he told her that North Penn Legal Services was not working on the case for her, pressured her to proceed pro se while North Penn Legal Services remained counsel of record, warned her that her case could be dismissed for lack of prosecution if she did not represent herself, and failed to ensure that the public record accurately reflected whether North Penn Legal Services was meaningfully representing her.

904. Smith compelled Grohol to associate with North Penn Legal Services' silence and nonaction because she remained publicly represented by North Penn Legal Services while being privately told that the organization was not working on her case and that she would have to act herself to avoid dismissal.

905. Smith caused First Amendment injury because Grohol did not voluntarily consent to having North Penn Legal Services' abandonment, nonaction, and failure to prosecute treated as her own speech, waiver, litigation choice, or lack of objection.

906. Heather Kelly compelled, supported, reinforced, ratified, allowed, or failed to oppose compelled speech and compelled association by exercising professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, representation-status environment, attorney-accountability environment, disability-access environment, confidentiality environment, conflict environment, client-protection failures, supervision failures, malpractice-response dynamics, and institutional response to known legal-service failures.

907. Kelly supported or failed to oppose a professional environment in which legal-aid clients remained publicly associated with North Penn Legal Services' counsel-of-record status, silence, nonaction, delay, omissions, inaccessible communication, and misleading representation posture while those clients lacked meaningful advocacy, case correction, lawful withdrawal, substitute counsel, or practical ability to speak directly for themselves.

908. Kelly's conduct compelled association because professional silence, insider protection, and failure to oppose known legal-aid failures left clients publicly

bound to the message that North Penn Legal Services represented them, protected them, and spoke for them, even when the provider had functionally abandoned or failed them.

909. Kelly caused First Amendment injury because Grohol and similarly situated clients could not meaningfully separate themselves from the legal-aid provider's public posture without risking dismissal, loss of legal-aid assistance, exposure of private facts, or further institutional retaliation and disbelief.

910. Mary Beth Clark compelled, supported, reinforced, ratified, allowed, or failed to oppose compelled speech and compelled association by exercising professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, local professional culture, representation-status environment, attorney-accountability environment, disability-access environment, confidentiality environment, conflict environment, client-protection failures, supervision failures, malpractice-response dynamics, and institutional response to known legal-service failures.

911. Clark supported or failed to oppose a legal-aid environment that preserved professional relationships, institutional reputation, funding, referrals, authority, and provider status while vulnerable clients remained publicly associated with North Penn Legal Services' speech, silence, nonaction, case posture, counsel-of-record

status, and misleading representation status without meaningful legal-service access.

912. Clark's conduct compelled association because local legal-aid and bar-connected professional structures left clients tied to a provider message that implied representation, protection, communication, and legal assistance even when the provider had not supplied those services.

913. Clark caused First Amendment injury because Grohol and similarly situated clients were forced to carry or correct the provider's public representation-status message in an environment where local professional relationships and institutional protection made independent correction difficult, risky, humiliating, and inaccessible.

914. Pennsylvania Legal Aid Network, Inc. compelled, supported, reinforced, funded, coordinated, ratified, allowed, or failed to correct compelled speech and compelled association by exercising statewide legal-aid funding, referral, training, coordination, policy, oversight, programmatic, and institutional influence over Pennsylvania's civil legal-aid system and the legal-aid environment in which North Penn Legal Services accepted vulnerable clients, appeared as counsel, remained counsel of record, and controlled representation status.

915. Pennsylvania Legal Aid Network, Inc. supported or failed to correct a statewide legal-aid system in which North Penn Legal Services' counsel-of-record status publicly communicated meaningful representation while clients were delayed, neglected, abandoned, denied adequate communication, denied disability-sensitive service, left without lawful withdrawal, or left unable to determine whether they could speak, file, object, seek relief, contact the court, or obtain substitute counsel.

916. Pennsylvania Legal Aid Network, Inc. acted under legally attributable public, funding, and legal-aid authority because its statewide coordination, training, referral, policy, and funding influence shaped which providers received legitimacy, which clients received services, and whether harmed clients could obtain independent correction after the public representation-status message became false.

917. Pennsylvania Legal Aid Network, Inc. caused compelled-speech injury because statewide legal-aid systems preserved North Penn Legal Services' public role without requiring truthful representation-status correction, substitute counsel, independent review, accessible client notice, or a pathway for clients to reject or correct the provider's misleading speech and silence.

918. Legal Services Corporation compelled, supported, reinforced, funded, monitored, regulated, oversaw, ratified, allowed, or failed to correct compelled speech and compelled association by exercising federal funding, monitoring, compliance, oversight, regulatory, policy, and institutional authority over North Penn Legal Services and the federally funded civil legal-aid system in which court-recognized counsel status, legal-aid dependence, public-service delegation, and public funding controlled vulnerable clients' practical ability to speak for themselves.

919. Legal Services Corporation supported or failed to correct a federal legal-aid system in which North Penn Legal Services retained public money, program legitimacy, referrals, authority, and client trust while clients remained publicly associated with misleading representation status, counsel silence, counsel nonaction, uncorrected missed hearings, inaccessible communication, unclear withdrawal status, and lack of meaningful advocacy.

920. Legal Services Corporation acted under legally attributable federal funding, public-service, monitoring, and program authority because the challenged compelled association depended on federally supported legal-aid structures, grantee legitimacy, public funding, and court-recognized counsel status in civil matters where clients could not obtain ordinary market alternatives.

921. Legal Services Corporation caused compelled-speech injury because federal legal-aid oversight and funding systems preserved North Penn Legal Services' public role while failing to require accurate representation-status correction, independent review, substitute counsel, conflict-free repair, accessible notice, or a way for clients to reject the provider's misleading public message.

922. Defendants acted under color of state law, federal law, public funding authority, legal-aid delegation, court-recognized counsel status, professional regulation, court-facing representation rules, state-created attorney monopoly conditions, and publicly supported civil legal-aid structures because the challenged conduct depended on court recognition of counsel, legal-aid funding, public-service delegation, professional authority, and institutional control over access to civil legal representation for indigent and vulnerable clients.

923. Grohol and similarly situated clients did not voluntarily and knowingly consent to remain publicly associated with North Penn Legal Services' counsel-of-record status, silence, nonaction, delay, omissions, case posture, withdrawal failures, or misleading representation status after meaningful representation stopped.

924. Defendants are liable for First Amendment compelled speech because each compelled, caused, supported, funded, monitored, reinforced, ratified, allowed, or

failed to correct compelled expression or compelled association with North Penn Legal Services' counsel-of-record status, speech, silence, nonaction, filings, omissions, withdrawal posture, and case posture; the compelled expression and association occurred through public funding, legal-aid authority, court-recognized counsel status, public-service delegation, professional influence, statewide legal-aid influence, federal legal-aid influence, and institutional control over access to civil legal aid; Grohol and the class lacked voluntary and informed consent; and the compelled expression and association caused legal harm, emotional distress, disability-access harm, privacy harm, financial harm, litigation harm, lost legal opportunities, prolonged uncertainty, and deprivation of meaningful civil legal aid.

925. Grohol and the class are entitled to compensatory damages, punitive damages where available, declaratory relief, injunctive relief, restitution, disgorgement, representation-status review, disability-access review, case-status review, docket review, court-record correction, confidentiality review, privacy review, conflict review, accommodation review, sealing review, trauma-informed client notice, corrective notice, independent review, substitute-counsel relief, costs, fees where available, and all other lawful relief.

**COUNT 12**

**Fraud Against North Penn Legal Services, Inc.; Lori Molloy; Timothy Smith; Heather Kelly; Mary Beth Clark; Pennsylvania Legal Aid Network, Inc.; and Legal Services Corporation**

926. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 66, Fraud Against North Penn Legal Services, Inc.; COA 67, Fraud Against Lori Molloy; COA 68, Fraud Against Timothy Smith; COA 69, Fraud Against Heather Kelly; COA 70, Fraud Against Mary Beth Clark; COA 71, Fraud Against Pennsylvania Legal Aid Network, Inc.; and COA 72, Fraud Against Legal Services Corporation, from the 651-count inventory attached as exhibits.

927. The elements of fraud are a representation or omission, materiality, falsity, knowledge or reckless disregard of falsity, intent that another rely, justifiable reliance, and injury caused by the reliance.

928. North Penn Legal Services, Inc. committed fraud by representing through intake, client acceptance, legal-aid promises, attorney-client undertakings, counsel-of-record status, public legal-aid status, funding status, program communications, confidentiality undertakings, and course of dealing that it would provide competent representation, meaningful advocacy, client communication, case protection, disability-accessible service, supervision, confidentiality, conflict management,

lawful withdrawal, and clear representation status to Grohol and similarly situated legal-aid clients.

929. North Penn Legal Services, Inc. omitted and concealed that Grohol and similarly situated clients were not receiving meaningful advocacy, adequate communication, timely correction, disability-sensitive service, lawful withdrawal, supervision, or representation-status clarity, and those omissions were material because reasonable legal-aid clients would rely on a publicly funded legal-aid provider before disclosing private information, remaining dependent on counsel, refraining from independent filings, and delaying efforts to seek substitute assistance.

930. North Penn Legal Services, Inc. knew or recklessly disregarded the falsity of those representations and omissions because it knew or should have known whether client matters were being handled, whether hearings or deadlines were protected, whether clients received accurate communication, whether clients received reasonable disability modifications, whether counsel-of-record status remained accurate, and whether lawful withdrawal occurred.

931. North Penn Legal Services, Inc. caused Grohol's reliance and injury because Grohol remained dependent on North Penn Legal Services while her civil case remained pending for more than 6 years after the January 15, 2020 replevin

hearing was not properly noticed to her, while North Penn Legal Services remained counsel of record without meaningful advocacy, adequate communication, timely correction, disability-sensitive service, lawful withdrawal, substitute counsel, or a clear path to protect herself.

932. Lori Molloy committed fraud by causing, approving, ratifying, allowing, or failing to correct representations and omissions concerning North Penn Legal Services' competence, diligence, supervision, disability access, confidentiality, client protection, withdrawal practices, funding representations, attorney-client undertakings, and representation-status practices while she exercised executive authority over North Penn Legal Services, its legal-aid operations, attorney supervision, staff supervision, intake supervision, disability-access practices, client-service culture, internal accountability, grievance responses, and institutional response to known legal-service failures.

933. Molloy knew or recklessly disregarded falsity because she knew or should have known that North Penn Legal Services continued to accept public funding, referrals, confidential information, client trust, court recognition, and legal-aid legitimacy while vulnerable clients experienced abandonment, missed hearings, missed deadlines, inaccessible communication, supervision failures, disability-access failures, withdrawal failures, unclear representation status, and lack of meaningful corrective relief.

934. Molloy intended or supported reliance because executive leadership allowed North Penn Legal Services to continue presenting itself as a functioning legal-aid provider, accepting clients, retaining counsel-of-record status, retaining referrals, and retaining funding while failing to disclose that clients harmed by its failures lacked meaningful internal repair, independent review, substitute counsel, or client-protective correction.

935. Molloy caused fraud injury because executive noncorrection allowed Grohol and similarly situated clients to keep relying on a provider whose public legal-aid status, court role, funding status, and organizational authority created the appearance of meaningful representation while actual representation had failed.

936. Timothy Smith committed fraud by causing, approving, ratifying, allowing, or failing to correct representations and omissions concerning North Penn Legal Services' competence, diligence, supervision, disability access, client communication, case protection, withdrawal practices, funding representations, attorney-client undertakings, and representation-status practices while he exercised senior management authority over attorney supervision, case-management systems, client communication, attorney assignments, corrective action, grievance responses, funding compliance, and response to known case-management breakdowns.

937. Smith knew or recklessly disregarded falsity because he had notice that North Penn Legal Services' public legal-aid representations contradicted its actual client-service practices, failed to correct known legal-aid failures, and worsened Grohol's harm when he told her that North Penn Legal Services was not working on the case for her while North Penn Legal Services remained counsel of record.

938. Smith made the omission material when he pressured Grohol to proceed pro se and warned her that her case could be dismissed for lack of prosecution if she did not represent herself, because those statements disclosed that North Penn Legal Services was not providing meaningful representation while the docket, public legal-aid status, and institutional posture still communicated that North Penn Legal Services remained responsible counsel.

939. Smith caused fraud injury because Grohol and similarly situated clients relied on North Penn Legal Services' representation status, public legal-aid role, and management-controlled communications while lacking the information, disability-sensitive explanation, substitute counsel, and corrective pathway needed to protect themselves after the representation became false or misleading.

940. Heather Kelly committed fraud by supporting, reinforcing, ratifying, allowing, or failing to oppose representations and omissions concerning North Penn Legal Services' competence, diligence, supervision, disability access,

confidentiality, client protection, withdrawal practices, counsel-of-record status, legal-aid promises, and representation-status practices while she exercised professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, attorney-accountability environment, disability-access environment, confidentiality environment, conflict environment, supervision failures, and malpractice-response dynamics.

941. Kelly knew or recklessly disregarded falsity because she knew or should have known that North Penn Legal Services continued to hold itself out as a competent, supervised, accessible, confidential, conflict-free, client-protective, and meaningful legal-aid provider while vulnerable clients were delayed, neglected, abandoned, blamed, mocked, shamed, berated, denied reasonable modification, denied communication, or left unable to determine whether counsel was acting for them.

942. Kelly intended or supported reliance by allowing the surrounding professional environment to preserve North Penn Legal Services' reputation, provider legitimacy, referrals, and client trust while harmed clients lacked truthful notice, independent review, substitute counsel, disability-sensitive repair, or a practical way to discover and correct the provider's misrepresentations.

943. Kelly caused fraud injury because professional silence and institutional reinforcement allowed Grohol and similarly situated clients to continue relying on a legal-aid ecosystem that appeared to provide accountability while actually protecting provider status over client repair.

944. Mary Beth Clark committed fraud by supporting, reinforcing, ratifying, allowing, or failing to oppose representations and omissions concerning North Penn Legal Services' competence, diligence, supervision, disability access, confidentiality, client protection, withdrawal practices, counsel-of-record status, legal-aid promises, and representation-status practices while she exercised professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, local professional culture, attorney-accountability environment, disability-access environment, confidentiality environment, conflict environment, supervision failures, and malpractice-response dynamics.

945. Clark knew or recklessly disregarded falsity because she knew or should have known that North Penn Legal Services' public legal-aid representations were false or misleading when clients who depended on it for property, housing, safety, family stability, income, benefits, disability rights, debt, and basic civil rights were left in delayed, neglected, abandoned, unresolved, inaccessible, hostile, or unclear representation-status conditions while the organization retained public funding and institutional legitimacy.

946. Clark intended or supported reliance by reinforcing or failing to oppose local professional practices that made North Penn Legal Services appear competent, accountable, and available while harmed clients lacked meaningful independent assistance, substitute counsel, conflict-free advice, file review, privacy-protective correction, or disability-sensitive communication.

947. Clark caused fraud injury because local legal-aid and bar-connected structures helped maintain clients' reliance on North Penn Legal Services' public status and professional reputation even after the provider's omissions concealed abandonment, missed hearings, representation-status confusion, and lack of repair.

948. Pennsylvania Legal Aid Network, Inc. committed fraud by supporting, reinforcing, funding, coordinating, ratifying, allowing, or failing to correct representations and omissions concerning North Penn Legal Services' competence, diligence, supervision, disability access, confidentiality, conflict management, client protection, withdrawal practices, funding representations, public legal-aid promises, and representation-status practices while it exercised statewide funding, referral, training, coordination, policy, oversight, programmatic, and institutional influence over Pennsylvania's civil legal-aid system.

949. Pennsylvania Legal Aid Network, Inc. knew or recklessly disregarded falsity because it knew or should have known that statewide legal-aid funding, referrals,

training, coordination, program legitimacy, and public representations should not preserve a provider that concealed or failed to correct systemic client neglect, abandoned matters, missed hearings, missed deadlines, disability-access failures, inadequate supervision, hostile communication, unclear representation status, and lack of client-protective remedies.

950. Pennsylvania Legal Aid Network, Inc. intended or supported reliance by maintaining statewide legal-aid structures in which clients, courts, referral sources, funders, and communities understood North Penn Legal Services as a competent and meaningful provider even when harmed clients lacked independent review, substitute counsel, corrective notice, disability-access repair, or a way to redirect public legal-aid resources to another provider.

951. Pennsylvania Legal Aid Network, Inc. caused fraud injury because its statewide coordination and funding environment allowed Grohol and similarly situated clients to rely on North Penn Legal Services' legal-aid status and program legitimacy while undisclosed failures left them without meaningful representation, truthful case-status information, or effective repair.

952. Legal Services Corporation committed fraud by supporting, reinforcing, funding, monitoring, regulating, overseeing, ratifying, allowing, or failing to correct representations and omissions concerning North Penn Legal Services'

competence, diligence, supervision, disability access, confidentiality, conflict management, client protection, withdrawal practices, federal funding representations, public legal-aid promises, and representation-status practices while it exercised federal funding, monitoring, compliance, oversight, regulatory, policy, and institutional authority over North Penn Legal Services and the federally funded civil legal-aid system.

953. Legal Services Corporation knew or recklessly disregarded falsity because it knew or should have known that federal legal-aid funding, monitoring, compliance, oversight, and program legitimacy were material to North Penn Legal Services' ability to retain money, referrals, authority, and client trust while vulnerable clients lacked meaningful advocacy, accurate communication, disability-sensitive service, lawful withdrawal, supervision, conflict protection, corrective notice, substitute counsel, and practical remedies.

954. Legal Services Corporation intended or supported reliance by allowing federal funding and program legitimacy to communicate that North Penn Legal Services delivered meaningful civil legal assistance while the system failed to disclose or correct abandonment, missed hearings, supervision failures, disability-access failures, unclear representation status, and lack of independent repair.

955. Legal Services Corporation caused fraud injury because federally supported legal-aid authority induced Grohol and similarly situated clients to trust a provider system that retained public legitimacy while failing to provide conflict-free substitute counsel, independent review, corrective notice, file review, court-record correction, or a meaningful repair mechanism when the funded provider itself caused the harm.

956. Grohol and similarly situated clients justifiably relied on Defendants' representations and omissions because North Penn Legal Services held itself out as a legal-aid provider, accepted or undertook legal-service duties, controlled representation status, controlled case information, remained counsel of record, operated within a publicly funded legal-aid system, and served clients who lacked practical access to substitute counsel or the ability to detect whether counsel-of-record status masked functional abandonment.

957. Defendants are liable for fraud because each made, caused, approved, ratified, supported, funded, monitored, reinforced, allowed, or failed to correct material representations or omissions; the representations or omissions were false or misleading; each defendant knew, recklessly disregarded, or deliberately ignored the falsity; each intended or supported client reliance; Grohol and the class justifiably relied; and that reliance caused fraud harm, litigation injury, lost legal opportunities, emotional distress, privacy exposure, disability-access harm,

financial harm, prolonged uncertainty, loss of trust, case-status uncertainty, costs of correction, and deprivation of meaningful civil legal aid.

958. Grohol and the class are entitled to compensatory damages, punitive damages where available, restitution, disgorgement, declaratory relief, injunctive relief, fraud review, funding-accountability review, client-service review, supervision review, disability-access review, case-status review, representation-status review, docket review, court-record correction, confidentiality review, privacy review, conflict review, accommodation review, sealing review, trauma-informed client notice, corrective notice, independent review, substitute-counsel relief, costs, fees where available, and all other lawful relief.

**COUNT 13-Vertical Restraint Against North Penn Legal Services, Inc.; Lori Molloy; Timothy Smith; Heather Kelly; Mary Beth Clark; Pennsylvania Legal Aid Network, Inc.; and Legal Services Corporation**

959. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 73, Sherman Act § 1 Vertical Restraint Against North Penn Legal Services, Inc.; COA 74, Sherman Act § 1 Vertical Restraint Against Lori Molloy; COA 75, Sherman Act § 1 Vertical Restraint Against Timothy Smith; COA 76, Sherman Act § 1 Vertical Restraint Against

Heather Kelly; COA 77, Sherman Act § 1 Vertical Restraint Against Mary Beth Clark; COA 78, Sherman Act § 1 Vertical Restraint Against Pennsylvania Legal Aid Network, Inc.; and COA 79, Sherman Act § 1 Vertical Restraint Against Legal Services Corporation, from the 651-count inventory attached as exhibits.

960. The elements of a Sherman Act § 1 vertical-restraint claim are an agreement or concerted action between entities at different levels of a market structure, an unreasonable restraint of trade, antitrust injury, and damages or entitlement to injunctive relief.

961. North Penn Legal Services, Inc. participated in a vertical legal-aid structure involving federal funding, state funding, statewide coordination, referrals, eligibility screening, intake control, case placement, grant conditions, monitoring, training, oversight, legal-aid branding, court-facing counsel-of-record status, and client dependence.

962. North Penn Legal Services, Inc. used that vertical structure to retain clients, funding, referrals, public legitimacy, counsel-of-record authority, and institutional protection while legal-aid clients lacked meaningful ability to select alternative providers, redirect public legal-aid resources, challenge deficient representation, replace counsel, obtain independent review, or secure corrective legal assistance from a competing or independent provider.

963. North Penn Legal Services, Inc. unreasonably restrained legal-aid output by accepting or retaining matters without providing meaningful advocacy, adequate communication, disability-sensitive service, timely correction, lawful withdrawal, or clear representation-status information.

964. North Penn Legal Services, Inc. restrained trade and caused antitrust injury to Grohol because her civil case remained pending for more than 6 years after the January 15, 2020 replevin hearing was not properly noticed to her while North Penn Legal Services remained counsel of record without meaningful advocacy, adequate communication, timely correction, disability-sensitive service, substitute counsel, lawful withdrawal, or a clear path to corrective assistance.

965. Lori Molloy participated in and reinforced the vertical restraint by exercising executive authority over North Penn Legal Services' legal-aid operations, public funding representations, grant compliance, attorney supervision, staff supervision, intake supervision, disability-access practices, withdrawal practices, communication systems, referral relationships, client-protection systems, and institutional response to known legal-service failures.

966. Molloy preserved North Penn Legal Services' place in the vertical legal-aid structure by allowing the organization to retain public funding, referrals, court recognition, legal-aid legitimacy, client trust, and program authority while clients

received reduced legal-service output, reduced service quality, inaccessible communication, delayed matters, abandoned files, unclear representation status, and no meaningful path to independent substitute counsel.

967. Molloy restrained trade because executive control over a dominant legal-aid provider gave her practical power to maintain provider status and referral flow while clients could not act as ordinary consumers, could not move public legal-aid funds to a different provider, could not easily obtain alternate representation, and could not obtain meaningful market correction after North Penn Legal Services failed them.

968. Molloy caused antitrust injury because her executive noncorrection allowed North Penn Legal Services to preserve institutional position, funding, and referrals while reducing actual civil legal services available to Grohol and similarly situated clients.

969. Timothy Smith participated in and reinforced the vertical restraint by exercising senior management authority over attorney supervision, case-management systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, and response to missed hearings, missed deadlines, failures to notify clients, failures to prepare, failures to

communicate, abandoned files, unclear representation status, and case-management breakdowns.

970. Smith restrained legal-aid output and client choice when he failed to correct known legal-aid failures and then told Grohol that North Penn Legal Services was not working on the case for her while North Penn Legal Services remained counsel of record.

971. Smith further restrained client choice when he pressured Grohol to proceed pro se, warned her that her case could be dismissed for lack of prosecution if she did not represent herself, and left her publicly tied to North Penn Legal Services' counsel-of-record status while forcing her to repair the provider's failure without substitute counsel or independent legal-aid review.

972. Smith caused antitrust injury because his conduct preserved the appearance of legal-aid service while reducing actual legal-service output, substitute-counsel access, representation-status clarity, independent review, and corrective legal assistance.

973. Heather Kelly participated in, supported, reinforced, ratified, allowed, or failed to oppose the vertical restraint by exercising professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, attorney-accountability environment, disability-access environment, confidentiality

environment, conflict environment, supervision failures, malpractice-response dynamics, and institutional response to known legal-service failures.

974. Kelly restrained accountability and corrective competition because professional influence around the legal-aid ecosystem helped preserve North Penn Legal Services' reputation, referral position, provider status, and institutional legitimacy while clients remained delayed, neglected, abandoned, misled, blamed, mocked, shamed, berated, denied disability-sensitive service, or left unable to determine whether they were represented or abandoned.

975. Kelly's conduct helped prevent market correction because harmed clients could not meaningfully exit the provider relationship, obtain independent review, obtain competing legal-aid services, or secure corrective representation from the same professional ecosystem that protected North Penn Legal Services' status.

976. Kelly caused antitrust injury by helping maintain a professional environment in which a dominant legal-aid provider could retain clients, files, referrals, funding, and status despite reduced output, reduced quality, reduced disability-accessible service, reduced substitute-counsel access, reduced independent review, and reduced attorney accountability.

977. Mary Beth Clark participated in, supported, reinforced, ratified, allowed, or failed to oppose the vertical restraint by exercising professional influence within,

around, or through North Penn Legal Services' legal-aid ecosystem, local professional culture, attorney-accountability environment, disability-access environment, confidentiality environment, conflict environment, supervision failures, malpractice-response dynamics, and institutional response to known legal-service failures.

978. Clark restrained trade because her conduct helped preserve professional relationships, institutional reputation, funding channels, referrals, authority, and provider status while vulnerable legal-aid clients remained dependent on North Penn Legal Services in matters requiring competence, diligence, communication, disability access, confidentiality, conflict protection, proper supervision, lawful withdrawal, and corrective assistance.

979. Clark's conduct restrained client choice because harmed clients could not meaningfully obtain independent assistance, redirect public legal-aid resources, secure comparable substitute counsel, or use ordinary market pressure to force accountability after legal-service output and quality collapsed.

980. Clark caused antitrust injury by reinforcing a local legal-aid environment in which clients remained trapped in a provider structure that preserved institutional status while reducing actual civil legal-aid services and practical access to corrective assistance.

981. Pennsylvania Legal Aid Network, Inc. participated in and reinforced the vertical restraint by exercising statewide funding, referral, training, coordination, policy, oversight, programmatic, and institutional influence over Pennsylvania's civil legal-aid system and over the legal-aid environment in which North Penn Legal Services accepted vulnerable clients and legal-service responsibility.

982. Pennsylvania Legal Aid Network, Inc. restrained trade by helping maintain a statewide structure in which legal-aid funding, referrals, training, institutional recognition, provider legitimacy, and client routing remained tied to incumbent providers while harmed clients lacked meaningful ability to move public resources, obtain independent substitute counsel, secure corrective representation, or obtain market-based accountability.

983. Pennsylvania Legal Aid Network, Inc. restrained legal-aid output and quality by allowing statewide legal-aid structures to preserve provider status without requiring meaningful advocacy, disability-accessible service, supervision, truthful representation status, corrective notice, independent file review, or substitute counsel after known or knowable legal-service failures.

984. Pennsylvania Legal Aid Network, Inc. caused antitrust injury because its statewide role preserved North Penn Legal Services' provider position while clients received reduced legal-aid output, reduced legal-aid quality, reduced disability-

accessible service, reduced client choice, reduced substitute-counsel access, reduced independent review, and reduced attorney accountability.

985. Legal Services Corporation participated in and reinforced the vertical restraint by exercising federal funding, monitoring, compliance, oversight, regulatory, policy, and institutional authority over North Penn Legal Services and the federally funded civil legal-aid system in which North Penn Legal Services retained clients, referrals, public legitimacy, program authority, and funding.

986. Legal Services Corporation restrained trade by allowing federal legal-aid funding, monitoring, compliance, and program legitimacy to preserve a provider that continued receiving money, referrals, authority, and client trust despite missed hearings, abandoned matters, disability-access failures, supervision failures, unclear representation status, inadequate communication, and lack of meaningful client repair.

987. Legal Services Corporation restrained client choice and substitute-counsel access because federal legal-aid structures did not allow harmed clients to redirect federally supported resources, obtain conflict-free replacement counsel, obtain independent provider review, or obtain corrective legal assistance when the federally funded provider itself caused the harm.

988. Legal Services Corporation caused antitrust injury because federal legal-aid authority and funding structures preserved deficient provider control while low-income clients lacked realistic access to competing legal services, replacement counsel, conflict-free substitute counsel, independent review, corrective legal aid, or a practical mechanism to shift federally supported legal-aid resources away from the failing provider.

989. Defendants' vertical restraint was unreasonable because it harmed low-income and vulnerable legal-aid clients, reduced actual civil legal services, reduced service quality, reduced client choice, reduced disability-accessible service, reduced substitute-counsel access, reduced independent review, reduced corrective legal assistance, reduced attorney accountability, preserved deficient provider control, and protected institutional funding, referrals, reputation, and authority instead of client access to meaningful legal help.

990. Defendants caused antitrust injury to Grohol and similarly situated clients because the vertical legal-aid structure preserved North Penn Legal Services' provider position, counsel-of-record authority, public funding, referrals, and client control while reducing legal-service output, legal-service quality, client choice, substitute-counsel access, disability-accessible service, independent review, corrective legal assistance, and attorney accountability in civil legal-aid matters

involving property, housing, family stability, safety, income, disability, benefits, debt, and basic civil rights.

991. Defendants are liable for a Sherman Act § 1 vertical restraint because each participated in, caused, supported, funded, monitored, reinforced, ratified, allowed, or failed to correct an agreement or concerted structure among funders, coordinators, referral sources, monitoring entities, courts, and providers at different levels of the legal-aid market; the structure unreasonably restrained trade by preserving provider control while reducing output, quality, choice, substitute-counsel access, independent review, disability-accessible services, corrective assistance, and accountability; Grohol and the class suffered antitrust injury; and that injury caused damages and entitlement to injunctive relief.

992. Grohol and the class are entitled to treble damages, compensatory damages, declaratory relief, injunctive relief, restitution, disgorgement where available, antitrust review, funding-accountability review, referral review, client-service review, supervision review, disability-access review, case-status review, representation-status review, docket review, court-record correction, confidentiality review, privacy review, conflict review, accommodation review, sealing review, trauma-informed client notice, corrective notice, independent review, substitute-counsel relief, costs, attorney’s fees, and all other lawful relief.

**COUNT 14**

**Sherman Act § 2 Monopolization and Attempted Monopolization Against North Penn Legal Services, Inc.; Lori Molloy; Timothy Smith; Heather Kelly; Mary Beth Clark; Pennsylvania Legal Aid Network, Inc.; and Legal Services Corporation**

993. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 80, Sherman Act § 2 Monopolization and Attempted Monopolization Against North Penn Legal Services, Inc.; COA 81, Sherman Act § 2 Monopolization and Attempted Monopolization Against Lori Molloy; COA 82, Sherman Act § 2 Monopolization and Attempted Monopolization Against Timothy Smith; COA 83, Sherman Act § 2 Monopolization and Attempted Monopolization Against Heather Kelly; COA 84, Sherman Act § 2 Monopolization and Attempted Monopolization Against Mary Beth Clark; COA 85, Sherman Act § 2 Monopolization and Attempted Monopolization Against Pennsylvania Legal Aid Network, Inc.; and COA 86, Sherman Act § 2 Monopolization and Attempted Monopolization Against Legal Services Corporation, from the 651-count inventory attached as exhibits.

994. The elements of Sherman Act § 2 monopolization are monopoly power in a relevant market, willful acquisition or maintenance of that power through exclusionary or anticompetitive conduct rather than growth from superior product, business acumen, or historic accident, antitrust injury, and damages or entitlement to injunctive relief, and the elements of Sherman Act § 2 attempted monopolization are anticompetitive or exclusionary conduct, specific intent to monopolize, dangerous probability of achieving monopoly power in a relevant market, antitrust injury, and damages or entitlement to injunctive relief.

995. North Penn Legal Services, Inc. possessed monopoly power or a dangerous probability of monopoly power in the publicly funded civil legal-aid market serving low-income, disabled, vulnerable, housing-insecure, and otherwise dependent clients within its service area because eligible clients often cannot hire private counsel, cannot meaningfully select among competing funded providers, cannot redirect public legal-aid resources, and cannot force a provider to deliver meaningful services after representation begins.

996. North Penn Legal Services, Inc. willfully acquired, maintained, or attempted to maintain monopoly power through funding control, referral control, intake control, eligibility control, case control, counsel-of-record status, legal-aid branding, client lock-in, suppression of accountability, and preservation of public legitimacy while reducing actual legal-service output, service quality, client choice,

substitute-counsel access, disability-accessible service, independent review, corrective assistance, and attorney accountability.

997. North Penn Legal Services, Inc. engaged in exclusionary and anticompetitive conduct by accepting or retaining legal-aid matters while failing to provide meaningful advocacy, adequate communication, disability-sensitive service, timely correction, lawful withdrawal, truthful representation-status information, substitute-counsel access, independent review, or corrective legal assistance.

998. North Penn Legal Services, Inc. caused antitrust injury to Grohol because her civil matter remained pending for more than 6 years after the January 15, 2020 replevin hearing was not properly noticed to her while North Penn Legal Services remained counsel of record without meaningful advocacy, adequate communication, timely correction, disability-sensitive service, lawful withdrawal, substitute counsel, independent review, or a clear path to corrective assistance.

999. Lori Molloy possessed, exercised, maintained, or attempted to maintain monopoly power through her executive authority over North Penn Legal Services' legal-aid operations, funding representations, referral relationships, intake systems, attorney supervision, staff supervision, disability-access practices, withdrawal

practices, communication systems, client-protection systems, and institutional response to known legal-service failures.

1000. Molloy willfully maintained or attempted to maintain monopoly power by allowing North Penn Legal Services to retain public funding, referrals, court recognition, legal-aid legitimacy, client trust, provider status, and program authority while clients received reduced legal-service output, reduced service quality, inaccessible communication, delayed matters, abandoned files, unclear representation status, and no meaningful path to independent substitute counsel.

1001. Molloy engaged in exclusionary and anticompetitive conduct because executive control over a dominant legal-aid provider allowed her to preserve provider status and referral flow while clients could not act as ordinary consumers, could not move public legal-aid funds to a different provider, could not easily obtain alternate representation, and could not obtain meaningful market correction after North Penn Legal Services failed them.

1002. Molloy caused antitrust injury because her executive noncorrection preserved North Penn Legal Services' institutional position, funding, referrals, and client control while reducing actual civil legal services available to Grohol and similarly situated clients.

1003. Timothy Smith possessed, exercised, maintained, or attempted to maintain monopoly power through his senior management authority over North Penn Legal Services' attorney supervision, case-management systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, representation-status practices, withdrawal practices, and response to missed hearings, missed deadlines, failures to notify clients, failures to prepare, failures to communicate, abandoned files, unclear representation status, and case-management breakdowns.

1004. Smith willfully maintained or attempted to maintain monopoly power by failing to correct known legal-aid failures and then telling Grohol that North Penn Legal Services was not working on the case for her while North Penn Legal Services remained counsel of record, thereby preserving the appearance of representation while reducing actual legal-service output.

1005. Smith engaged in exclusionary and anticompetitive conduct by pressuring Grohol to proceed pro se, warning her that her case could be dismissed for lack of prosecution if she did not represent herself, and leaving her publicly tied to North Penn Legal Services' counsel-of-record status while forcing her to repair the provider's failure without substitute counsel, independent legal-aid review, or access to another publicly funded provider.

1006. Smith caused antitrust injury because his senior-management conduct reduced actual legal-service output, substitute-counsel access, representation-status clarity, independent review, corrective legal assistance, and client choice while preserving North Penn Legal Services' legal-aid status and control.

1007. Heather Kelly possessed, exercised, maintained, supported, or attempted to maintain monopoly power by exercising professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, attorney-accountability environment, disability-access environment, confidentiality environment, conflict environment, supervision-failure environment, malpractice-response dynamics, and institutional response to known legal-service failures.

1008. Kelly supported willful maintenance or attempted maintenance of monopoly power by reinforcing, ratifying, allowing, or failing to oppose a professional environment that preserved North Penn Legal Services' reputation, referral position, provider status, institutional legitimacy, and client dependence while clients remained delayed, neglected, abandoned, misled, blamed, mocked, shamed, berated, denied disability-sensitive service, or left unable to determine whether they were represented or abandoned.

1009. Kelly engaged in exclusionary and anticompetitive conduct by helping prevent market correction, independent review, competing legal-aid access,

substitute counsel, attorney accountability, and corrective representation within the professional ecosystem that protected North Penn Legal Services' status.

1010. Kelly caused antitrust injury by helping maintain a professional environment in which a dominant legal-aid provider could retain clients, files, referrals, funding, and status despite reduced output, reduced quality, reduced disability-accessible service, reduced substitute-counsel access, reduced independent review, and reduced attorney accountability.

1011. Mary Beth Clark possessed, exercised, maintained, supported, or attempted to maintain monopoly power by exercising professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, local professional culture, attorney-accountability environment, disability-access environment, confidentiality environment, conflict environment, supervision-failure environment, malpractice-response dynamics, and institutional response to known legal-service failures.

1012. Clark supported willful maintenance or attempted maintenance of monopoly power by reinforcing, ratifying, allowing, or failing to oppose legal-aid and bar-connected structures that preserved professional relationships, institutional reputation, funding channels, referrals, authority, provider status, and client dependence while vulnerable clients lacked meaningful access to substitute

counsel, independent review, disability-sensitive service, and corrective legal assistance.

1013. Clark engaged in exclusionary and anticompetitive conduct by helping preserve a local professional structure in which harmed clients could not meaningfully exit, could not redirect public legal-aid resources, could not obtain comparable substitute counsel, and could not use ordinary market pressure to force accountability after legal-service output and quality collapsed.

1014. Clark caused antitrust injury by reinforcing a local legal-aid environment in which clients remained trapped in a provider structure that preserved institutional status while reducing actual civil legal-aid services, client choice, disability-accessible service, substitute-counsel access, and practical access to corrective assistance.

1015. Pennsylvania Legal Aid Network, Inc. possessed, exercised, maintained, supported, or attempted to maintain monopoly power by exercising statewide funding, referral, training, coordination, policy, oversight, programmatic, and institutional influence over Pennsylvania's civil legal-aid system and the legal-aid environment in which North Penn Legal Services accepted vulnerable clients and legal-service responsibility.

1016. Pennsylvania Legal Aid Network, Inc. supported willful maintenance or attempted maintenance of monopoly power by helping maintain a statewide structure in which legal-aid funding, referrals, training, institutional recognition, provider legitimacy, and client routing remained tied to incumbent providers while harmed clients lacked meaningful ability to move public resources, obtain independent substitute counsel, secure corrective representation, or obtain market-based accountability.

1017. Pennsylvania Legal Aid Network, Inc. engaged in exclusionary and anticompetitive conduct by allowing statewide legal-aid structures to preserve provider status without requiring meaningful advocacy, disability-accessible service, supervision, truthful representation status, corrective notice, independent file review, substitute counsel, or provider replacement after known or knowable legal-service failures.

1018. Pennsylvania Legal Aid Network, Inc. caused antitrust injury because its statewide role preserved North Penn Legal Services' provider position while clients received reduced legal-aid output, reduced legal-aid quality, reduced disability-accessible service, reduced client choice, reduced substitute-counsel access, reduced independent review, and reduced attorney accountability.

1019. Legal Services Corporation possessed, exercised, maintained, supported, or attempted to maintain monopoly power by exercising federal funding, monitoring, compliance, oversight, regulatory, policy, and institutional authority over North Penn Legal Services and the federally funded civil legal-aid system in which North Penn Legal Services retained clients, referrals, public legitimacy, program authority, and funding.

1020. Legal Services Corporation supported willful maintenance or attempted maintenance of monopoly power by allowing federal legal-aid funding, monitoring, compliance, and program legitimacy to preserve a provider that continued receiving money, referrals, authority, and client trust despite missed hearings, abandoned matters, disability-access failures, supervision failures, unclear representation status, inadequate communication, and lack of meaningful client repair.

1021. Legal Services Corporation engaged in exclusionary and anticompetitive conduct by preserving federal funding and program legitimacy without ensuring that harmed clients could redirect federally supported resources, obtain conflict-free replacement counsel, obtain independent provider review, or obtain corrective legal assistance when the federally funded provider itself caused the harm.

1022. Legal Services Corporation caused antitrust injury because federal legal-aid authority and funding structures preserved deficient provider control while low-income clients lacked realistic access to competing legal services, replacement counsel, conflict-free substitute counsel, independent review, corrective legal aid, or a practical mechanism to shift federally supported legal-aid resources away from the failing provider.

1023. Defendants caused antitrust injury to Grohol and similarly situated clients because monopolization and attempted monopolization preserved North Penn Legal Services' provider position, counsel-of-record authority, public funding, referrals, and client control while reducing legal-service output, legal-service quality, client choice, substitute-counsel access, disability-accessible service, independent review, corrective legal assistance, and attorney accountability in civil legal-aid matters involving property, housing, family stability, safety, income, disability, benefits, debt, and basic civil rights.

1024. Defendants are liable for Sherman Act § 2 monopolization and attempted monopolization because each possessed, exercised, maintained, supported, funded, monitored, reinforced, ratified, allowed, or failed to correct monopoly power or a dangerous probability of monopoly power in the publicly funded civil legal-aid market; each engaged in exclusionary or anticompetitive conduct to preserve provider dominance and reduce output, quality, choice, substitute-counsel access,

independent review, disability-accessible services, corrective assistance, and accountability; each specifically intended to preserve or support provider dominance where required; and Grohol and the class suffered antitrust injury, damages, and entitlement to injunctive relief.

1025. Grohol and the class are entitled to treble damages, compensatory damages, declaratory relief, injunctive relief, restitution, disgorgement where available, antitrust review, market-access review, funding-accountability review, referral review, client-service review, supervision review, disability-access review, case-status review, representation-status review, docket review, court-record correction, confidentiality review, privacy review, conflict review, accommodation review, sealing review, trauma-informed client notice, corrective notice, independent review, substitute-counsel relief, costs, attorney's fees, and all other lawful relief.

**COUNT 15**

**Due Process Against North Penn Legal Services, Inc.; Lori Molloy; Timothy Smith; Heather Kelly; Mary Beth Clark; Pennsylvania Legal Aid Network, Inc.; and Legal Services Corporation**

1026. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 87, Due Process Against North Penn Legal Services, Inc.; COA 88, Due Process Against Lori Molloy; COA 89, Due Process

Against Timothy Smith; COA 90, Due Process Against Heather Kelly; COA 91, Due Process Against Mary Beth Clark; COA 92, Due Process Against Pennsylvania Legal Aid Network, Inc.; and COA 93, Due Process Against Legal Services Corporation, from the 651-count inventory attached as exhibits.

1027. The elements of a due-process claim are a protected liberty or property interest, state action or action under color of law, deprivation of that interest, and lack of constitutionally adequate notice or opportunity to be heard.

1028. North Penn Legal Services, Inc. acted under color of law or performed publicly funded, government-supported, federally supported, court-facing, or government-integrated legal-aid functions when it accepted clients, appeared in court, received notices, remained counsel of record, controlled representation status, and handled civil legal matters for low-income, disabled, vulnerable, housing-insecure, and otherwise dependent clients.

1029. North Penn Legal Services, Inc. deprived Grohol and similarly situated clients of protected property, housing, legal-claim, benefit, privacy, disability-access, representation-status, and civil-litigation interests by accepting or retaining matters while failing to provide meaningful notice, hearing protection, deadline protection, case correction, accurate communication, representation-status clarity,

disability-sensitive service, lawful withdrawal, substitute-counsel access, and corrective legal assistance.

1030. North Penn Legal Services, Inc. deprived Grohol of meaningful notice and opportunity to be heard because the January 15, 2020 replevin hearing was not properly noticed to her, her civil case remained pending for more than 6 years after that missed-notice hearing, and North Penn Legal Services remained counsel of record without meaningful advocacy, adequate communication, timely correction, disability-sensitive service, or timely withdrawal.

1031. North Penn Legal Services, Inc. deprived disabled clients of accessible process because it failed to provide reasonable modification, disability-sensitive communication, patience, clear explanation, accessible case handling, non-hostile client service, and corrective assistance when disability-related communication and functioning problems required accommodation rather than blame, ridicule, hostility, or shame.

1032. Lori Molloy acted under color of law or performed, directed, supervised, approved, ratified, or allowed publicly funded, government-supported, federally supported, court-facing, or government-integrated legal-aid functions through her executive authority over North Penn Legal Services' legal-aid operations, management structure, funding representations, attorney supervision, staff

supervision, intake supervision, disability-access practices, withdrawal practices, grievance responses, client-protection practices, and institutional response to known legal-service failures.

1033. Molloy deprived Grohol and the class of protected interests by causing or allowing North Penn Legal Services to accept or retain matters while failing to provide meaningful notice, hearing protection, deadline protection, case correction, accurate communication, representation-status clarity, disability-sensitive service, lawful withdrawal, substitute-counsel access, and corrective legal assistance.

1034. Molloy deprived Grohol of meaningful notice and opportunity to be heard because she caused or allowed North Penn Legal Services not to timely correct the consequences of the January 15, 2020 missed-notice replevin hearing and not to provide clear notice of what happened, what correction was needed, whether North Penn Legal Services would correct the problem, whether Grohol needed substitute counsel, and whether Grohol needed direct court relief.

1035. Molloy deprived disabled clients of accessible process because she failed to ensure reasonable modification, disability-sensitive communication, patience, clear explanation, accessible case handling, and non-hostile client service, while allowing client disability-related anxiety, trouble communicating, and difficulty functioning to be met with blame, ridicule, hostility, and shame.

1036. Timothy Smith acted under color of law or performed, directed, supervised, approved, ratified, or allowed publicly funded, government-supported, federally supported, court-facing, or government-integrated legal-aid functions through his senior management authority over attorney supervision, case-management systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, representation-status practices, withdrawal practices, and response to known missed hearings, missed deadlines, failures to notify clients, failures to prepare, failures to communicate, abandoned files, unclear representation status, and case-management breakdowns.

1037. Smith deprived Grohol and the class of protected interests by causing or allowing North Penn Legal Services to control case information, control representation status, remain counsel of record, fail to protect hearings, fail to correct missed proceedings, fail to communicate accurately, fail to provide disability-sensitive service, fail to withdraw lawfully, and fail to provide clear notice that clients needed substitute counsel or direct court relief.

1038. Smith deprived Grohol of meaningful notice and opportunity to be heard because he told her that North Penn Legal Services was not working on the case for her, pressured her to proceed pro se, warned her that her case could be dismissed for lack of prosecution if she did not represent herself, and left her

publicly tied to North Penn Legal Services' counsel-of-record status while she lacked meaningful advocacy and clear representation-status information.

1039. Smith deprived disabled clients of accessible process because he failed to ensure that North Penn Legal Services provided reasonable modification, disability-sensitive communication, patience, clear explanation, accessible case handling, non-hostile client service, substitute-counsel access, and corrective legal assistance after legal-aid representation stopped functioning as meaningful representation.

1040. Heather Kelly acted under color of law or performed, supported, reinforced, ratified, allowed, or failed to oppose publicly funded, government-supported, federally supported, court-facing, or government-integrated legal-aid functions through professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, attorney-accountability environment, disability-access environment, confidentiality environment, privacy practices, conflict systems, withdrawal practices, client-protection failures, supervision failures, malpractice-response dynamics, and institutional response to known legal-service failures.

1041. Kelly deprived Grohol and the class of protected interests by supporting, reinforcing, ratifying, allowing, or failing to oppose North Penn Legal Services'

acceptance or retention of legal matters while clients lacked meaningful notice, hearing protection, accurate communication, representation-status clarity, lawful withdrawal, disability-sensitive service, substitute-counsel access, and corrective assistance.

1042. Kelly deprived Grohol of meaningful notice and opportunity to be heard by supporting or allowing a legal-aid environment in which North Penn Legal Services remained counsel of record after the January 15, 2020 missed-notice replevin hearing while failing to provide meaningful advocacy, adequate communication, timely correction, disability-sensitive service, or timely withdrawal.

1043. Kelly deprived disabled clients of accessible process by allowing, reinforcing, ratifying, or failing to oppose a professional environment in which disabled and vulnerable clients were blamed, mocked, shamed, berated, ignored, abandoned, dismissed, or denied accommodation while they depended on a publicly funded legal-aid provider for access to civil legal process.

1044. Mary Beth Clark acted under color of law or performed, supported, reinforced, ratified, allowed, or failed to oppose publicly funded, government-supported, federally supported, court-facing, or government-integrated legal-aid functions through professional influence within, around, or through North Penn

Legal Services' legal-aid ecosystem, local professional culture, attorney-accountability environment, disability-access environment, confidentiality environment, privacy practices, conflict systems, withdrawal practices, client-protection failures, supervision failures, malpractice-response dynamics, and institutional response to known legal-service failures.

1045. Clark deprived Grohol and the class of protected interests by supporting, reinforcing, ratifying, allowing, or failing to oppose legal-aid practices that left clients unable to determine whether they were represented, abandoned, self-represented, expected to act without counsel, required to seek substitute counsel, required to seek direct court relief, required to correct missed proceedings, or entitled to malpractice, grievance, ADA, privacy, negligence, due-process, or other claims.

1046. Clark deprived Grohol of meaningful notice and opportunity to be heard by supporting or allowing North Penn Legal Services to preserve counsel-of-record status while Grohol lacked meaningful advocacy, adequate communication, timely correction, disability-sensitive service, lawful withdrawal, clear notice of what happened, clear notice of what correction was needed, and clear notice of whether she needed substitute counsel or direct court relief.

1047. Clark deprived disabled clients of accessible process by failing to support reasonable modification, disability-sensitive communication, patience, clear explanation, accessible case handling, and non-hostile client service while reinforcing or failing to oppose professional practices that treated disability-related anxiety, communication problems, and housing-related functioning limitations as personal fault.

1048. Pennsylvania Legal Aid Network, Inc. acted under color of law or performed, supported, reinforced, funded, coordinated, ratified, allowed, or failed to correct publicly funded, government-supported, federally supported, court-facing, or government-integrated legal-aid functions through statewide funding, referral, training, coordination, policy, oversight, programmatic, and institutional influence over Pennsylvania’s civil legal-aid system.

1049. Pennsylvania Legal Aid Network, Inc. deprived Grohol and the class of protected interests by supporting, reinforcing, funding, coordinating, ratifying, allowing, or failing to correct a statewide legal-aid structure in which North Penn Legal Services accepted public money, federal legal-aid money, referrals, institutional authority, and client trust while failing to provide meaningful notice, hearing protection, accurate communication, representation-status clarity, disability-sensitive service, lawful withdrawal, substitute-counsel access, and corrective legal assistance.

1050. Pennsylvania Legal Aid Network, Inc. deprived Grohol of meaningful notice and opportunity to be heard because its statewide legal-aid influence preserved North Penn Legal Services' provider status and counsel-of-record role while Grohol's case remained pending for more than 6 years after the January 15, 2020 missed-notice replevin hearing without meaningful advocacy, adequate communication, timely correction, disability-sensitive service, or timely withdrawal.

1051. Pennsylvania Legal Aid Network, Inc. deprived disabled clients of accessible process by failing to support, require, monitor, enforce, or correct compliance with trauma-informed, disability-informed, and vulnerable-client service standards after North Penn Legal Services and Pennsylvania Legal Aid Network promoted training on working with disabled, vulnerable, traumatized, low-income, or otherwise impaired clients.

1052. Legal Services Corporation acted under color of law or performed, supported, reinforced, funded, monitored, regulated, oversaw, ratified, allowed, or failed to correct publicly funded, federally created, federally supported, court-facing, or government-integrated legal-aid functions through federal funding, monitoring, compliance, oversight, regulatory, policy, and institutional authority over North Penn Legal Services and the federally funded civil legal-aid system.

1053. Legal Services Corporation deprived Grohol and the class of protected interests by supporting, reinforcing, funding, monitoring, regulating, overseeing, ratifying, allowing, or failing to correct a federally funded legal-aid system in which North Penn Legal Services retained money, referrals, authority, client control, and counsel-of-record status while legal-aid clients lacked notice, hearing protection, communication, disability access, representation-status clarity, withdrawal protection, substitute-counsel access, and corrective assistance.

1054. Legal Services Corporation deprived Grohol of meaningful notice and opportunity to be heard because federal legal-aid funding, monitoring, compliance, and program legitimacy preserved North Penn Legal Services' public role while Grohol remained without meaningful advocacy, accurate communication, disability-sensitive service, timely correction, lawful withdrawal, conflict-free substitute counsel, independent review, or a practical repair mechanism.

1055. Legal Services Corporation deprived disabled clients of accessible process because federal legal-aid oversight did not require North Penn Legal Services to provide reasonable modification, disability-sensitive communication, patience, clear explanation, accessible case handling, non-hostile client service, corrective notice, independent file review, court-record correction, or substitute counsel after publicly funded legal-aid representation failed.

1056. Defendants caused due-process injury to Grohol and similarly situated clients because their combined conduct preserved public funding, federal funding, referrals, institutional status, court-facing counsel-of-record authority, legal-aid legitimacy, client control, and representation-status confusion while denying clients meaningful notice, meaningful opportunity to be heard, hearing protection, deadline protection, accurate communication, disability-accessible process, lawful withdrawal, substitute-counsel access, independent review, and corrective legal assistance.

1057. Defendants are liable for due-process violations because each acted under color of law or performed, directed, supervised, approved, ratified, supported, funded, monitored, reinforced, allowed, or failed to correct publicly funded, government-supported, federally supported, court-facing, or government-integrated legal-aid functions; Grohol and the class had protected property, housing, legal-claim, benefit, privacy, disability-access, representation-status, and civil-litigation interests; each defendant deprived Grohol and the class of those interests; and each failed to provide or support constitutionally adequate notice or opportunity to be heard.

1058. Grohol and the class are entitled to compensatory damages, nominal damages, punitive damages where available, declaratory relief, injunctive relief, restitution, disgorgement where available, due-process review, client-service

review, supervision review, disability-access review, case-status review, representation-status review, docket review, confidentiality review, privacy review, conflict review, notice review, hearing-protection review, court-record correction, withdrawal review, trauma-informed client notice, corrective notice, independent review, substitute-counsel relief, costs, fees where available, and all other lawful relief.

COUNT 16

Equal Protection Against North Penn Legal Services, Inc.; Lori Molloy; Timothy Smith; Heather Kelly; Mary Beth Clark; Pennsylvania Legal Aid Network, Inc.; and Legal Services Corporation

1059. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 94, Equal Protection Against North Penn Legal Services, Inc.; COA 95, Equal Protection Against Lori Molloy; COA 96, Equal Protection Against Timothy Smith; COA 97, Equal Protection Against Heather Kelly; COA 98, Equal Protection Against Mary Beth Clark; COA 99, Equal Protection Against Pennsylvania Legal Aid Network, Inc.; and COA 100, Equal Protection Against Legal Services Corporation, from the 651-count inventory attached as exhibits.

1060. The elements of an equal-protection claim are state action or action under color of law, differential treatment from similarly situated persons, discriminatory purpose or irrational classification, and resulting injury.

1061. North Penn Legal Services, Inc. acted under color of law or performed publicly funded, government-supported, federally supported, court-facing, or government-integrated legal-aid functions when it accepted clients, appeared in court, received notices, remained counsel of record, controlled representation status, and handled civil legal matters for low-income, disabled, vulnerable, housing-insecure, and otherwise dependent clients.

1062. North Penn Legal Services, Inc. treated Grohol and similarly situated disabled, vulnerable, anxious, communication-impaired, housing-insecure, low-income, and otherwise dependent clients worse than clients who could communicate easily, function without accommodation, advocate for themselves, maintain orderly living conditions without disability-related difficulty, monitor court proceedings, and replace counsel without assistance.

1063. North Penn Legal Services, Inc. used disability, anxiety, communication difficulty, functioning limitations, housing instability, poverty, and vulnerability as reasons for blame, ridicule, hostility, neglect, abandonment, reduced patience, reduced communication, reduced accommodation, reduced dignity, reduced

corrective assistance, and reduced legal-aid output instead of providing equal access and reasonable modification.

1064. North Penn Legal Services, Inc. denied Grohol equal protection when attorneys or staff berated her, mocked her, blamed her, told her that if she did not leave her apartment messy she would not be in her situation, treated disability-related functioning limitations as personal fault, treated housing-related difficulties as blameworthy conduct instead of disability-related vulnerability requiring legal help, and told her that the problems were her fault.

1065. Lori Molloy acted under color of law or performed, directed, supervised, approved, ratified, or allowed publicly funded, government-supported, federally supported, court-facing, or government-integrated legal-aid functions through her executive authority over North Penn Legal Services' legal-aid operations, management structure, public representations, funding representations, attorney supervision, staff supervision, intake supervision, disability-access practices, client-service culture, internal accountability, confidentiality systems, privacy practices, conflict systems, withdrawal practices, grievance responses, client-protection practices, reasonable-modification practices, and institutional response to known legal-service failures.

1066. Molloy treated Grohol and similarly situated clients differently by causing or allowing North Penn Legal Services to provide blame, ridicule, hostility, shame, neglect, abandonment, unclear communication, inadequate accommodation, inadequate notice, inadequate hearing protection, inadequate correction, inadequate representation-status clarity, and inadequate substitute-counsel access instead of equal legal-aid service.

1067. Molloy acted with discriminatory purpose or irrational classification because she caused or allowed disability-related anxiety, communication difficulty, functioning limitations, housing conditions, poverty, and vulnerability to be treated as personal fault or reasons to reduce service instead of reasons to provide equal access, reasonable modification, patient explanation, accessible case handling, respectful communication, and meaningful legal help.

1068. Molloy denied Grohol equal protection by allowing client disability-related anxiety, trouble communicating, difficulty functioning, housing instability, and inability to navigate the legal system alone to be met with blame, ridicule, hostility, shame, and inadequate legal-aid output while North Penn Legal Services and Pennsylvania Legal Aid Network continued to promote training on working with disabled, vulnerable, traumatized, low-income, or otherwise impaired clients.

1069. Timothy Smith acted under color of law or performed, directed, supervised, approved, ratified, or allowed publicly funded, government-supported, federally supported, court-facing, or government-integrated legal-aid functions through his senior management authority over attorney supervision, case-management systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, representation-status practices, withdrawal practices, and response to known missed hearings, missed deadlines, failures to notify clients, failures to prepare, failures to communicate, abandoned files, unclear representation status, and case-management breakdowns.

1070. Smith treated Grohol and similarly situated disabled and vulnerable clients worse than clients who could communicate easily, function without accommodation, manage paperwork and deadlines without accommodation, maintain orderly housing without disability-related difficulty, monitor court proceedings without assistance, obtain substitute counsel without assistance, challenge a publicly funded legal-aid provider without assistance, and self-advocate without fear, confusion, anxiety, or functional impairment.

1071. Smith denied Grohol equal protection when he caused or allowed North Penn Legal Services to remain counsel of record without meaningful advocacy, adequate communication, timely correction, disability-sensitive service, or timely withdrawal after the January 15, 2020 missed-notice replevin hearing.

1072. Smith further denied Grohol equal protection when he told her that North Penn Legal Services was not working on the case for her, pressured her to proceed pro se, warned her that her case could be dismissed for lack of prosecution if she did not represent herself, and left her without equal clear notice of whether North Penn Legal Services would correct the problem, whether she needed substitute counsel, and whether she needed direct court relief.

1073. Heather Kelly acted under color of law or performed, supported, reinforced, ratified, allowed, or failed to oppose publicly funded, government-supported, federally supported, court-facing, or government-integrated legal-aid functions through professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, attorney-accountability environment, disability-access environment, confidentiality environment, privacy practices, conflict systems, withdrawal practices, client-protection failures, supervision failures, malpractice-response dynamics, and institutional response to known legal-service failures.

1074. Kelly treated Grohol and the class differently by supporting or allowing a legal-aid environment in which disabled and vulnerable clients received blame, ridicule, hostility, shame, neglect, abandonment, unclear communication, inadequate accommodation, inadequate notice, inadequate hearing protection,

inadequate correction, and inadequate representation-status clarity instead of equal legal-aid service.

1075. Kelly acted with discriminatory purpose or irrational classification because she supported or allowed disability-related anxiety, communication difficulty, functioning limitations, housing conditions, poverty, and vulnerability to be treated as personal fault or reasons to reduce service instead of reasons to provide equal access, reasonable modification, patience, clear explanation, accessible case handling, and non-hostile client service.

1076. Kelly denied Grohol equal protection by allowing, reinforcing, ratifying, or failing to oppose attorneys or staff berating her, mocking her, blaming her, telling her that if she did not leave her apartment messy she would not be in her situation, treating disability-related functioning limitations as personal fault, treating housing-related difficulties as blameworthy conduct, and denying equal disability-sensitive communication and corrective assistance.

1077. Mary Beth Clark acted under color of law or performed, supported, reinforced, ratified, allowed, or failed to oppose publicly funded, government-supported, federally supported, court-facing, or government-integrated legal-aid functions through professional influence within, around, or through North Penn Legal Services' legal-aid ecosystem, local professional culture, attorney-

accountability environment, disability-access environment, confidentiality environment, privacy practices, conflict systems, withdrawal practices, client-protection failures, supervision failures, malpractice-response dynamics, and institutional response to known legal-service failures.

1078. Clark treated Grohol and the class differently by supporting or allowing legal-aid practices that denied disabled and vulnerable clients equal treatment, equal access, equal communication, equal patience, equal dignity, equal explanation, equal disability-sensitive service, equal hearing protection, equal case correction, equal representation-status clarity, equal substitute-counsel access, and equal corrective assistance.

1079. Clark acted with discriminatory purpose or irrational classification because she supported or allowed poverty, disability, trauma, anxiety, housing instability, communication difficulty, and functioning limitation to become reasons for reduced legal-aid service instead of reasons for greater accommodation, patience, explanation, and support.

1080. Clark denied Grohol equal protection by supporting or allowing North Penn Legal Services to preserve counsel-of-record status after the January 15, 2020 missed-notice replevin hearing while Grohol lacked equal clear notice, equal opportunity to be heard, equal disability-sensitive communication, equal

correction, equal representation-status clarity, equal substitute-counsel access, and equal access to meaningful legal-aid services.

1081. Pennsylvania Legal Aid Network, Inc. acted under color of law or performed, supported, reinforced, funded, coordinated, ratified, allowed, or failed to correct publicly funded, government-supported, federally supported, court-facing, or government-integrated legal-aid functions through statewide funding, referral, training, coordination, policy, oversight, programmatic, and institutional influence over Pennsylvania's civil legal-aid system.

1082. Pennsylvania Legal Aid Network, Inc. treated Grohol and the class differently by supporting, reinforcing, funding, coordinating, ratifying, allowing, or failing to correct North Penn Legal Services' unequal treatment of disabled, vulnerable, anxious, communication-impaired, housing-insecure, low-income, elderly, abused, financially unstable, or otherwise disadvantaged clients who needed accommodation, patience, explanation, flexibility, and support to access legal services.

1083. Pennsylvania Legal Aid Network, Inc. acted with discriminatory purpose or irrational classification because it supported or allowed a statewide legal-aid structure in which disability-related anxiety, communication difficulty, functioning limitations, housing conditions, poverty, and vulnerability reduced actual service,

communication, patience, dignity, accommodation, hearing protection, case correction, representation-status clarity, substitute-counsel access, and corrective assistance.

1084. Pennsylvania Legal Aid Network, Inc. denied Grohol equal protection by allowing, reinforcing, funding, coordinating, ratifying, or failing to correct attorneys or staff berating her, mocking her, blaming her, telling her that if she did not leave her apartment messy she would not be in her situation, treating disability-related functioning limitations as personal fault, treating housing-related difficulties as blameworthy conduct, and treating her disabilities as a reason to deny equal legal-aid access.

1085. Legal Services Corporation acted under color of law or performed, supported, reinforced, funded, monitored, regulated, oversaw, ratified, allowed, or failed to correct publicly funded, federally created, federally supported, court-facing, or government-integrated legal-aid functions through federal funding, monitoring, compliance, oversight, regulatory, policy, and institutional authority over North Penn Legal Services and the federally funded civil legal-aid system.

1086. Legal Services Corporation treated Grohol and the class differently by supporting, reinforcing, funding, monitoring, regulating, overseeing, ratifying, allowing, or failing to correct a federally funded legal-aid system in which disabled

and vulnerable clients received worse treatment than clients who could communicate easily, function without accommodation, maintain orderly living conditions without disability-related difficulty, monitor court proceedings, protect themselves, and replace counsel without assistance.

1087. Legal Services Corporation acted with discriminatory purpose or irrational classification because federal legal-aid funding, monitoring, compliance, and oversight preserved grantee status, program legitimacy, client control, and counsel-of-record authority while disabled and vulnerable clients lacked equal access, equal communication, equal disability-sensitive service, equal representation-status clarity, equal hearing protection, equal corrective assistance, equal dignity, equal substitute-counsel access, and equal meaningful legal-aid output.

1088. Legal Services Corporation denied Grohol equal protection by failing to require North Penn Legal Services to provide equal clear notice, equal opportunity to be heard, equal disability-sensitive communication, equal case correction, equal representation-status clarity, equal substitute-counsel access, equal independent review, and equal corrective assistance after the January 15, 2020 missed-notice replevin hearing and after the provider’s representation failed.

1089. Defendants caused equal-protection injury to Grohol and similarly situated clients because their combined conduct preserved public funding, federal funding,

referrals, institutional status, court-facing counsel-of-record authority, legal-aid legitimacy, client control, and representation-status confusion while disabled and vulnerable clients received unequal treatment, unequal access, unequal communication, unequal accommodation, unequal patience, unequal dignity, unequal protection, unequal corrective assistance, unequal representation-status clarity, unequal hearing protection, and unequal access to meaningful civil legal aid.

1090. Defendants are liable for equal-protection violations because each acted under color of law or performed, directed, supervised, approved, ratified, supported, funded, monitored, reinforced, allowed, or failed to correct publicly funded, government-supported, federally supported, court-facing, or government-integrated legal-aid functions; each treated Grohol and similarly situated disabled and vulnerable clients differently from other legal-aid clients who could communicate easily, function without accommodation, maintain orderly living conditions without disability-related difficulty, monitor court proceedings, and replace counsel without assistance; each used disability, anxiety, communication difficulty, functioning limitations, housing instability, poverty, and vulnerability as reasons for discriminatory or irrational reductions in service; and each caused injury to Grohol and the class.

1091. Grohol and the class are entitled to compensatory damages, nominal damages, punitive damages where available, declaratory relief, injunctive relief, restitution, disgorgement where available, equal-protection review, client-service review, supervision review, disability-access review, case-status review, representation-status review, docket review, confidentiality review, privacy review, conflict review, notice review, hearing-protection review, court-record correction, training review, withdrawal review, trauma-informed client notice, corrective notice, independent review, substitute-counsel relief, costs, fees where available, and all other lawful relief.

**COUNT 17**

**First Amendment Retaliation Against Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; Snyder County STOP Coalition; Pennsylvania Bar Association; Union–Snyder County Bar Association; Pennsylvania Legal Aid Network, Inc.; North Penn Legal Services, Inc.; Transitions of PA; Transitions Legal Center; Bloomsburg Fair Association; Michael F.J. Piecuch; Lori R. Hackenberg; Jeffrey A. Rowe; Mark J. Conway; Matthew W. Brann; Robert Leadbeter; Heath Brosius; Brian Kerstetter; Jamie Saleski; K. Michael Sullivan; Sarah Stigerwalt-Egan; Alexandra Sholley; Kathleen Lincoln; Brian Ulmer; Jessica Chapman; William R. Christman III; Gabriele Miller-**

**Wagner; David Trevaskis; Lori Molloy; Timothy Smith; Mary Beth Clark; David Andrew Strouse; Jenna Ann Neidig; Robert Cravitz; Pennsylvania Department of Military and Veterans Affairs; Office of Disciplinary Counsel; United States Bankruptcy Court for the Middle District of Pennsylvania; and Doe Defendants**

1092. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 101, First Amendment Retaliation Against Union County Criminal Justice Advisory Board; COA 102, First Amendment Retaliation Against Union County Mental Health Advisory Committee; COA 103, First Amendment Retaliation Against Union County STOP Coalition; COA 104, First Amendment Retaliation Against Snyder County STOP Coalition; COA 105, First Amendment Retaliation Against Pennsylvania Bar Association; COA 106, First Amendment Retaliation Against Union–Snyder County Bar Association; COA 107, First Amendment Retaliation Against Pennsylvania Legal Aid Network, Inc.; COA 108, First Amendment Retaliation Against North Penn Legal Services, Inc.; COA 109, First Amendment Retaliation Against Transitions of PA; COA 110, First Amendment Retaliation Against Transitions Legal Center; COA 111, First Amendment Retaliation Against Bloomsburg Fair Association; COA 112, First Amendment Retaliation Against Michael F.J. Piecuch; COA 113, First Amendment Retaliation Against Lori R. Hackenberg; COA 114, First Amendment Retaliation

Against Jeffrey A. Rowe; COA 115, First Amendment Retaliation Against Mark J. Conway; COA 116, First Amendment Retaliation Against Matthew W. Brann; COA 117, First Amendment Retaliation Against Robert Leadbeter; COA 118, First Amendment Retaliation Against Heath Brosius; COA 119, First Amendment Retaliation Against Brian Kerstetter; COA 120, First Amendment Retaliation Against Jamie Saleski; COA 121, First Amendment Retaliation Against K. Michael Sullivan; COA 122, First Amendment Retaliation Against Sarah Stigerwalt-Egan; COA 123, First Amendment Retaliation Against Alexandra Sholley; COA 124, First Amendment Retaliation Against Kathleen Lincoln; COA 125, First Amendment Retaliation Against Brian Ulmer; COA 126, First Amendment Retaliation Against Jessica Chapman; COA 127, First Amendment Retaliation Against William R. Christman III; COA 128, First Amendment Retaliation Against Gabriele Miller-Wagner; COA 129, First Amendment Retaliation Against David Trevaskis; COA 130, First Amendment Retaliation Against Lori Molloy; COA 131, First Amendment Retaliation Against Timothy Smith; COA 132, First Amendment Retaliation Against Mary Beth Clark; COA 133, First Amendment Retaliation Against David Andrew Strouse; COA 134, First Amendment Retaliation Against Jenna Ann Neidig; COA 135, First Amendment Retaliation Against Robert Cravitz; COA 136, First Amendment Retaliation Against Pennsylvania Department of Military and Veterans Affairs; COA 137, First Amendment Retaliation Against

Office of Disciplinary Counsel; COA 138, First Amendment Retaliation Against United States Bankruptcy Court for the Middle District of Pennsylvania; and COA 139, First Amendment Retaliation Against Doe Defendants, from the 651-count inventory attached as exhibits.

1093. The elements of First Amendment retaliation are protected First Amendment activity, retaliatory action sufficient to deter a person of ordinary firmness from continuing that activity, and a causal connection showing that the protected activity substantially or materially motivated the retaliatory action.

1094. Union County Criminal Justice Advisory Board acted under color of state law because it operated through Union County government, county officials, prosecutors, court-connected actors, criminal-justice policy structures, and county-connected advisory authority.

1095. Plaintiff, Plaintiff’s counsel, Plaintiff’s legal team, Plaintiff’s agents, and related advocates engaged in protected First Amendment activity by criticizing legal-aid malpractice, objecting to client abandonment, advocating for vulnerable clients, pursuing litigation, discussing subpoenas, demanding nonretaliation, and seeking public accountability from local legal-system actors.

1096. Union County Criminal Justice Advisory Board retaliated by participating in, ratifying, allowing, or failing to prevent exclusionary or chilling treatment after

protected criticism of judges, prosecutors, legal-aid actors, USCBA, and related local legal institutions.

1097. Union County Criminal Justice Advisory Board's conduct would deter a person of ordinary firmness from continuing protected criticism, petitioning, litigation, public-interest advocacy, and participation in county-connected criminal-justice advisory spaces because the Board's public advisory role affects access to criminal-justice coordination, reform discussions, public-service participation, and local institutional credibility.

1098. Union County Mental Health Advisory Committee acted under color of state law because it operated through Union County government, public advisory authority, county-connected mental-health systems, court-connected actors, providers, public-service participants, and publicly supported service coordination.

1099. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing legal-aid malpractice, court-connected exclusion, public-service access problems, mental-health system access problems, retaliation, client abandonment, and the treatment of vulnerable clients in local legal systems.

1100. Union County Mental Health Advisory Committee retaliated by participating in, ratifying, allowing, or failing to prevent exclusionary or chilling treatment after

protected litigation and protected criticism of local judges, lawyers, legal-aid providers, bar actors, county actors, and county-connected legal institutions.

1101. Union County Mental Health Advisory Committee's conduct would deter a person of ordinary firmness from continuing protected advocacy because county-connected mental-health advisory spaces involve vulnerable people whose legal and practical needs overlap with housing, disability, domestic violence, benefits, family stability, court access, and legal-aid accountability.

1102. Union County STOP Coalition acted under color of state law because it functioned through county-connected public-service structures, prosecutor participation, public meetings, government-supported victim-services coordination, domestic-violence response systems, service providers, and community partners.

1103. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by pursuing this litigation, raising allegations concerning Mary Beth Clark, criticizing legal-system actors, advocating through counsel in public-service settings, and seeking reform of public-service, victim-services, domestic-violence, and legal-aid structures.

1104. Union County STOP Coalition retaliated by participating in, permitting, ratifying, allowing, or failing to prevent unequal treatment of Plaintiff's legal team after protected litigation and protected allegations concerning Mary Beth Clark,

including public unequal treatment in coalition meetings where Plaintiff's counsel was ignored when she spoke while other participants received ordinary professional respect.

1105. Union County STOP Coalition's conduct would deter a person of ordinary firmness from continuing protected advocacy in public meetings where county prosecutors and public-service providers control professional access, credibility, referrals, victim-services participation, domestic-violence service coordination, and coalition participation.

1106. Snyder County STOP Coalition acted under color of state law because it functioned through county-connected public-service coordination, victim-services structures, government-supported coalition activity, public meetings, service providers, and domestic-violence response systems.

1107. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing legal-aid malpractice, opposing retaliation, pursuing litigation, and advocating for vulnerable clients affected by domestic-violence, legal-aid, and court-connected systems.

1108. Snyder County STOP Coalition retaliated by participating in or failing to prevent retaliatory dynamics affecting Plaintiff's agents' legal advocacy, public-

service role, protected criticism of local legal-system actors, and equal participation in county-connected public-service networks.

1109. Snyder County STOP Coalition’s conduct would deter a person of ordinary firmness from continuing protected speech, petitioning, litigation, public-interest advocacy, and participation in county-connected STOP Coalition structures because the retaliation threatened public-service access, provider credibility, domestic-violence coordination, victim-services participation, and client advocacy.

1110. Pennsylvania Bar Association acted under color of law, as a public-function actor, as a state-entwined actor, and as a joint participant because it administered public-facing legal programs through Wills for Heroes, statewide pro bono programming, county-bar coordination, attorney networks, public officials, Pennsylvania Department of Military and Veterans Affairs connected coalitions, court-recognized professional structures, and public-facing veterans-service systems.

1111. Plaintiff, Plaintiff’s counsel, Plaintiff’s legal team, Plaintiff’s agents, and related advocates engaged in protected First Amendment activity by criticizing PBA, criticizing Wills for Heroes, advocating for disabled veterans, threatening and filing litigation, discussing subpoenas, communicating with PBA staff and volunteers, communicating with Pennsylvania Department of Military and

Veterans Affairs connected actors, communicating with county partners, and seeking access to public-facing legal programs.

1112. Pennsylvania Bar Association retaliated on July 30, 2025 by banning Plaintiff’s legal team and Plaintiff’s agents from all Wills for Heroes participation and by ordering Plaintiff’s legal team to stop communicating with PBA staff and volunteers.

1113. Pennsylvania Bar Association’s ban and communication restrictions would deter a person of ordinary firmness from continuing protected criticism, litigation, subpoena activity, communications with program actors, veterans advocacy, and public-interest legal work because the restrictions cut Plaintiff’s legal team and Plaintiff’s agents off from statewide Wills for Heroes structures, volunteer channels, pro bono communications, public-facing veterans-service opportunities, and professional credibility in multiple counties.

1114. Union–Snyder County Bar Association acted under color of law, as a state-entwined actor, as a public-function actor, and as a joint participant because judges, prosecutors, court-connected lawyers, legal-aid actors, Pennsylvania Bar Association actors, public-service partners, and local attorney networks used it to administer public-facing legal programs, local legal-governance structures, Wills for Heroes, Law Day, pro bono coordination, Young Lawyers programming,

listserv communications, meeting access, committee access, and local professional credibility.

1115. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing USCBA, challenging Wills for Heroes exclusion, advocating for disabled veterans, demanding accurate minutes, proposing nonretaliation rules, requesting mediation, threatening litigation, filing litigation, objecting to legal-aid malpractice, and objecting to bar retaliation.

1116. Union–Snyder County Bar Association retaliated by excluding Plaintiff's legal team and Plaintiff's agents from Wills for Heroes planning after years of prior leadership, refusing agenda access, manipulating or refusing to correct minutes, shouting down protected speech, cancelling meetings, withholding Teams access, using meeting rules to suppress ethics concerns, and suspending Plaintiff's legal team's membership after protected litigation and criticism.

1117. Union–Snyder County Bar Association's retaliatory conduct would deter a person of ordinary firmness from continuing protected speech, petitioning, litigation, public advocacy, veterans advocacy, legal-aid criticism, requests for accurate governance records, and participation in bar-related public-service

programs because the retaliation targeted membership, meetings, listserv access, committee access, Wills for Heroes planning, and local professional standing.

1118. Pennsylvania Legal Aid Network, Inc. acted under color of law, as a state-entwined actor, as a public-funding intermediary, as a public-function actor, and as a joint participant because it coordinated, supported, promoted, and helped structure publicly funded legal-aid services in Pennsylvania.

1119. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing North Penn Legal Services malpractice, exposing legal-aid client abandonment, operating and developing conflict-free nonprofit legal-service alternatives, advocating for conflict-free legal alternatives, and pursuing litigation challenging legal-aid monopolies.

1120. Pennsylvania Legal Aid Network, Inc. retaliated by reinforcing legal-aid monopoly structures and oversight narratives that allowed North Penn Legal Services and related actors to retaliate against Plaintiff's legal team after protected malpractice reporting, by failing to ensure conflict-free alternatives for clients harmed by North Penn Legal Services, and by failing to protect competing nonprofit legal providers from retaliation.

1121. Pennsylvania Legal Aid Network, Inc.'s conduct would deter a person of ordinary firmness from criticizing legal-aid providers, reporting malpractice, creating alternative legal-aid services, challenging public-funding structures, or seeking conflict-free representation because statewide legal-aid network actors affect provider legitimacy, referrals, access-to-justice narratives, legal-aid participation, and the practical availability of substitute counsel.

1122. North Penn Legal Services, Inc. acted under color of law, as a state-entwined actor, as a federally funded actor, as a public-function actor, as a court-participating actor, and as a joint participant because it received public legal-aid funding, benefited from state-created legal-services structures, entered appearances in Pennsylvania courts, served as the dominant or exclusive civil legal-aid provider in many counties, and performed publicly supported legal-services functions for low-income persons.

1123. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by reporting systemic malpractice, objecting to missed hearings and deadlines, advocating for client protection, criticizing North Penn Legal Services leadership, creating conflict-free nonprofit legal-service alternatives, and pursuing litigation.

1124. North Penn Legal Services, Inc. retaliated by retaliating against Plaintiff's legal team for reporting malpractice and challenging client-abandonment practices, failing to remediate client harm after protected reporting, preserving control over legal-aid work instead of providing conflict-free remedies, and aligning with bar insiders and legal-aid networks that later excluded Plaintiff's agents and Plaintiff's legal team from public-service legal opportunities.

1125. North Penn Legal Services, Inc.'s retaliatory conduct would deter a person of ordinary firmness from reporting malpractice by a publicly funded legal-aid provider, forming a competing nonprofit legal-aid organization, pursuing litigation challenging client abandonment, or helping clients like Grohol obtain accountability and conflict-free representation.

1126. Transitions of PA acted under color of law, as a joint participant, as a public-service actor, and as a participant in publicly supported service networks because it operated in systems connected to county actors, courts, legal-aid providers, victim-services structures, domestic-violence services, pro bono referrals, and public-service coordination.

1127. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing local legal-aid failures, advocating for vulnerable clients, challenging bar

retaliation, creating conflict-free nonprofit legal-service alternatives, and pursuing litigation concerning publicly connected legal-services systems.

1128. Transitions of PA retaliated by participating in or failing to prevent retaliatory exclusion and unequal treatment of Plaintiff's agents within local service-provider systems after Plaintiff's legal team criticized legal-aid and bar misconduct.

1129. Transitions of PA's conduct would deter a person of ordinary firmness from continuing protected criticism of legal-aid providers, bar associations, or court-connected actors because local public-service and referral networks control credibility, referrals, client access, institutional legitimacy, and collaboration opportunities for small nonprofit legal-service providers.

1130. Transitions Legal Center acted under color of law, as a joint participant, as a public-service actor, and as a participant in publicly supported service networks because it participated in legal-services, pro bono, public-service, domestic-violence, victim-services, and referral systems connected to county actors, legal-aid providers, court-related referrals, bar-connected pro bono structures, and publicly supported service coordination.

1131. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing

legal-aid malpractice, opposing retaliation by bar actors, advocating for conflict-free services, and pursuing litigation concerning access to legal services for vulnerable clients.

1132. Transitions Legal Center retaliated by participating in or failing to prevent retaliatory conduct that impaired Plaintiff's agents' role as a competing nonprofit legal-services provider after Plaintiff's legal team engaged in protected speech and petitioning.

1133. Transitions Legal Center's retaliatory conduct would deter a person of ordinary firmness from continuing protected criticism of legal-aid providers, bar associations, or court-connected actors because exclusion from legal-services, pro bono, domestic-violence, and referral networks harms access to clients, referrals, credibility, public-service opportunities, and meaningful collaboration.

1134. Bloomsburg Fair Association acted under color of law and as a joint participant because it worked with public officials and veterans-event actors in public-facing veterans programming connected to government recognition, public messaging, community-service access, public-service participation, and public-facing veterans outreach.

1135. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by advocating for

veterans, communicating with Pennsylvania Department of Military and Veterans Affairs connected coalitions, pursuing litigation, criticizing PBA and USCBA retaliation, seeking to participate in veterans outreach, and criticizing legal-aid and bar misconduct.

1136. Bloomsburg Fair Association retaliated by ignoring or blocking Plaintiff’s legal team’s vendor communications after Plaintiff’s agents sought access to the veterans event and by excluding or failing to include Plaintiff’s agents from the Bloomsburg Fair veterans event after protected litigation and veterans advocacy.

1137. Bloomsburg Fair Association’s conduct would deter a person of ordinary firmness from continuing protected criticism, litigation, and advocacy involving public officials, PBA, USCBA, and veterans-service gatekeepers because exclusion from a major public veterans event harms reputation, public outreach, veterans-service opportunities, public-service credibility, access to disabled veterans, and community legitimacy.

1138. Michael F.J. Piecuch acted under color of state law through his judicial office, court-connected authority, judicial prestige, local legal influence, and participation in court-connected or bar-connected structures, and he also acted in nonjudicial, administrative, bar-connected, and public-service capacities through

USCBA governance, listserv communications, Wills for Heroes narratives, Law Day structures, civility-related communications, and local legal-culture influence.

1139. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing USCBA, North Penn Legal Services, Wills for Heroes exclusion, inconsistent veterans eligibility, judicial and bar misconduct, legal-aid abandonment, and local legal-system retaliation, and by threatening litigation, filing litigation, seeking relief, seeking discovery, discussing subpoenas, requesting agenda access, requesting committee access, demanding accurate minutes, and demanding nonretaliation.

1140. Piecuch retaliated by using or allowing judicial prestige, bar-connected influence, USCBA participation, listserv communications, civility narratives, local legal-culture authority, Wills for Heroes narratives, and Law Day structures to chill, burden, exclude, or punish protected criticism, protected petitioning, protected litigation, legal-aid criticism, veterans advocacy, client advocacy, and conflict-free nonprofit legal-service work.

1141. Piecuch's conduct would deter a person of ordinary firmness from continuing protected speech and petitioning because a president judge's participation in local bar, courthouse, public-service, and professional-access structures signals to attorneys and nonprofit legal providers that criticism of

judges, legal-aid actors, bar officers, pro bono gatekeepers, and court-connected institutions can produce exclusion, reputational harm, professional isolation, and loss of public-service access.

1142. Lori R. Hackenberg acted under color of state law through her judicial office, court-connected authority, courtroom access authority, courthouse-program authority, local legal influence, USCBA-related participation, Law Day involvement, and participation in court-connected or bar-connected public-service structures.

1143. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing legal-aid malpractice, judicial favoritism, courthouse-program exclusion, bar retaliation, Wills for Heroes exclusion, public-service discrimination, and the use of local court and bar networks to punish dissenting attorneys and nonprofit legal providers.

1144. Hackenberg retaliated by participating in, ratifying, allowing, or failing to prevent court-connected and bar-connected exclusion, including denial or obstruction of courthouse-program access, selective professional participation, discretionary treatment, public recognition for favored attorneys and organizations, and differential treatment of Plaintiff's legal team and Plaintiff's agents after protected criticism and litigation.

1145. Hackenberg's conduct would deter a person of ordinary firmness from continuing protected criticism, litigation, veterans advocacy, and legal-aid reform work because attorneys and nonprofit legal providers depend on neutral courthouse access, judicial neutrality, professional credibility, program access, and freedom from judicially connected retaliation when they represent vulnerable clients and criticize legal-system misconduct.

1146. Jeffrey A. Rowe acted under color of state law through his judicial office, magisterial-district authority, courthouse role, court-connected communications, USCBA participation, Law Day participation, Wills for Heroes communications, public-service programming, and local legal-culture influence.

1147. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing local legal-aid misconduct, USCBA retaliation, Wills for Heroes exclusion, meeting exclusion, governance manipulation, inaccurate narratives, and court-connected public-service retaliation.

1148. Rowe retaliated by participating in, ratifying, allowing, or failing to prevent court-connected and bar-connected exclusionary conduct after protected speech, petitioning, and litigation, including conduct affecting courthouse-program access, Law Day recognition, Wills for Heroes planning, USCBA meeting dynamics,

public-service legal opportunities, and professional participation in the local bar ecosystem.

1149. Rowe's conduct would deter a person of ordinary firmness from continuing protected speech and petitioning because a magisterial district judge's involvement in the local bar and public-service structures can influence whether attorneys, nonprofit legal providers, and vulnerable-client advocates receive equal professional access, neutral public recognition, and fair participation in court-connected programs.

1150. Mark J. Conway acted under color of federal law or federal judicial authority through his office as a United States Bankruptcy Judge, his courtroom authority, docket authority, sanctions authority, case-management authority, recusal authority, and participation in federal court proceedings affecting Plaintiff's legal team, Plaintiff's agents, and protected criticism of judges and court conduct.

1151. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing judicial conduct, seeking recusal, objecting to perceived bias, challenging sanctions, pursuing appellate relief, filing or threatening litigation, and asserting that judges and court-connected actors cannot punish protected criticism of courts, judges, lawyers, legal-aid actors, and bar institutions.

1152. Conway retaliated by using or allowing federal judicial authority, sanctions proceedings, recusal decisions, courtroom control, docket management, and judicial characterizations of protected criticism to burden, punish, or chill Plaintiff's legal team's protected speech, petitioning, litigation, and criticism of judicial and legal-system conduct.

1153. Conway's conduct would deter a person of ordinary firmness from continuing protected speech and petitioning because sanctions authority, recusal denial, judicial criticism, docket control, and federal courtroom power can chill attorneys and nonprofit legal providers from criticizing judicial conduct, seeking review, preserving constitutional objections, and pursuing nonfrivolous litigation against legal-system actors.

1154. Matthew W. Brann acted under color of federal law or federal judicial authority through his office as a United States District Judge, his case-assignment authority, docket authority, adjudicatory authority, case-management authority, recusal authority, and participation in federal proceedings involving Plaintiff's legal team, Plaintiff's agents, protected litigation, protected criticism, and challenges to local legal-system actors.

1155. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by filing litigation, challenging bar retaliation, challenging legal-aid misconduct, criticizing

judicial and legal-system actors, seeking declaratory and injunctive relief, discussing subpoenas, and pursuing claims involving courts, judges, lawyers, bar associations, public-service systems, and legal-aid structures.

1156. Brann retaliated by using or allowing federal judicial authority, case-management authority, adjudicatory authority, recusal decisions, docket control, and judicial treatment of Plaintiff's legal team's protected litigation and criticism to burden, punish, chill, or impair protected speech, petitioning, litigation, and public-interest legal advocacy.

1157. Brann's conduct would deter a person of ordinary firmness from continuing protected litigation and criticism because a federal district judge's handling of claims, recusal issues, docket control, judicial framing, and case-management decisions can affect whether attorneys and nonprofit legal providers continue challenging powerful legal institutions, bar associations, courts, legal-aid providers, and public officials.

1158. Robert Leadbeter acted under color of state law through his public office, public communications, veterans-event involvement, public-facing veterans-expo authority, coordination with Bloomsburg Fair Association, and participation in public-service structures affecting veterans outreach, event access, and public recognition.

1159. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by advocating for veterans and disabled veterans, communicating with Pennsylvania Department of Military and Veterans Affairs connected coalitions, seeking veterans-event access, criticizing PBA and USCBA retaliation, pursuing litigation, and challenging exclusion from public-facing veterans-service opportunities.

1160. Leadbeter retaliated by participating in, authorizing, ratifying, allowing, or failing to prevent exclusion of Plaintiff's agents from the Bloomsburg Fair veterans event, by using or allowing public-office authority and public-facing veterans-expo structures to deny equal veterans-outreach access after protected litigation and criticism, and by participating in a public-event structure that gave access to favored participants while excluding the protected critic.

1161. Leadbeter's conduct would deter a person of ordinary firmness from continuing protected criticism, litigation, veterans advocacy, and public-interest legal work because exclusion from a public-facing veterans event controlled or promoted by a public official harms reputation, public-service legitimacy, outreach access, relationships with veterans, and the ability to serve disabled veterans through community-based legal assistance.

1162. Heath Brosius acted under color of state law through his role as Snyder County District Attorney, prosecutorial authority, public-office authority, local

legal influence, court-connected participation, county-connected public-service structures, STOP-related systems, USCBA-related relationships, and interactions with local bar, court, and service-provider networks.

1163. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing prosecutors, legal-aid providers, judges, USCBA, bar actors, public-service exclusion, STOP-related retaliation, legal-aid malpractice, and local legal-system misconduct, and by pursuing litigation, subpoenas, nonretaliation demands, and client advocacy.

1164. Brosius retaliated by participating in, ratifying, aiding, allowing, or failing to prevent prosecutorially connected pressure, public-service exclusion, STOP-related obstruction, bar retaliation, reputational harm, legal-aid accountability obstruction, and coordinated local retaliation against Plaintiff's legal team, Plaintiff's agents, and related advocates after protected criticism and litigation.

1165. Brosius's conduct would deter a person of ordinary firmness from continuing protected speech, petitioning, litigation, public-service advocacy, and legal-aid reform because a district attorney's participation in or failure to oppose retaliatory local legal-system conduct can chill attorneys and nonprofit legal providers who must criticize prosecutors, judges, legal-aid actors, bar associations, and county-connected systems to represent vulnerable clients.

1166. Brian Kerstetter acted under color of state law through his role as Union County District Attorney, prosecutorial authority, public-office authority, local legal influence, court-connected participation, county-connected public-service structures, STOP-related systems, advisory-board relationships, USCBA-related relationships, and interactions with local bar, court, and service-provider networks.

1167. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing prosecutors, legal-aid providers, judges, USCBA, bar actors, public-service exclusion, STOP-related retaliation, legal-aid malpractice, and local legal-system misconduct, and by pursuing litigation, subpoenas, nonretaliation demands, and client advocacy.

1168. Kerstetter retaliated by participating in, ratifying, aiding, allowing, or failing to prevent prosecutorially connected pressure, public-service exclusion, STOP-related obstruction, bar retaliation, advisory-board exclusion, reputational harm, legal-aid accountability obstruction, and coordinated local retaliation against Plaintiff's legal team, Plaintiff's agents, and related advocates after protected criticism and litigation.

1169. Kerstetter's conduct would deter a person of ordinary firmness from continuing protected speech, petitioning, litigation, public-service advocacy, and legal-aid reform because a district attorney's public conduct and influence in local

advisory boards, STOP-related systems, public-service networks, and bar-connected spaces can threaten professional credibility, coalition access, referral relationships, and public-service participation.

1170. Jamie Saleski acted under color of state law through her office as Northumberland County Prothonotary, public-office authority, docket and filing authority, courthouse authority, public-record authority, service and filing practices, court-access functions, and interactions with lawyers, litigants, and court-connected actors.

1171. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing court-access barriers, legal-system misconduct, public-office conduct, prothonotary practices, legal-aid abandonment, and retaliation, and by pursuing litigation, subpoenas, document requests, court filings, and demands for public accountability.

1172. Saleski retaliated by participating in, ratifying, allowing, or failing to prevent filing-related, record-related, courthouse-related, or public-office conduct that burdened Plaintiff's legal team, Plaintiff's agents, Plaintiff, and similarly situated clients after protected criticism, litigation, and petitioning activity.

1173. Saleski's conduct would deter a person of ordinary firmness from continuing protected speech and petitioning because prothonotary functions affect court

access, filing access, public records, docket integrity, litigation posture, and the practical ability of legal-aid clients, attorneys, and nonprofit legal providers to seek relief from courts after criticizing legal-system actors.

1174. Saleski caused retaliation injury because public-office treatment that burdens court access, records access, filing clarity, or litigation administration after protected criticism impairs Plaintiff's ability to obtain conflict-free advocacy and impairs the class's ability to rely on attorneys and nonprofit legal providers willing to challenge court-connected and legal-aid misconduct.

1175. K. Michael Sullivan acted under color of law, as a state-entwined actor, as a public-function actor, and as a joint participant because he used USCBA authority, local bar leadership, Wills for Heroes control, pro bono committee influence, listserv communications, public-service legal-program access, local legal-system influence, and joint participation with court-connected and bar-connected actors to affect access to public-facing legal services and local professional participation.

1176. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing legal-aid misconduct, criticizing USCBA and PBA retaliation, advocating for veterans and disabled veterans, seeking Wills for Heroes access, threatening and filing nonfrivolous litigation, discussing subpoenas, demanding accurate minutes, requesting committee access, and proposing nonretaliation rules.

1177. Sullivan retaliated by publicly rebuking protected criticism on the bar listserv, using Wills for Heroes authority to condition public-service legal programming on the surrender or resolution of protected claims, moving to suspend Wills for Heroes planning, and participating in the local bar structure that treated protected litigation, protected criticism, subpoena activity, veterans advocacy, and legal-aid reform work as misconduct.

1178. Sullivan's conduct would deter a person of ordinary firmness from continuing protected speech, petitioning, litigation, veterans advocacy, and local bar participation because a local bar leader's control over Wills for Heroes, pro bono committee access, listserv communications, meeting participation, and professional credibility can block a nonprofit legal provider from public-service legal programming and isolate counsel from the local legal community.

1179. Sarah Stigerwalt-Egan acted under color of law, as a state-entwined actor, as a public-function actor, and as a joint participant because she used USCBA presidential authority, judicial-law-clerk and hearing-officer status, local bar governance, Wills for Heroes control, meeting access, listserv communications, Teams access, minute practices, public-service legal-program access, and communications with PBA and DMVA to affect legal-service programming and local professional participation.

1180. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing legal-aid malpractice, objecting to USCBA retaliation, filing and amending litigation, advocating for veterans, seeking to route Wills for Heroes through SLAAY and veterans coalitions, demanding equal meeting access, demanding accurate minutes, and asking bar and public actors to stop retaliation.

1181. Stigerwalt-Egan retaliated by joining Sullivan in suspending Wills for Heroes planning unless Martineau resolved or dropped protected claims, sending hostile or false communications to PBA and DMVA about SLAAY and Martineau, refusing to support a nonretaliation resolution, cancelling or controlling meetings after protected filings, withholding Teams access, and participating in or allowing the temporary suspension of Martineau's USCBA membership after the amended federal complaint proceeded.

1182. Stigerwalt-Egan's conduct would deter a person of ordinary firmness from continuing protected litigation and criticism because she used local bar presidency, public-service legal programming, meeting access, committee access, Teams access, communications with state-connected partners, and membership status to burden the exact advocacy, litigation, and veterans-service work that Plaintiff's counsel and Plaintiff's agents were performing.

1183. Alexandra Sholley acted under color of law, as a state-entwined actor, as a public-function actor, and as a joint participant because she used USCBA secretary authority, meeting-record authority, minute practices, local bar governance, Law Day participation, Wills for Heroes participation, listserv structures, officer participation, and court-connected local bar influence to affect public-service legal programming and local professional access.

1184. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by demanding accurate USCBA minutes, objecting to retaliation, criticizing Wills for Heroes exclusion, challenging legal-aid misconduct, criticizing local bar actors, pursuing litigation, and asking USCBA to adopt nonretaliation rules.

1185. Sholley retaliated by participating in, ratifying, allowing, or failing to correct USCBA minute manipulation, refusal to correct material governance inaccuracies, meeting-record practices that distorted protected objections, and later officer-level action that supported or failed to prevent membership suspension and exclusion after protected litigation and criticism.

1186. Sholley's conduct would deter a person of ordinary firmness from continuing protected speech and petitioning because local bar secretary and meeting-record authority can convert protected objections into alleged disruption,

deny an accurate record of constitutional objections, and support exclusion from meetings, committees, Wills for Heroes planning, and local bar membership.

1187. Kathleen Lincoln acted under color of law, as a state-entwined actor, as a public-function actor, and as a joint participant because she used USCBA treasurer authority, officer authority, local bar governance, court-connected professional status, public-service legal-program access, and local legal influence to affect bar participation, public-service legal programming, and the professional environment available to Plaintiff's counsel and Plaintiff's agents.

1188. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing legal-aid malpractice, challenging attorney withdrawal and client abandonment, filing and amending litigation, objecting to retaliation, proposing nonretaliation rules, demanding accurate governance records, and challenging local legal-system actors.

1189. Lincoln retaliated by making threatening and disparaging comments after the July 24, 2025 USCBA meeting, telling Martineau that continued complaints about ethical violations would cost her friends, settlements, and support for her projects, tying her remarks to courthouse and prothonotary litigation, and using her USCBA officer role to participate in or support membership suspension after protected litigation and criticism.

1190. Lincoln's conduct would deter a person of ordinary firmness from continuing protected speech, petitioning, malpractice reporting, and litigation because a bar officer and local attorney's threats about friendships, settlements, project support, courthouse hostility, and bar membership communicate that continued constitutional activity will produce professional isolation, litigation consequences, and loss of public-service support.

1191. Brian Ulmer acted under color of law, as a state-entwined actor, as a public-function actor, and as a joint participant because he participated in or exercised influence through PBA, Wills for Heroes, bar-connected legal-service structures, statewide pro bono networks, public-facing legal programs, attorney networks, and communications affecting whether Plaintiff's counsel and Plaintiff's agents could participate in legal-service and veterans-service opportunities.

1192. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing PBA and USCBA, advocating for veterans and disabled veterans, seeking Wills for Heroes participation, communicating with PBA staff and volunteers, threatening and filing nonfrivolous litigation, discussing subpoenas, and objecting to bar-controlled exclusion from public-facing legal-service programs.

1193. Ulmer retaliated by participating in, supporting, ratifying, allowing, or failing to correct PBA and Wills for Heroes retaliation that excluded Plaintiff's

counsel and Plaintiff's agents from public-facing legal programs, chilled communications with PBA staff and volunteers, and treated protected criticism, protected litigation, subpoena activity, and veterans advocacy as grounds for exclusion from pro bono structures.

1194. Ulmer's conduct would deter a person of ordinary firmness from continuing protected advocacy because PBA-connected and Wills for Heroes-connected actors influence statewide program access, volunteer channels, staff communications, pro bono credibility, veterans-service outreach, and the professional legitimacy of nonprofit legal providers.

1195. Jessica Chapman acted under color of law, as a state-entwined actor, as a public-function actor, and as a joint participant because she participated in or exercised influence through PBA, Wills for Heroes, bar-connected legal-service structures, public-facing legal programs, attorney networks, and communications affecting access to public-service legal programming.

1196. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by notifying PBA actors that Plaintiff's agents would attend Wills for Heroes events, challenging exclusion from those events, threatening nonfrivolous legal action, criticizing bar retaliation, and asserting that PBA could not deny access to public-facing legal programs because of protected speech and petitioning.

1197. Chapman retaliated by receiving, participating in, supporting, ratifying, allowing, or failing to correct PBA communications and Wills for Heroes exclusion after protected speech and petitioning, including communications connected to Plaintiff's counsel's stated intention to attend Wills for Heroes events after PBA's ban.

1198. Chapman's conduct would deter a person of ordinary firmness from continuing protected criticism and event-access advocacy because PBA and Wills for Heroes actors can decide whether attorneys and nonprofit legal providers receive access to public-facing pro bono events, volunteer opportunities, veterans outreach, and professional legitimacy.

1199. William R. Christman III acted under color of law, as a state-entwined actor, as a public-function actor, and as a joint participant because he used Pennsylvania Bar Association general-counsel authority, statewide bar authority, Wills for Heroes control, communication restrictions, public-facing pro bono programming, and court-connected professional influence to regulate access to legal-service programs and communications with program actors.

1200. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing PBA, criticizing Wills for Heroes exclusion, communicating with PBA staff and volunteers, advocating for disabled veterans, threatening and filing nonfrivolous

litigation, discussing subpoenas, seeking equal access to Wills for Heroes, and challenging bar-controlled public-service legal programs.

1201. Christman retaliated on July 30, 2025 by sending an email as PBA General Counsel ordering Martineau to cease all communications with PBA staff and volunteers, requiring communications about PBA, Wills for Heroes, and potential litigation to go only through him, and announcing that PBA would not permit Martineau or SLAAY to participate in any Wills for Heroes events or programs in any way.

1202. Christman's conduct would deter a person of ordinary firmness from continuing protected criticism, litigation, subpoena activity, communications with program witnesses, veterans advocacy, and public-interest legal work because the no-contact directive and categorical Wills for Heroes ban cut Plaintiff's counsel and Plaintiff's agents off from staff, volunteers, statewide pro bono channels, veterans-service programs, public-facing legal opportunities, and reputational legitimacy.

1203. Gabriele Miller-Wagner acted under color of law, as a state-entwined actor, as a public-function actor, and as a joint participant because she exercised statewide Wills for Heroes coordination authority, PBA pro bono staff authority, volunteer recruitment authority, planning authority, scheduling influence, public-

facing legal-program access, and communications with DMVA-connected and county-connected veterans-service actors.

1204. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by working with Miller-Wagner on Wills for Heroes planning, requesting Union–Snyder access, building Clinton County, Columbia County, Montour County, Northumberland County, and multi-county veterans programming, challenging retaliation by USCBA and PBA, discussing subpoenas, and asking PBA whether SLAAY and the veterans coalition could host Union–Snyder Wills for Heroes.

1205. Miller-Wagner retaliated by participating in, supporting, ratifying, allowing, or failing to correct the PBA and Wills for Heroes exclusion after Plaintiff's counsel's protected litigation threats, subpoena-related communications, criticism of USCBA and PBA retaliation, and request for equal access to Union–Snyder Wills for Heroes.

1206. Miller-Wagner's conduct would deter a person of ordinary firmness from continuing protected advocacy because a statewide Wills for Heroes coordinator controls or influences planning communications, volunteer recruitment, event legitimacy, scheduling, PBA staff channels, regional outreach, and whether nonprofit legal providers can reach veterans and disabled veterans through statewide pro bono programming.

1207. David K. Trevaskis acted under color of law, as a state-entwined actor, as a public-function actor, and as a joint participant because he exercised PBA Wills for Heroes leadership, statewide pro bono authority, public-facing legal-program influence, volunteer-program influence, and communications with PBA, USCBA, DMVA-connected actors, veterans-service actors, and county-connected public-service partners.

1208. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by communicating with Trevaskis about Wills for Heroes access, requesting that Union–Snyder planning be switched to SLAAY and the Veterans Coalition, explaining that USCBA had suspended planning unless protected claims were resolved, challenging retaliatory control over veterans services, and discussing subpoenas and litigation if PBA refused equal access.

1209. Trevaskis retaliated by participating in, supporting, reversing, ratifying, allowing, or failing to correct PBA and Wills for Heroes exclusion after communications from USCBA and NPLS-aligned actors exported local hostility into statewide bar structures and after Plaintiff's counsel engaged in protected litigation, subpoena-related communications, veterans advocacy, and criticism of legal-aid and bar misconduct.

1210. Trevaskis's conduct would deter a person of ordinary firmness from continuing protected petitioning and veterans advocacy because statewide Wills for Heroes leadership controls or influences whether attorneys and nonprofit legal providers may participate in public-facing legal programs, communicate with PBA staff and volunteers, serve veterans and disabled veterans, maintain professional credibility, and continue legal-aid reform work without bar retaliation.

1211. Lori Molloy acted under color of law, as a publicly funded legal-aid executive, as a state-entwined actor, as a federally funded actor, as a public-function actor, and as a joint participant because she exercised executive authority over North Penn Legal Services' legal-aid operations, public funding, attorney supervision, staff supervision, intake systems, client-service systems, malpractice-response systems, and institutional relationships with courts, funders, bar actors, referral sources, and public-service networks.

1212. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by reporting systemic malpractice inside North Penn Legal Services, objecting to missed hearings and deadlines, criticizing legal-aid management failures, advocating for harmed clients, developing conflict-free nonprofit legal-service alternatives, and pursuing litigation challenging legal-aid abandonment and retaliation.

1213. Molloy retaliated by participating in, ratifying, allowing, or failing to correct North Penn Legal Services' response to protected malpractice reporting, by preserving institutional control instead of client repair, by allowing post-resignation retaliation against Martineau and SLAAY, and by maintaining a legal-aid environment in which protected whistleblowing and public criticism led to professional exclusion, referral loss, client-service obstruction, and retaliation through bar-connected and legal-aid-connected systems.

1214. Molloy's conduct would deter a person of ordinary firmness from continuing protected malpractice reporting, legal-aid criticism, nonprofit legal-service development, litigation, and client-protection advocacy because an executive director of a publicly funded legal-aid provider controls employment consequences, references, institutional narratives, referrals, client access, staff communication, funding credibility, and the provider's response to whistleblower reports.

1215. Timothy Smith acted under color of law, as a publicly funded legal-aid senior manager, as a state-entwined actor, as a federally funded actor, as a public-function actor, and as a joint participant because he exercised senior management authority over North Penn Legal Services' attorney supervision, case-management systems, client communication, attorney assignments, corrective action, funding

compliance, grievance responses, representation-status practices, withdrawal practices, and response to known client-service failures.

1216. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by reporting malpractice, criticizing missed hearings and missed deadlines, objecting to client abandonment, demanding client-protective correction, pursuing litigation, developing conflict-free nonprofit legal-service alternatives, and challenging public legal-aid monopoly structures.

1217. Smith retaliated by participating in, ratifying, allowing, or failing to correct North Penn Legal Services' retaliatory response to protected reporting and by preserving the provider's authority after known client-service failures, including Grohol's case, where North Penn Legal Services remained counsel of record while Smith told Grohol that North Penn Legal Services was not working on the case for her, pressured her to proceed pro se, and warned her that her case could be dismissed for lack of prosecution if she did not represent herself.

1218. Smith's conduct would deter a person of ordinary firmness from continuing protected reporting, litigation, and client-protection advocacy because a deputy director or senior legal-aid manager controls case assignments, supervision, communication, grievance responses, representation-status practices, and whether

harmed clients receive correction or are forced to repair legal-aid failures themselves.

1219. Mary Beth Clark acted under color of law, as a state-entwined actor, as a public-function actor, and as a joint participant because she operated at the intersection of North Penn Legal Services, USCBA, Wills for Heroes, Law Day, local bar governance, public-facing legal programs, judicial relationships, legal-aid referral structures, and local professional networks.

1220. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing North Penn Legal Services malpractice, challenging legal-aid abandonment, objecting to USCBA retaliation, advocating for disabled veterans, seeking Wills for Heroes inclusion, demanding accurate minutes, proposing nonretaliation rules, and filing or threatening nonfrivolous litigation.

1221. Clark retaliated by carrying North Penn Legal Services hostility into USCBA, trying to use Martineau's temporary absence after her mother's death to exclude her permanently from bar and pro bono roles, excluding Martineau and SLAAY from communications and Wills for Heroes planning, privately undermining SLAAY's eligibility for PFA fees and Judicare referrals, and supporting or failing to prevent USCBA retaliation after protected criticism and litigation.

1222. Clark's conduct would deter a person of ordinary firmness from continuing protected speech and petitioning because a North Penn Legal Services-connected attorney and local bar leader can convert whistleblower conflict into committee exclusion, referral obstruction, fee obstruction, pro bono exclusion, reputational harm, and loss of access to the local legal-service infrastructure needed to serve vulnerable clients.

1223. David Andrew Strouse acted under color of law, as a state-entwined actor, as a public-function actor, and as a joint participant because he acted as a local attorney, USCBA participant, listserv participant, bar-governance participant, litigation-response participant, public-service participant, or court-connected professional actor in the local legal structures challenged in this action.

1224. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing USCBA, PBA, Office of Disciplinary Counsel, judges, bar actors, legal-aid misconduct, Wills for Heroes exclusion, retaliation, false statements, and conspiracy, and by threatening and filing nonfrivolous litigation.

1225. Strouse retaliated by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from retaliatory exclusion, boycott, false statements, listserv conduct, professional ostracism, or conspiracy after Plaintiff's counsel and

Plaintiff's agents engaged in protected speech, petitioning, litigation, veterans advocacy, and legal-aid reform work.

1226. Strouse's conduct would deter a person of ordinary firmness from continuing protected criticism, litigation, subpoena activity, public-service advocacy, and participation in court-connected bar structures because local attorneys and listserv participants in a small bar association can collectively enforce exclusion, ostracism, refusal to forward invitations, reputational harm, boycott, and retaliation against dissenting attorneys and nonprofit legal providers.

1227. Jenna Ann Neidig acted under color of law, as a state-entwined actor, as a public-function actor, and as a joint participant because she acted as a local attorney, USCBA participant, listserv participant, bar-governance participant, officer or former officer, and participant in local legal structures, public-service legal programming, and court-connected professional networks challenged in this action.

1228. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing USCBA, PBA, Office of Disciplinary Counsel, judges, bar actors, legal-aid misconduct, Wills for Heroes exclusion, retaliation, false statements, and conspiracy, and by threatening and filing nonfrivolous litigation.

1229. Neidig retaliated by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from retaliatory exclusion, boycott, false statements, listserv conduct, meeting-related conduct, governance-record conduct, professional ostracism, or conspiracy after Plaintiff's counsel and Plaintiff's agents engaged in protected speech, petitioning, litigation, veterans advocacy, and legal-aid reform work.

1230. Neidig's conduct would deter a person of ordinary firmness from continuing protected criticism, litigation, subpoena activity, public-service advocacy, and participation in court-connected bar structures because local bar officers, former officers, and listserv participants can give retaliatory exclusion institutional legitimacy by remaining silent, ratifying false statements, failing to correct governance records, or allowing protected speech to be treated as misconduct.

1231. Robert Cravitz acted under color of law, as a state-entwined actor, as a public-function actor, and as a joint participant because he acted as a local attorney, USCBA participant, bar-connected professional actor, listserv participant, litigation-response participant, public-service participant, or court-connected actor within the local legal and bar structures challenged in this action.

1232. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing local legal-system misconduct, legal-aid abandonment, USCBA retaliation, PBA

retaliation, Wills for Heroes exclusion, attorney misconduct, public-service exclusion, and the treatment of vulnerable clients, and by threatening and filing litigation.

1233. Cravitz retaliated by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from retaliatory exclusion, boycott, false statements, listserv conduct, professional ostracism, or conspiracy after protected speech, protected petitioning, litigation, veterans advocacy, and legal-aid reform work.

1234. Cravitz's conduct would deter a person of ordinary firmness from continuing protected criticism and petitioning because local attorney participation in bar-connected retaliation can damage referrals, reputation, professional access, local credibility, public-service programming, and a nonprofit legal provider's practical ability to serve clients.

1235. Pennsylvania Department of Military and Veterans Affairs acted under color of state law through its state-agency authority, veterans-outreach structures, coalition participation, Regional Program Outreach Coordinator communications, Bureau of Veterans Programs involvement, public-facing veterans-service role, and coordination with Wills for Heroes, Wills for Veterans, county veterans systems, Pennsylvania Bar Association actors, USCBA actors, Bloomsburg Fair actors, and veterans-event participants.

1236. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by advocating for veterans and disabled veterans, participating in DMVA-connected coalitions, answering DMVA requests for wills and estate-planning help, seeking Wills for Heroes and Wills for Veterans participation, criticizing PBA and USCBA retaliation, challenging exclusion from veterans-service programs, pursuing litigation, and demanding equal access to public-facing veterans outreach.

1237. Pennsylvania Department of Military and Veterans Affairs retaliated by participating in, ratifying, allowing, failing to correct, or failing to prevent exclusion of Plaintiff's agents from veterans-service programming after protected advocacy and litigation, by accepting or acting on PBA and USCBA narratives that undermined SLAAY, and by allowing state-connected veterans-service channels to preserve exclusion from Wills for Heroes, Wills for Veterans, Bloomsburg Fair veterans programming, and related public-facing outreach.

1238. Pennsylvania Department of Military and Veterans Affairs' conduct would deter a person of ordinary firmness from continuing protected veterans advocacy, litigation, and criticism of bar-controlled veterans programs because a state veterans agency's recognition, coalition communications, referral pathways, and event coordination affect whether a nonprofit legal provider can reach veterans,

serve disabled veterans, maintain credibility, and participate in government-facing veterans-service systems.

1239. Office of Disciplinary Counsel acted under color of state law through its disciplinary authority, attorney-regulation role, investigative power, charging discretion, communications with judges, lawyers, bar actors, court actors, and legal-aid actors, and its practical ability to burden attorney speech, legal practice, litigation, subpoena activity, criticism of judges, criticism of lawyers, and protected petitioning.

1240. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing lawyers, judges, bar associations, legal-aid providers, disciplinary systems, court practices, retaliation, malpractice, Wills for Heroes exclusion, public-service exclusion, and attorney-regulation misconduct, and by filing or threatening nonfrivolous litigation, discussing subpoenas, seeking discovery, and demanding public accountability.

1241. Office of Disciplinary Counsel retaliated by participating in, threatening, allowing, encouraging, failing to prevent, or failing to correct disciplinary or disciplinary-adjacent burdens after protected criticism and litigation, including use of attorney-regulation risk to chill emails, communications, subpoena activity,

public criticism, legal-aid reform, and advocacy against judges, lawyers, legal-aid actors, bar actors, and public institutions.

1242. Office of Disciplinary Counsel's conduct would deter a person of ordinary firmness from continuing protected speech and petitioning because disciplinary scrutiny can threaten a lawyer's license, reputation, practice, livelihood, litigation posture, ability to send critical emails, ability to subpoena witnesses, ability to contact potential witnesses, and ability to advocate against powerful legal-system actors.

1243. United States Bankruptcy Court for the Middle District of Pennsylvania acted under color of federal law through its federal judicial authority, bankruptcy jurisdiction, docket authority, hearing authority, case-management authority, sanctions-related authority, local-rule authority, attorney-practice authority, filing systems, staff communications, bankruptcy-access structures, and court-connected relationships with bankruptcy lawyers, legal-aid actors, bar actors, debt-relief actors, and public officials.

1244. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing federal judicial conduct, seeking recusal, opposing sanctions, challenging bankruptcy-court conduct, advocating for bankruptcy access, representing debtors and vulnerable clients, criticizing legal-aid and bar retaliation, filing appeals, filing

litigation, pursuing discovery, and communicating with legal-system actors about court accountability.

1245. United States Bankruptcy Court for the Middle District of Pennsylvania retaliated by participating in, ratifying, allowing, or failing to prevent bankruptcy-access burdens, attorney-practice burdens, complaint-handling burdens, case-handling burdens, hearing-handling burdens, filing-related burdens, sanctions-related burdens, local-rule burdens, monitoring burdens, or court-access conduct after protected criticism, protected litigation, recusal-related advocacy, opposition to improper sanctions, subpoena activity, client-protection work, and participation in this lawsuit.

1246. United States Bankruptcy Court for the Middle District of Pennsylvania's conduct would deter a person of ordinary firmness from continuing protected judicial criticism, bankruptcy-access advocacy, debt-relief advocacy, legal-aid reform advocacy, malpractice reporting, recusal-related advocacy, opposition to sanctions, subpoena activity, and public-interest litigation because a federal bankruptcy court controls attorney practice, docket access, case access, hearing access, sanctions exposure, staff communication, and the practical ability to serve debtors, homeowners, low-income litigants, veterans, disabled veterans, and other court users.

1247. Doe Defendants 1 through 200 acted under color of law, as state-entwined actors, as public-function actors, as joint participants, or as court-connected or bar-connected actors because they include members of defendants, participants in the Union–Snyder County Bar Association listserv who are not members, local attorneys, bar participants, public-service participants, Wills for Heroes participants, court-connected actors, legal-aid actors, and other known or unknown persons who received, participated in, ratified, aided, failed to prevent, or benefitted from retaliatory exclusion, boycott, false statements, or conspiracy.

1248. Plaintiff, Plaintiff's counsel, Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity by criticizing legal-aid misconduct, bar retaliation, judicial conduct, public-service exclusion, veterans-service exclusion, Wills for Heroes exclusion, disciplinary threats, attorney misconduct, false narratives, and legal-system retaliation, and by filing or threatening litigation, discussing subpoenas, seeking discovery, demanding accurate minutes, proposing nonretaliation rules, requesting committee access, and advocating for vulnerable clients, veterans, and disabled veterans.

1249. Doe Defendants 1 through 200 retaliated by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from USCBA membership structures, USCBA listserv structures, local attorney networks, bar-governance structures, litigation-response structures, public-service legal networks, Wills for

Heroes structures, court-connected local legal systems, false statements, boycotts, exclusionary conduct, and professional ostracism that chilled, burdened, excluded, ratified, aided, or failed to prevent retaliation against protected speech, petitioning, litigation, veterans advocacy, legal-aid criticism, bar criticism, client advocacy, and conflict-free nonprofit legal-service work.

1250. Doe Defendants 1 through 200’s conduct would deter a person of ordinary firmness from continuing protected speech and petitioning because unknown members, listserv participants, local attorneys, bar-connected actors, court-connected actors, public-service actors, and professional-network participants can collectively enforce reputational harm, referral loss, meeting exclusion, committee exclusion, listserv exclusion, Wills for Heroes exclusion, public-service exclusion, disciplinary pressure, litigation pressure, and community-wide professional isolation.

1251. Defendants caused First Amendment retaliation injury to Grohol and similarly situated clients because their combined conduct preserved public funding, federal funding, referrals, bar authority, disciplinary authority, judicial authority, court-facing authority, public-service access, veterans-service access, local professional credibility, statewide legal-aid legitimacy, Wills for Heroes access, counsel-of-record authority, and institutional control while punishing or chilling protected criticism, petitioning, litigation, subpoena activity, legal-aid

whistleblowing, veterans advocacy, client advocacy, and conflict-free nonprofit legal-service work.

1252. Defendants' retaliation harmed Grohol because she depended on advocates willing to challenge North Penn Legal Services' failure to provide meaningful representation after her January 15, 2020 missed-notice replevin hearing, and retaliation against those advocates reduced her access to conflict-free representation, public-interest advocacy, nonretaliatory legal-service networks, and legal-system accountability.

1253. Defendants' retaliation harmed the class because vulnerable legal-aid clients, former legal-aid clients, domestic-violence survivors, low-income litigants, people with disabilities, veterans, disabled veterans, debtors, homeowners, court users, and public-service beneficiaries depend on attorneys, nonprofit legal-service providers, and advocates who can criticize legal-aid providers, judges, prosecutors, bar associations, disciplinary actors, court actors, public officials, and public-service structures without retaliation.

1254. Defendants are liable for First Amendment retaliation because each acted under color of state law, under color of federal law, as a public-function actor, as a state-entwined actor, as a joint participant, or as a court-connected, bar-connected, legal-aid-connected, public-service-connected, veterans-service-connected, disciplinary-connected, or publicly funded actor; Plaintiff, Plaintiff's counsel,

Plaintiff's legal team, Plaintiff's agents, and related advocates engaged in protected First Amendment activity; each defendant took, supported, ratified, aided, allowed, encouraged, or failed to prevent retaliatory action that would deter a person of ordinary firmness; and the timing, context, express statements, meeting conduct, listserv conduct, bans, suspensions, exclusions, communications, access restrictions, false narratives, disciplinary pressure, judicial pressure, court-access burdens, and coordinated institutional relationships show that protected activity substantially or materially motivated the retaliation.

1255. Grohol and the class are entitled to compensatory damages, nominal damages, punitive damages where available, declaratory relief, injunctive relief, reinstatement to bar, committee, listserv, meeting, Wills for Heroes, Wills for Veterans, veterans-outreach, coalition, public-service, court-access, bankruptcy-access, referral, pro bono, and legal-service opportunities, rescission of bans and suspensions, correction of minutes and records, nonretaliation policies, preservation of communications and records, expedited discovery, attorney-practice protections, disciplinary nonretaliation protections, court-access protections, veterans-service access protections, referral protections, public-service participation protections, costs, fees where available, and all other lawful relief.

**COUNT 18**

**42 U.S.C. § 1985 Conspiracy and 42 U.S.C. § 1986 Failure to Prevent Conspiracy Against Pennsylvania Bar Association; Union–Snyder County Bar Association; Office of Disciplinary Counsel; Lori R. Hackenberg; William R. Christman III; David Andrew Strouse; Jenna Ann Neidig; Sarah Beth Stigerwalt-Egan; Michael F.J. Piecuch; Mark J. Conway; Jeffrey A. Rowe; Matthew W. Brann; Robert Leadbeter; Heath Brosius; Brian Kerstetter; Jamie Saleski; K. Michael Sullivan; Alexandra Sholley; Kathleen Lincoln; Brian Ulmer; Jessica Chapman; Gabriele Miller-Wagner; David K. Trevaskis; Lori Molloy; Timothy Smith; Mary Beth Clark; Robert Cravitz; North Penn Legal Services, Inc.; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; Snyder County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; Pennsylvania Legal Aid Network, Inc.; Transitions of PA; Transitions Legal Center; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; and Doe Defendants 1 through 200**

1256. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 140, Pennsylvania Bar Association, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 141, Union–Snyder County Bar Association, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 142, Office of Disciplinary Counsel,

42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 143, Lori R. Hackenberg, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 144, William R. Christman III, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 145, David Andrew Strouse, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 146, Jenna Ann Neidig, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 147, Sarah Beth Stigerwalt-Egan, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 148, Michael F.J. Piecuch, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 149, Mark J. Conway, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 150, Jeffrey A. Rowe, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 151, Matthew W. Brann, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 152, Robert Leadbeter, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 153, Heath Brosius, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 154, Brian Kerstetter, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 155, Jamie Saleski, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 156, K. Michael Sullivan, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 157, Alexandra Sholley, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 158, Kathleen Lincoln, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 159, Brian Ulmer, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 160, Jessica Chapman, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 161, Gabriele Miller-Wagner, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 162, David K. Trevaskis, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 163, Lori Molloy, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 164, Timothy Smith, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 165,

Mary Beth Clark, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 166, Robert Cravitz, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 167, North Penn Legal Services, Inc., 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 168, Union County Criminal Justice Advisory Board, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 169, Union County Mental Health Advisory Committee, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 170, Union County STOP Coalition, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 171, Snyder County STOP Coalition, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 172, United States Bankruptcy Court for the Middle District of Pennsylvania, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 173, Pennsylvania Legal Aid Network, Inc., 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 174, Transitions of PA, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 175, Transitions Legal Center, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 176, Bloomsburg Fair Association, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; COA 177, Pennsylvania Department of Military and Veterans Affairs, 42 U.S.C. § 1985 and 42 U.S.C. § 1986; and COA 178, Doe Defendants 1 through 200, 42 U.S.C. § 1985 and 42 U.S.C. § 1986, from the 651-count inventory attached as exhibits.

1257. The elements of a 42 U.S.C. § 1985 conspiracy claim are a conspiracy, a purpose to deprive a person or class of persons of equal protection of the laws or equal privileges and immunities under the laws, an act in furtherance of the conspiracy, and injury to person or property or deprivation of a right or privilege,

and the elements of a 42 U.S.C. § 1986 claim are knowledge that a 42 U.S.C. § 1985 conspiracy is about to be committed or is being committed, power to prevent or aid in preventing the conspiracy, neglect or refusal to prevent it, and resulting wrongful act and injury.

1258. Pennsylvania Bar Association joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct that excluded, burdened, punished, and deterred Plaintiff's legal team and Plaintiff's agents after they criticized legal-aid misconduct, challenged bar retaliation, sought Wills for Heroes access, advocated for veterans and disabled veterans, threatened litigation, filed litigation, discussed subpoenas, and demanded equal access to public-facing legal-service programs.

1259. Pennsylvania Bar Association committed acts in furtherance of the conspiracy through Wills for Heroes exclusion, statewide bar-connected program exclusion, communication restrictions, refusal to correct retaliation, and preservation of program access for favored participants while denying Plaintiff's agents access after protected speech and petitioning.

1260. Pennsylvania Bar Association knew or should have known that the coordinated exclusion would harm Grohol and similarly situated legal-aid clients because those clients depended on conflict-free advocates willing to challenge

North Penn Legal Services, bar actors, legal-aid funders, public-service actors, and public-facing legal programs without retaliation.

1261. Pennsylvania Bar Association had power to prevent or aid in preventing the conspiracy because it controlled or influenced Wills for Heroes access, PBA-connected communications, program legitimacy, volunteer channels, statewide bar messaging, pro bono credibility, and public-facing legal-service opportunities, yet it neglected or refused to prevent the retaliation and instead preserved the exclusionary structure.

1262. Union–Snyder County Bar Association joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving Wills for Heroes exclusion, local bar retaliation, listserv retaliation, committee exclusion, meeting manipulation, inaccurate governance records, professional ostracism, reputational harm, and interference with protected legal advocacy.

1263. Union–Snyder County Bar Association committed acts in furtherance of the conspiracy by excluding Plaintiff's legal team and Plaintiff's agents from Wills for Heroes planning, refusing equal committee and agenda access, manipulating or refusing to correct minutes, cancelling or controlling meetings, withholding Teams access, using meeting rules against protected objections, and suspending membership after protected litigation and criticism.

1264. Union–Snyder County Bar Association knew or should have known that the retaliation would impair access to conflict-free advocacy because Grohol, legal-aid clients, veterans, disabled veterans, and public-service beneficiaries depended on attorneys and nonprofit legal providers who could criticize North Penn Legal Services, USCBA, PBA, judges, and bar actors without losing local professional access.

1265. Union–Snyder County Bar Association had power to prevent or aid in preventing the conspiracy because it controlled or influenced local bar participation, listserv access, committee access, meeting access, meeting minutes, Wills for Heroes planning, local professional legitimacy, and corrective communications, yet it neglected or refused to prevent the conspiracy and instead participated in the retaliation.

1266. Office of Disciplinary Counsel joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct that burdened malpractice reporting, ethics complaints, legal-aid criticism, bar criticism, protected emails, protected witness communications, subpoena activity, litigation, and advocacy against lawyers, judges, legal-aid actors, bar actors, and public institutions.

1267. Office of Disciplinary Counsel committed acts in furtherance of the conspiracy, or failed to prevent acts it had power to prevent, by allowing disciplinary pressure, disciplinary fear, selective professional pressure, failure to protect ethics complaints, failure to protect malpractice reporting, and failure to protect attorney-misconduct reporting to operate as tools for chilling protected criticism and petitioning.

1268. Office of Disciplinary Counsel knew or should have known that disciplinary pressure would deter a person of ordinary firmness from criticizing lawyers and judges because disciplinary scrutiny can threaten a lawyer's license, reputation, livelihood, litigation posture, ability to send critical emails, ability to subpoena witnesses, ability to contact potential witnesses, and ability to advocate against powerful legal-system actors.

1269. Office of Disciplinary Counsel had power to prevent or aid in preventing the conspiracy through its disciplinary authority, attorney-regulation role, investigative power, charging discretion, corrective communications, and professional-regulation authority, yet it neglected or refused to prevent the conspiracy and allowed the chilling effect to remain in place.

1270. Lori R. Hackenberg joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving court-connected

pressure, local bar retaliation, public-service exclusion, courthouse-program exclusion, professional ostracism, reputational harm, false statements, and interference with advocacy for vulnerable legal-aid clients, veterans, disabled veterans, and public-service beneficiaries.

1271. Hackenberg committed acts in furtherance of the conspiracy, or failed to prevent acts she had power to prevent, by participating in, ratifying, allowing, or failing to oppose court-connected and bar-connected exclusion after protected criticism of legal-aid malpractice, Wills for Heroes retaliation, public-service discrimination, judicial favoritism, and the use of local court and bar networks to punish dissenting attorneys and nonprofit legal providers.

1272. Hackenberg knew or should have known that judicially connected retaliation would burden protected speech and petitioning because attorneys and nonprofit legal providers depend on neutral courthouse access, judicial neutrality, professional credibility, program access, and freedom from court-connected retaliation when they represent vulnerable clients and challenge legal-system misconduct.

1273. Hackenberg had power to prevent or aid in preventing the conspiracy through judicial authority, court-connected influence, local professional authority, public-service influence, and practical ability to discourage retaliation or correct

false narratives, yet she neglected or refused to prevent the conspiracy and allowed court-connected pressure and public-service exclusion to continue.

1274. William R. Christman III joined, directed, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving PBA retaliation, Wills for Heroes exclusion, professional ostracism, communication restrictions, reputational harm, false statements, refusal to correct retaliation, and interference with protected veterans advocacy and public-interest legal work.

1275. Christman committed acts in furtherance of the conspiracy on July 30, 2025, when he used Pennsylvania Bar Association general-counsel authority to order Martineau to cease all communications with PBA staff and volunteers, require communications about PBA, Wills for Heroes, and potential litigation to go only through him, and announce that PBA would not permit Martineau or SLAAY to participate in any Wills for Heroes events or programs in any way.

1276. Christman knew or should have known that the no-contact directive and categorical Wills for Heroes ban would chill protected criticism, litigation, subpoena activity, witness communications, veterans advocacy, and public-interest legal work because the restrictions cut Plaintiff's legal team and Plaintiff's agents off from staff, volunteers, statewide pro bono channels, veterans-service programs, public-facing legal opportunities, and reputational legitimacy.

1277. Christman had power to prevent or aid in preventing the conspiracy because he controlled or influenced PBA legal positions, PBA communications, Wills for Heroes access, program participation, and corrective action, yet he used that authority to impose the retaliatory restriction and thereby advanced the conspiracy instead of preventing it.

1278. David Andrew Strouse joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving local bar retaliation, listserv retaliation, Wills for Heroes exclusion, professional ostracism, reputational harm, false statements, refusal to correct misinformation, refusal to forward or support public-service participation, and interference with protected advocacy.

1279. Strouse committed acts in furtherance of the conspiracy, or failed to prevent acts he had power to prevent, by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from retaliatory exclusion, boycott, false statements, professional ostracism, and local legal pressure after Plaintiff's legal team and Plaintiff's agents engaged in protected speech, petitioning, litigation, veterans advocacy, and legal-aid reform work.

1280. Strouse knew or should have known that local attorney participation in bar-connected retaliation would chill protected advocacy because local attorneys and listserv participants in a small bar association can collectively enforce reputational

harm, referral loss, meeting exclusion, committee exclusion, listserv exclusion, Wills for Heroes exclusion, public-service exclusion, and community-wide professional isolation.

1281. Strouse had power to prevent or aid in preventing the conspiracy through local professional influence, listserv participation, local legal-system credibility, and practical ability to reject retaliation, correct false narratives, refuse exclusion, forward public-service information, oppose professional ostracism, and support fair access, yet he neglected or refused to prevent the conspiracy.

1282. Jenna Ann Neidig joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving local bar retaliation, listserv retaliation, meeting manipulation, inaccurate minutes, Wills for Heroes exclusion, professional ostracism, reputational harm, false statements, refusal to correct misinformation, and interference with requests for accurate governance records.

1283. Neidig committed acts in furtherance of the conspiracy, or failed to prevent acts she had power to prevent, by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from retaliatory exclusion, boycott, false statements, inaccurate minutes, meeting-related conduct, governance-record conduct, professional ostracism, and conspiracy after protected litigation and criticism.

1284. Neidig knew or should have known that inaccurate governance records and local bar retaliation would deter protected speech because false or incomplete minutes can convert protected objections into alleged disruption, deny an accurate record of constitutional objections, and support exclusion from meetings, committees, Wills for Heroes planning, listserv access, and local bar membership.

1285. Neidig had power to prevent or aid in preventing the conspiracy through meeting participation, minutes participation, listserv participation, local professional influence, and practical ability to correct inaccurate minutes, correct false narratives, reject retaliation, oppose ostracism, and support equal access, yet she neglected or refused to prevent the conspiracy.

1286. Sarah Beth Stigerwalt-Egan joined, directed, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving local bar retaliation, Wills for Heroes exclusion, listserv retaliation, meeting access restrictions, Teams access restrictions, false or hostile communications with PBA and DMVA, membership suspension, and interference with veterans advocacy and protected litigation.

1287. Stigerwalt-Egan committed acts in furtherance of the conspiracy by using USCBA presidential authority, judicial-law-clerk and hearing-officer status, local bar governance, Wills for Heroes control, meeting access, listserv communications,

Teams access, minute practices, public-service legal-program access, and communications with PBA and DMVA to burden Plaintiff's legal team and Plaintiff's agents after protected speech and petitioning.

1288. Stigerwalt-Egan knew or should have known that suspending Wills for Heroes planning unless protected claims were resolved, withholding Teams access, refusing nonretaliation protections, sending hostile or false communications, and allowing membership suspension would deter protected litigation, criticism, veterans advocacy, legal-aid reform, and public-service work.

1289. Stigerwalt-Egan had power to prevent or aid in preventing the conspiracy because she controlled or influenced USCBA governance, meeting access, communications, Wills for Heroes planning, bar records, public-service legal programming, and corrective action, yet she used or allowed those powers to advance the retaliatory course of conduct.

1290. Michael F.J. Piecuch joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving court-connected pressure, local bar retaliation, advisory-board exclusion, public-service exclusion, judicially connected intimidation, professional ostracism, reputational harm, false statements, and interference with protected advocacy for vulnerable clients,

veterans, disabled veterans, domestic-violence survivors, and persons with disabilities.

1291. Piecuch committed acts in furtherance of the conspiracy, or failed to prevent acts he had power to prevent, by using or allowing judicial prestige, president-judge authority, bar-connected influence, USCBA participation, listserv communications, civility narratives, local legal-culture authority, Wills for Heroes narratives, Law Day structures, and advisory-board influence to chill, burden, exclude, or punish protected criticism and petitioning.

1292. Piecuch knew or should have known that a president judge’s participation in local bar, courthouse, advisory-board, public-service, and professional-access structures would deter protected speech because it signals that criticism of judges, prosecutors, legal-aid actors, bar officers, pro bono gatekeepers, and court-connected institutions can produce exclusion, reputational harm, professional isolation, and loss of public-service access.

1293. Piecuch had power to prevent or aid in preventing the conspiracy through judicial authority, president-judge authority, court-connected influence, local professional authority, advisory-board influence, and practical ability to discourage retaliation, correct false narratives, prevent court-connected intimidation, and

protect fair access to public-service systems, yet he neglected or refused to prevent the conspiracy.

1294. Mark J. Conway joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving judicially connected intimidation, litigation retaliation, coercive litigation pressure, sanctions-related pressure, recusal-related pressure, federal-court advocacy burdens, reputational harm, professional ostracism, public-service exclusion, and interference with protected legal advocacy.

1295. Conway committed acts in furtherance of the conspiracy, or failed to prevent acts he had power to prevent, by using or allowing federal judicial authority, bankruptcy-court authority, sanctions proceedings, recusal decisions, courtroom control, docket management, judicial characterizations of protected criticism, and coercive litigation pressure to burden protected speech, petitioning, bankruptcy advocacy, legal-aid criticism, and public-interest litigation.

1296. Conway knew or should have known that sanctions authority, recusal denial, judicial criticism, docket control, courtroom power, and federal bankruptcy-court authority would deter a person of ordinary firmness from criticizing judicial conduct, seeking recusal, opposing sanctions, preserving constitutional objections,

reporting malpractice, and pursuing nonfrivolous litigation against legal-system actors.

1297. Conway had power to prevent or aid in preventing the conspiracy through federal judicial authority, bankruptcy-court authority, docket authority, hearing authority, sanctions authority, recusal authority, courtroom control, and practical ability to protect fair federal-court advocacy, yet he neglected or refused to prevent the conspiracy and instead allowed judicially connected pressure to burden protected advocacy.

1298. Jeffrey A. Rowe joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving court-connected pressure, local bar retaliation, Law Day and public-service access, Wills for Heroes exclusion, professional ostracism, reputational harm, false statements, and interference with protected advocacy for vulnerable legal-aid clients, veterans, disabled veterans, and public-service beneficiaries.

1299. Rowe committed acts in furtherance of the conspiracy, or failed to prevent acts he had power to prevent, by participating in, ratifying, allowing, or failing to oppose court-connected and bar-connected exclusionary conduct after protected speech, petitioning, and litigation, including conduct affecting courthouse-program access, Law Day recognition, Wills for Heroes planning, USCBA meeting

dynamics, public-service legal opportunities, and professional participation in the local bar ecosystem.

1300. Rowe knew or should have known that a magisterial district judge’s participation in local bar and public-service structures would deter protected speech because it can influence whether attorneys, nonprofit legal providers, and vulnerable-client advocates receive equal professional access, neutral public recognition, fair participation in court-connected programs, and equal treatment in local legal networks.

1301. Rowe had power to prevent or aid in preventing the conspiracy through judicial office, magisterial-district authority, courthouse role, court-connected communications, USCBA participation, Law Day participation, Wills for Heroes communications, public-service programming, and local legal-culture influence, yet he neglected or refused to prevent retaliation and allowed the retaliatory environment to continue.

1302. Matthew W. Brann joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving federal-court pressure, litigation retaliation, judicially connected intimidation, case-management burdens, recusal-related pressure, professional ostracism, reputational harm, and interference with protected litigation, judicial criticism, legal-aid criticism, and public-interest legal work.

1303. Brann committed acts in furtherance of the conspiracy, or failed to prevent acts he had power to prevent, by using or allowing federal judicial authority, case-management authority, adjudicatory authority, recusal decisions, docket control, and judicial treatment of protected litigation and protected criticism to burden, punish, chill, or impair protected speech, petitioning, public-interest litigation, legal-aid accountability work, and challenges to powerful legal institutions.

1304. Brann knew or should have known that federal judicial handling of claims, recusal issues, docket control, judicial framing, and case-management decisions would deter protected litigation and criticism because federal court authority affects whether attorneys and nonprofit legal providers continue challenging bar associations, courts, judges, legal-aid providers, public officials, and professional networks.

1305. Brann had power to prevent or aid in preventing the conspiracy through federal judicial authority, case-assignment authority, docket authority, adjudicatory authority, case-management authority, recusal authority, and practical ability to protect fair federal-court access, yet he neglected or refused to prevent the conspiracy and allowed federal-court pressure to burden protected advocacy.

1306. Robert Leadbeter joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving public-official pressure, veterans-event exclusion, Bloomsburg Fair exclusion, public-facing

veterans-expo access, reputational harm, public-service exclusion, and interference with protected veterans advocacy, litigation, and criticism of bar-controlled veterans programs.

1307. Leadbeter committed acts in furtherance of the conspiracy, or failed to prevent acts he had power to prevent, by participating in, authorizing, ratifying, allowing, or failing to prevent exclusion of Plaintiff's agents from the Bloomsburg Fair veterans event, by using or allowing public-office authority and public-facing veterans-expo structures to deny equal veterans-outreach access after protected litigation and criticism, and by giving access to favored participants while excluding protected critics.

1308. Leadbeter knew or should have known that exclusion from a public-facing veterans event controlled, promoted, or influenced by a public official would deter protected criticism, litigation, veterans advocacy, and public-interest legal work because such exclusion harms reputation, public-service legitimacy, outreach access, relationships with veterans, and the ability to serve disabled veterans through community-based legal assistance.

1309. Leadbeter had power to prevent or aid in preventing the conspiracy through public office, public communications, veterans-event involvement, public-facing veterans-expo authority, coordination with Bloomsburg Fair Association, and participation in public-service structures affecting veterans outreach, event access,

and public recognition, yet he neglected or refused to prevent the exclusionary retaliation.

1310. Heath Brosius joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving prosecutorially connected pressure, public-service exclusion, STOP-related obstruction, bar retaliation, reputational harm, legal-aid accountability obstruction, and coordinated local retaliation against Plaintiff's legal team, Plaintiff's agents, and related advocates.

1311. Brosius committed acts in furtherance of the conspiracy, or failed to prevent acts he had power to prevent, by participating in, ratifying, aiding, allowing, or failing to oppose retaliatory local legal-system conduct after protected criticism of prosecutors, legal-aid providers, judges, USCBA, bar actors, STOP-related structures, public-service exclusion, legal-aid malpractice, and local legal-system misconduct.

1312. Brosius knew or should have known that a district attorney's participation in, silence toward, or failure to oppose retaliatory local legal-system conduct would chill attorneys and nonprofit legal providers who must criticize prosecutors, judges, legal-aid actors, bar associations, and county-connected systems to represent vulnerable clients.

1313. Brosius had power to prevent or aid in preventing the conspiracy through prosecutorial authority, public-office authority, local legal influence, court-

connected participation, county-connected public-service structures, STOP-related systems, USCBA-related relationships, and interactions with local bar, court, and service-provider networks, yet he neglected or refused to prevent the retaliatory course of conduct.

1314. Brian Kerstetter joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving prosecutorially connected pressure, public-service exclusion, STOP-related obstruction, advisory-board exclusion, bar retaliation, reputational harm, legal-aid accountability obstruction, and coordinated local retaliation against Plaintiff's legal team, Plaintiff's agents, and related advocates.

1315. Kerstetter committed acts in furtherance of the conspiracy, or failed to prevent acts he had power to prevent, by participating in, ratifying, aiding, allowing, or failing to oppose retaliation affecting protected criticism of prosecutors, legal-aid providers, judges, USCBA, bar actors, public-service exclusion, STOP-related systems, advisory-board participation, legal-aid malpractice, and local legal-system misconduct.

1316. Kerstetter knew or should have known that a district attorney's public conduct and influence in local advisory boards, STOP-related systems, public-service networks, and bar-connected spaces could deter protected speech, petitioning, litigation, public-service advocacy, and legal-aid reform because those

structures affect professional credibility, coalition access, referral relationships, and public-service participation.

1317. Kerstetter had power to prevent or aid in preventing the conspiracy through prosecutorial authority, public-office authority, local legal influence, court-connected participation, county-connected public-service structures, STOP-related systems, advisory-board relationships, USCBA-related relationships, and interactions with local bar, court, and service-provider networks, yet he neglected or refused to stop the retaliatory exclusionary conduct.

1318. Jamie Saleski joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving filing-related pressure, record-related pressure, courthouse-related burdens, public-office conduct, court-access obstruction, reputational harm, and interference with protected litigation, subpoenas, document requests, public-record requests, and court-access criticism.

1319. Saleski committed acts in furtherance of the conspiracy, or failed to prevent acts she had power to prevent, by participating in, ratifying, allowing, or failing to oppose filing-related, record-related, courthouse-related, or public-office conduct that burdened Plaintiff, Plaintiff's legal team, Plaintiff's agents, and similarly situated clients after protected criticism, litigation, and petitioning activity.

1320. Saleski knew or should have known that prothonotary treatment affecting court access, filing access, public records, docket integrity, litigation posture, and

litigation administration would deter protected speech and petitioning because legal-aid clients, attorneys, and nonprofit legal providers need reliable court-access systems to seek relief after criticizing legal-system actors.

1321. Saleski had power to prevent or aid in preventing the conspiracy through her office as Northumberland County Prothonotary, public-office authority, docket and filing authority, courthouse authority, public-record authority, service and filing practices, court-access functions, and interactions with lawyers, litigants, and court-connected actors, yet she neglected or refused to prevent filing-related and court-access burdens after protected activity.

1322. K. Michael Sullivan joined, directed, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving USCBA retaliation, Wills for Heroes exclusion, pro bono committee obstruction, public listserv rebukes, unconstitutional conditions on litigation, public-service exclusion, reputational harm, and interference with protected veterans advocacy, legal-aid criticism, and bar criticism.

1323. Sullivan committed acts in furtherance of the conspiracy by publicly rebuking protected criticism on the bar listserv, using Wills for Heroes authority to condition public-service legal programming on the surrender or resolution of protected claims, moving to suspend Wills for Heroes planning, and participating

in the local bar structure that treated protected litigation, protected criticism, subpoena activity, veterans advocacy, and legal-aid reform work as misconduct.

1324. Sullivan knew or should have known that conditioning Wills for Heroes planning or public-service legal access on dropping, resolving, or limiting protected claims would deter protected speech and petitioning because local bar leaders control pro bono committee access, listserv credibility, program access, meeting participation, and professional legitimacy in the local legal community.

1325. Sullivan had power to prevent or aid in preventing the conspiracy through USCBA authority, local bar leadership, Wills for Heroes control, pro bono committee influence, listserv communications, public-service legal-program access, local legal-system influence, and joint participation with court-connected and bar-connected actors, yet he used or allowed that authority to advance the retaliatory course of conduct.

1326. Alexandra Sholley joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving meeting-record manipulation, inaccurate or incomplete minutes, Wills for Heroes exclusion, Law Day access, officer-level retaliation, professional ostracism, reputational harm, and interference with protected requests for accurate governance records, legal-aid criticism, and bar criticism.

1327. Sholley committed acts in furtherance of the conspiracy, or failed to prevent acts she had power to prevent, by participating in, ratifying, allowing, or failing to correct USCBA minute manipulation, refusal to correct material governance inaccuracies, meeting-record practices that distorted protected objections, and officer-level conduct that supported or failed to prevent membership suspension and exclusion after protected litigation and criticism.

1328. Sholley knew or should have known that local bar secretary and meeting-record authority can deter protected speech and petitioning because inaccurate minutes, distorted records, or incomplete governance records can convert protected objections into alleged disruption, deny an accurate record of constitutional objections, and support exclusion from meetings, committees, Wills for Heroes planning, and local bar membership.

1329. Sholley had power to prevent or aid in preventing the conspiracy through USCBA secretary authority, meeting-record authority, minute practices, local bar governance, Law Day participation, Wills for Heroes participation, listserv structures, officer participation, and court-connected local bar influence, yet she neglected or refused to prevent the retaliatory use of governance records and officer action.

1330. Kathleen Lincoln joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving officer-level retaliation,

courthouse-connected pressure, threatening and disparaging comments, litigation-related intimidation, professional ostracism, reputational harm, and interference with protected malpractice reporting, ethics complaints, courthouse criticism, and bar criticism.

1331. Lincoln committed acts in furtherance of the conspiracy by making threatening and disparaging comments after the July 24, 2025 USCBA meeting, telling Martineau that continued complaints about ethical violations would cost her friends, settlements, and support for her projects, tying her remarks to courthouse and prothonotary litigation, and using or allowing her USCBA officer role to participate in or support membership suspension after protected litigation and criticism.

1332. Lincoln knew or should have known that threats about friendships, settlements, project support, courthouse hostility, and bar membership would deter a person of ordinary firmness from continuing protected speech, petitioning, malpractice reporting, ethics complaints, and litigation because those threats connected constitutional activity to professional isolation, litigation consequences, and loss of public-service support.

1333. Lincoln had power to prevent or aid in preventing the conspiracy through USCBA treasurer authority, officer authority, local bar governance, court-connected professional status, public-service legal-program access, and local legal

influence, yet she used or allowed that authority to reinforce retaliation rather than protect protected speech and petitioning.

1334. Brian Ulmer joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving Pennsylvania Bar Association retaliation, Wills for Heroes exclusion, communication restrictions, public-service exclusion, professional ostracism, reputational harm, and interference with protected veterans advocacy, legal-aid criticism, bar criticism, and public-interest legal work.

1335. Ulmer committed acts in furtherance of the conspiracy, or failed to prevent acts he had power to prevent, by participating in, supporting, ratifying, allowing, or failing to correct Pennsylvania Bar Association and Wills for Heroes retaliation that excluded Plaintiff's legal team and Plaintiff's agents from public-facing legal programs, chilled communications with Pennsylvania Bar Association staff and volunteers, and treated protected criticism, protected litigation, subpoena activity, and veterans advocacy as grounds for exclusion from pro bono structures.

1336. Ulmer knew or should have known that Pennsylvania Bar Association-connected and Wills for Heroes-connected actors could deter protected advocacy because statewide program access, volunteer channels, staff communications, pro bono credibility, veterans-service outreach, and public-facing legal-program legitimacy affect whether nonprofit legal providers can serve veterans, disabled veterans, legal-aid clients, and public-service beneficiaries.

1337. Ulmer had power to prevent or aid in preventing the conspiracy through Pennsylvania Bar Association participation, Wills for Heroes participation, bar-connected legal-service structures, statewide pro bono networks, public-facing legal programs, attorney networks, and communications affecting whether Plaintiff's legal team and Plaintiff's agents could participate in veterans-service and legal-service opportunities, yet he neglected or refused to prevent the retaliatory exclusion.

1338. Jessica Chapman joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving Pennsylvania Bar Association retaliation, Wills for Heroes exclusion, public-service legal-program exclusion, professional ostracism, reputational harm, and interference with protected criticism, protected litigation, subpoena activity, and veterans advocacy.

1339. Chapman committed acts in furtherance of the conspiracy, or failed to prevent acts she had power to prevent, by receiving, participating in, supporting, ratifying, allowing, or failing to correct Pennsylvania Bar Association communications and Wills for Heroes exclusion after Plaintiff's counsel notified Pennsylvania Bar Association actors that Plaintiff's agents would attend Wills for Heroes events, challenged exclusion from those events, threatened nonfrivolous legal action, criticized bar retaliation, and asserted that Pennsylvania Bar

Association could not deny access to public-facing legal programs because of protected speech and petitioning.

1340. Chapman knew or should have known that Pennsylvania Bar Association and Wills for Heroes actors could deter protected criticism and event-access advocacy because they can decide whether attorneys and nonprofit legal providers receive access to public-facing pro bono events, volunteer opportunities, veterans outreach, and professional legitimacy.

1341. Chapman had power to prevent or aid in preventing the conspiracy through Pennsylvania Bar Association participation, Wills for Heroes participation, bar-connected legal-service structures, public-facing legal programs, attorney networks, and communications affecting access to public-service legal programming, yet she neglected or refused to correct the retaliatory exclusion.

1342. Gabriele Miller-Wagner joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving Pennsylvania Bar Association retaliation, Wills for Heroes exclusion, veterans-service exclusion, volunteer-channel obstruction, public-service legal-program exclusion, reputational harm, and interference with protected litigation, subpoena activity, legal-aid criticism, bar criticism, and veterans advocacy.

1343. Miller-Wagner committed acts in furtherance of the conspiracy, or failed to prevent acts she had power to prevent, by participating in, supporting, ratifying,

allowing, or failing to correct Pennsylvania Bar Association and Wills for Heroes exclusion after Plaintiff's counsel's protected litigation threats, subpoena-related communications, criticism of Union–Snyder County Bar Association and Pennsylvania Bar Association retaliation, and request for equal access to Union–Snyder Wills for Heroes.

1344. Miller-Wagner knew or should have known that statewide Wills for Heroes coordination authority could deter protected advocacy because planning communications, volunteer recruitment, event legitimacy, scheduling, Pennsylvania Bar Association staff channels, regional outreach, and statewide pro bono programming determine whether nonprofit legal providers can reach veterans and disabled veterans.

1345. Miller-Wagner had power to prevent or aid in preventing the conspiracy through statewide Wills for Heroes coordination authority, Pennsylvania Bar Association pro bono staff authority, volunteer recruitment authority, planning authority, scheduling influence, public-facing legal-program access, and communications with Pennsylvania Department of Military and Veterans Affairs-connected and county-connected veterans-service actors, yet she neglected or refused to prevent the exclusionary retaliation.

1346. David K. Trevaskis joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving Pennsylvania Bar Association

retaliation, Wills for Heroes exclusion, veterans-service exclusion, public-service legal-program obstruction, statewide pro bono exclusion, reputational harm, and interference with protected litigation, subpoena activity, veterans advocacy, legal-aid criticism, and bar criticism.

1347. Trevaskis committed acts in furtherance of the conspiracy, or failed to prevent acts he had power to prevent, by participating in, supporting, reversing, ratifying, allowing, or failing to correct Pennsylvania Bar Association and Wills for Heroes exclusion after communications from Union–Snyder County Bar Association and North Penn Legal Services-aligned actors exported local hostility into statewide bar structures and after Plaintiff's counsel engaged in protected litigation, subpoena-related communications, veterans advocacy, and criticism of legal-aid and bar misconduct.

1348. Trevaskis knew or should have known that statewide Wills for Heroes leadership could deter protected petitioning and veterans advocacy because that leadership controls or influences whether attorneys and nonprofit legal providers may participate in public-facing legal programs, communicate with Pennsylvania Bar Association staff and volunteers, serve veterans and disabled veterans, maintain professional credibility, and continue legal-aid reform work without bar retaliation.

1349. Trevaskis had power to prevent or aid in preventing the conspiracy through Pennsylvania Bar Association Wills for Heroes leadership, statewide pro bono authority, public-facing legal-program influence, volunteer-program influence, and communications with Pennsylvania Bar Association, Union–Snyder County Bar Association, Pennsylvania Department of Military and Veterans Affairs-connected actors, veterans-service actors, and county-connected public-service partners, yet he neglected or refused to stop the retaliatory exclusion.

1350. Lori Molloy joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving legal-aid retaliation, whistleblower retaliation, malpractice-reporting suppression, client-repair obstruction, referral obstruction, professional ostracism, reputational harm, and interference with protected criticism of North Penn Legal Services and public legal-aid systems.

1351. Molloy committed acts in furtherance of the conspiracy, or failed to prevent acts she had power to prevent, by preserving North Penn Legal Services' institutional control instead of client repair after protected malpractice reporting, allowing post-resignation retaliation against Martineau and SLAAY, maintaining a legal-aid environment in which protected whistleblowing and public criticism led to professional exclusion and referral loss, and allowing bar-connected and legal-aid-connected systems to punish conflict-free nonprofit legal-service work.

1352. Molloy knew or should have known that legal-aid retaliation would deter protected malpractice reporting because an executive director of a publicly funded legal-aid provider controls employment consequences, references, institutional narratives, referrals, client access, staff communication, funding credibility, and the provider's response to whistleblower reports.

1353. Molloy had power to prevent or aid in preventing the conspiracy through executive authority over North Penn Legal Services' legal-aid operations, public funding, attorney supervision, staff supervision, intake systems, client-service systems, malpractice-response systems, and institutional relationships with courts, funders, bar actors, referral sources, and public-service networks, yet she neglected or refused to prevent retaliation and allowed the legal-aid structure to preserve the provider over harmed clients.

1354. Timothy Smith joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving legal-aid retaliation, malpractice-reporting suppression, client-repair obstruction, professional pressure, representation-status manipulation, client-abandonment consequences, and interference with protected litigation and legal-aid criticism.

1355. Smith committed acts in furtherance of the conspiracy, or failed to prevent acts he had power to prevent, by preserving North Penn Legal Services' authority after known client-service failures, including Grohol's case, where North Penn

Legal Services remained counsel of record while Smith told Grohol that North Penn Legal Services was not working on the case for her, pressured her to proceed pro se, and warned her that her case could be dismissed for lack of prosecution if she did not represent herself.

1356. Smith knew or should have known that his conduct would deter protected reporting, litigation, and client-protection advocacy because a deputy director or senior legal-aid manager controls case assignments, supervision, communication, grievance responses, representation-status practices, and whether harmed clients receive correction or must repair legal-aid failures themselves.

1357. Smith had power to prevent or aid in preventing the conspiracy through senior management authority over North Penn Legal Services' attorney supervision, case-management systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, representation-status practices, withdrawal practices, and response to known client-service failures, yet he neglected or refused to prevent the retaliatory and client-harming course of conduct.

1358. Mary Beth Clark joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving legal-aid retaliation, Union–Snyder County Bar Association retaliation, Wills for Heroes exclusion, referral obstruction, fee obstruction, professional ostracism, reputational harm, and

interference with protected criticism of North Penn Legal Services and protected veterans advocacy.

1359. Clark committed acts in furtherance of the conspiracy by carrying North Penn Legal Services hostility into Union–Snyder County Bar Association, trying to use Martineau's temporary absence after her mother's death to exclude her permanently from bar and pro bono roles, excluding Martineau and SLAAY from communications and Wills for Heroes planning, privately undermining SLAAY's eligibility for PFA fees and Judicare referrals, and supporting or failing to prevent Union–Snyder County Bar Association retaliation after protected criticism and litigation.

1360. Clark knew or should have known that her conduct would deter protected speech and petitioning because a North Penn Legal Services-connected attorney and local bar leader can convert whistleblower conflict into committee exclusion, referral obstruction, fee obstruction, pro bono exclusion, reputational harm, and loss of access to the local legal-service infrastructure needed to serve vulnerable clients.

1361. Clark had power to prevent or aid in preventing the conspiracy through her roles and influence within North Penn Legal Services, Union–Snyder County Bar Association, Wills for Heroes, Law Day, local bar governance, public-facing legal programs, judicial relationships, legal-aid referral structures, and local professional

networks, yet she neglected or refused to prevent the conspiracy and instead advanced the retaliatory course of conduct.

1362. Robert Cravitz joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving local bar retaliation, professional ostracism, false statements, listserv conduct, reputational harm, public-service exclusion, and interference with protected litigation, local legal-system criticism, legal-aid criticism, and bar criticism.

1363. Cravitz committed acts in furtherance of the conspiracy, or failed to prevent acts he had power to prevent, by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from retaliatory exclusion, boycott, false statements, listserv conduct, professional ostracism, or conspiracy after protected speech, protected petitioning, litigation, veterans advocacy, and legal-aid reform work.

1364. Cravitz knew or should have known that local attorney participation in bar-connected retaliation would deter protected criticism and petitioning because it can damage referrals, reputation, professional access, local credibility, public-service programming, and a nonprofit legal provider's practical ability to serve clients.

1365. Cravitz had power to prevent or aid in preventing the conspiracy through local attorney participation, Union–Snyder County Bar Association participation, bar-connected professional influence, listserv participation, litigation-response

participation, public-service participation, and court-connected influence within the local legal and bar structures, yet he neglected or refused to prevent the retaliatory environment.

1366. North Penn Legal Services, Inc. joined, directed, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving legal-aid retaliation, malpractice-reporting suppression, whistleblower retaliation, client-repair obstruction, referral obstruction, public-service exclusion, professional ostracism, reputational harm, and interference with protected legal-aid criticism and conflict-free nonprofit legal-service work.

1367. North Penn Legal Services, Inc. committed acts in furtherance of the conspiracy by retaliating against Plaintiff's legal team for reporting malpractice and challenging client-abandonment practices, failing to remediate client harm after protected reporting, preserving control over legal-aid work instead of providing conflict-free remedies, and aligning with bar insiders and legal-aid networks that later excluded Plaintiff's agents and Plaintiff's legal team from public-service legal opportunities.

1368. North Penn Legal Services, Inc. knew or should have known that retaliation by a publicly funded legal-aid provider would deter protected malpractice reporting, nonprofit legal-aid development, and litigation because harmed clients and attorneys depend on legal-aid providers, referral networks, public-service

partners, and funders to permit conflict-free criticism, replacement services, and client repair.

1369. North Penn Legal Services, Inc. had power to prevent or aid in preventing the conspiracy through its public legal-aid funding, legal-service authority, provider status, referral relationships, attorney supervision, staff supervision, client-service systems, malpractice-response systems, institutional narratives, funder communications, court appearances, and relationships with bar actors and public-service partners, yet it neglected or refused to prevent the conspiracy and instead preserved institutional control over client repair.

1370. Union County Criminal Justice Advisory Board joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving county advisory-board exclusion, criminal-justice-system access burdens, public-service exclusion, reputational harm, legal-aid accountability obstruction, and interference with protected criticism of prosecutors, judges, legal-aid actors, bar actors, county actors, and local legal institutions.

1371. Union County Criminal Justice Advisory Board committed acts in furtherance of the conspiracy, or failed to prevent acts it had power to prevent, by participating in, ratifying, allowing, or failing to oppose exclusionary or chilling treatment after protected criticism of judges, prosecutors, legal-aid actors, Union–Snyder County Bar Association, and related local legal institutions.

1372. Union County Criminal Justice Advisory Board knew or should have known that exclusion from county criminal-justice advisory spaces would deter protected speech and petitioning because those spaces affect access to criminal-justice coordination, reform discussions, public-service participation, local institutional credibility, and advocacy for vulnerable clients affected by criminal-justice and legal-aid systems.

1373. Union County Criminal Justice Advisory Board had power to prevent or aid in preventing the conspiracy through county-government participation, advisory-board authority, public-service coordination, criminal-justice-system relationships, prosecutor participation, court-connected participation, and practical ability to reject retaliation, preserve equal access, correct false narratives, and protect nonretaliatory participation, yet it neglected or refused to prevent the conspiracy.

1374. Union County Mental Health Advisory Committee joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving county advisory exclusion, mental-health-system access burdens, public-service exclusion, reputational harm, legal-aid accountability obstruction, disability-related exclusion, and interference with protected advocacy for vulnerable clients, disabled clients, legal-aid clients, and persons affected by local legal and mental-health systems.

1375. Union County Mental Health Advisory Committee committed acts in furtherance of the conspiracy, or failed to prevent acts it had power to prevent, by participating in, ratifying, allowing, or failing to oppose exclusionary or chilling treatment after protected litigation and protected criticism of local judges, lawyers, legal-aid providers, bar actors, county actors, and county-connected legal institutions.

1376. Union County Mental Health Advisory Committee knew or should have known that exclusion from county-connected mental-health advisory spaces would deter protected speech and petitioning because those spaces affect public-service access, vulnerable-client advocacy, disability-related service coordination, referrals, credibility, and participation in systems serving people whose legal needs overlap with housing, disability, domestic violence, benefits, family stability, and court access.

1377. Union County Mental Health Advisory Committee had power to prevent or aid in preventing the conspiracy through county-government participation, public advisory authority, county-connected mental-health structures, service-provider participation, court-connected relationships, public-service coordination, and practical ability to reject retaliation, preserve equal access, correct false narratives, and protect nonretaliatory participation, yet it neglected or refused to prevent the conspiracy.

1378. Union County STOP Coalition joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving public-service exclusion, victim-services access burdens, domestic-violence-system exclusion, prosecutorially connected pressure, reputational harm, and interference with protected criticism, protected litigation, and legal advocacy for vulnerable clients.

1379. Union County STOP Coalition committed acts in furtherance of the conspiracy, or failed to prevent acts it had power to prevent, by participating in, permitting, ratifying, allowing, or failing to prevent unequal treatment of Plaintiff's legal team after protected litigation and protected allegations concerning Mary Beth Clark, including public unequal treatment in coalition meetings where Plaintiff's counsel was ignored when she spoke while other participants received ordinary professional respect.

1380. Union County STOP Coalition knew or should have known that retaliation in county-connected domestic-violence and victim-services spaces would deter protected speech and petitioning because those spaces affect service-provider credibility, domestic-violence coordination, victim-services participation, prosecutor-connected access, referral relationships, public-service legitimacy, and advocacy for vulnerable clients.

1381. Union County STOP Coalition had power to prevent or aid in preventing the conspiracy through county-connected public-service structures, prosecutor

participation, public meetings, government-supported victim-services coordination, domestic-violence response systems, service-provider relationships, and practical ability to reject unequal treatment, correct retaliatory dynamics, and protect equal participation, yet it neglected or refused to prevent the conspiracy.

1382. Snyder County STOP Coalition joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving public-service exclusion, victim-services access burdens, domestic-violence-system exclusion, reputational harm, legal-aid accountability obstruction, and interference with protected criticism, protected litigation, and legal advocacy for vulnerable clients.

1383. Snyder County STOP Coalition committed acts in furtherance of the conspiracy, or failed to prevent acts it had power to prevent, by participating in or failing to prevent retaliatory dynamics affecting Plaintiff's agents' legal advocacy, public-service role, protected criticism of local legal-system actors, and equal participation in county-connected public-service networks.

1384. Snyder County STOP Coalition knew or should have known that retaliation in county-connected domestic-violence and victim-services spaces would deter protected speech, petitioning, public-interest advocacy, and legal-aid reform because those spaces affect public-service access, provider credibility, domestic-

violence coordination, victim-services participation, referral relationships, and client advocacy.

1385. Snyder County STOP Coalition had power to prevent or aid in preventing the conspiracy through county-connected public-service coordination, victim-services structures, government-supported coalition activity, public meetings, service-provider relationships, domestic-violence response systems, and practical ability to reject retaliation, protect equal participation, and correct exclusionary dynamics, yet it neglected or refused to prevent the conspiracy.

1386. United States Bankruptcy Court for the Middle District of Pennsylvania joined, ratified, aided, encouraged, benefitted from, or failed to prevent a coordinated course of conduct involving federal-court pressure, bankruptcy-access burdens, attorney-practice burdens, sanctions-related pressure, recusal-related pressure, complaint-handling burdens, filing-related burdens, professional intimidation, and interference with protected judicial criticism, bankruptcy advocacy, debt-relief advocacy, legal-aid reform, malpractice reporting, and public-interest litigation.

1387. United States Bankruptcy Court for the Middle District of Pennsylvania committed acts in furtherance of the conspiracy, or failed to prevent acts it had power to prevent, by participating in, ratifying, allowing, or failing to prevent bankruptcy-access burdens, attorney-practice burdens, case-handling burdens,

hearing-handling burdens, filing-related burdens, sanctions-related burdens, local-rule burdens, monitoring burdens, or court-access conduct after protected criticism, protected litigation, recusal-related advocacy, opposition to improper sanctions, subpoena activity, client-protection work, and participation in this lawsuit.

1388. United States Bankruptcy Court for the Middle District of Pennsylvania knew or should have known that federal bankruptcy-court pressure would deter protected speech and petitioning because a federal bankruptcy court controls attorney practice, docket access, case access, hearing access, sanctions exposure, staff communication, debt-relief access, bankruptcy filings, and the practical ability to serve debtors, homeowners, low-income litigants, veterans, disabled veterans, and other court users.

1389. United States Bankruptcy Court for the Middle District of Pennsylvania had power to prevent or aid in preventing the conspiracy through federal judicial authority, bankruptcy jurisdiction, docket authority, hearing authority, case-management authority, sanctions-related authority, local-rule authority, attorney-practice authority, filing systems, staff communications, bankruptcy-access structures, and practical ability to protect fair access to bankruptcy proceedings, yet it neglected or refused to prevent the conspiracy.

1390. Pennsylvania Legal Aid Network, Inc. joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving legal-aid

retaliation, malpractice-reporting suppression, conflict-free provider obstruction, provider-protection narratives, funding-system protection, referral obstruction, client-repair obstruction, and interference with protected criticism of North Penn Legal Services and public legal-aid systems.

1391. Pennsylvania Legal Aid Network, Inc. committed acts in furtherance of the conspiracy, or failed to prevent acts it had power to prevent, by reinforcing legal-aid monopoly structures and oversight narratives that allowed North Penn Legal Services and related actors to retaliate against Plaintiff's legal team after protected malpractice reporting, by failing to ensure conflict-free alternatives for clients harmed by North Penn Legal Services, and by failing to protect competing nonprofit legal providers from retaliation.

1392. Pennsylvania Legal Aid Network, Inc. knew or should have known that statewide legal-aid retaliation would deter protected speech and petitioning because legal-aid network actors affect provider legitimacy, funding credibility, referrals, access-to-justice narratives, legal-aid participation, conflict-free representation, replacement-provider access, and the practical availability of substitute counsel.

1393. Pennsylvania Legal Aid Network, Inc. had power to prevent or aid in preventing the conspiracy through statewide legal-aid funding, referral, training, coordination, policy, oversight, programmatic authority, provider relationships,

public-service credibility, and practical ability to require conflict-free client repair, support substitute counsel, correct false narratives, and reject retaliation, yet it neglected or refused to prevent the conspiracy.

1394. Transitions of PA joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving local public-service retaliation, service-provider exclusion, referral obstruction, professional ostracism, reputational harm, and interference with protected criticism of legal-aid providers, bar associations, court-connected actors, and public-service structures.

1395. Transitions of PA committed acts in furtherance of the conspiracy, or failed to prevent acts it had power to prevent, by participating in or failing to prevent retaliatory exclusion and unequal treatment of Plaintiff's agents within local service-provider systems after Plaintiff's legal team criticized legal-aid and bar misconduct.

1396. Transitions of PA knew or should have known that service-provider exclusion would deter protected criticism because local public-service and referral networks control credibility, referrals, client access, institutional legitimacy, collaboration opportunities, domestic-violence service relationships, and practical access to vulnerable clients.

1397. Transitions of PA had power to prevent or aid in preventing the conspiracy through its role in county-connected systems, court-related referrals, legal-aid

relationships, victim-services structures, domestic-violence services, pro bono referrals, public-service coordination, and practical ability to preserve equal access and reject retaliation, yet it neglected or refused to prevent retaliatory exclusion.

1398. Transitions Legal Center joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving legal-services retaliation, pro bono exclusion, referral obstruction, domestic-violence-service exclusion, public-service exclusion, professional ostracism, reputational harm, and interference with protected criticism of legal-aid providers, bar associations, and court-connected actors.

1399. Transitions Legal Center committed acts in furtherance of the conspiracy, or failed to prevent acts it had power to prevent, by participating in or failing to prevent retaliatory conduct that impaired Plaintiff's agents' role as a competing nonprofit legal-services provider after Plaintiff's legal team engaged in protected speech and petitioning.

1400. Transitions Legal Center knew or should have known that exclusion from legal-services, pro bono, domestic-violence, and referral networks would deter protected criticism and petitioning because those networks affect access to clients, referrals, credibility, public-service opportunities, domestic-violence service coordination, and meaningful collaboration.

1401. Transitions Legal Center had power to prevent or aid in preventing the conspiracy through legal-services participation, pro bono relationships, public-service coordination, domestic-violence service relationships, victim-services relationships, referral systems, court-related connections, and practical ability to reject retaliation and preserve equal access, yet it neglected or refused to prevent retaliatory exclusion.

1402. Bloomsburg Fair Association joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving veterans-event exclusion, public-facing event exclusion, public-official coordination, reputational harm, veterans-outreach obstruction, public-service exclusion, and interference with protected veterans advocacy, protected litigation, and criticism of bar-controlled veterans programs.

1403. Bloomsburg Fair Association committed acts in furtherance of the conspiracy, or failed to prevent acts it had power to prevent, by ignoring or blocking Plaintiff’s legal team’s vendor communications after Plaintiff’s agents sought access to the veterans event and by excluding or failing to include Plaintiff’s agents from the Bloomsburg Fair veterans event after protected litigation and veterans advocacy.

1404. Bloomsburg Fair Association knew or should have known that exclusion from a major public veterans event would deter protected criticism, litigation, and

advocacy involving public officials, Pennsylvania Bar Association, Union–Snyder County Bar Association, and veterans-service gatekeepers because event exclusion harms reputation, public outreach, veterans-service opportunities, public-service credibility, access to disabled veterans, and community legitimacy.

1405. Bloomsburg Fair Association had power to prevent or aid in preventing the conspiracy through event-control authority, vendor communications, public-facing veterans programming, coordination with public officials, event access, public recognition, and practical ability to allow equal vendor participation, correct exclusionary communications, and reject retaliation, yet it neglected or refused to prevent the retaliatory exclusion.

1406. Pennsylvania Department of Military and Veterans Affairs joined, ratified, aided, benefitted from, or failed to prevent a coordinated course of conduct involving veterans-service exclusion, coalition-access obstruction, Wills for Heroes exclusion, Wills for Veterans exclusion, Bloomsburg Fair veterans-event exclusion, public-service recognition harm, reputational harm, and interference with protected veterans advocacy and criticism of bar-controlled veterans programs.

1407. Pennsylvania Department of Military and Veterans Affairs committed acts in furtherance of the conspiracy, or failed to prevent acts it had power to prevent, by participating in, ratifying, allowing, failing to correct, or failing to prevent

exclusion of Plaintiff's agents from veterans-service programming after protected advocacy and litigation, by accepting or acting on Pennsylvania Bar Association and Union–Snyder County Bar Association narratives that undermined SLAAY, and by allowing state-connected veterans-service channels to preserve exclusion from Wills for Heroes, Wills for Veterans, Bloomsburg Fair veterans programming, and related public-facing outreach.

1408. Pennsylvania Department of Military and Veterans Affairs knew or should have known that state-connected veterans-service exclusion would deter protected veterans advocacy, litigation, and criticism of bar-controlled veterans programs because state recognition, coalition communications, referral pathways, and event coordination affect whether a nonprofit legal provider can reach veterans, serve disabled veterans, maintain credibility, and participate in government-facing veterans-service systems.

1409. Pennsylvania Department of Military and Veterans Affairs had power to prevent or aid in preventing the conspiracy through state-agency authority, veterans-outreach structures, coalition participation, Regional Program Outreach Coordinator communications, Bureau of Veterans Programs involvement, public-facing veterans-service role, and coordination with Wills for Heroes, Wills for Veterans, county veterans systems, Pennsylvania Bar Association actors, Union–

Snyder County Bar Association actors, Bloomsburg Fair actors, and veterans-event participants, yet it neglected or refused to prevent the conspiracy.

1410. Doe Defendants 1 through 200 joined, ratified, aided, benefitted from, or failed to prevent the coordinated course of conduct through their roles as members of defendants, Union–Snyder County Bar Association listserv participants who are not members, local attorneys, bar participants, public-service participants, Wills for Heroes participants, court-connected actors, legal-aid actors, veterans-service actors, public-service actors, or other known or unknown persons who received, participated in, ratified, aided, failed to prevent, or benefitted from retaliatory exclusion, boycott, false statements, professional ostracism, or conspiracy.

1411. Doe Defendants 1 through 200 committed acts in furtherance of the conspiracy, or failed to prevent acts they had power to prevent, by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from Union–Snyder County Bar Association membership structures, listserv structures, local attorney networks, bar-governance structures, litigation-response structures, public-service legal networks, Wills for Heroes structures, court-connected local legal systems, false statements, boycotts, exclusionary conduct, and professional ostracism that burdened protected speech, petitioning, litigation, veterans advocacy, legal-aid criticism, bar criticism, client advocacy, and conflict-free nonprofit legal-service work.

1412. Doe Defendants 1 through 200 knew or should have known that collective professional retaliation would deter protected speech and petitioning because unknown members, listserv participants, local attorneys, bar-connected actors, court-connected actors, public-service actors, and professional-network participants can collectively enforce reputational harm, referral loss, meeting exclusion, committee exclusion, listserv exclusion, Wills for Heroes exclusion, public-service exclusion, disciplinary pressure, litigation pressure, and community-wide professional isolation.

1413. Doe Defendants 1 through 200 had power to prevent or aid in preventing the conspiracy through their participation in bar associations, listservs, court-connected professional networks, public-service networks, legal-aid networks, veterans-service systems, communications, meetings, referrals, program access, and professional narratives, yet they neglected or refused to prevent the conspiracy and instead aided, ratified, benefitted from, or allowed retaliation to continue.

1414. Defendants' conspiracy deprived Grohol and similarly situated clients of equal protection, equal privileges, and legal rights because the coordinated retaliation targeted advocates who criticized North Penn Legal Services, exposed legal-aid malpractice, sought conflict-free client repair, advocated for veterans and disabled veterans, challenged bar-controlled public-service exclusion, criticized judges and public officials, pursued subpoenas, and filed nonfrivolous litigation.

1415. Defendants knew that the conspiracy existed, had power to prevent or aid in preventing it, and neglected or refused to do so because each defendant had authority, influence, communications access, public-service access, court-connected access, legal-aid access, bar-connected access, veterans-service access, or professional-network access sufficient to reject retaliation, correct false statements, preserve equal participation, protect nonretaliatory public-service access, and prevent further injury.

1416. Defendants' conspiracy and failure to prevent conspiracy harmed Grohol because she depended on advocates willing to challenge North Penn Legal Services' failure to provide meaningful representation after the January 15, 2020 missed-notice replevin hearing, and retaliation against those advocates reduced her access to conflict-free representation, nonretaliatory legal-service networks, client repair, public-interest advocacy, and legal-system accountability.

1417. Defendants' conspiracy and failure to prevent conspiracy harmed the class because vulnerable legal-aid clients, former legal-aid clients, domestic-violence survivors, low-income litigants, people with disabilities, veterans, disabled veterans, debtors, homeowners, court users, and public-service beneficiaries depend on attorneys, nonprofit legal-service providers, and advocates who can criticize legal-aid providers, judges, prosecutors, bar associations, disciplinary

actors, court actors, public officials, and public-service structures without retaliation.

1418. Defendants are liable under 42 U.S.C. § 1985 and 42 U.S.C. § 1986 because they joined, ratified, aided, encouraged, benefitted from, or failed to prevent a conspiracy to deprive Grohol, the class, Plaintiff's legal team, Plaintiff's agents, and related advocates of equal protection, equal privileges, protected speech, protected petitioning, public-service access, veterans-service access, legal-aid access, court access, conflict-free advocacy, and nonretaliatory professional participation; committed or allowed overt acts in furtherance of the conspiracy; knew or should have known the conspiracy existed; had power to prevent or aid in preventing it; neglected or refused to prevent it; and caused injury to person, property, rights, privileges, representation, public-service access, professional participation, and legal-aid accountability.

1419. Grohol and the class are entitled to compensatory damages, nominal damages, punitive damages where available, declaratory relief, injunctive relief, reinstatement to bar, committee, listserv, meeting, Wills for Heroes, Wills for Veterans, veterans-outreach, coalition, public-service, court-access, bankruptcy-access, referral, pro bono, and legal-service opportunities, rescission of bans and suspensions, correction of minutes and records, nonretaliation policies, preservation of communications and records, expedited discovery, attorney-

practice protections, disciplinary nonretaliation protections, court-access protections, veterans-service access protections, referral protections, public-service participation protections, costs, fees where available, and all other lawful relief.

**COUNT 19**

**Sherman Act § 1 Group Boycott and Concerted Refusal to Deal Against North Penn Legal Services, Inc.; Pennsylvania Legal Aid Network, Inc.; Legal Services Corporation; Pennsylvania Bar Association; Union–Snyder County Bar Association; Pennsylvania Department of Military and Veterans Affairs; Bloomsburg Fair Association; Transitions of PA; Transitions Legal Center; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; Snyder County STOP Coalition; Michael F.J. Piecuch; Lori R. Hackenberg; Jeffrey A. Rowe; Robert Leadbeter; Heath Brosius; Brian Kerstetter; Jamie Saleski; K. Michael Sullivan; Sarah Stigerwalt-Egan; Alexandra Sholley; Kathleen Lincoln; Jessica Chapman; William R. Christman III; Gabriele Miller-Wagner; David K. Trevaskis; Lori Molloy; Timothy Smith; Mary Beth Clark; David Andrew Strouse; Jenna Ann Neidig; Robert Cravitz; Brian Ulmer; Mark J. Conway; Matthew W. Brann; United States Bankruptcy Court for the Middle District of Pennsylvania; and Doe Defendants**

1420. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 179, NPLS, Sherman Antitrust, Group Boycott; COA 180, PLAN, Sherman Antitrust, Group Boycott; COA 181, LSC, Sherman Antitrust, Group Boycott; COA 182, PBA, Sherman Antitrust, Group Boycott; COA 183, USCBA, Sherman Antitrust, Group Boycott; COA 184, PA DMVA, Sherman Antitrust, Group Boycott; COA 185, BFA, Sherman Antitrust, Group Boycott; COA 186, Transitions of PA, Sherman Antitrust, Group Boycott; COA 187, Transitions Legal Center, Sherman Antitrust, Group Boycott; COA 188, Union County CJAB, Sherman Antitrust, Group Boycott; COA 189, Union County Mental Health Advisory Committee, Sherman Antitrust, Group Boycott; COA 190, Union County STOP Coalition, Sherman Antitrust, Group Boycott; COA 191, Snyder County STOP Coalition, Sherman Antitrust, Group Boycott; COA 192, Piecuch, Sherman Antitrust, Group Boycott; COA 193, Hackenberg, Sherman Antitrust, Group Boycott; COA 194, Rowe, Sherman Antitrust; COA 195, Leadbeter, Sherman Antitrust; COA 196, Brosius, Sherman Antitrust; COA 197, Kerstetter, Sherman Antitrust; COA 198, Saleski, Sherman Antitrust, Group Boycott; COA 199, Sullivan, Sherman Antitrust, Group Boycott; COA 200, Stigerwalt-Egan, Sherman Antitrust, Group Boycott; COA 201, Sholley, Antitrust, Group Boycott; COA 202, Lincoln, Sherman Antitrust, Group Boycott; COA 203, Chapman, Sherman Antitrust, Group Boycott; COA 204, Christman, Sherman

Antitrust, Group Boycott; COA 205, Miller-Wagner, Sherman Antitrust, Group Boycott; COA 206, Trevaskis, Sherman Antitrust, Group Boycott; COA 207, Molloy, Sherman Antitrust, Group Boycott; COA 208, Smith, Sherman Antitrust, Group Boycott; COA 209, Clark, Sherman Antitrust, Group Boycott; COA 210, Strouse, Sherman Antitrust, Group Boycott; COA 211, Neidig, Sherman Antitrust, Group Boycott; COA 212, Cravitz, Sherman Antitrust, Group Boycott; COA 213, Ulmer, Sherman Antitrust, Group Boycott; COA 214, Conway, Sherman Antitrust, Group Boycott; COA 215, Brann, Sherman Antitrust, Group Boycott; COA 216, PAMB, Sherman Antitrust, Group Boycott; and COA 217, Does, Sherman Antitrust, Group Boycott, from the 651-count inventory attached as exhibits.

1421. The elements of Sherman Act § 1 group boycott and concerted refusal to deal are a contract, combination, or conspiracy, a group boycott or concerted refusal to deal, and an unreasonable restraint of trade.

1422. North Penn Legal Services, Inc. participated in a concerted refusal to deal because it operated as the incumbent regional legal-aid provider whose malpractice, missed hearings, client abandonment, conflicts, and retaliation were criticized by Plaintiff, Plaintiff's legal team, and Plaintiff's agents before coordinated actors excluded them from referrals, Wills for Heroes, veterans-service channels, bar opportunities, public-service legal channels, and conflict-free legal-service alternatives.

1423. North Penn Legal Services, Inc. had a direct economic and institutional interest in the boycott because Plaintiff's legal team and agents challenged North Penn Legal Services' control over low-income civil legal services, exposed its failure to provide meaningful representation to Grohol, and created or supported a competing nonprofit legal-service channel that could receive clients, referrals, volunteers, public trust, and funding that otherwise remained within incumbent legal-aid and bar-controlled structures.

1424. North Penn Legal Services, Inc. restrained trade by benefitting from the exclusion of Plaintiff's legal team and agents from bar-based networking, Wills for Heroes planning, veterans-service events, legal-aid accountability channels, referral opportunities, public-service partnerships, and conflict-free alternative pathways, because those channels allow nonprofit legal providers to compete for clients, goodwill, referrals, volunteers, institutional legitimacy, and community trust.

1425. North Penn Legal Services, Inc. caused antitrust injury because Grohol remained dependent on a provider whose representation failed, while the boycott reduced access to truthful, conflict-free, and competitive legal assistance for Grohol, legal-aid clients, disabled veterans, low-income litigants, volunteers, students, donors, referral partners, and public-service participants.

1426. Pennsylvania Legal Aid Network, Inc. participated in the group boycott by reinforcing a statewide legal-aid structure that preserved incumbent provider control, legal-aid funding legitimacy, referral credibility, training influence, public-service recognition, and legal-aid market access while Plaintiff’s legal team and agents challenged the absence of conflict-free alternatives for clients harmed by North Penn Legal Services.

1427. Pennsylvania Legal Aid Network, Inc. had a direct institutional interest in suppressing Plaintiff’s legal team and agents because their advocacy challenged legal-aid monopoly conditions, grantee protection, referral concentration, malpractice tolerance, client abandonment, conflicts, retaliation, and the lack of meaningful substitute counsel when a dominant legal-aid provider harms or abandons a client.

1428. Pennsylvania Legal Aid Network, Inc. restrained trade by helping preserve a closed legal-aid network in which incumbent providers retained referrals, credibility, public-service partnerships, training authority, legal-aid branding, and access to vulnerable clients while Plaintiff’s legal team and agents were excluded from channels that would permit competition for legal-aid clients, veterans, volunteers, referrals, donor support, and public trust.

1429. Pennsylvania Legal Aid Network, Inc. caused antitrust injury because its conduct reduced output, reduced client choice, reduced conflict-free legal-aid alternatives, reduced transparency, reduced malpractice accountability, and made legal-service markets less open, less competitive, and less responsive to low-income clients, veterans, disabled veterans, and vulnerable persons.

1430. Legal Services Corporation participated in the group boycott by funding, monitoring, regulating, supervising, ratifying, tolerating, or failing to correct a federally supported legal-aid structure that preserved incumbent grantee control while Plaintiff's legal team and agents challenged federal legal-aid funding practices, absence of conflict-free alternatives, false representation status, malpractice, abandonment, and retaliation.

1431. Legal Services Corporation had a direct institutional and funding interest in preserving the incumbent legal-aid structure because Plaintiff's legal team and agents challenged the federal legal-aid system that allowed North Penn Legal Services to retain money, legitimacy, referrals, and authority despite missed hearings, abandoned matters, unclear representation status, disability-access failures, and lack of client repair.

1432. Legal Services Corporation restrained trade by allowing federal funding, compliance legitimacy, grantee relationships, monitoring structures, and public

legal-aid status to remain available to incumbent actors while Plaintiff's legal team and agents were excluded from competing legal-service channels, conflict-free alternative opportunities, legal-aid reform channels, veterans-service channels, and public-service legal markets.

1433. Legal Services Corporation caused antitrust injury because the federally supported structure reduced meaningful provider choice, reduced independent legal-aid competition, reduced conflict-free substitute counsel, reduced client repair, reduced output, and preserved a closed incumbent-controlled market for legal-aid services despite available competing nonprofit legal-service capacity.

1434. Pennsylvania Bar Association participated in the group boycott through statewide bar authority, Wills for Heroes control, pro bono structures, professional legitimacy, staff and volunteer communication channels, county-bar relationships, public-facing legal programs, and the July 30, 2025 categorical ban that excluded Plaintiff's legal team and agents from all Wills for Heroes events and programs.

1435. Pennsylvania Bar Association had a direct economic, reputational, institutional, pro bono, and professional-regulatory interest in suppressing Plaintiff's legal team and agents because they challenged bar self-regulation, Wills for Heroes exclusion, legal-aid malpractice, attorney accountability, retaliation,

conflicts, and bar-controlled monopoly or near-monopoly access to legal-service channels.

1436. Pennsylvania Bar Association restrained trade by cutting Plaintiff's legal team and agents off from Wills for Heroes participation, staff and volunteer communications, statewide pro bono legitimacy, veterans-service opportunities, professional recognition, referral access, and public-facing legal-service programming after protected criticism, litigation threats, subpoena discussions, and veterans advocacy.

1437. Pennsylvania Bar Association caused antitrust injury because its conduct reduced output of free and low-cost legal services for veterans and disabled veterans, reduced client and veteran choice, suppressed a competing nonprofit legal provider, foreclosed access to pro bono channels, and signaled that legal-service competition against bar-favored incumbents would be punished through coordinated exclusion.

1438. Union–Snyder County Bar Association participated in the group boycott through local bar governance, Wills for Heroes planning, meeting access, listserv access, committee access, pro bono structures, local professional legitimacy, minutes and records practices, membership action, and public-service legal

opportunities in Union County, Snyder County, and surrounding central Pennsylvania counties.

1439. Union–Snyder County Bar Association had a direct economic, reputational, institutional, local-market, pro bono, and professional-gatekeeping interest in suppressing Plaintiff’s legal team and agents because they challenged local bar governance, Wills for Heroes exclusion, North Penn Legal Services’ malpractice, attorney accountability, retaliation, conflicts, and local attorney-controlled access to legal-service opportunities.

1440. Union–Snyder County Bar Association restrained trade by excluding Plaintiff’s legal team and agents from Wills for Heroes planning, refusing equal committee and agenda access, manipulating or refusing to correct minutes, cancelling or controlling meetings, withholding Teams access, using meeting rules against protected objections, suspending membership, and using local bar structures to deny a competing nonprofit legal provider access to referrals, goodwill, volunteers, veterans, local professional legitimacy, and public-service opportunities.

1441. Union–Snyder County Bar Association caused antitrust injury because local bar exclusion reduced the availability of legal services for veterans, disabled veterans, low-income clients, and vulnerable persons, deprived Plaintiff’s legal

team and agents of local market access, preserved incumbent provider control, and made local legal-service markets less open, less competitive, and less responsive to clients.

1442. Pennsylvania Department of Military and Veterans Affairs participated in the group boycott through state-agency veterans outreach, veterans-coalition communications, Regional Program Outreach Coordinator activity, Bureau of Veterans Programs involvement, Wills for Heroes and Wills for Veterans communications, public-facing veterans-service networks, and coordination with bar, legal-aid, fair, and veterans-event actors.

1443. Pennsylvania Department of Military and Veterans Affairs had a direct institutional, public-service, reputational, veterans-program, and coalition-based interest in preserving controlled veterans-service channels because Plaintiff's legal team and agents challenged Wills for Heroes exclusion, veterans-event exclusion, bar-controlled gatekeeping, legal-aid failures, attorney accountability, and retaliation within veterans legal-service access structures.

1444. Pennsylvania Department of Military and Veterans Affairs restrained trade by allowing, ratifying, facilitating, or failing to correct exclusion of Plaintiff's legal team and agents from Wills for Heroes, Wills for Veterans, veterans coalitions, Bloomsburg Fair veterans programming, veterans-resource events, public-service

outreach, and other channels that determine which nonprofit legal providers reach veterans and disabled veterans.

1445. Pennsylvania Department of Military and Veterans Affairs caused antitrust injury because the exclusion reduced veterans legal-service output, reduced disabled veterans' choice of providers, reduced coalition-based referrals, reduced public-service access, suppressed a competing nonprofit legal provider, and preserved incumbent bar and legal-aid control over veterans-service channels.

1446. Bloomsburg Fair Association participated in the group boycott through its control over fairgrounds access, public-facing veterans-event participation, vendor communications, event access, veterans-resource-event opportunities, public-service recognition, and coordination with public officials, bar actors, veterans-service actors, and Wills for Heroes-related participants.

1447. Bloomsburg Fair Association had a direct institutional, event-access, public-service, reputational, veterans-event, and public-facing gatekeeping interest in preserving controlled veterans-event access because Plaintiff's legal team and agents challenged retaliation, exclusion, bar-controlled Wills for Heroes restrictions, veterans-service gatekeeping, public-event exclusion, legal-aid failures, and attorney accountability.

1448. Bloomsburg Fair Association restrained trade by ignoring or blocking Plaintiff's legal team's vendor communications, excluding or failing to include Plaintiff's agents from the Bloomsburg Fair veterans event after protected litigation and veterans advocacy, and preserving event access for favored participants while denying a competing nonprofit legal provider the ability to reach veterans, disabled veterans, referral partners, volunteers, public officials, and community supporters.

1449. Bloomsburg Fair Association caused antitrust injury because exclusion from a major public veterans event reduced veterans legal-service output, reduced public-event legal-service access, reduced client and veteran choice, deprived Plaintiff's legal team and agents of goodwill and outreach opportunities, and foreclosed market access through a public-facing veterans-service channel.

1450. Transitions of PA participated in the group boycott through victim-service structures, public-service referral networks, domestic-violence service relationships, pro bono channels, legal-aid relationships, county-connected systems, court-related referral structures, and local service-provider networks affecting access to vulnerable clients, victims, survivors, and legal-service opportunities.

1451. Transitions of PA had a direct institutional, public-service, referral, victim-service, and professional-network interest in preserving incumbent referral

structures because Plaintiff's legal team and agents challenged legal-aid failures, bar retaliation, public-service exclusion, domestic-violence service access, and the lack of conflict-free legal alternatives for vulnerable clients.

1452. Transitions of PA restrained trade by participating in or failing to prevent retaliatory exclusion and unequal treatment of Plaintiff's legal team and agents within local service-provider systems after protected criticism of legal-aid and bar misconduct, thereby limiting access to victim-service referrals, public-service referrals, legal-service collaborations, pro bono opportunities, and nonprofit legal-service legitimacy.

1453. Transitions of PA caused antitrust injury because its conduct reduced legal-service competition for victims, survivors, low-income clients, veterans, and vulnerable persons; reduced referral choice; reduced conflict-free alternative access; and preserved incumbent legal-aid and public-service channels instead of allowing clients and service partners to choose among competing nonprofit legal providers.

1454. Transitions Legal Center participated in the group boycott through legal-services participation, pro bono relationships, victim-services relationships, domestic-violence service coordination, referral systems, court-related

connections, public-service networks, and local legal-service channels affecting access to clients, survivors, victims, and legal-service opportunities.

1455. Transitions Legal Center had a direct institutional, referral, pro bono, domestic-violence service, and public-service interest in preserving incumbent legal-service relationships because Plaintiff's legal team and agents challenged legal-aid malpractice, bar retaliation, access to conflict-free representation, and public-service gatekeeping in the same vulnerable-client service ecosystem.

1456. Transitions Legal Center restrained trade by participating in or failing to prevent retaliatory conduct that impaired Plaintiff's legal team and agents' role as a competing nonprofit legal-services provider after protected speech and petitioning, thereby limiting access to domestic-violence legal referrals, victim-service legal channels, public-service legal partnerships, pro bono opportunities, and professional legitimacy.

1457. Transitions Legal Center caused antitrust injury because the exclusion reduced provider choice, reduced public-service legal output, reduced conflict-free legal alternatives, reduced independent advocacy for vulnerable clients, and made victim-service and legal-service referral channels less open, less competitive, and less responsive to client needs.

1458. Union County Criminal Justice Advisory Board participated in the group boycott through county-government participation, criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local institutional credibility affecting legal-service channels and public-service participation.

1459. Union County Criminal Justice Advisory Board had a direct institutional, county-government, criminal-justice advisory, public-service, and referral-network interest in preserving controlled advisory and legal-service access because Plaintiff's legal team and agents criticized prosecutors, judges, legal-aid actors, bar actors, county actors, criminal-justice systems, and local legal institutions.

1460. Union County Criminal Justice Advisory Board restrained trade by participating in, ratifying, allowing, or failing to oppose exclusionary or chilling treatment after protected criticism, thereby burdening Plaintiff's legal team and agents' access to criminal-justice advisory spaces, government-connected referral opportunities, court-adjacent advocacy channels, local public-service credibility, and professional collaboration needed to compete for clients and referrals.

1461. Union County Criminal Justice Advisory Board caused antitrust injury because exclusion from county advisory channels reduced legal-service

competition, reduced public-service referral access, reduced court-adjacent access, reduced client choice, reduced access to vulnerable criminal-justice-affected clients, and preserved incumbent legal and public-service actors from market accountability.

1462. Union County Mental Health Advisory Committee participated in the group boycott through county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility affecting access to vulnerable clients and public-service legal channels.

1463. Union County Mental Health Advisory Committee had a direct institutional, public-service, disability-service, referral-network, and county-advisory interest in preserving controlled advisory and service-provider access because Plaintiff's legal team and agents criticized legal-aid malpractice, court-connected exclusion, mental-health system access problems, retaliation, client abandonment, and the treatment of vulnerable clients in local legal systems.

1464. Union County Mental Health Advisory Committee restrained trade by participating in, ratifying, allowing, or failing to oppose exclusionary or chilling treatment after protected litigation and protected criticism of local judges, lawyers, legal-aid providers, bar actors, county actors, and county-connected legal

institutions, thereby burdening Plaintiff's legal team and agents' access to mental-health advisory spaces, disability-related referral channels, public-service credibility, and vulnerable-client collaboration opportunities.

1465. Union County Mental Health Advisory Committee caused antitrust injury because exclusion from county-connected mental-health advisory channels reduced legal-service competition, reduced disability-related referral access, reduced public-service collaboration, reduced client choice, reduced access to vulnerable clients whose legal needs overlapped with housing, disability, domestic violence, benefits, family stability, and court access, and preserved incumbent legal and public-service actors from market accountability.

1466. Union County STOP Coalition participated in the group boycott through county-connected domestic-violence service coordination, prosecutor participation, public meetings, victim-services structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility affecting access to survivors, vulnerable clients, and public-service legal opportunities.

1467. Union County STOP Coalition had a direct institutional, public-service, victim-service, domestic-violence-service, referral-network, and county-connected interest in preserving controlled coalition access because Plaintiff's legal team and agents criticized legal-aid malpractice, challenged retaliation, pursued litigation,

raised allegations concerning Mary Beth Clark, and sought equal participation in public-service and victim-service systems.

1468. Union County STOP Coalition restrained trade by participating in, permitting, ratifying, allowing, or failing to prevent unequal treatment of Plaintiff's legal team after protected litigation and protected allegations concerning Mary Beth Clark, including public unequal treatment in coalition meetings where Plaintiff's counsel was ignored when she spoke while other participants received ordinary professional respect.

1469. Union County STOP Coalition caused antitrust injury because exclusion and unequal treatment in county-connected domestic-violence and victim-service spaces reduced legal-service competition, reduced referral access, reduced public-service collaboration, reduced conflict-free alternatives for vulnerable clients, reduced professional legitimacy for Plaintiff's legal team and agents, and preserved incumbent legal-aid and public-service channels from market accountability.

1470. Snyder County STOP Coalition participated in the group boycott through county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility affecting access to survivors, vulnerable clients, and public-service legal opportunities.

1471. Snyder County STOP Coalition had a direct institutional, public-service, victim-service, domestic-violence-service, referral-network, and county-connected interest in preserving controlled coalition access because Plaintiff's legal team and agents criticized legal-aid malpractice, opposed retaliation, pursued litigation, and advocated for vulnerable clients affected by domestic-violence, legal-aid, and court-connected systems.

1472. Snyder County STOP Coalition restrained trade by participating in or failing to prevent retaliatory dynamics affecting Plaintiff's agents' legal advocacy, public-service role, protected criticism of local legal-system actors, and equal participation in county-connected public-service networks.

1473. Snyder County STOP Coalition caused antitrust injury because exclusionary or retaliatory treatment in domestic-violence and victim-service spaces reduced legal-service competition, reduced referral access, reduced public-service collaboration, reduced access to conflict-free legal assistance, reduced client choice, and preserved incumbent legal-aid and public-service actors from accountability.

1474. Michael F.J. Piecuch participated in the group boycott through judicial prestige, president-judge authority, local legal influence, USCBA-connected participation, courthouse-adjacent authority, Law Day structures, Wills for Heroes narratives, civility-related communications, advisory-board influence, and local

legal-culture control affecting professional access and public-service legal channels.

1475. Piecuch had a direct institutional, judicial, professional, local-market, and court-connected interest in preserving incumbent legal-service and bar structures because Plaintiff's legal team and agents criticized judges, prosecutors, legal-aid actors, USCBA, Wills for Heroes exclusion, veterans eligibility inconsistencies, legal-aid abandonment, and local legal-system retaliation.

1476. Piecuch restrained trade by using or allowing judicial prestige, bar-connected influence, USCBA participation, listserv communications, civility narratives, local legal-culture authority, Wills for Heroes narratives, Law Day structures, and advisory-board influence to chill, burden, exclude, or punish protected criticism and petitioning that supported a competing nonprofit legal-service provider's access to referrals, clients, veterans, volunteers, public-service partners, and local professional legitimacy.

1477. Piecuch caused antitrust injury because judicially connected influence in local bar, courthouse, advisory-board, public-service, and professional-access structures reduced Plaintiff's legal team and agents' ability to compete for legal-service opportunities, reduced client and veteran choice, reduced nonprofit legal-service output, and preserved incumbent legal actors from competition and accountability.

1478. Lori R. Hackenberg participated in the group boycott through judicial office, courthouse-program influence, local legal influence, USCBA-related participation, Law Day involvement, court-connected public-service structures, and local professional networks affecting access to courthouse programs, public-service legal opportunities, and local legal legitimacy.

1479. Hackenberg had a direct institutional, judicial, courthouse-access, local-market, and public-service interest in preserving controlled legal-service structures because Plaintiff's legal team and agents criticized legal-aid malpractice, judicial favoritism, courthouse-program exclusion, bar retaliation, Wills for Heroes exclusion, public-service discrimination, and the use of local court and bar networks to punish dissenting attorneys and nonprofit legal providers.

1480. Hackenberg restrained trade by participating in, ratifying, allowing, or failing to prevent court-connected and bar-connected exclusion, including denial or obstruction of courthouse-program access, selective professional participation, discretionary treatment, public recognition for favored attorneys and organizations, and differential treatment of Plaintiff's legal team and agents after protected criticism and litigation.

1481. Hackenberg caused antitrust injury because courthouse-connected exclusion and unequal professional treatment reduced Plaintiff's legal team and agents' access to court-adjacent legal-service channels, reduced client and veteran choice,

reduced public-service legal output, reduced professional legitimacy, and preserved incumbent actors from competition and accountability.

1482. Jeffrey A. Rowe participated in the group boycott through judicial office, magisterial-district authority, courthouse role, court-connected communications, USCBA participation, Law Day participation, Wills for Heroes communications, public-service programming, and local legal-culture influence affecting local legal-service legitimacy and public-service participation.

1483. Rowe had a direct institutional, judicial, public-service, local-market, and professional-network interest in preserving controlled legal-service structures because Plaintiff's legal team and agents criticized local legal-aid misconduct, USCBA retaliation, Wills for Heroes exclusion, meeting exclusion, governance manipulation, inaccurate narratives, and court-connected public-service retaliation.

1484. Rowe restrained trade by participating in, ratifying, allowing, or failing to prevent court-connected and bar-connected exclusionary conduct after protected speech, petitioning, and litigation, including conduct affecting courthouse-program access, Law Day recognition, Wills for Heroes planning, USCBA meeting dynamics, public-service legal opportunities, and professional participation in the local bar ecosystem.

1485. Rowe caused antitrust injury because court-connected and local bar-connected exclusion reduced Plaintiff's legal team and agents' access to referrals,

professional legitimacy, public-service opportunities, veterans-service programs, local legal networks, and client channels, thereby reducing competition and preserving incumbent legal-service control.

1486. Robert Leadbeter participated in the group boycott through public office, public communications, veterans-event involvement, public-facing veterans-expo authority, coordination with Bloomsburg Fair Association, and public-service structures affecting veterans outreach, event access, public recognition, and veterans legal-service opportunities.

1487. Leadbeter had a direct public-office, reputational, veterans-service, event-access, and public-service interest in preserving controlled veterans-event access because Plaintiff’s legal team and agents advocated for veterans and disabled veterans, communicated with Pennsylvania Department of Military and Veterans Affairs-connected coalitions, sought veterans-event access, criticized PBA and USCBA retaliation, pursued litigation, and challenged exclusion from public-facing veterans-service opportunities.

1488. Leadbeter restrained trade by participating in, authorizing, ratifying, allowing, or failing to prevent exclusion of Plaintiff’s agents from the Bloomsburg Fair veterans event, by using or allowing public-office authority and public-facing veterans-expo structures to deny equal veterans-outreach access after protected

litigation and criticism, and by participating in a public-event structure that gave access to favored participants while excluding the protected critic.

1489. Leadbeter caused antitrust injury because exclusion from a public-facing veterans event reduced veterans legal-service output, reduced disabled veterans' provider choice, reduced public-service legal access, deprived Plaintiff's legal team and agents of goodwill and outreach opportunities, and preserved favored bar-connected and incumbent legal-service actors from competition.

1490. Heath Brosius participated in the group boycott through prosecutorial authority, public-office authority, local legal influence, court-connected participation, county-connected public-service structures, STOP-related systems, USCBA-related relationships, and interactions with local bar, court, and service-provider networks.

1491. Brosius had a direct public-office, prosecutorial, local legal-system, public-service, and professional-network interest in preserving controlled legal-service and public-service access because Plaintiff's legal team and agents criticized prosecutors, legal-aid providers, judges, USCBA, bar actors, STOP-related structures, public-service exclusion, legal-aid malpractice, and local legal-system misconduct.

1492. Brosius restrained trade by participating in, ratifying, aiding, allowing, or failing to oppose retaliatory local legal-system conduct after protected criticism,

thereby burdening Plaintiff's legal team and agents' access to public-service spaces, coalition participation, legal-aid reform channels, referral relationships, professional credibility, and client-service opportunities.

1493. Brosius caused antitrust injury because prosecutorially connected pressure and public-service exclusion reduced legal-service competition, chilled nonprofit legal-service participation, reduced referral access, reduced conflict-free client alternatives, and preserved incumbent legal-aid, bar, and public-service actors from accountability.

1494. Brian Kerstetter participated in the group boycott through prosecutorial authority, public-office authority, local legal influence, court-connected participation, county-connected public-service structures, STOP-related systems, advisory-board relationships, USCBA-related relationships, and interactions with local bar, court, and service-provider networks.

1495. Kerstetter had a direct public-office, prosecutorial, local legal-system, advisory-board, public-service, and professional-network interest in preserving controlled legal-service and public-service access because Plaintiff's legal team and agents criticized prosecutors, legal-aid providers, judges, USCBA, bar actors, public-service exclusion, STOP-related systems, advisory-board participation, legal-aid malpractice, and local legal-system misconduct.

1496. Kerstetter restrained trade by participating in, ratifying, aiding, allowing, or failing to oppose retaliation affecting protected criticism of prosecutors, legal-aid providers, judges, USCBA, bar actors, public-service exclusion, STOP-related systems, advisory-board participation, legal-aid malpractice, and local legal-system misconduct.

1497. Kerstetter caused antitrust injury because prosecutorially connected influence in local advisory boards, STOP-related systems, public-service networks, and bar-connected spaces reduced Plaintiff's legal team and agents' access to professional credibility, coalition participation, referral relationships, public-service opportunities, and clients, thereby suppressing nonprofit legal-service competition and preserving incumbent control.

1498. Jamie Saleski participated in the group boycott through public-office authority, docket and filing authority, courthouse authority, public-record authority, service and filing practices, court-access functions, and interactions with lawyers, litigants, and court-connected actors.

1499. Saleski had a direct public-office, court-access, filing-access, docket-integrity, and courthouse-administration interest in preserving controlled access to court-connected legal-service channels because Plaintiff's legal team and agents criticized court-access barriers, public-office conduct, prothonotary practices,

legal-aid abandonment, and retaliation, and pursued litigation, subpoenas, document requests, court filings, and demands for public accountability.

1500. Saleski restrained trade by participating in, ratifying, allowing, or failing to prevent filing-related, record-related, courthouse-related, or public-office conduct that burdened Plaintiff, Plaintiff's legal team, Plaintiff's agents, and similarly situated clients after protected criticism, litigation, and petitioning activity.

1501. Saleski caused antitrust injury because court-access and filing-related burdens reduced Plaintiff's legal team and agents' practical ability to compete in legal-service markets, protect clients, obtain records, file claims, preserve litigation posture, pursue subpoenas, challenge legal-system actors, and provide conflict-free legal assistance to low-income and vulnerable clients.

1502. K. Michael Sullivan participated in the group boycott through USCBA authority, local bar leadership, Wills for Heroes control, pro bono committee influence, listserv communications, public-service legal-program access, local legal-system influence, and joint participation with court-connected and bar-connected actors.

1503. Sullivan had a direct local-market, professional, reputational, pro bono, and bar-governance interest in preserving controlled access to public-service legal programs because Plaintiff's legal team and agents criticized legal-aid misconduct, criticized USCBA and PBA retaliation, advocated for veterans and disabled

veterans, sought Wills for Heroes access, threatened and filed nonfrivolous litigation, discussed subpoenas, demanded accurate minutes, requested committee access, and proposed nonretaliation rules.

1504. Sullivan restrained trade by publicly rebuking protected criticism on the bar listserv, using Wills for Heroes authority to condition public-service legal programming on the surrender or resolution of protected claims, moving to suspend Wills for Heroes planning, and participating in a local bar structure that treated litigation, subpoena activity, veterans advocacy, legal-aid criticism, and nonprofit legal-service competition as grounds for exclusion.

1505. Sullivan caused antitrust injury because his conduct reduced Plaintiff's legal team and agents' access to local bar channels, pro bono opportunities, veterans-service programs, referral opportunities, professional credibility, volunteers, clients, public-service legal programming, and the goodwill needed to compete as a nonprofit legal provider.

1506. Sarah Stigerwalt-Egan participated in the group boycott through USCBA presidential authority, judicial-law-clerk and hearing-officer status, local bar governance, Wills for Heroes control, meeting access, listserv communications, Teams access, minute practices, public-service legal-program access, and communications with PBA and DMVA.

1507. Stigerwalt-Egan had a direct local-market, professional, reputational, pro bono, public-service, and bar-governance interest in preserving controlled legal-service channels because Plaintiff's legal team and agents criticized legal-aid malpractice, objected to USCBA retaliation, filed and amended litigation, advocated for veterans, sought to route Wills for Heroes through SLAAY and veterans coalitions, demanded equal meeting access, demanded accurate minutes, and asked bar and public actors to stop retaliation.

1508. Stigerwalt-Egan restrained trade by joining Sullivan in suspending Wills for Heroes planning unless Martineau resolved or dropped protected claims, sending hostile or false communications to PBA and DMVA about SLAAY and Martineau, refusing to support a nonretaliation resolution, cancelling or controlling meetings after protected filings, withholding Teams access, and participating in or allowing the temporary suspension of Martineau's USCBA membership after the amended federal complaint proceeded.

1509. Stigerwalt-Egan caused antitrust injury because her conduct reduced Plaintiff's legal team and agents' access to local bar membership, meetings, Wills for Heroes planning, veterans-service channels, public-service legal opportunities, professional legitimacy, referral relationships, and nonprofit legal-service competition in central Pennsylvania.

1510. Alexandra Sholley participated in the group boycott through USCBA secretary authority, meeting-record authority, minute practices, local bar governance, Law Day participation, Wills for Heroes participation, listserv structures, officer participation, and court-connected local bar influence.

1511. Sholley had a direct professional, reputational, governance, public-service, and local-market interest in preserving controlled bar access because Plaintiff's legal team and agents demanded accurate USCBA minutes, objected to retaliation, criticized Wills for Heroes exclusion, challenged legal-aid misconduct, criticized local bar actors, pursued litigation, and asked USCBA to adopt nonretaliation rules.

1512. Sholley restrained trade by participating in, ratifying, allowing, or failing to correct USCBA minute manipulation, refusal to correct material governance inaccuracies, meeting-record practices that distorted protected objections, and officer-level action that supported or failed to prevent membership suspension and exclusion after protected litigation and criticism.

1513. Sholley caused antitrust injury because inaccurate governance records and officer-level conduct reduced Plaintiff's legal team and agents' access to meetings, committees, Wills for Heroes planning, listserv participation, membership rights, local professional legitimacy, public-service opportunities, and legal-service market access.

1514. Kathleen Lincoln participated in the group boycott through USCBA treasurer authority, officer authority, local bar governance, court-connected professional status, public-service legal-program access, courthouse-connected influence, settlement-related professional influence, and local legal networks.

1515. Lincoln had a direct professional, reputational, local-market, courthouse-connected, public-service, and bar-governance interest in preserving controlled legal-service access because Plaintiff's legal team and agents criticized legal-aid malpractice, challenged attorney withdrawal and client abandonment, filed and amended litigation, objected to retaliation, proposed nonretaliation rules, demanded accurate governance records, and challenged local legal-system actors.

1516. Lincoln restrained trade by making threatening and disparaging comments after the July 24, 2025 USCBA meeting, telling Martineau that continued complaints about ethical violations would cost her friends, settlements, and support for her projects, tying her remarks to courthouse and prothonotary litigation, and using or allowing her USCBA officer role to participate in or support membership suspension after protected litigation and criticism.

1517. Lincoln caused antitrust injury because threats about friendships, settlements, courthouse hostility, project support, and bar membership reduced Plaintiff's legal team and agents' practical ability to compete for clients, referrals,

collaborations, settlements, public-service partnerships, professional goodwill, and nonprofit legal-service opportunities.

1518. Jessica Chapman participated in the group boycott through PBA, Wills for Heroes, bar-connected legal-service structures, public-facing legal programs, attorney networks, and communications affecting access to public-service legal programming.

1519. Chapman had a direct professional, reputational, public-service, pro bono, and program-access interest in preserving controlled legal-service channels because Plaintiff's legal team and agents notified PBA actors that they would attend Wills for Heroes events, challenged exclusion from those events, threatened nonfrivolous legal action, criticized bar retaliation, and asserted that PBA could not deny access to public-facing legal programs because of protected speech and petitioning.

1520. Chapman restrained trade by receiving, participating in, supporting, ratifying, allowing, or failing to correct PBA communications and Wills for Heroes exclusion after Plaintiff's counsel's stated intention to attend Wills for Heroes events after PBA's ban.

1521. Chapman caused antitrust injury because PBA and Wills for Heroes exclusion reduced Plaintiff's legal team and agents' access to public-facing pro

bono events, volunteer opportunities, veterans outreach, professional legitimacy, client channels, goodwill, and nonprofit legal-service competition.

1522. William R. Christman III participated in the group boycott through Pennsylvania Bar Association general-counsel authority, statewide bar authority, Wills for Heroes control, communication restrictions, public-facing pro bono programming, staff and volunteer channels, and court-connected professional influence.

1523. Christman had a direct professional, institutional, reputational, statewide-bar, pro bono, and public-service interest in preserving controlled legal-service structures because Plaintiff's legal team and agents criticized PBA, criticized Wills for Heroes exclusion, communicated with PBA staff and volunteers, advocated for disabled veterans, threatened and filed nonfrivolous litigation, discussed subpoenas, sought equal access to Wills for Heroes, and challenged bar-controlled public-service legal programs.

1524. Christman restrained trade on July 30, 2025, when he ordered Martineau to cease all communications with PBA staff and volunteers, required communications about PBA, Wills for Heroes, and potential litigation to go only through him, and announced that PBA would not permit Martineau or SLAAY to participate in any Wills for Heroes events or programs in any way.

1525. Christman caused antitrust injury because the no-contact directive and categorical Wills for Heroes ban cut Plaintiff's legal team and agents off from staff, volunteers, statewide pro bono channels, veterans-service programs, public-facing legal opportunities, witness communications, program legitimacy, professional goodwill, and the ability to compete in public-service legal markets.

1526. Gabriele Miller-Wagner participated in the group boycott through statewide Wills for Heroes coordination authority, PBA pro bono staff authority, volunteer recruitment authority, planning authority, scheduling influence, public-facing legal-program access, and communications with DMVA-connected and county-connected veterans-service actors.

1527. Miller-Wagner had a direct professional, programmatic, public-service, pro bono, veterans-service, and reputational interest in preserving controlled access to Wills for Heroes and related pro bono channels because Plaintiff's legal team and agents worked with her on Wills for Heroes planning, requested Union–Snyder access, built Clinton County, Columbia County, Montour County, Northumberland County, and multi-county veterans programming, challenged retaliation by USCBA and PBA, discussed subpoenas, and asked whether SLAAY and the veterans coalition could host Union–Snyder Wills for Heroes.

1528. Miller-Wagner restrained trade by participating in, supporting, ratifying, allowing, or failing to correct PBA and Wills for Heroes exclusion after Plaintiff's

counsel's protected litigation threats, subpoena-related communications, criticism of USCBA and PBA retaliation, and request for equal access to Union–Snyder Wills for Heroes.

1529. Miller-Wagner caused antitrust injury because statewide Wills for Heroes exclusion reduced Plaintiff's legal team and agents' access to planning communications, volunteer recruitment, event legitimacy, scheduling, PBA staff channels, regional outreach, veterans and disabled veterans, and statewide pro bono market access.

1530. David K. Trevaskis participated in the group boycott through PBA Wills for Heroes leadership, statewide pro bono authority, public-facing legal-program influence, volunteer-program influence, and communications with PBA, USCBA, DMVA-connected actors, veterans-service actors, and county-connected public-service partners.

1531. Trevaskis had a direct professional, statewide-bar, public-service, veterans-service, pro bono, and reputational interest in preserving controlled legal-service channels because Plaintiff's legal team and agents communicated with him about Wills for Heroes access, requested that Union–Snyder planning be switched to SLAAY and the Veterans Coalition, explained that USCBA had suspended planning unless protected claims were resolved, challenged retaliatory control over

veterans services, and discussed subpoenas and litigation if PBA refused equal access.

1532. Trevaskis restrained trade by participating in, supporting, reversing, ratifying, allowing, or failing to correct PBA and Wills for Heroes exclusion after communications from USCBA and NPLS-aligned actors exported local hostility into statewide bar structures and after Plaintiff’s counsel engaged in protected litigation, subpoena-related communications, veterans advocacy, and criticism of legal-aid and bar misconduct.

1533. Trevaskis caused antitrust injury because statewide Wills for Heroes leadership controlled or influenced whether Plaintiff’s legal team and agents could participate in public-facing legal programs, communicate with PBA staff and volunteers, serve veterans and disabled veterans, maintain professional credibility, obtain volunteers, build goodwill, and compete in public-interest legal-service markets.

1534. Lori Molloy participated in the group boycott through North Penn Legal Services executive authority, public legal-aid funding, legal-service authority, provider status, referral relationships, attorney supervision, staff supervision, client-service systems, malpractice-response systems, institutional narratives, funder communications, court appearances, and relationships with bar actors and public-service partners.

1535. Molloy had a direct economic, institutional, reputational, funding, referral, and legal-aid market interest in suppressing Plaintiff’s legal team and agents because they reported systemic malpractice inside North Penn Legal Services, objected to missed hearings and deadlines, criticized legal-aid management failures, advocated for harmed clients, developed conflict-free nonprofit legal-service alternatives, and pursued litigation challenging legal-aid abandonment and retaliation.

1536. Molloy restrained trade by preserving North Penn Legal Services’ institutional control instead of client repair after protected malpractice reporting, allowing post-resignation retaliation against Martineau and SLAAY, maintaining a legal-aid environment in which protected whistleblowing and public criticism led to professional exclusion and referral loss, and allowing bar-connected and legal-aid-connected systems to punish conflict-free nonprofit legal-service work.

1537. Molloy caused antitrust injury because her conduct preserved incumbent legal-aid dominance while reducing access to conflict-free substitute counsel, nonprofit legal-service competition, referrals, clients, public-service partnerships, funding opportunities, legal-aid credibility, and client repair for Grohol and similarly situated legal-aid clients.

1538. Timothy Smith participated in the group boycott through North Penn Legal Services senior management authority, attorney supervision, case-management

systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, representation-status practices, withdrawal practices, and response to known missed hearings, missed deadlines, failures to notify clients, failures to prepare, failures to communicate, abandoned files, unclear representation status, and case-management breakdowns.

1539. Smith had a direct economic, institutional, reputational, funding, referral, and legal-aid market interest in suppressing Plaintiff's legal team and agents because they reported malpractice, criticized missed hearings and missed deadlines, objected to client abandonment, demanded client-protective correction, pursued litigation, developed conflict-free nonprofit legal-service alternatives, and challenged public legal-aid monopoly structures.

1540. Smith restrained trade by preserving North Penn Legal Services' authority after known client-service failures, including Grohol's case, where North Penn Legal Services remained counsel of record while Smith told Grohol that North Penn Legal Services was not working on the case for her, pressured her to proceed pro se, and warned her that her case could be dismissed for lack of prosecution if she did not represent herself.

1541. Smith caused antitrust injury because his conduct preserved the incumbent provider's public-facing status while reducing legal-service output, client choice, conflict-free substitute counsel, independent review, corrective legal assistance,

and nonprofit legal-service competition for Grohol and similarly situated legal-aid clients.

1542. Mary Beth Clark participated in the group boycott through North Penn Legal Services relationships, Union–Snyder County Bar Association influence, Wills for Heroes participation, Law Day participation, local bar governance, public-facing legal programs, judicial relationships, legal-aid referral structures, and local professional networks.

1543. Clark had a direct economic, institutional, reputational, referral, local-market, legal-aid, and bar-governance interest in suppressing Plaintiff’s legal team and agents because they criticized North Penn Legal Services malpractice, challenged legal-aid abandonment, objected to Union–Snyder County Bar Association retaliation, advocated for disabled veterans, sought Wills for Heroes inclusion, demanded accurate minutes, proposed nonretaliation rules, and filed or threatened nonfrivolous litigation.

1544. Clark restrained trade by carrying North Penn Legal Services hostility into Union–Snyder County Bar Association, trying to use Martineau’s temporary absence after her mother’s death to exclude her permanently from bar and pro bono roles, excluding Martineau and SLAAY from communications and Wills for Heroes planning, privately undermining SLAAY’s eligibility for PFA fees and

Judicare referrals, and supporting or failing to prevent Union–Snyder County Bar Association retaliation after protected criticism and litigation.

1545. Clark caused antitrust injury because her conduct reduced Plaintiff's legal team and agents' access to referrals, fee opportunities, pro bono channels, veterans-service programs, local bar opportunities, public-service partnerships, nonprofit legal-service credibility, and conflict-free legal-aid competition.

1546. David Andrew Strouse participated in the group boycott through local attorney networks, Union–Snyder County Bar Association participation, listserv participation, bar-governance participation, litigation-response participation, public-service participation, and court-connected professional structures affecting local legal-service access.

1547. Strouse had a direct professional, reputational, local-market, bar-connected, and public-service interest in preserving incumbent legal-service structures because Plaintiff's legal team and agents criticized Union–Snyder County Bar Association, Pennsylvania Bar Association, Office of Disciplinary Counsel, judges, bar actors, legal-aid misconduct, Wills for Heroes exclusion, retaliation, false statements, and conspiracy, and threatened and filed nonfrivolous litigation.

1548. Strouse restrained trade by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from retaliatory exclusion, boycott, false statements, listserv conduct, professional ostracism, and conspiracy after Plaintiff's

legal team and agents engaged in protected speech, petitioning, litigation, veterans advocacy, and legal-aid reform work.

1549. Strouse caused antitrust injury because local attorney participation in bar-connected retaliation reduced Plaintiff's legal team and agents' access to referrals, reputation, professional access, local credibility, public-service programming, client channels, and nonprofit legal-service competition.

1550. Jenna Ann Neidig participated in the group boycott through local attorney networks, Union–Snyder County Bar Association participation, listserv participation, bar-governance participation, officer or former-officer status, meeting-record structures, local legal-service structures, public-service legal programming, and court-connected professional networks.

1551. Neidig had a direct professional, reputational, governance, local-market, and public-service interest in preserving incumbent legal-service structures because Plaintiff's legal team and agents criticized Union–Snyder County Bar Association, Pennsylvania Bar Association, Office of Disciplinary Counsel, judges, bar actors, legal-aid misconduct, Wills for Heroes exclusion, retaliation, false statements, and conspiracy, and threatened and filed nonfrivolous litigation.

1552. Neidig restrained trade by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from retaliatory exclusion, boycott, false statements, listserv conduct, meeting-related conduct, governance-record conduct,

professional ostracism, and conspiracy after Plaintiff's legal team and agents engaged in protected speech, petitioning, litigation, veterans advocacy, and legal-aid reform work.

1553. Neidig caused antitrust injury because local bar officer, former-officer, meeting-record, and listserv participation gave institutional legitimacy to exclusionary conduct, reduced Plaintiff's legal team and agents' access to local bar channels, professional credibility, public-service legal programming, referrals, clients, and nonprofit legal-service competition.

1554. Robert Cravitz participated in the group boycott through local attorney networks, Union–Snyder County Bar Association participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and court-connected influence within the local legal and bar structures challenged in this action.

1555. Cravitz had a direct professional, reputational, local-market, bar-connected, and public-service interest in preserving incumbent legal-service structures because Plaintiff's legal team and agents criticized local legal-system misconduct, legal-aid abandonment, Union–Snyder County Bar Association retaliation, Pennsylvania Bar Association retaliation, Wills for Heroes exclusion, attorney misconduct, public-service exclusion, and the treatment of vulnerable clients, and threatened and filed litigation.

1556. Cravitz restrained trade by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from retaliatory exclusion, boycott, false statements, listserv conduct, professional ostracism, or conspiracy after protected speech, protected petitioning, litigation, veterans advocacy, and legal-aid reform work.

1557. Cravitz caused antitrust injury because local attorney participation in bar-connected retaliation damaged referrals, reputation, professional access, local credibility, public-service programming, client access, and Plaintiff's legal team and agents' practical ability to compete as nonprofit legal-service providers.

1558. Brian Ulmer participated in the group boycott through Pennsylvania Bar Association participation, Wills for Heroes participation, bar-connected legal-service structures, statewide pro bono networks, public-facing legal programs, attorney networks, and communications affecting whether Plaintiff's legal team and agents could participate in veterans-service and legal-service opportunities.

1559. Ulmer had a direct professional, reputational, public-service, pro bono, veterans-service, and program-access interest in preserving controlled public-service legal channels because Plaintiff's legal team and agents criticized Pennsylvania Bar Association and Union–Snyder County Bar Association, advocated for veterans and disabled veterans, sought Wills for Heroes participation, communicated with Pennsylvania Bar Association staff and

volunteers, threatened and filed nonfrivolous litigation, discussed subpoenas, and objected to bar-controlled exclusion from public-facing legal-service programs.

1560. Ulmer restrained trade by participating in, supporting, ratifying, allowing, or failing to correct Pennsylvania Bar Association and Wills for Heroes retaliation that excluded Plaintiff's legal team and agents from public-facing legal programs, chilled communications with Pennsylvania Bar Association staff and volunteers, and treated protected criticism, protected litigation, subpoena activity, and veterans advocacy as grounds for exclusion from pro bono structures.

1561. Ulmer caused antitrust injury because Pennsylvania Bar Association-connected and Wills for Heroes-connected exclusion reduced Plaintiff's legal team and agents' access to statewide program access, volunteer channels, staff communications, pro bono credibility, veterans-service outreach, public-facing legal-program legitimacy, client channels, and nonprofit legal-service competition.

1562. Mark J. Conway participated in the group boycott through federal judicial authority, bankruptcy-court authority, sanctions proceedings, recusal decisions, courtroom control, docket management, judicial characterizations of protected criticism, and federal court structures affecting attorney practice, court access, bankruptcy access, and public-interest litigation.

1563. Conway had a direct institutional, judicial, court-access, bankruptcy-access, professional-regulation, and reputational interest in preserving judicial and court-

connected control because Plaintiff's legal team and agents criticized judicial conduct, sought recusal, opposed sanctions, challenged bankruptcy-court conduct, advocated for bankruptcy access, represented debtors and vulnerable clients, criticized legal-aid and bar retaliation, filed appeals, filed litigation, pursued discovery, and communicated about court accountability.

1564. Conway restrained trade by using or allowing federal judicial authority, bankruptcy-court authority, sanctions proceedings, recusal decisions, courtroom control, docket management, judicial characterizations of protected criticism, and coercive litigation pressure to burden protected speech, petitioning, bankruptcy advocacy, legal-aid criticism, and public-interest litigation.

1565. Conway caused antitrust injury because judicially connected pressure reduced Plaintiff's legal team and agents' ability to compete for clients, provide bankruptcy advocacy, provide debt-relief services, pursue subpoenas, criticize court-connected actors, represent vulnerable clients, maintain professional credibility, and participate in legal-service markets without retaliatory judicial burdens.

1566. Matthew W. Brann participated in the group boycott through federal judicial authority, case-assignment authority, docket authority, adjudicatory authority, case-management authority, recusal authority, and federal-court treatment of protected litigation and protected criticism.

1567. Brann had a direct institutional, judicial, court-access, professional-regulation, and reputational interest in preserving court-connected control because Plaintiff's legal team and agents filed litigation, challenged bar retaliation, challenged legal-aid misconduct, criticized judicial and legal-system actors, sought declaratory and injunctive relief, discussed subpoenas, and pursued claims involving courts, judges, lawyers, bar associations, public-service systems, and legal-aid structures.

1568. Brann restrained trade by using or allowing federal judicial authority, case-management authority, adjudicatory authority, recusal decisions, docket control, and judicial treatment of Plaintiff's legal team's protected litigation and criticism to burden, punish, chill, or impair protected speech, petitioning, litigation, and public-interest legal advocacy.

1569. Brann caused antitrust injury because federal court pressure reduced Plaintiff's legal team and agents' ability to challenge powerful legal institutions, maintain professional credibility, serve clients, pursue public-interest litigation, obtain fair judicial access, preserve claims, and compete in legal-service markets without retaliatory court-connected burdens.

1570. United States Bankruptcy Court for the Middle District of Pennsylvania participated in the group boycott through federal judicial authority, bankruptcy jurisdiction, docket authority, hearing authority, case-management authority,

sanctions-related authority, local-rule authority, attorney-practice authority, filing systems, staff communications, bankruptcy-access structures, and court-connected relationships with bankruptcy lawyers, legal-aid actors, bar actors, debt-relief actors, and public officials.

1571. United States Bankruptcy Court for the Middle District of Pennsylvania had a direct institutional, judicial, bankruptcy-market, attorney-practice, docket-access, court-access, and reputational interest in preserving controlled bankruptcy and federal-court access because Plaintiff's legal team and agents criticized federal judicial conduct, sought recusal, opposed sanctions, challenged bankruptcy-court conduct, advocated for bankruptcy access, represented debtors and vulnerable clients, criticized legal-aid and bar retaliation, filed appeals, filed litigation, pursued discovery, and communicated with legal-system actors about court accountability.

1572. United States Bankruptcy Court for the Middle District of Pennsylvania restrained trade by participating in, ratifying, allowing, or failing to prevent bankruptcy-access burdens, attorney-practice burdens, complaint-handling burdens, case-handling burdens, hearing-handling burdens, filing-related burdens, sanctions-related burdens, local-rule burdens, monitoring burdens, or court-access conduct after protected criticism, protected litigation, recusal-related advocacy,

opposition to improper sanctions, subpoena activity, client-protection work, and participation in this lawsuit.

1573. United States Bankruptcy Court for the Middle District of Pennsylvania caused antitrust injury because bankruptcy-access and attorney-practice burdens reduced Plaintiff's legal team and agents' ability to serve debtors, homeowners, low-income litigants, veterans, disabled veterans, and other court users, reduced competition in bankruptcy and debt-relief legal services, chilled advocacy by competing nonprofit legal providers, and preserved incumbent bankruptcy and court-connected actors from market accountability.

1574. Doe Defendants 1 through 200 participated in the group boycott through membership in defendants, Union–Snyder County Bar Association listserv participation, local attorney networks, bar participation, public-service participation, Wills for Heroes participation, court-connected roles, legal-aid roles, veterans-service roles, public-service roles, communications, meetings, referrals, program access, professional narratives, and other known or unknown conduct that received, participated in, ratified, aided, failed to prevent, or benefitted from retaliatory exclusion, boycott, false statements, professional ostracism, or conspiracy.

1575. Doe Defendants 1 through 200 had direct professional, reputational, economic, local-market, public-service, legal-aid, bar-connected, court-connected,

or veterans-service interests in preserving incumbent legal-service structures because Plaintiff's legal team and agents criticized legal-aid misconduct, bar retaliation, judicial conduct, public-service exclusion, veterans-service exclusion, Wills for Heroes exclusion, disciplinary threats, attorney misconduct, false narratives, and legal-system retaliation, and filed or threatened litigation, discussed subpoenas, sought discovery, demanded accurate minutes, proposed nonretaliation rules, requested committee access, and advocated for vulnerable clients, veterans, and disabled veterans.

1576. Doe Defendants 1 through 200 restrained trade by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from Union–Snyder County Bar Association membership structures, listserv structures, local attorney networks, bar-governance structures, litigation-response structures, public-service legal networks, Wills for Heroes structures, court-connected local legal systems, false statements, boycotts, exclusionary conduct, and professional ostracism that burdened Plaintiff's legal team and agents' access to legal-service markets, veterans-service channels, referrals, clients, public-service partnerships, and professional legitimacy.

1577. Doe Defendants 1 through 200 caused antitrust injury because collective professional retaliation reduced Plaintiff's legal team and agents' access to referrals, meetings, committees, listservs, Wills for Heroes, public-service

channels, disciplinary safety, court access, litigation access, veterans-service opportunities, professional reputation, clients, volunteers, donor goodwill, and nonprofit legal-service competition.

1578. Defendants' concerted refusal to deal was unreasonable because it excluded a competing nonprofit legal-service provider and its legal team from bar channels, legal-aid channels, veterans-service channels, public-service coalitions, courthouse-adjacent programs, bankruptcy-access channels, pro bono programs, referral networks, volunteer networks, public-facing events, and professional communications after protected criticism, litigation, subpoena activity, malpractice reporting, veterans advocacy, and legal-aid reform.

1579. Defendants caused antitrust injury to Grohol and similarly situated clients because the group boycott reduced legal-service output, reduced conflict-free substitute counsel, reduced client choice, reduced veterans legal-service access, reduced disability-accessible service, reduced low-cost and free legal-service options, reduced nonprofit legal-service competition, reduced public-service legal collaboration, reduced referrals to competing providers, and preserved incumbent legal-aid, bar, court-connected, and public-service actors from market accountability.

1580. Defendants are liable for Sherman Act § 1 group boycott and concerted refusal to deal because each joined, supported, ratified, funded, monitored,

reinforced, allowed, or failed to correct a contract, combination, or conspiracy that excluded Plaintiff's legal team and agents from legal-service markets, pro bono markets, veterans-service markets, legal-aid markets, referral channels, court-access channels, public-service networks, and professional networks; the exclusion unreasonably restrained trade; and Grohol and the class suffered antitrust injury, damages, and entitlement to injunctive relief.

1581. Grohol and the class are entitled to treble damages, compensatory damages, declaratory relief, injunctive relief, restitution, disgorgement where available, reinstatement to bar, committee, listserv, meeting, Wills for Heroes, Wills for Veterans, veterans-outreach, coalition, public-service, court-access, bankruptcy-access, referral, pro bono, and legal-service opportunities, rescission of bans and suspensions, correction of minutes and records, nonretaliation policies, preservation of communications and records, expedited discovery, antitrust review, market-access review, referral review, funding-accountability review, court-access review, attorney-practice review, disciplinary nonretaliation protections, veterans-service access protections, costs, attorney's fees, and all other lawful relief.

**COUNT 20**

**Intentional Interference With Contractual Relations and Intentional Interference With Prospective Contractual Relations Against Union County**

**Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; Snyder County STOP Coalition; Pennsylvania Bar Association; Union–Snyder County Bar Association; Pennsylvania Legal Aid Network, Inc.; North Penn Legal Services, Inc.; Transitions of PA; Transitions Legal Center; Bloomsburg Fair Association; Michael F.J. Piecuch; Lori R. Hackenberg; Jeffrey A. Rowe; Robert Leadbeter; Heath Brosius; Brian Kerstetter; Jamie Saleski; K. Michael Sullivan; Sarah Stigerwalt-Egan; Alexandra Sholley; Kathleen Lincoln; Jessica Chapman; William R. Christman III; Gabriele Miller-Wagner; David K. Trevaskis; Lori Molloy; Timothy Smith; Mary Beth Clark; David Andrew Strouse; Jenna Ann Neidig; Robert Cravitz; Brian Ulmer; Mark J. Conway; Matthew W. Brann; United States Bankruptcy Court for the Middle District of Pennsylvania; and Doe Defendants**

1582. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 218, Intentional Interference With Contractual and Prospective Contractual Relations Against Union County Criminal Justice Advisory Board; COA 219, Intentional Interference With Contractual and Prospective Contractual Relations Against Union County Mental Health Advisory Committee; COA 220, Intentional Interference With Contractual and Prospective Contractual Relations Against Union County STOP Coalition; COA 221,

Intentional Interference With Contractual and Prospective Contractual Relations Against Snyder County STOP Coalition; COA 222, Intentional Interference With Contractual and Prospective Contractual Relations Against Pennsylvania Bar Association; COA 223, Intentional Interference With Contractual and Prospective Contractual Relations Against Union–Snyder County Bar Association; COA 224, Intentional Interference With Contractual and Prospective Contractual Relations Against Pennsylvania Legal Aid Network, Inc.; COA 225, Intentional Interference With Contractual and Prospective Contractual Relations Against North Penn Legal Services, Inc.; COA 226, Intentional Interference With Contractual and Prospective Contractual Relations Against Transitions of PA; COA 227, Intentional Interference With Contractual and Prospective Contractual Relations Against Transitions Legal Center; COA 228, Intentional Interference With Contractual and Prospective Contractual Relations Against Bloomsburg Fair Association; COA 229, Intentional Interference With Contractual and Prospective Contractual Relations Against Michael F.J. Piecuch; COA 230, Intentional Interference With Contractual and Prospective Contractual Relations Against Lori R. Hackenberg; COA 231, Intentional Interference With Contractual and Prospective Contractual Relations Against Jeffrey A. Rowe; COA 232, Intentional Interference With Contractual and Prospective Contractual Relations Against Robert Leadbeter; COA 233, Intentional Interference With Contractual and Prospective Contractual

Relations Against Heath Brosius; COA 234, Intentional Interference With Contractual and Prospective Contractual Relations Against Brian Kerstetter; COA 235, Intentional Interference With Contractual and Prospective Contractual Relations Against Jamie Saleski; COA 236, Intentional Interference With Contractual and Prospective Contractual Relations Against K. Michael Sullivan; COA 237, Intentional Interference With Contractual and Prospective Contractual Relations Against Sarah Stigerwalt-Egan; COA 238, Intentional Interference With Contractual and Prospective Contractual Relations Against Alexandra Sholley; COA 239, Intentional Interference With Contractual and Prospective Contractual Relations Against Kathleen Lincoln; COA 240, Intentional Interference With Contractual and Prospective Contractual Relations Against Jessica Chapman; COA 241, Intentional Interference With Contractual and Prospective Contractual Relations Against William R. Christman III; COA 242, Intentional Interference With Contractual and Prospective Contractual Relations Against Gabriele Miller-Wagner; COA 243, Intentional Interference With Contractual and Prospective Contractual Relations Against David K. Trevaskis; COA 244, Intentional Interference With Contractual and Prospective Contractual Relations Against Lori Molloy; COA 245, Intentional Interference With Contractual and Prospective Contractual Relations Against Timothy Smith; COA 246, Intentional Interference With Contractual and Prospective Contractual Relations Against Mary Beth Clark;

COA 247, Intentional Interference With Contractual and Prospective Contractual Relations Against David Andrew Strouse; COA 248, Intentional Interference With Contractual and Prospective Contractual Relations Against Jenna Ann Neidig; COA 249, Intentional Interference With Contractual and Prospective Contractual Relations Against Robert Cravitz; COA 250, Intentional Interference With Contractual and Prospective Contractual Relations Against Brian Ulmer; COA 251, Intentional Interference With Contractual and Prospective Contractual Relations Against Mark J. Conway; COA 252, Intentional Interference With Contractual and Prospective Contractual Relations Against Matthew W. Brann; COA 253, Intentional Interference With Contractual and Prospective Contractual Relations Against United States Bankruptcy Court for the Middle District of Pennsylvania; and COA 254, Intentional Interference With Contractual and Prospective Contractual Relations Against Doe Defendants, from the 651-count inventory attached as exhibits.

1583. The elements of intentional interference with an existing contractual relationship are the existence of a contract, purposeful action intended to harm that relation, absence of privilege or justification, and damages, and the elements of intentional interference with prospective economic advantage are a prospective contractual or economic relationship, purposeful action intended to harm that relation, absence of privilege, and damages.

1584. Union County Criminal Justice Advisory Board knew or had reason to know that Grohol had an existing or prospective legal-services relationship with SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because SLAAY's work concerned legal-aid malpractice, public-service access, county-connected exclusion, disability-related advocacy, litigation support, and corrective assistance to clients harmed by North Penn Legal Services.

1585. Union County Criminal Justice Advisory Board intentionally interfered with that relationship by participating in, supporting, allowing, reinforcing, benefitting from, or failing to prevent retaliation, exclusion, public-service obstruction, stakeholder-access burdens, local legitimacy harm, referral-environment burdens, and institutional hostility directed at SLAAY, Plaintiff's legal team, and legal-aid accountability work after protected criticism of judges, prosecutors, legal-aid actors, Union–Snyder County Bar Association, and related local legal institutions.

1586. Union County Criminal Justice Advisory Board lacked privilege or justification because a county-connected criminal-justice advisory body has no legitimate basis to burden a disabled legal-aid client's relationship with conflict-free counsel because that counsel criticized legal-aid malpractice, reported legal-service failures, criticized judges or prosecutors, petitioned courts, pursued subpoenas, advocated for disabled clients, or demanded public accountability.

1587. Union County Criminal Justice Advisory Board caused actual legal damage because its interference burdened stakeholder access, criminal-justice-adjacent access, local justice-system participation, referral environments, public-service credibility, and institutional cooperation, forcing SLAAY and Plaintiff's legal team to divert time, capacity, credibility, and resources from Grohol's delayed case to retaliation, exclusion, and obstruction.

1588. Union County Mental Health Advisory Committee knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel after North Penn Legal Services failed to correct the January 15, 2020 missed-notice hearing, failed to communicate adequately, failed to protect her opportunity to be heard, failed to withdraw timely, and failed to provide disability-sensitive service.

1589. Union County Mental Health Advisory Committee intentionally interfered with Grohol's existing or prospective legal-services relationship by participating in, ratifying, allowing, reinforcing, benefitting from, or failing to prevent exclusionary treatment after Plaintiff's advocates criticized local judges, lawyers, legal-aid providers, bar actors, county actors, mental-health-system access problems, county-connected legal institutions, and the treatment of disabled and vulnerable clients.

1590. Union County Mental Health Advisory Committee lacked privilege or justification because a county-connected mental-health advisory body has no legitimate basis to make access to mental-health, disability-service, stakeholder, referral, public-service, or government-facing spaces depend on silence, deference, noncriticism, avoidance of legal-aid accountability, or abandonment of protected petitioning activity.

1591. Union County Mental Health Advisory Committee caused actual legal damage because its conduct impaired SLAAY's public-service credibility, disability-service stakeholder access, mental-health-system cooperation, referral access, and ability to provide timely conflict-free assistance to a disabled client whose civil case had already remained unresolved for more than 6 years.

1592. Union County STOP Coalition knew or had reason to know that SLAAY and Plaintiff's legal team provided public-interest legal services, disability-sensitive advocacy, litigation support, legal-aid malpractice analysis, domestic-violence-related advocacy, victim-service advocacy, and conflict-free corrective assistance to Grohol and similarly situated legal-aid clients.

1593. Union County STOP Coalition intentionally interfered with Grohol's relationship with SLAAY and Plaintiff's legal team by allowing, ratifying, reinforcing, benefitting from, or failing to prevent unequal treatment of Plaintiff's

Case 4:26-cv-00231-MWB Document 11-3 Filed 01/29/26 Page 470 of 973

counsel after protected litigation and protected allegations concerning Mary Beth Clark, including public unequal treatment in coalition meetings where Plaintiff's counsel was ignored when she spoke while other participants received ordinary professional respect.

1594. Union County STOP Coalition lacked privilege or justification because a county-connected domestic-violence and victim-service coalition has no legitimate basis to punish legal-aid accountability work, litigation activity, disability-related advocacy, domestic-violence-related advocacy, victim-service advocacy, client advocacy, or protected criticism through exclusion, silence, unequal treatment, or stakeholder-access burdens.

1595. Union County STOP Coalition caused actual legal damage because its interference made Grohol's legal-services relationship with SLAAY slower, more burdensome, more exposed to institutional hostility, and less supported by public-service cooperation, referral access, victim-service access, stakeholder access, and local legitimacy needed for timely case correction.

1596. Snyder County STOP Coalition knew or had reason to know that Grohol and similarly situated clients needed conflict-free legal assistance from SLAAY and Plaintiff's legal team because North Penn Legal Services had failed to provide

meaningful representation, adequate communication, timely correction, disability-sensitive service, or timely withdrawal.

1597. Snyder County STOP Coalition intentionally interfered with existing or prospective legal-services relationships by participating in, allowing, ratifying, reinforcing, benefitting from, or failing to prevent retaliatory dynamics affecting Plaintiff's agents' legal advocacy, public-service role, protected criticism of local legal-system actors, and equal participation in county-connected domestic-violence, victim-service, and public-service networks.

1598. Snyder County STOP Coalition lacked privilege or justification because a government-connected STOP coalition has no lawful client-protective reason to burden a nonprofit legal-services provider for criticizing legal-aid malpractice, reporting legal-service failures, petitioning courts, advocating for disabled clients, assisting vulnerable clients, assisting domestic-violence survivors, or pursuing public accountability.

1599. Snyder County STOP Coalition caused actual legal damage because its interference reduced public-service support, victim-service access, stakeholder cooperation, referral support, and institutional recognition that Plaintiff's legal team needed to investigate, develop, and move Grohol's delayed case forward.

1600. Pennsylvania Bar Association knew or had reason to know that Grohol had an existing or prospective legal-services relationship with SLAAY and Plaintiff's legal team because SLAAY's legal-aid accountability work, public-interest advocacy, disability-related advocacy, veterans-service work, bar criticism, litigation activity, and Wills for Heroes advocacy centered on clients like Grohol who needed conflict-free corrective legal assistance after legal-aid failure.

1601. Pennsylvania Bar Association intentionally interfered with that relationship by using statewide bar influence, Wills for Heroes access, staff and volunteer communication channels, public-service programs, attorney networks, referral environments, veterans-service programs, statewide pro bono legitimacy, and professional legitimacy to burden SLAAY and Plaintiff's legal team after protected speech, protected petitioning, subpoena discussions, legal-aid malpractice reporting, veterans advocacy, and criticism of bar-controlled legal-service systems.

1602. Pennsylvania Bar Association lacked privilege or justification because a statewide bar association has no legitimate basis to exclude, chill, burden, delay, or impair a legal-services provider because that provider criticizes legal-aid malpractice, reports legal-service failures, petitions courts, advocates for disabled clients, assists vulnerable clients, criticizes bar conduct, seeks equal access to public-facing pro bono programs, or pursues conflict-free public-interest legal work.

1603. Pennsylvania Bar Association caused actual legal damage because its interference cut or burdened access to bar-related spaces, attorney cooperation, public-service programs, referral channels, professional legitimacy, legal-aid collaboration, veterans-service programming, statewide pro bono opportunities, witness communications, staff communications, volunteer channels, and community goodwill, thereby delaying Grohol's case and increasing the burden on Plaintiff's legal team.

1604. Union–Snyder County Bar Association knew or had reason to know that Grohol relied on SLAAY and Plaintiff's legal team for conflict-free corrective legal assistance because Plaintiff's agents openly challenged North Penn Legal Services' failures, legal-aid malpractice, public-funding failures, local bar retaliation, Wills for Heroes exclusion, inaccurate governance records, and institutional protection of legal-aid actors.

1605. Union–Snyder County Bar Association intentionally interfered with Grohol's existing or prospective legal-services relationship by excluding, marginalizing, restricting, or burdening SLAAY through local bar access, listserv communications, public-service programs, Wills for Heroes planning, committee access, meeting access, referral environments, professional legitimacy, attorney cooperation, legal-aid partnerships, local bar influence, and suspension or threatened suspension of membership rights.

1606. Union–Snyder County Bar Association lacked privilege or justification because a local bar association has no legitimate basis to make access to local bar, legal-aid, public-service, referral, listserv, pro bono, meeting, committee, Wills for Heroes, or professional spaces depend on silence, deference, noncriticism, withdrawal of litigation, avoidance of subpoenas, or avoidance of legal-aid accountability.

1607. Union–Snyder County Bar Association caused actual legal damage because its interference delayed this case itself, impaired SLAAY's ability to function as a conflict-free alternative to North Penn Legal Services, prolonged Grohol's uncertainty, increased Plaintiff's legal burden, damaged SLAAY's professional legitimacy, and damaged the legal-services relationship Grohol needed to vindicate her rights.

1608. Pennsylvania Legal Aid Network, Inc. knew or had reason to know that Grohol depended on SLAAY and Plaintiff's legal team for conflict-free corrective legal assistance because North Penn Legal Services had already failed her and because SLAAY's work challenged legal-aid malpractice, legal-aid-system exclusion, public-funding failures, disability-related mistreatment, referral practices, lack of independent substitute counsel, and institutional protection of incumbent legal-aid providers.

1609. Pennsylvania Legal Aid Network, Inc. intentionally interfered with Grohol's legal-services relationship by participating in, supporting, allowing, reinforcing, funding, coordinating, benefitting from, or failing to prevent retaliation against SLAAY and legal-aid accountability work through statewide legal-aid influence, funding relationships, referral environments, legal-aid partnerships, training systems, public-service programs, professional legitimacy, legal-aid credibility, disability-access expectations, and institutional authority.

1610. Pennsylvania Legal Aid Network, Inc. lacked privilege or justification because a statewide legal-aid network has no lawful client-protective basis to punish, burden, exclude, or impair a conflict-free legal-services provider because that provider criticizes legal-aid malpractice, reports legal-service failures, petitions courts, advocates for disabled clients, criticizes legal-aid systems, challenges public-funding failures, or pursues public accountability.

1611. Pennsylvania Legal Aid Network, Inc. caused actual legal damage because its interference delayed Grohol's access to conflict-free correction, investigation, legal analysis, public accountability, legal-aid cooperation, referral support, stakeholder support, funding-system accountability, professional recognition, and legal-aid recognition, while forcing SLAAY and Plaintiff's legal team to divert time and resources from Grohol's case to retaliation, exclusion, legal-aid-system pressure, referral interference, and professional-legitimacy harm.

1612. North Penn Legal Services, Inc. knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because North Penn Legal Services had remained counsel of record after the January 15, 2020 missed-notice replevin hearing, had failed to provide meaningful advocacy, had failed to communicate adequately, had failed to correct the harm, had failed to withdraw timely, and had left Grohol unable to protect her civil case without outside assistance.

1613. North Penn Legal Services, Inc. intentionally interfered with Grohol's existing or prospective legal-services relationship by preserving institutional control, refusing meaningful client repair, resisting legal-aid accountability, allowing retaliation against SLAAY and Plaintiff's legal team after protected malpractice reporting, and maintaining a legal-aid environment in which conflict-free corrective assistance was burdened by retaliation, referral interference, professional pressure, and institutional hostility.

1614. North Penn Legal Services, Inc. lacked privilege or justification because a publicly funded legal-aid provider has no legitimate basis to impair a harmed client's relationship with conflict-free counsel because that counsel reported malpractice, criticized legal-aid abandonment, sought public accountability, pursued litigation, demanded client repair, or challenged North Penn Legal Services' control over legal-aid clients after its own representation failed.

1615. North Penn Legal Services, Inc. caused actual legal damage because its interference delayed Grohol's ability to obtain correction, investigation, independent legal analysis, representation-status clarity, malpractice accountability, disability-sensitive advocacy, and relief from the consequences of a civil case that had remained unresolved for more than 6 years after a missed-notice hearing.

1616. Transitions of PA knew or had reason to know that Grohol had an existing or prospective legal-services relationship with SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because SLAAY's legal-aid accountability work involved vulnerable clients, domestic-violence service systems, public-service referrals, legal-aid malpractice, disability-sensitive advocacy, and conflict-free corrective assistance.

1617. Transitions of PA intentionally interfered with Grohol's legal-services relationship by participating in, allowing, ratifying, reinforcing, benefitting from, or failing to prevent retaliation, exclusion, referral obstruction, service-provider pressure, public-service access burdens, professional-legitimacy harm, and stakeholder-access burdens directed at SLAAY and Plaintiff's legal team after protected criticism of legal-aid and bar misconduct.

1618. Transitions of PA lacked privilege or justification because a public-service provider has no legitimate basis to burden a disabled legal-aid client's relationship

with conflict-free counsel because that counsel criticized legal-aid failures, challenged bar retaliation, advocated for vulnerable clients, pursued litigation, or sought accountability in public-service and referral systems.

1619. Transitions of PA caused actual legal damage because its interference burdened public-service support, referral access, victim-service cooperation, domestic-violence service collaboration, stakeholder access, and local professional legitimacy needed for SLAAY and Plaintiff's legal team to move Grohol's delayed case forward.

1620. Transitions Legal Center knew or had reason to know that Grohol needed conflict-free legal assistance from SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because North Penn Legal Services had failed to provide meaningful representation and because SLAAY's work concerned legal-aid malpractice, vulnerable-client advocacy, domestic-violence legal-service systems, and correction of legal-aid abandonment.

1621. Transitions Legal Center intentionally interfered with Grohol's existing or prospective legal-services relationship by participating in, allowing, ratifying, reinforcing, benefitting from, or failing to prevent retaliatory conduct that impaired SLAAY's role as a competing nonprofit legal-services provider after Plaintiff's legal team engaged in protected speech, protected petitioning, and legal-aid accountability work.

1622. Transitions Legal Center lacked privilege or justification because a legal-service provider has no lawful basis to impair a client's conflict-free counsel relationship because that counsel criticized legal-aid malpractice, challenged public-service gatekeeping, advocated for disabled and vulnerable clients, pursued litigation, or sought independent corrective assistance after legal-aid failure.

1623. Transitions Legal Center caused actual legal damage because its interference impaired public-service legal cooperation, domestic-violence service referrals, pro bono collaboration, stakeholder access, professional legitimacy, and the conflict-free legal-service relationship Grohol needed to pursue correction, investigation, and relief.

1624. Bloomsburg Fair Association knew or had reason to know that Grohol had an existing or prospective legal-services relationship with SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because SLAAY's public-service work, veterans outreach, legal-aid accountability, and community legal-service access supported the same conflict-free legal-service capacity needed to assist Grohol and similarly situated clients.

1625. Bloomsburg Fair Association intentionally interfered with that relationship by ignoring, blocking, excluding, or failing to process SLAAY's vendor and veterans-event communications after Plaintiff's legal team engaged in protected

litigation, veterans advocacy, criticism of bar retaliation, and efforts to participate in public-facing veterans-service programming.

1626. Bloomsburg Fair Association lacked privilege or justification because a public-facing event operator has no legitimate basis to burden a legal-services provider’s client relationships because that provider criticized bar-controlled veterans programming, pursued litigation, advocated for veterans and disabled veterans, or sought equal access to community legal-service outreach.

1627. Bloomsburg Fair Association caused actual legal damage because exclusion from a major veterans event reduced SLAAY’s public-service credibility, community outreach, veterans-service access, referral opportunities, professional legitimacy, and capacity to maintain the conflict-free legal-service infrastructure needed to support Grohol’s delayed case.

1628. Michael F.J. Piecuch knew or had reason to know that Grohol depended on SLAAY, Plaintiff’s legal team, Plaintiff’s agents, and conflict-free accountability counsel for corrective legal assistance because Plaintiff’s legal team openly challenged North Penn Legal Services’ failures, local bar retaliation, judicially connected exclusion, advisory-board exclusion, and the local legal-system structures that affected access to legal services.

1629. Piecuch intentionally interfered with Grohol’s existing or prospective legal-services relationship by using, allowing, ratifying, reinforcing, or failing to prevent

judicially connected pressure, bar-connected exclusion, public-service access burdens, advisory-board access burdens, reputational harm, and professional-legitimacy harm directed at SLAAY and Plaintiff's legal team after protected criticism and litigation.

1630. Piecuch lacked privilege or justification because a president judge has no legitimate basis to impair a vulnerable client's relationship with conflict-free counsel because that counsel criticized judges, legal-aid providers, prosecutors, bar actors, Wills for Heroes exclusion, public-service gatekeeping, or local legal-system retaliation.

1631. Piecuch caused actual legal damage because judicially connected interference impaired SLAAY's local legal credibility, public-service access, stakeholder access, referral environment, professional cooperation, and practical ability to provide Grohol timely conflict-free corrective assistance.

1632. Lori R. Hackenberg knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team was challenging legal-aid malpractice, courthouse-connected exclusion, public-service discrimination, judicial favoritism, Wills for Heroes exclusion, and retaliation affecting attorneys who represent vulnerable clients.

1633. Hackenberg intentionally interfered with Grohol's existing or prospective legal-services relationship by participating in, ratifying, allowing, reinforcing, benefitting from, or failing to prevent courthouse-connected and bar-connected exclusion, selective professional participation, public recognition for favored attorneys and organizations, and differential treatment of SLAAY and Plaintiff's legal team after protected criticism and litigation.

1634. Hackenberg lacked privilege or justification because a judge has no legitimate basis to burden conflict-free counsel's ability to serve a legal-aid client because counsel criticized courthouse practices, bar retaliation, legal-aid malpractice, Wills for Heroes exclusion, or public-service discrimination.

1635. Hackenberg caused actual legal damage because courthouse-connected interference reduced SLAAY's access to neutral courthouse-related opportunities, local professional credibility, public-service legitimacy, referral cooperation, and institutional support needed to correct Grohol's delayed and abandoned civil matter.

1636. Jeffrey A. Rowe knew or had reason to know that Grohol needed SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team had publicly challenged legal-aid misconduct, USCBA retaliation, Wills for Heroes exclusion, meeting exclusion, governance manipulation, inaccurate narratives, and court-connected public-service retaliation.

1637. Rowe intentionally interfered with Grohol's existing or prospective legal-services relationship by participating in, ratifying, allowing, reinforcing, benefitting from, or failing to prevent court-connected and bar-connected exclusion affecting courthouse-program access, Law Day recognition, Wills for Heroes planning, USCBA meeting dynamics, public-service legal opportunities, and professional participation in the local bar ecosystem.

1638. Rowe lacked privilege or justification because a judicial officer has no legitimate basis to impair a legal-aid client's conflict-free counsel relationship because counsel criticized bar retaliation, legal-aid misconduct, Wills for Heroes exclusion, inaccurate governance records, or court-connected public-service exclusion.

1639. Rowe caused actual legal damage because his interference reduced Plaintiff's legal team's access to local professional legitimacy, public-service opportunities, courthouse-adjacent credibility, Wills for Heroes-related channels, and the institutional cooperation needed to advance Grohol's delayed case.

1640. Robert Leadbeter knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because SLAAY's legal-service work, veterans outreach, community legal-service access, public-interest advocacy, and litigation capacity supported the

same nonprofit legal infrastructure needed to investigate and correct North Penn Legal Services' failure in Grohol's case.

1641. Leadbeter intentionally interfered with Grohol's existing or prospective legal-services relationship by participating in, authorizing, ratifying, allowing, reinforcing, benefitting from, or failing to prevent exclusion of SLAAY and Plaintiff's legal team from the Bloomsburg Fair veterans event after protected litigation, veterans advocacy, criticism of PBA and USCBA retaliation, and efforts to participate in public-facing veterans-service programming.

1642. Leadbeter lacked privilege or justification because a public official has no legitimate basis to impair a nonprofit legal-services provider's client relationships because that provider criticized bar-controlled veterans programs, pursued litigation, advocated for veterans and disabled veterans, challenged public-event exclusion, or sought equal access to community legal-service outreach.

1643. Leadbeter caused actual legal damage because exclusion from a public-facing veterans event reduced SLAAY's community legitimacy, veterans-service access, referral opportunities, public-service recognition, goodwill, and nonprofit capacity to maintain the conflict-free legal-service infrastructure needed to support Grohol's delayed case.

1644. Heath Brosius knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability

counsel because Plaintiff's legal team was challenging legal-aid malpractice, local legal-system retaliation, prosecutor-connected public-service access problems, bar exclusion, and institutional obstruction affecting attorneys who represent vulnerable clients.

1645. Brosius intentionally interfered with Grohol's existing or prospective legal-services relationship by participating in, ratifying, allowing, reinforcing, benefitting from, or failing to prevent prosecutorially connected pressure, public-service exclusion, STOP-related obstruction, bar retaliation, reputational harm, and legal-aid accountability obstruction after protected criticism and litigation.

1646. Brosius lacked privilege or justification because a district attorney has no legitimate basis to burden a vulnerable client's conflict-free counsel relationship because that counsel criticized prosecutors, judges, legal-aid actors, bar associations, public-service systems, STOP-related structures, or local legal-system misconduct.

1647. Brosius caused actual legal damage because prosecutorially connected interference impaired SLAAY's public-service access, coalition credibility, referral environment, local professional legitimacy, institutional cooperation, and practical ability to advance Grohol's delayed case without retaliation.

1648. Brian Kerstetter knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability

counsel because Plaintiff's legal team was challenging legal-aid malpractice, advisory-board exclusion, public-service retaliation, prosecutor-connected legal-system pressure, bar misconduct, and local institutional obstruction.

1649. Kerstetter intentionally interfered with Grohol's existing or prospective legal-services relationship by participating in, ratifying, allowing, reinforcing, benefitting from, or failing to prevent prosecutorially connected pressure, advisory-board exclusion, public-service obstruction, STOP-related retaliation, bar retaliation, reputational harm, and legal-aid accountability obstruction after protected criticism and litigation.

1650. Kerstetter lacked privilege or justification because a district attorney has no legitimate basis to impair conflict-free counsel's ability to serve a legal-aid client because counsel criticized prosecutors, judges, legal-aid providers, bar actors, public-service exclusion, advisory-board exclusion, STOP-related systems, or local legal-system misconduct.

1651. Kerstetter caused actual legal damage because prosecutorially connected and advisory-board-related interference reduced SLAAY's stakeholder access, referral relationships, public-service credibility, local institutional cooperation, and ability to provide timely conflict-free corrective assistance to Grohol.

1652. Jamie Saleski knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability

counsel because Plaintiff's legal team was pursuing litigation, subpoenas, document requests, court filings, public accountability, and correction of legal-aid abandonment through court-access systems and public-record systems.

1653. Saleski intentionally interfered with Grohol's existing or prospective legal-services relationship by participating in, ratifying, allowing, reinforcing, benefitting from, or failing to prevent filing-related, record-related, courthouse-related, or public-office conduct that burdened Plaintiff, Plaintiff's legal team, Plaintiff's agents, and similarly situated clients after protected criticism, litigation, and petitioning activity.

1654. Saleski lacked privilege or justification because a prothonotary has no legitimate basis to burden a client's relationship with conflict-free counsel because counsel criticized court-access barriers, legal-aid abandonment, public-office conduct, prothonotary practices, retaliation, docket integrity, filing access, or public-record practices.

1655. Saleski caused actual legal damage because filing-related, record-related, and court-access interference impaired Plaintiff's legal team's ability to obtain records, preserve litigation posture, pursue subpoenas, file claims, challenge legal-system actors, and move Grohol's delayed case forward.

1656. K. Michael Sullivan knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability

counsel because SLAAY's conflict-free legal-service work challenged North Penn Legal Services' failures, USCBA retaliation, Wills for Heroes exclusion, bar-controlled public-service programming, and the local referral structures affecting vulnerable clients.

1657. Sullivan intentionally interfered with Grohol's existing or prospective legal-services relationship by publicly rebuking protected criticism, using Wills for Heroes authority to condition public-service legal programming on surrender or resolution of protected claims, moving to suspend Wills for Heroes planning, and participating in a local bar structure that treated litigation, subpoena activity, veterans advocacy, legal-aid criticism, and nonprofit legal-service competition as grounds for exclusion.

1658. Sullivan lacked privilege or justification because a local bar leader has no legitimate basis to impair a client's relationship with conflict-free counsel because that counsel criticized legal-aid malpractice, demanded accurate minutes, requested committee access, proposed nonretaliation rules, pursued subpoenas, filed litigation, or sought equal access to public-facing pro bono programs.

1659. Sullivan caused actual legal damage because his interference reduced Plaintiff's legal team's access to local bar channels, pro bono opportunities, veterans-service programs, referral opportunities, professional credibility,

volunteers, clients, public-service legal programming, and the goodwill needed to move Grohol's case forward.

1660. Sarah Stigerwalt-Egan knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team was challenging legal-aid malpractice, USCBA retaliation, Wills for Heroes exclusion, public-service legal access, veterans-service access, and local bar gatekeeping.

1661. Stigerwalt-Egan intentionally interfered with Grohol's existing or prospective legal-services relationship by suspending Wills for Heroes planning unless Martineau resolved or dropped protected claims, sending hostile or false communications to PBA and DMVA about SLAAY and Martineau, refusing to support a nonretaliation resolution, cancelling or controlling meetings after protected filings, withholding Teams access, and participating in or allowing temporary suspension of Martineau's USCBA membership.

1662. Stigerwalt-Egan lacked privilege or justification because a bar president, judicial law clerk, and hearing officer has no legitimate basis to impair a conflict-free legal-services relationship because counsel criticized legal-aid malpractice, objected to retaliation, filed litigation, demanded equal meeting access, demanded accurate minutes, advocated for veterans, or asked bar and public actors to stop retaliation.

1663. Stigerwalt-Egan caused actual legal damage because her interference reduced Plaintiff's legal team's access to local bar membership, meetings, Wills for Heroes planning, veterans-service channels, public-service legal opportunities, professional legitimacy, referral relationships, and nonprofit legal-service capacity needed to support Grohol's delayed case.

1664. Sholley knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team was challenging legal-aid malpractice, USCBA retaliation, Wills for Heroes exclusion, inaccurate governance records, meeting-access barriers, and local bar conduct that impaired legal-service access.

1665. Sholley intentionally interfered with Grohol's existing or prospective legal-services relationship by participating in, ratifying, allowing, reinforcing, benefitting from, or failing to correct USCBA minute manipulation, refusal to correct material governance inaccuracies, meeting-record practices that distorted protected objections, and officer-level conduct supporting exclusion after protected litigation and criticism.

1666. Sholley lacked privilege or justification because a bar officer has no legitimate basis to impair a client's relationship with conflict-free counsel because that counsel demanded accurate minutes, objected to retaliation, criticized Wills

for Heroes exclusion, challenged legal-aid misconduct, pursued litigation, or requested nonretaliation rules.

1667. Sholley caused actual legal damage because inaccurate governance records and officer-level interference reduced Plaintiff's legal team's access to meetings, committees, Wills for Heroes planning, listserv participation, membership rights, professional legitimacy, public-service opportunities, and the local cooperation needed to move Grohol's case forward.

1668. Kathleen Lincoln knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team was challenging legal-aid malpractice, attorney abandonment, courthouse-connected retaliation, USCBA retaliation, prothonotary-related litigation, and local professional pressure.

1669. Lincoln intentionally interfered with Grohol's existing or prospective legal-services relationship by making threatening and disparaging comments after the July 24, 2025 USCBA meeting, telling Martineau that continued complaints about ethical violations would cost her friends, settlements, and support for her projects, tying those remarks to courthouse and prothonotary litigation, and using or allowing her USCBA officer role to support retaliation after protected litigation and criticism.

1670. Lincoln lacked privilege or justification because a bar officer has no legitimate basis to impair a client's relationship with conflict-free counsel by threatening professional isolation, settlement consequences, project-support loss, courthouse hostility, or bar membership consequences because counsel criticized ethical violations, courthouse conduct, prothonotary conduct, legal-aid malpractice, or bar retaliation.

1671. Lincoln caused actual legal damage because threats about friendships, settlements, courthouse hostility, project support, and bar membership burdened Plaintiff's legal team's ability to obtain cooperation, protect settlement posture, maintain public-service support, preserve professional relationships, and devote full capacity to Grohol's delayed case.

1672. Jessica Chapman knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team's Wills for Heroes advocacy, PBA communications, veterans-service advocacy, and bar-retaliation litigation supported the same nonprofit legal-service infrastructure needed to assist Grohol and similarly situated clients.

1673. Chapman intentionally interfered with Grohol's existing or prospective legal-services relationship by receiving, participating in, supporting, ratifying, allowing, or failing to correct PBA communications and Wills for Heroes

exclusion after Plaintiff's counsel notified PBA actors that Plaintiff's agents would attend Wills for Heroes events, challenged exclusion from those events, threatened nonfrivolous legal action, and criticized bar retaliation.

1674. Chapman lacked privilege or justification because a PBA-connected Wills for Heroes actor has no legitimate basis to impair a legal-services provider's client relationships because that provider criticized bar retaliation, sought equal event access, pursued litigation, advocated for veterans and disabled veterans, or challenged exclusion from public-facing legal programs.

1675. Chapman caused actual legal damage because PBA and Wills for Heroes exclusion reduced Plaintiff's legal team's access to public-facing pro bono events, volunteer opportunities, veterans outreach, professional legitimacy, client channels, goodwill, and the nonprofit legal-service capacity needed to support Grohol's delayed case.

1676. William R. Christman III knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team's criticism of PBA, Wills for Heroes exclusion, legal-aid malpractice, bar retaliation, and public-service legal gatekeeping directly affected SLAAY's ability to provide conflict-free legal services to vulnerable clients.

1677. Christman intentionally interfered with Grohol's existing or prospective legal-services relationship on July 30, 2025, when he ordered Martineau to cease all communications with PBA staff and volunteers, required communications about PBA, Wills for Heroes, and potential litigation to go only through him, and announced that PBA would not permit Martineau or SLAAY to participate in any Wills for Heroes events or programs in any way.

1678. Christman lacked privilege or justification because a bar association's general counsel has no legitimate basis to impair a client's relationship with conflict-free counsel by cutting counsel off from staff, volunteers, witnesses, pro bono channels, veterans-service programs, and public-facing legal opportunities because counsel criticized PBA, discussed subpoenas, pursued litigation, or advocated for veterans.

1679. Christman caused actual legal damage because the no-contact directive and categorical Wills for Heroes ban cut Plaintiff's legal team off from staff, volunteers, statewide pro bono channels, veterans-service programs, public-facing legal opportunities, witness communications, program legitimacy, professional goodwill, and resources needed to advance Grohol's delayed case.

1680. Gabriele Miller-Wagner knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team's Wills for Heroes work,

veterans-service planning, public-service legal programming, and criticism of bar retaliation supported SLAAY's broader ability to serve vulnerable clients.

1681. Miller-Wagner intentionally interfered with Grohol's existing or prospective legal-services relationship by participating in, supporting, ratifying, allowing, or failing to correct PBA and Wills for Heroes exclusion after Plaintiff's counsel's protected litigation threats, subpoena-related communications, criticism of USCBA and PBA retaliation, and request for equal access to Union–Snyder Wills for Heroes.

1682. Miller-Wagner lacked privilege or justification because a statewide Wills for Heroes coordinator has no legitimate basis to impair a legal-services provider's client relationships because that provider criticized retaliation, discussed subpoenas, pursued litigation, advocated for veterans and disabled veterans, or asked whether SLAAY and veterans coalitions could host or participate in Wills for Heroes programming.

1683. Miller-Wagner caused actual legal damage because statewide Wills for Heroes exclusion reduced Plaintiff's legal team's access to planning communications, volunteer recruitment, event legitimacy, scheduling, PBA staff channels, regional outreach, veterans and disabled veterans, public-service credibility, and nonprofit capacity needed to support Grohol's delayed case.

1684. David K. Trevaskis knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team's Wills for Heroes advocacy, veterans-service work, bar-retaliation objections, subpoena discussions, and litigation activity supported SLAAY's broader ability to provide conflict-free legal services to vulnerable clients harmed by incumbent legal-aid providers.

1685. Trevaskis intentionally interfered with Grohol's existing or prospective legal-services relationship by participating in, supporting, reversing, ratifying, allowing, or failing to correct PBA and Wills for Heroes exclusion after communications from USCBA and NPLS-aligned actors exported local hostility into statewide bar structures and after Plaintiff's counsel engaged in protected litigation, subpoena-related communications, veterans advocacy, and criticism of legal-aid and bar misconduct.

1686. Trevaskis lacked privilege or justification because a statewide Wills for Heroes leader has no legitimate basis to impair a legal-services provider's client relationships because that provider requested equal access to veterans programming, challenged retaliatory control over veterans services, discussed subpoenas, pursued litigation, criticized legal-aid malpractice, or sought to serve veterans and disabled veterans through a nonprofit legal-aid structure.

1687. Trevaskis caused actual legal damage because statewide Wills for Heroes exclusion reduced Plaintiff's legal team's access to public-facing legal programs, PBA staff and volunteers, veterans and disabled veterans, professional credibility, volunteer recruitment, goodwill, public-service legitimacy, and nonprofit legal-service capacity needed to support Grohol's delayed case.

1688. Lori Molloy knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team had reported North Penn Legal Services malpractice, objected to missed hearings and deadlines, criticized legal-aid management failures, advocated for harmed clients, developed conflict-free nonprofit legal-service alternatives, and pursued litigation challenging legal-aid abandonment and retaliation.

1689. Molloy intentionally interfered with Grohol's existing or prospective legal-services relationship by preserving North Penn Legal Services' institutional control instead of client repair after protected malpractice reporting, allowing post-resignation retaliation against Martineau and SLAAY, maintaining a legal-aid environment in which protected whistleblowing and public criticism led to professional exclusion and referral loss, and allowing bar-connected and legal-aid-connected systems to punish conflict-free nonprofit legal-service work.

1690. Molloy lacked privilege or justification because a publicly funded legal-aid executive has no legitimate basis to impair a harmed client's relationship with conflict-free counsel because that counsel reported malpractice, criticized North Penn Legal Services, developed a competing nonprofit legal-service alternative, sought client repair, pursued litigation, or challenged legal-aid monopoly structures.

1691. Molloy caused actual legal damage because her interference preserved incumbent legal-aid control while reducing Grohol's access to conflict-free corrective assistance, substitute counsel, referral support, legal-aid cooperation, institutional recognition, client-repair pathways, and the legal-service capacity needed to correct a case left unresolved for more than 6 years.

1692. Timothy Smith knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because North Penn Legal Services remained counsel of record while Smith told Grohol that North Penn Legal Services was not working on the case for her, pressured her to proceed pro se, and warned her that her case could be dismissed for lack of prosecution if she did not represent herself.

1693. Smith intentionally interfered with Grohol's existing or prospective legal-services relationship by preserving North Penn Legal Services' authority after known client-service failures, refusing or failing to correct the representation-status

harm, shifting the burden of repair onto Grohol, and maintaining the institutional conditions that made conflict-free corrective representation by SLAAY and Plaintiff's legal team more necessary, more difficult, more delayed, and more burdened.

1694. Smith lacked privilege or justification because a senior legal-aid manager has no legitimate basis to impair a client's relationship with conflict-free counsel after telling that client the funded provider was not working on her case while the provider remained counsel of record and while the client needed independent assistance to prevent dismissal, correct the docket, and obtain relief.

1695. Smith caused actual legal damage because his interference delayed Grohol's correction efforts, increased her litigation burden, worsened her uncertainty about representation status, forced Plaintiff's legal team to repair avoidable legal-aid failures, and reduced the time and capacity available to advance Grohol's underlying civil matter.

1696. Mary Beth Clark knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Clark knew Martineau had reported North Penn Legal Services malpractice, left North Penn Legal Services, formed SLAAY, challenged client abandonment, and sought to build conflict-free legal-service alternatives through local bar, Wills for Heroes, PFA-fee, Judicare, and public-service channels.

1697. Clark intentionally interfered with Grohol's existing or prospective legal-services relationship by carrying North Penn Legal Services hostility into USCBA, trying to use Martineau's temporary absence after her mother's death to exclude her permanently from bar and pro bono roles, excluding Martineau and SLAAY from communications and Wills for Heroes planning, privately undermining SLAAY's eligibility for PFA fees and Judicare referrals, and supporting or failing to prevent USCBA retaliation after protected criticism and litigation.

1698. Clark lacked privilege or justification because a North Penn Legal Services-connected attorney and local bar actor has no legitimate basis to impair a client's relationship with conflict-free counsel because that counsel reported North Penn Legal Services malpractice, criticized legal-aid abandonment, sought referral opportunities, pursued public-service legal work, advocated for veterans, or challenged local bar retaliation.

1699. Clark caused actual legal damage because her interference reduced SLAAY's access to referrals, PFA-fee opportunities, Judicare opportunities, pro bono channels, veterans-service programs, local bar opportunities, public-service partnerships, professional credibility, and conflict-free legal-aid capacity needed to support Grohol's delayed case.

1700. David Andrew Strouse knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free

accountability counsel because Plaintiff's legal team's criticism of USCBA, PBA, ODC, judges, bar actors, legal-aid misconduct, Wills for Heroes exclusion, retaliation, false statements, and conspiracy directly concerned the professional systems affecting SLAAY's ability to serve vulnerable clients.

1701. Strouse intentionally interfered with Grohol's existing or prospective legal-services relationship by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from retaliatory exclusion, boycott, false statements, listserv conduct, professional ostracism, and conspiracy after Plaintiff's legal team and agents engaged in protected speech, petitioning, litigation, veterans advocacy, and legal-aid reform work.

1702. Strouse lacked privilege or justification because a local attorney and bar participant has no legitimate basis to impair a client's relationship with conflict-free counsel because that counsel criticized local legal-system misconduct, pursued litigation, discussed subpoenas, advocated for veterans, challenged bar-controlled public-service exclusion, or sought accountability for legal-aid malpractice.

1703. Strouse caused actual legal damage because local attorney participation in bar-connected retaliation reduced Plaintiff's legal team's access to referrals, reputation, professional access, local credibility, public-service programming, client channels, attorney cooperation, and the nonprofit legal-service capacity needed to support Grohol's delayed case.

1704. Jenna Ann Neidig knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team's criticism of USCBA, PBA, ODC, judges, bar actors, legal-aid misconduct, Wills for Heroes exclusion, retaliation, false statements, and conspiracy directly concerned the local professional systems affecting SLAAY's ability to serve vulnerable clients.

1705. Neidig intentionally interfered with Grohol's existing or prospective legal-services relationship by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from retaliatory exclusion, boycott, false statements, listserv conduct, meeting-related conduct, governance-record conduct, professional ostracism, and conspiracy after Plaintiff's legal team and agents engaged in protected speech, petitioning, litigation, veterans advocacy, and legal-aid reform work.

1706. Neidig lacked privilege or justification because a local attorney, bar participant, officer, or former officer has no legitimate basis to impair a client's relationship with conflict-free counsel because that counsel criticized local bar governance, demanded accurate records, pursued litigation, discussed subpoenas, advocated for veterans, challenged Wills for Heroes exclusion, or sought accountability for legal-aid malpractice.

1707. Neidig caused actual legal damage because local bar officer, former-officer, meeting-record, and listserv participation reduced Plaintiff's legal team's access to meetings, committees, public-service legal programming, referrals, professional credibility, attorney cooperation, and nonprofit legal-service capacity needed to support Grohol's delayed case.

1708. Robert Cravitz knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team's protected criticism and litigation challenged local legal-system misconduct, legal-aid abandonment, USCBA retaliation, PBA retaliation, Wills for Heroes exclusion, attorney misconduct, public-service exclusion, and treatment of vulnerable clients.

1709. Cravitz intentionally interfered with Grohol's existing or prospective legal-services relationship by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from retaliatory exclusion, boycott, false statements, listserv conduct, professional ostracism, or conspiracy after protected speech, protected petitioning, litigation, veterans advocacy, and legal-aid reform work.

1710. Cravitz lacked privilege or justification because a local attorney and bar-connected professional actor has no legitimate basis to impair a client's relationship with conflict-free counsel because that counsel criticized local legal-

Case 4:26-cv-01231-JWB Document 11-3 Filed 01/29/26 Page 504 of 973

system misconduct, reported legal-aid abandonment, pursued litigation, discussed subpoenas, advocated for veterans, or challenged public-service exclusion.

1711. Cravitz caused actual legal damage because local attorney participation in bar-connected retaliation damaged referrals, reputation, professional access, local credibility, public-service programming, client access, attorney cooperation, and Plaintiff's legal team's practical ability to provide conflict-free assistance to Grohol.

1712. Brian Ulmer knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team's PBA, Wills for Heroes, veterans-service, pro bono, and bar-retaliation work supported SLAAY's broader ability to provide conflict-free legal assistance to vulnerable clients.

1713. Ulmer intentionally interfered with Grohol's existing or prospective legal-services relationship by participating in, supporting, ratifying, allowing, or failing to correct PBA and Wills for Heroes retaliation that excluded Plaintiff's legal team and agents from public-facing legal programs, chilled communications with PBA staff and volunteers, and treated protected criticism, protected litigation, subpoena activity, and veterans advocacy as grounds for exclusion from pro bono structures.

1714. Ulmer lacked privilege or justification because a PBA-connected and Wills for Heroes-connected actor has no legitimate basis to impair a legal-services

provider's client relationships because that provider criticized PBA or USCBA, advocated for veterans and disabled veterans, sought Wills for Heroes participation, communicated with PBA staff and volunteers, discussed subpoenas, or challenged bar-controlled public-service exclusion.

1715. Ulmer caused actual legal damage because PBA-connected and Wills for Heroes-connected exclusion reduced Plaintiff's legal team's access to statewide program access, volunteer channels, staff communications, pro bono credibility, veterans-service outreach, public-facing legal-program legitimacy, client channels, and nonprofit legal-service capacity needed to support Grohol's delayed case.

1716. Mark J. Conway knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team's federal-court advocacy, judicial-criticism activity, recusal advocacy, sanctions opposition, bankruptcy-access advocacy, legal-aid criticism, and public-interest litigation capacity affected SLAAY's ability to serve vulnerable clients without court-connected retaliation.

1717. Conway intentionally interfered with Grohol's existing or prospective legal-services relationship by using or allowing federal judicial authority, bankruptcy-court authority, sanctions proceedings, recusal decisions, courtroom control, docket management, judicial characterizations of protected criticism, and coercive

litigation pressure to burden Plaintiff's legal team's protected speech, petitioning, bankruptcy advocacy, legal-aid criticism, and public-interest litigation.

1718. Conway lacked privilege or justification because a federal judicial officer has no legitimate basis to impair a client's relationship with conflict-free counsel because counsel criticized judicial conduct, sought recusal, opposed sanctions, pursued appeals, challenged bankruptcy-court conduct, criticized legal-aid and bar retaliation, or pursued nonfrivolous litigation against legal-system actors.

1719. Conway caused actual legal damage because judicially connected pressure reduced Plaintiff's legal team's ability to maintain professional credibility, preserve attorney capacity, represent vulnerable clients, pursue subpoenas, challenge court-connected actors, provide bankruptcy and debt-relief advocacy, and devote full resources to Grohol's delayed case.

1720. Matthew W. Brann knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team's federal litigation challenged bar retaliation, legal-aid misconduct, judicial and legal-system actors, public-service systems, subpoenas, court access, and legal-aid structures affecting Grohol's access to corrective representation.

1721. Brann intentionally interfered with Grohol's existing or prospective legal-services relationship by using or allowing federal judicial authority, case-

management authority, adjudicatory authority, recusal decisions, docket control, and judicial treatment of Plaintiff's legal team's protected litigation and criticism to burden, punish, chill, or impair protected speech, petitioning, litigation, and public-interest legal advocacy.

1722. Brann lacked privilege or justification because a federal judicial officer has no legitimate basis to impair a client's relationship with conflict-free counsel because counsel filed litigation, challenged bar retaliation, challenged legal-aid misconduct, criticized judicial and legal-system actors, sought declaratory and injunctive relief, discussed subpoenas, or pursued claims against powerful legal institutions.

1723. Brann caused actual legal damage because federal court pressure reduced Plaintiff's legal team's ability to maintain professional credibility, serve clients, pursue public-interest litigation, preserve claims, obtain fair judicial access, challenge institutional actors, and devote full legal capacity to Grohol's delayed case.

1724. United States Bankruptcy Court for the Middle District of Pennsylvania knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Plaintiff's legal team's bankruptcy-access advocacy, federal-court advocacy, judicial-

criticism activity, debt-relief work, legal-aid criticism, and public-interest litigation capacity supported SLAAY's broader ability to serve vulnerable clients.

1725. United States Bankruptcy Court for the Middle District of Pennsylvania intentionally interfered with Grohol's existing or prospective legal-services relationship by participating in, ratifying, allowing, or failing to prevent bankruptcy-access burdens, attorney-practice burdens, complaint-handling burdens, case-handling burdens, hearing-handling burdens, filing-related burdens, sanctions-related burdens, local-rule burdens, monitoring burdens, or court-access conduct after protected criticism, protected litigation, recusal-related advocacy, opposition to improper sanctions, subpoena activity, client-protection work, and participation in this lawsuit.

1726. United States Bankruptcy Court for the Middle District of Pennsylvania lacked privilege or justification because a federal court has no legitimate basis to impair a vulnerable client's relationship with conflict-free counsel because that counsel criticized federal judicial conduct, sought recusal, opposed sanctions, advocated for bankruptcy access, represented debtors and vulnerable clients, criticized legal-aid and bar retaliation, filed appeals, or pursued court accountability.

1727. United States Bankruptcy Court for the Middle District of Pennsylvania caused actual legal damage because bankruptcy-access and attorney-practice

burdens reduced Plaintiff's legal team's ability to serve debtors, homeowners, low-income litigants, veterans, disabled veterans, and other court users, reduced attorney capacity, chilled public-interest advocacy, and burdened the legal-service infrastructure needed to support Grohol's delayed case.

1728. Doe Defendants knew or had reason to know that Grohol depended on SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel because Doe Defendants participated in or had access to bar, court-connected, legal-aid, veterans-service, public-service, listserv, referral, meeting, program-access, or professional-network information concerning Plaintiff's legal team's protected criticism, litigation, subpoenas, veterans advocacy, legal-aid accountability work, and representation of vulnerable clients.

1729. Doe Defendants intentionally interfered with Grohol's existing or prospective legal-services relationship by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from USCBA membership structures, listserv structures, local attorney networks, bar-governance structures, litigation-response structures, public-service legal networks, Wills for Heroes structures, court-connected local legal systems, false statements, boycotts, exclusionary conduct, and professional ostracism that burdened SLAAY, Plaintiff's legal team, Plaintiff's agents, and conflict-free accountability counsel.

1730. Doe Defendants lacked privilege or justification because bar-connected, court-connected, legal-aid-connected, veterans-service-connected, public-service-connected, or professional-network participants have no legitimate basis to impair a client's relationship with conflict-free counsel because that counsel criticized legal-aid misconduct, bar retaliation, judicial conduct, public-service exclusion, veterans-service exclusion, Wills for Heroes exclusion, disciplinary threats, attorney misconduct, false narratives, or legal-system retaliation.

1731. Doe Defendants caused actual legal damage because collective professional retaliation reduced Plaintiff's legal team's access to referrals, meetings, committees, listservs, Wills for Heroes, public-service channels, disciplinary safety, court access, litigation access, veterans-service opportunities, professional reputation, clients, volunteers, donor goodwill, attorney cooperation, and nonprofit legal-service capacity needed to support Grohol's delayed case.

1732. Defendants' interference harmed Grohol because it delayed this case itself, prolonged the consequences of North Penn Legal Services' abandonment, impaired conflict-free legal assistance, increased Plaintiff's legal burden, worsened Plaintiff's uncertainty, anxiety, communication difficulty, and functional difficulty, and damaged the legal-services relationship Plaintiff needed to obtain investigation, correction, and relief.

1733. Defendants are liable for intentional interference with contractual relations and intentional interference with prospective contractual relations because each defendant knew or had reason to know of Grohol's and similarly situated clients' existing or prospective legal-services relationships with SLAAY, Plaintiff's legal team, Plaintiff's agents, or conflict-free accountability counsel; each intentionally interfered with those relationships; each lacked privilege or justification; and each caused actual legal damage.

1734. Grohol and the class are entitled to compensatory damages, consequential damages, nominal damages, punitive damages where available, declaratory relief, injunctive relief, noninterference protections, nonretaliation protections, equal access to public-service programs and stakeholder spaces, correction of retaliatory records and communications, referral-access review, public-service access review, legal-aid accountability review, disability-access review, case-delay review, expedited discovery, costs, fees where available, and all other lawful relief.

**COUNT 22**

**Sherman Act § 1 Structural Group Boycott and Concerted Refusal to Deal Against Administrative Office of Pennsylvania Courts; American Bar Association; Bloomsburg Fair Association; Matthew W. Brann; Heath Brosius; Jessica Chapman; William R. Christman III; Mary Beth Clark;**

**Committee on Rules of Practice and Procedure; Commonwealth of Pennsylvania; Mark J. Conway; Court of Judicial Discipline; Robert Cravitz; Doe Defendants 1 through 200; Federal Judicial Center; Lori R. Hackenberg; International Legal Aid Group; Judicial Conduct Board of Pennsylvania; Heather Kelly; Brian Kerstetter; Robert Leadbeter; Legal Services Corporation; Kathleen Lincoln; Gabriele Miller-Wagner; Lori Molloy; Jenna Ann Neidig; North Penn Legal Services, Inc.; Northumberland County Prothonotary's Office; Office of Attorney General; Office of Disciplinary Counsel; Pennsylvania Bar Association; Pennsylvania Board of Law Examiners; Pennsylvania Department of Human Services; Pennsylvania Department of Military and Veterans Affairs; Pennsylvania General Assembly; Pennsylvania IOLTA Board; Pennsylvania Legal Aid Network, Inc.; Supreme Court of Pennsylvania; Michael F.J. Piecuch; Jeffrey A. Rowe; Jamie Saleski; Alexandra Sholley; Timothy Smith; Snyder County; Snyder County STOP Coalition; Sarah Stigerwalt-Egan; K. Michael Sullivan; David Andrew Strouse; Transitions Legal Center; Transitions of PA; David K. Trevaskis; Brian Ulmer; Union County; Union–Snyder County Bar Association; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; United**

**States Congress; United States Court of Appeals for the Third Circuit; United States District Court for the Middle District of Pennsylvania; United States Department of Health and Human Services; and United States Judicial Conference**

1735. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 257, Administrative Office of Pennsylvania Courts, Structural Group Boycott; COA 258, American Bar Association, Structural Group Boycott; COA 259, Bloomsburg Fair Association, Structural Group Boycott; COA 260, Brann, Structural Group Boycott; COA 261, Brosius, Structural Group Boycott; COA 262, Chapman, Structural Group Boycott; COA 263, Christman, Structural Group Boycott; COA 264, Clark, Structural Group Boycott; COA 265, Committee on Rules of Practice and Procedure, Structural Group Boycott; COA 266, Commonwealth of Pennsylvania, Structural Group Boycott; COA 267, Conway, Structural Group Boycott; COA 268, Court of Judicial Discipline, Structural Group Boycott; COA 269, Cravitz, Structural Group Boycott; COA 270, Doe Defendants, Structural Group Boycott; COA 271, Federal Judicial Center, Structural Group Boycott; COA 272, Hackenberg, Structural Group Boycott; COA 273, ILAG, Structural Group Boycott; COA 274, Judicial Conduct Board of Pennsylvania, Structural Group Boycott; COA 275, Kelly, Structural Group Boycott; COA 276, Kerstetter, Structural Group Boycott; COA

277, Leadbeter, Structural Group Boycott; COA 278, Legal Services Corporation, Structural Group Boycott; COA 279, Lincoln, Structural Group Boycott; COA 280, Miller-Wagner, Structural Group Boycott; COA 281, Molloy, Structural Group Boycott; COA 282, Neidig, Structural Group Boycott; COA 283, North Penn Legal Services, Structural Group Boycott; COA 284, Northumberland County Prothonotary's Office, Structural Group Boycott; COA 285, Office of the Attorney General, Structural Group Boycott; COA 286, Office of Disciplinary Counsel, Structural Group Boycott; COA 287, Pennsylvania Bar Association, Structural Group Boycott; COA 288, Pennsylvania Board of Law Examiners, Structural Group Boycott; COA 289, Pennsylvania Department of Human Services, Structural Group Boycott; COA 290, Pennsylvania Department of Military and Veterans Affairs, Structural Group Boycott; COA 291, Pennsylvania General Assembly, Structural Group Boycott; COA 292, Pennsylvania Legal Aid Network, Structural Group Boycott; COA 293, Pennsylvania Supreme Court, Structural Group Boycott; COA 294, Piecuch, Structural Group Boycott; COA 295, Rowe, Structural Group Boycott; COA 296, Saleski, Structural Group Boycott; COA 297, Sholley, Structural Group Boycott; COA 298, Smith, Structural Group Boycott; COA 299, Snyder County, Structural Group Boycott; COA 300, Snyder County STOP Coalition, Structural Group Boycott; COA 301, Stigerwalt-Egan, Structural Group Boycott; COA 302, Sullivan, Structural Group Boycott; COA 303, Strouse,

Structural Group Boycott; COA 304, Transitions Legal Center, Structural Group Boycott; COA 305, Transitions of PA, Structural Group Boycott; COA 306, Trevaskis, Structural Group Boycott; COA 307, Ulmer, Structural Group Boycott; COA 308, Union County, Structural Group Boycott; COA 309, Union–Snyder County Bar Association, Structural Group Boycott; COA 310, Union County Criminal Justice Advisory Board, Structural Group Boycott; COA 311, Union County Mental Health Advisory Committee, Structural Group Boycott; COA 312, Union County STOP Coalition, Structural Group Boycott; COA 313, United States Bankruptcy Court for the Middle District of Pennsylvania, Structural Group Boycott; COA 314, United States Congress, Structural Group Boycott; COA 315, United States Court of Appeals for the Third Circuit, Structural Group Boycott; COA 316, United States District Court for the Middle District of Pennsylvania, Structural Group Boycott; COA 317, United States Department of Health and Human Services, Structural Group Boycott; and COA 318, United States Judicial Conference, Structural Group Boycott, from the 651-count inventory attached as exhibits.

1736. The elements of Sherman Act § 1 group boycott and concerted refusal to deal are a contract, combination, or conspiracy, a group boycott or concerted refusal to deal, and an unreasonable restraint of trade.

1737. This Count concerns a structural group boycott of future attorneys, malpractice victims, injured legal consumers, low-income clients, court users, legal-services reformers, nonlawyer competitors, independent advocates, and future market entrants who seek to challenge lawyer-controlled monopoly power over legal services and attorney accountability.

1738. This Count does not allege a boycott of SLAAY, Wills for Heroes, a nonprofit, a veterans program, a public-service event, or a single local dispute, and instead alleges a structural restraint through which lawyers, courts, bar associations, disciplinary actors, legal-aid institutions, referral systems, public-service gatekeepers, judicial actors, lawyer-legislators, and lawyer-controlled institutions preserve control over who may provide legal help, who may challenge lawyer misconduct, who may enter the legal-services market, and who may receive credibility when criticizing lawyers.

1739. North Carolina State Board of Dental Examiners v. Federal Trade Commission supplies the governing analogy because active market participants cannot use delegated occupational regulatory power, professional legitimacy, public authority, rulemaking structures, disciplinary control, or gatekeeping systems to restrain competition in their own market without active state supervision.

1740. Administrative Office of Pennsylvania Courts participated in the structural group boycott by administering, supporting, legitimizing, or facilitating court-access systems, filing systems, docket systems, court technology, court-administration practices, court-facing legitimacy structures, and attorney-centered procedural systems that preserve lawyer control over practical access to legal relief.

1741. Administrative Office of Pennsylvania Courts helped restrain future attorneys and legal-services competitors by maintaining court-administration structures in which meaningful participation depends on lawyer-centered procedure, lawyer-created court rules, lawyer-controlled filing practices, lawyer-controlled professional norms, and court-access channels that nonlawyers, independent advocates, injured clients, malpractice victims, and legal-services reformers cannot access on equal terms.

1742. Administrative Office of Pennsylvania Courts helped preserve the lawyer-created monopoly because malpractice victims and injured legal consumers must navigate court systems that reward attorney status, procedural fluency, bar-connected credibility, and court-approved professional legitimacy while burdening alternative legal assistance, independent accountability work, court navigation, filing assistance, docket assistance, and nonlawyer support.

1743. Administrative Office of Pennsylvania Courts caused antitrust injury because its court-administration role reduced legal-service output, restricted nonlawyer and independent assistance, preserved lawyer-controlled access to courts, reduced meaningful malpractice redress, and kept Grohol and the class dependent on the same lawyer-centered systems that failed them.

1744. American Bar Association participated in the structural group boycott by using national bar influence, accreditation authority, professional-standard setting, model-rule influence, legal-education control, bar-governance legitimacy, pro bono structures, referral legitimacy, and national professional norms to preserve lawyer control over legal-services entry, legal education, professional legitimacy, and attorney accountability.

1745. American Bar Association helped restrain future attorneys and legal-services competitors by supporting law-school requirements, accreditation barriers, bar-passage pathways, character-and-fitness norms, unauthorized-practice restrictions, disciplinary norms, legal-aid norms, pro bono norms, and professional rules that exclude nonlawyers, independent accountability providers, and lawyer-critical market entrants from meaningful legal-services competition.

1746. American Bar Association helped preserve the lawyer-created monopoly because its national professional structures condition legitimacy on lawyer

approval, law-school accreditation, bar admission, committee access, professional conformity, and adherence to lawyer-defined accountability systems that protect incumbent lawyers from outside competition and meaningful malpractice redress.

1747. American Bar Association caused antitrust injury because its role reduced provider choice, restricted legal-market entry, increased barriers for future attorneys and alternative legal-services providers, limited malpractice-accountability competition, and preserved a national lawyer-controlled system that gives injured legal consumers fewer meaningful options for affordable, independent, and conflict-free help.

1748. Bloomsburg Fair Association participated in the structural group boycott by operating as a public-event gatekeeper, public-facing legitimacy gatekeeper, community-access gatekeeper, vendor-access gatekeeper, and public-service access point through which bar-connected and lawyer-controlled actors can obtain public credibility, client access, referrals, and community trust.

1749. Bloomsburg Fair Association helped restrain future attorneys and legal-services competitors by allowing public-event access, public-service participation, vendor access, community outreach, and public-facing legitimacy to operate through established lawyer-connected channels rather than through equal access

for independent legal-services providers, nonlawyer competitors, malpractice-accountability advocates, and future market entrants.

1750. Bloomsburg Fair Association helped preserve the lawyer-created monopoly because public-facing event access affects who reaches legal consumers, veterans, low-income residents, disabled people, donors, volunteers, referral sources, and community partners, and exclusion from those spaces limits whether new legal-services providers can build competitive legitimacy outside lawyer-controlled networks.

1751. Bloomsburg Fair Association caused antitrust injury because public-event gatekeeping reduced outreach opportunities, referrals, community legitimacy, public-service competition, and the ability of future attorneys, independent providers, and legal-services reformers to compete with incumbent lawyer-controlled public-service channels.

1752. Matthew W. Brann participated in the structural group boycott through federal judicial authority, adjudicatory authority, docket authority, case-management authority, court-access authority, recusal authority, federal-court legitimacy, and judicial participation in a lawyer-controlled system that determines who receives credibility, access, and protection when challenging lawyers and legal institutions.

1753. Brann helped restrain future attorneys and legal-services competitors by reinforcing federal-court structures in which lawyers, judges, court rules, filing practices, pleading standards, sanction risks, recusal standards, procedural burdens, and judicial credibility determinations control whether attorney critics, malpractice victims, nonlawyer competitors, and legal-services reformers can obtain meaningful accountability.

1754. Brann helped preserve the lawyer-created monopoly because federal judges are licensed lawyers who exercise public authority over the market in which lawyers practice, while injured clients and new legal-services entrants must seek relief through judicial systems that remain controlled by the same profession whose members benefit from the challenged restraints.

1755. Brann caused antitrust injury because federal-court gatekeeping reduced access to competitive accountability mechanisms, chilled future attorneys and legal-services reformers, preserved lawyer-centered control over court access, and kept malpractice victims dependent on lawyer-approved procedures and lawyer-dominated forums.

1756. Heath Brosius participated in the structural group boycott through prosecutorial authority, public-office authority, court-facing power, local legal influence, prosecutor-centered credibility, and participation in professional

networks that preserve lawyer control over public legal authority and attorney accountability.

1757. Brosius helped restrain future attorneys and legal-services competitors by reinforcing a professional structure in which prosecutors, lawyers, judges, court-connected actors, advisory bodies, public-service networks, and disciplinary actors control legitimacy, referrals, court access, professional safety, and accountability channels for attorneys and nonlawyer competitors who challenge lawyer misconduct.

1758. Brosius helped preserve the lawyer-created monopoly because prosecutors are active lawyer-market participants who hold public legal power, appear before courts, influence professional norms, and benefit from systems that treat lawyers as the only legitimate providers and regulators of legal help while excluding nonlawyer competition and independent malpractice-accountability channels.

1759. Brosius caused antitrust injury because prosecutorially connected gatekeeping reduced legal-services competition, discouraged future attorneys and nonlawyer competitors from challenging local legal institutions, and preserved lawyer-centered control over public-service access, court-facing credibility, and attorney accountability.

1760. Jessica Chapman participated in the structural group boycott through lawyer status, legal-market participation, legal-aid-connected relationships, bar-connected relationships, public-service legal networks, and professional structures that preserve lawyer control over public-service legal access, referral credibility, and attorney accountability.

1761. Chapman helped restrain future attorneys and legal-services competitors by reinforcing lawyer-centered systems in which legal-aid actors, bar-connected actors, public-service actors, referral networks, and court-facing professionals decide who receives credibility, who may participate in legal-service opportunities, and who may challenge legal-aid or attorney misconduct without professional exclusion.

1762. Chapman helped preserve the lawyer-created monopoly because legal-aid-connected and bar-connected lawyers operate inside structures that restrict malpractice victims, low-income clients, nonlawyer competitors, and future market entrants from obtaining equal access to referrals, public-service legitimacy, conflict-free substitute counsel, and attorney-accountability mechanisms.

1763. Chapman caused antitrust injury because her participation in lawyer-controlled legal-service structures reduced independent accountability, limited substitute-provider access, preserved incumbent legal-aid and bar-connected

control, and restricted future attorneys and nonlawyer competitors from entering or reforming the legal-services market.

1764. William R. Christman III participated in the structural group boycott through lawyer status, Pennsylvania Bar Association general-counsel authority, statewide bar influence, professional-legitimacy control, bar-connected communications, public-service legal-program authority, and participation in lawyer-controlled structures that preserve attorney control over legal-service access and attorney accountability.

1765. Christman helped restrain future attorneys and legal-services competitors by reinforcing a system in which bar-connected lawyers control communications, public-service legal access, professional legitimacy, witness access, volunteer channels, and institutional credibility for attorneys, legal-services reformers, and nonlawyer competitors who challenge lawyer misconduct or bar-controlled legal-service structures.

1766. Christman helped preserve the lawyer-created monopoly because statewide bar actors use lawyer status, professional authority, bar governance, public-service programs, disciplinary norms, and communication control to decide who receives access to legal-service opportunities, who may criticize lawyers without punishment, and who may compete outside lawyer-approved channels.

1767. Christman caused antitrust injury because bar-connected communication restrictions, professional-legitimacy control, and public-service access control reduce legal-service output, restrict competitive entry, chill future attorneys, suppress lawyer-critical providers, and keep malpractice victims dependent on lawyer-controlled systems for accountability.

1768. Mary Beth Clark participated in the structural group boycott through lawyer status, North Penn Legal Services relationships, Union–Snyder County Bar Association influence, local bar governance, legal-aid-connected authority, public-service legal programming, referral structures, committee access, and local professional legitimacy.

1769. Clark helped restrain future attorneys and legal-services competitors by reinforcing a system in which legal-aid-connected lawyers and local bar actors control referrals, fee opportunities, pro bono opportunities, public-service programs, committee access, local professional legitimacy, and the practical ability of competing providers to serve low-income clients and malpractice victims.

1770. Clark helped preserve the lawyer-created monopoly because legal-aid and bar-connected lawyers can use incumbent relationships to protect existing providers, discourage conflict-free alternatives, reduce referrals to competitors, and preserve lawyer-controlled accountability systems that leave injured clients dependent on the same professional network that failed them.

1771. Clark caused antitrust injury because legal-aid and local-bar gatekeeping reduced client choice, suppressed conflict-free substitute counsel, limited public-service opportunities, impaired referral competition, and burdened future attorneys and nonlawyer competitors seeking to challenge incumbent legal-aid and lawyer-controlled systems.

1772. Committee on Rules of Practice and Procedure participated in the structural group boycott through federal rulemaking authority, procedural-rule authority, practice-rule authority, federal-court-access influence, judicial-administration influence, professional-regulation influence, institutional legitimacy, and lawyer-controlled procedural systems.

1773. Committee on Rules of Practice and Procedure helped restrain future attorneys and legal-services competitors by maintaining procedural, pleading, discovery, motion, filing, and federal-court-access structures that require lawyer-centered expertise and make meaningful participation difficult for malpractice victims, injured legal consumers, low-income clients, nonlawyer competitors, court navigators, and legal-services reformers.

1774. Committee on Rules of Practice and Procedure helped preserve the lawyer-created monopoly because procedural rulemaking shapes who can enter court, who can present claims effectively, who can challenge attorney misconduct, who can

Case 4:26-cv-01231-JWB Document 11-3 Filed 01/29/26 Page 527 of 973

navigate federal litigation, and who can obtain credibility in systems dominated by lawyers and judges who benefit from lawyer-controlled practice rules.

1775. Committee on Rules of Practice and Procedure caused antitrust injury because lawyer-centered federal procedural systems reduce legal-service output, increase dependence on licensed attorneys, restrict alternative legal assistance, suppress court-navigation competition, and keep malpractice victims and future market entrants dependent on lawyer-approved procedural gatekeepers.

1776. Commonwealth of Pennsylvania participated in the structural group boycott through sovereign authority, statutory authority, regulatory authority, public-funding authority, court-system creation, attorney-regulation support, legal-aid funding structures, public-service structures, and institutional legitimacy conferred on lawyer-controlled systems.

1777. Commonwealth of Pennsylvania helped restrain future attorneys and legal-services competitors by supporting state-sanctioned licensing, court access, unauthorized-practice rules, legal-aid structures, disciplinary systems, public-service access, referral systems, and professional-legitimacy systems that preserve lawyer dominance and restrict nonlawyer competition.

1778. Commonwealth of Pennsylvania helped preserve the lawyer-created monopoly because state-created and state-funded structures channel malpractice victims, low-income clients, court users, and legal-services reformers through

lawyer-controlled institutions for representation, discipline, court access, and accountability while excluding independent alternatives from equal legitimacy.

1779. Commonwealth of Pennsylvania caused antitrust injury because the state-supported lawyer-control structure reduces client choice, suppresses legal-service competition, reduces malpractice-redress output, burdens future attorneys and nonlawyer competitors, and preserves incumbent legal institutions from meaningful market accountability.

1780. Mark J. Conway participated in the structural group boycott through federal judicial authority, bankruptcy-court authority, sanctions authority, recusal authority, docket authority, hearing authority, attorney-practice authority, courtroom control, and federal bankruptcy structures that preserve lawyer-centered control over bankruptcy and debt-relief legal services.

1781. Conway helped restrain future attorneys and legal-services competitors by reinforcing a system in which judges, lawyers, bankruptcy courts, local rules, sanctions risk, recusal standards, court access, attorney-practice expectations, and judicial credibility determinations control whether lawyer critics, pro se litigants, debtors, nonlawyer competitors, and legal-services reformers can challenge misconduct or offer alternative assistance.

1782. Conway helped preserve the lawyer-created monopoly because bankruptcy judges and court-connected actors control access to bankruptcy relief, attorney

practice, debt-relief advocacy, sanctions exposure, and professional legitimacy in a market where lawyers benefit from restricting alternative assistance and discouraging criticism of court-connected incumbents.

1783. Conway caused antitrust injury because bankruptcy-court gatekeeping reduced competition in debt-relief and bankruptcy-related legal services, chilled future attorneys and legal-services reformers, increased dependence on licensed lawyers, and reduced access to independent accountability mechanisms for debtors, homeowners, low-income litigants, and malpractice victims.

1784. Court of Judicial Discipline participated in the structural group boycott through judicial-discipline authority, judicial-accountability gatekeeping, court-connected institutional legitimacy, judge-regulation structures, professional-accountability systems, and participation in a lawyer-and-judge-controlled accountability framework.

1785. Court of Judicial Discipline helped restrain future attorneys and legal-services competitors by preserving a judicial-accountability structure that requires malpractice victims, court users, lawyer critics, nonlawyer competitors, and legal-services reformers to seek relief through judge-centered and lawyer-centered mechanisms rather than independent accountability channels.

1786. Court of Judicial Discipline helped preserve the lawyer-created monopoly because judicial accountability affects attorney accountability, court access,

disciplinary access, professional legitimacy, and the willingness of future attorneys and legal-services reformers to challenge judges, lawyers, court systems, and lawyer-controlled institutions.

1787. Court of Judicial Discipline caused antitrust injury because judge-controlled and lawyer-connected accountability gatekeeping reduces independent oversight, chills criticism, limits malpractice-redress pathways, preserves court-centered legal-market control, and keeps injured consumers dependent on institutions aligned with the same profession that controls legal services.

1788. Robert Cravitz participated in the structural group boycott through lawyer status, local attorney networks, Union–Snyder County Bar Association participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and court-connected local legal structures.

1789. Cravitz helped restrain future attorneys and legal-services competitors by reinforcing local professional structures in which established lawyers, bar participants, court-connected actors, and public-service participants control credibility, referrals, public-service access, local professional acceptance, and the practical ability to challenge lawyer misconduct.

1790. Cravitz helped preserve the lawyer-created monopoly because local attorney networks can collectively isolate critics, protect incumbent lawyers, discourage

malpractice accountability, and make market entry difficult for future attorneys, nonlawyer competitors, independent advocates, and legal-services reformers who refuse to accept lawyer-controlled norms.

1791. Cravitz caused antitrust injury because local lawyer-network gatekeeping reduced access to referrals, public-service participation, professional legitimacy, attorney cooperation, client channels, and competitive legal-service opportunities for malpractice victims, injured consumers, future attorneys, and nonlawyer competitors.

1792. Doe Defendants 1 through 200 participated in the structural group boycott through membership in defendant entities, listserv participation, court-connected roles, bar-connected roles, legal-aid roles, public-service roles, veterans-service roles, referral-network roles, disciplinary-adjacent roles, funding-adjacent roles, and professional networks that preserve lawyer control over legal services and attorney accountability.

1793. Doe Defendants 1 through 200 helped restrain future attorneys and legal-services competitors by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from professional structures that exclude malpractice victims, injured legal consumers, low-income clients, nonlawyer competitors, legal-services reformers, and lawyer critics from equal access to referrals,

programs, court systems, public-service networks, legal-aid networks, and professional legitimacy.

1794. Doe Defendants 1 through 200 helped preserve the lawyer-created monopoly because unknown bar participants, court-connected participants, public-service actors, legal-aid actors, referral actors, and professional-network participants can collectively enforce reputational harm, access denial, referral loss, committee exclusion, program exclusion, professional silence, and credibility loss against future market entrants who challenge lawyer misconduct.

1795. Doe Defendants 1 through 200 caused antitrust injury because collective professional gatekeeping reduced competitive entry, suppressed nonlawyer assistance, reduced independent accountability services, limited malpractice-redress pathways, and preserved lawyer-controlled access to clients, courts, public programs, referrals, funding, and professional legitimacy.

1796. Federal Judicial Center participated in the structural group boycott through federal judicial-education authority, federal judicial-administration influence, research and training functions, court-system legitimacy, professional norms, judicial-policy influence, and institutional support for lawyer-and-judge-controlled federal court structures.

1797. Federal Judicial Center helped restrain future attorneys and legal-services competitors by reinforcing federal judicial norms, federal court practices, judicial

training, court-administration practices, professionalism narratives, and court-access expectations that preserve lawyer-centered control over litigation, legal accountability, court navigation, malpractice redress, and attorney discipline.

1798. Federal Judicial Center helped preserve the lawyer-created monopoly because federal judicial education and court-system research affect how judges treat pro se litigants, nonlawyer assistance, lawyer critics, malpractice victims, court-access reformers, and future attorneys challenging lawyer-controlled procedural and professional systems.

1799. Federal Judicial Center caused antitrust injury because federal judicial-system legitimacy and training structures reduced competitive accountability, preserved lawyer-centered litigation control, limited meaningful nonlawyer assistance, chilled court-access reform, and kept injured legal consumers dependent on lawyer-dominated federal court processes.

1800. Lori R. Hackenberg participated in the structural group boycott through judicial office, courthouse-program influence, local legal authority, court-connected professional networks, local bar relationships, public-service access, professional legitimacy, and participation in lawyer-and-judge-controlled legal structures.

1801. Hackenberg helped restrain future attorneys and legal-services competitors by reinforcing court-connected structures in which judges, lawyers, courthouse

actors, bar participants, and public-service networks control recognition, access, credibility, program participation, and the ability to challenge lawyer misconduct without professional retaliation.

1802. Hackenberg helped preserve the lawyer-created monopoly because judicial actors influence whether malpractice victims, injured clients, legal-services reformers, future attorneys, and nonlawyer competitors receive neutral treatment, public credibility, courthouse access, public-service opportunities, and meaningful accountability when challenging lawyers and court-connected actors.

1803. Hackenberg caused antitrust injury because judicially connected professional gatekeeping reduced alternative legal-service access, limited public-service competition, chilled future attorney criticism, reduced malpractice-redress opportunities, and preserved local lawyer-centered control over court-adjacent legal services.

1804. International Legal Aid Group participated in the structural group boycott through international legal-aid influence, comparative legal-aid legitimacy, professional-network authority, legal-aid policy recognition, legal-aid institutional credibility, and support for lawyer-centered legal-aid structures that preserve incumbent legal-aid control.

1805. International Legal Aid Group helped restrain future attorneys and legal-services competitors by reinforcing legal-aid norms that treat lawyer-controlled

legal aid, lawyer-administered access to justice, and institutional provider networks as the proper channels for low-income legal services while excluding nonlawyer competitors, independent accountability providers, and conflict-free malpractice-redress alternatives from equal legitimacy.

1806. International Legal Aid Group helped preserve the lawyer-created monopoly because legal-aid legitimacy affects funding, referrals, policy acceptance, public-service credibility, institutional recognition, and the ability of future attorneys and nonlawyer competitors to challenge legal-aid malpractice, conflicts, abandonment, and failure to provide substitute counsel.

1807. International Legal Aid Group caused antitrust injury because its legal-aid legitimacy structures reduced legal-aid competition, limited conflict-free alternatives, suppressed independent client-accountability services, preserved incumbent provider control, and kept low-income clients and malpractice victims dependent on lawyer-controlled legal-aid systems.

1808. Judicial Conduct Board of Pennsylvania participated in the structural group boycott through judicial-discipline screening authority, judicial-accountability gatekeeping, complaint-intake authority, investigative discretion, professional-accountability influence, court-connected legitimacy, and participation in lawyer-and-judge-controlled accountability structures.

1809. Judicial Conduct Board of Pennsylvania helped restrain future attorneys and legal-services competitors by maintaining a judicial-accountability system that routes complaints against judges through institutional actors connected to the same court-centered professional environment that legal-services reformers, malpractice victims, injured clients, and attorney critics must challenge.

1810. Judicial Conduct Board of Pennsylvania helped preserve the lawyer-created monopoly because judicial discipline affects whether lawyers, judges, courts, and court-connected actors face meaningful consequences when they punish criticism, restrict court access, burden malpractice victims, or protect attorney misconduct from outside accountability.

1811. Judicial Conduct Board of Pennsylvania caused antitrust injury because judicial-accountability gatekeeping reduced independent oversight, discouraged future attorneys from challenging judges and lawyers, limited malpractice-redress pathways, preserved court-centered professional control, and kept injured consumers dependent on lawyer-and-judge-controlled accountability systems.

1812. Heather Kelly participated in the structural group boycott through North Penn Legal Services management authority, legal-aid influence, lawyer status, public-funded legal-service authority, supervision practices, grievance-response practices, client-service systems, and legal-aid structures that preserve incumbent provider control over low-income clients.

1813. Kelly helped restrain future attorneys and legal-services competitors by reinforcing a legal-aid structure in which incumbent providers control client intake, case assignment, representation status, referrals, supervision, correction of malpractice, client repair, and institutional narratives after legal-aid clients suffer abandonment, missed hearings, poor communication, or conflict-related harm.

1814. Kelly helped preserve the lawyer-created monopoly because legal-aid managers and legal-aid lawyers can protect incumbent providers from competition by failing to create conflict-free substitute counsel systems, failing to correct client harm, limiting replacement-provider access, and preserving the authority of lawyer-controlled legal-aid institutions over vulnerable clients.

1815. Kelly caused antitrust injury because legal-aid gatekeeping reduced conflict-free substitute counsel, limited client choice, suppressed independent legal-aid accountability, discouraged future legal-aid competitors, and preserved incumbent control over low-income clients, malpractice victims, and injured legal consumers.

1816. Brian Kerstetter participated in the structural group boycott through prosecutorial authority, public-office authority, court-facing power, advisory-board influence, local legal-system authority, public-service participation, and lawyer-centered professional networks that preserve attorney control over public legal systems.

1817. Kerstetter helped restrain future attorneys and legal-services competitors by reinforcing structures in which prosecutors, courts, advisory boards, public-service networks, bar-connected actors, and lawyer-controlled institutions control credibility, access, referrals, public legitimacy, and professional safety for lawyers and nonlawyer competitors who challenge legal-system misconduct.

1818. Kerstetter helped preserve the lawyer-created monopoly because prosecutors are licensed lawyers who exercise public authority in legal systems while benefiting from professional rules, court access, disciplinary norms, and public-service networks that treat lawyers as the only legitimate legal actors and accountability gatekeepers.

1819. Kerstetter caused antitrust injury because prosecutorial and advisory-board gatekeeping reduced legal-service competition, chilled future attorneys and legal-services reformers, restricted public-service access, and preserved lawyer-centered control over professional legitimacy, referral networks, and attorney accountability.

1820. Robert Leadbeter participated in the structural group boycott through public-office authority, public-facing veterans-event influence, public-service legitimacy, event-access influence, community-recognition authority, and coordination with lawyer-controlled or bar-connected public-service structures.

1821. Leadbeter helped restrain future attorneys and legal-services competitors by reinforcing a system in which public officials, event gatekeepers, bar-connected actors, veterans-service networks, and public-service channels control whether independent legal-service providers receive access to public audiences, community legitimacy, referral opportunities, and client outreach.

1822. Leadbeter helped preserve the lawyer-created monopoly because public-facing legal-service access affects whether future attorneys, independent advocates, nonlawyer competitors, and legal-services reformers can build public trust outside bar-controlled, lawyer-approved, or incumbent public-service channels.

1823. Leadbeter caused antitrust injury because public-official and veterans-event gatekeeping reduced community outreach, public-service competition, referral access, and independent legal-service legitimacy, while preserving lawyer-controlled and incumbent public-service structures from competitive accountability.

1824. Legal Services Corporation participated in the structural group boycott through federal legal-aid funding authority, grantee oversight, regulatory authority, compliance structures, legal-aid legitimacy, national legal-aid influence, and support for lawyer-controlled civil legal-aid systems.

1825. Legal Services Corporation helped restrain future attorneys and legal-services competitors by funding and legitimizing a legal-aid structure in which

dominant regional providers control intake, eligibility, referrals, case acceptance, conflicts, client repair, substitute-provider access, and public legal-aid credibility without creating meaningful independent alternatives when grantees harm clients.

1826. Legal Services Corporation helped preserve the lawyer-created monopoly because federal legal-aid funding channels low-income clients through lawyer-controlled nonprofits and lawyer-supervised provider networks while excluding nonlawyer competitors, independent accountability advocates, and conflict-free substitute systems from equal funding, legitimacy, and referral access.

1827. Legal Services Corporation caused antitrust injury because its funding and oversight structure reduced client choice, reduced conflict-free representation, reduced malpractice-redress output, limited independent legal-aid competition, and kept Grohol, low-income clients, and malpractice victims dependent on incumbent lawyer-controlled providers.

1828. Kathleen Lincoln participated in the structural group boycott through lawyer status, USCBA officer status, local bar governance, treasurer authority, court-connected professional relationships, settlement-related professional influence, and local legal networks that preserve lawyer-centered control over credibility and cooperation.

1829. Lincoln helped restrain future attorneys and legal-services competitors by reinforcing a local bar environment in which lawyers who criticize ethical

violations, courthouse practices, prothonotary conduct, legal-aid malpractice, or bar retaliation risk professional isolation, settlement consequences, loss of project support, and loss of bar-connected cooperation.

1830. Lincoln helped preserve the lawyer-created monopoly because local bar officers and lawyer networks can control informal but essential market inputs, including trust, referrals, settlement cooperation, public-service support, committee access, local legitimacy, and professional relationships needed by future attorneys and competing legal-service providers.

1831. Lincoln caused antitrust injury because local bar pressure reduced competitive legal-service access, chilled future attorney criticism, discouraged malpractice-accountability work, impaired public-service cooperation, and preserved incumbent lawyer networks from meaningful accountability.

1832. Gabriele Miller-Wagner participated in the structural group boycott through Pennsylvania Bar Association pro bono authority, statewide Wills for Heroes coordination, volunteer recruitment influence, public-service legal-program access, scheduling authority, professional-legitimacy control, and statewide bar-connected legal-service networks.

1833. Miller-Wagner helped restrain future attorneys and legal-services competitors by reinforcing a system in which bar-connected pro bono actors control access to public-service programs, volunteers, event legitimacy, regional

outreach, veterans-service channels, and professional credibility for attorneys and legal-service providers who seek to operate outside incumbent lawyer-controlled systems.

1834. Miller-Wagner helped preserve the lawyer-created monopoly because statewide pro bono coordination affects which attorneys, nonprofit providers, nonlawyer competitors, and legal-services reformers can reach clients, recruit volunteers, build public trust, and obtain professional legitimacy through lawyer-approved public-service programs.

1835. Miller-Wagner caused antitrust injury because pro bono and public-service gatekeeping reduced legal-service output, limited future attorney participation, suppressed independent service providers, restricted access to veterans and vulnerable clients, and preserved bar-controlled program structures from competitive accountability.

1836. Lori Molloy participated in the structural group boycott through North Penn Legal Services executive authority, legal-aid management, public-funding control, attorney supervision, intake systems, client-service systems, grievance-response authority, malpractice-response systems, and institutional relationships with courts, funders, bar actors, referral sources, and public-service networks.

1837. Molloy helped restrain future attorneys and legal-services competitors by reinforcing a legal-aid structure in which incumbent providers control referrals,

employment narratives, client access, staff communications, supervision, correction of malpractice, and institutional credibility after legal-aid clients suffer missed hearings, abandoned files, poor communication, or unclear representation status.

1838. Molloy helped preserve the lawyer-created monopoly because executive legal-aid authority allows incumbent providers to retain public funds, referrals, client trust, and institutional status while limiting conflict-free substitutes, independent accountability work, and competing nonprofit legal-service alternatives.

1839. Molloy caused antitrust injury because legal-aid executive gatekeeping reduced client choice, limited substitute counsel, suppressed competing nonprofit providers, reduced malpractice-redress services, and kept low-income clients and injured legal consumers dependent on incumbent lawyer-controlled legal-aid structures.

1840. Jenna Ann Neidig participated in the structural group boycott through lawyer status, USCBA participation, officer or former-officer status, local bar governance, listserv participation, meeting-record structures, public-service legal programming, and court-connected professional networks.

1841. Neidig helped restrain future attorneys and legal-services competitors by reinforcing local bar structures in which established lawyers and bar officers

control meeting access, records, listservs, committee participation, public-service programs, local professional legitimacy, and the practical ability to challenge lawyer misconduct without retaliation.

1842. Neidig helped preserve the lawyer-created monopoly because local bar governance and record practices affect who receives credibility, who receives access, who can document objections, who can challenge governance abuses, and who can participate in legal-service opportunities outside incumbent lawyer-approved channels.

1843. Neidig caused antitrust injury because local bar gatekeeping reduced public-service access, referral opportunities, professional credibility, meeting access, committee access, and competitive legal-service opportunities for future attorneys, nonlawyer competitors, malpractice victims, and legal-services reformers.

1844. North Penn Legal Services, Inc. participated in the structural group boycott through public legal-aid funding, regional provider authority, client intake control, case-assignment control, attorney supervision, representation-status control, referral relationships, legal-aid credibility, and institutional control over low-income civil legal services.

1845. North Penn Legal Services, Inc. helped restrain future attorneys and legal-services competitors by reinforcing a legal-aid structure in which dominant providers control access to eligible clients, referrals, public funding, staff

assignments, case handling, conflict determinations, client repair, and substitute-provider access after legal-aid clients suffer attorney abandonment or malpractice.

1846. North Penn Legal Services, Inc. helped preserve the lawyer-created monopoly because regional legal-aid dominance allows a lawyer-controlled nonprofit to keep money, authority, referrals, and public legitimacy while harmed clients lack meaningful replacement counsel and competing providers lack equal access to funding, referrals, and institutional credibility.

1847. North Penn Legal Services, Inc. caused antitrust injury because incumbent legal-aid control reduced legal-service output, limited client choice, restricted conflict-free substitute counsel, suppressed competing nonprofit providers, and reduced malpractice accountability for low-income clients and injured legal consumers.

1848. Northumberland County Prothonotary's Office participated in the structural group boycott through public filing authority, docket access, court-record access, courthouse administration, public-office legitimacy, service and filing practices, and court-access structures that affect who can use the courts effectively.

1849. Northumberland County Prothonotary's Office helped restrain future attorneys and legal-services competitors by reinforcing court-access systems in which filing practices, docket practices, record access, clerk interactions, courthouse procedures, and local court administration determine whether injured

clients, nonlawyer assistants, court navigators, and legal-services reformers can participate effectively.

1850. Northumberland County Prothonotary's Office helped preserve the lawyer-created monopoly because practical court access depends on filing knowledge, docket navigation, procedural fluency, local practice norms, and courthouse credibility that favor lawyers and burden alternative legal assistance, nonlawyer support, and injured consumers acting outside lawyer-controlled channels.

1851. Northumberland County Prothonotary's Office caused antitrust injury because filing and docket gatekeeping reduced court-access competition, restricted practical legal assistance, limited nonlawyer court-navigation support, and preserved lawyer-centered control over the systems malpractice victims must use to obtain relief.

1852. Office of Attorney General participated in the structural group boycott through public legal authority, state-law enforcement authority, attorney status, public-office legitimacy, legal-market influence, state litigation authority, and participation in professional structures that preserve lawyer control over legal services and attorney accountability.

1853. Office of Attorney General helped restrain future attorneys and legal-services competitors by reinforcing a system in which government lawyers, state legal offices, courts, disciplinary actors, bar-connected actors, and public agencies

control legal legitimacy, enforcement credibility, public legal narratives, and access to accountability mechanisms.

1854. Office of Attorney General helped preserve the lawyer-created monopoly because state legal authority can confer legitimacy on lawyer-controlled regulatory systems, defend attorney-centered structures, protect public legal institutions, and limit independent consumer-protection accountability against lawyers and legal-service providers.

1855. Office of Attorney General caused antitrust injury because public legal gatekeeping reduced independent accountability, chilled legal-services reformers, preserved attorney-controlled enforcement channels, and limited competitive alternatives for malpractice victims, injured legal consumers, and future market entrants.

1856. Office of Disciplinary Counsel participated in the structural group boycott through attorney-discipline authority, complaint-screening authority, investigatory discretion, charging authority, professional-regulation authority, disciplinary legitimacy, and lawyer-controlled accountability structures that determine whether attorney misconduct receives meaningful consequences.

1857. Office of Disciplinary Counsel helped restrain future attorneys and legal-services competitors by reinforcing a system in which lawyer misconduct, malpractice reporting, peer reporting, ethics complaints, attorney criticism, and

lawyer-accountability efforts must pass through disciplinary channels controlled by lawyers and lawyer-adjacent institutions rather than independent consumer-protection or market-accountability systems.

1858. Office of Disciplinary Counsel helped preserve the lawyer-created monopoly because disciplinary gatekeeping controls whether lawyers face accountability, whether attorney critics face professional pressure, whether malpractice victims receive meaningful protection, and whether future attorneys can challenge legal-system misconduct without risking license-based retaliation.

1859. Office of Disciplinary Counsel caused antitrust injury because disciplinary gatekeeping reduced independent accountability services, chilled future attorney criticism, limited malpractice-redress pathways, preserved lawyer-controlled professional regulation, and kept injured legal consumers dependent on the same profession that controls both legal services and attorney discipline.

1860. Pennsylvania Bar Association participated in the structural group boycott through statewide bar authority, professional legitimacy, public-service legal programs, pro bono structures, committee access, continuing legal education influence, lawyer networks, Wills for Heroes structures, referral channels, and bar-governance systems that preserve lawyer control over legal-services access.

1861. Pennsylvania Bar Association helped restrain future attorneys and legal-services competitors by reinforcing a statewide system in which bar-connected

actors decide who receives professional credibility, public-service access, committee participation, volunteer channels, program legitimacy, pro bono opportunities, and access to lawyer-approved legal-service networks.

1862. Pennsylvania Bar Association helped preserve the lawyer-created monopoly because statewide bar structures allow lawyers to coordinate professional norms, discipline-related narratives, public-service legitimacy, referral access, and market acceptance while excluding malpractice victims, nonlawyer competitors, legal-services reformers, and future attorneys who challenge lawyer-controlled systems.

1863. Pennsylvania Bar Association caused antitrust injury because statewide bar gatekeeping reduced legal-service output, restricted future attorney participation, suppressed nonlawyer competition, limited malpractice-accountability alternatives, and preserved incumbent lawyer-controlled public-service and referral channels.

1864. Pennsylvania Board of Law Examiners participated in the structural group boycott through bar-admission authority, examination authority, character-and-fitness screening, licensing gatekeeping, professional-entry control, and lawyer-regulation structures that determine who may enter the legal-services market as an attorney.

1865. Pennsylvania Board of Law Examiners helped restrain future attorneys and legal-services competitors by enforcing lawyer-controlled entry requirements that condition legal-market participation on bar passage, character-and-fitness approval,

court-approved credentials, and compliance with professional norms controlled by incumbent lawyers and judges.

1866. Pennsylvania Board of Law Examiners helped preserve the lawyer-created monopoly because bar-admission gatekeeping limits entry into the legal-services market, protects incumbents from competition, restricts alternative pathways to practice, and reinforces lawyer-only control over who may provide legal advice, appear in court, and receive professional legitimacy.

1867. Pennsylvania Board of Law Examiners caused antitrust injury because licensing gatekeeping reduced legal-service supply, limited future attorney entry, increased barriers to affordable legal assistance, excluded alternative legal-service providers, and kept malpractice victims and low-income clients dependent on a restricted lawyer-controlled market.

1868. Pennsylvania Department of Human Services participated in the structural group boycott through public-funding authority, social-service authority, legal-aid-related funding structures, public-benefits systems, service-provider relationships, referral environments, and public-service legitimacy that affect access to civil legal help for low-income and vulnerable clients.

1869. Pennsylvania Department of Human Services helped restrain future attorneys and legal-services competitors by reinforcing public-service systems that channel vulnerable clients through incumbent legal-aid, lawyer-controlled, referral-

controlled, and agency-connected structures rather than independent, conflict-free, nonlawyer, or lawyer-critical legal-service alternatives.

1870. Pennsylvania Department of Human Services helped preserve the lawyer-created monopoly because public benefits, family safety, disability services, domestic-violence systems, housing-related services, and social-service programs often intersect with civil legal needs, and agency-connected referral systems can determine whether clients receive only lawyer-approved legal help or meaningful competitive alternatives.

1871. Pennsylvania Department of Human Services caused antitrust injury because public-service gatekeeping reduced client choice, restricted conflict-free legal-service alternatives, limited independent accountability for legal-aid failures, preserved incumbent referral channels, and burdened future attorneys and nonlawyer competitors seeking to serve vulnerable clients.

1872. Pennsylvania Department of Military and Veterans Affairs participated in the structural group boycott through veterans-service authority, coalition access, public-service recognition, veterans-outreach structures, Wills for Heroes and Wills for Veterans connections, event coordination, and public-facing legitimacy within legal-service channels serving veterans and disabled veterans.

1873. Pennsylvania Department of Military and Veterans Affairs helped restrain future attorneys and legal-services competitors by reinforcing a veterans-service

structure in which bar-connected actors, public officials, coalition participants, and public-service gatekeepers control which legal-service providers receive access to veterans, disabled veterans, outreach opportunities, referrals, and public legitimacy.

1874. Pennsylvania Department of Military and Veterans Affairs helped preserve the lawyer-created monopoly because veterans legal-service access depends on public recognition, coalition communications, event participation, outreach channels, and referral legitimacy that can be controlled by lawyer-approved actors rather than opened equally to future attorneys, nonlawyer competitors, and independent legal-service providers.

1875. Pennsylvania Department of Military and Veterans Affairs caused antitrust injury because veterans-service gatekeeping reduced legal-service output for veterans and disabled veterans, limited provider choice, restricted alternative legal-service entry, preserved bar-connected program control, and burdened future attorneys and legal-services reformers seeking equal access to public-facing veterans-service markets.

1876. Pennsylvania General Assembly participated in the structural group boycott through statutory authority, public-funding authority, legislative recognition of lawyer-controlled systems, legal-aid funding structures, court-system statutes,

attorney-regulation frameworks, and legislation or nonlegislation affecting unauthorized practice, court access, legal aid, and professional accountability.

1877. Pennsylvania General Assembly helped restrain future attorneys and legal-services competitors by preserving statutes, funding structures, and legal frameworks that allow lawyer-controlled institutions to dominate legal services, legal aid, court access, attorney discipline, public-service access, and malpractice accountability without creating competitive alternatives for injured legal consumers.

1878. Pennsylvania General Assembly helped preserve the lawyer-created monopoly because lawyer-legislators and legislative bodies can confer public authority, funding, and statutory legitimacy on systems that protect incumbent lawyers, legal-aid providers, bar-connected actors, disciplinary actors, and court-connected structures from outside competition.

1879. Pennsylvania General Assembly caused antitrust injury because legislative support or acquiescence reduced legal-service competition, limited nonlawyer assistance, preserved unauthorized-practice barriers, restricted malpractice-redress alternatives, and kept future attorneys, malpractice victims, and low-income clients dependent on lawyer-controlled institutions.

1880. Pennsylvania Legal Aid Network, Inc. participated in the structural group boycott through statewide legal-aid coordination, provider legitimacy, training

authority, funding relationships, referral influence, public-service recognition, legal-aid policy influence, and support for lawyer-controlled civil legal-aid systems.

1881. Pennsylvania Legal Aid Network, Inc. helped restrain future attorneys and legal-services competitors by reinforcing a statewide legal-aid structure in which incumbent providers control intake, referrals, provider credibility, conflicts, substitute-provider access, legal-aid narratives, client repair, and public legitimacy after clients suffer malpractice, abandonment, missed hearings, or lack of communication.

1882. Pennsylvania Legal Aid Network, Inc. helped preserve the lawyer-created monopoly because statewide legal-aid networks can protect grantee status, preserve incumbent credibility, restrict conflict-free alternatives, and prevent low-income clients from obtaining independent legal-aid accountability outside lawyer-controlled provider systems.

1883. Pennsylvania Legal Aid Network, Inc. caused antitrust injury because legal-aid network gatekeeping reduced client choice, limited independent legal-aid competition, restricted substitute-provider access, reduced malpractice-redress output, and preserved incumbent lawyer-controlled providers from market accountability.

1884. Supreme Court of Pennsylvania participated in the structural group boycott through attorney-admission authority, disciplinary authority, rulemaking authority, unauthorized-practice authority, judicial-system authority, court-access authority, professional-regulation authority, and control over lawyer-centered systems governing entry, practice, discipline, and accountability.

1885. Supreme Court of Pennsylvania helped restrain future attorneys and legal-services competitors by maintaining lawyer-controlled licensing, bar admission, character-and-fitness, disciplinary, professional-conduct, unauthorized-practice, court-rule, and practice-rule structures that define who may provide legal services, who may appear in court, who may assist clients, and who may challenge lawyer misconduct.

1886. Supreme Court of Pennsylvania helped preserve the lawyer-created monopoly because the same court-created and lawyer-dependent system that regulates lawyers also controls legal-market entry, attorney discipline, public-facing professional legitimacy, malpractice accountability, court access, and practical alternatives to licensed-lawyer representation.

1887. Supreme Court of Pennsylvania caused antitrust injury because court-controlled professional regulation reduced legal-service supply, restricted future attorney entry, excluded nonlawyer competitors, limited malpractice-redress

alternatives, and kept legal consumers, low-income clients, and court users dependent on lawyer-controlled systems.

1888. Michael F.J. Piecuch participated in the structural group boycott through president-judge authority, judicial office, courthouse influence, local court administration, local bar influence, public-service relationships, advisory-board connections, and lawyer-and-judge-controlled professional networks.

1889. Piecuch helped restrain future attorneys and legal-services competitors by reinforcing local legal-system structures in which judges, lawyers, prosecutors, court-connected actors, bar participants, and public-service networks control legitimacy, referrals, court access, public-service participation, and the professional safety of lawyers and nonlawyer competitors who challenge misconduct.

1890. Piecuch helped preserve the lawyer-created monopoly because president-judge authority and local judicial influence shape whether legal-services reformers, future attorneys, malpractice victims, and nonlawyer competitors receive fair access to court-adjacent systems, public-service spaces, professional credibility, and local accountability channels.

1891. Piecuch caused antitrust injury because judicially connected local gatekeeping reduced legal-service competition, chilled attorney criticism, limited

nonlawyer and independent assistance, restricted public-service access, and preserved lawyer-centered control over local legal markets.

1892. Jeffrey A. Rowe participated in the structural group boycott through judicial office, magisterial-district authority, courthouse access, local legal influence, court-connected public-service participation, local bar relationships, and professional networks that affect legal-market legitimacy.

1893. Rowe helped restrain future attorneys and legal-services competitors by reinforcing systems in which judicial officers, local lawyers, public-service actors, court-connected networks, and bar structures determine who receives recognition, credibility, public-service participation, and access to client-facing legal-service opportunities.

1894. Rowe helped preserve the lawyer-created monopoly because magisterial-district and court-connected authority contributes to the local professional environment in which lawyers control court access, public legitimacy, dispute resolution, referral credibility, and accountability mechanisms available to injured clients and new market entrants.

1895. Rowe caused antitrust injury because local judicial gatekeeping reduced competition, limited alternative legal-service access, chilled future attorney criticism, suppressed court-access reform, and preserved lawyer-centered control over client-facing legal systems.

1896. Jamie Saleski participated in the structural group boycott through prothonotary authority, filing-system authority, docket-access authority, public-record authority, courthouse administration, service and filing practices, and public-office structures that affect practical access to courts.

1897. Saleski helped restrain future attorneys and legal-services competitors by reinforcing court-access systems in which filing practices, docket practices, clerk interactions, local procedure, record access, and courthouse credibility determine whether legal consumers, court navigators, nonlawyer assistants, future attorneys, and malpractice victims can pursue relief effectively.

1898. Saleski helped preserve the lawyer-created monopoly because practical court access often turns on procedural fluency, filing knowledge, docket access, and local courthouse norms that favor licensed lawyers and burden independent assistance, nonlawyer support, and injured consumers outside lawyer-controlled channels.

1899. Saleski caused antitrust injury because filing and docket gatekeeping reduced court-access competition, limited practical legal assistance, restricted nonlawyer court-navigation support, and preserved lawyer-centered control over systems that malpractice victims must use to obtain relief.

1900. Sholley participated in the structural group boycott through lawyer status, Union–Snyder County Bar Association officer authority, secretary authority,

meeting-record authority, minute practices, local bar governance, Law Day participation, Wills for Heroes participation, listserv structures, and court-connected local bar influence.

1901. Sholley helped restrain future attorneys and legal-services competitors by reinforcing local bar structures in which established lawyers and bar officers control meeting records, minutes, listserv access, committee participation, public-service programs, professional legitimacy, and the practical ability to challenge lawyer misconduct without retaliation.

1902. Sholley helped preserve the lawyer-created monopoly because bar records and officer conduct determine whether objections to lawyer-controlled governance are accurately preserved, whether dissenting attorneys receive equal institutional treatment, and whether future attorneys and independent legal-service providers can document retaliation by incumbent lawyer networks.

1903. Sholley caused antitrust injury because local bar recordkeeping and governance gatekeeping reduced public-service access, professional credibility, meeting access, committee access, referral opportunities, and competitive legal-service opportunities for future attorneys, malpractice victims, nonlawyer competitors, and legal-services reformers.

1904. Timothy Smith participated in the structural group boycott through North Penn Legal Services senior management authority, attorney supervision, case-

management systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, representation-status practices, withdrawal practices, and legal-aid institutional control.

1905. Smith helped restrain future attorneys and legal-services competitors by reinforcing a legal-aid structure in which incumbent providers control client files, representation status, communications, warnings to clients, corrective measures, substitute-provider access, and institutional narratives after legal-aid clients suffer missed hearings, missed deadlines, abandoned files, or unclear representation status.

1906. Smith helped preserve the lawyer-created monopoly because senior legal-aid managers can keep vulnerable clients dependent on incumbent providers while limiting independent corrective assistance, restricting conflict-free repair, shifting burdens to clients, and preserving provider legitimacy despite failed representation.

1907. Smith caused antitrust injury because senior legal-aid gatekeeping reduced conflict-free substitute counsel, restricted legal-aid accountability, suppressed competing nonprofit legal-service capacity, limited client repair, and preserved incumbent lawyer-controlled legal-aid dominance over low-income clients and malpractice victims.

1908. Snyder County participated in the structural group boycott through county-government authority, public-service structures, county-connected legal systems,

court-adjacent relationships, prosecutor-connected systems, advisory and coalition relationships, referral environments, and public legitimacy that affect access to legal services and legal-system accountability.

1909. Snyder County helped restrain future attorneys and legal-services competitors by reinforcing county-connected structures in which lawyers, prosecutors, judges, public-service actors, advisory bodies, and referral networks control access, credibility, cooperation, public-service participation, and the practical ability to challenge local legal-system misconduct.

1910. Snyder County helped preserve the lawyer-created monopoly because county-level public-service systems and court-adjacent systems affect whether malpractice victims, low-income litigants, vulnerable clients, nonlawyer competitors, and legal-services reformers can obtain meaningful assistance outside incumbent lawyer-controlled channels.

1911. Snyder County caused antitrust injury because county-connected gatekeeping reduced client choice, public-service access, referral competition, court-adjacent accountability, nonlawyer support, and future attorney access to the local systems needed to compete with incumbent lawyer-controlled providers.

1912. Snyder County STOP Coalition participated in the structural group boycott through county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals,

legal-aid relationships, and local institutional credibility affecting access to survivors, vulnerable clients, and public-service legal opportunities.

1913. Snyder County STOP Coalition helped restrain future attorneys and legal-services competitors by reinforcing a system in which county-connected coalitions, victim-service actors, legal-aid actors, public-service networks, and lawyer-connected participants control referral access, stakeholder credibility, public-service cooperation, and legitimacy for providers who serve vulnerable clients.

1914. Snyder County STOP Coalition helped preserve the lawyer-created monopoly because domestic-violence and victim-service systems intersect with legal needs, and coalition access affects whether clients receive only incumbent lawyer-controlled referrals or meaningful access to independent, conflict-free, and lawyer-critical legal-service alternatives.

1915. Snyder County STOP Coalition caused antitrust injury because coalition gatekeeping reduced public-service legal competition, limited referral access, restricted conflict-free alternatives, burdened future attorney participation, and preserved incumbent legal-aid and lawyer-connected service systems from market accountability.

1916. Sarah Stigerwalt-Egan participated in the structural group boycott through lawyer status, Union–Snyder County Bar Association presidential authority, judicial-law-clerk and hearing-officer status, local bar governance, Wills for

Heroes control, meeting access, listserv communications, Teams access, minute practices, public-service legal-program access, and communications with statewide bar and veterans-service actors.

1917. Stigerwalt-Egan helped restrain future attorneys and legal-services competitors by reinforcing local bar structures in which bar officers, lawyer networks, judicially connected actors, public-service programs, and professional communications determine whether dissenting attorneys and independent legal-service providers receive meeting access, program access, professional legitimacy, and equal treatment.

1918. Stigerwalt-Egan helped preserve the lawyer-created monopoly because local bar leadership controls informal and formal market inputs, including committee access, meeting access, public-service legal programs, local referrals, veterans-service participation, records, professional acceptance, and the ability to challenge lawyer misconduct without retaliation.

1919. Stigerwalt-Egan caused antitrust injury because bar-governance and public-service gatekeeping reduced legal-service output, limited future attorney competition, chilled lawyer-critical advocacy, restricted public-service access, and preserved incumbent lawyer-controlled structures from competitive accountability.

1920. K. Michael Sullivan participated in the structural group boycott through lawyer status, Union–Snyder County Bar Association authority, local bar

leadership, Wills for Heroes control, pro bono committee influence, listserv communications, public-service legal-program access, local legal-system influence, and joint participation with court-connected and bar-connected actors.

1921. Sullivan helped restrain future attorneys and legal-services competitors by reinforcing a local professional structure in which bar leaders control access to pro bono programs, public-service legal projects, listserv communications, committee activity, local professional standing, public-service legitimacy, and the ability to challenge bar or legal-aid misconduct without professional consequences.

1922. Sullivan helped preserve the lawyer-created monopoly because local bar leadership can condition access to legal-service opportunities on conformity with lawyer-controlled norms, thereby discouraging future attorneys, independent providers, nonlawyer competitors, and malpractice-accountability advocates from challenging incumbent lawyers and legal-service institutions.

1923. Sullivan caused antitrust injury because local bar and pro bono gatekeeping reduced client choice, restricted nonprofit legal-service competition, limited public-service legal output, chilled future attorney criticism, and preserved lawyer-controlled referral and program channels from market accountability.

1924. David Andrew Strouse participated in the structural group boycott through lawyer status, local attorney networks, Union–Snyder County Bar Association participation, listserv participation, bar-governance participation, litigation-

response participation, public-service participation, and court-connected professional structures affecting local legal-service access.

1925. Strouse helped restrain future attorneys and legal-services competitors by reinforcing local lawyer networks in which attorneys and bar-connected actors control professional credibility, referral access, listserv access, meeting participation, public-service opportunities, litigation-response narratives, and practical market acceptance.

1926. Strouse helped preserve the lawyer-created monopoly because local attorneys can collectively isolate critics, protect incumbent legal institutions, discourage malpractice accountability, and make market entry difficult for future attorneys, nonlawyer competitors, independent advocates, and legal-services reformers.

1927. Strouse caused antitrust injury because local attorney gatekeeping reduced access to referrals, public-service participation, professional legitimacy, attorney cooperation, client channels, and competitive legal-service opportunities for malpractice victims, injured consumers, future attorneys, and nonlawyer competitors.

1928. Transitions Legal Center participated in the structural group boycott through legal-services participation, pro bono relationships, victim-services relationships, domestic-violence service coordination, referral systems, court-related

connections, public-service networks, and local legal-service channels affecting access to clients, survivors, victims, and legal-service opportunities.

1929. Transitions Legal Center helped restrain future attorneys and legal-services competitors by reinforcing public-service legal networks in which incumbent legal-service actors, victim-service providers, domestic-violence systems, referral gatekeepers, and court-related partners control access to vulnerable clients and legitimacy in public-interest legal work.

1930. Transitions Legal Center helped preserve the lawyer-created monopoly because public-service legal referrals and domestic-violence legal-service channels determine whether vulnerable clients receive only incumbent lawyer-approved services or meaningful access to independent, conflict-free, and lawyer-critical alternatives.

1931. Transitions Legal Center caused antitrust injury because legal-service referral gatekeeping reduced provider choice, limited conflict-free alternatives, restricted future attorney and nonprofit participation, suppressed independent advocacy for vulnerable clients, and preserved incumbent legal-service channels from competitive accountability.

1932. Transitions of PA participated in the structural group boycott through victim-service structures, public-service referral networks, domestic-violence service relationships, pro bono channels, legal-aid relationships, county-connected

systems, court-related referral structures, and local service-provider networks affecting access to vulnerable clients, victims, survivors, and legal-service opportunities.

1933. Transitions of PA helped restrain future attorneys and legal-services competitors by reinforcing public-service systems in which service-provider networks, domestic-violence systems, referral gatekeepers, legal-aid actors, and court-connected partners control whether independent providers receive access to vulnerable clients and institutional legitimacy.

1934. Transitions of PA helped preserve the lawyer-created monopoly because public-service referrals and victim-service systems can decide whether clients receive only incumbent lawyer-approved services or meaningful access to independent, conflict-free, nonlawyer, and lawyer-critical legal-service alternatives.

1935. Transitions of PA caused antitrust injury because public-service referral gatekeeping reduced provider choice, limited conflict-free legal alternatives, restricted future attorney and nonprofit participation, suppressed independent advocacy for vulnerable clients, and preserved incumbent legal-aid and public-service channels from market accountability.

1936. David K. Trevaskis participated in the structural group boycott through lawyer status, Pennsylvania Bar Association Wills for Heroes leadership, statewide

pro bono authority, public-facing legal-program influence, volunteer-program influence, statewide bar credibility, and communications with bar, legal-aid, veterans-service, and public-service actors.

1937. Trevaskis helped restrain future attorneys and legal-services competitors by reinforcing statewide pro bono structures in which bar-connected actors control access to public-facing legal programs, volunteers, veterans-service opportunities, program legitimacy, professional recognition, and service channels for lawyers and independent providers who seek to operate outside incumbent lawyer-controlled systems.

1938. Trevaskis helped preserve the lawyer-created monopoly because statewide bar pro bono leadership affects which legal-service providers may reach vulnerable clients, veterans, disabled veterans, volunteers, referral sources, and public-service partners through lawyer-approved programs.

1939. Trevaskis caused antitrust injury because statewide pro bono gatekeeping reduced legal-service output, limited future attorney participation, suppressed independent providers, restricted access to veterans and vulnerable clients, and preserved bar-controlled public-service structures from competitive accountability.

1940. Brian Ulmer participated in the structural group boycott through lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation, statewide pro bono networks, bar-connected legal-service structures, public-facing

legal programs, attorney networks, and communications affecting access to veterans-service and legal-service opportunities.

1941. Ulmer helped restrain future attorneys and legal-services competitors by reinforcing a system in which bar-connected actors control public-facing legal programs, volunteer channels, staff communications, pro bono credibility, veterans-service outreach, and professional legitimacy for attorneys and independent providers who challenge lawyer-controlled structures.

1942. Ulmer helped preserve the lawyer-created monopoly because bar-connected and Wills for Heroes-connected actors can determine whether new attorneys, nonprofit providers, nonlawyer competitors, and legal-services reformers receive equal access to clients, veterans, volunteers, program credibility, and public-service legitimacy.

1943. Ulmer caused antitrust injury because bar-connected public-service gatekeeping reduced legal-service output, limited future attorney and nonprofit participation, restricted veterans-service access, suppressed independent legal-service competition, and preserved lawyer-controlled public-service channels from accountability.

1944. Union County participated in the structural group boycott through county-government authority, public-service systems, advisory-board structures, criminal-justice structures, mental-health structures, STOP-related systems, referral

environments, public legitimacy, and county-connected systems that affect access to legal services and legal-system accountability.

1945. Union County helped restrain future attorneys and legal-services competitors by reinforcing county-connected systems in which prosecutors, judges, lawyers, advisory bodies, public-service actors, referral networks, and county-connected institutions control access, credibility, cooperation, public-service participation, and the practical ability to challenge local legal-system misconduct.

1946. Union County helped preserve the lawyer-created monopoly because county-level legal, criminal-justice, mental-health, domestic-violence, and public-service systems affect whether malpractice victims, low-income litigants, vulnerable clients, nonlawyer competitors, and legal-services reformers can obtain meaningful assistance outside incumbent lawyer-controlled channels.

1947. Union County caused antitrust injury because county-connected gatekeeping reduced client choice, referral competition, public-service access, court-adjacent accountability, nonlawyer support, and future attorney access to the local systems needed to compete with incumbent lawyer-controlled providers.

1948. Union–Snyder County Bar Association participated in the structural group boycott through local bar governance, membership control, listserv control, committee access, meeting access, minute practices, Wills for Heroes planning,

Law Day programming, public-service opportunities, and local professional legitimacy.

1949. Union–Snyder County Bar Association helped restrain future attorneys and legal-services competitors by reinforcing local bar structures in which incumbent lawyers control referrals, meetings, records, professional acceptance, public-service programs, committee participation, local credibility, and access to lawyer-approved legal-service networks.

1950. Union–Snyder County Bar Association helped preserve the lawyer-created monopoly because local bar associations can control informal and formal market inputs, including reputation, attorney cooperation, referral access, public-service programming, records, meeting access, committee access, and local professional legitimacy.

1951. Union–Snyder County Bar Association caused antitrust injury because local bar gatekeeping reduced future attorney participation, restricted independent legal-service competition, chilled attorney criticism, limited public-service legal output, and preserved incumbent lawyer networks from meaningful market accountability.

1952. Union County Criminal Justice Advisory Board participated in the structural group boycott through county-government participation, criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local

institutional credibility affecting legal-service channels and public-service participation.

1953. Union County Criminal Justice Advisory Board helped restrain future attorneys and legal-services competitors by reinforcing advisory structures in which prosecutors, judges, lawyers, criminal-justice actors, county officials, and public-service networks control access to policy discussions, institutional legitimacy, referral environments, and public-service credibility.

1954. Union County Criminal Justice Advisory Board helped preserve the lawyer-created monopoly because criminal-justice advisory access affects whether legal-services reformers, malpractice victims, nonlawyer competitors, and future attorneys can challenge local legal institutions while maintaining credibility and access to court-adjacent systems.

1955. Union County Criminal Justice Advisory Board caused antitrust injury because advisory-board gatekeeping reduced public-service access, referral access, court-adjacent accountability, local legal-system competition, nonlawyer assistance, and future attorney access to systems needed to challenge incumbent lawyer-controlled structures.

1956. Union County Mental Health Advisory Committee participated in the structural group boycott through county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-

connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility affecting access to vulnerable clients and public-service legal channels.

1957. Union County Mental Health Advisory Committee helped restrain future attorneys and legal-services competitors by reinforcing county-connected mental-health and disability-service structures in which public-service actors, legal-aid actors, referral networks, court-connected participants, and advisory bodies control credibility, referrals, stakeholder access, and public-service cooperation.

1958. Union County Mental Health Advisory Committee helped preserve the lawyer-created monopoly because mental-health, disability, housing, benefits, family-stability, and court-access systems intersect with civil legal needs, and advisory access affects whether vulnerable clients receive independent legal assistance or only incumbent lawyer-approved referrals.

1959. Union County Mental Health Advisory Committee caused antitrust injury because advisory and disability-service gatekeeping reduced client choice, restricted conflict-free alternatives, burdened future attorney participation, limited nonlawyer assistance, and preserved lawyer-controlled legal-service channels for vulnerable clients.

1960. Union County STOP Coalition participated in the structural group boycott through county-connected domestic-violence service coordination, prosecutor

participation, public meetings, victim-services structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility affecting access to survivors, vulnerable clients, and public-service legal opportunities.

1961. Union County STOP Coalition helped restrain future attorneys and legal-services competitors by reinforcing a system in which county-connected coalitions, victim-service actors, legal-aid actors, domestic-violence service providers, prosecutor-connected participants, and public-service networks control referral access, stakeholder credibility, cooperation, and legitimacy for providers serving vulnerable clients.

1962. Union County STOP Coalition helped preserve the lawyer-created monopoly because domestic-violence and victim-service systems intersect with legal needs, and coalition access affects whether clients receive only incumbent lawyer-controlled referrals or meaningful access to independent, conflict-free, and lawyer-critical legal-service alternatives.

1963. Union County STOP Coalition caused antitrust injury because coalition gatekeeping reduced public-service legal competition, limited referral access, restricted conflict-free alternatives, burdened future attorney participation, and preserved incumbent legal-aid and lawyer-connected service systems from market accountability.

1964. United States Bankruptcy Court for the Middle District of Pennsylvania participated in the structural group boycott through federal judicial authority, bankruptcy jurisdiction, docket authority, hearing authority, case-management authority, sanctions-related authority, local-rule authority, attorney-practice authority, filing systems, staff communications, and bankruptcy-access structures.

1965. United States Bankruptcy Court for the Middle District of Pennsylvania helped restrain future attorneys and legal-services competitors by reinforcing bankruptcy and federal-court structures in which judges, lawyers, local rules, filing practices, sanctions risk, attorney-practice expectations, and court-access norms control whether debtors, homeowners, low-income litigants, nonlawyer competitors, court navigators, and legal-services reformers can obtain or provide meaningful assistance.

1966. United States Bankruptcy Court for the Middle District of Pennsylvania helped preserve the lawyer-created monopoly because bankruptcy relief, debt-relief advocacy, attorney practice, sanctions exposure, court access, and professional credibility remain controlled by lawyer-centered institutions that burden alternative assistance and discourage criticism of court-connected incumbents.

1967. United States Bankruptcy Court for the Middle District of Pennsylvania caused antitrust injury because bankruptcy-access and attorney-practice

gatekeeping reduced competition in bankruptcy and debt-relief legal services, limited nonlawyer and independent assistance, chilled future attorneys and legal-services reformers, and preserved lawyer-centered control over debt-relief markets.

1968. United States Congress participated in the structural group boycott through federal legislative authority, federal-court creation, federal legal-aid funding statutes, federal attorney-regulation structures, federal procedural-rule delegation, federal judicial structures, legal-services funding, and legislative decisions that preserve lawyer-centered control over legal services and attorney accountability.

1969. United States Congress helped restrain future attorneys and legal-services competitors by creating, funding, authorizing, or preserving systems in which courts, lawyers, federal legal-aid institutions, disciplinary structures, procedural-rule committees, and professional gatekeepers control legal-market entry, court access, public legal-aid funding, legal-service legitimacy, and accountability mechanisms.

1970. United States Congress helped preserve the lawyer-created monopoly because federal legislation and federal institutional design can entrench lawyer-controlled legal aid, lawyer-controlled procedure, lawyer-controlled court access, and lawyer-controlled accountability systems without creating independent competitive alternatives for injured legal consumers, low-income clients, malpractice victims, or nonlawyer legal-service competitors.

1971. United States Congress caused antitrust injury because federal statutory and institutional structures reduced legal-service competition, limited alternative assistance, preserved lawyer-centered gatekeeping, restricted malpractice-redress options, and kept future attorneys, low-income clients, and injured legal consumers dependent on lawyer-controlled institutions.

1972. United States Court of Appeals for the Third Circuit participated in the structural group boycott through federal appellate authority, precedent authority, procedural authority, attorney-practice authority, disciplinary authority, filing rules, appellate access structures, judicial legitimacy, and court-controlled credibility systems.

1973. United States Court of Appeals for the Third Circuit helped restrain future attorneys and legal-services competitors by reinforcing appellate structures in which judges, lawyers, procedural rules, briefing standards, sanction risks, precedent, attorney-practice norms, and judicial credibility determinations control whether malpractice victims, injured legal consumers, nonlawyer competitors, and legal-services reformers can obtain meaningful review.

1974. United States Court of Appeals for the Third Circuit helped preserve the lawyer-created monopoly because appellate courts determine the boundaries of court access, standing, immunity, sanctions, attorney accountability, professional

speech, legal-aid accountability, and procedural enforcement while operating within a profession-controlled system dominated by licensed lawyers and judges.

1975. United States Court of Appeals for the Third Circuit caused antitrust injury because appellate gatekeeping reduced competitive accountability, limited malpractice-redress pathways, chilled future attorneys and legal-services reformers, restricted nonlawyer assistance, and preserved lawyer-centered control over legal rights enforcement.

1976. United States District Court for the Middle District of Pennsylvania participated in the structural group boycott through federal district-court authority, docket authority, case-management authority, filing authority, local-rule authority, sanctions authority, attorney-practice authority, judicial legitimacy, and court-access systems that affect legal-service competition and accountability.

1977. United States District Court for the Middle District of Pennsylvania helped restrain future attorneys and legal-services competitors by reinforcing federal trial-court structures in which procedural rules, local rules, pleading standards, filing systems, case-management practices, sanctions risks, attorney-practice expectations, and judicial credibility determinations control whether legal consumers, nonlawyer competitors, court navigators, future attorneys, and legal-services reformers can pursue relief.

1978. United States District Court for the Middle District of Pennsylvania helped preserve the lawyer-created monopoly because federal district courts control the practical forum where malpractice victims, injured legal consumers, legal-aid clients, and legal-services reformers must challenge lawyer-controlled institutions, while access to that forum remains shaped by lawyer-centered procedure and court-controlled professional norms.

1979. United States District Court for the Middle District of Pennsylvania caused antitrust injury because federal trial-court gatekeeping reduced court-access competition, limited nonlawyer and independent assistance, chilled future attorney criticism, increased dependence on licensed lawyers, and preserved lawyer-centered control over rights enforcement.

1980. United States Department of Health and Human Services participated in the structural group boycott through federal public-funding authority, social-service authority, legal-aid-related funding structures, public-benefits systems, civil-rights compliance structures, service-provider relationships, referral environments, and public-service legitimacy affecting access to civil legal help for vulnerable clients.

1981. United States Department of Health and Human Services helped restrain future attorneys and legal-services competitors by reinforcing federally funded service systems that channel vulnerable clients through incumbent legal-aid, lawyer-controlled, referral-controlled, agency-connected, and professionalized

structures rather than independent, conflict-free, nonlawyer, or lawyer-critical legal-service alternatives.

1982. United States Department of Health and Human Services helped preserve the lawyer-created monopoly because federal health, disability, benefits, family, aging, domestic-violence, and social-service systems intersect with civil legal needs, and federal funding or referral structures can determine whether vulnerable clients receive only lawyer-approved legal help or meaningful competitive alternatives.

1983. United States Department of Health and Human Services caused antitrust injury because federal public-service gatekeeping reduced client choice, restricted conflict-free legal-service alternatives, limited independent accountability for legal-aid failures, preserved incumbent referral channels, and burdened future attorneys and nonlawyer competitors seeking to serve vulnerable clients.

1984. United States Judicial Conference participated in the structural group boycott through federal judicial-administration authority, policy authority, rules-related authority, court-governance influence, administrative oversight, federal court legitimacy, and institutional support for lawyer-and-judge-controlled federal court systems.

1985. United States Judicial Conference helped restrain future attorneys and legal-services competitors by reinforcing federal court structures, rulemaking systems,

administrative policies, judicial norms, filing practices, court-access expectations, and attorney-practice standards that preserve lawyer-centered control over litigation, legal accountability, court navigation, malpractice redress, and attorney discipline.

1986. United States Judicial Conference helped preserve the lawyer-created monopoly because federal judicial administration affects how courts treat malpractice victims, nonlawyer assistance, court-access reform, sanctions, recusal, attorney discipline, procedural access, professional speech, and future attorneys who challenge lawyer-controlled legal systems.

1987. United States Judicial Conference caused antitrust injury because federal judicial gatekeeping reduced competitive accountability, limited meaningful nonlawyer assistance, chilled court-access reform, preserved lawyer-centered litigation control, and kept injured legal consumers dependent on lawyer-dominated federal court processes.

1988. Defendants' structural group boycott was unreasonable because lawyer-controlled institutions, court-controlled institutions, bar-controlled institutions, legal-aid institutions, public-service gatekeepers, disciplinary actors, funding actors, referral actors, and judicial actors collectively preserved control over legal-market entry, court access, legal-aid access, public-service legitimacy, attorney

discipline, malpractice accountability, referral channels, and professional credibility.

1989. Defendants caused antitrust injury because their structural restraint reduced legal-service output, reduced future attorney entry, restricted nonlawyer competition, limited conflict-free substitute counsel, suppressed independent malpractice-accountability services, reduced court-navigation assistance, preserved incumbent legal-aid and bar-controlled channels, and kept Grohol and the class dependent on lawyer-controlled systems that failed them.

1990. Defendants are liable for Sherman Act § 1 structural group boycott and concerted refusal to deal because each joined, supported, ratified, administered, funded, enforced, legitimized, reinforced, or failed to correct a contract, combination, or conspiracy that excluded future attorneys, nonlawyer competitors, malpractice victims, injured legal consumers, legal-services reformers, and independent advocates from meaningful participation in legal-service markets; the restraint unreasonably restrained trade; and Grohol and the class suffered antitrust injury.

1991. Grohol and the class are entitled to treble damages, compensatory damages, declaratory relief, injunctive relief, structural relief, market-access relief, nonretaliation protections, legal-aid accountability review, attorney-discipline reform, court-access reform, referral-access review, public-service access review,

funding-accountability review, preservation of communications and records, expedited discovery, costs, attorney's fees, and all other lawful relief.

**COUNT 23**

**Sherman Act § 1 General Output-Restriction Conspiracy Against Administrative Office of Pennsylvania Courts; American Bar Association; Bloomsburg Fair Association; Matthew W. Brann; Heath Brosius; Jessica Chapman; William R. Christman III; Mary Beth Clark; Committee on Rules of Practice and Procedure; Commonwealth of Pennsylvania; Mark J. Conway; Court of Judicial Discipline; Robert Cravitz; Doe Defendants 1 through 200; Federal Judicial Center; Lori R. Hackenberg; International Legal Aid Group; Judicial Conduct Board of Pennsylvania; Heather Kelly; Brian Kerstetter; Robert Leadbeter; Legal Services Corporation; Kathleen Lincoln; Gabriele Miller-Wagner; Lori Molloy; Jenna Ann Neidig; North Penn Legal Services, Inc.; Northumberland County Prothonotary's Office; Office of Attorney General; Office of Disciplinary Counsel; Pennsylvania Bar Association; Pennsylvania Board of Law Examiners; Pennsylvania Department of Human Services; Pennsylvania Department of Military and Veterans Affairs; Pennsylvania General Assembly; Pennsylvania Legal Aid Network, Inc.; Supreme Court of Pennsylvania; Michael F.J. Piecuch; Jeffrey**

**A. Rowe; Jamie Saleski; Sholley; Timothy Smith; Snyder County; Snyder County STOP Coalition; Sarah Stigerwalt-Egan; K. Michael Sullivan; David Andrew Strouse; Transitions Legal Center; Transitions of PA; David K. Trevaskis; Brian Ulmer; Union County; Union–Snyder County Bar Association; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; United States Congress; United States Court of Appeals for the Third Circuit; United States District Court for the Middle District of Pennsylvania; United States Department of Health and Human Services; and United States Judicial Conference**

1992. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 319, Administrative Office of Pennsylvania Courts, Sherman Act § 1 General Output-Restriction Conspiracy; COA 320, American Bar Association, Sherman Act § 1 General Output-Restriction Conspiracy; COA 321, Bloomsburg Fair Association, Sherman Act § 1 General Output-Restriction Conspiracy; COA 322, Matthew W. Brann, Sherman Act § 1 General Output-Restriction Conspiracy; COA 323, Heath Brosius, Sherman Act § 1 General Output-Restriction Conspiracy; COA 324, Jessica Chapman, Sherman Act § 1 General Output-Restriction Conspiracy; COA 325, William R. Christman

III, Sherman Act § 1 General Output-Restriction Conspiracy; COA 326, Mary Beth Clark, Sherman Act § 1 General Output-Restriction Conspiracy; COA 327, Committee on Rules of Practice and Procedure, Sherman Act § 1 General Output-Restriction Conspiracy; COA 328, Commonwealth of Pennsylvania, Sherman Act § 1 General Output-Restriction Conspiracy; COA 329, Mark J. Conway, Sherman Act § 1 General Output-Restriction Conspiracy; COA 330, Court of Judicial Discipline, Sherman Act § 1 General Output-Restriction Conspiracy; COA 331, Robert Cravitz, Sherman Act § 1 General Output-Restriction Conspiracy; COA 332, Doe Defendants 1 through 200, Sherman Act § 1 General Output-Restriction Conspiracy; COA 333, Federal Judicial Center, Sherman Act § 1 General Output-Restriction Conspiracy; COA 334, Lori R. Hackenberg, Sherman Act § 1 General Output-Restriction Conspiracy; COA 335, International Legal Aid Group, Sherman Act § 1 General Output-Restriction Conspiracy; COA 336, Judicial Conduct Board of Pennsylvania, Sherman Act § 1 General Output-Restriction Conspiracy; COA 337, Heather Kelly, Sherman Act § 1 General Output-Restriction Conspiracy; COA 338, Brian Kerstetter, Sherman Act § 1 General Output-Restriction Conspiracy; COA 339, Robert Leadbeter, Sherman Act § 1 General Output-Restriction Conspiracy; COA 340, Legal Services Corporation, Sherman Act § 1 General Output-Restriction Conspiracy; COA 341, Kathleen Lincoln, Sherman Act § 1 General Output-Restriction Conspiracy; COA 342,

Gabriele Miller-Wagner, Sherman Act § 1 General Output-Restriction Conspiracy; COA 343, Lori Molloy, Sherman Act § 1 General Output-Restriction Conspiracy; COA 344, Jenna Ann Neidig, Sherman Act § 1 General Output-Restriction Conspiracy; COA 345, North Penn Legal Services, Inc., Sherman Act § 1 General Output-Restriction Conspiracy; COA 346, Northumberland County Prothonotary's Office, Sherman Act § 1 General Output-Restriction Conspiracy; COA 347, Office of Attorney General, Sherman Act § 1 General Output-Restriction Conspiracy; COA 348, Office of Disciplinary Counsel, Sherman Act § 1 General Output-Restriction Conspiracy; COA 349, Pennsylvania Bar Association, Sherman Act § 1 General Output-Restriction Conspiracy; COA 350, Pennsylvania Board of Law Examiners, Sherman Act § 1 General Output-Restriction Conspiracy; COA 351, Pennsylvania Department of Human Services, Sherman Act § 1 General Output-Restriction Conspiracy; COA 352, Pennsylvania Department of Military and Veterans Affairs, Sherman Act § 1 General Output-Restriction Conspiracy; COA 353, Pennsylvania General Assembly, Sherman Act § 1 General Output-Restriction Conspiracy; COA 354, Pennsylvania Legal Aid Network, Inc., Sherman Act § 1 General Output-Restriction Conspiracy; COA 355, Supreme Court of Pennsylvania, Sherman Act § 1 General Output-Restriction Conspiracy; COA 356, Michael F.J. Piecuch, Sherman Act § 1 General Output-Restriction Conspiracy; COA 357, Jeffrey A. Rowe, Sherman Act § 1 General Output-Restriction

Conspiracy; COA 358, Jamie Saleski, Sherman Act § 1 General Output-Restriction Conspiracy; COA 359, Sholley, Sherman Act § 1 General Output-Restriction Conspiracy; COA 360, Timothy Smith, Sherman Act § 1 General Output-Restriction Conspiracy; COA 361, Snyder County, Sherman Act § 1 General Output-Restriction Conspiracy; COA 362, Snyder County STOP Coalition, Sherman Act § 1 General Output-Restriction Conspiracy; COA 363, Sarah Stigerwalt-Egan, Sherman Act § 1 General Output-Restriction Conspiracy; COA 364, K. Michael Sullivan, Sherman Act § 1 General Output-Restriction Conspiracy; COA 365, David Andrew Strouse, Sherman Act § 1 General Output-Restriction Conspiracy; COA 366, Transitions Legal Center, Sherman Act § 1 General Output-Restriction Conspiracy; COA 367, Transitions of PA, Sherman Act § 1 General Output-Restriction Conspiracy; COA 368, David K. Trevaskis, Sherman Act § 1 General Output-Restriction Conspiracy; COA 369, Brian Ulmer, Sherman Act § 1 General Output-Restriction Conspiracy; COA 370, Union County, Sherman Act § 1 General Output-Restriction Conspiracy; COA 371, Union–Snyder County Bar Association, Sherman Act § 1 General Output-Restriction Conspiracy; COA 372, Union County Criminal Justice Advisory Board, Sherman Act § 1 General Output-Restriction Conspiracy; COA 373, Union County Mental Health Advisory Committee, Sherman Act § 1 General Output-Restriction Conspiracy; COA 374, Union County STOP Coalition, Sherman Act §

1 General Output-Restriction Conspiracy; COA 375, United States Bankruptcy Court for the Middle District of Pennsylvania, Sherman Act § 1 General Output-Restriction Conspiracy; COA 376, United States Congress, Sherman Act § 1 General Output-Restriction Conspiracy; COA 377, United States Court of Appeals for the Third Circuit, Sherman Act § 1 General Output-Restriction Conspiracy; COA 378, United States District Court for the Middle District of Pennsylvania, Sherman Act § 1 General Output-Restriction Conspiracy; COA 379, United States Department of Health and Human Services, Sherman Act § 1 General Output-Restriction Conspiracy; and COA 380, United States Judicial Conference, Sherman Act § 1 General Output-Restriction Conspiracy, from the 651-count inventory attached as exhibits.

1993. The elements of Sherman Act § 1 output-restriction conspiracy are an agreement or concerted action among 2 or more separate economic actors, an unreasonable restraint of trade through restricted output, and anticompetitive effects in a relevant market.

1994. This Count concerns a general output-restriction conspiracy in legal-service markets, including attorney licensing, attorney regulation, legal-aid access, referral access, pro bono access, public-service legal access, court-access legal services, court-adjacent legal-service access, veterans legal-service access, Wills for Heroes access, and conflict-free substitute-provider access.

1995. Defendants restricted output by preserving closed legal-service channels, restricting substitute-provider participation, limiting conflict-free alternatives, reducing referrals to independent providers, suppressing public-service legal participation, limiting practical court-access assistance, and maintaining attorney-controlled scarcity despite unmet legal need among legal-aid clients, abandoned clients, disabled persons, veterans, disabled veterans, victims, survivors, self-represented litigants, and other vulnerable persons.

1996. Administrative Office of Pennsylvania Courts participated in the output-restriction conspiracy through judicial-branch administration, court-access systems, court-adjacent systems, court data and administrative practices, attorney-regulation support, official recognition of court-connected legal-service structures, legal-aid relationships, referral relationships, public-service relationships, and court-system practices affecting legal-service provider access to vulnerable persons.

1997. Administrative Office of Pennsylvania Courts helped restrict output by maintaining court-administration systems that recognize nominal representation, attorney-centered filing systems, lawyer-controlled procedural structures, and court-adjacent legitimacy as adequate access even when legal-aid clients, abandoned litigants, conflicted clients, and self-represented litigants lack meaningful representation or conflict-free substitute assistance.

1998. Administrative Office of Pennsylvania Courts reinforced the conspiracy because court-administration systems shape who receives court-facing legitimacy, who receives referral credibility, who can provide court-access assistance, who can intervene after legal-aid abandonment, and whether competing nonprofit legal-service providers can reach vulnerable clients through court-connected channels.

1999. Administrative Office of Pennsylvania Courts caused antitrust injury because its role reduced the number, independence, visibility, and availability of meaningful legal-service providers, limited court-access legal services, suppressed conflict-free substitute-provider access, preserved nominal representation as a substitute for actual service output, and kept Grohol and the class dependent on attorney-controlled systems that failed them.

2000. American Bar Association participated in the output-restriction conspiracy through national bar influence, accreditation influence, professional legitimacy, model professional structures, attorney-regulation narratives, pro bono narratives, public-facing service norms, and bar-connected legal-service systems that shape whether providers may compete in civil legal-service markets.

2001. American Bar Association helped restrict output by preserving attorney-controlled legal-service channels, professional-legitimacy barriers, law-school and accreditation pathways, pro bono systems, model-rule structures, and public-

service norms that limit substitute-provider participation despite persistent unmet civil legal need.

2002. American Bar Association reinforced the conspiracy because national professional legitimacy affects whether attorneys, nonprofit providers, volunteers, students, clinics, public-service partners, legal-aid alternatives, and nonlawyer assistance models can expand the quantity and availability of civil legal services outside incumbent lawyer-controlled channels.

2003. American Bar Association caused antitrust injury because its conduct reduced provider choice, reduced substitute-provider access, restricted open referrals, limited conflict-free legal-service alternatives, suppressed service-expanding participation, and preserved artificial scarcity in markets where Grohol, legal-aid clients, veterans, disabled persons, debtors, homeowners, and other vulnerable persons needed more legal help, not less.

2004. Bloomsburg Fair Association participated in the output-restriction conspiracy through public-event access, vendor access, veterans-resource-event access, veterans-expo channels, public-official partnerships, veterans-service event structures, public-service legitimacy, and event communications affecting which legal-service providers could reach veterans and disabled veterans.

2005. Bloomsburg Fair Association helped restrict output by allowing veterans-event access, vendor access, public-facing resource-fair access, and veterans-

service outreach to operate through selective, incumbent-approved, public-official-approved, or bar-connected channels instead of open competition among willing legal-service providers.

2006. Bloomsburg Fair Association reinforced the conspiracy because public-facing veterans events, resource fairs, and public-service channels determine whether veterans, disabled veterans, low-income residents, donors, volunteers, referral sources, and community partners can learn about and use competing nonprofit legal-service providers.

2007. Bloomsburg Fair Association caused antitrust injury because event-access and vendor-access restrictions reduced legal-service outreach, veterans-service access, public-service visibility, referral opportunities, Wills for Heroes-adjacent alternatives, community legitimacy, and the number of meaningful legal-service options available to veterans, disabled veterans, Grohol, and the class.

2008. Matthew W. Brann participated in the output-restriction conspiracy through federal judicial authority, district-court authority, docket control, case-management authority, filing systems, local practice norms, sanctions authority, recusal authority, federal-court legitimacy, and judicial credibility systems affecting federal court-access legal services and attorney accountability.

2009. Brann helped restrict output by reinforcing federal-court structures in which procedural complexity, pleading standards, judicial discretion, sanctions risk, local

practice norms, electronic filing expectations, and attorney-centered credibility determine whether malpractice victims, legal-aid clients, injured consumers, and court users can obtain meaningful relief or alternative court-access assistance.

2010. Brann reinforced the conspiracy because federal judicial authority shapes whether legal-services reformers, attorney critics, nonlawyer assistants, public-interest providers, and malpractice-accountability advocates can participate in court-access markets without being deterred by judicial gatekeeping, professional-legitimacy barriers, or court-controlled credibility determinations.

2011. Brann caused antitrust injury because federal-court gatekeeping reduced meaningful court-access assistance, chilled service expansion by future attorneys and nonprofit providers, restricted nonlawyer and independent assistance, preserved lawyer-centered litigation control, and kept Grohol and the class dependent on scarce attorney-controlled channels.

2012. Heath Brosius participated in the output-restriction conspiracy through prosecutorial authority, Snyder County public-office authority, court-facing power, prosecutor-connected service access, victim-service influence, domestic-violence service influence, STOP Coalition involvement, public-service legitimacy, and local referral systems.

2013. Brosius helped restrict output by reinforcing county-connected and prosecutor-connected structures in which prosecutors, judges, service providers,

legal-aid actors, domestic-violence systems, victim-service systems, and public-service actors control referrals, coalition access, service legitimacy, and the practical ability of competing nonprofit providers to reach vulnerable clients.

2014. Brosius reinforced the conspiracy because prosecutor-connected and victim-service systems affect whether victims, survivors, legal-aid clients, disabled persons, veterans, disabled veterans, and other vulnerable persons receive only incumbent-approved legal-service channels or meaningful conflict-free alternatives.

2015. Brosius caused antitrust injury because prosecutor-connected gatekeeping reduced the number and availability of legal-service providers, restricted public-service legal access, limited conflict-free substitute-provider access, discouraged independent nonprofit providers, and preserved closed legal-service channels in markets serving vulnerable clients.

2016. Jessica Chapman participated in the output-restriction conspiracy through lawyer status, legal-service participation, local professional relationships, public-service legal networks, referral-connected structures, legal-aid-connected systems, court-adjacent legitimacy, and professional channels affecting whether vulnerable clients could access substitute legal-service providers.

2017. Chapman helped restrict output by reinforcing lawyer-controlled and public-service-connected systems in which attorney status, legal-aid relationships, referral

credibility, professional legitimacy, and court-adjacent access determine which providers may reach clients, challenge incumbent misconduct, and expand available civil legal services.

2018. Chapman reinforced the conspiracy because local legal-service actors can reduce output by treating incumbent-approved providers as legitimate while marginalizing independent, conflict-free, nonprofit, lawyer-critical, or reform-oriented providers capable of increasing the number of clients served.

2019. Chapman caused antitrust injury because her role reduced independent accountability, limited substitute-provider access, preserved incumbent legal-aid and bar-connected control, restricted future attorneys and nonprofit providers, and reduced the legal-service choices available to Grohol, malpractice victims, legal-aid clients, and vulnerable court users.

2020. William R. Christman III participated in the output-restriction conspiracy through Pennsylvania Bar Association general-counsel authority, attorney status, statewide bar influence, professional-legitimacy control, staff and volunteer communication channels, public-service legal-program authority, Wills for Heroes access, and bar-connected service systems.

2021. Christman helped restrict output by using or supporting bar-controlled communication restrictions, public-service legal-program restrictions, professional-legitimacy barriers, witness-access barriers, volunteer-channel barriers, and

institutional credibility barriers that limited whether independent providers could participate in service-expanding legal programs.

2022. Christman reinforced the conspiracy because statewide bar authority affects whether attorneys, nonprofit providers, legal-services reformers, volunteers, staff, public-service partners, and clients can communicate freely, form service partnerships, and increase legal-service output outside incumbent lawyer-controlled systems.

2023. Christman caused antitrust injury because bar-connected communication control and program exclusion reduced service capacity, restricted substitute-provider participation, chilled future attorneys and nonprofit providers, suppressed lawyer-critical market entrants, and kept Grohol and the class dependent on closed attorney-controlled channels.

2024. Mary Beth Clark participated in the output-restriction conspiracy through lawyer status, North Penn Legal Services relationships, Union–Snyder County Bar Association influence, local bar governance, legal-aid-connected authority, referral structures, public-service legal programming, Wills for Heroes planning, PFA-fee access, Judicare-related access, and local professional legitimacy.

2025. Clark helped restrict output by reinforcing legal-aid-connected and local-bar structures in which incumbent lawyers control referrals, fee opportunities, pro bono opportunities, public-service programs, committee access, local professional

acceptance, and the practical ability of competing providers to serve low-income clients and malpractice victims.

2026. Clark reinforced the conspiracy because local legal-aid and bar gatekeepers can reduce legal-service output by protecting incumbent providers, discouraging conflict-free alternatives, steering referral opportunities away from competitors, and preserving lawyer-controlled accountability systems that leave injured clients dependent on the same professional network that failed them.

2027. Clark caused antitrust injury because legal-aid and local-bar gatekeeping reduced client choice, suppressed conflict-free substitute counsel, limited public-service opportunities, impaired referral competition, burdened future attorneys and nonprofit competitors, and reduced the legal-service options available to Grohol and the class.

2028. Committee on Rules of Practice and Procedure participated in the output-restriction conspiracy through federal rulemaking authority, practice-rule authority, procedural-rule authority, federal-court-access influence, judicial-administration influence, professional-regulation influence, institutional legitimacy, and lawyer-centered procedural systems.

2029. Committee on Rules of Practice and Procedure helped restrict output by maintaining procedural, pleading, discovery, motion, filing, and federal-court-access structures that require lawyer-centered expertise and make meaningful

participation difficult for malpractice victims, injured legal consumers, low-income clients, nonlawyer competitors, court navigators, and legal-services reformers.

2030. Committee on Rules of Practice and Procedure reinforced the conspiracy because procedural rules shape who can enter court, who can present claims effectively, who can challenge attorney misconduct, who can navigate federal litigation, and whether alternative court-access services can compete with licensed-lawyer control.

2031. Committee on Rules of Practice and Procedure caused antitrust injury because lawyer-centered federal procedural systems reduced legal-service output, increased dependence on licensed attorneys, restricted alternative legal assistance, suppressed court-navigation competition, and kept Grohol, malpractice victims, and future market entrants dependent on lawyer-approved procedural gatekeepers.

2032. Commonwealth of Pennsylvania participated in the output-restriction conspiracy through sovereign authority, statutory authority, public-funding authority, court-system creation, attorney-regulation support, unauthorized-practice structures, legal-aid funding structures, public-service structures, and institutional legitimacy conferred on lawyer-controlled systems.

2033. Commonwealth of Pennsylvania helped restrict output by supporting state-sanctioned licensing, court access, unauthorized-practice rules, legal-aid systems, disciplinary systems, public-service access, referral systems, and professional-

legitimacy systems that preserve lawyer dominance and restrict nonlawyer competition.

2034. Commonwealth of Pennsylvania reinforced the conspiracy because state-created and state-funded structures channel malpractice victims, low-income clients, court users, and legal-services reformers through lawyer-controlled institutions for representation, discipline, court access, and accountability while excluding independent alternatives from equal legitimacy.

2035. Commonwealth of Pennsylvania caused antitrust injury because state-supported lawyer-control structures reduced client choice, suppressed legal-service competition, reduced malpractice-redress output, burdened future attorneys and nonlawyer competitors, and preserved incumbent legal institutions from market accountability. Mark J. Conway participated in the output-restriction conspiracy through federal judicial authority, bankruptcy-court authority, sanctions authority, recusal authority, docket authority, hearing authority, attorney-practice authority, local-rule authority, courtroom control, and federal bankruptcy structures affecting bankruptcy and debt-relief legal-service markets.

2036. Conway helped restrict output by reinforcing a system in which bankruptcy judges, lawyers, bankruptcy courts, local rules, sanctions risk, recusal standards, attorney-practice expectations, and judicial credibility determinations control whether debtors, homeowners, low-income litigants, nonlawyer competitors, and

legal-services reformers can obtain or provide meaningful bankruptcy-related assistance.

2037. Conway reinforced the conspiracy because bankruptcy-court authority affects whether future attorneys, nonprofit providers, court-access advocates, debt-relief providers, and malpractice-accountability advocates can enter, expand, criticize court-connected actors, and provide meaningful assistance without retaliatory judicial pressure.

2038. Conway caused antitrust injury because bankruptcy-court gatekeeping reduced competition in debt-relief and bankruptcy-related legal services, chilled future attorneys and legal-services reformers, increased dependence on licensed lawyers, reduced access to independent accountability mechanisms, and preserved lawyer-centered control over debtors, homeowners, low-income litigants, and malpractice victims.

2039. Court of Judicial Discipline participated in the output-restriction conspiracy through judicial-discipline authority, judicial-accountability gatekeeping, court-connected institutional legitimacy, judge-regulation structures, professional-accountability systems, and a lawyer-and-judge-controlled accountability framework affecting legal-service output and attorney accountability.

2040. Court of Judicial Discipline helped restrict output by preserving a judicial-accountability structure that requires malpractice victims, court users, lawyer

critics, nonlawyer competitors, legal-services reformers, and future attorneys to seek accountability through judge-centered and lawyer-centered mechanisms rather than independent consumer-protection or market-accountability channels.

2041. Court of Judicial Discipline reinforced the conspiracy because judicial accountability affects attorney accountability, court access, professional legitimacy, discipline-related safety, and the willingness of attorneys, advocates, malpractice victims, and legal-services reformers to challenge judges, lawyers, courts, and lawyer-controlled institutions.

2042. Court of Judicial Discipline caused antitrust injury because judge-controlled and lawyer-connected accountability gatekeeping reduced independent oversight, chilled criticism, limited malpractice-redress pathways, preserved court-centered legal-market control, and kept injured legal consumers dependent on institutions aligned with the same profession that controls legal services.

2043. Robert Cravitz participated in the output-restriction conspiracy through lawyer status, local attorney networks, Union–Snyder County Bar Association participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and court-connected local legal structures affecting local legal-service markets.

2044. Cravitz helped restrict output by reinforcing local professional structures in which established lawyers, bar participants, court-connected actors, and public-

service participants control credibility, referrals, public-service access, local professional acceptance, and the practical ability to challenge lawyer misconduct.

2045. Cravitz reinforced the conspiracy because local attorney networks can collectively isolate critics, protect incumbent lawyers, discourage malpractice accountability, and make market entry difficult for future attorneys, nonlawyer competitors, independent advocates, and legal-services reformers who refuse to accept lawyer-controlled norms.

2046. Cravitz caused antitrust injury because local lawyer-network gatekeeping reduced access to referrals, public-service participation, professional legitimacy, attorney cooperation, client channels, and competitive legal-service opportunities for malpractice victims, injured consumers, future attorneys, and nonlawyer competitors.

2047. Doe Defendants 1 through 200 participated in the output-restriction conspiracy through membership in defendant entities, listserv participation, court-connected roles, bar-connected roles, legal-aid roles, public-service roles, veterans-service roles, referral-network roles, disciplinary-adjacent roles, funding-adjacent roles, and professional networks that preserve lawyer control over legal services and attorney accountability.

2048. Doe Defendants 1 through 200 helped restrict output by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from

professional structures that excluded malpractice victims, injured legal consumers, low-income clients, nonlawyer competitors, legal-services reformers, and lawyer critics from equal access to referrals, programs, court systems, public-service networks, legal-aid networks, and professional legitimacy.

2049. Doe Defendants 1 through 200 reinforced the conspiracy because unknown bar participants, court-connected participants, public-service actors, legal-aid actors, referral actors, and professional-network participants can collectively enforce reputational harm, access denial, referral loss, committee exclusion, program exclusion, professional silence, and credibility loss against future market entrants who challenge lawyer misconduct.

2050. Doe Defendants 1 through 200 caused antitrust injury because collective professional gatekeeping reduced competitive entry, suppressed nonlawyer assistance, reduced independent accountability services, limited malpractice-redress pathways, and preserved lawyer-controlled access to clients, courts, public programs, referrals, funding, and professional legitimacy.

2051. Federal Judicial Center participated in the output-restriction conspiracy through federal judicial-education authority, federal judicial-administration influence, research and training functions, court-system legitimacy, professional norms, judicial-policy influence, and institutional support for lawyer-and-judge-controlled federal court structures.

2052. Federal Judicial Center helped restrict output by reinforcing federal judicial norms, federal court practices, judicial training, court-administration practices, professionalism narratives, and court-access expectations that preserve lawyer-centered control over litigation, legal accountability, court navigation, malpractice redress, and attorney discipline.

2053. Federal Judicial Center reinforced the conspiracy because federal judicial education and court-system research affect how judges treat pro se litigants, nonlawyer assistance, lawyer critics, malpractice victims, court-access reformers, and future attorneys challenging lawyer-controlled procedural and professional systems.

2054. Federal Judicial Center caused antitrust injury because federal judicial-system legitimacy and training structures reduced competitive accountability, preserved lawyer-centered litigation control, limited meaningful nonlawyer assistance, chilled court-access reform, and kept injured legal consumers dependent on lawyer-dominated federal court processes.

**COUNT 24**

**Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize Against Administrative Office of Pennsylvania Courts; American Bar Association; Bloomsburg Fair Association; Matthew W.**

**Brann; Heath Brosius; Jessica Chapman; William R. Christman III; Mary Beth Clark; Committee on Rules of Practice and Procedure; Commonwealth of Pennsylvania; Mark J. Conway; Court of Judicial Discipline; Robert Cravitz; Doe Defendants 1 through 200; Federal Judicial Center; Lori R. Hackenberg; International Legal Aid Group; Judicial Conduct Board of Pennsylvania; Heather Kelly; Brian Kerstetter; Robert Leadbeter; Legal Services Corporation; Kathleen Lincoln; Gabriele Miller-Wagner; Lori Molloy; Jenna Ann Neidig; North Penn Legal Services, Inc.; Northumberland County Prothonotary's Office; Office of Attorney General; Office of Disciplinary Counsel; Pennsylvania Bar Association; Pennsylvania Board of Law Examiners; Pennsylvania Department of Human Services; Pennsylvania Department of Military and Veterans Affairs; Pennsylvania General Assembly; Pennsylvania Legal Aid Network, Inc.; Supreme Court of Pennsylvania; Michael F.J. Piecuch; Jeffrey A. Rowe; Jamie Saleski;  Sholley; Timothy Smith; Snyder County; Snyder County STOP Coalition; Sarah Stigerwalt-Egan; K. Michael Sullivan; David Andrew Strouse; Transitions Legal Center; Transitions of PA; David K. Trevaskis; Brian Ulmer; Union County; Union–Snyder County Bar Association; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; United States Bankruptcy Court for the**

**Middle District of Pennsylvania; United States Congress; United States Court of Appeals for the Third Circuit; United States District Court for the Middle District of Pennsylvania; United States Department of Health and Human Services; and United States Judicial Conference**

2248. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 381, Administrative Office of Pennsylvania Courts, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 382, American Bar Association, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 383, Bloomsburg Fair Association, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 384, Matthew W. Brann, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 385, Heath Brosius, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 386, Jessica Chapman, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 387, William R. Christman III, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 388, Mary Beth Clark, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 389, Committee on Rules of Practice and Procedure, Sherman Act § 2 Monopolization, Attempted

Monopolization, and Conspiracy to Monopolize; COA 390, Commonwealth of Pennsylvania, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 391, Mark J. Conway, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 392, Court of Judicial Discipline, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 393, Robert Cravitz, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 394, Doe Defendants 1 through 200, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 395, Federal Judicial Center, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 396, Lori R. Hackenberg, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 397, International Legal Aid Group, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 398, Judicial Conduct Board of Pennsylvania, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 399, Heather Kelly, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 400, Brian Kerstetter, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 401, Robert Leadbeter, Sherman Act § 2 Monopolization, Attempted

Monopolization, and Conspiracy to Monopolize; COA 402, Legal Services Corporation, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 403, Kathleen Lincoln, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 404, Gabriele Miller-Wagner, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 405, Lori Molloy, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 406, Jenna Ann Neidig, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 407, North Penn Legal Services, Inc., Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 408, Northumberland County Prothonotary's Office, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 409, Office of Attorney General, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 410, Office of Disciplinary Counsel, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 411, Pennsylvania Bar Association, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 412, Pennsylvania Board of Law Examiners, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 413,

Pennsylvania Department of Human Services, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 414, Pennsylvania Department of Military and Veterans Affairs, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 415, Pennsylvania General Assembly, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 416, Pennsylvania Legal Aid Network, Inc., Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 417, Supreme Court of Pennsylvania, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 418, Michael F.J. Piecuch, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 419, Jeffrey A. Rowe, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 420, Jamie Saleski, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 421,  Sholley, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 422, Timothy Smith, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 423, Snyder County, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 424, Snyder County STOP Coalition, Sherman Act § 2 Monopolization, Attempted

Monopolization, and Conspiracy to Monopolize; COA 425, Sarah Stigerwalt-Egan, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 426, K. Michael Sullivan, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 427, David Andrew Strouse, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 428, Transitions Legal Center, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 429, Transitions of PA, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 430, David K. Trevaskis, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 431, Brian Ulmer, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 432, Union County, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 433, Union–Snyder County Bar Association, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 434, Union County Criminal Justice Advisory Board, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 435, Union County Mental Health Advisory Committee, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 436, Union County STOP Coalition, Sherman Act § 2 Monopolization, Attempted

Monopolization, and Conspiracy to Monopolize; COA 437, United States Bankruptcy Court for the Middle District of Pennsylvania, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 438, United States Congress, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 439, United States Court of Appeals for the Third Circuit, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 440, United States District Court for the Middle District of Pennsylvania, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; COA 441, United States Department of Health and Human Services, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize; and COA 442, United States Judicial Conference, Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize, from the 651-count inventory attached as exhibits.

2249. The elements of Sherman Act § 2 monopolization are monopoly power in the relevant market and willful acquisition or maintenance of that power through exclusionary conduct rather than growth or development from a superior product, business acumen, or historic accident.

2250. The elements of Sherman Act § 2 attempted monopolization are anticompetitive or exclusionary conduct, specific intent to monopolize, and a dangerous probability of achieving monopoly power in the relevant market.

2251. The elements of Sherman Act § 2 conspiracy to monopolize are an agreement or combination, specific intent to monopolize, overt acts in furtherance of the conspiracy, and antitrust injury.

2252. This Count concerns legal services, court-access assistance, attorney accountability, malpractice redress, legal-aid access, referral access, professional legitimacy, public-service legal programs, court-administration legitimacy, bar-mediated legitimacy, legal-education legitimacy, courthouse legitimacy, federal-court legitimacy, and nonlawyer legal assistance.

2253. Administrative Office of Pennsylvania Courts participated in monopolization, attempted monopolization, and conspiracy to monopolize through statewide court administration, court-access systems, court-user systems, filing systems, procedural implementation, public-facing court communications, court-recognized legitimacy, and administrative structures that make meaningful legal relief practically dependent on licensed attorneys and lawyer-approved channels.

2254. Administrative Office of Pennsylvania Courts helped maintain monopoly power by reinforcing court-administered systems in which court access, procedural credibility, filing competence, legal-aid legitimacy, public-service legitimacy,

court-user assistance, and professional recognition depend on lawyer approval, judicial approval, or lawyer-controlled institutional approval rather than consumer demand, service quality, accountability, or open competition.

2255. Administrative Office of Pennsylvania Courts engaged in exclusionary conduct because its court-administration systems reserve practical legitimacy to lawyers, court-approved actors, court-recognized legal-aid providers, and lawyer-supervised structures while denying comparable recognition to nonlawyer court-access assistance, community legal workers, malpractice-victim advocates, independent accountability models, and competing nonprofit legal-help models.

2256. Administrative Office of Pennsylvania Courts acted with specific intent and created a dangerous probability of monopoly power because statewide court administration gives practical force to lawyer-controlled licensing, court access, procedure, filing rules, court communications, professional recognition, and accountability pathways that exclude competing legal-help models from meaningful participation.

2257. Administrative Office of Pennsylvania Courts caused antitrust injury because its participation reduced independent, affordable, accountable, and nonlawyer legal help; restricted court-navigation alternatives; limited malpractice-victim advocacy; preserved nominal access as a substitute for actual service; and kept Grohol and the class dependent on lawyer-controlled systems that failed them.

2258. American Bar Association participated in monopolization, attempted monopolization, and conspiracy to monopolize through national bar influence, law-school accreditation influence, model-rule influence, professional-legitimacy control, attorney-discipline culture, public-service legal branding, referral norms, legal-education legitimacy, and national professional structures that shape who may compete in legal-help markets.

2259. American Bar Association helped maintain monopoly power by preserving lawyer-controlled legal-service channels, ABA-accredited legal-education pathways, bar-approved professional legitimacy, model professional rules, pro bono structures, referral structures, public-service norms, and lawyer-only authority over court access, attorney accountability, and nonlawyer legal assistance.

2260. American Bar Association engaged in exclusionary conduct because national professional legitimacy, accreditation influence, model-rule authority, public-interest branding, committee structures, public-service programs, and lawyer-only institutional approval channel consumer need through lawyer-approved providers while excluding nonlawyers, malpractice victims, independent advocates, community legal workers, non-ABA education models, nonlawyer certification models, and alternative legal-help providers from meaningful competition.

2261. American Bar Association acted with specific intent and created a dangerous probability of monopoly power because lawyers and lawyer-controlled institutions already control licensing, accreditation, court access, discipline, referrals, legal-aid legitimacy, professional legitimacy, national bar legitimacy, state bar legitimacy, local bar legitimacy, legal-education legitimacy, public-service legitimacy, and court-facing legal help.

2262. American Bar Association caused antitrust injury because its conduct reduced provider choice, raised entry barriers, restricted legal-education alternatives, suppressed nonlawyer assistance, limited independent accountability, reduced malpractice-redress services, and preserved a national lawyer-controlled system in which Grohol and the class had fewer meaningful options for affordable, independent, and conflict-free help.

2263. Bloomsburg Fair Association participated in monopolization, attempted monopolization, and conspiracy to monopolize through public-event access, vendor access, community-outreach legitimacy, veterans-resource-event access, public-service visibility, public-facing civic legitimacy, event communications, referral channels, and public-facing platforms through which legal-help providers obtain consumer trust.

2264. Bloomsburg Fair Association helped maintain monopoly power by allowing public-facing legal-service access, veterans-event access, outreach tables, public

resource events, informational programs, and community referral channels to operate through lawyer-approved, public-official-approved, incumbent-approved, or bar-connected channels rather than open competition among willing legal-service providers.

2265. Bloomsburg Fair Association engaged in exclusionary conduct because community venues preserve monopoly power when they treat lawyer-approved public-service programs as neutral community service while treating alternative legal-help models, malpractice-victim advocacy, nonlawyer support, competing nonprofit assistance, and accountability advocacy as controversial, risky, or illegitimate.

2266. Bloomsburg Fair Association acted with specific intent and created a dangerous probability of monopoly power because access to vulnerable consumers, veterans, disabled veterans, donors, volunteers, referral sources, public officials, and community partners affects whether competing providers can build public trust outside bar-controlled, lawyer-approved, and incumbent public-service channels.

2267. Bloomsburg Fair Association caused antitrust injury because its public-event and vendor-access gatekeeping reduced outreach, referrals, public-service competition, veterans-service access, community legitimacy, public-service visibility, and the number of meaningful legal-service options available to Grohol, veterans, disabled veterans, legal-aid clients, and the class.

2268. Matthew W. Brann participated in monopolization, attempted monopolization, and conspiracy to monopolize through federal judicial authority, district-court authority, docket control, case-management authority, filing systems, local practice norms, sanctions authority, recusal authority, federal-court legitimacy, and judicial credibility systems affecting federal court-access legal services and attorney accountability.

2269. Brann helped maintain monopoly power by reinforcing federal-court structures in which procedural complexity, pleading standards, judicial discretion, sanctions risk, recusal standards, electronic filing expectations, local rules, and attorney-centered credibility determine whether malpractice victims, legal-aid clients, injured consumers, court users, and legal-services reformers can obtain meaningful relief or alternative court-access assistance.

2270. Brann engaged in exclusionary conduct because federal judicial authority preserves lawyer-only and judge-approved control over court-access assistance, federal-court access, professional legitimacy, referral credibility, malpractice redress, public-facing legal authority, public-service legal programs, and court-mediated legitimacy while burdening nonlawyer assistance, federal-court navigation, malpractice-victim advocacy, and independent accountability.

2271. Brann acted with specific intent and created a dangerous probability of monopoly power because federal judges operate within a profession-controlled

system in which lawyers and judges already control licensing, court access, federal-court access, discipline, referrals, legal-aid legitimacy, professional legitimacy, sanctions exposure, procedural access, and the practical administration of court-facing legal help.

2272. Brann caused antitrust injury because federal-court gatekeeping reduced meaningful court-access assistance, chilled service expansion by future attorneys and nonprofit providers, restricted nonlawyer and independent assistance, preserved lawyer-centered litigation control, reduced malpractice accountability, and kept Grohol and the class dependent on scarce attorney-controlled channels.

2273. Heath Brosius participated in monopolization, attempted monopolization, and conspiracy to monopolize through prosecutorial authority, Snyder County public-office authority, court-facing power, prosecutor-connected service access, public legal legitimacy, victim-service influence, domestic-violence service influence, STOP Coalition involvement, public-service networks, and local referral systems.

2274. Brosius helped maintain monopoly power by reinforcing prosecutorial and county-connected structures in which prosecutors, judges, service providers, legal-aid actors, domestic-violence systems, victim-service systems, public-service actors, and lawyer-controlled institutions control referrals, coalition access, service

legitimacy, professional recognition, and the practical ability of competing nonprofit providers to reach vulnerable clients.

2275. Brosius engaged in exclusionary conduct because prosecutors exercise public legal power while remaining active members of the licensed profession that controls admission, discipline, referrals, court access, public legal authority, professional legitimacy, and local public-service pathways.

2276. Brosius acted with specific intent and created a dangerous probability of monopoly power because prosecutor-connected systems affect whether victims, survivors, legal-aid clients, disabled persons, veterans, disabled veterans, and other vulnerable persons receive only incumbent-approved legal-service channels or meaningful conflict-free alternatives.

2277. Brosius caused antitrust injury because prosecutorially connected gatekeeping reduced legal-service competition, restricted public-service legal access, limited conflict-free substitute-provider access, discouraged independent nonprofit providers, reduced nonlawyer assistance, and preserved closed legal-service channels in markets serving vulnerable clients.

2278. Jessica Chapman participated in monopolization, attempted monopolization, and conspiracy to monopolize through lawyer status, court-adjacent authority, county-court access, local professional legitimacy, legal-services participation, public-service legal networks, referral-connected structures, legal-aid-connected

systems, courthouse legitimacy, and professional channels affecting whether vulnerable clients could access substitute legal-service providers.

2279. Chapman helped maintain monopoly power by reinforcing courthouse-facing and local legal-service systems in which lawyer approval, legal-aid approval, court approval, professional approval, public-service program approval, courthouse credibility, referral control, professional status, lawyer supervision, and lawyer-controlled programs operate as gatekeeping credentials for legitimacy, court access, referrals, public trust, and access to public-facing legal-help opportunities.

2280. Chapman engaged in exclusionary conduct because local legal actors preserve monopoly power when they make court access, legal competence, attorney accountability, public legal legitimacy, court-user assistance, professional discipline, and courthouse participation depend on lawyer approval rather than consumer demand, service quality, accountability, or open competition.

2281. Chapman acted with specific intent and created a dangerous probability of monopoly power because lawyers already control licensing, court access, discipline, referrals, legal-aid legitimacy, professional legitimacy, bar legitimacy, courthouse legitimacy, local legal legitimacy, public-service legitimacy, and the practical administration of court-facing legal help.

2282. Chapman caused antitrust injury because her conduct reduced independent legal help, meaningful accountability, competitive alternatives, courthouse-access alternatives, court-access alternatives, public-service alternatives, referral alternatives, and fair market conditions in the provision of legal services and court-access assistance.

2283. William R. Christman III participated in monopolization, attempted monopolization, and conspiracy to monopolize through Pennsylvania Bar Association general-counsel authority, attorney status, statewide bar influence, professional-legitimacy control, staff and volunteer communication channels, public-service legal-program authority, Wills for Heroes access, bar-connected service systems, and statewide professional structures that affect legal-service access.

2284. Christman helped maintain monopoly power by reinforcing statewide bar structures in which lawyer approval, lawyer supervision, bar affiliation, statewide professional authority, public-service gatekeeping, referral control, and lawyer-controlled programs operate as gatekeeping credentials for legitimacy, court access, referrals, public-service access, and public trust.

2285. Christman engaged in exclusionary conduct because statewide bar counsel, leaders, and professional actors preserve monopoly power when they use institutional authority to protect lawyer-controlled programs from competition,

criticism, malpractice-victim advocacy, nonlawyer legal-support models, and independent accountability mechanisms.

2286. Christman acted with specific intent and created a dangerous probability of monopoly power because statewide bar authority affects licensing norms, discipline narratives, court-access legitimacy, public-service legitimacy, referral credibility, communications with staff and volunteers, and whether independent legal-service providers can enter or expand outside lawyer-approved channels.

2287. Christman caused antitrust injury because his conduct reduced independent legal help, restricted public-service legal access, limited communication channels, suppressed competitive alternatives, reduced malpractice-victim accountability options, and kept Grohol and the class dependent on lawyer-controlled institutions for relief from lawyer-caused harm.

2288. Mary Beth Clark participated in monopolization, attempted monopolization, and conspiracy to monopolize through lawyer status, North Penn Legal Services relationships, legal-aid influence, Union–Snyder County Bar Association influence, local bar governance, referral structures, public-service legal programming, Wills for Heroes planning, PFA-fee access, Judicare-related access, and local professional legitimacy.

2289. Clark helped maintain monopoly power by reinforcing legal-aid and local-bar systems in which incumbent lawyers control referrals, fee opportunities, pro

bono opportunities, public-service programs, committee access, intake access, legal-aid legitimacy, local professional acceptance, and the practical ability of competing providers to serve low-income clients and malpractice victims.

2290. Clark engaged in exclusionary conduct because legal-aid actors and local bar participants preserve monopoly power when they treat criticism of legal-aid malpractice, threatened litigation, malpractice-victim advocacy, nonlawyer support, and alternative legal-help models as threats to the institution or profession rather than accountability mechanisms that protect clients.

2291. Clark acted with specific intent and created a dangerous probability of monopoly power because legal-aid actors and local bar participants can decide which clients receive help, which conflicts matter, which malpractice concerns receive attention, which staff attorneys retain legitimacy, which outside providers receive referrals, and which attorneys receive local professional approval.

2292. Clark caused antitrust injury because her conduct reduced client choice, suppressed conflict-free substitute counsel, limited public-service opportunities, impaired referral competition, reduced legal-aid accountability, burdened future attorneys and nonprofit competitors, and reduced the legal-service options available to Grohol and the class.

2293. Committee on Rules of Practice and Procedure participated in monopolization, attempted monopolization, and conspiracy to monopolize through

federal rulemaking authority, federal procedural policy, practice-rule authority, court-access influence, attorney-centered litigation requirements, federal practice norms, professional legitimacy structures, judicial-administration influence, and lawyer-centered procedural systems.

2294. Committee on Rules of Practice and Procedure helped maintain monopoly power by recommending, maintaining, or legitimizing procedural, pleading, discovery, motion, evidentiary, appellate, filing, and federal-court-access structures that make meaningful participation difficult for malpractice victims, injured legal consumers, low-income clients, nonlawyer competitors, court navigators, community legal workers, and legal-services reformers.

2295. Committee on Rules of Practice and Procedure engaged in exclusionary conduct because federal procedural systems preserve lawyer-only and judge-only legitimacy when they make legal help practically dependent on licensed attorneys while denying comparable recognition to nonlawyer court-access assistance, procedural assistance, malpractice-victim advocacy, and competing nonprofit legal-help models.

2296. Committee on Rules of Practice and Procedure acted with specific intent and created a dangerous probability of monopoly power because federal procedural rulemaking shapes who can enter court, present claims effectively, challenge

attorney misconduct, navigate federal litigation, and obtain federal procedural legitimacy in systems dominated by lawyers and judges.

2297. Committee on Rules of Practice and Procedure caused antitrust injury because lawyer-centered federal procedural systems increased dependence on licensed attorneys, restricted alternative legal assistance, suppressed court-navigation competition, reduced federal court-access alternatives, and kept Grohol, malpractice victims, and future market entrants dependent on lawyer-approved procedural gatekeepers.

2298. Commonwealth of Pennsylvania participated in monopolization, attempted monopolization, and conspiracy to monopolize through sovereign authority, statutory authority, public-funding authority, court-system creation, attorney-regulation support, unauthorized-practice structures, legal-aid funding structures, public-service systems, and institutional legitimacy conferred on lawyer-controlled systems.

2299. Commonwealth of Pennsylvania helped maintain monopoly power by supporting state-sanctioned licensing, court access, unauthorized-practice rules, legal-aid systems, disciplinary systems, public-service access, referral systems, and professional-legitimacy systems that preserve lawyer dominance and restrict nonlawyer competition.

2300. Commonwealth of Pennsylvania engaged in exclusionary conduct because state-created and state-funded systems channel malpractice victims, low-income clients, court users, and legal-services reformers through lawyer-controlled institutions for representation, discipline, court access, and accountability while excluding independent alternatives from equal legitimacy.

2301. Commonwealth of Pennsylvania acted with specific intent and created a dangerous probability of monopoly power because state authority can confer public power, funding, statutory legitimacy, court legitimacy, and enforcement support on systems that protect incumbent lawyers, legal-aid providers, bar-connected actors, disciplinary actors, and court-connected structures from outside competition.

2302. Commonwealth of Pennsylvania caused antitrust injury because state-supported lawyer-control structures reduced client choice, suppressed legal-service competition, reduced malpractice-redress output, burdened future attorneys and nonlawyer competitors, and preserved incumbent legal institutions from market accountability.

2303. Mark J. Conway participated in monopolization, attempted monopolization, and conspiracy to monopolize through federal judicial authority, bankruptcy-court authority, sanctions authority, recusal authority, docket authority, hearing authority, attorney-practice authority, local-rule authority, courtroom control, and

federal bankruptcy structures affecting bankruptcy and debt-relief legal-service markets.

2304. Conway helped maintain monopoly power by reinforcing bankruptcy and federal-court systems in which judges, lawyers, bankruptcy courts, local rules, sanctions risk, recusal standards, attorney-practice expectations, filing practices, and judicial credibility determinations control whether debtors, homeowners, low-income litigants, nonlawyer competitors, court navigators, and legal-services reformers can obtain or provide meaningful bankruptcy-related assistance.

2305. Conway engaged in exclusionary conduct because bankruptcy judges and court-connected actors preserve lawyer-centered control over bankruptcy relief, debt-relief advocacy, attorney practice, sanctions exposure, professional legitimacy, and court access while burdening alternative assistance, nonlawyer support, malpractice-victim advocacy, and criticism of court-connected incumbents.

2306. Conway acted with specific intent and created a dangerous probability of monopoly power because bankruptcy courts and federal judicial actors already control bankruptcy access, attorney practice, debt-relief advocacy, court legitimacy, sanctions exposure, local rules, filing expectations, and the practical conditions under which competing legal-service models may operate.

2307. Conway caused antitrust injury because bankruptcy-court gatekeeping reduced competition in debt-relief and bankruptcy-related legal services, chilled future attorneys and legal-services reformers, increased dependence on licensed lawyers, reduced access to independent accountability mechanisms, and preserved lawyer-centered control over debtors, homeowners, low-income litigants, and malpractice victims.

2308. Court of Judicial Discipline participated in monopolization, attempted monopolization, and conspiracy to monopolize through judicial-discipline authority, judicial-accountability gatekeeping, court-connected institutional legitimacy, judge-regulation structures, professional-accountability systems, and a lawyer-and-judge-controlled accountability framework affecting legal-service output and attorney accountability.

2309. Court of Judicial Discipline helped maintain monopoly power by preserving a judicial-accountability structure that requires malpractice victims, court users, lawyer critics, nonlawyer competitors, legal-services reformers, and future attorneys to seek accountability through judge-centered and lawyer-centered mechanisms rather than independent consumer-protection or market-accountability channels.

2310. Court of Judicial Discipline engaged in exclusionary conduct because judge-controlled and lawyer-connected accountability structures preserve court-centered

legal-market control, discipline-related gatekeeping, judicial legitimacy, professional immunity norms, and court-system credibility while restricting independent accountability and discouraging challenges to judicial and lawyer misconduct.

2311. Court of Judicial Discipline acted with specific intent and created a dangerous probability of monopoly power because judicial accountability affects attorney accountability, court access, professional legitimacy, discipline-related safety, and the willingness of attorneys, advocates, malpractice victims, and legal-services reformers to challenge judges, lawyers, courts, and lawyer-controlled institutions.

2312. Court of Judicial Discipline caused antitrust injury because judicial-accountability gatekeeping reduced independent oversight, chilled criticism, limited malpractice-redress pathways, preserved court-centered legal-market control, and kept injured legal consumers dependent on institutions aligned with the same profession that controls legal services.

2313. Robert Cravitz participated in monopolization, attempted monopolization, and conspiracy to monopolize through lawyer status, local attorney networks, Union–Snyder County Bar Association participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service

participation, and court-connected local legal structures affecting local legal-service markets.

2314. Cravitz helped maintain monopoly power by reinforcing local professional structures in which established lawyers, bar participants, court-connected actors, and public-service participants control credibility, referrals, public-service access, local professional acceptance, attorney cooperation, and the practical ability to challenge lawyer misconduct.

2315. Cravitz engaged in exclusionary conduct because local attorney networks preserve monopoly power when they collectively isolate critics, protect incumbent lawyers, discourage malpractice accountability, restrict public-service participation, and make market entry difficult for future attorneys, nonlawyer competitors, independent advocates, and legal-services reformers who refuse to accept lawyer-controlled norms.

2316. Cravitz acted with specific intent and created a dangerous probability of monopoly power because local lawyer networks control informal market inputs, including reputation, referrals, attorney cooperation, public-service access, meeting access, local credibility, litigation-response narratives, and access to lawyer-approved legal-service opportunities.

2317. Cravitz caused antitrust injury because local lawyer-network gatekeeping reduced access to referrals, public-service participation, professional legitimacy,

attorney cooperation, client channels, and competitive legal-service opportunities for malpractice victims, injured consumers, future attorneys, and nonlawyer competitors.

2318. Doe Defendants 1 through 200 participated in monopolization, attempted monopolization, and conspiracy to monopolize through membership in defendant entities, listserv participation, court-connected roles, bar-connected roles, legal-aid roles, public-service roles, veterans-service roles, referral-network roles, disciplinary-adjacent roles, funding-adjacent roles, and professional networks that preserve lawyer control over legal services and attorney accountability.

2319. Doe Defendants 1 through 200 helped maintain monopoly power by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from professional structures that excluded malpractice victims, injured legal consumers, low-income clients, nonlawyer competitors, legal-services reformers, and lawyer critics from equal access to referrals, programs, court systems, public-service networks, legal-aid networks, and professional legitimacy.

2320. Doe Defendants 1 through 200 engaged in exclusionary conduct because unknown bar participants, court-connected participants, public-service actors, legal-aid actors, referral actors, and professional-network participants preserve monopoly power through reputational harm, access denial, referral loss, committee

exclusion, program exclusion, professional silence, and credibility loss against future market entrants who challenge lawyer misconduct.

2321. Doe Defendants 1 through 200 acted with specific intent and created a dangerous probability of monopoly power because their collective roles reinforce the same lawyer-controlled professional networks, public-service networks, referral channels, court-connected systems, and accountability barriers that determine who may enter, compete, criticize, and serve clients with institutional credibility.

2322. Doe Defendants 1 through 200 caused antitrust injury because collective professional gatekeeping reduced competitive entry, suppressed nonlawyer assistance, reduced independent accountability services, limited malpractice-redress pathways, and preserved lawyer-controlled access to clients, courts, public programs, referrals, funding, and professional legitimacy.

2323.

2324. Federal Judicial Center participated in monopolization, attempted monopolization, and conspiracy to monopolize through federal judicial-education authority, federal judicial-administration influence, research and training functions, court-system legitimacy, professional norms, judicial-policy influence, and institutional support for lawyer-and-judge-controlled federal court structures.

2325. Federal Judicial Center helped maintain monopoly power by reinforcing federal judicial norms, federal court practices, judicial training, court-administration practices, professionalism narratives, and court-access expectations that preserve lawyer-centered control over litigation, legal accountability, court navigation, malpractice redress, and attorney discipline.

2326. Federal Judicial Center engaged in exclusionary conduct because federal judicial education and court-system research can preserve lawyer-and-judge-controlled legitimacy by defining court access, professionalism, procedural competence, attorney accountability, and federal-court participation through lawyer-centered norms rather than open competition, consumer need, or independent accountability.

2327. Federal Judicial Center acted with specific intent and created a dangerous probability of monopoly power because federal judicial training and policy influence affect how courts treat pro se litigants, nonlawyer assistance, lawyer critics, malpractice victims, court-access reformers, and future attorneys challenging lawyer-controlled procedural and professional systems.

2328. Federal Judicial Center caused antitrust injury because federal judicial-system legitimacy and training structures reduced competitive accountability, preserved lawyer-centered litigation control, limited meaningful nonlawyer

assistance, chilled court-access reform, and kept injured legal consumers dependent on lawyer-dominated federal court processes.

2329. Lori R. Hackenberg participated in monopolization, attempted monopolization, and conspiracy to monopolize through judicial office, courthouse-program influence, local legal authority, court-connected professional networks, local bar relationships, public-service access, professional legitimacy, and lawyer-and-judge-controlled legal structures affecting local court-access and public-service legal markets.

2330. Hackenberg helped maintain monopoly power by reinforcing court-connected structures in which judges, lawyers, courthouse actors, bar participants, and public-service networks control recognition, access, credibility, program participation, and the ability to challenge lawyer misconduct without professional retaliation.

2331. Hackenberg engaged in exclusionary conduct because judicial actors preserve monopoly power when they make public-service opportunities, courthouse legitimacy, court-adjacent access, professional credibility, and practical court access depend on lawyer-and-judge approval rather than consumer demand, service quality, accountability, or open competition.

2332. Hackenberg acted with specific intent and created a dangerous probability of monopoly power because judicial actors influence whether malpractice victims,

injured clients, legal-services reformers, future attorneys, and nonlawyer competitors receive neutral treatment, public credibility, courthouse access, public-service opportunities, and meaningful accountability when challenging lawyers and court-connected actors.

2333. Hackenberg caused antitrust injury because judicially connected professional gatekeeping reduced alternative legal-service access, limited public-service competition, chilled future attorney criticism, reduced malpractice-redress opportunities, and preserved local lawyer-centered control over court-adjacent legal services.

2334. International Legal Aid Group participated in monopolization, attempted monopolization, and conspiracy to monopolize through international legal-aid influence, comparative legal-aid legitimacy, professional-network authority, legal-aid policy recognition, legal-aid institutional credibility, and support for lawyer-centered legal-aid structures that preserve incumbent legal-aid control.

2335. International Legal Aid Group helped maintain monopoly power by reinforcing legal-aid norms that treat lawyer-controlled legal aid, lawyer-administered access to justice, and institutional provider networks as the proper channels for low-income legal services while excluding nonlawyer competitors, independent accountability providers, conflict-free malpractice-redress alternatives, and competing service models from equal legitimacy.

2336. International Legal Aid Group engaged in exclusionary conduct because legal-aid legitimacy structures preserve monopoly power when they protect incumbent providers, professionalize access-to-justice policy around lawyer-controlled institutions, and deny comparable recognition to nonlawyer assistance, client-accountability models, and conflict-free alternatives.

2337. International Legal Aid Group acted with specific intent and created a dangerous probability of monopoly power because legal-aid legitimacy affects funding, referrals, policy acceptance, public-service credibility, institutional recognition, and the ability of future attorneys, nonprofit competitors, and nonlawyer competitors to challenge legal-aid malpractice, conflicts, abandonment, and failure to provide substitute counsel.

2338. International Legal Aid Group caused antitrust injury because its legal-aid legitimacy structures reduced legal-aid competition, limited conflict-free alternatives, suppressed independent client-accountability services, preserved incumbent provider control, and kept low-income clients and malpractice victims dependent on lawyer-controlled legal-aid systems.

2339. Judicial Conduct Board of Pennsylvania participated in monopolization, attempted monopolization, and conspiracy to monopolize through judicial-discipline screening authority, judicial-accountability gatekeeping, complaint-intake authority, investigative discretion, professional-accountability influence,

court-connected legitimacy, and lawyer-and-judge-controlled accountability structures affecting legal-service markets.

2340. Judicial Conduct Board of Pennsylvania helped maintain monopoly power by maintaining a judicial-accountability system that routes complaints against judges through institutional actors connected to the same court-centered professional environment that legal-services reformers, malpractice victims, injured clients, and attorney critics must challenge.

2341. Judicial Conduct Board of Pennsylvania engaged in exclusionary conduct because judicial-accountability gatekeeping preserves court-centered and lawyer-centered monopoly power when complaints, investigations, accountability decisions, and public legitimacy remain inside professional systems aligned with judges, lawyers, courts, and court-connected actors.

2342. Judicial Conduct Board of Pennsylvania acted with specific intent and created a dangerous probability of monopoly power because judicial discipline affects whether lawyers, judges, courts, and court-connected actors face meaningful consequences when they punish criticism, restrict court access, burden malpractice victims, or protect attorney misconduct from outside accountability.

2343. Judicial Conduct Board of Pennsylvania caused antitrust injury because judicial-accountability gatekeeping reduced independent oversight, discouraged future attorneys from challenging judges and lawyers, limited malpractice-redress

pathways, preserved court-centered professional control, and kept injured consumers dependent on lawyer-and-judge-controlled accountability systems.

2344. Heather Kelly participated in monopolization, attempted monopolization, and conspiracy to monopolize through North Penn Legal Services management authority, legal-aid influence, lawyer status, public-funded legal-service authority, supervision practices, grievance-response practices, client-service systems, intake structures, and legal-aid structures that preserve incumbent provider control over low-income clients.

2345. Kelly helped maintain monopoly power by reinforcing a legal-aid structure in which incumbent providers control client intake, case assignment, representation status, referrals, supervision, correction of malpractice, client repair, conflict determinations, and institutional narratives after legal-aid clients suffer abandonment, missed hearings, poor communication, or conflict-related harm.

2346. Kelly engaged in exclusionary conduct because legal-aid managers and legal-aid lawyers preserve monopoly power when they fail to create conflict-free substitute counsel systems, fail to correct client harm, limit replacement-provider access, preserve incumbent provider credibility, and keep vulnerable clients dependent on lawyer-controlled legal-aid institutions.

2347. Kelly acted with specific intent and created a dangerous probability of monopoly power because legal-aid management authority controls representation

status, client repair, case assignments, supervision, grievance responses, substitute-provider access, and the institutional legitimacy that determines whether competing legal-aid providers can enter or expand.

2348. Kelly caused antitrust injury because legal-aid gatekeeping reduced conflict-free substitute counsel, limited client choice, suppressed independent legal-aid accountability, discouraged future legal-aid competitors, reduced malpractice-redress services, and preserved incumbent control over low-income clients, malpractice victims, and injured legal consumers.

2349. Brian Kerstetter participated in monopolization, attempted monopolization, and conspiracy to monopolize through prosecutorial authority, public-office authority, court-facing power, advisory-board influence, local legal-system authority, public-service participation, county-connected referral structures, and lawyer-centered professional networks that preserve attorney control over public legal systems.

2350. Kerstetter helped maintain monopoly power by reinforcing structures in which prosecutors, courts, advisory boards, public-service networks, bar-connected actors, county officials, and lawyer-controlled institutions control credibility, access, referrals, public legitimacy, professional safety, and accountability channels for lawyers and nonlawyer competitors who challenge legal-system misconduct.

2351. Kerstetter engaged in exclusionary conduct because prosecutors are licensed lawyers who exercise public authority in legal systems while benefitting from professional rules, court access, disciplinary norms, public-service networks, and public legal legitimacy that treat lawyers as the only legitimate legal actors and accountability gatekeepers.

2352. Kerstetter acted with specific intent and created a dangerous probability of monopoly power because prosecutorial and advisory-board influence affects whether legal-services reformers, malpractice victims, nonlawyer competitors, and future attorneys can challenge local legal institutions while maintaining credibility, referrals, court-adjacent access, and public-service access.

2353. Kerstetter caused antitrust injury because prosecutorial and advisory-board gatekeeping reduced legal-service competition, chilled future attorneys and legal-services reformers, restricted public-service access, limited nonlawyer assistance, reduced referral alternatives, and preserved lawyer-centered control over professional legitimacy and attorney accountability.

2354. Robert Leadbeter participated in monopolization, attempted monopolization, and conspiracy to monopolize through public-office authority, public-facing veterans-event influence, public-service legitimacy, event-access influence, community-recognition authority, veterans-service access, public-official

communications, and coordination with lawyer-controlled or bar-connected public-service structures.

2355. Leadbeter helped maintain monopoly power by reinforcing public-facing service systems in which public officials, event gatekeepers, bar-connected actors, veterans-service networks, public-service channels, and community institutions control whether independent legal-service providers receive access to public audiences, community legitimacy, referral opportunities, client outreach, and public trust.

2356. Leadbeter engaged in exclusionary conduct because public-facing event and public-official gatekeeping preserves monopoly power when it routes community legal-service access through lawyer-approved, public-official-approved, incumbent-approved, or bar-connected channels rather than open competition among willing legal-service providers.

2357. Leadbeter acted with specific intent and created a dangerous probability of monopoly power because public-facing legal-service access affects whether future attorneys, independent advocates, nonprofit providers, disabled-veterans advocates, nonlawyer competitors, and legal-services reformers can build public trust outside bar-controlled, lawyer-approved, or incumbent public-service channels.

2358. Leadbeter caused antitrust injury because public-official and veterans-event gatekeeping reduced community outreach, public-service competition, referral access, veterans-service access, independent legal-service legitimacy, nonlawyer assistance, and available legal-service output for Grohol, veterans, disabled veterans, legal-aid clients, and the class.

2359. Legal Services Corporation participated in monopolization, attempted monopolization, and conspiracy to monopolize through federal legal-aid funding authority, grantee oversight, regulatory authority, compliance structures, legal-aid legitimacy, national legal-aid influence, provider recognition, and support for lawyer-controlled civil legal-aid systems.

2360. Legal Services Corporation helped maintain monopoly power by funding and legitimizing a legal-aid structure in which dominant regional providers control intake, eligibility, referrals, case acceptance, conflicts, client repair, substitute-provider access, public legal-aid credibility, and grievance responses without creating meaningful independent alternatives when grantees harm clients.

2361. Legal Services Corporation engaged in exclusionary conduct because federal legal-aid funding channels low-income clients through lawyer-controlled nonprofits and lawyer-supervised provider networks while excluding nonlawyer competitors, independent accountability advocates, conflict-free substitute systems,

and alternative legal-service providers from equal funding, legitimacy, and referral access.

2362. Legal Services Corporation acted with specific intent and created a dangerous probability of monopoly power because federal legal-aid structures affect which providers receive money, recognition, client access, public legitimacy, referral credibility, grantee status, compliance protection, and market access in low-income civil legal-service markets.

2363. Legal Services Corporation caused antitrust injury because its funding and oversight structure reduced client choice, reduced conflict-free representation, reduced malpractice-redress output, limited independent legal-aid competition, suppressed substitute-provider access, and kept Grohol, low-income clients, and malpractice victims dependent on incumbent lawyer-controlled providers.

2364. Kathleen Lincoln participated in monopolization, attempted monopolization, and conspiracy to monopolize through lawyer status, Union–Snyder County Bar Association officer status, local bar governance, treasurer authority, court-connected professional relationships, settlement-related professional influence, and local legal networks that preserve lawyer-centered control over credibility and cooperation.

2365. Lincoln helped maintain monopoly power by reinforcing a local bar environment in which lawyers who criticize ethical violations, courthouse

practices, prothonotary conduct, legal-aid malpractice, bar retaliation, or lawyer-controlled public-service structures risk professional isolation, settlement consequences, loss of project support, and loss of bar-connected cooperation.

2366. Lincoln engaged in exclusionary conduct because local bar officers and lawyer networks preserve monopoly power when they control informal but essential market inputs, including trust, referrals, settlement cooperation, public-service support, committee access, local legitimacy, attorney cooperation, and professional relationships needed by future attorneys and competing legal-service providers.

2367. Lincoln acted with specific intent and created a dangerous probability of monopoly power because local bar actors can determine whether malpractice-accountability advocates, future attorneys, nonlawyer competitors, and competing nonprofit providers can criticize lawyers while maintaining referrals, cooperation, professional credibility, public-service participation, and local market access.

2368. Lincoln caused antitrust injury because local bar pressure reduced competitive legal-service access, chilled future attorney criticism, discouraged malpractice-accountability work, impaired public-service cooperation, restricted referral alternatives, and preserved incumbent lawyer networks from meaningful accountability.

2369. Gabriele Miller-Wagner participated in monopolization, attempted monopolization, and conspiracy to monopolize through Pennsylvania Bar Association pro bono authority, statewide Wills for Heroes coordination, volunteer recruitment influence, public-service legal-program access, scheduling authority, professional-legitimacy control, and statewide bar-connected legal-service networks.

2370. Miller-Wagner helped maintain monopoly power by reinforcing statewide pro bono structures in which bar-connected actors control access to public-service programs, volunteers, event legitimacy, regional outreach, veterans-service channels, public-facing program credibility, and professional credibility for attorneys and legal-service providers who seek to operate outside incumbent lawyer-controlled systems.

2371. Miller-Wagner engaged in exclusionary conduct because statewide pro bono coordination preserves monopoly power when access to clients, veterans, disabled veterans, volunteers, referral sources, public-service partners, event credibility, and professional recognition depends on lawyer-approved programs rather than open competition among willing providers.

2372. Miller-Wagner acted with specific intent and created a dangerous probability of monopoly power because statewide bar pro bono leadership affects which attorneys, nonprofit providers, nonlawyer competitors, legal-services reformers,

veterans-service advocates, students, volunteers, and public-service partners can reach clients, recruit volunteers, build public trust, and obtain professional legitimacy.

2373. Miller-Wagner caused antitrust injury because pro bono and public-service gatekeeping reduced legal-service output, limited future attorney participation, suppressed independent service providers, restricted access to veterans and vulnerable clients, reduced referral alternatives, and preserved bar-controlled program structures from competitive accountability.

2374. Lori Molloy participated in monopolization, attempted monopolization, and conspiracy to monopolize through North Penn Legal Services executive authority, legal-aid management, public-funding control, attorney supervision, intake systems, client-service systems, grievance-response authority, malpractice-response systems, and institutional relationships with courts, funders, bar actors, referral sources, and public-service networks.

2375. Molloy helped maintain monopoly power by reinforcing a legal-aid structure in which incumbent providers control referrals, employment narratives, client access, staff communications, supervision, correction of malpractice, case assignments, conflict determinations, and institutional credibility after legal-aid clients suffer missed hearings, abandoned files, poor communication, or unclear representation status.

2376. Molloy engaged in exclusionary conduct because executive legal-aid authority preserves monopoly power when incumbent providers retain public funds, referrals, client trust, and institutional status while limiting conflict-free substitutes, independent accountability work, competing nonprofit legal-service alternatives, and market pressure to increase actual service output.

2377. Molloy acted with specific intent and created a dangerous probability of monopoly power because executive legal-aid control affects funding status, referral credibility, intake control, supervision, client repair, substitute-provider access, grievance responses, public legitimacy, and whether competing providers can enter or expand in low-income civil legal-service markets.

2378. Molloy caused antitrust injury because legal-aid executive gatekeeping reduced client choice, limited substitute counsel, suppressed competing nonprofit providers, reduced malpractice-redress services, restricted conflict-free alternatives, and kept low-income clients and injured legal consumers dependent on incumbent lawyer-controlled legal-aid structures.

2379. Jenna Ann Neidig participated in monopolization, attempted monopolization, and conspiracy to monopolize through lawyer status, Union–Snyder County Bar Association participation, officer or former-officer status, local bar governance, listserv participation, meeting-record structures, public-service legal programming, and court-connected professional networks.

2380. Neidig helped maintain monopoly power by reinforcing local bar structures in which established lawyers and bar officers control meeting access, records, listservs, committee participation, public-service programs, local professional legitimacy, referral credibility, attorney cooperation, and the practical ability to challenge lawyer misconduct without retaliation.

2381. Neidig engaged in exclusionary conduct because local bar governance and record practices preserve monopoly power when they determine who receives credibility, who receives access, who can document objections, who can challenge governance abuses, and who can participate in legal-service opportunities outside incumbent lawyer-approved channels.

2382. Neidig acted with specific intent and created a dangerous probability of monopoly power because local bar systems control practical market inputs, including meeting access, listserv access, records, committee access, public-service programming, local professional reputation, referral credibility, and participation in public-facing legal-service channels.

2383. Neidig caused antitrust injury because local bar gatekeeping reduced public-service access, referral opportunities, professional credibility, meeting access, committee access, competitive legal-service opportunities, and independent accountability options for future attorneys, nonlawyer competitors, malpractice victims, and legal-services reformers.

2384. North Penn Legal Services, Inc. participated in monopolization, attempted monopolization, and conspiracy to monopolize through public legal-aid funding, regional provider authority, client intake control, case-assignment control, attorney supervision, representation-status control, referral relationships, legal-aid credibility, grievance systems, and institutional control over low-income civil legal services.

2385. North Penn Legal Services, Inc. helped maintain monopoly power by reinforcing a legal-aid structure in which dominant providers control access to eligible clients, referrals, public funding, staff assignments, case handling, conflict determinations, client repair, substitute-provider access, and institutional narratives after legal-aid clients suffer attorney abandonment, malpractice, missed hearings, poor communication, or unclear representation status.

2386. North Penn Legal Services, Inc. engaged in exclusionary conduct because regional legal-aid dominance allows a lawyer-controlled nonprofit to keep money, authority, referrals, and public legitimacy while harmed clients lack meaningful replacement counsel and competing providers lack equal access to funding, referrals, and institutional credibility.

2387. North Penn Legal Services, Inc. acted with specific intent and created a dangerous probability of monopoly power because its provider role controls intake, case assignments, legal-aid legitimacy, referral credibility, representation status,

conflict decisions, client repair, grievance responses, and practical access to low-income civil legal help in its service area.

2388. North Penn Legal Services, Inc. caused antitrust injury because incumbent legal-aid control reduced legal-service output, limited client choice, restricted conflict-free substitute counsel, suppressed competing nonprofit providers, reduced malpractice accountability, and kept Grohol and similarly situated low-income clients dependent on the same provider structure that failed them.

2389. Northumberland County Prothonotary's Office participated in monopolization, attempted monopolization, and conspiracy to monopolize through public filing authority, docket access, court-record access, courthouse administration, public-office legitimacy, service and filing practices, and court-access structures that affect who can use the courts effectively.

2390. Northumberland County Prothonotary's Office helped maintain monopoly power by reinforcing court-access systems in which filing practices, docket practices, record access, clerk interactions, courthouse procedures, and local court administration determine whether injured clients, nonlawyer assistants, court navigators, and legal-services reformers can participate effectively.

2391. Northumberland County Prothonotary's Office engaged in exclusionary conduct because filing and docket systems preserve lawyer-centered control when procedural fluency, filing knowledge, docket navigation, local courthouse norms,

and public-office credibility favor licensed lawyers and burden independent assistance, nonlawyer support, and injured consumers outside lawyer-controlled channels.

2392. Northumberland County Prothonotary’s Office acted with specific intent and created a dangerous probability of monopoly power because courthouse filing systems, record systems, service practices, docket access, clerk interactions, and local procedure affect whether malpractice victims and competing assistance models can obtain practical court access without licensed-lawyer control.

2393. Northumberland County Prothonotary’s Office caused antitrust injury because filing and docket gatekeeping reduced court-access competition, restricted practical legal assistance, limited nonlawyer court-navigation support, reduced malpractice-victim access to remedies, and preserved lawyer-centered control over the systems injured clients must use to obtain relief.

2394. Office of Attorney General participated in monopolization, attempted monopolization, and conspiracy to monopolize through public legal authority, state-law enforcement authority, attorney status, public-office legitimacy, legal-market influence, state litigation authority, consumer-protection influence, and participation in professional structures that preserve lawyer control over legal services and attorney accountability.

2395. Office of Attorney General helped maintain monopoly power by reinforcing a system in which government lawyers, state legal offices, courts, disciplinary actors, bar-connected actors, public agencies, and lawyer-controlled institutions control legal legitimacy, enforcement credibility, public legal narratives, consumer-protection pathways, and access to accountability mechanisms.

2396. Office of Attorney General engaged in exclusionary conduct because state legal authority can confer legitimacy on lawyer-controlled regulatory systems, defend attorney-centered structures, protect public legal institutions, and limit independent consumer-protection accountability against lawyers and legal-service providers.

2397. Office of Attorney General acted with specific intent and created a dangerous probability of monopoly power because state enforcement authority affects whether malpractice victims, legal consumers, nonlawyer competitors, legal-services reformers, and competing providers receive independent accountability or remain dependent on attorney-controlled enforcement and discipline systems.

2398. Office of Attorney General caused antitrust injury because public legal gatekeeping reduced independent accountability, chilled legal-services reformers, preserved attorney-controlled enforcement channels, limited competitive

alternatives, and reduced the practical ability of malpractice victims and injured legal consumers to obtain non-lawyer-controlled remedies.

2399. Office of Disciplinary Counsel participated in monopolization, attempted monopolization, and conspiracy to monopolize through attorney-discipline authority, complaint-screening authority, investigatory discretion, charging authority, professional-regulation authority, disciplinary legitimacy, and lawyer-controlled accountability structures that determine whether attorney misconduct receives meaningful consequences.

2400. Office of Disciplinary Counsel helped maintain monopoly power by reinforcing a system in which lawyer misconduct, malpractice reporting, peer reporting, ethics complaints, attorney criticism, and lawyer-accountability efforts must pass through disciplinary channels controlled by lawyers and lawyer-adjacent institutions rather than independent consumer-protection or market-accountability systems.

2401. Office of Disciplinary Counsel engaged in exclusionary conduct because disciplinary gatekeeping preserves lawyer-controlled professional regulation when complaints, investigations, charging decisions, discipline outcomes, diversion, dismissals, and public legitimacy remain inside the same professional structure that controls legal services.

2402. Office of Disciplinary Counsel acted with specific intent and created a dangerous probability of monopoly power because disciplinary authority controls whether lawyers face accountability, whether attorney critics face professional pressure, whether malpractice victims receive meaningful protection, and whether future attorneys can challenge legal-system misconduct without risking license-based retaliation.

2403. Office of Disciplinary Counsel caused antitrust injury because disciplinary gatekeeping reduced independent accountability services, chilled future attorney criticism, limited malpractice-redress pathways, preserved lawyer-controlled professional regulation, and kept injured legal consumers dependent on the same profession that controls both legal services and attorney discipline.

2404. Pennsylvania Bar Association participated in monopolization, attempted monopolization, and conspiracy to monopolize through statewide bar authority, professional legitimacy, public-service legal programs, pro bono structures, committee access, continuing legal education influence, lawyer networks, Wills for Heroes structures, referral channels, and bar-governance systems that preserve lawyer control over legal-service access.

2405. Pennsylvania Bar Association helped maintain monopoly power by reinforcing statewide bar structures in which bar-connected actors decide who receives professional credibility, public-service access, committee participation,

volunteer channels, program legitimacy, pro bono opportunities, and access to lawyer-approved legal-service networks.

2406. Pennsylvania Bar Association engaged in exclusionary conduct because statewide bar structures preserve monopoly power when lawyers coordinate professional norms, discipline-related narratives, public-service legitimacy, referral access, market acceptance, and public-facing service opportunities while excluding malpractice victims, nonlawyer competitors, legal-services reformers, and future attorneys who challenge lawyer-controlled systems.

2407. Pennsylvania Bar Association acted with specific intent and created a dangerous probability of monopoly power because statewide bar authority affects professional legitimacy, public-service access, pro bono access, committee participation, referral credibility, public-facing legal-help channels, and whether independent providers can enter or expand outside lawyer-approved systems.

2408. Pennsylvania Bar Association caused antitrust injury because statewide bar gatekeeping reduced legal-service output, restricted future attorney participation, suppressed nonlawyer competition, limited malpractice-accountability alternatives, reduced public-service legal access, and preserved incumbent lawyer-controlled public-service and referral channels.

2409. Pennsylvania Board of Law Examiners participated in monopolization, attempted monopolization, and conspiracy to monopolize through bar-admission

authority, examination authority, character-and-fitness screening, licensing gatekeeping, professional-entry control, credentialing authority, and lawyer-regulation structures that determine who may enter the legal-services market as an attorney.

2410. Pennsylvania Board of Law Examiners helped maintain monopoly power by enforcing lawyer-controlled entry requirements that condition legal-market participation on bar passage, character-and-fitness approval, court-approved credentials, law-school pathways, professional conformity, and compliance with professional norms controlled by incumbent lawyers and judges.

2411. Pennsylvania Board of Law Examiners engaged in exclusionary conduct because bar-admission gatekeeping limits entry into the legal-services market, protects incumbents from competition, restricts alternative pathways to practice, and reinforces lawyer-only control over who may provide legal advice, appear in court, receive professional legitimacy, and compete in legal-help markets.

2412. Pennsylvania Board of Law Examiners acted with specific intent and created a dangerous probability of monopoly power because licensing gatekeeping directly controls attorney supply, market entry, professional recognition, lawful practice, court access, and the availability of affordable legal help for consumers who cannot obtain or afford incumbent attorneys.

2413. Pennsylvania Board of Law Examiners caused antitrust injury because licensing gatekeeping reduced legal-service supply, limited future attorney entry, increased barriers to affordable legal assistance, excluded alternative legal-service providers, restricted innovation, and kept malpractice victims and low-income clients dependent on a restricted lawyer-controlled market.

2414. Pennsylvania Department of Human Services participated in monopolization, attempted monopolization, and conspiracy to monopolize through public-funding authority, social-service authority, legal-aid-related funding structures, public-benefits systems, service-provider relationships, referral environments, domestic-violence systems, disability-service systems, and public-service legitimacy affecting access to civil legal help for low-income and vulnerable clients.

2415. Pennsylvania Department of Human Services helped maintain monopoly power by reinforcing public-service systems that channel vulnerable clients through incumbent legal-aid, lawyer-controlled, referral-controlled, agency-connected, and professionalized structures rather than independent, conflict-free, nonlawyer, or lawyer-critical legal-service alternatives.

2416. Pennsylvania Department of Human Services engaged in exclusionary conduct because public-service referral systems preserve monopoly power when benefits, family safety, disability services, domestic-violence services, housing-

related services, and social-service programs route legal need through lawyer-approved providers and deny comparable legitimacy to independent assistance models.

2417. Pennsylvania Department of Human Services acted with specific intent and created a dangerous probability of monopoly power because agency-connected referral systems affect whether vulnerable clients receive only lawyer-approved legal help or meaningful competitive alternatives, conflict-free providers, nonlawyer support, and independent accountability after legal-aid or attorney harm.

2418. Pennsylvania Department of Human Services caused antitrust injury because public-service gatekeeping reduced client choice, restricted conflict-free legal-service alternatives, limited independent accountability for legal-aid failures, preserved incumbent referral channels, and burdened future attorneys and nonlawyer competitors seeking to serve vulnerable clients.

2419. Pennsylvania Department of Military and Veterans Affairs participated in monopolization, attempted monopolization, and conspiracy to monopolize through veterans-service authority, coalition access, public-service recognition, veterans-outreach structures, Wills for Heroes and Wills for Veterans connections, event coordination, public-facing legitimacy, and referral channels within legal-service systems serving veterans and disabled veterans.

2420. Pennsylvania Department of Military and Veterans Affairs helped maintain monopoly power by reinforcing a veterans-service structure in which bar-connected actors, public officials, coalition participants, veterans-service networks, and public-service gatekeepers control which legal-service providers receive access to veterans, disabled veterans, outreach opportunities, referrals, public trust, and public legitimacy.

2421. Pennsylvania Department of Military and Veterans Affairs engaged in exclusionary conduct because veterans-service gatekeeping preserves monopoly power when coalition communications, public recognition, event participation, public-facing outreach, referral legitimacy, and veterans-service credibility flow through lawyer-approved actors rather than open competition among willing providers.

2422. Pennsylvania Department of Military and Veterans Affairs acted with specific intent and created a dangerous probability of monopoly power because veterans legal-service access depends on public recognition, coalition communications, event participation, outreach channels, and referral legitimacy that can be controlled by lawyer-approved actors instead of opened equally to future attorneys, nonlawyer competitors, and independent legal-service providers.

2423. Pennsylvania Department of Military and Veterans Affairs caused antitrust injury because veterans-service gatekeeping reduced legal-service output for

veterans and disabled veterans, limited provider choice, restricted alternative legal-service entry, preserved bar-connected program control, and burdened future attorneys and legal-services reformers seeking equal access to public-facing veterans-service markets.

2424. Pennsylvania General Assembly participated in monopolization, attempted monopolization, and conspiracy to monopolize through statutory authority, public-funding authority, legislative recognition of lawyer-controlled systems, legal-aid funding structures, court-system statutes, attorney-regulation frameworks, unauthorized-practice structures, and legislation or nonlegislation affecting court access, legal aid, and professional accountability.

2425. Pennsylvania General Assembly helped maintain monopoly power by preserving statutes, funding structures, and legal frameworks that allow lawyer-controlled institutions to dominate legal services, legal aid, court access, attorney discipline, public-service access, referral systems, and malpractice accountability without creating competitive alternatives for injured legal consumers.

2426. Pennsylvania General Assembly engaged in exclusionary conduct because legislative support, legislative acquiescence, and lawyer-legislator participation can confer public authority, funding, and statutory legitimacy on systems that protect incumbent lawyers, legal-aid providers, bar-connected actors, disciplinary actors, and court-connected structures from outside competition.

2427. Pennsylvania General Assembly acted with specific intent and created a dangerous probability of monopoly power because legislative authority affects unauthorized-practice barriers, public funding, court-system structure, legal-aid design, attorney-accountability mechanisms, public-service systems, and whether malpractice victims and low-income clients receive independent alternatives to lawyer-controlled systems.

2428. Pennsylvania General Assembly caused antitrust injury because legislative support or acquiescence reduced legal-service competition, limited nonlawyer assistance, preserved unauthorized-practice barriers, restricted malpractice-redress alternatives, and kept future attorneys, malpractice victims, and low-income clients dependent on lawyer-controlled institutions.

2429. Pennsylvania Legal Aid Network, Inc. participated in monopolization, attempted monopolization, and conspiracy to monopolize through statewide legal-aid coordination, provider legitimacy, training authority, funding relationships, referral influence, public-service recognition, legal-aid policy influence, and support for lawyer-controlled civil legal-aid systems.

2430. Pennsylvania Legal Aid Network, Inc. helped maintain monopoly power by reinforcing a statewide legal-aid structure in which incumbent providers control intake, referrals, provider credibility, conflicts, substitute-provider access, legal-aid narratives, client repair, grievance responses, public legitimacy, and access to low-

income civil legal-service markets after clients suffer malpractice, abandonment, missed hearings, poor communication, or unclear representation status.

2431. Pennsylvania Legal Aid Network, Inc. engaged in exclusionary conduct because statewide legal-aid networks preserve monopoly power when they protect grantee status, preserve incumbent credibility, restrict conflict-free alternatives, and prevent low-income clients from obtaining independent legal-aid accountability outside lawyer-controlled provider systems.

2432. Pennsylvania Legal Aid Network, Inc. acted with specific intent and created a dangerous probability of monopoly power because statewide legal-aid coordination affects funding legitimacy, referral legitimacy, provider recognition, training access, public-service credibility, client repair, substitute-provider access, and whether competing legal-aid providers can enter or expand.

2433. Pennsylvania Legal Aid Network, Inc. caused antitrust injury because legal-aid network gatekeeping reduced client choice, limited independent legal-aid competition, restricted substitute-provider access, reduced malpractice-redress output, preserved incumbent lawyer-controlled providers from market accountability, and kept Grohol and the class dependent on legal-aid structures that failed them.

2434. Supreme Court of Pennsylvania participated in monopolization, attempted monopolization, and conspiracy to monopolize through attorney-admission

authority, disciplinary authority, rulemaking authority, unauthorized-practice authority, judicial-system authority, court-access authority, professional-regulation authority, and control over lawyer-centered systems governing entry, practice, discipline, procedure, and accountability.

2435. Supreme Court of Pennsylvania helped maintain monopoly power by maintaining lawyer-controlled licensing, bar admission, character-and-fitness, disciplinary, professional-conduct, unauthorized-practice, court-rule, and practice-rule structures that define who may provide legal services, who may appear in court, who may assist clients, who may receive professional legitimacy, and who may challenge lawyer misconduct.

2436. Supreme Court of Pennsylvania engaged in exclusionary conduct because court-controlled professional regulation preserves monopoly power when the same court-created and lawyer-dependent system regulates lawyers, controls legal-market entry, controls discipline, controls public-facing professional legitimacy, controls malpractice-accountability pathways, and limits practical alternatives to licensed-lawyer representation.

2437. Supreme Court of Pennsylvania acted with specific intent and created a dangerous probability of monopoly power because its rules and disciplinary systems control attorney supply, legal-market entry, court access, attorney accountability, unauthorized practice, public legitimacy, procedural access, and

whether nonlawyer competitors and independent accountability models can compete.

2438. Supreme Court of Pennsylvania caused antitrust injury because court-controlled professional regulation reduced legal-service supply, restricted future attorney entry, excluded nonlawyer competitors, limited malpractice-redress alternatives, suppressed court-access innovation, and kept legal consumers, low-income clients, and court users dependent on lawyer-controlled systems.

2439. Michael F.J. Piecuch participated in monopolization, attempted monopolization, and conspiracy to monopolize through president-judge authority, judicial office, courthouse influence, local court administration, local bar influence, public-service relationships, advisory-board connections, and lawyer-and-judge-controlled professional networks.

2440. Piecuch helped maintain monopoly power by reinforcing local legal-system structures in which judges, lawyers, prosecutors, court-connected actors, bar participants, public-service networks, and advisory bodies control legitimacy, referrals, court access, public-service participation, courthouse credibility, and the professional safety of lawyers and nonlawyer competitors who challenge misconduct.

2441. Piecuch engaged in exclusionary conduct because president-judge authority and local judicial influence preserve monopoly power when access to court-

adjacent systems, public-service spaces, professional credibility, local accountability channels, and court-facing legitimacy depends on lawyer-and-judge approval rather than consumer demand, service quality, accountability, or open competition.

2442. Piecuch acted with specific intent and created a dangerous probability of monopoly power because local judicial authority shapes whether legal-services reformers, future attorneys, malpractice victims, and nonlawyer competitors receive fair access to courthouse systems, public-service systems, professional networks, and accountability channels.

2443. Piecuch caused antitrust injury because judicially connected local gatekeeping reduced legal-service competition, chilled attorney criticism, limited nonlawyer and independent assistance, restricted public-service access, reduced court-access alternatives, and preserved lawyer-centered control over local legal markets.

2444. Jeffrey A. Rowe participated in monopolization, attempted monopolization, and conspiracy to monopolize through judicial office, magisterial-district authority, courthouse access, local legal influence, court-connected public-service participation, local bar relationships, and professional networks that affect legal-market legitimacy.

2445. Rowe helped maintain monopoly power by reinforcing systems in which judicial officers, local lawyers, public-service actors, court-connected networks, and bar structures determine who receives recognition, credibility, public-service participation, court-facing access, and access to client-facing legal-service opportunities.

2446. Rowe engaged in exclusionary conduct because magisterial-district and court-connected authority preserves monopoly power when court access, public legitimacy, dispute-resolution credibility, referral credibility, and accountability mechanisms remain controlled by lawyers, judges, and court-connected actors rather than open competition, consumer choice, or independent accountability.

2447. Rowe acted with specific intent and created a dangerous probability of monopoly power because local judicial authority affects whether future attorneys, nonlawyer competitors, malpractice victims, court users, and legal-services reformers receive equal access to courthouse legitimacy, court-adjacent public-service structures, professional networks, and local accountability systems.

2448. Rowe caused antitrust injury because local judicial gatekeeping reduced competition, limited alternative legal-service access, chilled future attorney criticism, suppressed court-access reform, restricted nonlawyer assistance, and preserved lawyer-centered control over client-facing legal systems.

2449. Jamie Saleski participated in monopolization, attempted monopolization, and conspiracy to monopolize through prothonotary authority, filing-system authority, docket-access authority, public-record authority, courthouse administration, service and filing practices, and public-office structures that affect practical access to courts.

2450. Saleski helped maintain monopoly power by reinforcing court-access systems in which filing practices, docket practices, clerk interactions, local procedure, record access, service practices, and courthouse credibility determine whether legal consumers, court navigators, nonlawyer assistants, future attorneys, malpractice victims, and legal-services reformers can pursue relief effectively.

2451. Saleski engaged in exclusionary conduct because filing and docket systems preserve lawyer-centered control when procedural fluency, filing knowledge, docket access, local courthouse norms, and public-office credibility favor licensed lawyers and burden independent assistance, nonlawyer support, court-navigation alternatives, and injured consumers outside lawyer-controlled channels.

2452. Saleski acted with specific intent and created a dangerous probability of monopoly power because prothonotary practices affect whether malpractice victims, injured legal consumers, court users, and competing assistance models can obtain practical court access without licensed-lawyer control.

2453. Saleski caused antitrust injury because filing and docket gatekeeping reduced court-access competition, limited practical legal assistance, restricted nonlawyer court-navigation support, preserved lawyer-centered control over systems that malpractice victims must use to obtain relief, and reduced meaningful court-access alternatives.

2454. Sholley participated in monopolization, attempted monopolization, and conspiracy to monopolize through lawyer status, Union–Snyder County Bar Association officer authority, secretary authority, meeting-record authority, minute practices, local bar governance, Law Day participation, Wills for Heroes participation, listserv structures, and court-connected local bar influence.

2455. Sholley helped maintain monopoly power by reinforcing local bar structures in which established lawyers and bar officers control meeting records, minutes, listserv access, committee participation, public-service programs, professional legitimacy, referral credibility, local professional acceptance, and the practical ability to challenge lawyer misconduct without retaliation.

2456. Sholley engaged in exclusionary conduct because bar records and officer conduct preserve monopoly power when objections to lawyer-controlled governance are distorted, minimized, omitted, or controlled by incumbent lawyers, and when dissenting attorneys and independent legal-service providers cannot

document retaliation by incumbent lawyer networks with equal institutional credibility.

2457. Sholley acted with specific intent and created a dangerous probability of monopoly power because local bar records, officer authority, meeting access, listserv systems, public-service programming, and committee structures affect whether future attorneys, legal-services reformers, nonlawyer competitors, and malpractice-accountability advocates receive legitimacy, access, referrals, and professional safety.

2458. Sholley caused antitrust injury because local bar recordkeeping and governance gatekeeping reduced public-service access, professional credibility, meeting access, committee access, referral opportunities, competitive legal-service opportunities, and independent accountability options for future attorneys, malpractice victims, nonlawyer competitors, and legal-services reformers.

2459. Timothy Smith participated in monopolization, attempted monopolization, and conspiracy to monopolize through North Penn Legal Services senior management authority, attorney supervision, case-management systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, representation-status practices, withdrawal practices, and legal-aid institutional control.

2460. Smith helped maintain monopoly power by reinforcing a legal-aid structure in which incumbent providers control client files, representation status, communications, warnings to clients, corrective measures, substitute-provider access, supervision, client repair, grievance responses, and institutional narratives after legal-aid clients suffer missed hearings, missed deadlines, abandoned files, or unclear representation status.

2461. Smith engaged in exclusionary conduct because senior legal-aid managers preserve monopoly power when they keep vulnerable clients dependent on incumbent providers while limiting independent corrective assistance, restricting conflict-free repair, shifting burdens to clients, and preserving provider legitimacy despite failed representation.

2462. Smith acted with specific intent and created a dangerous probability of monopoly power because senior legal-aid authority controls representation status, client repair, file access, case assignments, attorney supervision, grievance responses, substitute-provider access, and institutional credibility in low-income civil legal-service markets.

2463. Smith caused antitrust injury because senior legal-aid gatekeeping reduced conflict-free substitute counsel, restricted legal-aid accountability, suppressed competing nonprofit legal-service capacity, limited client repair, preserved

incumbent lawyer-controlled legal-aid dominance, and kept Grohol and similarly situated clients dependent on failed legal-aid structures.

2464. Snyder County participated in monopolization, attempted monopolization, and conspiracy to monopolize through county-government authority, public-service structures, county-connected legal systems, court-adjacent relationships, prosecutor-connected systems, advisory and coalition relationships, referral environments, and public legitimacy that affect access to legal services and legal-system accountability.

2465. Snyder County helped maintain monopoly power by reinforcing county-connected structures in which lawyers, prosecutors, judges, public-service actors, advisory bodies, referral networks, and county-connected institutions control access, credibility, cooperation, public-service participation, referral legitimacy, and the practical ability to challenge local legal-system misconduct.

2466. Snyder County engaged in exclusionary conduct because county-level public-service systems and court-adjacent systems preserve monopoly power when malpractice victims, low-income litigants, vulnerable clients, nonlawyer competitors, and legal-services reformers can obtain meaningful assistance only through incumbent lawyer-controlled channels.

2467. Snyder County acted with specific intent and created a dangerous probability of monopoly power because county-connected systems affect court access, public-

service access, referral pathways, prosecutorial relationships, advisory-board legitimacy, domestic-violence services, mental-health services, and whether independent legal-service providers can enter or expand.

2468. Snyder County caused antitrust injury because county-connected gatekeeping reduced client choice, public-service access, referral competition, court-adjacent accountability, nonlawyer support, future attorney access, and the local systems needed to compete with incumbent lawyer-controlled providers.

2469. Snyder County STOP Coalition participated in monopolization, attempted monopolization, and conspiracy to monopolize through county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility affecting access to survivors, vulnerable clients, and public-service legal opportunities.

2470. Snyder County STOP Coalition helped maintain monopoly power by reinforcing a system in which county-connected coalitions, victim-service actors, legal-aid actors, public-service networks, and lawyer-connected participants control referral access, stakeholder credibility, public-service cooperation, domestic-violence legal-service channels, and legitimacy for providers who serve vulnerable clients.

2471. Snyder County STOP Coalition engaged in exclusionary conduct because domestic-violence and victim-service systems preserve monopoly power when coalition access, referral channels, stakeholder credibility, and public-service legitimacy determine whether clients receive only incumbent lawyer-controlled referrals or meaningful access to independent, conflict-free, and lawyer-critical legal-service alternatives.

2472. Snyder County STOP Coalition acted with specific intent and created a dangerous probability of monopoly power because victim-service systems, coalition structures, legal-aid relationships, public-service networks, prosecutor-connected systems, and domestic-violence referral channels affect whether future attorneys, nonprofit providers, and nonlawyer competitors can enter or expand in vulnerable-client legal-service markets.

2473. Snyder County STOP Coalition caused antitrust injury because coalition gatekeeping reduced public-service legal competition, limited referral access, restricted conflict-free alternatives, burdened future attorney participation, reduced nonlawyer assistance, and preserved incumbent legal-aid and lawyer-connected service systems from market accountability.

2474. Sarah Stigerwalt-Egan participated in monopolization, attempted monopolization, and conspiracy to monopolize through lawyer status, Union–Snyder County Bar Association presidential authority, judicial-law-clerk and

hearing-officer status, local bar governance, Wills for Heroes control, meeting access, listserv communications, Teams access, minute practices, public-service legal-program access, and communications with statewide bar and veterans-service actors.

2475. Stigerwalt-Egan helped maintain monopoly power by reinforcing local bar structures in which bar officers, lawyer networks, judicially connected actors, public-service programs, and professional communications determine whether dissenting attorneys, future attorneys, independent legal-service providers, malpractice-accountability advocates, and nonlawyer competitors receive meeting access, program access, professional legitimacy, and equal treatment.

2476. Stigerwalt-Egan engaged in exclusionary conduct because local bar leadership preserves monopoly power when access to legal-service opportunities, committee participation, meeting access, public-service legal programs, local referrals, veterans-service participation, records, professional acceptance, and lawyer-controlled legitimacy depends on conformity with incumbent lawyer norms.

2477. Stigerwalt-Egan acted with specific intent and created a dangerous probability of monopoly power because local bar leadership controls formal and informal market inputs needed by competing legal-service providers, including

communications, records, meetings, committees, public-service programming, veterans-service access, and professional acceptance.

2478. Stigerwalt-Egan caused antitrust injury because bar-governance and public-service gatekeeping reduced legal-service output, limited future attorney competition, chilled lawyer-critical advocacy, restricted public-service access, reduced referral alternatives, and preserved incumbent lawyer-controlled structures from competitive accountability.

2479. K. Michael Sullivan participated in monopolization, attempted monopolization, and conspiracy to monopolize through lawyer status, Union–Snyder County Bar Association authority, local bar leadership, Wills for Heroes control, pro bono committee influence, listserv communications, public-service legal-program access, local legal-system influence, and joint participation with court-connected and bar-connected actors.

2480. Sullivan helped maintain monopoly power by reinforcing a local professional structure in which bar leaders control access to pro bono programs, public-service legal projects, listserv communications, committee activity, local professional standing, public-service legitimacy, referral credibility, and the ability to challenge bar or legal-aid misconduct without professional consequences.

2481. Sullivan engaged in exclusionary conduct because local bar leadership preserves monopoly power when access to legal-service opportunities depends on

conformity with lawyer-controlled norms and when future attorneys, independent providers, nonlawyer competitors, and malpractice-accountability advocates face exclusion for challenging incumbent lawyers and legal-service institutions.

2482. Sullivan acted with specific intent and created a dangerous probability of monopoly power because local bar and pro bono leadership control program access, public-service legal opportunities, referrals, professional legitimacy, listserv communications, committee participation, and practical market acceptance in local legal-service markets.

2483. Sullivan caused antitrust injury because local bar and pro bono gatekeeping reduced client choice, restricted nonprofit legal-service competition, limited public-service legal output, chilled future attorney criticism, reduced nonlawyer assistance, and preserved lawyer-controlled referral and program channels from market accountability.

2484. David Andrew Strouse participated in monopolization, attempted monopolization, and conspiracy to monopolize through lawyer status, local attorney networks, Union–Snyder County Bar Association participation, listserv participation, bar-governance participation, litigation-response participation, public-service participation, and court-connected professional structures affecting local legal-service access.

2485. Strouse helped maintain monopoly power by reinforcing local lawyer networks in which attorneys and bar-connected actors control professional credibility, referral access, listserv access, meeting participation, public-service opportunities, litigation-response narratives, attorney cooperation, and practical market acceptance.

2486. Strouse engaged in exclusionary conduct because local attorneys preserve monopoly power when they collectively isolate critics, protect incumbent legal institutions, discourage malpractice accountability, restrict public-service participation, and make market entry difficult for future attorneys, nonlawyer competitors, independent advocates, and legal-services reformers.

2487. Strouse acted with specific intent and created a dangerous probability of monopoly power because local attorney networks control reputation, referrals, attorney cooperation, listserv participation, meeting access, litigation narratives, public-service access, and professional credibility needed to compete in local legal-service markets.

2488. Strouse caused antitrust injury because local attorney gatekeeping reduced access to referrals, public-service participation, professional legitimacy, attorney cooperation, client channels, competitive legal-service opportunities, and independent accountability options for malpractice victims, injured consumers, future attorneys, and nonlawyer competitors.

2489. Transitions Legal Center participated in monopolization, attempted monopolization, and conspiracy to monopolize through legal-services participation, pro bono relationships, victim-services relationships, domestic-violence service coordination, referral systems, court-related connections, public-service networks, and local legal-service channels affecting access to clients, survivors, victims, and legal-service opportunities.

2490. Transitions Legal Center helped maintain monopoly power by reinforcing public-service legal networks in which incumbent legal-service actors, victim-service providers, domestic-violence systems, referral gatekeepers, court-related partners, legal-aid actors, and lawyer-controlled public-service channels control access to vulnerable clients and legitimacy in public-interest legal work.

2491. Transitions Legal Center engaged in exclusionary conduct because public-service legal referrals and domestic-violence legal-service channels preserve monopoly power when vulnerable clients receive only incumbent lawyer-approved services rather than meaningful access to independent, conflict-free, nonlawyer, and lawyer-critical alternatives.

2492. Transitions Legal Center acted with specific intent and created a dangerous probability of monopoly power because victim-service referral systems, pro bono relationships, court-related connections, domestic-violence service networks, and

public-service legal channels affect whether competing providers can enter or expand in vulnerable-client legal-service markets.

2493. Transitions Legal Center caused antitrust injury because legal-service referral gatekeeping reduced provider choice, limited conflict-free alternatives, restricted future attorney and nonprofit participation, suppressed independent advocacy for vulnerable clients, reduced nonlawyer assistance, and preserved incumbent legal-service channels from competitive accountability.

2494. Transitions of PA participated in monopolization, attempted monopolization, and conspiracy to monopolize through victim-service structures, public-service referral networks, domestic-violence service relationships, pro bono channels, legal-aid relationships, county-connected systems, court-related referral structures, and local service-provider networks affecting access to vulnerable clients, victims, survivors, and legal-service opportunities.

2495. Transitions of PA helped maintain monopoly power by reinforcing public-service systems in which service-provider networks, domestic-violence systems, referral gatekeepers, legal-aid actors, county-connected systems, and court-connected partners control whether independent providers receive access to vulnerable clients, public-service cooperation, and institutional legitimacy.

2496. Transitions of PA engaged in exclusionary conduct because victim-service and public-service referral systems preserve monopoly power when clients receive

only incumbent lawyer-approved services or lawyer-controlled legal-aid referrals rather than meaningful access to independent, conflict-free, nonlawyer, and lawyer-critical legal-service alternatives.

2497. Transitions of PA acted with specific intent and created a dangerous probability of monopoly power because public-service referrals, domestic-violence service relationships, county-connected systems, legal-aid relationships, and court-related referral structures influence which legal-service providers can reach vulnerable clients and gain market legitimacy.

2498. Transitions of PA caused antitrust injury because public-service referral gatekeeping reduced provider choice, limited conflict-free legal alternatives, restricted future attorney and nonprofit participation, suppressed independent advocacy for vulnerable clients, reduced nonlawyer assistance, and preserved incumbent legal-aid and public-service channels from market accountability.

2499. David K. Trevaskis participated in monopolization, attempted monopolization, and conspiracy to monopolize through lawyer status, Pennsylvania Bar Association Wills for Heroes leadership, statewide pro bono authority, public-facing legal-program influence, volunteer-program influence, statewide bar credibility, and communications with bar, legal-aid, veterans-service, and public-service actors.

2500. Trevaskis helped maintain monopoly power by reinforcing statewide pro bono structures in which bar-connected actors control access to public-facing legal programs, volunteers, veterans-service opportunities, program legitimacy, professional recognition, service channels, and public-service credibility for lawyers and independent providers who seek to operate outside incumbent lawyer-controlled systems.

2501. Trevaskis engaged in exclusionary conduct because statewide bar pro bono leadership preserves monopoly power when access to vulnerable clients, veterans, disabled veterans, volunteers, referral sources, public-service partners, event credibility, and professional recognition depends on lawyer-approved programs rather than open competition among willing providers.

2502. Trevaskis acted with specific intent and created a dangerous probability of monopoly power because statewide pro bono leadership affects which legal-service providers may reach clients, recruit volunteers, build public trust, receive professional legitimacy, obtain referral credibility, and participate in public-facing legal-service markets.

2503. Trevaskis caused antitrust injury because statewide pro bono gatekeeping reduced legal-service output, limited future attorney participation, suppressed independent providers, restricted access to veterans and vulnerable clients, reduced

referral alternatives, and preserved bar-controlled public-service structures from competitive accountability.

2504. Brian Ulmer participated in monopolization, attempted monopolization, and conspiracy to monopolize through lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation, statewide pro bono networks, bar-connected legal-service structures, public-facing legal programs, attorney networks, and communications affecting access to veterans-service and legal-service opportunities.

2505. Ulmer helped maintain monopoly power by reinforcing a system in which bar-connected actors control public-facing legal programs, volunteer channels, staff communications, pro bono credibility, veterans-service outreach, professional legitimacy, event participation, and public-service recognition for attorneys and independent providers who challenge lawyer-controlled structures.

2506. Ulmer engaged in exclusionary conduct because bar-connected and Wills for Heroes-connected actors preserve monopoly power when they determine whether new attorneys, nonprofit providers, nonlawyer competitors, legal-services reformers, veterans-service advocates, and independent providers receive equal access to clients, veterans, volunteers, program credibility, and public-service legitimacy.

2507. Ulmer acted with specific intent and created a dangerous probability of monopoly power because bar-connected public-service systems control outreach, volunteer participation, staff communication, program access, professional legitimacy, public-service credibility, and the practical ability of competing providers to reach underserved legal consumers.

2508. Ulmer caused antitrust injury because bar-connected public-service gatekeeping reduced legal-service output, limited future attorney and nonprofit participation, restricted veterans-service access, suppressed independent legal-service competition, reduced nonlawyer assistance, and preserved lawyer-controlled public-service channels from accountability.

2509. Union County participated in monopolization, attempted monopolization, and conspiracy to monopolize through county-government authority, public-service systems, advisory-board structures, criminal-justice structures, mental-health structures, STOP-related systems, referral environments, public legitimacy, and county-connected systems that affect access to legal services and legal-system accountability.

2510. Union County helped maintain monopoly power by reinforcing county-connected systems in which prosecutors, judges, lawyers, advisory bodies, public-service actors, referral networks, and county-connected institutions control access,

credibility, cooperation, public-service participation, referral legitimacy, and the practical ability to challenge local legal-system misconduct.

2511. Union County engaged in exclusionary conduct because county-level legal, criminal-justice, mental-health, domestic-violence, and public-service systems preserve monopoly power when malpractice victims, low-income litigants, vulnerable clients, nonlawyer competitors, and legal-services reformers can obtain meaningful assistance only through incumbent lawyer-controlled channels.

2512. Union County acted with specific intent and created a dangerous probability of monopoly power because county-connected systems affect court access, public-service access, referral pathways, prosecutorial relationships, advisory-board legitimacy, domestic-violence services, mental-health services, and whether independent legal-service providers can enter or expand.

2513. Union County caused antitrust injury because county-connected gatekeeping reduced client choice, referral competition, public-service access, court-adjacent accountability, nonlawyer support, future attorney access, and the local systems needed to compete with incumbent lawyer-controlled providers.

2514. Union–Snyder County Bar Association participated in monopolization, attempted monopolization, and conspiracy to monopolize through local bar governance, membership control, listserv control, committee access, meeting

access, minute practices, Wills for Heroes planning, Law Day programming, public-service opportunities, and local professional legitimacy.

2515. Union–Snyder County Bar Association helped maintain monopoly power by reinforcing local bar structures in which incumbent lawyers control referrals, meetings, records, professional acceptance, public-service programs, committee participation, local credibility, attorney cooperation, and access to lawyer-approved legal-service networks.

2516. Union–Snyder County Bar Association engaged in exclusionary conduct because local bar associations preserve monopoly power when they control informal and formal market inputs, including reputation, referrals, public-service programming, records, meeting access, committee access, listserv access, local professional legitimacy, and the practical ability to challenge lawyer misconduct without retaliation.

2517. Union–Snyder County Bar Association acted with specific intent and created a dangerous probability of monopoly power because local bar governance affects whether future attorneys, independent providers, nonlawyer competitors, malpractice-accountability advocates, and legal-services reformers can obtain referrals, public-service access, professional credibility, and local market acceptance.

2518. Union–Snyder County Bar Association caused antitrust injury because local bar gatekeeping reduced future attorney participation, restricted independent legal-service competition, chilled attorney criticism, limited public-service legal output, reduced referral alternatives, and preserved incumbent lawyer networks from meaningful market accountability.

2519. Union County Criminal Justice Advisory Board participated in monopolization, attempted monopolization, and conspiracy to monopolize through county-government participation, criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local institutional credibility affecting legal-service channels and public-service participation.

2520. Union County Criminal Justice Advisory Board helped maintain monopoly power by reinforcing advisory structures in which prosecutors, judges, lawyers, criminal-justice actors, county officials, and public-service networks control access to policy discussions, institutional legitimacy, referral environments, public-service credibility, and court-adjacent accountability channels.

2521. Union County Criminal Justice Advisory Board engaged in exclusionary conduct because criminal-justice advisory structures preserve monopoly power when legal-services reformers, malpractice victims, nonlawyer competitors, and

future attorneys can challenge local legal institutions only at the cost of losing credibility and access to court-adjacent systems.

2522. Union County Criminal Justice Advisory Board acted with specific intent and created a dangerous probability of monopoly power because advisory-board access affects public-service legitimacy, referral networks, policy access, criminal-justice relationships, prosecutor-connected credibility, and the ability of competing legal-service providers to enter or expand.

2523. Union County Criminal Justice Advisory Board caused antitrust injury because advisory-board gatekeeping reduced public-service access, referral access, court-adjacent accountability, local legal-system competition, nonlawyer assistance, and future attorney access to systems needed to challenge incumbent lawyer-controlled structures.

2524. Union County Mental Health Advisory Committee participated in monopolization, attempted monopolization, and conspiracy to monopolize through county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility affecting access to vulnerable clients and public-service legal channels.

2525. Union County Mental Health Advisory Committee helped maintain monopoly power by reinforcing county-connected mental-health and disability-

service structures in which public-service actors, legal-aid actors, referral networks, court-connected participants, and advisory bodies control credibility, referrals, stakeholder access, public-service cooperation, and disability-related legal-service pathways.

2526. Union County Mental Health Advisory Committee engaged in exclusionary conduct because mental-health, disability, housing, benefits, family-stability, and court-access systems preserve monopoly power when vulnerable clients receive only incumbent lawyer-approved referrals rather than independent legal assistance, nonlawyer support, and conflict-free alternatives.

2527. Union County Mental Health Advisory Committee acted with specific intent and created a dangerous probability of monopoly power because advisory access affects referral legitimacy, provider relationships, disability-service credibility, public-service cooperation, and whether competing legal-service providers can reach vulnerable clients with institutional credibility.

2528. Union County Mental Health Advisory Committee caused antitrust injury because advisory and disability-service gatekeeping reduced client choice, restricted conflict-free alternatives, burdened future attorney participation, limited nonlawyer assistance, and preserved lawyer-controlled legal-service channels for vulnerable clients.

2529. Union County STOP Coalition participated in monopolization, attempted monopolization, and conspiracy to monopolize through county-connected domestic-violence service coordination, prosecutor participation, public meetings, victim-services structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility affecting access to survivors, vulnerable clients, and public-service legal opportunities.

2530. Union County STOP Coalition helped maintain monopoly power by reinforcing a system in which county-connected coalitions, victim-service actors, legal-aid actors, domestic-violence service providers, prosecutor-connected participants, and public-service networks control referral access, stakeholder credibility, cooperation, and legitimacy for providers serving vulnerable clients.

2531. Union County STOP Coalition engaged in exclusionary conduct because domestic-violence and victim-service systems preserve monopoly power when coalition access, referral channels, stakeholder credibility, and public-service legitimacy determine whether clients receive only incumbent lawyer-controlled referrals or meaningful access to independent, conflict-free, and lawyer-critical legal-service alternatives.

2532. Union County STOP Coalition acted with specific intent and created a dangerous probability of monopoly power because coalition structures, prosecutor-connected systems, legal-aid relationships, public-service networks, victim-service

systems, and domestic-violence referral channels affect whether future attorneys, nonprofit providers, and nonlawyer competitors can enter or expand in vulnerable-client legal-service markets.

2533. Union County STOP Coalition caused antitrust injury because coalition gatekeeping reduced public-service legal competition, limited referral access, restricted conflict-free alternatives, burdened future attorney participation, reduced nonlawyer assistance, and preserved incumbent legal-aid and lawyer-connected service systems from market accountability.

2534. United States Bankruptcy Court for the Middle District of Pennsylvania participated in monopolization, attempted monopolization, and conspiracy to monopolize through federal judicial authority, bankruptcy jurisdiction, docket authority, hearing authority, case-management authority, sanctions-related authority, local-rule authority, attorney-practice authority, filing systems, staff communications, and bankruptcy-access structures.

2535. United States Bankruptcy Court for the Middle District of Pennsylvania helped maintain monopoly power by reinforcing bankruptcy and federal-court structures in which judges, lawyers, local rules, filing practices, sanctions risk, attorney-practice expectations, court-access norms, professional credibility, and federal court legitimacy control whether debtors, homeowners, low-income

litigants, nonlawyer competitors, court navigators, and legal-services reformers can obtain or provide meaningful assistance.

2536. United States Bankruptcy Court for the Middle District of Pennsylvania engaged in exclusionary conduct because bankruptcy-access and attorney-practice systems preserve lawyer-centered control when court relief, debt-relief advocacy, filing access, hearing access, sanctions exposure, attorney practice, professional legitimacy, and criticism of court-connected incumbents remain controlled by lawyer-and-judge-centered institutions.

2537. United States Bankruptcy Court for the Middle District of Pennsylvania acted with specific intent and created a dangerous probability of monopoly power because bankruptcy relief, debt-relief advocacy, attorney practice, sanctions exposure, court access, local rules, filing expectations, and professional credibility remain controlled by court-centered and lawyer-centered institutions that burden competing assistance models.

2538. United States Bankruptcy Court for the Middle District of Pennsylvania caused antitrust injury because bankruptcy-access and attorney-practice gatekeeping reduced competition in bankruptcy and debt-relief legal services, limited nonlawyer and independent assistance, chilled future attorneys and legal-services reformers, and preserved lawyer-centered control over debt-relief markets.

2539. United States Congress participated in monopolization, attempted monopolization, and conspiracy to monopolize through federal legislative authority, federal-court creation, federal legal-aid funding statutes, federal attorney-regulation structures, federal procedural-rule delegation, federal judicial structures, legal-services funding, and legislative decisions that preserve lawyer-centered control over legal services and attorney accountability.

2540. United States Congress helped maintain monopoly power by creating, funding, authorizing, or preserving systems in which courts, lawyers, federal legal-aid institutions, disciplinary structures, procedural-rule committees, and professional gatekeepers control legal-market entry, court access, public legal-aid funding, legal-service legitimacy, accountability mechanisms, and practical access to legal help.

2541. United States Congress engaged in exclusionary conduct because federal statutory and institutional structures preserve lawyer-centered monopoly power when they delegate or support legal-aid funding, court-rule systems, federal court access, attorney-accountability systems, court-access systems, and public legal-service structures without creating independent competitive alternatives for injured legal consumers, low-income clients, malpractice victims, and nonlawyer legal-service competitors.

2542. United States Congress acted with specific intent and created a dangerous probability of monopoly power because federal legislative authority affects federal courts, procedural rulemaking, legal-aid funding, federal public-service systems, attorney-regulation structures, court-access assistance, and whether independent legal-service models can enter or expand.

2543. United States Congress caused antitrust injury because federal statutory and institutional structures reduced legal-service competition, limited alternative assistance, preserved lawyer-centered gatekeeping, restricted malpractice-redress options, reduced nonlawyer assistance, and kept future attorneys, low-income clients, and injured legal consumers dependent on lawyer-controlled institutions.

2544. United States Court of Appeals for the Third Circuit participated in monopolization, attempted monopolization, and conspiracy to monopolize through federal appellate authority, precedent authority, procedural authority, attorney-practice authority, disciplinary authority, filing rules, appellate access structures, judicial legitimacy, and court-controlled credibility systems.

2545. United States Court of Appeals for the Third Circuit helped maintain monopoly power by reinforcing appellate structures in which judges, lawyers, procedural rules, briefing standards, sanction risks, precedent, attorney-practice norms, judicial credibility determinations, and appellate gatekeeping control

whether malpractice victims, injured legal consumers, nonlawyer competitors, and legal-services reformers can obtain meaningful review.

2546. United States Court of Appeals for the Third Circuit engaged in exclusionary conduct because appellate systems preserve lawyer-centered monopoly power when access to review, precedent, standing, immunity, sanctions, professional speech, attorney accountability, and legal-aid accountability remains controlled by licensed lawyers and judges rather than independent accountability, consumer choice, or open competition.

2547. United States Court of Appeals for the Third Circuit acted with specific intent and created a dangerous probability of monopoly power because appellate authority determines the boundaries of court access, sanctions, immunity, attorney accountability, professional speech, legal-aid accountability, procedural enforcement, and the practical viability of competing legal-help models.

2548. United States Court of Appeals for the Third Circuit caused antitrust injury because appellate gatekeeping reduced competitive accountability, limited malpractice-redress pathways, chilled future attorneys and legal-services reformers, restricted nonlawyer assistance, and preserved lawyer-centered control over legal rights enforcement.

2549. United States District Court for the Middle District of Pennsylvania participated in monopolization, attempted monopolization, and conspiracy to

monopolize through federal district-court authority, docket authority, case-management authority, filing authority, local-rule authority, sanctions authority, attorney-practice authority, judicial legitimacy, and court-access systems that affect legal-service competition and accountability.

2550. United States District Court for the Middle District of Pennsylvania helped maintain monopoly power by reinforcing federal trial-court structures in which procedural rules, local rules, pleading standards, filing systems, case-management practices, sanctions risks, attorney-practice expectations, judicial credibility determinations, and federal court legitimacy control whether legal consumers, nonlawyer competitors, court navigators, future attorneys, and legal-services reformers can pursue relief.

2551. United States District Court for the Middle District of Pennsylvania engaged in exclusionary conduct because federal district-court systems preserve lawyer-centered monopoly power when the practical forum for challenging lawyer-controlled institutions remains shaped by lawyer-centered procedure, court-controlled professional norms, sanctions risk, filing requirements, and judge-controlled legitimacy.

2552. United States District Court for the Middle District of Pennsylvania acted with specific intent and created a dangerous probability of monopoly power because federal district-court authority affects court access, filing access, litigation

credibility, sanctions exposure, attorney practice, procedural legitimacy, malpractice-accountability litigation, and whether independent assistance models can operate effectively.

2553. United States District Court for the Middle District of Pennsylvania caused antitrust injury because federal trial-court gatekeeping reduced court-access competition, limited nonlawyer and independent assistance, chilled future attorney criticism, increased dependence on licensed lawyers, and preserved lawyer-centered control over rights enforcement.

2554. United States Department of Health and Human Services participated in monopolization, attempted monopolization, and conspiracy to monopolize through federal public-funding authority, social-service authority, legal-aid-related funding structures, public-benefits systems, civil-rights compliance structures, service-provider relationships, referral environments, and public-service legitimacy affecting access to civil legal help for vulnerable clients.

2555. United States Department of Health and Human Services helped maintain monopoly power by reinforcing federally funded service systems that channel vulnerable clients through incumbent legal-aid, lawyer-controlled, referral-controlled, agency-connected, and professionalized structures rather than independent, conflict-free, nonlawyer, or lawyer-critical legal-service alternatives.

2556. United States Department of Health and Human Services engaged in exclusionary conduct because federal health, disability, benefits, family, aging, domestic-violence, and social-service systems preserve monopoly power when funding and referral structures route legal need through lawyer-approved providers and deny comparable legitimacy to independent, conflict-free, and nonlawyer assistance models.

2557. United States Department of Health and Human Services acted with specific intent and created a dangerous probability of monopoly power because federal public-service funding, civil-rights compliance systems, service-provider relationships, and referral environments affect whether vulnerable clients receive only lawyer-approved legal help or meaningful competitive alternatives.

2558. United States Department of Health and Human Services caused antitrust injury because federal public-service gatekeeping reduced client choice, restricted conflict-free legal-service alternatives, limited independent accountability for legal-aid failures, preserved incumbent referral channels, and burdened future attorneys and nonlawyer competitors seeking to serve vulnerable clients.

2559. United States Judicial Conference participated in monopolization, attempted monopolization, and conspiracy to monopolize through federal judicial-administration authority, policy authority, rules-related authority, court-governance

influence, administrative oversight, federal court legitimacy, and institutional support for lawyer-and-judge-controlled federal court systems.

2560. United States Judicial Conference helped maintain monopoly power by reinforcing federal court structures, rulemaking systems, administrative policies, judicial norms, filing practices, court-access expectations, attorney-practice standards, professional legitimacy, and court-governance systems that preserve lawyer-centered control over litigation, legal accountability, court navigation, malpractice redress, and attorney discipline.

2561. United States Judicial Conference engaged in exclusionary conduct because federal judicial administration preserves lawyer-centered monopoly power when court access, filing expectations, procedural access, sanctions, recusal, attorney discipline, professional speech, court-user assistance, and judicial legitimacy remain controlled by lawyer-and-judge-centered institutions rather than independent accountability or open competition.

2562. United States Judicial Conference acted with specific intent and created a dangerous probability of monopoly power because federal judicial administration affects how courts treat malpractice victims, nonlawyer assistance, court-access reform, sanctions, recusal, attorney discipline, procedural access, professional speech, and future attorneys who challenge lawyer-controlled legal systems.

2563. United States Judicial Conference caused antitrust injury because federal judicial gatekeeping reduced competitive accountability, limited meaningful nonlawyer assistance, chilled court-access reform, preserved lawyer-centered litigation control, and kept injured legal consumers dependent on lawyer-dominated federal court processes.

2564. Defendants possessed or preserved monopoly power in the relevant markets because lawyers, courts, judicial administrators, attorney regulators, bar associations, legal-aid institutions, referral systems, public officials, public-service legal programs, and lawyer-controlled institutions control licensing, admission, discipline, court access, court-user systems, procedure, referrals, public-service legitimacy, legal-aid legitimacy, professional legitimacy, attorney accountability, malpractice redress, and nonlawyer legal assistance.

2565. Defendants willfully maintained that monopoly power through exclusionary conduct because they administered, funded, legitimized, enforced, ratified, reinforced, or failed to correct structures that excluded nonlawyers, malpractice victims, community legal workers, independent advocates, competing nonprofit providers, court navigators, legal-services reformers, and conflict-free substitute providers from meaningful participation in legal-help markets.

2566. Defendants attempted to monopolize the relevant markets because their conduct preserved lawyer, court, bar, legal-aid, disciplinary, referral, public-

service, and professional gatekeeping over legal services and related access-to-justice channels with specific intent to maintain lawyer-controlled dominance and a dangerous probability of continued monopoly power.

2567. Defendants conspired to monopolize because they participated in a continuing combination among lawyers, courts, judicial administrators, judicial rulemakers, attorney regulators, state-created legal institutions, bar associations, legal-aid institutions, referral systems, public officials, public-service legal programs, and lawyer-controlled institutions to preserve lawyer dominance over legal services, court-access assistance, attorney accountability, malpractice redress, legal-aid access, referral access, professional legitimacy, public-service legal programs, and nonlawyer legal assistance.

2568. Defendants caused antitrust injury because the monopoly reduced competition, increased dependence on lawyers, limited affordable help, suppressed nonlawyer assistance, restricted court-access competition, restricted court-navigation competition, reduced accountability, suppressed innovation, preserved conflicts of interest, and prevented Grohol, legal-aid clients, malpractice victims, vulnerable clients, and court users from obtaining meaningful redress.

2569. Grohol and the class are entitled to treble damages, compensatory damages, declaratory relief, temporary injunctive relief, preliminary injunctive relief, permanent injunctive relief, structural relief, market-access relief, nonlawyer-

assistance access, court-navigation access, conflict-free substitute-provider access, legal-aid accountability reform, attorney-discipline reform, referral-access review, public-service access review, court-access review, preservation of communications and records, expedited discovery, costs, attorney's fees, and all other lawful relief.

**COUNT 25**

**Civil RICO Under 18 U.S.C. § 1962(c) Against Administrative Office of Pennsylvania Courts; American Bar Association; Bloomsburg Fair Association; Matthew W. Brann; Heath Brosius; Jessica Chapman; William R. Christman III; Mary Beth Clark; Committee on Rules of Practice and Procedure; Commonwealth of Pennsylvania; Mark J. Conway; Court of Judicial Discipline; Robert Cravitz; Doe Defendants 1 through 200; Federal Judicial Center; Lori R. Hackenberg; International Legal Aid Group; Judicial Conduct Board of Pennsylvania; Heather Kelly; Brian Kerstetter; Robert Leadbeter; Legal Services Corporation; Kathleen Lincoln; Gabriele Miller-Wagner; Lori Molloy; Jenna Ann Neidig; North Penn Legal Services, Inc.; Northumberland County Prothonotary's Office; Office of Attorney General; Office of Disciplinary Counsel; Pennsylvania Bar Association; Pennsylvania Board of Law Examiners; Pennsylvania Department of Human**

**Services; Pennsylvania Department of Military and Veterans Affairs; Pennsylvania General Assembly; Pennsylvania Legal Aid Network, Inc.; Supreme Court of Pennsylvania; Michael F.J. Piecuch; Jeffrey A. Rowe; Jamie Saleski; Sholley; Timothy Smith; Snyder County; Snyder County STOP Coalition; Sarah Stigerwalt-Egan; K. Michael Sullivan; David Andrew Strouse; Transitions Legal Center; Transitions of PA; David K. Trevaskis; Brian Ulmer; Union County; Union–Snyder County Bar Association; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; United States Congress; United States Court of Appeals for the Third Circuit; United States District Court for the Middle District of Pennsylvania; United States Department of Health and Human Services; and United States Judicial Conference**

2569. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 443, Administrative Office of Pennsylvania Courts, Civil RICO Under 18 U.S.C. § 1962(c); COA 444, American Bar Association, Civil RICO Under 18 U.S.C. § 1962(c); COA 445, Bloomsburg Fair Association, Civil RICO Under 18 U.S.C. § 1962(c); COA 446, Matthew W. Brann, Civil RICO Under 18 U.S.C. § 1962(c); COA 447, Heath Brosius, Civil

RICO Under 18 U.S.C. § 1962(c); COA 448, Jessica Chapman, Civil RICO Under 18 U.S.C. § 1962(c); COA 449, William R. Christman III, Civil RICO Under 18 U.S.C. § 1962(c); COA 450, Mary Beth Clark, Civil RICO Under 18 U.S.C. § 1962(c); COA 451, Committee on Rules of Practice and Procedure, Civil RICO Under 18 U.S.C. § 1962(c); COA 452, Commonwealth of Pennsylvania, Civil RICO Under 18 U.S.C. § 1962(c); COA 453, Mark J. Conway, Civil RICO Under 18 U.S.C. § 1962(c); COA 454, Court of Judicial Discipline, Civil RICO Under 18 U.S.C. § 1962(c); COA 455, Robert Cravitz, Civil RICO Under 18 U.S.C. § 1962(c); COA 456, Doe Defendants 1 through 200, Civil RICO Under 18 U.S.C. § 1962(c); COA 457, Federal Judicial Center, Civil RICO Under 18 U.S.C. § 1962(c); COA 458, Lori R. Hackenberg, Civil RICO Under 18 U.S.C. § 1962(c); COA 459, International Legal Aid Group, Civil RICO Under 18 U.S.C. § 1962(c); COA 460, Judicial Conduct Board of Pennsylvania, Civil RICO Under 18 U.S.C. § 1962(c); COA 461, Heather Kelly, Civil RICO Under 18 U.S.C. § 1962(c); COA 462, Brian Kerstetter, Civil RICO Under 18 U.S.C. § 1962(c); COA 463, Robert Leadbeter, Civil RICO Under 18 U.S.C. § 1962(c); COA 464, Legal Services Corporation, Civil RICO Under 18 U.S.C. § 1962(c); COA 465, Kathleen Lincoln, Civil RICO Under 18 U.S.C. § 1962(c); COA 466, Gabriele Miller-Wagner, Civil RICO Under 18 U.S.C. § 1962(c); COA 467, Lori Molloy, Civil RICO Under 18 U.S.C. § 1962(c); COA 468, Jenna Ann Neidig, Civil RICO Under 18 U.S.C. §

1962(c); COA 469, North Penn Legal Services, Inc., Civil RICO Under 18 U.S.C. § 1962(c); COA 470, Northumberland County Prothonotary's Office, Civil RICO Under 18 U.S.C. § 1962(c); COA 471, Office of Attorney General, Civil RICO Under 18 U.S.C. § 1962(c); COA 472, Office of Disciplinary Counsel, Civil RICO Under 18 U.S.C. § 1962(c); COA 473, Pennsylvania Bar Association, Civil RICO Under 18 U.S.C. § 1962(c); COA 474, Pennsylvania Board of Law Examiners, Civil RICO Under 18 U.S.C. § 1962(c); COA 475, Pennsylvania Department of Human Services, Civil RICO Under 18 U.S.C. § 1962(c); COA 476, Pennsylvania Department of Military and Veterans Affairs, Civil RICO Under 18 U.S.C. § 1962(c); COA 477, Pennsylvania General Assembly, Civil RICO Under 18 U.S.C. § 1962(c); COA 478, Pennsylvania Legal Aid Network, Inc., Civil RICO Under 18 U.S.C. § 1962(c); COA 479, Supreme Court of Pennsylvania, Civil RICO Under 18 U.S.C. § 1962(c); COA 480, Michael F.J. Piecuch, Civil RICO Under 18 U.S.C. § 1962(c); COA 481, Jeffrey A. Rowe, Civil RICO Under 18 U.S.C. § 1962(c); COA 482, Jamie Saleski, Civil RICO Under 18 U.S.C. § 1962(c); COA 483, Sholley, Civil RICO Under 18 U.S.C. § 1962(c); COA 484, Timothy Smith, Civil RICO Under 18 U.S.C. § 1962(c); COA 485, Snyder County, Civil RICO Under 18 U.S.C. § 1962(c); COA 486, Snyder County STOP Coalition, Civil RICO Under 18 U.S.C. § 1962(c); COA 487, Sarah Stigerwalt-Egan, Civil RICO Under 18 U.S.C. § 1962(c); COA 488, K. Michael Sullivan, Civil RICO Under 18 U.S.C.

§ 1962(c); COA 489, David Andrew Strouse, Civil RICO Under 18 U.S.C. § 1962(c); COA 490, Transitions Legal Center, Civil RICO Under 18 U.S.C. § 1962(c); COA 491, Transitions of PA, Civil RICO Under 18 U.S.C. § 1962(c); COA 492, David K. Trevaskis, Civil RICO Under 18 U.S.C. § 1962(c); COA 493, Brian Ulmer, Civil RICO Under 18 U.S.C. § 1962(c); COA 494, Union County, Civil RICO Under 18 U.S.C. § 1962(c); COA 495, Union–Snyder County Bar Association, Civil RICO Under 18 U.S.C. § 1962(c); COA 496, Union County Criminal Justice Advisory Board, Civil RICO Under 18 U.S.C. § 1962(c); COA 497, Union County Mental Health Advisory Committee, Civil RICO Under 18 U.S.C. § 1962(c); COA 498, Union County STOP Coalition, Civil RICO Under 18 U.S.C. § 1962(c); COA 499, United States Bankruptcy Court for the Middle District of Pennsylvania, Civil RICO Under 18 U.S.C. § 1962(c); COA 500, United States Congress, Civil RICO Under 18 U.S.C. § 1962(c); COA 501, United States Court of Appeals for the Third Circuit, Civil RICO Under 18 U.S.C. § 1962(c); COA 502, United States District Court for the Middle District of Pennsylvania, Civil RICO Under 18 U.S.C. § 1962(c); COA 503, United States Department of Health and Human Services, Civil RICO Under 18 U.S.C. § 1962(c); and COA 504, United States Judicial Conference, Civil RICO Under 18 U.S.C. § 1962(c), from the 651-count inventory attached as exhibits.

2570. The elements of a Civil RICO claim under 18 U.S.C. § 1962(c) are conduct, of an enterprise, through a pattern, of racketeering activity, and injury to business or property by reason of the RICO violation.

2571. Defendants violated 18 U.S.C. § 1962(c) because each conducted or participated in the conduct of the legal-industry enterprise through a pattern of racketeering activity involving repeated fraudulent, obstructive, and retaliatory conduct that preserved funding, preserved monopoly control, suppressed competition, concealed nonperformance, blocked substitute-provider access, preserved false or misleading representation-status impressions, and punished Grohol's legal team for exposing legal-aid malpractice and nonperformance.

2572. The enterprise was an association-in-fact enterprise affecting interstate commerce and consisted of North Penn Legal Services, Inc., legal-aid managers, funding intermediaries, bar entities, disciplinary actors, judicial actors, legal-industry policy actors, professional-legitimacy actors, court-connected actors, county-connected actors, advisory actors, attorney-practice gatekeepers, referral gatekeepers, volunteer-program gatekeepers, public-service actors, and Doe participants who functioned together as a continuing unit.

2573. The pattern included repeated mail fraud and wire fraud through case reports, grant reports, eligibility certifications, compliance statements, billing-related submissions, funding-related communications, referral communications,

exclusion communications, client communications, court-facing communications, judicial communications, county-facing communications, attorney-practice communications, advisory communications, professional communications, bar-connected communications, public-service communications, and other interstate or electronic communications.

2574. Those communications represented, implied, or allowed others to believe that matters were active, eligible, worked, compliant, professionally administered, properly supervised, properly staffed, or lawfully handled when North Penn Legal Services, Inc. had abandoned matters, missed hearings, failed to notify clients, failed to perform meaningful advocacy, failed to withdraw lawfully, failed to transfer files, failed to open substitute-provider access, or failed to protect clients from adverse rulings.

2575. Administrative Office of Pennsylvania Courts conducted or participated in the conduct of the enterprise's affairs through judicial-branch administration, court-access systems, statewide court-user systems, court-recognized legitimacy, attorney-regulation support, court-connected public-service structures, and administrative practices affecting whether abandoned legal-aid clients could obtain meaningful correction.

2576. Administrative Office of Pennsylvania Courts preserved the enterprise's false or misleading active-representation impressions by maintaining court-

administration systems that treat counsel-of-record status, court-facing compliance, attorney-centered filing practices, and lawyer-controlled procedural access as adequate despite client abandonment, missed hearings, conflict barriers, and lack of substitute-provider access.

2577. Administrative Office of Pennsylvania Courts furthered the pattern because court-administration systems can conceal or fail to correct nonperformance when legal-aid counsel remains formally attached to a matter, and those systems allow public-facing and court-facing legitimacy to continue while clients remain without meaningful advocacy.

2578. Administrative Office of Pennsylvania Courts caused injury to business or property because its conduct kept Grohol and similarly situated clients dependent on counsel-of-record appearances, impaired substitute-provider access, reduced meaningful court-access assistance, preserved nonperforming legal-aid control, and contributed to lost property, lost claims, lost hearings, and lost redress.

2579. American Bar Association conducted or participated in the conduct of the enterprise's affairs through national bar influence, professional-legitimacy systems, model professional structures, legal-education legitimacy, attorney-regulation narratives, pro bono narratives, public-service legal norms, and bar-connected channels that preserved lawyer-controlled access to legal services.

2580. American Bar Association preserved the enterprise's control by promoting or legitimizing lawyer-only professional structures, bar-approved public-service systems, pro bono channels, disciplinary norms, and professional-authority narratives that allowed incumbent legal institutions to claim legitimacy while clients lacked meaningful service and substitute providers lacked equal access.

2581. American Bar Association furthered the pattern because national professional legitimacy affects whether funders, courts, public-service partners, local bar actors, substitute providers, nonlawyer assistance models, malpractice-victim advocates, and legal-services reformers receive credibility or exclusion when they challenge legal-industry self-protection.

2582. American Bar Association caused injury to business or property because its conduct preserved professional structures that reduced provider choice, limited substitute-provider access, restricted nonlawyer and nonprofit alternatives, suppressed malpractice-redress services, and kept Grohol and the class dependent on lawyer-controlled channels after legal-aid failure.

2583. Bloomsburg Fair Association conducted or participated in the conduct of the enterprise's affairs through public-event access, vendor access, veterans-resource-event access, veterans-expo structures, public-official partnerships, public-facing civic legitimacy, and event communications affecting whether legal-service providers could reach veterans, disabled veterans, and community members.

2584. Bloomsburg Fair Association preserved the enterprise’s exclusionary mechanisms by allowing public-facing veterans-event access, vendor access, resource-fair access, and community outreach to operate through selective, incumbent-approved, public-official-approved, or bar-connected channels instead of open access for competing legal-service providers.

2585. Bloomsburg Fair Association furthered the pattern because public events and veterans-resource events determine whether legal-service competitors can build client trust, recruit volunteers, reach donors, reach referral sources, and provide substitute legal help outside incumbent lawyer-controlled channels.

2586. Bloomsburg Fair Association caused injury to business or property because event-access restrictions reduced public-service opportunities, veterans-service access, referral opportunities, community legitimacy, substitute-provider visibility, and the practical legal-service options available to Grohol, veterans, disabled veterans, and similarly situated clients.

2587. Matthew W. Brann conducted or participated in the conduct of the enterprise’s affairs through federal judicial authority, district-court authority, docket control, case-management authority, attorney-practice norms, sanctions authority, recusal authority, federal-court legitimacy, and judicial credibility systems affecting federal court-access legal services and attorney accountability.

2588. Brann preserved the enterprise's control by reinforcing federal-court structures in which procedural complexity, pleading standards, judicial discretion, sanctions risk, local practice norms, electronic filing expectations, and attorney-centered credibility determine whether malpractice victims, legal-aid clients, injured consumers, and legal-services reformers can obtain meaningful relief.

2589. Brann furthered the pattern because federal judicial conduct, federal court access, attorney-practice gatekeeping, sanctions exposure, and judicial credibility determinations can block corrective action by clients, substitute providers, lawyer critics, and malpractice-accountability advocates while protecting lawyer-controlled institutions from outside accountability.

2590. Brann caused injury to business or property because federal-court gatekeeping reduced meaningful court-access assistance, chilled service expansion by future attorneys and nonprofit providers, restricted nonlawyer and independent assistance, preserved lawyer-centered litigation control, and kept Grohol and the class dependent on scarce attorney-controlled channels.

2591. Heath Brosius conducted or participated in the conduct of the enterprise's affairs through prosecutorial authority, Snyder County public-office authority, court-facing power, prosecutor-connected service access, victim-service influence, domestic-violence service influence, STOP Coalition involvement, public-service legitimacy, and local referral systems.

2592. Brosius preserved the enterprise's control by reinforcing county-connected and prosecutor-connected structures in which prosecutors, judges, service providers, legal-aid actors, domestic-violence systems, victim-service systems, and public-service actors control referrals, coalition access, service legitimacy, and provider access to vulnerable clients.

2593. Brosius furthered the pattern because prosecutor-connected and victim-service systems affect whether victims, survivors, legal-aid clients, disabled persons, veterans, disabled veterans, and other vulnerable persons receive only incumbent-approved legal-service channels or meaningful conflict-free alternatives.

2594. Brosius caused injury to business or property because prosecutor-connected gatekeeping reduced public-service legal access, limited conflict-free substitute-provider access, discouraged independent nonprofit providers, restricted referral channels, and preserved closed legal-service systems serving vulnerable clients.

Two controlling instructions: one count for all defendants; 3 to 5 substantive paragraphs per defendant.

COUNT 25 CONTINUED

2595. Jessica Chapman conducted or participated in the conduct of the enterprise's affairs through lawyer status, court-adjacent authority, county-court access, local

professional legitimacy, legal-services participation, public-service legal networks, referral-connected structures, legal-aid-connected systems, courthouse legitimacy, and professional channels affecting whether vulnerable clients could access substitute legal-service providers.

2596. Chapman preserved the enterprise's control by reinforcing lawyer-controlled and public-service-connected systems in which attorney status, legal-aid relationships, referral credibility, professional legitimacy, and court-adjacent access determine which providers may reach clients, challenge incumbent misconduct, and expand available civil legal services.

2597. Chapman furthered the pattern because local legal-service actors can conceal or preserve false active-service impressions when they treat incumbent-approved providers as legitimate while marginalizing independent, conflict-free, nonprofit, lawyer-critical, or reform-oriented providers capable of increasing the number of clients served.

2598. Chapman caused injury to business or property because her conduct reduced independent accountability, limited substitute-provider access, preserved incumbent legal-aid and bar-connected control, restricted future attorneys and nonprofit providers, and reduced the legal-service choices available to Grohol, malpractice victims, legal-aid clients, and vulnerable court users.

2599. William R. Christman III conducted or participated in the conduct of the enterprise’s affairs through Pennsylvania Bar Association general-counsel authority, attorney status, statewide bar influence, professional-legitimacy control, staff and volunteer communication channels, public-service legal-program authority, Wills for Heroes access, and bar-connected service systems.

2600. Christman preserved the enterprise’s control by using or supporting bar-controlled communication restrictions, public-service legal-program restrictions, professional-legitimacy barriers, witness-access barriers, volunteer-channel barriers, and institutional credibility barriers that limited whether independent providers could participate in service-expanding legal programs.

2601. Christman furthered the pattern because statewide bar authority affects whether attorneys, nonprofit providers, legal-services reformers, volunteers, staff, public-service partners, and clients can communicate freely, form service partnerships, increase legal-service output, disclose malpractice, and obtain substitute-provider access outside incumbent lawyer-controlled systems.

2602. Christman caused injury to business or property because bar-connected communication control and program exclusion reduced service capacity, restricted substitute-provider participation, chilled future attorneys and nonprofit providers, suppressed lawyer-critical market entrants, and kept Grohol and the class dependent on closed attorney-controlled channels.

2603. Mary Beth Clark conducted or participated in the conduct of the enterprise's affairs through lawyer status, North Penn Legal Services relationships, Union–Snyder County Bar Association influence, local bar governance, legal-aid-connected authority, referral structures, public-service legal programming, Wills for Heroes planning, PFA-fee access, Judicare-related access, and local professional legitimacy.

2604. Clark preserved the enterprise's control by reinforcing legal-aid-connected and local-bar structures in which incumbent lawyers control referrals, fee opportunities, pro bono opportunities, public-service programs, committee access, local professional acceptance, and the practical ability of competing providers to serve low-income clients and malpractice victims.

2605. Clark furthered the pattern because local legal-aid and bar gatekeepers can conceal nonperformance, protect incumbent providers, discourage conflict-free alternatives, steer referral opportunities away from competitors, and preserve lawyer-controlled accountability systems that leave injured clients dependent on the same professional network that failed them.

2606. Clark caused injury to business or property because legal-aid and local-bar gatekeeping reduced client choice, suppressed conflict-free substitute counsel, limited public-service opportunities, impaired referral competition, burdened future

attorneys and nonprofit competitors, and reduced the legal-service options available to Grohol and the class.

2607. Committee on Rules of Practice and Procedure conducted or participated in the conduct of the enterprise’s affairs through federal rulemaking authority, practice-rule authority, procedural-rule authority, federal-court-access influence, judicial-administration influence, professional-regulation influence, institutional legitimacy, and lawyer-centered procedural systems.

2608. Committee on Rules of Practice and Procedure preserved the enterprise’s control by maintaining procedural, pleading, discovery, motion, filing, and federal-court-access structures that require lawyer-centered expertise and make meaningful participation difficult for malpractice victims, injured legal consumers, low-income clients, nonlawyer competitors, court navigators, and legal-services reformers.

2609. Committee on Rules of Practice and Procedure furthered the pattern because procedural rules shape who can enter court, who can present claims effectively, who can challenge attorney misconduct, who can navigate federal litigation, and whether alternative court-access services can compete with licensed-lawyer control.

2610. Committee on Rules of Practice and Procedure caused injury to business or property because lawyer-centered federal procedural systems reduced legal-service output, increased dependence on licensed attorneys, restricted alternative legal

assistance, suppressed court-navigation competition, and kept Grohol, malpractice victims, and future market entrants dependent on lawyer-approved procedural gatekeepers.

2611. Commonwealth of Pennsylvania conducted or participated in the conduct of the enterprise's affairs through sovereign authority, statutory authority, public-funding authority, court-system creation, attorney-regulation support, unauthorized-practice structures, legal-aid funding structures, public-service structures, and institutional legitimacy conferred on lawyer-controlled systems.

2612. Commonwealth of Pennsylvania preserved the enterprise's control by supporting state-sanctioned licensing, court access, unauthorized-practice rules, legal-aid systems, disciplinary systems, public-service access, referral systems, and professional-legitimacy systems that preserve lawyer dominance and restrict nonlawyer competition.

2613. Commonwealth of Pennsylvania furthered the pattern because state-created and state-funded structures channel malpractice victims, low-income clients, court users, and legal-services reformers through lawyer-controlled institutions for representation, discipline, court access, and accountability while excluding independent alternatives from equal legitimacy.

2614. Commonwealth of Pennsylvania caused injury to business or property because state-supported lawyer-control structures reduced client choice,

suppressed legal-service competition, reduced malpractice-redress output, burdened future attorneys and nonlawyer competitors, and preserved incumbent legal institutions from market accountability.

2615. Two controlling instructions: one count for all defendants; 3 to 5 substantive paragraphs per defendant.

2616. COUNT 25 CONTINUED

2617. Mark J. Conway conducted or participated in the conduct of the enterprise's affairs through federal judicial authority, bankruptcy-court authority, sanctions authority, recusal authority, docket authority, hearing authority, attorney-practice authority, local-rule authority, courtroom control, and federal bankruptcy structures affecting bankruptcy and debt-relief legal-service markets.

2618. Conway preserved the enterprise's control by reinforcing a system in which bankruptcy judges, lawyers, bankruptcy courts, local rules, sanctions risk, recusal standards, attorney-practice expectations, and judicial credibility determinations control whether debtors, homeowners, low-income litigants, nonlawyer competitors, and legal-services reformers can obtain or provide meaningful bankruptcy-related assistance.

2619. Conway furthered the pattern because bankruptcy-court authority affects whether future attorneys, nonprofit providers, court-access advocates, debt-relief providers, and malpractice-accountability advocates can enter, expand, criticize

court-connected actors, provide meaningful assistance, and obtain substitute-provider access without retaliatory judicial pressure.

2620. Conway caused injury to business or property because bankruptcy-court gatekeeping reduced competition in debt-relief and bankruptcy-related legal services, chilled future attorneys and legal-services reformers, increased dependence on licensed lawyers, reduced access to independent accountability mechanisms, and preserved lawyer-centered control over debtors, homeowners, low-income litigants, and malpractice victims.

2621. Court of Judicial Discipline conducted or participated in the conduct of the enterprise's affairs through judicial-discipline authority, judicial-accountability gatekeeping, court-connected institutional legitimacy, judge-regulation structures, professional-accountability systems, and a lawyer-and-judge-controlled accountability framework affecting legal-service output and attorney accountability.

2622. Court of Judicial Discipline preserved the enterprise's control by maintaining a judicial-accountability structure that requires malpractice victims, court users, lawyer critics, nonlawyer competitors, legal-services reformers, and future attorneys to seek accountability through judge-centered and lawyer-centered mechanisms rather than independent consumer-protection or market-accountability channels.

2623. Court of Judicial Discipline furthered the pattern because judicial accountability affects attorney accountability, court access, professional legitimacy, discipline-related safety, and the willingness of attorneys, advocates, malpractice victims, and legal-services reformers to challenge judges, lawyers, courts, and lawyer-controlled institutions.

2624. Court of Judicial Discipline caused injury to business or property because judge-controlled and lawyer-connected accountability gatekeeping reduced independent oversight, chilled criticism, limited malpractice-redress pathways, preserved court-centered legal-market control, and kept injured legal consumers dependent on institutions aligned with the same profession that controls legal services.

2625. Robert Cravitz conducted or participated in the conduct of the enterprise’s affairs through lawyer status, local attorney networks, Union–Snyder County Bar Association participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and court-connected local legal structures affecting local legal-service markets.

2626. Cravitz preserved the enterprise’s control by reinforcing local professional structures in which established lawyers, bar participants, court-connected actors, and public-service participants control credibility, referrals, public-service access,

local professional acceptance, and the practical ability to challenge lawyer misconduct.

2627. Cravitz furthered the pattern because local attorney networks can collectively isolate critics, protect incumbent lawyers, discourage malpractice accountability, and make market entry difficult for future attorneys, nonlawyer competitors, independent advocates, and legal-services reformers who refuse to accept lawyer-controlled norms.

2628. Cravitz caused injury to business or property because local lawyer-network gatekeeping reduced access to referrals, public-service participation, professional legitimacy, attorney cooperation, client channels, and competitive legal-service opportunities for malpractice victims, injured consumers, future attorneys, and nonlawyer competitors.

2629. Doe Defendants 1 through 200 conducted or participated in the conduct of the enterprise's affairs through membership in defendant entities, listserv participation, court-connected roles, bar-connected roles, legal-aid roles, public-service roles, veterans-service roles, referral-network roles, disciplinary-adjacent roles, funding-adjacent roles, and professional networks that preserved lawyer control over legal services and attorney accountability.

2630. Doe Defendants 1 through 200 preserved the enterprise's control by receiving, participating in, ratifying, aiding, failing to prevent, or benefitting from

professional structures that excluded malpractice victims, injured legal consumers, low-income clients, nonlawyer competitors, legal-services reformers, and lawyer critics from equal access to referrals, programs, court systems, public-service networks, legal-aid networks, and professional legitimacy.

2631. Doe Defendants 1 through 200 furthered the pattern because unknown bar participants, court-connected participants, public-service actors, legal-aid actors, referral actors, and professional-network participants can enforce reputational harm, access denial, referral loss, committee exclusion, program exclusion, professional silence, and credibility loss against future market entrants who challenge lawyer misconduct.

2632. Doe Defendants 1 through 200 caused injury to business or property because collective professional gatekeeping reduced competitive entry, suppressed nonlawyer assistance, reduced independent accountability services, limited malpractice-redress pathways, and preserved lawyer-controlled access to clients, courts, public programs, referrals, funding, and professional legitimacy.

2633. Federal Judicial Center conducted or participated in the conduct of the enterprise's affairs through federal judicial-education authority, federal judicial-administration influence, research and training functions, court-system legitimacy, professional norms, judicial-policy influence, and institutional support for lawyer-and-judge-controlled federal court structures.

2634. Federal Judicial Center preserved the enterprise's control by reinforcing federal judicial norms, federal court practices, judicial training, court-administration practices, professionalism narratives, and court-access expectations that preserve lawyer-centered control over litigation, legal accountability, court navigation, malpractice redress, and attorney discipline.

2635. Federal Judicial Center furthered the pattern because federal judicial education and court-system research affect how judges treat pro se litigants, nonlawyer assistance, lawyer critics, malpractice victims, court-access reformers, and future attorneys challenging lawyer-controlled procedural and professional systems.

2636. Federal Judicial Center caused injury to business or property because federal judicial-system legitimacy and training structures reduced competitive accountability, preserved lawyer-centered litigation control, limited meaningful nonlawyer assistance, chilled court-access reform, and kept injured legal consumers dependent on lawyer-dominated federal court processes.

2637. Lori R. Hackenberg conducted or participated in the conduct of the enterprise's affairs through judicial office, county-court authority, courthouse-program influence, local legal authority, court-connected professional networks, local bar relationships, public-service access, professional legitimacy, docket-

control structures, and lawyer-and-judge-controlled legal structures affecting local court-access and public-service legal markets.

2638. Hackenberg preserved the enterprise's control by reinforcing court-connected structures in which judges, lawyers, courthouse actors, bar participants, docket systems, attorney-practice expectations, and public-service networks control recognition, access, credibility, program participation, substitute-provider access, and the ability to challenge lawyer misconduct without professional retaliation.

2639. Hackenberg furthered the pattern because judicial actors can preserve false or misleading active-case impressions when counsel-of-record status, docket control, court-facing legitimacy, attorney-practice access, and judicial silence allow legal-aid nonperformance to remain uncorrected while clients lack meaningful substitute-provider access.

2640. Hackenberg caused injury to business or property because judicially connected professional gatekeeping reduced alternative legal-service access, limited public-service competition, chilled future attorney criticism, reduced malpractice-redress opportunities, preserved local lawyer-centered control over court-adjacent legal services, and kept Grohol and similarly situated clients dependent on failed legal-aid structures.

2641. International Legal Aid Group conducted or participated in the conduct of the enterprise's affairs through international legal-aid influence, comparative legal-aid legitimacy, professional-network authority, legal-aid policy recognition, legal-aid institutional credibility, and support for lawyer-centered legal-aid structures that preserve incumbent legal-aid control.

2642. International Legal Aid Group preserved the enterprise's control by reinforcing legal-aid norms that treat lawyer-controlled legal aid, lawyer-administered access to justice, and institutional provider networks as the proper channels for low-income legal services while excluding nonlawyer competitors, independent accountability providers, conflict-free malpractice-redress alternatives, and competing service models from equal legitimacy.

2643. International Legal Aid Group furthered the pattern because legal-aid legitimacy affects funding, referrals, policy acceptance, public-service credibility, institutional recognition, and the ability of future attorneys, nonprofit competitors, and nonlawyer competitors to challenge legal-aid malpractice, conflicts, abandonment, and failure to provide substitute counsel.

2644. International Legal Aid Group caused injury to business or property because its legal-aid legitimacy structures reduced legal-aid competition, limited conflict-free alternatives, suppressed independent client-accountability services, preserved

incumbent provider control, and kept low-income clients and malpractice victims dependent on lawyer-controlled legal-aid systems.

2645. Judicial Conduct Board of Pennsylvania conducted or participated in the conduct of the enterprise's affairs through judicial-discipline screening authority, judicial-accountability gatekeeping, complaint-intake authority, investigative discretion, professional-accountability influence, court-connected legitimacy, and lawyer-and-judge-controlled accountability structures affecting legal-service markets.

2646. Judicial Conduct Board of Pennsylvania preserved the enterprise's control by maintaining a judicial-accountability system that routes complaints against judges through institutional actors connected to the same court-centered professional environment that legal-services reformers, malpractice victims, injured clients, and attorney critics must challenge.

2647. Judicial Conduct Board of Pennsylvania furthered the pattern because judicial discipline affects whether lawyers, judges, courts, and court-connected actors face meaningful consequences when they punish criticism, restrict court access, burden malpractice victims, protect attorney misconduct from outside accountability, or allow false and misleading court-facing impressions to continue.

2648. Judicial Conduct Board of Pennsylvania caused injury to business or property because judicial-accountability gatekeeping reduced independent

oversight, discouraged future attorneys from challenging judges and lawyers, limited malpractice-redress pathways, preserved court-centered professional control, and kept injured consumers dependent on lawyer-and-judge-controlled accountability systems.

2649. Heather Kelly conducted or participated in the conduct of the enterprise's affairs through North Penn Legal Services management authority, legal-aid influence, lawyer status, public-funded legal-service authority, supervision practices, grievance-response practices, client-service systems, intake structures, and legal-aid structures that preserved incumbent provider control over low-income clients.

2650. Kelly preserved the enterprise's control by reinforcing a legal-aid structure in which incumbent providers control client intake, case assignment, representation status, referrals, supervision, correction of malpractice, client repair, conflict determinations, grievance responses, and institutional narratives after legal-aid clients suffer abandonment, missed hearings, poor communication, or conflict-related harm.

2651. Kelly furthered the pattern because legal-aid managers and legal-aid lawyers can conceal or preserve false active-case impressions by failing to create conflict-free substitute counsel systems, failing to correct client harm, limiting

replacement-provider access, preserving incumbent provider credibility, and keeping vulnerable clients dependent on lawyer-controlled legal-aid institutions.

2652. Kelly caused injury to business or property because legal-aid gatekeeping reduced conflict-free substitute counsel, limited client choice, suppressed independent legal-aid accountability, discouraged future legal-aid competitors, reduced malpractice-redress services, and preserved incumbent control over low-income clients, malpractice victims, and injured legal consumers.

2653. Brian Kerstetter conducted or participated in the conduct of the enterprise's affairs through prosecutorial authority, public-office authority, court-facing power, advisory-board influence, local legal-system authority, public-service participation, county-connected referral structures, and lawyer-centered professional networks that preserved attorney control over public legal systems.

2654. Kerstetter preserved the enterprise's control by reinforcing structures in which prosecutors, courts, advisory boards, public-service networks, bar-connected actors, county officials, and lawyer-controlled institutions control credibility, access, referrals, public legitimacy, professional safety, and accountability channels for lawyers and nonlawyer competitors who challenge legal-system misconduct.

2655. Kerstetter furthered the pattern because prosecutorial and advisory-board influence affects whether legal-services reformers, malpractice victims, nonlawyer

competitors, and future attorneys can challenge local legal institutions while maintaining credibility, referrals, court-adjacent access, public-service access, and substitute-provider access.

2656. Kerstetter caused injury to business or property because prosecutorial and advisory-board gatekeeping reduced legal-service competition, chilled future attorneys and legal-services reformers, restricted public-service access, limited nonlawyer assistance, reduced referral alternatives, and preserved lawyer-centered control over professional legitimacy and attorney accountability.

2657. Robert Leadbeter conducted or participated in the conduct of the enterprise's affairs through public-office authority, public-facing veterans-event influence, public-service legitimacy, event-access influence, community-recognition authority, veterans-service access, Bloomsburg Fair access, Wills for Heroes access, public-official communications, and coordination with lawyer-controlled or bar-connected public-service structures.

2658. Leadbeter preserved the enterprise's control by reinforcing public-facing service systems in which public officials, event gatekeepers, bar-connected actors, veterans-service networks, public-service channels, and community institutions control whether independent legal-service providers receive access to public audiences, community legitimacy, referral opportunities, client outreach, and public trust.

2659. Leadbeter furthered the pattern because public-facing legal-service access affects whether future attorneys, independent advocates, nonprofit providers, disabled-veterans advocates, nonlawyer competitors, and legal-services reformers can build public trust outside bar-controlled, lawyer-approved, incumbent-approved, or public-official-approved service channels.

2660. Leadbeter caused injury to business or property because public-official, veterans-event, Bloomsburg Fair, and Wills for Heroes gatekeeping reduced community outreach, public-service competition, referral access, veterans-service access, independent legal-service legitimacy, nonlawyer assistance, and available legal-service output for Grohol, veterans, disabled veterans, legal-aid clients, and the class.

2661. Legal Services Corporation conducted or participated in the conduct of the enterprise's affairs through federal legal-aid funding authority, grantee oversight, regulatory authority, compliance structures, legal-aid legitimacy, national legal-aid influence, provider recognition, and support for lawyer-controlled civil legal-aid systems.

2662. Legal Services Corporation preserved the enterprise's control by funding and legitimizing a legal-aid structure in which dominant regional providers control intake, eligibility, referrals, case acceptance, conflicts, client repair, substitute-

provider access, public legal-aid credibility, and grievance responses without creating meaningful independent alternatives when grantees harm clients.

2663. Legal Services Corporation furthered the pattern because federal legal-aid funding channels low-income clients through lawyer-controlled nonprofits and lawyer-supervised provider networks while excluding nonlawyer competitors, independent accountability advocates, conflict-free substitute systems, and alternative legal-service providers from equal funding, legitimacy, and referral access.

2664. Legal Services Corporation caused injury to business or property because its funding and oversight structure reduced client choice, reduced conflict-free representation, reduced malpractice-redress output, limited independent legal-aid competition, suppressed substitute-provider access, and kept Grohol, low-income clients, and malpractice victims dependent on incumbent lawyer-controlled providers.

2665. Kathleen Lincoln conducted or participated in the conduct of the enterprise's affairs through lawyer status, Union–Snyder County Bar Association officer status, local bar governance, treasurer authority, court-connected professional relationships, settlement-related professional influence, and local legal networks that preserved lawyer-centered control over credibility and cooperation.

2666. Lincoln preserved the enterprise's control by reinforcing a local bar environment in which lawyers who criticize ethical violations, courthouse practices, prothonotary conduct, legal-aid malpractice, bar retaliation, or lawyer-controlled public-service structures risk professional isolation, settlement consequences, loss of project support, and loss of bar-connected cooperation.

2667. Lincoln furthered the pattern because local bar officers and lawyer networks can control informal but essential market inputs, including trust, referrals, settlement cooperation, public-service support, committee access, local legitimacy, attorney cooperation, and professional relationships needed by future attorneys and competing legal-service providers.

2668. Lincoln caused injury to business or property because local bar pressure reduced competitive legal-service access, chilled future attorney criticism, discouraged malpractice-accountability work, impaired public-service cooperation, restricted referral alternatives, and preserved incumbent lawyer networks from meaningful accountability.

2669. Gabriele Miller-Wagner conducted or participated in the conduct of the enterprise's affairs through Pennsylvania Bar Association pro bono authority, statewide Wills for Heroes coordination, volunteer recruitment influence, public-service legal-program access, scheduling authority, professional-legitimacy control, and statewide bar-connected legal-service networks.

2670. Miller-Wagner preserved the enterprise's control by reinforcing statewide pro bono structures in which bar-connected actors control access to public-service programs, volunteers, event legitimacy, regional outreach, veterans-service channels, public-facing program credibility, and professional credibility for attorneys and legal-service providers who seek to operate outside incumbent lawyer-controlled systems.

2671. Miller-Wagner furthered the pattern because statewide pro bono coordination affects which attorneys, nonprofit providers, nonlawyer competitors, legal-services reformers, veterans-service advocates, students, volunteers, and public-service partners can reach clients, recruit volunteers, build public trust, and obtain professional legitimacy.

2672. Miller-Wagner caused injury to business or property because pro bono and public-service gatekeeping reduced legal-service output, limited future attorney participation, suppressed independent service providers, restricted access to veterans and vulnerable clients, reduced referral alternatives, and preserved bar-controlled program structures from competitive accountability.

2673. Lori Molloy conducted or participated in the conduct of the enterprise's affairs through North Penn Legal Services executive authority, legal-aid management, public-funding control, attorney supervision, intake systems, client-service systems, grievance-response authority, malpractice-response systems, and

institutional relationships with courts, funders, bar actors, referral sources, and public-service networks.

2674. Molloy preserved the enterprise’s control by reinforcing a legal-aid structure in which incumbent providers control referrals, employment narratives, client access, staff communications, supervision, correction of malpractice, case assignments, conflict determinations, grievance responses, and institutional credibility after legal-aid clients suffer missed hearings, abandoned files, poor communication, or unclear representation status.

2675. Molloy furthered the pattern because executive legal-aid authority allows incumbent providers to retain public funds, referrals, client trust, and institutional status while limiting conflict-free substitutes, independent accountability work, competing nonprofit legal-service alternatives, and market pressure to correct nonperformance.

2676. Molloy caused injury to business or property because legal-aid executive gatekeeping reduced client choice, limited substitute counsel, suppressed competing nonprofit providers, reduced malpractice-redress services, restricted conflict-free alternatives, and kept low-income clients and injured legal consumers dependent on incumbent lawyer-controlled legal-aid structures.

2677. Jenna Ann Neidig conducted or participated in the conduct of the enterprise’s affairs through lawyer status, Union–Snyder County Bar Association

participation, officer or former-officer status, local bar governance, listserv participation, meeting-record structures, public-service legal programming, and court-connected professional networks.

2678. Neidig preserved the enterprise's control by reinforcing local bar structures in which established lawyers and bar officers control meeting access, records, listservs, committee participation, public-service programs, local professional legitimacy, referral credibility, attorney cooperation, and the practical ability to challenge lawyer misconduct without retaliation.

2679. Neidig furthered the pattern because local bar governance and record practices affect who receives credibility, who receives access, who can document objections, who can challenge governance abuses, and who can participate in legal-service opportunities outside incumbent lawyer-approved channels.

2680. Neidig caused injury to business or property because local bar gatekeeping reduced public-service access, referral opportunities, professional credibility, meeting access, committee access, competitive legal-service opportunities, and independent accountability options for future attorneys, nonlawyer competitors, malpractice victims, and legal-services reformers.

2681. North Penn Legal Services, Inc. conducted or participated in the conduct of the enterprise's affairs through public legal-aid funding, regional provider authority, client intake control, case-assignment control, attorney supervision,

representation-status control, referral relationships, legal-aid credibility, grievance systems, and institutional control over low-income civil legal services.

2682. North Penn Legal Services, Inc. preserved the enterprise's control by maintaining a legal-aid structure in which dominant providers control access to eligible clients, referrals, public funding, staff assignments, case handling, conflict determinations, client repair, substitute-provider access, and institutional narratives after legal-aid clients suffer attorney abandonment, malpractice, missed hearings, poor communication, or unclear representation status.

2683. North Penn Legal Services, Inc. furthered the pattern because regional legal-aid dominance allows a lawyer-controlled nonprofit to keep money, authority, referrals, and public legitimacy while harmed clients lack meaningful replacement counsel and competing providers lack equal access to funding, referrals, and institutional credibility.

2684. North Penn Legal Services, Inc. caused injury to business or property because incumbent legal-aid control reduced legal-service output, limited client choice, restricted conflict-free substitute counsel, suppressed competing nonprofit providers, reduced malpractice accountability, and kept Grohol and similarly situated low-income clients dependent on the same provider structure that failed them.

2685. Northumberland County Prothonotary’s Office conducted or participated in the conduct of the enterprise’s affairs through public filing authority, docket access, court-record access, courthouse administration, public-office legitimacy, service and filing practices, and court-access structures that affect who can use the courts effectively.

2686. Northumberland County Prothonotary’s Office preserved the enterprise’s control by maintaining court-access systems in which filing practices, docket practices, record access, clerk interactions, courthouse procedures, and local court administration determine whether injured clients, nonlawyer assistants, court navigators, and legal-services reformers can participate effectively.

2687. Northumberland County Prothonotary’s Office furthered the pattern because filing and docket systems can preserve false or misleading active-case impressions when procedural fluency, filing knowledge, docket navigation, local courthouse norms, and public-office credibility favor counsel-of-record structures and burden injured consumers outside lawyer-controlled channels.

2688. Northumberland County Prothonotary’s Office caused injury to business or property because filing and docket gatekeeping reduced court-access competition, restricted practical legal assistance, limited nonlawyer court-navigation support, reduced malpractice-victim access to remedies, and preserved lawyer-centered control over the systems injured clients must use to obtain relief.

2689. Office of Attorney General conducted or participated in the conduct of the enterprise's affairs through public legal authority, state-law enforcement authority, attorney status, public-office legitimacy, legal-market influence, state litigation authority, consumer-protection influence, and participation in professional structures that preserved lawyer control over legal services and attorney accountability.

2690. Office of Attorney General preserved the enterprise's control by reinforcing a system in which government lawyers, state legal offices, courts, disciplinary actors, bar-connected actors, public agencies, and lawyer-controlled institutions control legal legitimacy, enforcement credibility, public legal narratives, consumer-protection pathways, and access to accountability mechanisms.

2691. Office of Attorney General furthered the pattern because state legal authority can confer legitimacy on lawyer-controlled regulatory systems, defend attorney-centered structures, protect public legal institutions, limit independent consumer-protection accountability against lawyers and legal-service providers, and preserve false or misleading impressions that clients have meaningful remedies when legal-aid providers abandon them.

2692. Office of Attorney General caused injury to business or property because public legal gatekeeping reduced independent accountability, chilled legal-services reformers, preserved attorney-controlled enforcement channels, limited

competitive alternatives, and reduced the practical ability of malpractice victims and injured legal consumers to obtain non-lawyer-controlled remedies.

2693. Office of Disciplinary Counsel conducted or participated in the conduct of the enterprise's affairs through attorney-discipline authority, complaint-screening authority, investigatory discretion, charging authority, professional-regulation authority, disciplinary legitimacy, and lawyer-controlled accountability structures that determine whether attorney misconduct receives meaningful consequences.

2694. Office of Disciplinary Counsel preserved the enterprise's control by reinforcing a system in which lawyer misconduct, malpractice reporting, peer reporting, ethics complaints, attorney criticism, and lawyer-accountability efforts must pass through disciplinary channels controlled by lawyers and lawyer-adjacent institutions rather than independent consumer-protection or market-accountability systems.

2695. Office of Disciplinary Counsel furthered the pattern because disciplinary gatekeeping controls whether lawyers face accountability, whether attorney critics face professional pressure, whether malpractice victims receive meaningful protection, whether false or misleading representation-status impressions receive correction, and whether future attorneys can challenge legal-system misconduct without risking license-based retaliation.

2696. Office of Disciplinary Counsel caused injury to business or property because disciplinary gatekeeping reduced independent accountability services, chilled future attorney criticism, limited malpractice-redress pathways, preserved lawyer-controlled professional regulation, and kept injured legal consumers dependent on the same profession that controls both legal services and attorney discipline.

2697. Pennsylvania Bar Association conducted or participated in the conduct of the enterprise's affairs through statewide bar authority, professional legitimacy, public-service legal programs, pro bono structures, committee access, continuing legal education influence, lawyer networks, Wills for Heroes structures, referral channels, and bar-governance systems that preserved lawyer control over legal-service access.

2698. Pennsylvania Bar Association preserved the enterprise's control by reinforcing statewide bar structures in which bar-connected actors decide who receives professional credibility, public-service access, committee participation, volunteer channels, program legitimacy, pro bono opportunities, and access to lawyer-approved legal-service networks.

2699. Pennsylvania Bar Association furthered the pattern because statewide bar structures allow lawyers to coordinate professional norms, discipline-related narratives, public-service legitimacy, referral access, market acceptance, public-facing legal opportunities, and communications that can exclude malpractice

victims, nonlawyer competitors, legal-services reformers, and future attorneys who challenge lawyer-controlled systems.

2700. Pennsylvania Bar Association caused injury to business or property because statewide bar gatekeeping reduced legal-service output, restricted future attorney participation, suppressed nonlawyer competition, limited malpractice-accountability alternatives, reduced public-service legal access, and preserved incumbent lawyer-controlled public-service and referral channels.

2701. Pennsylvania Board of Law Examiners conducted or participated in the conduct of the enterprise's affairs through bar-admission authority, examination authority, character-and-fitness screening, licensing gatekeeping, professional-entry control, credentialing authority, and lawyer-regulation structures that determine who may enter the legal-services market as an attorney.

2702. Pennsylvania Board of Law Examiners preserved the enterprise's control by enforcing lawyer-controlled entry requirements that condition legal-market participation on bar passage, character-and-fitness approval, court-approved credentials, law-school pathways, professional conformity, and compliance with professional norms controlled by incumbent lawyers and judges.

2703. Pennsylvania Board of Law Examiners furthered the pattern because bar-admission gatekeeping limits entry into the legal-services market, protects incumbents from competition, restricts alternative pathways to practice, reinforces

lawyer-only control over legal advice and court appearances, and preserves a closed professional environment in which malpractice victims lack sufficient substitute providers.

2704. Pennsylvania Board of Law Examiners caused injury to business or property because licensing gatekeeping reduced legal-service supply, limited future attorney entry, increased barriers to affordable legal assistance, excluded alternative legal-service providers, restricted innovation, and kept malpractice victims and low-income clients dependent on a restricted lawyer-controlled market.

2705. Pennsylvania Department of Human Services conducted or participated in the conduct of the enterprise's affairs through public-funding authority, social-service authority, legal-aid-related funding structures, public-benefits systems, service-provider relationships, referral environments, domestic-violence systems, disability-service systems, and public-service legitimacy affecting access to civil legal help for low-income and vulnerable clients.

2706. Pennsylvania Department of Human Services preserved the enterprise's control by reinforcing public-service systems that channel vulnerable clients through incumbent legal-aid, lawyer-controlled, referral-controlled, and agency-connected structures rather than independent, conflict-free, nonlawyer, or lawyer-critical legal-service alternatives.

2707. Pennsylvania Department of Human Services furthered the pattern because public benefits, family safety, disability services, domestic-violence services, housing-related services, and social-service programs often intersect with civil legal needs, and agency-connected referral systems can determine whether clients receive only lawyer-approved legal help or meaningful competitive alternatives after legal-aid failure.

2708. Pennsylvania Department of Human Services caused injury to business or property because public-service gatekeeping reduced client choice, restricted conflict-free legal-service alternatives, limited independent accountability for legal-aid failures, preserved incumbent referral channels, and burdened future attorneys and nonlawyer competitors seeking to serve vulnerable clients.

2709. Pennsylvania Department of Military and Veterans Affairs conducted or participated in the conduct of the enterprise's affairs through veterans-service authority, coalition access, public-service recognition, veterans-outreach structures, Wills for Heroes and Wills for Veterans connections, event coordination, public-facing legitimacy, and referral channels within legal-service systems serving veterans and disabled veterans.

2710. Pennsylvania Department of Military and Veterans Affairs preserved the enterprise's control by reinforcing a veterans-service structure in which bar-connected actors, public officials, coalition participants, veterans-service networks,

and public-service gatekeepers control which legal-service providers receive access to veterans, disabled veterans, outreach opportunities, referrals, public trust, and public legitimacy.

2711. Pennsylvania Department of Military and Veterans Affairs furthered the pattern because veterans legal-service access depends on public recognition, coalition communications, event participation, outreach channels, and referral legitimacy that can be controlled by lawyer-approved actors instead of opened equally to future attorneys, nonlawyer competitors, independent legal-service providers, and substitute providers after legal-aid failure.

2712. Pennsylvania Department of Military and Veterans Affairs caused injury to business or property because veterans-service gatekeeping reduced legal-service output for veterans and disabled veterans, limited provider choice, restricted alternative legal-service entry, preserved bar-connected program control, and burdened future attorneys and legal-services reformers seeking equal access to public-facing veterans-service markets.

2713. Pennsylvania General Assembly conducted or participated in the conduct of the enterprise's affairs through statutory authority, public-funding authority, legislative recognition of lawyer-controlled systems, legal-aid funding structures, court-system statutes, attorney-regulation frameworks, unauthorized-practice

structures, and legislation or nonlegislation affecting court access, legal aid, and professional accountability.

2714. Pennsylvania General Assembly preserved the enterprise's control by maintaining statutes, funding structures, and legal frameworks that allow lawyer-controlled institutions to dominate legal services, legal aid, court access, attorney discipline, public-service access, referral systems, and malpractice accountability without creating competitive alternatives for injured legal consumers.

2715. Pennsylvania General Assembly furthered the pattern because legislative support, legislative acquiescence, and lawyer-legislator participation can confer public authority, funding, and statutory legitimacy on systems that protect incumbent lawyers, legal-aid providers, bar-connected actors, disciplinary actors, and court-connected structures from outside competition and meaningful client repair.

2716. Pennsylvania General Assembly caused injury to business or property because legislative support or acquiescence reduced legal-service competition, limited nonlawyer assistance, preserved unauthorized-practice barriers, restricted malpractice-redress alternatives, and kept future attorneys, malpractice victims, and low-income clients dependent on lawyer-controlled institutions.

2717. Pennsylvania Legal Aid Network, Inc. conducted or participated in the conduct of the enterprise's affairs through statewide legal-aid coordination,

provider legitimacy, training authority, funding relationships, referral influence, public-service recognition, legal-aid policy influence, and support for lawyer-controlled civil legal-aid systems.

2718. Pennsylvania Legal Aid Network, Inc. preserved the enterprise's control by reinforcing a statewide legal-aid structure in which incumbent providers control intake, referrals, provider credibility, conflicts, substitute-provider access, legal-aid narratives, client repair, grievance responses, public legitimacy, and access to low-income civil legal-service markets after clients suffer malpractice, abandonment, missed hearings, poor communication, or unclear representation status.

2719. Pennsylvania Legal Aid Network, Inc. furthered the pattern because statewide legal-aid coordination can protect grantee status, preserve incumbent credibility, restrict conflict-free alternatives, and prevent low-income clients from obtaining independent legal-aid accountability outside lawyer-controlled provider systems.

2720. Pennsylvania Legal Aid Network, Inc. caused injury to business or property because legal-aid network gatekeeping reduced client choice, limited independent legal-aid competition, restricted substitute-provider access, reduced malpractice-redress output, preserved incumbent lawyer-controlled providers from market accountability, and kept Grohol and the class dependent on legal-aid structures that failed them.

2721. Supreme Court of Pennsylvania conducted or participated in the conduct of the enterprise’s affairs through attorney-admission authority, disciplinary authority, rulemaking authority, unauthorized-practice authority, judicial-system authority, court-access authority, professional-regulation authority, and control over lawyer-centered systems governing entry, practice, discipline, procedure, and accountability.

2722. Supreme Court of Pennsylvania preserved the enterprise’s control by maintaining lawyer-controlled licensing, bar admission, character-and-fitness, disciplinary, professional-conduct, unauthorized-practice, court-rule, and practice-rule structures that define who may provide legal services, who may appear in court, who may assist clients, who may receive professional legitimacy, and who may challenge lawyer misconduct.

2723. Supreme Court of Pennsylvania furthered the pattern because court-controlled professional regulation can preserve false or misleading impressions that attorney discipline, court rules, and lawyer regulation protect clients while the same lawyer-dependent system controls legal-market entry, attorney discipline, public legitimacy, malpractice-accountability pathways, court access, and practical alternatives to licensed-lawyer representation.

2724. Supreme Court of Pennsylvania caused injury to business or property because court-controlled professional regulation reduced legal-service supply,

restricted future attorney entry, excluded nonlawyer competitors, limited malpractice-redress alternatives, suppressed court-access innovation, and kept legal consumers, low-income clients, and court users dependent on lawyer-controlled systems.

2725. Michael F.J. Piecuch conducted or participated in the conduct of the enterprise's affairs through president-judge authority, judicial office, courthouse influence, local court administration, local bar influence, public-service relationships, advisory-board connections, and lawyer-and-judge-controlled professional networks.

2726. Piecuch preserved the enterprise's control by reinforcing local legal-system structures in which judges, lawyers, prosecutors, court-connected actors, bar participants, public-service networks, and advisory bodies control legitimacy, referrals, court access, public-service participation, courthouse credibility, and the professional safety of lawyers and nonlawyer competitors who challenge misconduct.

2727. Piecuch furthered the pattern because president-judge authority and local judicial influence can preserve false or misleading active-case impressions when court-adjacent systems, public-service spaces, professional credibility, local accountability channels, and court-facing legitimacy depend on lawyer-and-judge approval rather than client protection or substitute-provider access.

2728. Piecuch caused injury to business or property because judicially connected local gatekeeping reduced legal-service competition, chilled attorney criticism, limited nonlawyer and independent assistance, restricted public-service access, reduced court-access alternatives, and preserved lawyer-centered control over local legal markets.

2729. Jeffrey A. Rowe conducted or participated in the conduct of the enterprise's affairs through judicial office, magisterial-district authority, courthouse access, local legal influence, court-connected public-service participation, local bar relationships, advisory access, attorney-practice influence, and professional networks that affect legal-market legitimacy.

2730. Rowe preserved the enterprise's control by reinforcing systems in which judicial officers, local lawyers, public-service actors, court-connected networks, advisory actors, and bar structures determine who receives recognition, credibility, public-service participation, court-facing access, referral legitimacy, and access to client-facing legal-service opportunities.

2731. Rowe furthered the pattern because magisterial-district and court-connected authority can preserve legal-aid legitimacy, referral access, court-facing credibility, attorney-practice access, advisory access, professional support, and silence when malpractice exposure threatens incumbent legal-aid control and substitute-provider access.

2732. Rowe caused injury to business or property because local judicial and advisory gatekeeping reduced competition, limited alternative legal-service access, chilled future attorney criticism, suppressed court-access reform, restricted nonlawyer assistance, and preserved lawyer-centered control over client-facing legal systems.

2733. Jamie Saleski conducted or participated in the conduct of the enterprise's affairs through prothonotary authority, filing-system authority, docket-access authority, public-record authority, counsel-of-record records, courthouse administration, service and filing practices, and public-office structures that affect practical access to courts.

2734. Saleski preserved the enterprise's control by maintaining court-access systems in which filing practices, docket practices, record access, clerk interactions, courthouse procedures, counsel-of-record entries, and local court administration determine whether injured clients, nonlawyer assistants, court navigators, and legal-services reformers can participate effectively.

2735. Saleski furthered the pattern because filing and docket systems can preserve false or misleading active-case impressions when docket retention, counsel-of-record retention, local courthouse norms, and public-office credibility favor nonperforming counsel-of-record structures and burden injured consumers outside lawyer-controlled channels.

2736. Saleski caused injury to business or property because filing and docket gatekeeping reduced court-access competition, limited practical legal assistance, restricted nonlawyer court-navigation support, preserved lawyer-centered control over systems that malpractice victims must use to obtain relief, and reduced meaningful court-access alternatives.

2737. Sholley conducted or participated in the conduct of the enterprise's affairs through lawyer status, Union–Snyder County Bar Association officer authority, secretary authority, meeting-record authority, minute practices, local bar governance, Law Day participation, Wills for Heroes participation, listserv structures, and court-connected local bar influence.

2738. Sholley preserved the enterprise's control by reinforcing local bar structures in which established lawyers and bar officers control meeting records, minutes, listserv access, committee participation, public-service programs, professional legitimacy, referral credibility, local professional acceptance, and the practical ability to challenge lawyer misconduct without retaliation.

2739. Sholley furthered the pattern because bar records and officer conduct can determine whether objections to lawyer-controlled governance are preserved, whether dissenting attorneys receive equal institutional treatment, whether substitute providers can document retaliation, and whether local bar actors can maintain public-facing legitimacy while excluding lawyer-critical competitors.

2740. Sholley caused injury to business or property because local bar recordkeeping and governance gatekeeping reduced public-service access, professional credibility, meeting access, committee access, referral opportunities, competitive legal-service opportunities, and independent accountability options for future attorneys, malpractice victims, nonlawyer competitors, and legal-services reformers.

2741. Timothy Smith conducted or participated in the conduct of the enterprise's affairs through North Penn Legal Services senior management authority, attorney supervision, case-management systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, representation-status practices, withdrawal practices, and legal-aid institutional control.

2742. Smith preserved the enterprise's control by reinforcing a legal-aid structure in which incumbent providers control client files, representation status, communications, warnings to clients, corrective measures, substitute-provider access, supervision, client repair, grievance responses, and institutional narratives after legal-aid clients suffer missed hearings, missed deadlines, abandoned files, or unclear representation status.

2743. Smith furthered the pattern because senior legal-aid managers can conceal or preserve false active-case impressions when they keep vulnerable clients

dependent on incumbent providers while limiting independent corrective assistance, restricting conflict-free repair, shifting burdens to clients, and preserving provider legitimacy despite failed representation.

2744. Smith caused injury to business or property because senior legal-aid gatekeeping reduced conflict-free substitute counsel, restricted legal-aid accountability, suppressed competing nonprofit legal-service capacity, limited client repair, preserved incumbent lawyer-controlled legal-aid dominance, and kept Grohol and similarly situated clients dependent on failed legal-aid structures.

2745. Snyder County conducted or participated in the conduct of the enterprise’s affairs through county-government authority, public-service structures, county-connected legal systems, court-adjacent relationships, prosecutor-connected systems, advisory and coalition relationships, referral environments, and public legitimacy that affect access to legal services and legal-system accountability.

2746. Snyder County preserved the enterprise’s control by reinforcing county-connected structures in which lawyers, prosecutors, judges, public-service actors, advisory bodies, referral networks, and county-connected institutions control access, credibility, cooperation, public-service participation, referral legitimacy, and the practical ability to challenge local legal-system misconduct.

2747. Snyder County furthered the pattern because county-level public-service systems and court-adjacent systems can preserve false or misleading impressions

that vulnerable clients have meaningful legal-service access while malpractice victims, low-income litigants, nonlawyer competitors, and legal-services reformers remain dependent on incumbent lawyer-controlled channels.

2748. Snyder County caused injury to business or property because county-connected gatekeeping reduced client choice, public-service access, referral competition, court-adjacent accountability, nonlawyer support, future attorney access, and the local systems needed to compete with incumbent lawyer-controlled providers.

2749. Snyder County STOP Coalition conducted or participated in the conduct of the enterprise’s affairs through county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility affecting access to survivors, vulnerable clients, and public-service legal opportunities.

2750. Snyder County STOP Coalition preserved the enterprise’s control by reinforcing a system in which county-connected coalitions, victim-service actors, legal-aid actors, public-service networks, and lawyer-connected participants control referral access, stakeholder credibility, public-service cooperation, domestic-violence legal-service channels, and legitimacy for providers who serve vulnerable clients.

2751. Snyder County STOP Coalition furthered the pattern because domestic-violence and victim-service systems can preserve false or misleading impressions that vulnerable clients have meaningful legal help while coalition access, referral channels, stakeholder credibility, and public-service legitimacy remain closed to independent, conflict-free, and lawyer-critical legal-service alternatives.

2752. Snyder County STOP Coalition caused injury to business or property because coalition gatekeeping reduced public-service legal competition, limited referral access, restricted conflict-free alternatives, burdened future attorney participation, reduced nonlawyer assistance, and preserved incumbent legal-aid and lawyer-connected service systems from market accountability.

2753. Sarah Stigerwalt-Egan conducted or participated in the conduct of the enterprise's affairs through lawyer status, Union–Snyder County Bar Association presidential authority, judicial-law-clerk and hearing-officer status, local bar governance, Wills for Heroes control, meeting access, listserv communications, Teams access, minute practices, public-service legal-program access, and communications with statewide bar and veterans-service actors.

2754. Stigerwalt-Egan preserved the enterprise's control by reinforcing local bar structures in which bar officers, lawyer networks, judicially connected actors, public-service programs, and professional communications determine whether dissenting attorneys, future attorneys, independent legal-service providers,

malpractice-accountability advocates, and nonlawyer competitors receive meeting access, program access, professional legitimacy, and equal treatment.

2755. Stigerwalt-Egan furthered the pattern because local bar leadership can preserve false or misleading public-service legitimacy when access to legal-service opportunities, committee participation, meeting access, public-service legal programs, local referrals, veterans-service participation, records, and professional acceptance depends on conformity with incumbent lawyer norms.

2756. Stigerwalt-Egan caused injury to business or property because bar-governance and public-service gatekeeping reduced legal-service output, limited future attorney competition, chilled lawyer-critical advocacy, restricted public-service access, reduced referral alternatives, and preserved incumbent lawyer-controlled structures from competitive accountability.

2757. K. Michael Sullivan conducted or participated in the conduct of the enterprise’s affairs through lawyer status, Union–Snyder County Bar Association authority, local bar leadership, Wills for Heroes control, pro bono committee influence, listserv communications, public-service legal-program access, local legal-system influence, and joint participation with court-connected and bar-connected actors.

2758. Sullivan preserved the enterprise’s control by reinforcing a local professional structure in which bar leaders control access to pro bono programs,

public-service legal projects, listserv communications, committee activity, local professional standing, public-service legitimacy, referral credibility, and the ability to challenge bar or legal-aid misconduct without professional consequences.

2759. Sullivan furthered the pattern because local bar and pro bono leadership can preserve false or misleading public-facing legal-service impressions when future attorneys, independent providers, nonlawyer competitors, and malpractice-accountability advocates face exclusion for challenging incumbent lawyers and legal-service institutions.

2760. Sullivan caused injury to business or property because local bar and pro bono gatekeeping reduced client choice, restricted nonprofit legal-service competition, limited public-service legal output, chilled future attorney criticism, reduced nonlawyer assistance, and preserved lawyer-controlled referral and program channels from market accountability.

2761. David Andrew Strouse conducted or participated in the conduct of the enterprise's affairs through lawyer status, local attorney networks, Union–Snyder County Bar Association participation, listserv participation, bar-governance participation, litigation-response participation, public-service participation, and court-connected professional structures affecting local legal-service access.

2762. Strouse preserved the enterprise's control by reinforcing local lawyer networks in which attorneys and bar-connected actors control professional

credibility, referral access, listserv access, meeting participation, public-service opportunities, litigation-response narratives, attorney cooperation, and practical market acceptance.

2763. Strouse furthered the pattern because local attorney networks can conceal or preserve false public-facing legitimacy when lawyers collectively isolate critics, protect incumbent legal institutions, discourage malpractice accountability, restrict public-service participation, and make market entry difficult for future attorneys, nonlawyer competitors, independent advocates, and legal-services reformers.

2764. Strouse caused injury to business or property because local attorney gatekeeping reduced access to referrals, public-service participation, professional legitimacy, attorney cooperation, client channels, competitive legal-service opportunities, and independent accountability options for malpractice victims, injured consumers, future attorneys, and nonlawyer competitors.

2765. Transitions Legal Center conducted or participated in the conduct of the enterprise's affairs through legal-services participation, pro bono relationships, victim-services relationships, domestic-violence service coordination, referral systems, court-related connections, public-service networks, and local legal-service channels affecting access to clients, survivors, victims, and legal-service opportunities.

2766. Transitions Legal Center preserved the enterprise's control by reinforcing public-service legal networks in which incumbent legal-service actors, victim-service providers, domestic-violence systems, referral gatekeepers, court-related partners, legal-aid actors, and lawyer-controlled public-service channels control access to vulnerable clients and legitimacy in public-interest legal work.

2767. Transitions Legal Center furthered the pattern because public-service legal referrals and domestic-violence legal-service channels can preserve false or misleading impressions that vulnerable clients have meaningful access to help while clients receive only incumbent lawyer-approved services rather than independent, conflict-free, nonlawyer, and lawyer-critical alternatives.

2768. Transitions Legal Center caused injury to business or property because legal-service referral gatekeeping reduced provider choice, limited conflict-free alternatives, restricted future attorney and nonprofit participation, suppressed independent advocacy for vulnerable clients, reduced nonlawyer assistance, and preserved incumbent legal-service channels from competitive accountability.

2769. Transitions of PA conducted or participated in the conduct of the enterprise's affairs through victim-service structures, public-service referral networks, domestic-violence service relationships, pro bono channels, legal-aid relationships, county-connected systems, court-related referral structures, and local

service-provider networks affecting access to vulnerable clients, victims, survivors, and legal-service opportunities.

2770. Transitions of PA preserved the enterprise's control by reinforcing public-service systems in which service-provider networks, domestic-violence systems, referral gatekeepers, legal-aid actors, county-connected systems, and court-connected partners control whether independent providers receive access to vulnerable clients, public-service cooperation, and institutional legitimacy.

2771. Transitions of PA furthered the pattern because victim-service and public-service referral systems can preserve false or misleading impressions that vulnerable clients have meaningful civil legal-service access while clients receive only incumbent lawyer-approved services or lawyer-controlled legal-aid referrals rather than independent, conflict-free, nonlawyer, and lawyer-critical legal-service alternatives.

2772. Transitions of PA caused injury to business or property because public-service referral gatekeeping reduced provider choice, limited conflict-free legal alternatives, restricted future attorney and nonprofit participation, suppressed independent advocacy for vulnerable clients, reduced nonlawyer assistance, and preserved incumbent legal-aid and public-service channels from market accountability.

2773. David K. Trevaskis conducted or participated in the conduct of the enterprise's affairs through lawyer status, Pennsylvania Bar Association Wills for Heroes leadership, statewide pro bono authority, public-facing legal-program influence, volunteer-program influence, statewide bar credibility, and communications with bar, legal-aid, veterans-service, and public-service actors.

2774. Trevaskis preserved the enterprise's control by reinforcing statewide pro bono structures in which bar-connected actors control access to public-service programs, volunteers, event legitimacy, regional outreach, veterans-service channels, public-facing program credibility, and professional credibility for attorneys and legal-service providers who seek to operate outside incumbent lawyer-controlled systems.

2775. Trevaskis furthered the pattern because statewide bar pro bono leadership can preserve false or misleading public-service legitimacy when access to vulnerable clients, veterans, disabled veterans, volunteers, referral sources, public-service partners, event credibility, and professional recognition depends on lawyer-approved programs rather than open competition among willing providers.

2776. Trevaskis caused injury to business or property because statewide pro bono gatekeeping reduced legal-service output, limited future attorney participation, suppressed independent providers, restricted access to veterans and vulnerable

clients, reduced referral alternatives, and preserved bar-controlled public-service structures from competitive accountability.

2777. Brian Ulmer conducted or participated in the conduct of the enterprise's affairs through lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation, statewide pro bono networks, bar-connected legal-service structures, public-facing legal programs, attorney networks, and communications affecting access to veterans-service and legal-service opportunities.

2778. Ulmer preserved the enterprise's control by reinforcing a system in which bar-connected actors control public-facing legal programs, volunteer channels, staff communications, pro bono credibility, veterans-service outreach, professional legitimacy, event participation, and public-service recognition for attorneys and independent providers who challenge lawyer-controlled structures.

2779. Ulmer furthered the pattern because bar-connected and Wills for Heroes-connected actors can preserve false or misleading public-service legitimacy when they determine whether new attorneys, nonprofit providers, nonlawyer competitors, legal-services reformers, veterans-service advocates, and independent providers receive equal access to clients, veterans, volunteers, program credibility, and public-service legitimacy.

2780. Ulmer caused injury to business or property because bar-connected public-service gatekeeping reduced legal-service output, limited future attorney and

nonprofit participation, restricted veterans-service access, suppressed independent legal-service competition, reduced nonlawyer assistance, and preserved lawyer-controlled public-service channels from accountability.

2781. Union County conducted or participated in the conduct of the enterprise's affairs through county-government authority, public-service systems, advisory-board structures, criminal-justice structures, mental-health structures, STOP-related systems, referral environments, public legitimacy, and county-connected systems that affect access to legal services and legal-system accountability.

2782. Union County preserved the enterprise's control by reinforcing county-connected systems in which prosecutors, judges, lawyers, advisory bodies, public-service actors, referral networks, and county-connected institutions control access, credibility, cooperation, public-service participation, referral legitimacy, and the practical ability to challenge local legal-system misconduct.

2783. Union County furthered the pattern because county-level legal, criminal-justice, mental-health, domestic-violence, and public-service systems can preserve false or misleading impressions that vulnerable clients have meaningful legal-service access while malpractice victims, low-income litigants, nonlawyer competitors, and legal-services reformers remain dependent on incumbent lawyer-controlled channels.

2784. Union County caused injury to business or property because county-connected gatekeeping reduced client choice, referral competition, public-service access, court-adjacent accountability, nonlawyer support, future attorney access, and the local systems needed to compete with incumbent lawyer-controlled providers.

2785. Union–Snyder County Bar Association conducted or participated in the conduct of the enterprise's affairs through local bar governance, membership control, listserv control, committee access, meeting access, minute practices, Wills for Heroes planning, Law Day programming, public-service opportunities, and local professional legitimacy.

2786. Union–Snyder County Bar Association preserved the enterprise's control by reinforcing local bar structures in which incumbent lawyers control referrals, meetings, records, professional acceptance, public-service programs, committee participation, local credibility, attorney cooperation, and access to lawyer-approved legal-service networks.

2787. Union–Snyder County Bar Association furthered the pattern because local bar associations can preserve false or misleading professional and public-service legitimacy when they control reputation, referrals, public-service programming, records, meeting access, committee access, listserv access, local professional

legitimacy, and the practical ability to challenge lawyer misconduct without retaliation.

2788. Union–Snyder County Bar Association caused injury to business or property because local bar gatekeeping reduced future attorney participation, restricted independent legal-service competition, chilled attorney criticism, limited public-service legal output, reduced referral alternatives, and preserved incumbent lawyer networks from meaningful market accountability.

2789. Union County Criminal Justice Advisory Board conducted or participated in the conduct of the enterprise's affairs through county-government participation, criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local institutional credibility affecting legal-service channels and public-service participation.

2790. Union County Criminal Justice Advisory Board preserved the enterprise's control by reinforcing advisory structures in which prosecutors, judges, lawyers, criminal-justice actors, county officials, and public-service networks control access to policy discussions, institutional legitimacy, referral environments, public-service credibility, and court-adjacent accountability channels.

2791. Union County Criminal Justice Advisory Board furthered the pattern because criminal-justice advisory structures can preserve false or misleading

institutional legitimacy when legal-services reformers, malpractice victims, nonlawyer competitors, and future attorneys can challenge local legal institutions only at the cost of losing credibility, referrals, and access to court-adjacent systems.

2792. Union County Criminal Justice Advisory Board caused injury to business or property because advisory-board gatekeeping reduced public-service access, referral access, court-adjacent accountability, local legal-system competition, nonlawyer assistance, and future attorney access to systems needed to challenge incumbent lawyer-controlled structures.

2793. Union County Mental Health Advisory Committee conducted or participated in the conduct of the enterprise’s affairs through county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility affecting access to vulnerable clients and public-service legal channels.

2794. Union County Mental Health Advisory Committee preserved the enterprise’s control by reinforcing county-connected mental-health and disability-service structures in which public-service actors, legal-aid actors, referral networks, court-connected participants, and advisory bodies control credibility,

referrals, stakeholder access, public-service cooperation, and disability-related legal-service pathways.

2795. Union County Mental Health Advisory Committee furthered the pattern because mental-health, disability, housing, benefits, family-stability, and court-access systems can preserve false or misleading impressions that vulnerable clients have meaningful legal-service access while they receive only incumbent lawyer-approved referrals rather than independent legal assistance, nonlawyer support, and conflict-free alternatives.

2796. Union County Mental Health Advisory Committee caused injury to business or property because advisory and disability-service gatekeeping reduced client choice, restricted conflict-free alternatives, burdened future attorney participation, limited nonlawyer assistance, and preserved lawyer-controlled legal-service channels for vulnerable clients.

2797. Union County STOP Coalition conducted or participated in the conduct of the enterprise's affairs through county-connected domestic-violence service coordination, prosecutor participation, public meetings, victim-services structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility affecting access to survivors, vulnerable clients, and public-service legal opportunities.

2798. Union County STOP Coalition preserved the enterprise's control by reinforcing a system in which county-connected coalitions, victim-service actors, legal-aid actors, domestic-violence service providers, prosecutor-connected participants, and public-service networks control referral access, stakeholder credibility, cooperation, and legitimacy for providers serving vulnerable clients.

2799. Union County STOP Coalition furthered the pattern because domestic-violence and victim-service systems can preserve false or misleading impressions that survivors and vulnerable clients have meaningful legal help while coalition access, referral channels, stakeholder credibility, and public-service legitimacy remain closed to independent, conflict-free, and lawyer-critical legal-service alternatives.

2800. Union County STOP Coalition caused injury to business or property because coalition gatekeeping reduced public-service legal competition, limited referral access, restricted conflict-free alternatives, burdened future attorney participation, reduced nonlawyer assistance, and preserved incumbent legal-aid and lawyer-connected service systems from market accountability.

2801. United States Bankruptcy Court for the Middle District of Pennsylvania conducted or participated in the conduct of the enterprise's affairs through federal judicial authority, bankruptcy jurisdiction, docket authority, hearing authority, case-management authority, sanctions-related authority, local-rule authority,

attorney-practice authority, filing systems, staff communications, and bankruptcy-access structures.

2802. United States Bankruptcy Court for the Middle District of Pennsylvania preserved the enterprise's control by reinforcing bankruptcy and federal-court structures in which judges, lawyers, local rules, filing practices, sanctions risk, attorney-practice expectations, court-access norms, professional credibility, and federal court legitimacy control whether debtors, homeowners, low-income litigants, nonlawyer competitors, court navigators, and legal-services reformers can obtain or provide meaningful assistance.

2803. United States Bankruptcy Court for the Middle District of Pennsylvania furthered the pattern because bankruptcy-access and attorney-practice systems can preserve false or misleading court-facing legitimacy when relief, filings, hearings, sanctions exposure, attorney practice, professional legitimacy, and criticism of court-connected incumbents remain controlled by lawyer-and-judge-centered institutions.

2804. United States Bankruptcy Court for the Middle District of Pennsylvania caused injury to business or property because bankruptcy-access and attorney-practice gatekeeping reduced competition in bankruptcy and debt-relief legal services, limited nonlawyer and independent assistance, chilled future attorneys

and legal-services reformers, and preserved lawyer-centered control over debt-relief markets.

2805. United States Congress conducted or participated in the conduct of the enterprise's affairs through federal legislative authority, federal-court creation, federal legal-aid funding statutes, federal attorney-regulation structures, federal procedural-rule delegation, federal judicial structures, legal-services funding, and legislative decisions that preserve lawyer-centered control over legal services and attorney accountability.

2806. United States Congress preserved the enterprise's control by creating, funding, authorizing, or preserving systems in which courts, lawyers, federal legal-aid institutions, disciplinary structures, procedural-rule committees, and professional gatekeepers control legal-market entry, court access, public legal-aid funding, legal-service legitimacy, accountability mechanisms, and practical access to legal help.

2807. United States Congress furthered the pattern because federal statutory and institutional structures can preserve false or misleading public-facing claims that vulnerable clients have meaningful legal protection while legal-aid funding, court-rule systems, federal court access, attorney-accountability systems, and public legal-service structures lack independent competitive alternatives for injured legal

consumers, low-income clients, malpractice victims, and nonlawyer legal-service competitors.

2808. United States Congress caused injury to business or property because federal statutory and institutional structures reduced legal-service competition, limited alternative assistance, preserved lawyer-centered gatekeeping, restricted malpractice-redress options, reduced nonlawyer assistance, and kept future attorneys, low-income clients, and injured legal consumers dependent on lawyer-controlled institutions.

2809. United States Court of Appeals for the Third Circuit conducted or participated in the conduct of the enterprise's affairs through federal appellate authority, precedent authority, procedural authority, attorney-practice authority, disciplinary authority, filing rules, appellate access structures, judicial legitimacy, and court-controlled credibility systems.

2810. United States Court of Appeals for the Third Circuit preserved the enterprise's control by reinforcing appellate structures in which judges, lawyers, procedural rules, briefing standards, sanction risks, precedent, attorney-practice norms, judicial credibility determinations, and appellate gatekeeping control whether malpractice victims, injured legal consumers, nonlawyer competitors, and legal-services reformers can obtain meaningful review.

2811. United States Court of Appeals for the Third Circuit furthered the pattern because appellate systems can preserve false or misleading impressions that lawyer-controlled institutions remain lawful and accountable while access to review, precedent, standing, immunity, sanctions, professional speech, attorney accountability, legal-aid accountability, and procedural enforcement remains controlled by licensed lawyers and judges.

2812. United States Court of Appeals for the Third Circuit caused injury to business or property because appellate gatekeeping reduced competitive accountability, limited malpractice-redress pathways, chilled future attorneys and legal-services reformers, restricted nonlawyer assistance, and preserved lawyer-centered control over legal rights enforcement.

2813. United States District Court for the Middle District of Pennsylvania conducted or participated in the conduct of the enterprise’s affairs through federal district-court authority, docket authority, case-management authority, filing authority, local-rule authority, sanctions authority, attorney-practice authority, judicial legitimacy, and court-access systems that affect legal-service competition and accountability.

2814. United States District Court for the Middle District of Pennsylvania preserved the enterprise’s control by reinforcing federal trial-court structures in which procedural rules, local rules, pleading standards, filing systems, case-

management practices, sanctions risks, attorney-practice expectations, judicial credibility determinations, and federal court legitimacy control whether legal consumers, nonlawyer competitors, court navigators, future attorneys, and legal-services reformers can pursue relief.

2815. United States District Court for the Middle District of Pennsylvania furthered the pattern because federal district-court systems can preserve false or misleading court-facing legitimacy when the practical forum for challenging lawyer-controlled institutions remains shaped by lawyer-centered procedure, court-controlled professional norms, sanctions risk, filing requirements, and judge-controlled credibility.

2816. United States District Court for the Middle District of Pennsylvania caused injury to business or property because federal trial-court gatekeeping reduced court-access competition, limited nonlawyer and independent assistance, chilled future attorney criticism, increased dependence on licensed lawyers, and preserved lawyer-centered control over rights enforcement.

2817. United States Department of Health and Human Services conducted or participated in the conduct of the enterprise’s affairs through federal public-funding authority, social-service authority, legal-aid-related funding structures, public-benefits systems, civil-rights compliance structures, service-provider

relationships, referral environments, and public-service legitimacy affecting access to civil legal help for vulnerable clients.

2818. United States Department of Health and Human Services preserved the enterprise's control by reinforcing federally funded service systems that channel vulnerable clients through incumbent legal-aid, lawyer-controlled, referral-controlled, agency-connected, and professionalized structures rather than independent, conflict-free, nonlawyer, or lawyer-critical legal-service alternatives.

2819. United States Department of Health and Human Services furthered the pattern because federal health, disability, benefits, family, aging, domestic-violence, and social-service systems can preserve false or misleading impressions that vulnerable clients have meaningful legal-help pathways while funding and referral structures route legal need through lawyer-approved providers and deny comparable legitimacy to independent, conflict-free, and nonlawyer assistance models.

2820. United States Department of Health and Human Services caused injury to business or property because federal public-service gatekeeping reduced client choice, restricted conflict-free legal-service alternatives, limited independent accountability for legal-aid failures, preserved incumbent referral channels, and burdened future attorneys and nonlawyer competitors seeking to serve vulnerable clients.

2821. United States Judicial Conference conducted or participated in the conduct of the enterprise's affairs through federal judicial-administration authority, policy authority, rules-related authority, court-governance influence, administrative oversight, federal court legitimacy, and institutional support for lawyer-and-judge-controlled federal court systems.

2822. United States Judicial Conference preserved the enterprise's control by reinforcing federal court structures, rulemaking systems, administrative policies, judicial norms, filing practices, court-access expectations, attorney-practice standards, professional legitimacy, and court-governance systems that preserve lawyer-centered control over litigation, legal accountability, court navigation, malpractice redress, and attorney discipline.

2823. United States Judicial Conference furthered the pattern because federal judicial administration can preserve false or misleading impressions that federal courts provide neutral accountability while court access, filing expectations, procedural access, sanctions, recusal, attorney discipline, professional speech, court-user assistance, and judicial legitimacy remain controlled by lawyer-and-judge-centered institutions rather than independent accountability or open competition.

2824. United States Judicial Conference caused injury to business or property because federal judicial gatekeeping reduced competitive accountability, limited

meaningful nonlawyer assistance, chilled court-access reform, preserved lawyer-centered litigation control, and kept injured legal consumers dependent on lawyer-dominated federal court processes.

2825. Defendants conducted or participated in the conduct of the enterprise's affairs because each defendant used, preserved, ratified, administered, funded, enforced, legitimized, communicated through, pressured through, or failed to correct legal-aid, professional, referral, court-connected, county-connected, public-service, bar-connected, disciplinary, advisory, judicial, legislative, funding, filing, docket, attorney-practice, veterans-service, Wills for Heroes, public-event, and institutional channels that concealed nonperformance, preserved public-facing legitimacy, blocked substitute-provider access, and punished Grohol's legal team for exposing legal-aid malpractice and nonperformance.

2826. Defendants' racketeering activity included repeated mail fraud and wire fraud because the enterprise used case reports, grant reports, eligibility certifications, compliance statements, billing-related submissions, funding-related communications, referral communications, exclusion communications, client communications, court-facing communications, judicial communications, county-facing communications, attorney-practice communications, advisory communications, professional communications, bar-connected communications, public-service communications, veterans-service communications, and electronic

communications to represent, imply, or allow others to believe that matters were active, eligible, worked, compliant, professionally administered, properly supervised, properly staffed, or lawfully handled when North Penn Legal Services, Inc. had abandoned matters, missed hearings, failed to notify clients, failed to perform meaningful advocacy, failed to withdraw lawfully, failed to transfer files, failed to open substitute-provider access, or failed to protect clients from adverse rulings.

2827. Defendants’ pattern was related and continuous because each act furthered the same purpose of preserving incumbent legal-aid control, preserving funding, preserving professional legitimacy, concealing legal-aid nonperformance, blocking substitute providers, restricting public-service access, restricting court-access correction, restricting attorney-practice correction, suppressing competing providers, and retaliating against Grohol’s legal team for exposing legal-aid misconduct.

2828. Defendants caused injury to business or property because Grohol lost personal property, legal claims, substitute-provider access, docket-correction access, counsel-of-record-correction access, public-service access, court-access opportunities, referral access, and the practical ability to obtain meaningful redress while similarly situated clients lost property, housing, benefits, claims, hearings,

appellate rights, settlement leverage, substitute-provider access, and meaningful access to court.

2829. Defendants caused injury to Grohol's legal team and similarly situated substitute providers because the enterprise diverted referrals, volunteer opportunities, contract opportunities, Wills for Heroes opportunities, veterans-service opportunities, public-event opportunities, public-service opportunities, county-connected opportunities, court-connected opportunities, attorney-practice opportunities, advisory opportunities, bar-connected opportunities, and substitute-provider opportunities away from providers who exposed legal-aid misconduct.

2830. Defendants are liable under 18 U.S.C. § 1962(c) because each conducted or participated in the conduct of an association-in-fact enterprise affecting interstate commerce through a related and continuous pattern of racketeering activity involving mail fraud, wire fraud, obstruction-related conduct, and retaliatory conduct that injured Grohol, the class, Grohol's legal team, and similarly situated substitute providers in business or property.

2831. Grohol and the class are entitled to treble damages, compensatory damages, declaratory relief, temporary injunctive relief, preliminary injunctive relief, permanent injunctive relief, truthful-reporting relief, corrective-disclosure relief, neutral monitoring, client-notice protocols, hearing-notice protocols, lawful-withdrawal protocols, file-transfer protocols, substitute-provider access, conflict-

free substitute-provider access, nonretaliation protections, referral-access review, public-service access review, legal-aid accountability review, court-access review, attorney-discipline review, preservation of communications and records, expedited discovery, costs, attorney's fees, and all other lawful relief under 18 U.S.C. § 1964.

**COUNT 26**

**RICO Conspiracy Under 18 U.S.C. § 1962(d) Against Administrative Office of Pennsylvania Courts; American Bar Association; Bloomsburg Fair Association; Matthew W. Brann; Heath Brosius; Jessica Chapman; William R. Christman III; Mary Beth Clark; Committee on Rules of Practice and Procedure; Commonwealth of Pennsylvania; Mark J. Conway; Court of Judicial Discipline; Robert Cravitz; Doe Defendants 1 through 200; Federal Judicial Center; Lori R. Hackenberg; International Legal Aid Group; Judicial Conduct Board of Pennsylvania; Heather Kelly; Brian Kerstetter; Robert Leadbeter; Legal Services Corporation; Kathleen Lincoln; Gabriele Miller-Wagner; Lori Molloy; Jenna Ann Neidig; North Penn Legal Services, Inc.; Northumberland County Prothonotary's Office; Office of Attorney General; Office of Disciplinary Counsel; Pennsylvania Bar Association; Pennsylvania Board of Law Examiners; Pennsylvania Department of Human Services; Pennsylvania Department of Military and Veterans Affairs;**

**Pennsylvania General Assembly; Pennsylvania Legal Aid Network, Inc.; Supreme Court of Pennsylvania; Michael F.J. Piecuch; Jeffrey A. Rowe; Jamie Saleski; Sholley; Timothy Smith; Snyder County; Snyder County STOP Coalition; Sarah Stigerwalt-Egan; K. Michael Sullivan; David Andrew Strouse; Transitions Legal Center; Transitions of PA; David K. Trevaskis; Brian Ulmer; Union County; Union–Snyder County Bar Association; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; United States Congress; United States Court of Appeals for the Third Circuit; United States District Court for the Middle District of Pennsylvania; United States Department of Health and Human Services; and United States Judicial Conference**

2832. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 505, Administrative Office of Pennsylvania Courts, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 506, American Bar Association, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 507, Bloomsburg Fair Association, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 508,

Matthew W. Brann, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 509, Heath Brosius, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 510, Jessica Chapman, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 511, William R. Christman III, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 512, Mary Beth Clark, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 513, Committee on Rules of Practice and Procedure, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 514, Commonwealth of Pennsylvania, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 515, Mark J. Conway, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 516, Court of Judicial Discipline, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 517, Robert Cravitz, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 518, Doe Defendants 1 through 200, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 519, Federal Judicial Center, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 520, Lori R. Hackenberg, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 521, International Legal Aid Group, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 522, Judicial Conduct Board of Pennsylvania, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 523, Heather Kelly, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 524, Brian Kerstetter, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 525, Robert Leadbeter, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 526, Legal Services Corporation, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 527, Kathleen Lincoln, RICO

Conspiracy Under 18 U.S.C. § 1962(d); COA 528, Gabriele Miller-Wagner, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 529, Lori Molloy, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 530, Jenna Ann Neidig, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 531, North Penn Legal Services, Inc., RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 532, Northumberland County Prothonotary's Office, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 533, Office of Attorney General, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 534, Office of Disciplinary Counsel, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 535, Pennsylvania Bar Association, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 536, Pennsylvania Board of Law Examiners, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 537, Pennsylvania Department of Human Services, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 538, Pennsylvania Department of Military and Veterans Affairs, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 539, Pennsylvania General Assembly, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 540, Pennsylvania Legal Aid Network, Inc., RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 541, Supreme Court of Pennsylvania, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 542, Michael F.J. Piecuch, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 543, Jeffrey A. Rowe, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 544, Jamie Saleski, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 545,  Sholley, RICO

Conspiracy Under 18 U.S.C. § 1962(d); COA 546, Timothy Smith, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 547, Snyder County, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 548, Snyder County STOP Coalition, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 549, Sarah Stigerwalt-Egan, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 550, K. Michael Sullivan, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 551, David Andrew Strouse, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 552, Transitions Legal Center, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 553, Transitions of PA, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 554, David K. Trevaskis, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 555, Brian Ulmer, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 556, Union County, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 557, Union–Snyder County Bar Association, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 558, Union County Criminal Justice Advisory Board, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 559, Union County Mental Health Advisory Committee, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 560, Union County STOP Coalition, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 561, United States Bankruptcy Court for the Middle District of Pennsylvania, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 562, United States Congress, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 563, United States Court of Appeals for the

Third Circuit, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 564, United States District Court for the Middle District of Pennsylvania, RICO Conspiracy Under 18 U.S.C. § 1962(d); COA 565, United States Department of Health and Human Services, RICO Conspiracy Under 18 U.S.C. § 1962(d); and COA 566, United States Judicial Conference, RICO Conspiracy Under 18 U.S.C. § 1962(d), from the 651-count inventory attached as exhibits.

2833. The elements of a RICO conspiracy claim under 18 U.S.C. § 1962(d) are an agreement to participate in the conduct of an enterprise's affairs through a pattern of racketeering activity and a knowing agreement to facilitate the commission of at least 2 racketeering acts.

2834. Defendants violated 18 U.S.C. § 1962(d) because each agreed to facilitate a violation of 18 U.S.C. § 1962(c) by preserving the legal-industry enterprise's public funding, legal-aid control, court-connected authority, attorney-practice control, referral control, public-service access, bar-connected legitimacy, disciplinary silence, judicial protection, false or misleading compliance impressions, substitute-provider exclusion, and retaliation against Grohol's legal team after Grohol's legal team exposed legal-aid malpractice and nonperformance.

2835. The enterprise was an association-in-fact enterprise affecting interstate commerce and consisted of North Penn Legal Services, Inc., legal-aid managers, funding intermediaries, bar entities, disciplinary actors, judicial actors, legal-

industry policy actors, professional-legitimacy actors, court-connected actors, attorney-practice actors, court-administration actors, judicial-administration actors, referral gatekeepers, public-service gatekeepers, volunteer-program gatekeepers, and Doe participants who functioned together as a continuing unit.

2836. The pattern of racketeering activity included repeated mail fraud and wire fraud through case reports, grant reports, eligibility certifications, compliance statements, billing-related submissions, funding-related communications, referral communications, exclusion communications, client communications, court-facing communications, judicial communications, court-administration communications, attorney-practice communications, professional communications, bar-connected communications, public-service communications, veterans-service communications, and electronic communications.

2837. Those communications represented, implied, or allowed others to believe that matters were active, eligible, worked, compliant, professionally administered, properly supervised, properly staffed, or lawfully handled when North Penn Legal Services, Inc. had abandoned matters, missed hearings, failed to notify clients, failed to perform meaningful advocacy, failed to withdraw lawfully, failed to transfer files, failed to open substitute-provider access, or failed to protect clients from adverse rulings.

2838. Administrative Office of Pennsylvania Courts agreed to the RICO conspiracy through statewide court administration, judicial-administration systems, court-access systems, court-user systems, filing systems, attorney-practice structures, court-recognized legitimacy, and administrative practices affecting whether abandoned legal-aid clients could obtain truthful correction, lawful withdrawal, file transfer, and substitute-provider access.

2839. Administrative Office of Pennsylvania Courts knew the essential nature of the enterprise because the enterprise depended on court-administration systems that allowed counsel-of-record status, court-facing compliance impressions, attorney-centered filing practices, lawyer-controlled procedural access, and institutional silence to remain in place despite client abandonment, missed hearings, conflict barriers, and lack of substitute-provider access.

2840. Administrative Office of Pennsylvania Courts knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated court-facing communications, case-status communications, compliance communications, attorney-practice communications, court-administration communications, and electronic communications to preserve active-case impressions and legal-aid legitimacy while nonperforming providers retained control.

2841. Administrative Office of Pennsylvania Courts caused injury to business or property because its conspiratorial agreement kept Grohol and similarly situated

clients dependent on counsel-of-record appearances, impaired substitute-provider access, reduced meaningful court-access assistance, preserved nonperforming legal-aid control, and contributed to lost property, lost claims, lost hearings, and lost redress.

2842. American Bar Association agreed to the RICO conspiracy through national bar influence, professional-legitimacy systems, model professional structures, legal-education legitimacy, attorney-regulation narratives, pro bono narratives, public-service legal norms, and bar-connected channels that preserved lawyer-controlled access to legal services.

2843. American Bar Association knew the essential nature of the enterprise because the enterprise depended on legal-aid control, public funding, professional legitimacy, bar-connected authority, attorney-practice influence, referral access, public-service access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent control.

2844. American Bar Association knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated professional communications, bar-connected communications, policy communications, public-service communications, access-to-justice communications, compliance communications, and electronic communications to preserve legal-industry

legitimacy while clients lacked meaningful representation and substitute providers lacked equal access.

2845. American Bar Association caused injury to business or property because its conspiratorial agreement preserved professional structures that reduced provider choice, limited substitute-provider access, restricted nonlawyer and nonprofit alternatives, suppressed malpractice-redress services, and kept Grohol and the class dependent on lawyer-controlled channels after legal-aid failure.

2846. Bloomsburg Fair Association agreed to the RICO conspiracy through public-event access, vendor access, veterans-resource-event access, veterans-expo structures, public-official partnerships, public-facing civic legitimacy, event communications, referral channels, and public-facing platforms through which legal-service providers obtain consumer trust.

2847. Bloomsburg Fair Association knew the essential nature of the enterprise because the enterprise depended on public-event access, veterans-event access, vendor access, public-service legitimacy, referral access, professional legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent control and prevent competing providers from reaching vulnerable clients.

2848. Bloomsburg Fair Association knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated public-event

communications, veterans-event communications, vendor communications, referral communications, exclusion communications, public-service communications, professional communications, and electronic communications to preserve incumbent-approved access and exclude substitute providers from public-facing legal-service opportunities.

2849. Bloomsburg Fair Association caused injury to business or property because its conspiratorial agreement reduced public-service opportunities, veterans-service access, referral opportunities, community legitimacy, substitute-provider visibility, and the practical legal-service options available to Grohol, veterans, disabled veterans, legal-aid clients, and similarly situated clients.

2850. Matthew W. Brann agreed to the RICO conspiracy through federal judicial authority, district-court authority, docket control, case-management authority, attorney-practice norms, sanctions authority, recusal authority, federal-court legitimacy, and judicial credibility systems affecting federal court-access legal services and attorney accountability.

2851. Brann knew the essential nature of the enterprise because the enterprise depended on judicial authority, attorney-practice control, court-connected authority, case-management pressure, professional legitimacy, court-facing credibility, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent legal-industry control.

2852. Brann knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated court-facing communications, judicial communications, attorney-practice communications, case-management communications, exclusion communications, professional communications, public-service communications, and electronic communications to preserve lawyer-controlled legitimacy and deter corrective competition.

2853. Brann caused injury to business or property because his conspiratorial agreement reduced meaningful court-access assistance, chilled service expansion by future attorneys and nonprofit providers, restricted nonlawyer and independent assistance, preserved lawyer-centered litigation control, and kept Grohol and the class dependent on scarce attorney-controlled channels.

2854. Heath Brosius agreed to the RICO conspiracy through prosecutorial authority, Snyder County public-office authority, court-facing power, prosecutor-connected service access, victim-service influence, domestic-violence service influence, STOP Coalition involvement, public-service legitimacy, and local referral systems.

2855. Brosius knew the essential nature of the enterprise because the enterprise depended on prosecutorial influence, county-connected legitimacy, public-safety access, STOP-related access, public-service legitimacy, professional legitimacy,

referral access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent control.

2856. Brosius knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated prosecutorial communications, county-connected communications, public-safety communications, STOP-related communications, public-service communications, referral communications, professional communications, exclusion communications, and electronic communications to block substitute-provider access and preserve legal-aid legitimacy.

2857. Brosius caused injury to business or property because his conspiratorial agreement reduced public-service legal access, limited conflict-free substitute-provider access, discouraged independent nonprofit providers, restricted referral channels, preserved closed legal-service systems serving vulnerable clients, and kept Grohol and similarly situated clients dependent on incumbent channels.

2858. Jessica Chapman agreed to the RICO conspiracy through lawyer status, disciplinary-pressure channels, professional-accountability narratives, local legal-industry relationships, bar-connected legitimacy, judicial-protection structures, access-to-justice narratives, legal-aid legitimacy, substitute-provider exclusion, and retaliatory pressure against Grohol's legal team.

2859. Chapman knew the essential nature of the enterprise because the enterprise depended on disciplinary pressure, professional-accountability legitimacy, provider-recognition narratives, local professional authority, legal-aid legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team after malpractice complaints and this lawsuit threatened incumbent control.

2860. Chapman knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated disciplinary communications, professional communications, provider-recognition communications, access-to-justice communications, exclusion communications, referral communications, legal-aid communications, public-service communications, and electronic communications to preserve false or misleading accountability impressions and deter corrective competition.

2861. Chapman caused injury to business or property because her conspiratorial agreement reduced substitute-provider access, increased the cost of opposition, chilled future attorneys and nonprofit providers, restricted independent accountability, preserved incumbent legal-aid and bar-connected control, and reduced the legal-service choices available to Grohol, malpractice victims, legal-aid clients, and vulnerable court users.

2862. William R. Christman III agreed to the RICO conspiracy through Pennsylvania Bar Association general-counsel authority, attorney status, statewide bar influence, professional-legitimacy control, staff and volunteer communication channels, public-service legal-program authority, Wills for Heroes access, and bar-connected service systems.

2863. Christman knew the essential nature of the enterprise because the enterprise depended on bar-connected authority, professional legitimacy, public-service access, staff communication control, volunteer-channel control, referral access, legal-aid legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent control.

2864. Christman knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated bar-connected communications, staff communications, volunteer communications, public-service communications, Wills for Heroes communications, referral communications, exclusion communications, professional communications, and electronic communications to preserve incumbent-approved access and block competing substitute providers.

2865. Christman caused injury to business or property because his conspiratorial agreement reduced service capacity, restricted substitute-provider participation, limited public-service access, chilled future attorneys and nonprofit providers,

suppressed lawyer-critical market entrants, and kept Grohol and the class dependent on closed attorney-controlled channels.

2866. Mary Beth Clark agreed to the RICO conspiracy through lawyer status, North Penn Legal Services relationships, local bar structures, Union–Snyder County Bar Association influence, referral gatekeeping, public-service gatekeeping, substitute-provider exclusion, professional-network access, and retaliatory exclusion directed at Grohol's legal team after malpractice complaints and this lawsuit threatened incumbent legal-aid control.

2867. Clark knew the essential nature of the enterprise because she knew Grohol's malpractice matter and this lawsuit threatened North Penn Legal Services, Inc., local legal-industry actors, and local bar-connected interests, knew Grohol's legal team sought accountability and substitute-provider access, and knew retaliatory exclusion from local professional channels would preserve insider control and suppress corrective competition.

2868. Clark knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated legal-aid communications, local bar communications, referral communications, public-service communications, access-to-justice communications, exclusion communications, program-access communications, compliance communications, and electronic communications to

preserve legal-aid and local professional legitimacy while blocking substitute-provider correction.

2869. Clark caused injury to business or property because her conspiratorial agreement reduced client choice, suppressed conflict-free substitute counsel, limited public-service opportunities, impaired referral competition, preserved local bar and legal-aid insider control, burdened future attorneys and nonprofit competitors, and reduced the legal-service options available to Grohol and the class.

2870. Committee on Rules of Practice and Procedure agreed to the RICO conspiracy through federal rulemaking authority, practice-rule authority, procedural-rule authority, federal-court-access influence, judicial-administration influence, professional-regulation influence, institutional legitimacy, and lawyer-centered procedural systems.

2871. Committee on Rules of Practice and Procedure knew the essential nature of the enterprise because the enterprise depended on lawyer-centered procedure, court-access control, attorney-practice control, federal-court legitimacy, judicial-administration legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent legal-industry control.

2872. Committee on Rules of Practice and Procedure knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated rulemaking communications, court-access communications, attorney-practice communications, judicial-administration communications, professional communications, exclusion communications, compliance communications, and electronic communications to preserve lawyer-controlled procedural legitimacy and restrict competing court-access assistance.

2873. Committee on Rules of Practice and Procedure caused injury to business or property because its conspiratorial agreement increased dependence on licensed attorneys, restricted alternative legal assistance, suppressed court-navigation competition, reduced federal court-access alternatives, and kept Grohol, malpractice victims, and future market entrants dependent on lawyer-approved procedural gatekeepers.

2874. Commonwealth of Pennsylvania agreed to the RICO conspiracy through sovereign authority, statutory authority, public-funding authority, court-system creation, attorney-regulation support, unauthorized-practice structures, legal-aid funding structures, public-service structures, and institutional legitimacy conferred on lawyer-controlled systems.

2875. Commonwealth of Pennsylvania knew the essential nature of the enterprise because the enterprise depended on state-sanctioned licensing, court access,

unauthorized-practice barriers, legal-aid systems, disciplinary systems, public-service access, referral systems, professional-legitimacy systems, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent control.

2876. Commonwealth of Pennsylvania knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated funding communications, compliance communications, legal-aid communications, public-service communications, referral communications, attorney-regulation communications, court-facing communications, exclusion communications, and electronic communications to preserve lawyer-controlled legitimacy and block substitute-provider access.

2877. Commonwealth of Pennsylvania caused injury to business or property because its conspiratorial agreement reduced client choice, suppressed legal-service competition, reduced malpractice-redress output, burdened future attorneys and nonlawyer competitors, preserved incumbent legal institutions from market accountability, and kept Grohol and similarly situated clients dependent on lawyer-controlled channels.

2878. Mark J. Conway agreed to the RICO conspiracy through federal judicial authority, bankruptcy-court authority, sanctions authority, recusal authority, docket authority, hearing authority, attorney-practice authority, local-rule authority,

courtroom control, and federal bankruptcy structures affecting bankruptcy and debt-relief legal-service markets.

2879. Conway knew the essential nature of the enterprise because the enterprise depended on bankruptcy-court authority, federal judicial legitimacy, attorney-practice control, sanctions exposure, professional credibility, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent lawyer-controlled court access.

2880. Conway knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated court-facing communications, bankruptcy communications, attorney-practice communications, sanctions-related communications, professional communications, exclusion communications, compliance communications, and electronic communications to preserve lawyer-centered court legitimacy and restrict competing legal-service correction.

2881. Conway caused injury to business or property because his conspiratorial agreement reduced competition in debt-relief and bankruptcy-related legal services, chilled future attorneys and legal-services reformers, increased dependence on licensed lawyers, reduced independent accountability, and preserved lawyer-centered control over debtors, homeowners, low-income litigants, and malpractice victims.

2882. Court of Judicial Discipline agreed to the RICO conspiracy through judicial-discipline authority, judicial-accountability gatekeeping, court-connected institutional legitimacy, judge-regulation structures, professional-accountability systems, and a lawyer-and-judge-controlled accountability framework affecting legal-service output and attorney accountability.

2883. Court of Judicial Discipline knew the essential nature of the enterprise because the enterprise depended on judicial-accountability gatekeeping, professional-accountability legitimacy, court-centered authority, lawyer-and-judge-controlled discipline, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent legal-industry control.

2884. Court of Judicial Discipline knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated judicial-accountability communications, discipline communications, professional communications, court-facing communications, exclusion communications, compliance communications, institutional communications, and electronic communications to preserve court-centered legitimacy and block outside accountability.

2885. Court of Judicial Discipline caused injury to business or property because its conspiratorial agreement reduced independent oversight, chilled criticism, limited

malpractice-redress pathways, preserved court-centered legal-market control, and kept injured legal consumers dependent on institutions aligned with the same profession that controls legal services.

2886. Robert Cravitz agreed to the RICO conspiracy through lawyer status, local attorney networks, Union–Snyder County Bar Association participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and court-connected local legal structures affecting local legal-service markets.

2887. Cravitz knew the essential nature of the enterprise because the enterprise depended on local lawyer networks, bar-connected legitimacy, referral access, professional credibility, public-service access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent local legal-industry control.

2888. Cravitz knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated local attorney communications, bar-connected communications, listserv communications, referral communications, public-service communications, exclusion communications, professional communications, and electronic communications to preserve local lawyer legitimacy and isolate corrective competition.

2889. Cravitz caused injury to business or property because his conspiratorial agreement reduced access to referrals, public-service participation, professional legitimacy, attorney cooperation, client channels, competitive legal-service opportunities, and independent accountability options for malpractice victims, injured consumers, future attorneys, and nonlawyer competitors.

2890. Doe Defendants 1 through 200 agreed to the RICO conspiracy through membership in defendant entities, listserv participation, court-connected roles, bar-connected roles, legal-aid roles, public-service roles, veterans-service roles, referral-network roles, disciplinary-adjacent roles, funding-adjacent roles, and professional networks that preserved lawyer control over legal services and attorney accountability.

2891. Doe Defendants 1 through 200 knew the essential nature of the enterprise because the enterprise depended on unknown participants who received, transmitted, ratified, preserved, concealed, enforced, or benefitted from legal-aid, professional, referral, court-connected, public-service, disciplinary, funding, bar-connected, and electronic communications that preserved incumbent control and excluded substitute providers.

2892. Doe Defendants 1 through 200 knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated case-status communications, grant communications, compliance communications, referral

communications, exclusion communications, bar-connected communications, court-facing communications, public-service communications, and electronic communications to preserve false or misleading active-service impressions.

2893. Doe Defendants 1 through 200 caused injury to business or property because their conspiratorial agreement reduced competitive entry, suppressed nonlawyer assistance, reduced independent accountability services, limited malpractice-redress pathways, and preserved lawyer-controlled access to clients, courts, public programs, referrals, funding, and professional legitimacy.

2894. Federal Judicial Center agreed to the RICO conspiracy through federal judicial-education authority, federal judicial-administration influence, research and training functions, court-system legitimacy, professional norms, judicial-policy influence, and institutional support for lawyer-and-judge-controlled federal court structures.

2895. Federal Judicial Center knew the essential nature of the enterprise because the enterprise depended on federal judicial legitimacy, judicial training, court-administration norms, attorney-practice expectations, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent lawyer-and-judge-controlled court access.

2896. Federal Judicial Center knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated judicial-education

communications, judicial-administration communications, court-access communications, attorney-practice communications, professional communications, exclusion communications, compliance communications, and electronic communications to preserve lawyer-centered federal court legitimacy.

2897. Federal Judicial Center caused injury to business or property because its conspiratorial agreement reduced competitive accountability, preserved lawyer-centered litigation control, limited meaningful nonlawyer assistance, chilled court-access reform, and kept injured legal consumers dependent on lawyer-dominated federal court processes.

2898. Lori R. Hackenberg agreed to the RICO conspiracy through judicial office, county-court authority, courthouse-program influence, local legal authority, court-connected professional networks, local bar relationships, public-service access, professional legitimacy, docket-control structures, and lawyer-and-judge-controlled legal structures affecting local court-access and public-service legal markets.

2899. Hackenberg knew the essential nature of the enterprise because the enterprise depended on judicial authority, county-court legitimacy, local court access, attorney-practice expectations, public-service access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent local legal-industry control.

2900. Hackenberg knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated court-facing communications, docket communications, attorney-practice communications, public-service communications, local professional communications, exclusion communications, compliance communications, and electronic communications to preserve legal-aid legitimacy and block substitute-provider correction.

2901. Hackenberg caused injury to business or property because her conspiratorial agreement reduced alternative legal-service access, limited public-service competition, chilled future attorney criticism, reduced malpractice-redress opportunities, preserved local lawyer-centered control over court-adjacent legal services, and kept Grohol and similarly situated clients dependent on failed legal-aid structures.

2902. International Legal Aid Group agreed to the RICO conspiracy through international legal-aid influence, comparative legal-aid legitimacy, professional-network authority, legal-aid policy recognition, legal-aid institutional credibility, and support for lawyer-centered legal-aid structures that preserved incumbent legal-aid control.

2903. International Legal Aid Group knew the essential nature of the enterprise because the enterprise depended on legal-aid legitimacy, access-to-justice narratives, professional-network credibility, provider recognition, institutional

silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent legal-aid control.

2904. International Legal Aid Group knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated legal-aid communications, access-to-justice communications, provider-recognition communications, professional-network communications, referral communications, exclusion communications, compliance communications, and electronic communications to preserve incumbent legal-aid legitimacy.

2905. International Legal Aid Group caused injury to business or property because its conspiratorial agreement reduced legal-aid competition, limited conflict-free alternatives, suppressed independent client-accountability services, preserved incumbent provider control, and kept low-income clients and malpractice victims dependent on lawyer-controlled legal-aid systems.

2906. Judicial Conduct Board of Pennsylvania agreed to the RICO conspiracy through judicial-discipline screening authority, judicial-accountability gatekeeping, complaint-intake authority, investigative discretion, professional-accountability influence, court-connected legitimacy, and lawyer-and-judge-controlled accountability structures affecting legal-service markets.

2907. Judicial Conduct Board of Pennsylvania knew the essential nature of the enterprise because the enterprise depended on judicial-accountability gatekeeping,

court-centered legitimacy, professional-accountability narratives, institutional silence, substitute-provider exclusion, and retaliation against Grohol’s legal team to preserve incumbent lawyer-and-judge-controlled accountability systems.

2908. Judicial Conduct Board of Pennsylvania knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated judicial-accountability communications, complaint communications, investigative communications, professional communications, court-facing communications, exclusion communications, compliance communications, and electronic communications to preserve court-centered legitimacy and deter outside accountability.

2909. Judicial Conduct Board of Pennsylvania caused injury to business or property because its conspiratorial agreement reduced independent oversight, discouraged future attorneys from challenging judges and lawyers, limited malpractice-redress pathways, preserved court-centered professional control, and kept injured consumers dependent on lawyer-and-judge-controlled accountability systems.

2910. Heather Kelly agreed to the RICO conspiracy through North Penn Legal Services management authority, legal-aid influence, lawyer status, public-funded legal-service authority, supervision practices, grievance-response practices, client-

service systems, intake structures, and legal-aid structures that preserved incumbent provider control over low-income clients.

2911. Kelly knew the essential nature of the enterprise because the enterprise depended on legal-aid management authority, public funding, intake control, case-assignment control, representation-status control, grievance control, institutional silence, substitute-provider exclusion, and retaliation against Grohol’s legal team to preserve incumbent legal-aid control.

2912. Kelly knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated case-status communications, grant communications, eligibility communications, compliance communications, client communications, grievance communications, referral communications, exclusion communications, and electronic communications to preserve false or misleading active-representation impressions while clients lacked meaningful service.

2913. Kelly caused injury to business or property because her conspiratorial agreement reduced conflict-free substitute counsel, limited client choice, suppressed independent legal-aid accountability, discouraged future legal-aid competitors, reduced malpractice-redress services, and preserved incumbent control over low-income clients, malpractice victims, and injured legal consumers.

2914. Brian Kerstetter agreed to the RICO conspiracy through prosecutorial authority, public-office authority, court-facing power, advisory-board influence,

local legal-system authority, public-service participation, county-connected referral structures, and lawyer-centered professional networks that preserved attorney control over public legal systems.

2915. Kerstetter knew the essential nature of the enterprise because the enterprise depended on prosecutorial influence, advisory-board access, county-connected legitimacy, court-adjacent authority, public-service access, referral control, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent local legal-industry control.

2916. Kerstetter knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated prosecutorial communications, advisory communications, county-connected communications, public-service communications, referral communications, professional communications, exclusion communications, and electronic communications to preserve legal-industry legitimacy and block substitute-provider access.

2917. Kerstetter caused injury to business or property because his conspiratorial agreement reduced legal-service competition, chilled future attorneys and legal-services reformers, restricted public-service access, limited nonlawyer assistance, reduced referral alternatives, and preserved lawyer-centered control over professional legitimacy and attorney accountability.

2918. Robert Leadbeter agreed to the RICO conspiracy through public-office authority, public-facing veterans-event influence, public-service legitimacy, event-access influence, community-recognition authority, veterans-service access, Bloomsburg Fair access, Wills for Heroes access, public-official communications, and coordination with lawyer-controlled or bar-connected public-service structures.

2919. Leadbeter knew the essential nature of the enterprise because the enterprise depended on public-official legitimacy, veterans-event access, public-event access, bar-connected public-service programs, referral access, community recognition, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent access to vulnerable consumers.

2920. Leadbeter knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated public-official communications, veterans-event communications, public-event communications, Wills for Heroes communications, referral communications, public-service communications, exclusion communications, and electronic communications to preserve incumbent-approved legal-service access and block competing providers.

2921. Leadbeter caused injury to business or property because his conspiratorial agreement reduced community outreach, public-service competition, referral access, veterans-service access, independent legal-service legitimacy, nonlawyer

assistance, and available legal-service output for Grohol, veterans, disabled veterans, legal-aid clients, and the class.

2922. Legal Services Corporation agreed to the RICO conspiracy through federal legal-aid funding authority, grantee oversight, regulatory authority, compliance structures, legal-aid legitimacy, national legal-aid influence, provider recognition, and support for lawyer-controlled civil legal-aid systems.

2923. Legal Services Corporation knew the essential nature of the enterprise because the enterprise depended on federal legal-aid funding, grantee recognition, compliance legitimacy, provider status, legal-aid narratives, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent legal-aid control.

2924. Legal Services Corporation knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated grant reports, eligibility certifications, compliance statements, billing-related submissions, funding-related communications, provider communications, grievance communications, referral communications, and electronic communications to preserve false or misleading impressions of active, compliant, and properly administered legal-aid representation.

2925. Legal Services Corporation caused injury to business or property because its conspiratorial agreement reduced client choice, reduced conflict-free

representation, reduced malpractice-redress output, limited independent legal-aid competition, suppressed substitute-provider access, and kept Grohol, low-income clients, and malpractice victims dependent on incumbent lawyer-controlled providers.

2926. Kathleen Lincoln agreed to the RICO conspiracy through lawyer status, Union–Snyder County Bar Association officer status, local bar governance, treasurer authority, court-connected professional relationships, settlement-related professional influence, and local legal networks that preserved lawyer-centered control over credibility and cooperation.

2927. Lincoln knew the essential nature of the enterprise because the enterprise depended on local bar legitimacy, attorney cooperation, public-service access, referral credibility, settlement-related professional leverage, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent local legal-industry control.

2928. Lincoln knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated local bar communications, professional communications, referral communications, public-service communications, litigation-related communications, exclusion communications, compliance communications, and electronic communications to preserve local lawyer legitimacy and isolate corrective competition.

2929. Lincoln caused injury to business or property because her conspiratorial agreement reduced competitive legal-service access, chilled future attorney criticism, discouraged malpractice-accountability work, impaired public-service cooperation, restricted referral alternatives, and preserved incumbent lawyer networks from meaningful accountability.

2930. Gabriele Miller-Wagner agreed to the RICO conspiracy through Pennsylvania Bar Association pro bono authority, statewide Wills for Heroes coordination, volunteer recruitment influence, public-service legal-program access, scheduling authority, professional-legitimacy control, and statewide bar-connected legal-service networks.

2931. Miller-Wagner knew the essential nature of the enterprise because the enterprise depended on statewide bar pro bono legitimacy, volunteer-channel control, public-service access, veterans-service access, referral access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent lawyer-controlled service channels.

2932. Miller-Wagner knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated statewide bar communications, Wills for Heroes communications, volunteer communications, scheduling communications, public-service communications, referral communications, exclusion communications, professional communications, and electronic

communications to preserve bar-approved service access and block substitute-provider correction.

2933. Miller-Wagner caused injury to business or property because her conspiratorial agreement reduced legal-service output, limited future attorney participation, suppressed independent service providers, restricted access to veterans and vulnerable clients, reduced referral alternatives, and preserved bar-controlled program structures from competitive accountability.

2934. Lori Molloy agreed to the RICO conspiracy through North Penn Legal Services executive authority, legal-aid management, public-funding control, attorney supervision, intake systems, client-service systems, grievance-response authority, malpractice-response systems, and institutional relationships with courts, funders, bar actors, referral sources, and public-service networks.

2935. Molloy knew the essential nature of the enterprise because the enterprise depended on executive legal-aid control, public funding, intake control, case-assignment control, representation-status control, grievance control, institutional credibility, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent legal-aid dominance.

2936. Molloy knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated case-status communications, grant communications, eligibility communications, compliance communications, billing-

related communications, client communications, staff communications, grievance communications, referral communications, exclusion communications, and electronic communications to preserve false or misleading active-service and compliance impressions.

2937. Molloy caused injury to business or property because her conspiratorial agreement reduced client choice, limited substitute counsel, suppressed competing nonprofit providers, reduced malpractice-redress services, restricted conflict-free alternatives, preserved incumbent legal-aid control, and kept low-income clients and injured legal consumers dependent on lawyer-controlled legal-aid structures.

2938. Jenna Ann Neidig agreed to the RICO conspiracy through lawyer status, Union–Snyder County Bar Association participation, officer or former-officer status, local bar governance, listserv participation, meeting-record structures, public-service legal programming, and court-connected professional networks.

2939. Neidig knew the essential nature of the enterprise because the enterprise depended on local bar governance, meeting access, records, listservs, committee participation, public-service programs, local professional legitimacy, referral credibility, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent local legal-industry control.

2940. Neidig knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated local bar communications, listserv

communications, meeting communications, record communications, public-service communications, referral communications, exclusion communications, professional communications, and electronic communications to preserve local lawyer legitimacy and block substitute-provider correction.

2941. Neidig caused injury to business or property because her conspiratorial agreement reduced public-service access, referral opportunities, professional credibility, meeting access, committee access, competitive legal-service opportunities, and independent accountability options for future attorneys, nonlawyer competitors, malpractice victims, and legal-services reformers.

2942. North Penn Legal Services, Inc. agreed to the RICO conspiracy through public legal-aid funding, regional provider authority, client intake control, case-assignment control, attorney supervision, representation-status control, referral relationships, legal-aid credibility, grievance systems, and institutional control over low-income civil legal services.

2943. North Penn Legal Services, Inc. knew the essential nature of the enterprise because the enterprise depended on its legal-aid status, public funding, client intake, case retention, representation-status control, counsel-of-record control, institutional credibility, grievance control, substitute-provider exclusion, and retaliation against Grohol’s legal team to preserve incumbent provider control.

2944. North Penn Legal Services, Inc. knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated case-status reports, grant reports, eligibility certifications, compliance statements, billing-related submissions, client communications, court-facing communications, funding communications, referral communications, exclusion communications, and electronic communications to preserve false or misleading impressions that matters were active, eligible, worked, compliant, professionally administered, properly supervised, properly staffed, or lawfully handled.

2945. North Penn Legal Services, Inc. caused injury to business or property because its conspiratorial agreement reduced legal-service output, limited client choice, restricted conflict-free substitute counsel, suppressed competing nonprofit providers, reduced malpractice accountability, preserved nonperforming counsel-of-record control, and kept Grohol and similarly situated low-income clients dependent on the same provider structure that failed them.

2946. Northumberland County Prothonotary’s Office agreed to the RICO conspiracy through public filing authority, docket access, court-record access, courthouse administration, public-office legitimacy, counsel-of-record records, service practices, filing practices, and court-access structures affecting who can use the courts effectively.

2947. Northumberland County Prothonotary’s Office knew the essential nature of the enterprise because the enterprise depended on filing systems, docket systems, record access, counsel-of-record entries, local courthouse norms, public-office credibility, institutional silence, substitute-provider exclusion, and preservation of court-facing active-case impressions.

2948. Northumberland County Prothonotary’s Office knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated docket communications, filing communications, counsel-of-record communications, service communications, court-record communications, court-facing communications, exclusion communications, compliance communications, and electronic communications to preserve formal case-control impressions despite nonperformance and lack of substitute-provider access.

2949. Northumberland County Prothonotary’s Office caused injury to business or property because its conspiratorial agreement reduced court-access competition, restricted practical legal assistance, limited nonlawyer court-navigation support, reduced malpractice-victim access to remedies, preserved lawyer-centered control over systems injured clients must use to obtain relief, and kept Grohol and similarly situated clients trapped inside formal counsel-of-record structures.

2950. Office of Attorney General agreed to the RICO conspiracy through public legal authority, state-law enforcement authority, attorney status, public-office

legitimacy, legal-market influence, state litigation authority, consumer-protection influence, and participation in professional structures that preserved lawyer control over legal services and attorney accountability.

2951. Office of Attorney General knew the essential nature of the enterprise because the enterprise depended on government-lawyer legitimacy, state enforcement authority, attorney-controlled accountability channels, consumer-protection silence, institutional credibility, substitute-provider exclusion, and retaliation against Grohol’s legal team to preserve incumbent legal-industry control.

2952. Office of Attorney General knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated state-facing communications, enforcement communications, consumer-protection communications, attorney-regulation communications, funding communications, referral communications, exclusion communications, professional communications, and electronic communications to preserve lawyer-controlled legitimacy and block independent correction.

2953. Office of Attorney General caused injury to business or property because its conspiratorial agreement reduced independent accountability, chilled legal-services reformers, preserved attorney-controlled enforcement channels, limited

competitive alternatives, and reduced the practical ability of malpractice victims and injured legal consumers to obtain non-lawyer-controlled remedies.

2954. Office of Disciplinary Counsel agreed to the RICO conspiracy through attorney-discipline authority, complaint-screening authority, investigatory discretion, charging authority, professional-regulation authority, disciplinary legitimacy, and lawyer-controlled accountability structures that determined whether attorney misconduct received meaningful consequences.

2955. Office of Disciplinary Counsel knew the essential nature of the enterprise because the enterprise depended on disciplinary gatekeeping, professional-accountability legitimacy, attorney-controlled complaint channels, license-based pressure, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent lawyer control.

2956. Office of Disciplinary Counsel knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated disciplinary communications, complaint communications, investigative communications, attorney-accountability communications, professional communications, exclusion communications, compliance communications, and electronic communications to preserve false or misleading accountability impressions and deter lawyer-critical corrective competition.

2957. Office of Disciplinary Counsel caused injury to business or property because its conspiratorial agreement reduced independent accountability services, chilled future attorney criticism, limited malpractice-redress pathways, preserved lawyer-controlled professional regulation, and kept injured legal consumers dependent on the same profession that controls both legal services and attorney discipline.

2958. Pennsylvania Bar Association agreed to the RICO conspiracy through statewide bar authority, professional legitimacy, public-service legal programs, pro bono structures, committee access, continuing legal education influence, lawyer networks, Wills for Heroes structures, referral channels, and bar-governance systems that preserved lawyer control over legal-service access.

2959. Pennsylvania Bar Association knew the essential nature of the enterprise because the enterprise depended on statewide bar legitimacy, professional status, public-service access, pro bono access, Wills for Heroes access, referral access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent lawyer-controlled channels.

2960. Pennsylvania Bar Association knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated statewide bar communications, Wills for Heroes communications, public-service communications, committee communications, referral communications, exclusion communications, professional communications, compliance communications, and

electronic communications to preserve lawyer-approved service access and block substitute-provider correction.

2961. Pennsylvania Bar Association caused injury to business or property because its conspiratorial agreement reduced legal-service output, restricted future attorney participation, suppressed nonlawyer competition, limited malpractice-accountability alternatives, reduced public-service legal access, and preserved incumbent lawyer-controlled public-service and referral channels.

2962. Pennsylvania Board of Law Examiners agreed to the RICO conspiracy through bar-admission authority, examination authority, character-and-fitness screening, licensing gatekeeping, professional-entry control, credentialing authority, and lawyer-regulation structures that determined who could enter the legal-services market as an attorney.

2963. Pennsylvania Board of Law Examiners knew the essential nature of the enterprise because the enterprise depended on licensing gatekeeping, bar-admission control, character-and-fitness control, court-approved credentials, professional conformity, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve restricted lawyer-controlled market entry.

2964. Pennsylvania Board of Law Examiners knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated

admission communications, credentialing communications, character-and-fitness communications, professional communications, court-facing communications, exclusion communications, compliance communications, and electronic communications to preserve restricted entry and lawyer-only legitimacy.

2965. Pennsylvania Board of Law Examiners caused injury to business or property because its conspiratorial agreement reduced legal-service supply, limited future attorney entry, increased barriers to affordable legal assistance, excluded alternative legal-service providers, restricted innovation, and kept malpractice victims and low-income clients dependent on a restricted lawyer-controlled market.

2966. Pennsylvania Department of Human Services agreed to the RICO conspiracy through public-funding authority, social-service authority, legal-aid-related funding structures, public-benefits systems, service-provider relationships, referral environments, domestic-violence systems, disability-service systems, and public-service legitimacy affecting access to civil legal help for low-income and vulnerable clients.

2967. Pennsylvania Department of Human Services knew the essential nature of the enterprise because the enterprise depended on public-service referrals, agency-connected legitimacy, domestic-violence service channels, disability-service channels, legal-aid relationships, institutional silence, substitute-provider

exclusion, and retaliation against Grohol's legal team to preserve incumbent service pathways.

2968. Pennsylvania Department of Human Services knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated funding communications, benefits communications, service-provider communications, domestic-violence communications, disability-service communications, referral communications, exclusion communications, compliance communications, and electronic communications to preserve lawyer-approved legal-service access and block independent alternatives.

2969. Pennsylvania Department of Human Services caused injury to business or property because its conspiratorial agreement reduced client choice, restricted conflict-free legal-service alternatives, limited independent accountability for legal-aid failures, preserved incumbent referral channels, and burdened future attorneys and nonlawyer competitors seeking to serve vulnerable clients.

2970. Pennsylvania Department of Military and Veterans Affairs agreed to the RICO conspiracy through veterans-service authority, coalition access, public-service recognition, veterans-outreach structures, Wills for Heroes and Wills for Veterans connections, event coordination, public-facing legitimacy, and referral channels within legal-service systems serving veterans and disabled veterans.

2971. Pennsylvania Department of Military and Veterans Affairs knew the essential nature of the enterprise because the enterprise depended on veterans-service legitimacy, coalition communications, public recognition, event participation, outreach channels, referral access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent lawyer-approved veterans legal-service pathways.

2972. Pennsylvania Department of Military and Veterans Affairs knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated veterans-service communications, coalition communications, public-service communications, Wills for Heroes communications, referral communications, exclusion communications, professional communications, compliance communications, and electronic communications to preserve lawyer-approved veterans-service access and block competing providers.

2973. Pennsylvania Department of Military and Veterans Affairs caused injury to business or property because its conspiratorial agreement reduced legal-service output for veterans and disabled veterans, limited provider choice, restricted alternative legal-service entry, preserved bar-connected program control, and burdened future attorneys and legal-services reformers seeking equal access to public-facing veterans-service markets.

2974. Pennsylvania General Assembly agreed to the RICO conspiracy through statutory authority, public-funding authority, legislative recognition of lawyer-controlled systems, legal-aid funding structures, court-system statutes, attorney-regulation frameworks, unauthorized-practice structures, and legislation or nonlegislation affecting court access, legal aid, and professional accountability.

2975. Pennsylvania General Assembly knew the essential nature of the enterprise because the enterprise depended on statutory legitimacy, public funding, unauthorized-practice barriers, legal-aid funding structures, attorney-regulation frameworks, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve lawyer-controlled legal-service systems.

2976. Pennsylvania General Assembly knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated funding communications, legislative communications, legal-aid communications, attorney-regulation communications, public-service communications, referral communications, exclusion communications, compliance communications, and electronic communications to preserve lawyer-controlled legal-service legitimacy and block substitute-provider access.

2977. Pennsylvania General Assembly caused injury to business or property because its conspiratorial agreement reduced legal-service competition, limited nonlawyer assistance, preserved unauthorized-practice barriers, restricted

malpractice-redress alternatives, and kept future attorneys, malpractice victims, and low-income clients dependent on lawyer-controlled institutions.

2978. Pennsylvania Legal Aid Network, Inc. agreed to the RICO conspiracy through statewide legal-aid coordination, provider legitimacy, training authority, funding relationships, referral influence, public-service recognition, legal-aid policy influence, and support for lawyer-controlled civil legal-aid systems.

2979. Pennsylvania Legal Aid Network, Inc. knew the essential nature of the enterprise because the enterprise depended on statewide legal-aid coordination, grantee legitimacy, provider recognition, referral credibility, training access, public-service credibility, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent legal-aid control.

2980. Pennsylvania Legal Aid Network, Inc. knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated legal-aid communications, provider communications, training communications, referral communications, funding-related communications, public-service communications, exclusion communications, compliance communications, and electronic communications to preserve false or misleading legal-aid legitimacy and block independent correction.

2981. Pennsylvania Legal Aid Network, Inc. caused injury to business or property because its conspiratorial agreement reduced client choice, limited independent

legal-aid competition, restricted substitute-provider access, reduced malpractice-redress output, preserved incumbent lawyer-controlled providers from market accountability, and kept Grohol and the class dependent on legal-aid structures that failed them.

2982. Supreme Court of Pennsylvania agreed to the RICO conspiracy through attorney-admission authority, disciplinary authority, rulemaking authority, unauthorized-practice authority, judicial-system authority, court-access authority, professional-regulation authority, and control over lawyer-centered systems governing entry, practice, discipline, procedure, and accountability.

2983. Supreme Court of Pennsylvania knew the essential nature of the enterprise because the enterprise depended on attorney-admission control, disciplinary control, rulemaking control, unauthorized-practice control, court-access control, professional-regulation legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve lawyer-centered legal-service authority.

2984. Supreme Court of Pennsylvania knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated rulemaking communications, attorney-regulation communications, disciplinary communications, admission communications, court-facing communications, professional communications, exclusion communications, compliance

communications, and electronic communications to preserve lawyer-controlled legitimacy and block competing legal-help models.

2985. Supreme Court of Pennsylvania caused injury to business or property because its conspiratorial agreement reduced legal-service supply, restricted future attorney entry, excluded nonlawyer competitors, limited malpractice-redress alternatives, suppressed court-access innovation, and kept legal consumers, low-income clients, and court users dependent on lawyer-controlled systems.

2986. Michael F.J. Piecuch agreed to the RICO conspiracy through president-judge authority, judicial office, courthouse influence, local court administration, local bar influence, public-service relationships, advisory-board connections, and lawyer-and-judge-controlled professional networks.

2987. Piecuch knew the essential nature of the enterprise because the enterprise depended on local judicial authority, courthouse legitimacy, local court administration, public-service access, advisory-board access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent local legal-industry control.

2988. Piecuch knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated court-facing communications, judicial communications, local court communications, advisory communications, public-service communications, referral communications, exclusion

communications, compliance communications, and electronic communications to preserve local lawyer-and-judge legitimacy and block substitute-provider correction.

2989. Piecuch caused injury to business or property because his conspiratorial agreement reduced legal-service competition, chilled attorney criticism, limited nonlawyer and independent assistance, restricted public-service access, reduced court-access alternatives, and preserved lawyer-centered control over local legal markets.

2990. Jeffrey A. Rowe agreed to the RICO conspiracy through judicial office, magisterial-district authority, courthouse access, local legal influence, court-connected public-service participation, local bar relationships, advisory access, attorney-practice influence, and professional networks that affect legal-market legitimacy.

2991. Rowe knew the essential nature of the enterprise because the enterprise depended on local judicial authority, court-connected legitimacy, local bar relationships, advisory access, attorney-practice influence, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent local legal-industry control.

2992. Rowe knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated court-facing communications, advisory

communications, local professional communications, attorney-practice communications, public-service communications, referral communications, exclusion communications, and electronic communications to preserve local court-connected legitimacy and block substitute-provider correction.

2993. Rowe caused injury to business or property because his conspiratorial agreement reduced competition, limited alternative legal-service access, chilled future attorney criticism, suppressed court-access reform, restricted nonlawyer assistance, and preserved lawyer-centered control over client-facing legal systems.

2994. Jamie Saleski agreed to the RICO conspiracy through prothonotary authority, filing-system authority, docket-access authority, public-record authority, counsel-of-record records, courthouse administration, service and filing practices, and public-office structures that affect practical access to courts.

2995. Saleski knew the essential nature of the enterprise because the enterprise depended on filing systems, docket systems, record access, counsel-of-record entries, courthouse administration, public-office credibility, institutional silence, substitute-provider exclusion, and preservation of court-facing active-case impressions.

2996. Saleski knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated docket communications, filing communications, counsel-of-record communications, service communications,

court-record communications, court-facing communications, exclusion communications, compliance communications, and electronic communications to preserve formal case-control impressions despite nonperformance and lack of substitute-provider access.

2997. Saleski caused injury to business or property because her conspiratorial agreement reduced court-access competition, limited practical legal assistance, restricted nonlawyer court-navigation support, preserved lawyer-centered control over systems that malpractice victims must use to obtain relief, and reduced meaningful court-access alternatives.

2998. Sholley agreed to the RICO conspiracy through lawyer status, Union–Snyder County Bar Association officer authority, secretary authority, meeting-record authority, minute practices, local bar governance, Law Day participation, Wills for Heroes participation, listserv structures, and court-connected local bar influence.

2999. Sholley knew the essential nature of the enterprise because the enterprise depended on local bar governance, meeting records, minutes, listserv access, committee participation, public-service programs, professional legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent local legal-industry control.

3000. Sholley knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated local bar communications, meeting communications, record communications, minutes-related communications, listserv communications, public-service communications, referral communications, exclusion communications, professional communications, and electronic communications to preserve local lawyer legitimacy and block substitute-provider correction.

3001. Sholley caused injury to business or property because her conspiratorial agreement reduced public-service access, professional credibility, meeting access, committee access, referral opportunities, competitive legal-service opportunities, and independent accountability options for future attorneys, malpractice victims, nonlawyer competitors, and legal-services reformers.

3002. Timothy Smith agreed to the RICO conspiracy through North Penn Legal Services senior management authority, attorney supervision, case-management systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, representation-status practices, withdrawal practices, and legal-aid institutional control.

3003. Smith knew the essential nature of the enterprise because the enterprise depended on senior legal-aid authority, client-file control, representation-status control, attorney-assignment control, corrective-action control, grievance control,

institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent legal-aid dominance.

3004. Smith knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated case-status communications, grant communications, compliance communications, client communications, file communications, grievance communications, withdrawal communications, referral communications, exclusion communications, and electronic communications to preserve false or misleading active-service impressions despite missed hearings, missed deadlines, abandoned files, unclear representation status, and lack of substitute-provider access.

3005. Smith caused injury to business or property because his conspiratorial agreement reduced conflict-free substitute counsel, restricted legal-aid accountability, suppressed competing nonprofit legal-service capacity, limited client repair, preserved incumbent lawyer-controlled legal-aid dominance, and kept Grohol and similarly situated clients dependent on failed legal-aid structures.

3006. Snyder County agreed to the RICO conspiracy through county-government authority, public-service structures, county-connected legal systems, court-adjacent relationships, prosecutor-connected systems, advisory and coalition relationships, referral environments, and public legitimacy that affect access to legal services and legal-system accountability.

3007. Snyder County knew the essential nature of the enterprise because the enterprise depended on county-connected legitimacy, prosecutor-connected systems, public-service access, court-adjacent relationships, advisory access, coalition access, referral control, institutional silence, substitute-provider exclusion, and retaliation against Grohol’s legal team to preserve incumbent local legal-industry control.

3008. Snyder County knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated county communications, prosecutor-connected communications, public-service communications, advisory communications, coalition communications, referral communications, exclusion communications, compliance communications, and electronic communications to preserve legal-industry legitimacy and block substitute-provider correction.

3009. Snyder County caused injury to business or property because its conspiratorial agreement reduced client choice, public-service access, referral competition, court-adjacent accountability, nonlawyer support, future attorney access, and the local systems needed to compete with incumbent lawyer-controlled providers.

3010. Snyder County STOP Coalition agreed to the RICO conspiracy through county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals,

legal-aid relationships, and local institutional credibility affecting access to survivors, vulnerable clients, and public-service legal opportunities.

3011. Snyder County STOP Coalition knew the essential nature of the enterprise because the enterprise depended on victim-service legitimacy, domestic-violence referral channels, coalition access, service-provider networks, legal-aid relationships, public-service credibility, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent lawyer-approved service channels.

3012. Snyder County STOP Coalition knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated coalition communications, victim-service communications, domestic-violence communications, public-service communications, legal-aid communications, referral communications, exclusion communications, compliance communications, and electronic communications to preserve incumbent-approved legal-service access and block independent alternatives.

3013. Snyder County STOP Coalition caused injury to business or property because its conspiratorial agreement reduced public-service legal competition, limited referral access, restricted conflict-free alternatives, burdened future attorney participation, reduced nonlawyer assistance, and preserved incumbent legal-aid and lawyer-connected service systems from market accountability.

3014. Sarah Stigerwalt-Egan agreed to the RICO conspiracy through lawyer status, Union–Snyder County Bar Association presidential authority, judicial-law-clerk and hearing-officer status, local bar governance, Wills for Heroes control, meeting access, listserv communications, Teams access, minute practices, public-service legal-program access, and communications with statewide bar and veterans-service actors.

3015. Stigerwalt-Egan knew the essential nature of the enterprise because the enterprise depended on local bar leadership, judicially connected status, meeting access, listserv access, public-service legal-program control, Wills for Heroes control, professional legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent lawyer-controlled service channels.

3016. Stigerwalt-Egan knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated local bar communications, listserv communications, Teams communications, meeting communications, minute communications, Wills for Heroes communications, veterans-service communications, public-service communications, referral communications, exclusion communications, professional communications, and electronic communications to preserve lawyer-approved program access and block substitute-provider correction.

3017. Stigerwalt-Egan caused injury to business or property because her conspiratorial agreement reduced legal-service output, limited future attorney competition, chilled lawyer-critical advocacy, restricted public-service access, reduced referral alternatives, and preserved incumbent lawyer-controlled structures from competitive accountability.

3018. K. Michael Sullivan agreed to the RICO conspiracy through lawyer status, Union–Snyder County Bar Association authority, local bar leadership, Wills for Heroes control, pro bono committee influence, listserv communications, public-service legal-program access, local legal-system influence, and joint participation with court-connected and bar-connected actors.

3019. Sullivan knew the essential nature of the enterprise because the enterprise depended on local bar leadership, pro bono-program control, Wills for Heroes control, listserv communications, public-service legitimacy, referral credibility, professional standing, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent lawyer-controlled legal-service channels.

3020. Sullivan knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated local bar communications, pro bono communications, Wills for Heroes communications, listserv communications, public-service communications, referral communications, exclusion

communications, professional communications, compliance communications, and electronic communications to preserve incumbent-approved service opportunities and block corrective competition.

3021. Sullivan caused injury to business or property because his conspiratorial agreement reduced client choice, restricted nonprofit legal-service competition, limited public-service legal output, chilled future attorney criticism, reduced nonlawyer assistance, and preserved lawyer-controlled referral and program channels from market accountability.

3022. Brian Ulmer agreed to the RICO conspiracy through lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation, statewide pro bono networks, bar-connected legal-service structures, public-facing legal programs, attorney networks, and communications affecting access to veterans-service and legal-service opportunities.

3023. Ulmer knew the essential nature of the enterprise because the enterprise depended on statewide bar legitimacy, Wills for Heroes access, public-service access, volunteer-channel control, veterans-service access, referral credibility, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent lawyer-controlled service channels.

3024. Ulmer knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated bar-connected communications,

Wills for Heroes communications, volunteer communications, public-service communications, veterans-service communications, referral communications, exclusion communications, professional communications, and electronic communications to preserve lawyer-approved program access and block competing substitute providers.

3025. Ulmer caused injury to business or property because his conspiratorial agreement reduced legal-service output, limited future attorney and nonprofit participation, restricted veterans-service access, suppressed independent legal-service competition, reduced nonlawyer assistance, and preserved lawyer-controlled public-service channels from accountability.

3026. Union County agreed to the RICO conspiracy through county-government authority, public-service systems, advisory-board structures, criminal-justice structures, mental-health structures, STOP-related systems, referral environments, public legitimacy, and county-connected systems that affect access to legal services and legal-system accountability.

3027. Union County knew the essential nature of the enterprise because the enterprise depended on county-connected legitimacy, prosecutor-connected systems, advisory-board access, mental-health service channels, domestic-violence service channels, public-service access, referral control, institutional silence,

substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent local legal-industry control.

3028. Union County knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated county communications, advisory communications, criminal-justice communications, mental-health communications, STOP-related communications, public-service communications, referral communications, exclusion communications, compliance communications, and electronic communications to preserve lawyer-approved service access and block independent alternatives.

3029. Union County caused injury to business or property because its conspiratorial agreement reduced client choice, referral competition, public-service access, court-adjacent accountability, nonlawyer support, future attorney access, and the local systems needed to compete with incumbent lawyer-controlled providers.

3030. Union–Snyder County Bar Association agreed to the RICO conspiracy through local bar governance, membership control, listserv control, committee access, meeting access, minute practices, Wills for Heroes planning, Law Day programming, public-service opportunities, and local professional legitimacy.

3031. Union–Snyder County Bar Association knew the essential nature of the enterprise because the enterprise depended on local bar legitimacy, meeting access,

listserv access, committee access, public-service access, referral credibility, local professional acceptance, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent local lawyer control.

3032. Union–Snyder County Bar Association knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated local bar communications, listserv communications, meeting communications, committee communications, minute-related communications, Wills for Heroes communications, public-service communications, referral communications, exclusion communications, professional communications, and electronic communications to preserve local lawyer legitimacy and block substitute-provider correction.

3033. Union–Snyder County Bar Association caused injury to business or property because its conspiratorial agreement reduced future attorney participation, restricted independent legal-service competition, chilled attorney criticism, limited public-service legal output, reduced referral alternatives, and preserved incumbent lawyer networks from meaningful market accountability.

3034. Union County Criminal Justice Advisory Board agreed to the RICO conspiracy through county-government participation, criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local

institutional credibility affecting legal-service channels and public-service participation.

3035. Union County Criminal Justice Advisory Board knew the essential nature of the enterprise because the enterprise depended on criminal-justice advisory legitimacy, prosecutor-connected credibility, court-adjacent access, public-service coordination, policy access, referral environments, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent local legal-industry control.

3036. Union County Criminal Justice Advisory Board knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated advisory communications, criminal-justice communications, prosecutor-connected communications, court-connected communications, public-service communications, policy communications, referral communications, exclusion communications, compliance communications, and electronic communications to preserve institutional legitimacy and block corrective competition.

3037. Union County Criminal Justice Advisory Board caused injury to business or property because its conspiratorial agreement reduced public-service access, referral access, court-adjacent accountability, local legal-system competition, nonlawyer assistance, and future attorney access to systems needed to challenge incumbent lawyer-controlled structures.

3038. Union County Mental Health Advisory Committee agreed to the RICO conspiracy through county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility affecting access to vulnerable clients and public-service legal channels.

3039. Union County Mental Health Advisory Committee knew the essential nature of the enterprise because the enterprise depended on mental-health advisory legitimacy, disability-service access, public-service coordination, court-connected participation, provider-network access, referral credibility, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent lawyer-approved service channels.

3040. Union County Mental Health Advisory Committee knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated advisory communications, mental-health communications, disability-service communications, provider-network communications, court-connected communications, public-service communications, referral communications, exclusion communications, compliance communications, and electronic communications to preserve incumbent-approved legal-service pathways and block independent alternatives.

3041. Union County Mental Health Advisory Committee caused injury to business or property because its conspiratorial agreement reduced client choice, restricted conflict-free alternatives, burdened future attorney participation, limited nonlawyer assistance, reduced public-service legal access, and preserved lawyer-controlled legal-service channels for vulnerable clients.

3042. Union County STOP Coalition agreed to the RICO conspiracy through county-connected domestic-violence service coordination, prosecutor participation, public meetings, victim-services structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility affecting access to survivors, vulnerable clients, and public-service legal opportunities.

3043. Union County STOP Coalition knew the essential nature of the enterprise because the enterprise depended on domestic-violence service legitimacy, victim-service legitimacy, prosecutor-connected access, public-service coordination, legal-aid relationships, referral credibility, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent lawyer-approved service channels.

3044. Union County STOP Coalition knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated coalition communications, domestic-violence communications, victim-service communications, prosecutor-connected communications, public-service

communications, legal-aid communications, referral communications, exclusion communications, compliance communications, and electronic communications to preserve incumbent-approved legal-service access and block independent alternatives.

3045. Union County STOP Coalition caused injury to business or property because its conspiratorial agreement reduced public-service legal competition, limited referral access, restricted conflict-free alternatives, burdened future attorney participation, reduced nonlawyer assistance, and preserved incumbent legal-aid and lawyer-connected service systems from market accountability.

3046. United States Bankruptcy Court for the Middle District of Pennsylvania agreed to the RICO conspiracy through federal judicial authority, bankruptcy jurisdiction, docket authority, hearing authority, case-management authority, sanctions-related authority, local-rule authority, attorney-practice authority, filing systems, staff communications, and bankruptcy-access structures.

3047. United States Bankruptcy Court for the Middle District of Pennsylvania knew the essential nature of the enterprise because the enterprise depended on bankruptcy-court authority, federal judicial legitimacy, attorney-practice control, filing systems, sanctions exposure, court-access norms, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve lawyer-and-judge-controlled access to legal relief.

3048. United States Bankruptcy Court for the Middle District of Pennsylvania knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated bankruptcy communications, court-facing communications, filing communications, attorney-practice communications, sanctions-related communications, professional communications, exclusion communications, compliance communications, and electronic communications to preserve lawyer-centered court legitimacy and restrict corrective competition.

3049. United States Bankruptcy Court for the Middle District of Pennsylvania caused injury to business or property because its conspiratorial agreement reduced competition in bankruptcy and debt-relief legal services, limited nonlawyer and independent assistance, chilled future attorneys and legal-services reformers, preserved lawyer-centered control over debt-relief markets, and restricted meaningful substitute-provider access.

3050. United States Congress agreed to the RICO conspiracy through federal legislative authority, federal-court creation, federal legal-aid funding statutes, federal attorney-regulation structures, federal procedural-rule delegation, federal judicial structures, legal-services funding, and legislative decisions that preserved lawyer-centered control over legal services and attorney accountability.

3051. United States Congress knew the essential nature of the enterprise because the enterprise depended on federal statutory legitimacy, federal legal-aid funding,

federal-court authority, procedural-rule delegation, attorney-regulation structures, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve lawyer-controlled legal-service systems.

3052. United States Congress knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated funding communications, federal legal-aid communications, court-system communications, procedural-rule communications, public-service communications, referral communications, exclusion communications, compliance communications, and electronic communications to preserve lawyer-controlled institutional legitimacy and block independent alternatives.

3053. United States Congress caused injury to business or property because its conspiratorial agreement reduced legal-service competition, limited alternative assistance, preserved lawyer-centered gatekeeping, restricted malpractice-redress options, reduced nonlawyer assistance, and kept future attorneys, low-income clients, and injured legal consumers dependent on lawyer-controlled institutions.

3054. United States Court of Appeals for the Third Circuit agreed to the RICO conspiracy through federal appellate authority, precedent authority, procedural authority, attorney-practice authority, disciplinary authority, filing rules, appellate access structures, judicial legitimacy, and court-controlled credibility systems.

3055. United States Court of Appeals for the Third Circuit knew the essential nature of the enterprise because the enterprise depended on appellate authority, precedent control, procedural gatekeeping, attorney-practice control, judicial legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve lawyer-and-judge-controlled legal accountability systems.

3056. United States Court of Appeals for the Third Circuit knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated appellate communications, court-facing communications, attorney-practice communications, disciplinary communications, professional communications, exclusion communications, compliance communications, and electronic communications to preserve lawyer-centered appellate legitimacy and block independent corrective competition.

3057. United States Court of Appeals for the Third Circuit caused injury to business or property because its conspiratorial agreement reduced competitive accountability, limited malpractice-redress pathways, chilled future attorneys and legal-services reformers, restricted nonlawyer assistance, preserved lawyer-centered control over legal rights enforcement, and kept Grohol and similarly situated clients dependent on closed attorney-controlled channels.

3058. United States District Court for the Middle District of Pennsylvania agreed to the RICO conspiracy through federal district-court authority, docket authority, case-management authority, filing authority, local-rule authority, sanctions authority, attorney-practice authority, judicial legitimacy, and court-access systems that affect legal-service competition and accountability.

3059. United States District Court for the Middle District of Pennsylvania knew the essential nature of the enterprise because the enterprise depended on federal trial-court authority, docket control, filing systems, local rules, attorney-practice expectations, sanctions exposure, judicial legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve lawyer-controlled federal court access.

3060. United States District Court for the Middle District of Pennsylvania knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated court-facing communications, docket communications, filing communications, attorney-practice communications, case-management communications, exclusion communications, professional communications, compliance communications, and electronic communications to preserve lawyer-centered federal trial-court legitimacy and restrict corrective competition.

3061. United States District Court for the Middle District of Pennsylvania caused injury to business or property because its conspiratorial agreement reduced court-

access competition, limited nonlawyer and independent assistance, chilled future attorney criticism, increased dependence on licensed lawyers, preserved lawyer-centered control over rights enforcement, and kept Grohol and similarly situated clients dependent on scarce attorney-controlled channels.

3062. United States Department of Health and Human Services agreed to the RICO conspiracy through federal public-funding authority, social-service authority, legal-aid-related funding structures, public-benefits systems, civil-rights compliance structures, service-provider relationships, referral environments, and public-service legitimacy affecting access to civil legal help for vulnerable clients.

3063. United States Department of Health and Human Services knew the essential nature of the enterprise because the enterprise depended on federally funded service systems, agency-connected referral legitimacy, disability-service channels, benefits-related service channels, domestic-violence and family-service channels, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve incumbent lawyer-approved civil legal-service pathways.

3064. United States Department of Health and Human Services knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated funding communications, social-service communications, benefits communications, disability-service communications, civil-rights communications, service-provider communications, referral communications, exclusion

communications, compliance communications, and electronic communications to preserve lawyer-approved service access and block independent alternatives.

3065. United States Department of Health and Human Services caused injury to business or property because its conspiratorial agreement reduced client choice, restricted conflict-free legal-service alternatives, limited independent accountability for legal-aid failures, preserved incumbent referral channels, burdened future attorneys and nonlawyer competitors, and kept vulnerable clients dependent on lawyer-controlled systems that failed them.

3066. United States Judicial Conference agreed to the RICO conspiracy through federal judicial-administration authority, policy authority, rules-related authority, court-governance influence, administrative oversight, federal court legitimacy, and institutional support for lawyer-and-judge-controlled federal court systems.

3067. United States Judicial Conference knew the essential nature of the enterprise because the enterprise depended on federal judicial administration, rulemaking systems, court-governance norms, attorney-practice standards, filing expectations, sanctions norms, judicial legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team to preserve lawyer-and-judge-controlled federal court access.

3068. United States Judicial Conference knowingly agreed that at least 2 racketeering acts would be committed because the enterprise used repeated

judicial-administration communications, rulemaking communications, court-governance communications, filing-practice communications, attorney-practice communications, professional communications, exclusion communications, compliance communications, and electronic communications to preserve federal court legitimacy and restrict independent court-access assistance.

3069. United States Judicial Conference caused injury to business or property because its conspiratorial agreement reduced competitive accountability, limited meaningful nonlawyer assistance, chilled court-access reform, preserved lawyer-centered litigation control, restricted malpractice-redress pathways, and kept injured legal consumers dependent on lawyer-dominated federal court processes.

3070. Defendants' RICO conspiracy was related and continuous because each defendant agreed to preserve the same legal-aid, funding, reporting, court-connected, judicial, attorney-practice, bar-connected, disciplinary, referral, public-service, veterans-service, public-event, county-connected, advisory, local-professional, and electronic-communication channels that concealed nonperformance, preserved false or misleading active-service impressions, blocked substitute-provider access, and retaliated against Grohol's legal team.

3071. Defendants knowingly agreed to facilitate at least 2 racketeering acts because the enterprise depended on repeated mail and wire communications involving case status, grant reports, eligibility certifications, compliance

statements, billing-related submissions, funding reports, referral communications, court-facing communications, professional communications, disciplinary communications, bar-connected communications, public-service communications, exclusion communications, and electronic communications that preserved incumbent control and prevented corrective disclosure.

3072. Defendants caused injury to business or property because Grohol lost personal property, legal claims, hearing rights, substitute-provider access, file-transfer access, referral access, corrective advocacy, and meaningful redress, and similarly situated clients lost property, housing, benefits, claims, hearings, appellate rights, settlement leverage, substitute-provider access, and meaningful court access.

3073. Defendants caused injury to Grohol's legal team and similarly situated substitute providers because the conspiracy diverted referrals, volunteer opportunities, pro bono opportunities, contract opportunities, Wills for Heroes opportunities, veterans-service opportunities, public-service opportunities, court-access opportunities, attorney-practice opportunities, local-bar opportunities, advisory opportunities, professional opportunities, and substitute-provider opportunities away from providers who exposed legal-aid misconduct and legal-industry self-protection.

3074. Defendants are liable under 18 U.S.C. § 1962(d) because each agreed to participate in or facilitate the conduct of an association-in-fact enterprise's affairs through a pattern of racketeering activity, knew the essential nature of the plan, knowingly agreed to facilitate at least 2 racketeering acts, and directly injured Grohol, the class, Grohol's legal team, and similarly situated substitute providers in business or property.

3075. Grohol and the class are entitled to treble damages, compensatory damages, declaratory relief, temporary injunctive relief, preliminary injunctive relief, permanent injunctive relief, truthful-reporting relief, corrective-disclosure relief, neutral monitoring, client-notice protocols, hearing-notice protocols, lawful-withdrawal protocols, file-transfer protocols, substitute-provider access, conflict-free substitute-provider access, nonretaliation protections, provider-neutral referral access, public-service access review, legal-aid accountability review, court-access review, attorney-discipline review, preservation of communications and records, expedited discovery, costs, attorney's fees, and all other lawful relief under 18 U.S.C. § 1964.

**COUNT 27**

**Civil Conspiracy Against Administrative Office of Pennsylvania Courts; American Bar Association; Bloomsburg Fair Association; Matthew W.**

Brann; Heath Brosius; Jessica Chapman; William R. Christman III; Mary Beth Clark; Committee on Rules of Practice and Procedure; Commonwealth of Pennsylvania; Mark J. Conway; Court of Judicial Discipline; Robert Cravitz; Doe Defendants 1 through 200; Federal Judicial Center; Lori R. Hackenberg; International Legal Aid Group; Judicial Conduct Board of Pennsylvania; Heather Kelly; Brian Kerstetter; Robert Leadbeter; Legal Services Corporation; Kathleen Lincoln; Gabriele Miller-Wagner; Lori Molloy; Jenna Ann Neidig; North Penn Legal Services, Inc.; Northumberland County Prothonotary's Office; Office of Attorney General; Office of Disciplinary Counsel; Pennsylvania Bar Association; Pennsylvania Board of Law Examiners; Pennsylvania Department of Human Services; Pennsylvania Department of Military and Veterans Affairs; Pennsylvania General Assembly; Pennsylvania Legal Aid Network, Inc.; Supreme Court of Pennsylvania; Michael F.J. Piecuch; Jeffrey A. Rowe; Jamie Saleski;  Sholley; Timothy Smith; Snyder County; Snyder County STOP Coalition; Sarah Stigerwalt-Egan; K. Michael Sullivan; David Andrew Strouse; Transitions Legal Center; Transitions of PA; David K. Trevaskis; Brian Ulmer; Union County; Union–Snyder County Bar Association; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; United States Bankruptcy Court for the

**Middle District of Pennsylvania; United States Congress; United States Court of Appeals for the Third Circuit; United States District Court for the Middle District of Pennsylvania; United States Department of Health and Human Services; and United States Judicial Conference**

3076. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 567, Administrative Office of Pennsylvania Courts, Civil Conspiracy; COA 568, American Bar Association, Civil Conspiracy; COA 569, Bloomsburg Fair Association, Civil Conspiracy; COA 570, Matthew W. Brann, Civil Conspiracy; COA 571, Heath Brosius, Civil Conspiracy; COA 572, Jessica Chapman, Civil Conspiracy; COA 573, William R. Christman III, Civil Conspiracy; COA 574, Mary Beth Clark, Civil Conspiracy; COA 575, Committee on Rules of Practice and Procedure, Civil Conspiracy; COA 576, Commonwealth of Pennsylvania, Civil Conspiracy; COA 577, Mark J. Conway, Civil Conspiracy; COA 578, Court of Judicial Discipline, Civil Conspiracy; COA 579, Robert Cravitz, Civil Conspiracy; COA 580, Doe Defendants 1 through 200, Civil Conspiracy; COA 581, Federal Judicial Center, Civil Conspiracy; COA 582, Lori R. Hackenberg, Civil Conspiracy; COA 583, International Legal Aid Group, Civil Conspiracy; COA 584, Judicial Conduct Board of Pennsylvania, Civil Conspiracy; COA 585, Heather Kelly, Civil Conspiracy; COA 586, Brian Kerstetter, Civil Conspiracy; COA 587, Robert Leadbeter, Civil Conspiracy; COA 588, Legal

Services Corporation, Civil Conspiracy; COA 589, Kathleen Lincoln, Civil Conspiracy; COA 590, Gabriele Miller-Wagner, Civil Conspiracy; COA 591, Lori Molloy, Civil Conspiracy; COA 592, Jenna Ann Neidig, Civil Conspiracy; COA 593, North Penn Legal Services, Inc., Civil Conspiracy; COA 594, Northumberland County Prothonotary's Office, Civil Conspiracy; COA 595, Office of Attorney General, Civil Conspiracy; COA 596, Office of Disciplinary Counsel, Civil Conspiracy; COA 597, Pennsylvania Bar Association, Civil Conspiracy; COA 598, Pennsylvania Board of Law Examiners, Civil Conspiracy; COA 599, Pennsylvania Department of Human Services, Civil Conspiracy; COA 600, Pennsylvania Department of Military and Veterans Affairs, Civil Conspiracy; COA 601, Pennsylvania General Assembly, Civil Conspiracy; COA 602, Pennsylvania Legal Aid Network, Inc., Civil Conspiracy; COA 603, Supreme Court of Pennsylvania, Civil Conspiracy; COA 604, Michael F.J. Piecuch, Civil Conspiracy; COA 605, Jeffrey A. Rowe, Civil Conspiracy; COA 606, Jamie Saleski, Civil Conspiracy; COA 607, Sholley, Civil Conspiracy; COA 608, Timothy Smith, Civil Conspiracy; COA 609, Snyder County, Civil Conspiracy; COA 610, Snyder County STOP Coalition, Civil Conspiracy; COA 611, Sarah Stigerwalt-Egan, Civil Conspiracy; COA 612, K. Michael Sullivan, Civil Conspiracy; COA 613, David Andrew Strouse, Civil Conspiracy; COA 614, Transitions Legal Center, Civil Conspiracy; COA 615, Transitions of PA, Civil

Conspiracy; COA 616, David K. Trevaskis, Civil Conspiracy; COA 617, Brian Ulmer, Civil Conspiracy; COA 618, Union County, Civil Conspiracy; COA 619, Union–Snyder County Bar Association, Civil Conspiracy; COA 620, Union County Criminal Justice Advisory Board, Civil Conspiracy; COA 621, Union County Mental Health Advisory Committee, Civil Conspiracy; COA 622, Union County STOP Coalition, Civil Conspiracy; COA 623, United States Bankruptcy Court for the Middle District of Pennsylvania, Civil Conspiracy; COA 624, United States Congress, Civil Conspiracy; COA 625, United States Court of Appeals for the Third Circuit, Civil Conspiracy; COA 626, United States District Court for the Middle District of Pennsylvania, Civil Conspiracy; COA 627, United States Department of Health and Human Services, Civil Conspiracy; and COA 628, United States Judicial Conference, Civil Conspiracy, from the 651-count inventory attached as exhibits.

3077. The elements of civil conspiracy are a combination of 2 or more persons or entities, to do an unlawful act or a lawful act by unlawful means, an overt act in furtherance of the common purpose, and actual legal damage.

3078. Defendants committed civil conspiracy because each combined with legal-aid actors, funding actors, bar actors, disciplinary actors, judicial actors, county actors, referral actors, public-service actors, veterans-service actors, human-services actors, victim-service actors, court-access actors, professional-access

actors, filing-access actors, docket-access actors, institutional actors, and Doe actors to preserve incumbent legal-service control by unlawful means, committed overt acts that reinforced closed lawyer-controlled systems despite provider nonperformance and lack of substitute-provider access, and caused actual legal damage to Grohol, similarly situated clients, vulnerable clients, veterans, disabled veterans, public-service beneficiaries, court users, attorneys, and alternative providers.

3079. The conspiracy's unlawful purpose was to preserve exclusivity, suppress competition, block alternative providers, protect incumbent legal-aid institutions, protect incumbent lawyers, maintain county-court legitimacy, maintain prothonotary legitimacy, maintain docket-access legitimacy, maintain filing-access legitimacy, maintain human-services legitimacy, maintain veterans-service legitimacy, maintain victim-service legitimacy, maintain public-service legitimacy, maintain court-connected legitimacy, maintain bar-connected legitimacy, maintain local professional legitimacy, maintain legal-industry legitimacy, and control who could receive referrals, funding, public-service opportunities, professional recognition, court-connected access, provider recognition, vulnerable-client access, and substitute-provider access.

3080. The unlawful means included exclusionary conduct, interference with prospective economic advantage, deceptive representations about service capacity

and legal-service legitimacy, manipulation of referral and funding pathways, disciplinary pressure, local bar exclusion, public-service exclusion, veterans-service exclusion, victim-service exclusion, human-services exclusion, court-connected exclusion, prothonotary exclusion, docket-access exclusion, filing-access exclusion, professional-access exclusion, provider-recognition manipulation, and retaliation against criticism, malpractice complaints, litigation, public-interest advocacy, substitute-provider competition, and efforts to expose legal-aid and legal-industry nonperformance.

3081. Plaintiff sought legal assistance to recover personal belongings from her former landlord, North Penn Legal Services, Inc. accepted, entered, or remained in Plaintiff’s matter, a replevin hearing was scheduled for January 15, 2020, Plaintiff was not properly notified of that hearing, counsel appeared without Plaintiff, Plaintiff’s matter did not receive meaningful advocacy at that hearing, Plaintiff’s belongings were later discarded, North Penn Legal Services, Inc. nevertheless remained counsel of record, and North Penn Legal Services, Inc. did not provide meaningful, timely, continuous, or effective representation sufficient to protect Plaintiff’s property interests.

3082. Administrative Office of Pennsylvania Courts combined with 2 or more persons or entities through statewide court administration, judicial-administration systems, court-access systems, court-user systems, filing systems, attorney-practice

structures, court-recognized legitimacy, legal-aid legitimacy, disciplinary-adjacent structures, and administrative practices affecting whether abandoned legal-aid clients could obtain truthful correction, lawful withdrawal, file transfer, and substitute-provider access.

3083. Administrative Office of Pennsylvania Courts pursued the unlawful common purpose because court-administration systems preserved counsel-of-record status, court-facing compliance impressions, attorney-centered filing practices, lawyer-controlled procedural access, and institutional silence despite client abandonment, missed hearings, conflict barriers, and lack of substitute-provider access.

3084. Administrative Office of Pennsylvania Courts committed overt acts by lending court-administration legitimacy, filing-system legitimacy, court-user legitimacy, attorney-practice legitimacy, court-connected legitimacy, and institutional reinforcement to systems that concentrated court access, docket access, filing access, procedural credibility, and substitute-provider access in incumbent lawyers and legal-aid providers despite nonperformance and consumer harm.

3085. Administrative Office of Pennsylvania Courts caused actual legal damage because its conduct kept Grohol and similarly situated clients dependent on counsel-of-record appearances, impaired substitute-provider access, reduced meaningful court-access assistance, preserved nonperforming legal-aid control, and

contributed to lost property, lost claims, lost hearings, lost remedies, and lost redress.

3086. American Bar Association combined with 2 or more persons or entities through national bar influence, model professional structures, legal-education legitimacy, professional-legitimacy systems, attorney-regulation narratives, pro bono narratives, public-service legal norms, legal-aid legitimacy, access-to-justice narratives, and bar-connected channels that preserved lawyer-controlled access to legal services.

3087. American Bar Association pursued the unlawful common purpose because national professional legitimacy helped preserve lawyer-only structures, bar-approved public-service systems, pro bono channels, disciplinary norms, and professional-authority narratives that allowed incumbent legal institutions to retain legitimacy while clients lacked meaningful service and substitute providers lacked equal access.

3088. American Bar Association committed overt acts by lending national professional legitimacy, access-to-justice credibility, legal-education legitimacy, pro bono legitimacy, attorney-regulation legitimacy, and institutional reinforcement to systems that excluded malpractice victims, nonlawyer competitors, legal-services reformers, future attorneys, nonprofit competitors, and substitute providers from equal participation.

3089. American Bar Association caused actual legal damage because its conduct preserved professional structures that reduced provider choice, limited substitute-provider access, restricted nonlawyer and nonprofit alternatives, suppressed malpractice-redress services, reduced legal-service competition, and kept Grohol and the class dependent on lawyer-controlled channels after legal-aid failure.

3090. Bloomsburg Fair Association combined with 2 or more persons or entities through public-event access, vendor access, veterans-resource-event access, veterans-expo structures, public-official partnerships, public-facing civic legitimacy, event communications, referral channels, and public-facing platforms through which legal-service providers obtain consumer trust.

3091. Bloomsburg Fair Association pursued the unlawful common purpose because public-event access, veterans-event access, vendor access, public-service legitimacy, referral access, professional legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent control and prevented competing providers from reaching vulnerable clients, veterans, disabled veterans, and public-service beneficiaries.

3092. Bloomsburg Fair Association committed overt acts by lending public-event legitimacy, veterans-event legitimacy, vendor-access legitimacy, civic legitimacy, public-service legitimacy, referral legitimacy, and institutional reinforcement to

event structures that concentrated public-facing legal-service opportunities in incumbent-approved, public-official-approved, or bar-connected channels.

3093. Bloomsburg Fair Association caused actual legal damage because its conduct reduced public-service opportunities, veterans-service access, referral opportunities, community legitimacy, substitute-provider visibility, public trust, client outreach, and the practical legal-service options available to Grohol, veterans, disabled veterans, legal-aid clients, and similarly situated clients.

3094. Matthew W. Brann combined with 2 or more persons or entities through federal judicial authority, district-court authority, docket control, case-management authority, attorney-practice norms, sanctions authority, recusal authority, federal-court legitimacy, judicial credibility systems, and professional-access structures affecting federal court-access legal services and attorney accountability.

3095. Brann pursued the unlawful common purpose because federal judicial authority, attorney-practice control, court-connected authority, case-management pressure, professional legitimacy, court-facing credibility, institutional silence, substitute-provider exclusion, and retaliatory pressure preserved incumbent legal-industry control over federal court access and legal-accountability pathways.

3096. Brann committed overt acts by lending federal judicial legitimacy, docket legitimacy, case-management legitimacy, attorney-practice legitimacy, sanctions-related pressure, recusal-related authority, and court-facing credibility to systems

that make malpractice victims, legal-aid clients, injured consumers, legal-services reformers, future attorneys, and nonlawyer competitors dependent on lawyer-controlled federal court structures.

3097. Brann caused actual legal damage because federal-court gatekeeping reduced meaningful court-access assistance, chilled service expansion by future attorneys and nonprofit providers, restricted nonlawyer and independent assistance, preserved lawyer-centered litigation control, increased litigation burdens, and kept Grohol and the class dependent on scarce attorney-controlled channels.

3098. Heath Brosius combined with 2 or more persons or entities through prosecutorial authority, Snyder County public-office authority, court-facing power, prosecutor-connected service access, victim-service influence, domestic-violence service influence, STOP Coalition involvement, public-service legitimacy, local referral systems, and county-connected professional networks.

3099. Brosius pursued the unlawful common purpose because prosecutorial influence, county-connected legitimacy, public-safety access, STOP-related access, public-service legitimacy, professional legitimacy, referral access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent control over legal-service access for vulnerable clients, victims, survivors, veterans, and disabled veterans.

3100. Brosius committed overt acts by lending prosecution-connected legitimacy, county-connected legitimacy, STOP coalition legitimacy, victim-service legitimacy, domestic-violence service legitimacy, public-service legitimacy, referral legitimacy, and institutional reinforcement to closed lawyer-controlled systems that concentrated vulnerable-client access and public-service legal opportunities in incumbent legal-aid and bar-connected actors.

3101. Brosius caused actual legal damage because prosecutorial and victim-service gatekeeping reduced public-service legal access, limited conflict-free substitute-provider access, discouraged independent nonprofit providers, restricted referral channels, reduced nonlawyer assistance, preserved closed legal-service systems serving vulnerable clients, and kept Grohol and similarly situated clients dependent on incumbent channels.

3102. COUNT 27

3103. Civil Conspiracy Against Administrative Office of Pennsylvania Courts; American Bar Association; Bloomsburg Fair Association; Matthew W. Brann; Heath Brosius; Jessica Chapman; William R. Christman III; Mary Beth Clark; Committee on Rules of Practice and Procedure; Commonwealth of Pennsylvania; Mark J. Conway; Court of Judicial Discipline; Robert Cravitz; Doe Defendants 1 through 200; Federal Judicial Center; Lori R. Hackenberg; International Legal Aid Group; Judicial Conduct Board of Pennsylvania; Heather Kelly; Brian Kerstetter;

Robert Leadbeter; Legal Services Corporation; Kathleen Lincoln; Gabriele Miller-Wagner; Lori Molloy; Jenna Ann Neidig; North Penn Legal Services, Inc.; Northumberland County Prothonotary's Office; Office of Attorney General; Office of Disciplinary Counsel; Pennsylvania Bar Association; Pennsylvania Board of Law Examiners; Pennsylvania Department of Human Services; Pennsylvania Department of Military and Veterans Affairs; Pennsylvania General Assembly; Pennsylvania Legal Aid Network, Inc.; Supreme Court of Pennsylvania; Michael F.J. Piecuch; Jeffrey A. Rowe; Jamie Saleski;  Sholley; Timothy Smith; Snyder County; Snyder County STOP Coalition; Sarah Stigerwalt-Egan; K. Michael Sullivan; David Andrew Strouse; Transitions Legal Center; Transitions of PA; David K. Trevaskis; Brian Ulmer; Union County; Union–Snyder County Bar Association; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; United States Congress; United States Court of Appeals for the Third Circuit; United States District Court for the Middle District of Pennsylvania; United States Department of Health and Human Services; and United States Judicial Conference

3104. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 567, Administrative Office of Pennsylvania Courts, Civil Conspiracy; COA 568, American Bar Association, Civil Conspiracy;

COA 569, Bloomsburg Fair Association, Civil Conspiracy; COA 570, Matthew W. Brann, Civil Conspiracy; COA 571, Heath Brosius, Civil Conspiracy; COA 572, Jessica Chapman, Civil Conspiracy; COA 573, William R. Christman III, Civil Conspiracy; COA 574, Mary Beth Clark, Civil Conspiracy; COA 575, Committee on Rules of Practice and Procedure, Civil Conspiracy; COA 576, Commonwealth of Pennsylvania, Civil Conspiracy; COA 577, Mark J. Conway, Civil Conspiracy; COA 578, Court of Judicial Discipline, Civil Conspiracy; COA 579, Robert Cravitz, Civil Conspiracy; COA 580, Doe Defendants 1 through 200, Civil Conspiracy; COA 581, Federal Judicial Center, Civil Conspiracy; COA 582, Lori R. Hackenberg, Civil Conspiracy; COA 583, International Legal Aid Group, Civil Conspiracy; COA 584, Judicial Conduct Board of Pennsylvania, Civil Conspiracy; COA 585, Heather Kelly, Civil Conspiracy; COA 586, Brian Kerstetter, Civil Conspiracy; COA 587, Robert Leadbeter, Civil Conspiracy; COA 588, Legal Services Corporation, Civil Conspiracy; COA 589, Kathleen Lincoln, Civil Conspiracy; COA 590, Gabriele Miller-Wagner, Civil Conspiracy; COA 591, Lori Molloy, Civil Conspiracy; COA 592, Jenna Ann Neidig, Civil Conspiracy; COA 593, North Penn Legal Services, Inc., Civil Conspiracy; COA 594, Northumberland County Prothonotary’s Office, Civil Conspiracy; COA 595, Office of Attorney General, Civil Conspiracy; COA 596, Office of Disciplinary Counsel, Civil Conspiracy; COA 597, Pennsylvania Bar Association, Civil

Conspiracy; COA 598, Pennsylvania Board of Law Examiners, Civil Conspiracy; COA 599, Pennsylvania Department of Human Services, Civil Conspiracy; COA 600, Pennsylvania Department of Military and Veterans Affairs, Civil Conspiracy; COA 601, Pennsylvania General Assembly, Civil Conspiracy; COA 602, Pennsylvania Legal Aid Network, Inc., Civil Conspiracy; COA 603, Supreme Court of Pennsylvania, Civil Conspiracy; COA 604, Michael F.J. Piecuch, Civil Conspiracy; COA 605, Jeffrey A. Rowe, Civil Conspiracy; COA 606, Jamie Saleski, Civil Conspiracy; COA 607,  Sholley, Civil Conspiracy; COA 608, Timothy Smith, Civil Conspiracy; COA 609, Snyder County, Civil Conspiracy; COA 610, Snyder County STOP Coalition, Civil Conspiracy; COA 611, Sarah Stigerwalt-Egan, Civil Conspiracy; COA 612, K. Michael Sullivan, Civil Conspiracy; COA 613, David Andrew Strouse, Civil Conspiracy; COA 614, Transitions Legal Center, Civil Conspiracy; COA 615, Transitions of PA, Civil Conspiracy; COA 616, David K. Trevaskis, Civil Conspiracy; COA 617, Brian Ulmer, Civil Conspiracy; COA 618, Union County, Civil Conspiracy; COA 619, Union–Snyder County Bar Association, Civil Conspiracy; COA 620, Union County Criminal Justice Advisory Board, Civil Conspiracy; COA 621, Union County Mental Health Advisory Committee, Civil Conspiracy; COA 622, Union County STOP Coalition, Civil Conspiracy; COA 623, United States Bankruptcy Court for the Middle District of Pennsylvania, Civil Conspiracy; COA 624, United

States Congress, Civil Conspiracy; COA 625, United States Court of Appeals for the Third Circuit, Civil Conspiracy; COA 626, United States District Court for the Middle District of Pennsylvania, Civil Conspiracy; COA 627, United States Department of Health and Human Services, Civil Conspiracy; and COA 628, United States Judicial Conference, Civil Conspiracy, from the 651-count inventory attached as exhibits.

3105. The elements of civil conspiracy are a combination of 2 or more persons or entities, to do an unlawful act or a lawful act by unlawful means, an overt act in furtherance of the common purpose, and actual legal damage.

3106. Defendants committed civil conspiracy because each combined with legal-aid actors, funding actors, bar actors, disciplinary actors, judicial actors, county actors, referral actors, public-service actors, veterans-service actors, human-services actors, victim-service actors, court-access actors, professional-access actors, filing-access actors, docket-access actors, institutional actors, and Doe actors to preserve incumbent legal-service control by unlawful means, committed overt acts that reinforced closed lawyer-controlled systems despite provider nonperformance and lack of substitute-provider access, and caused actual legal damage to Grohol, similarly situated clients, vulnerable clients, veterans, disabled veterans, public-service beneficiaries, court users, attorneys, and alternative providers.

3107. The conspiracy's unlawful purpose was to preserve exclusivity, suppress competition, block alternative providers, protect incumbent legal-aid institutions, protect incumbent lawyers, maintain county-court legitimacy, maintain prothonotary legitimacy, maintain docket-access legitimacy, maintain filing-access legitimacy, maintain human-services legitimacy, maintain veterans-service legitimacy, maintain victim-service legitimacy, maintain public-service legitimacy, maintain court-connected legitimacy, maintain bar-connected legitimacy, maintain local professional legitimacy, maintain legal-industry legitimacy, and control who could receive referrals, funding, public-service opportunities, professional recognition, court-connected access, provider recognition, vulnerable-client access, and substitute-provider access.

3108. The unlawful means included exclusionary conduct, interference with prospective economic advantage, deceptive representations about service capacity and legal-service legitimacy, manipulation of referral and funding pathways, disciplinary pressure, local bar exclusion, public-service exclusion, veterans-service exclusion, victim-service exclusion, human-services exclusion, court-connected exclusion, prothonotary exclusion, docket-access exclusion, filing-access exclusion, professional-access exclusion, provider-recognition manipulation, and retaliation against criticism, malpractice complaints, litigation,

public-interest advocacy, substitute-provider competition, and efforts to expose legal-aid and legal-industry nonperformance.

3109. Plaintiff sought legal assistance to recover personal belongings from her former landlord, North Penn Legal Services, Inc. accepted, entered, or remained in Plaintiff’s matter, a replevin hearing was scheduled for January 15, 2020, Plaintiff was not properly notified of that hearing, counsel appeared without Plaintiff, Plaintiff’s matter did not receive meaningful advocacy at that hearing, Plaintiff’s belongings were later discarded, North Penn Legal Services, Inc. nevertheless remained counsel of record, and North Penn Legal Services, Inc. did not provide meaningful, timely, continuous, or effective representation sufficient to protect Plaintiff’s property interests.

3110. Administrative Office of Pennsylvania Courts combined with 2 or more persons or entities through statewide court administration, judicial-administration systems, court-access systems, court-user systems, filing systems, attorney-practice structures, court-recognized legitimacy, legal-aid legitimacy, disciplinary-adjacent structures, and administrative practices affecting whether abandoned legal-aid clients could obtain truthful correction, lawful withdrawal, file transfer, and substitute-provider access.

3111. Administrative Office of Pennsylvania Courts pursued the unlawful common purpose because court-administration systems preserved counsel-of-record status,

court-facing compliance impressions, attorney-centered filing practices, lawyer-controlled procedural access, and institutional silence despite client abandonment, missed hearings, conflict barriers, and lack of substitute-provider access.

3112. Administrative Office of Pennsylvania Courts committed overt acts by lending court-administration legitimacy, filing-system legitimacy, court-user legitimacy, attorney-practice legitimacy, court-connected legitimacy, and institutional reinforcement to systems that concentrated court access, docket access, filing access, procedural credibility, and substitute-provider access in incumbent lawyers and legal-aid providers despite nonperformance and consumer harm.

3113. Administrative Office of Pennsylvania Courts caused actual legal damage because its conduct kept Grohol and similarly situated clients dependent on counsel-of-record appearances, impaired substitute-provider access, reduced meaningful court-access assistance, preserved nonperforming legal-aid control, and contributed to lost property, lost claims, lost hearings, lost remedies, and lost redress.

3114. American Bar Association combined with 2 or more persons or entities through national bar influence, model professional structures, legal-education legitimacy, professional-legitimacy systems, attorney-regulation narratives, pro bono narratives, public-service legal norms, legal-aid legitimacy, access-to-justice

narratives, and bar-connected channels that preserved lawyer-controlled access to legal services.

3115. American Bar Association pursued the unlawful common purpose because national professional legitimacy helped preserve lawyer-only structures, bar-approved public-service systems, pro bono channels, disciplinary norms, and professional-authority narratives that allowed incumbent legal institutions to retain legitimacy while clients lacked meaningful service and substitute providers lacked equal access.

3116. American Bar Association committed overt acts by lending national professional legitimacy, access-to-justice credibility, legal-education legitimacy, pro bono legitimacy, attorney-regulation legitimacy, and institutional reinforcement to systems that excluded malpractice victims, nonlawyer competitors, legal-services reformers, future attorneys, nonprofit competitors, and substitute providers from equal participation.

3117. American Bar Association caused actual legal damage because its conduct preserved professional structures that reduced provider choice, limited substitute-provider access, restricted nonlawyer and nonprofit alternatives, suppressed malpractice-redress services, reduced legal-service competition, and kept Grohol and the class dependent on lawyer-controlled channels after legal-aid failure.

3118. Bloomsburg Fair Association combined with 2 or more persons or entities through public-event access, vendor access, veterans-resource-event access, veterans-expo structures, public-official partnerships, public-facing civic legitimacy, event communications, referral channels, and public-facing platforms through which legal-service providers obtain consumer trust.

3119. Bloomsburg Fair Association pursued the unlawful common purpose because public-event access, veterans-event access, vendor access, public-service legitimacy, referral access, professional legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent control and prevented competing providers from reaching vulnerable clients, veterans, disabled veterans, and public-service beneficiaries.

3120. Bloomsburg Fair Association committed overt acts by lending public-event legitimacy, veterans-event legitimacy, vendor-access legitimacy, civic legitimacy, public-service legitimacy, referral legitimacy, and institutional reinforcement to event structures that concentrated public-facing legal-service opportunities in incumbent-approved, public-official-approved, or bar-connected channels.

3121. Bloomsburg Fair Association caused actual legal damage because its conduct reduced public-service opportunities, veterans-service access, referral opportunities, community legitimacy, substitute-provider visibility, public trust,

client outreach, and the practical legal-service options available to Grohol, veterans, disabled veterans, legal-aid clients, and similarly situated clients.

3122. Matthew W. Brann combined with 2 or more persons or entities through federal judicial authority, district-court authority, docket control, case-management authority, attorney-practice norms, sanctions authority, recusal authority, federal-court legitimacy, judicial credibility systems, and professional-access structures affecting federal court-access legal services and attorney accountability.

3123. Brann pursued the unlawful common purpose because federal judicial authority, attorney-practice control, court-connected authority, case-management pressure, professional legitimacy, court-facing credibility, institutional silence, substitute-provider exclusion, and retaliatory pressure preserved incumbent legal-industry control over federal court access and legal-accountability pathways.

3124. Brann committed overt acts by lending federal judicial legitimacy, docket legitimacy, case-management legitimacy, attorney-practice legitimacy, sanctions-related pressure, recusal-related authority, and court-facing credibility to systems that make malpractice victims, legal-aid clients, injured consumers, legal-services reformers, future attorneys, and nonlawyer competitors dependent on lawyer-controlled federal court structures.

3125. Brann caused actual legal damage because federal-court gatekeeping reduced meaningful court-access assistance, chilled service expansion by future

attorneys and nonprofit providers, restricted nonlawyer and independent assistance, preserved lawyer-centered litigation control, increased litigation burdens, and kept Grohol and the class dependent on scarce attorney-controlled channels.

3126. Heath Brosius combined with 2 or more persons or entities through prosecutorial authority, Snyder County public-office authority, court-facing power, prosecutor-connected service access, victim-service influence, domestic-violence service influence, STOP Coalition involvement, public-service legitimacy, local referral systems, and county-connected professional networks.

3127. Brosius pursued the unlawful common purpose because prosecutorial influence, county-connected legitimacy, public-safety access, STOP-related access, public-service legitimacy, professional legitimacy, referral access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent control over legal-service access for vulnerable clients, victims, survivors, veterans, and disabled veterans.

3128. Brosius committed overt acts by lending prosecution-connected legitimacy, county-connected legitimacy, STOP coalition legitimacy, victim-service legitimacy, domestic-violence service legitimacy, public-service legitimacy, referral legitimacy, and institutional reinforcement to closed lawyer-controlled systems that concentrated vulnerable-client access and public-service legal opportunities in incumbent legal-aid and bar-connected actors.

3129. Brosius caused actual legal damage because prosecutorial and victim-service gatekeeping reduced public-service legal access, limited conflict-free substitute-provider access, discouraged independent nonprofit providers, restricted referral channels, reduced nonlawyer assistance, preserved closed legal-service systems serving vulnerable clients, and kept Grohol and similarly situated clients dependent on incumbent channels.

3130. Two controlling instructions: one count for all defendants; 3 to 5 substantive paragraphs per defendant.

3131. Jessica Chapman combined with 2 or more persons or entities through lawyer status, disciplinary-pressure channels, professional-accountability narratives, local legal-industry relationships, bar-connected legitimacy, judicial-protection structures, access-to-justice narratives, legal-aid legitimacy, substitute-provider exclusion, and retaliatory pressure against Grohol's legal team.

3132. Chapman pursued the unlawful common purpose because disciplinary pressure, professional-accountability legitimacy, provider-recognition narratives, local professional authority, legal-aid legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team after malpractice complaints and this lawsuit threatened incumbent control preserved lawyer-controlled legal-service authority.

3133. Chapman committed overt acts by lending professional-accountability legitimacy, disciplinary-pressure legitimacy, local legal-industry legitimacy, access-to-justice credibility, provider-recognition credibility, and institutional reinforcement to systems that deterred corrective competition, protected incumbent legal-service actors, and burdened providers who challenged legal-aid malpractice and legal-industry self-protection.

3134. Chapman caused actual legal damage because her conduct reduced substitute-provider access, increased the cost of opposition, chilled future attorneys and nonprofit providers, restricted independent accountability, preserved incumbent legal-aid and bar-connected control, and reduced the legal-service choices available to Grohol, malpractice victims, legal-aid clients, and vulnerable court users.

3135. William R. Christman III combined with 2 or more persons or entities through Pennsylvania Bar Association general-counsel authority, attorney status, statewide bar influence, professional-legitimacy control, staff and volunteer communication channels, public-service legal-program authority, Wills for Heroes access, and bar-connected service systems.

3136. Christman pursued the unlawful common purpose because bar-connected authority, professional legitimacy, public-service access, staff communication control, volunteer-channel control, referral access, legal-aid legitimacy,

institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent control over public-service legal opportunities and substitute-provider participation.

3137. Christman committed overt acts by lending statewide bar legitimacy, legal-program legitimacy, staff-channel legitimacy, volunteer-channel legitimacy, Wills for Heroes legitimacy, public-service legitimacy, and institutional reinforcement to closed lawyer-controlled systems that restricted communications, narrowed participation, and blocked independent providers from equal service opportunities.

3138. Christman caused actual legal damage because bar-connected communication control and program exclusion reduced service capacity, restricted substitute-provider participation, limited public-service access, chilled future attorneys and nonprofit providers, suppressed lawyer-critical market entrants, and kept Grohol and the class dependent on closed attorney-controlled channels.

3139. Mary Beth Clark combined with 2 or more persons or entities through lawyer status, North Penn Legal Services relationships, Union–Snyder County Bar Association influence, local bar structures, legal-aid-connected authority, referral gatekeeping, public-service gatekeeping, substitute-provider exclusion, professional-network access, and retaliatory exclusion directed at Grohol's legal team.

3140. Clark pursued the unlawful common purpose because Grohol's malpractice matter and this lawsuit threatened North Penn Legal Services, Inc., local legal-industry actors, and local bar-connected interests, and because exclusion from local professional channels preserved insider control and suppressed corrective competition after Grohol's legal team sought accountability and substitute-provider access.

3141. Clark committed overt acts by lending legal-aid legitimacy, local bar legitimacy, referral legitimacy, public-service legitimacy, professional-access legitimacy, and institutional reinforcement to systems that protected incumbent providers, discouraged conflict-free alternatives, steered opportunities away from competitors, and preserved lawyer-controlled accountability channels.

3142. Clark caused actual legal damage because legal-aid and local-bar gatekeeping reduced client choice, suppressed conflict-free substitute counsel, limited public-service opportunities, impaired referral competition, burdened future attorneys and nonprofit competitors, preserved insider control, and reduced the legal-service options available to Grohol and the class.

3143. Committee on Rules of Practice and Procedure combined with 2 or more persons or entities through federal rulemaking authority, practice-rule authority, procedural-rule authority, federal-court-access influence, judicial-administration

influence, professional-regulation influence, institutional legitimacy, and lawyer-centered procedural systems.

3144. Committee on Rules of Practice and Procedure pursued the unlawful common purpose because lawyer-centered procedure, court-access control, attorney-practice control, federal-court legitimacy, judicial-administration legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent legal-industry control over federal court access and court-navigation services.

3145. Committee on Rules of Practice and Procedure committed overt acts by lending rulemaking legitimacy, procedural legitimacy, judicial-administration legitimacy, court-access legitimacy, attorney-practice legitimacy, and institutional reinforcement to systems that require lawyer-centered expertise and burden malpractice victims, low-income clients, court users, nonlawyer competitors, court navigators, and legal-services reformers.

3146. Committee on Rules of Practice and Procedure caused actual legal damage because lawyer-centered federal procedural systems reduced legal-service output, increased dependence on licensed attorneys, restricted alternative legal assistance, suppressed court-navigation competition, reduced federal court-access alternatives, and kept Grohol, malpractice victims, and future market entrants dependent on lawyer-approved procedural gatekeepers.

3147. Commonwealth of Pennsylvania combined with 2 or more persons or entities through sovereign authority, statutory authority, public-funding authority, court-system creation, attorney-regulation support, unauthorized-practice structures, legal-aid funding structures, public-service structures, and institutional legitimacy conferred on lawyer-controlled systems.

3148. Commonwealth of Pennsylvania pursued the unlawful common purpose because state-sanctioned licensing, court access, unauthorized-practice barriers, legal-aid systems, disciplinary systems, public-service access, referral systems, professional-legitimacy systems, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer-controlled systems.

3149. Commonwealth of Pennsylvania committed overt acts by lending state legitimacy, statutory legitimacy, public-funding legitimacy, court-system legitimacy, attorney-regulation legitimacy, unauthorized-practice legitimacy, legal-aid legitimacy, and public-service legitimacy to structures that kept legal consumers dependent on incumbent lawyers and lawyer-controlled legal-service institutions.

3150. Commonwealth of Pennsylvania caused actual legal damage because state-supported lawyer-control structures reduced client choice, suppressed legal-service competition, reduced malpractice-redress output, burdened future attorneys and

nonlawyer competitors, preserved incumbent legal institutions from market accountability, and kept Grohol and similarly situated clients dependent on lawyer-controlled channels.

3151. Mark J. Conway combined with 2 or more persons or entities through federal judicial authority, bankruptcy-court authority, sanctions authority, recusal authority, docket authority, hearing authority, attorney-practice authority, local-rule authority, courtroom control, and federal bankruptcy structures affecting bankruptcy and debt-relief legal-service markets.

3152. Conway pursued the unlawful common purpose because bankruptcy-court authority, federal judicial legitimacy, attorney-practice control, sanctions exposure, professional credibility, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer-controlled court access and burdened corrective competition.

3153. Conway committed overt acts by lending bankruptcy-court legitimacy, federal judicial legitimacy, sanctions-related pressure, attorney-practice legitimacy, docket legitimacy, hearing legitimacy, local-rule legitimacy, and courtroom authority to systems that made debtors, homeowners, low-income litigants, malpractice victims, nonlawyer competitors, and legal-services reformers dependent on lawyer-controlled bankruptcy access.

3154. Conway caused actual legal damage because bankruptcy-court gatekeeping reduced competition in debt-relief and bankruptcy-related legal services, chilled future attorneys and legal-services reformers, increased dependence on licensed lawyers, reduced independent accountability, restricted meaningful substitute-provider access, and preserved lawyer-centered control over debtors, homeowners, low-income litigants, and malpractice victims.

3155. Court of Judicial Discipline combined with 2 or more persons or entities through judicial-discipline authority, judicial-accountability gatekeeping, court-connected institutional legitimacy, judge-regulation structures, professional-accountability systems, and a lawyer-and-judge-controlled accountability framework affecting legal-service output and attorney accountability.

3156. Court of Judicial Discipline pursued the unlawful common purpose because judicial-accountability gatekeeping, professional-accountability legitimacy, court-centered authority, lawyer-and-judge-controlled discipline, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent legal-industry control and protected court-centered systems from outside accountability.

3157. Court of Judicial Discipline committed overt acts by lending judicial-discipline legitimacy, judicial-accountability legitimacy, court-connected legitimacy, professional-accountability credibility, and institutional reinforcement

to systems that forced malpractice victims, court users, lawyer critics, nonlawyer competitors, legal-services reformers, and future attorneys to seek accountability through judge-centered and lawyer-centered mechanisms.

3158. Court of Judicial Discipline caused actual legal damage because judge-controlled and lawyer-connected accountability gatekeeping reduced independent oversight, chilled criticism, limited malpractice-redress pathways, preserved court-centered legal-market control, and kept injured legal consumers dependent on institutions aligned with the same profession that controls legal services.

3159. Robert Cravitz combined with 2 or more persons or entities through lawyer status, local attorney networks, Union–Snyder County Bar Association participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and court-connected local legal structures affecting local legal-service markets.

3160. Cravitz pursued the unlawful common purpose because local lawyer networks, bar-connected legitimacy, referral access, professional credibility, public-service access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent local legal-industry control and isolated corrective competition.

3161. Cravitz committed overt acts by lending local lawyer legitimacy, local bar legitimacy, referral credibility, public-service credibility, professional-access

credibility, and institutional reinforcement to systems that protected incumbent lawyers, discouraged malpractice accountability, restricted public-service participation, and burdened future attorneys, nonlawyer competitors, independent advocates, and legal-services reformers.

3162. Cravitz caused actual legal damage because local lawyer-network gatekeeping reduced access to referrals, public-service participation, professional legitimacy, attorney cooperation, client channels, competitive legal-service opportunities, and independent accountability options for malpractice victims, injured consumers, future attorneys, and nonlawyer competitors.

3163. Doe Defendants 1 through 200 combined with 2 or more persons or entities through membership in defendant entities, listserv participation, court-connected roles, bar-connected roles, legal-aid roles, public-service roles, veterans-service roles, referral-network roles, disciplinary-adjacent roles, funding-adjacent roles, and professional networks that preserved lawyer control over legal services and attorney accountability.

3164. Doe Defendants 1 through 200 pursued the unlawful common purpose because unknown participants received, transmitted, ratified, preserved, concealed, enforced, or benefitted from legal-aid, professional, referral, court-connected, public-service, disciplinary, funding, bar-connected, and electronic

communications that preserved incumbent control and excluded substitute providers.

3165. Doe Defendants 1 through 200 committed overt acts by using or supporting professional networks, listservs, referral channels, court-connected channels, public-service channels, veterans-service channels, legal-aid channels, disciplinary-adjacent channels, funding-adjacent channels, and institutional channels to preserve false or misleading active-service impressions and deter corrective competition.

3166. Doe Defendants 1 through 200 caused actual legal damage because collective professional gatekeeping reduced competitive entry, suppressed nonlawyer assistance, reduced independent accountability services, limited malpractice-redress pathways, and preserved lawyer-controlled access to clients, courts, public programs, referrals, funding, and professional legitimacy.

3167. Federal Judicial Center combined with 2 or more persons or entities through federal judicial-education authority, federal judicial-administration influence, research and training functions, court-system legitimacy, professional norms, judicial-policy influence, and institutional support for lawyer-and-judge-controlled federal court structures.

3168. Federal Judicial Center pursued the unlawful common purpose because federal judicial legitimacy, judicial training, court-administration norms, attorney-

practice expectations, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer-and-judge-controlled court access and legal accountability.

3169. Federal Judicial Center committed overt acts by lending judicial-education legitimacy, court-system legitimacy, federal judicial legitimacy, research legitimacy, professional-norm legitimacy, and institutional reinforcement to systems that burdened pro se litigants, nonlawyer assistance, lawyer critics, malpractice victims, court-access reformers, and future attorneys challenging lawyer-controlled procedural and professional systems.

3170. Federal Judicial Center caused actual legal damage because federal judicial-system legitimacy and training structures reduced competitive accountability, preserved lawyer-centered litigation control, limited meaningful nonlawyer assistance, chilled court-access reform, and kept injured legal consumers dependent on lawyer-dominated federal court processes.

3171. Lori R. Hackenberg combined with 2 or more persons or entities through judicial office, county-court authority, courthouse-program influence, local legal authority, court-connected professional networks, local bar relationships, public-service access, professional legitimacy, docket-control structures, and lawyer-and-judge-controlled legal structures affecting local court-access and public-service legal markets.

3172. Hackenberg pursued the unlawful common purpose because judicial authority, county-court legitimacy, local court access, attorney-practice expectations, public-service access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent local legal-industry control and blocked corrective competition.

3173. Hackenberg committed overt acts by lending judicial legitimacy, county-court legitimacy, docket legitimacy, courthouse-program legitimacy, local professional credibility, public-service legitimacy, and court-connected institutional reinforcement to systems that preserved legal-aid legitimacy, counsel-of-record control, local lawyer-centered authority, and substitute-provider barriers despite provider nonperformance.

3174. Hackenberg caused actual legal damage because judicially connected professional gatekeeping reduced alternative legal-service access, limited public-service competition, chilled future attorney criticism, reduced malpractice-redress opportunities, preserved local lawyer-centered control over court-adjacent legal services, and kept Grohol and similarly situated clients dependent on failed legal-aid structures.

3175. International Legal Aid Group combined with 2 or more persons or entities through international legal-aid influence, comparative legal-aid legitimacy, professional-network authority, legal-aid policy recognition, legal-aid institutional

credibility, access-to-justice narratives, and support for lawyer-centered legal-aid structures that preserved incumbent legal-aid control.

3176. International Legal Aid Group pursued the unlawful common purpose because legal-aid legitimacy, access-to-justice narratives, professional-network credibility, provider recognition, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent legal-aid control and limited equal recognition for conflict-free substitute providers.

3177. International Legal Aid Group committed overt acts by lending legal-aid legitimacy, comparative policy credibility, professional-network authority, access-to-justice credibility, provider-recognition credibility, and institutional reinforcement to lawyer-controlled legal-aid structures that excluded nonlawyer competitors, independent accountability providers, conflict-free malpractice-redress alternatives, and competing service models from equal legitimacy.

3178. International Legal Aid Group caused actual legal damage because its legal-aid legitimacy structures reduced legal-aid competition, limited conflict-free alternatives, suppressed independent client-accountability services, preserved incumbent provider control, and kept low-income clients and malpractice victims dependent on lawyer-controlled legal-aid systems.

3179. Judicial Conduct Board of Pennsylvania combined with 2 or more persons or entities through judicial-discipline screening authority, judicial-accountability

gatekeeping, complaint-intake authority, investigative discretion, professional-accountability influence, court-connected legitimacy, and lawyer-and-judge-controlled accountability structures affecting legal-service markets.

3180. Judicial Conduct Board of Pennsylvania pursued the unlawful common purpose because judicial-accountability gatekeeping, court-centered legitimacy, professional-accountability narratives, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer-and-judge-controlled accountability systems and deterred outside correction.

3181. Judicial Conduct Board of Pennsylvania committed overt acts by lending judicial-accountability legitimacy, complaint-screening legitimacy, investigative legitimacy, professional-accountability credibility, court-connected credibility, and institutional reinforcement to systems that insulated judges, courts, and court-connected actors from independent accountability when legal-services reformers, malpractice victims, injured clients, and attorney critics challenged legal-industry misconduct.

3182. Judicial Conduct Board of Pennsylvania caused actual legal damage because judicial-accountability gatekeeping reduced independent oversight, discouraged future attorneys from challenging judges and lawyers, limited malpractice-redress pathways, preserved court-centered professional control, and kept injured consumers dependent on lawyer-and-judge-controlled accountability systems.

3183. Heather Kelly combined with 2 or more persons or entities through North Penn Legal Services management authority, legal-aid influence, lawyer status, public-funded legal-service authority, supervision practices, grievance-response practices, client-service systems, intake structures, legal-aid legitimacy, and legal-aid structures that preserved incumbent provider control over low-income clients.

3184. Kelly pursued the unlawful common purpose because legal-aid management authority, public funding, intake control, case-assignment control, representation-status control, grievance control, institutional silence, substitute-provider exclusion, and retaliation against Grohol’s legal team preserved incumbent legal-aid dominance and blocked independent correction after provider nonperformance.

3185. Kelly committed overt acts by lending legal-aid management legitimacy, supervision legitimacy, client-service legitimacy, grievance-response legitimacy, intake legitimacy, and institutional reinforcement to systems that kept vulnerable clients dependent on incumbent providers while limiting independent corrective assistance, conflict-free repair, replacement-provider access, and client accountability.

3186. Kelly caused actual legal damage because legal-aid gatekeeping reduced conflict-free substitute counsel, limited client choice, suppressed independent legal-aid accountability, discouraged future legal-aid competitors, reduced

malpractice-redress services, preserved incumbent control over low-income clients, and injured Grohol, malpractice victims, and similarly situated legal-aid clients.

3187. Brian Kerstetter combined with 2 or more persons or entities through prosecutorial authority, public-office authority, court-facing power, advisory-board influence, local legal-system authority, public-service participation, county-connected referral structures, and lawyer-centered professional networks that preserved attorney control over public legal systems.

3188. Kerstetter pursued the unlawful common purpose because prosecutorial influence, advisory-board access, county-connected legitimacy, court-adjacent authority, public-service access, referral control, institutional silence, substitute-provider exclusion, and retaliation against Grohol’s legal team preserved incumbent local legal-industry control.

3189. Kerstetter committed overt acts by lending prosecutorial legitimacy, county-connected legitimacy, advisory-board legitimacy, public-office credibility, public-service legitimacy, referral legitimacy, and institutional reinforcement to systems that controlled access to local legal-service channels, professional credibility, court-adjacent accountability, and substitute-provider pathways.

3190. Kerstetter caused actual legal damage because prosecutorial and advisory-board gatekeeping reduced legal-service competition, chilled future attorneys and legal-services reformers, restricted public-service access, limited nonlawyer

assistance, reduced referral alternatives, preserved lawyer-centered control over professional legitimacy and attorney accountability, and injured Grohol and the class.

3191. Robert Leadbeter combined with 2 or more persons or entities through public-office authority, legislative-office legitimacy, public-facing veterans-event influence, public-service legitimacy, event-access influence, community-recognition authority, veterans-service access, Bloomsburg Fair access, Wills for Heroes access, public-official communications, and coordination with lawyer-controlled or bar-connected public-service structures.

3192. Leadbeter pursued the unlawful common purpose because public-official legitimacy, veterans-event access, public-event access, Bloomsburg Fair access, bar-connected public-service programs, referral access, community recognition, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent access to vulnerable consumers, veterans, and disabled veterans.

3193. Leadbeter committed overt acts by lending legislative-office legitimacy, public-event legitimacy, veterans-event legitimacy, Bloomsburg Fair legitimacy, public-service legitimacy, referral legitimacy, community-recognition credibility, and institutional reinforcement to structures that concentrated public-facing legal-service opportunities in incumbent-approved and bar-connected channels.

3194. Leadbeter caused actual legal damage because public-official, veterans-event, Bloomsburg Fair, public-service, and Wills for Heroes gatekeeping reduced community outreach, public-service competition, referral access, veterans-service access, independent legal-service legitimacy, nonlawyer assistance, and available legal-service output for Grohol, veterans, disabled veterans, legal-aid clients, and the class.

3195. Legal Services Corporation combined with 2 or more persons or entities through federal legal-aid funding authority, grantee oversight, regulatory authority, compliance structures, legal-aid legitimacy, national legal-aid influence, provider recognition, and support for lawyer-controlled civil legal-aid systems.

3196. Legal Services Corporation pursued the unlawful common purpose because federal legal-aid funding, grantee recognition, compliance legitimacy, provider status, legal-aid narratives, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent legal-aid control while clients lacked independent conflict-free correction when grantees failed.

3197. Legal Services Corporation committed overt acts by lending federal funding legitimacy, grantee legitimacy, compliance legitimacy, legal-aid credibility, provider-recognition legitimacy, and institutional reinforcement to a structure in which dominant regional providers controlled intake, eligibility, referrals, case

acceptance, conflicts, client repair, substitute-provider access, and grievance responses without meaningful independent alternatives.

3198. Legal Services Corporation caused actual legal damage because its funding and oversight structure reduced client choice, reduced conflict-free representation, reduced malpractice-redress output, limited independent legal-aid competition, suppressed substitute-provider access, and kept Grohol, low-income clients, and malpractice victims dependent on incumbent lawyer-controlled providers.

3199. Kathleen Lincoln combined with 2 or more persons or entities through lawyer status, Union–Snyder County Bar Association officer status, treasurer authority, local bar governance, court-connected professional relationships, settlement-related professional influence, and local legal networks that preserved lawyer-centered control over credibility and cooperation.

3200. Lincoln pursued the unlawful common purpose because local bar legitimacy, attorney cooperation, public-service access, referral credibility, settlement-related professional leverage, institutional silence, substitute-provider exclusion, and retaliation against Grohol’s legal team preserved incumbent local legal-industry control and discouraged corrective competition.

3201. Lincoln committed overt acts by lending treasurer authority, local bar legitimacy, professional credibility, settlement-related leverage, meeting legitimacy, and institutional reinforcement to systems that discouraged malpractice

accountability, pressured critics to stop complaining about ethical violations, and preserved professional cooperation for insiders while burdening future attorneys, malpractice victims, and legal-services reformers.

3202. Lincoln caused actual legal damage because local bar and professional-network gatekeeping reduced competitive legal-service access, chilled future attorney criticism, discouraged malpractice-accountability work, impaired public-service cooperation, restricted referral alternatives, and preserved incumbent lawyer networks from meaningful accountability.

3203. Gabriele Miller-Wagner combined with 2 or more persons or entities through Pennsylvania Bar Association pro bono authority, statewide Wills for Heroes coordination, volunteer recruitment influence, public-service legal-program access, scheduling authority, professional-legitimacy control, and statewide bar-connected legal-service networks.

3204. Miller-Wagner pursued the unlawful common purpose because statewide bar pro bono legitimacy, volunteer-channel control, Wills for Heroes access, veterans-service access, referral access, institutional silence, substitute-provider exclusion, and retaliation against Grohol’s legal team preserved incumbent lawyer-controlled public-service channels and blocked competing providers from equal access.

3205. Miller-Wagner committed overt acts by lending statewide bar legitimacy, Wills for Heroes legitimacy, scheduling legitimacy, volunteer-channel legitimacy,

public-service credibility, veterans-service credibility, and institutional reinforcement to systems that restricted substitute-provider participation, narrowed access to vulnerable clients, and preserved bar-approved service pathways.

3206. Miller-Wagner caused actual legal damage because statewide pro bono gatekeeping reduced legal-service output, limited future attorney participation, suppressed independent service providers, restricted access to veterans and vulnerable clients, reduced referral alternatives, and preserved bar-controlled program structures from competitive accountability.

3207. Lori Molloy combined with 2 or more persons or entities through North Penn Legal Services executive authority, legal-aid management, public-funding control, attorney supervision, intake systems, client-service systems, grievance-response authority, malpractice-response systems, and institutional relationships with courts, funders, bar actors, referral sources, and public-service networks.

3208. Molloy pursued the unlawful common purpose because executive legal-aid control, public funding, intake control, case-assignment control, representation-status control, grievance control, institutional credibility, substitute-provider exclusion, and retaliation against Grohol’s legal team preserved incumbent legal-aid dominance after client nonperformance and malpractice exposure.

3209. Molloy committed overt acts by lending executive authority, legal-aid legitimacy, funding legitimacy, supervision legitimacy, grievance-response

legitimacy, client-service legitimacy, and institutional reinforcement to systems that allowed failed providers to retain client control, funding credibility, referral credibility, and public-service legitimacy without supplying conflict-free substitute counsel or meaningful repair.

3210. Molloy caused actual legal damage because executive legal-aid gatekeeping reduced client choice, limited substitute counsel, suppressed competing nonprofit providers, reduced malpractice-redress services, restricted conflict-free alternatives, preserved incumbent legal-aid control, and kept low-income clients and injured legal consumers dependent on lawyer-controlled legal-aid structures.

3211. Jenna Ann Neidig combined with 2 or more persons or entities through lawyer status, Union–Snyder County Bar Association participation, officer or former-officer status, local bar governance, listserv participation, meeting-record structures, public-service legal programming, and court-connected professional networks.

3212. Neidig pursued the unlawful common purpose because local bar governance, meeting access, records, listservs, committee participation, public-service programs, local professional legitimacy, referral credibility, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent local legal-industry control and blocked corrective participation.

3213. Neidig committed overt acts by lending local bar legitimacy, record legitimacy, listserv legitimacy, meeting legitimacy, committee legitimacy, public-service credibility, and professional-access credibility to systems that protected insiders, restricted equal participation, and burdened future attorneys, nonlawyer competitors, malpractice victims, and legal-services reformers.

3214. Neidig caused actual legal damage because local bar gatekeeping reduced public-service access, referral opportunities, professional credibility, meeting access, committee access, competitive legal-service opportunities, and independent accountability options for future attorneys, nonlawyer competitors, malpractice victims, and legal-services reformers.

3215. North Penn Legal Services, Inc. combined with 2 or more persons or entities through public legal-aid funding, regional provider authority, client intake control, case-assignment control, attorney supervision, representation-status control, referral relationships, legal-aid credibility, grievance systems, and institutional control over low-income civil legal services.

3216. North Penn Legal Services, Inc. pursued the unlawful common purpose because its legal-aid status, public funding, client intake, case retention, representation-status control, counsel-of-record control, institutional credibility, grievance control, substitute-provider exclusion, and retaliation against Grohol’s

legal team preserved incumbent provider control despite missed hearings, missed deadlines, abandoned files, and client injury.

3217. North Penn Legal Services, Inc. committed overt acts by lending legal-aid legitimacy, funding legitimacy, grantee legitimacy, intake legitimacy, case-control legitimacy, grievance legitimacy, referral legitimacy, and institutional reinforcement to systems that preserved false or misleading impressions of active, eligible, compliant, supervised, staffed, and lawful representation while clients lacked meaningful service.

3218. North Penn Legal Services, Inc. caused actual legal damage because its conduct reduced legal-service output, limited client choice, restricted conflict-free substitute counsel, suppressed competing nonprofit providers, reduced malpractice accountability, preserved nonperforming counsel-of-record control, and kept Grohol and similarly situated low-income clients dependent on the same provider structure that failed them.

3219. Northumberland County Prothonotary's Office combined with 2 or more persons or entities through public filing authority, docket access, court-record access, courthouse administration, public-office legitimacy, counsel-of-record records, service practices, filing practices, and court-access structures affecting who can use the courts effectively.

3220. Northumberland County Prothonotary’s Office pursued the unlawful common purpose because filing systems, docket systems, record access, counsel-of-record entries, local courthouse norms, public-office credibility, institutional silence, substitute-provider exclusion, and preservation of court-facing active-case impressions protected incumbent lawyer-controlled systems despite nonperformance and lack of meaningful client repair.

3221. Northumberland County Prothonotary’s Office committed overt acts by lending docket legitimacy, filing legitimacy, court-record legitimacy, counsel-of-record legitimacy, service-practice legitimacy, courthouse legitimacy, and public-office reinforcement to systems that preserved formal case-control impressions and made malpractice victims dependent on lawyer-centered access points to correct or repair failed representation.

3222. Northumberland County Prothonotary’s Office caused actual legal damage because filing and docket gatekeeping reduced court-access competition, restricted practical legal assistance, limited nonlawyer court-navigation support, reduced malpractice-victim access to remedies, preserved lawyer-centered control over court systems injured clients must use to obtain relief, and kept Grohol and similarly situated clients trapped inside formal counsel-of-record structures.

3223. Office of Attorney General combined with 2 or more persons or entities through public legal authority, state-law enforcement authority, attorney status,

public-office legitimacy, legal-market influence, state litigation authority, consumer-protection influence, and participation in professional structures that preserved lawyer control over legal services and attorney accountability.

3224. Office of Attorney General pursued the unlawful common purpose because government-lawyer legitimacy, state enforcement authority, attorney-controlled accountability channels, consumer-protection silence, institutional credibility, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent legal-industry control and discouraged independent correction of legal-aid and attorney misconduct.

3225. Office of Attorney General committed overt acts by lending public-law-enforcement legitimacy, state-attorney legitimacy, consumer-protection legitimacy, litigation legitimacy, professional-access credibility, and institutional reinforcement to systems that left legal consumers dependent on lawyer-controlled remedies rather than neutral public protection from legal-service misconduct.

3226. Office of Attorney General caused actual legal damage because government-lawyer and consumer-protection gatekeeping reduced independent accountability, chilled legal-services reformers, preserved attorney-controlled enforcement channels, limited competitive alternatives, reduced practical remedies for malpractice victims and injured legal consumers, and burdened Grohol and similarly situated clients.

3227. Office of Disciplinary Counsel combined with 2 or more persons or entities through attorney-discipline authority, complaint-screening authority, investigatory discretion, charging authority, professional-regulation authority, disciplinary legitimacy, and lawyer-controlled accountability structures that determined whether attorney misconduct received meaningful consequences.

3228. Office of Disciplinary Counsel pursued the unlawful common purpose because disciplinary gatekeeping, professional-accountability legitimacy, attorney-controlled complaint channels, license-based pressure, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer control and deterred criticism, malpractice reporting, and corrective legal-service competition.

3229. Office of Disciplinary Counsel committed overt acts by lending disciplinary legitimacy, complaint-screening legitimacy, investigatory legitimacy, charging-authority legitimacy, professional-accountability credibility, and institutional reinforcement to systems that insulated incumbent lawyers, legal-aid providers, and court-connected actors from meaningful outside accountability.

3230. Office of Disciplinary Counsel caused actual legal damage because disciplinary gatekeeping reduced independent accountability services, chilled future attorney criticism, limited malpractice-redress pathways, preserved lawyer-

controlled professional regulation, and kept injured legal consumers dependent on the same profession that controls both legal services and attorney discipline.

3231. Pennsylvania Bar Association combined with 2 or more persons or entities through statewide bar authority, professional legitimacy, public-service legal programs, pro bono structures, committee access, continuing legal education influence, lawyer networks, Wills for Heroes structures, referral channels, and bar-governance systems that preserved lawyer control over legal-service access.

3232. Pennsylvania Bar Association pursued the unlawful common purpose because statewide bar legitimacy, professional status, public-service access, pro bono access, Wills for Heroes access, referral access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer-controlled channels and blocked competing providers from equal access to veterans, vulnerable clients, volunteers, and public-service programs.

3233. Pennsylvania Bar Association committed overt acts by lending statewide bar legitimacy, Wills for Heroes legitimacy, public-service credibility, pro bono credibility, committee credibility, professional-access credibility, and institutional reinforcement to systems that restricted substitute-provider participation, excluded lawyer-critical competitors, and concentrated public-service legal opportunities in bar-approved channels.

3234. Pennsylvania Bar Association caused actual legal damage because statewide bar gatekeeping reduced legal-service output, restricted future attorney participation, suppressed nonlawyer competition, limited malpractice-accountability alternatives, reduced public-service legal access, injured Grohol and the class, and preserved incumbent lawyer-controlled public-service and referral channels.

3235. Pennsylvania Board of Law Examiners combined with 2 or more persons or entities through bar-admission authority, examination authority, character-and-fitness screening, licensing gatekeeping, professional-entry control, credentialing authority, and lawyer-regulation structures that determined who could enter the legal-services market as an attorney.

3236. Pennsylvania Board of Law Examiners pursued the unlawful common purpose because licensing gatekeeping, bar-admission control, character-and-fitness control, court-approved credentials, professional conformity, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved restricted lawyer-controlled market entry and maintained scarcity in the civil legal-services market.

3237. Pennsylvania Board of Law Examiners committed overt acts by lending admission legitimacy, credentialing legitimacy, examination legitimacy, character-and-fitness legitimacy, professional-entry legitimacy, and institutional

reinforcement to systems that restricted entry, burdened future attorneys, excluded alternative legal-service models, and preserved lawyer-only market control.

3238. Pennsylvania Board of Law Examiners caused actual legal damage because admission and licensing gatekeeping reduced legal-service supply, limited future attorney entry, increased barriers to affordable legal assistance, excluded alternative providers, restricted innovation, and kept malpractice victims and low-income clients dependent on a restricted lawyer-controlled market.

3239. Pennsylvania Department of Human Services combined with 2 or more persons or entities through public-funding authority, social-service authority, legal-aid-related funding structures, public-benefits systems, service-provider relationships, referral environments, domestic-violence systems, disability-service systems, and public-service legitimacy affecting access to civil legal help for low-income and vulnerable clients.

3240. Pennsylvania Department of Human Services pursued the unlawful common purpose because public-service referrals, agency-connected legitimacy, domestic-violence service channels, disability-service channels, legal-aid relationships, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer-approved service pathways for vulnerable clients.

3241. Pennsylvania Department of Human Services committed overt acts by lending public-funding legitimacy, social-service legitimacy, public-benefits legitimacy, domestic-violence service legitimacy, disability-service legitimacy, referral legitimacy, and institutional reinforcement to systems that routed legal need through incumbent legal-aid and lawyer-approved providers while denying comparable access to independent, conflict-free, and nonlawyer assistance models.

3242. Pennsylvania Department of Human Services caused actual legal damage because public-service and referral gatekeeping reduced client choice, restricted conflict-free legal-service alternatives, limited independent accountability for legal-aid failures, preserved incumbent referral channels, burdened future attorneys and nonlawyer competitors, and injured Grohol and similarly situated vulnerable clients.

3243. Pennsylvania Department of Military and Veterans Affairs combined with 2 or more persons or entities through veterans-service authority, coalition access, public-service recognition, veterans-outreach structures, Wills for Heroes and Wills for Veterans connections, event coordination, public-facing legitimacy, and referral channels within legal-service systems serving veterans and disabled veterans.

3244. Pennsylvania Department of Military and Veterans Affairs pursued the unlawful common purpose because veterans-service legitimacy, coalition

communications, public recognition, event participation, outreach channels, referral access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer-approved veterans legal-service pathways and limited equal access for competing providers.

3245. Pennsylvania Department of Military and Veterans Affairs committed overt acts by lending veterans-service legitimacy, coalition legitimacy, public-service credibility, event-coordination credibility, outreach credibility, referral credibility, and institutional reinforcement to systems that controlled which providers could reach veterans, disabled veterans, service coalitions, public officials, and veterans-resource events.

3246. Pennsylvania Department of Military and Veterans Affairs caused actual legal damage because veterans-service and coalition gatekeeping reduced legal-service output for veterans and disabled veterans, limited provider choice, restricted alternative legal-service entry, preserved bar-connected program control, burdened future attorneys and legal-services reformers, and injured Grohol, veterans, disabled veterans, and similarly situated clients.

3247. Pennsylvania General Assembly combined with 2 or more persons or entities through statutory authority, public-funding authority, legislative recognition of lawyer-controlled systems, legal-aid funding structures, court-system statutes, attorney-regulation frameworks, unauthorized-practice structures,

and legislation or nonlegislation affecting court access, legal aid, and professional accountability.

3248. Pennsylvania General Assembly pursued the unlawful common purpose because statutory legitimacy, public funding, unauthorized-practice barriers, legal-aid funding structures, attorney-regulation frameworks, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved lawyer-controlled legal-service systems and protected incumbent institutions from competitive correction.

3249. Pennsylvania General Assembly committed overt acts by lending legislative legitimacy, statutory legitimacy, public-funding legitimacy, legal-aid legitimacy, court-system legitimacy, attorney-regulation legitimacy, and unauthorized-practice legitimacy to structures that made legal consumers dependent on incumbent lawyers, lawyer-controlled courts, lawyer-controlled regulation, and public legal-aid systems without conflict-free repair mechanisms.

3250. Pennsylvania General Assembly caused actual legal damage because legislative and funding gatekeeping reduced legal-service competition, limited nonlawyer assistance, preserved unauthorized-practice barriers, restricted malpractice-redress alternatives, and kept future attorneys, malpractice victims, and low-income clients dependent on lawyer-controlled institutions.

3251. Pennsylvania Legal Aid Network, Inc. combined with 2 or more persons or entities through statewide legal-aid coordination, provider legitimacy, training authority, funding relationships, referral influence, public-service recognition, legal-aid policy influence, and support for lawyer-controlled civil legal-aid systems.

3252. Pennsylvania Legal Aid Network, Inc. pursued the unlawful common purpose because statewide legal-aid coordination, grantee legitimacy, provider recognition, referral credibility, training access, public-service credibility, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent legal-aid control and blocked independent correction of grantee nonperformance.

3253. Pennsylvania Legal Aid Network, Inc. committed overt acts by lending statewide legal-aid legitimacy, provider-recognition legitimacy, training legitimacy, referral legitimacy, funding-relationship legitimacy, public-service credibility, and institutional reinforcement to systems that allowed dominant regional providers to retain status, referrals, and public credibility despite missed hearings, missed deadlines, abandoned clients, conflict barriers, and lack of substitute-provider access.

3254. Pennsylvania Legal Aid Network, Inc. caused actual legal damage because statewide legal-aid gatekeeping reduced client choice, limited independent legal-

aid competition, restricted substitute-provider access, reduced malpractice-redress output, preserved incumbent lawyer-controlled providers from market accountability, and kept Grohol and the class dependent on legal-aid structures that failed them.

3255. Supreme Court of Pennsylvania combined with 2 or more persons or entities through attorney-admission authority, disciplinary authority, rulemaking authority, unauthorized-practice authority, judicial-system authority, court-access authority, professional-regulation authority, and control over lawyer-centered systems governing entry, practice, discipline, procedure, and accountability.

3256. Supreme Court of Pennsylvania pursued the unlawful common purpose because attorney-admission control, disciplinary control, rulemaking control, unauthorized-practice control, court-access control, professional-regulation legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved lawyer-centered legal-service authority and protected incumbent legal institutions from public and market accountability.

3257. Supreme Court of Pennsylvania committed overt acts by lending judicial legitimacy, admission legitimacy, disciplinary legitimacy, rulemaking legitimacy, unauthorized-practice legitimacy, professional-regulation legitimacy, and court-access legitimacy to systems that restricted entry, restricted nonlawyer assistance,

preserved lawyer-only control, and forced injured consumers to seek relief through the same profession that controlled their injury.

3258. Supreme Court of Pennsylvania caused actual legal damage because court-controlled legal-market gatekeeping reduced legal-service supply, restricted future attorney entry, excluded nonlawyer competitors, limited malpractice-redress alternatives, suppressed court-access innovation, and kept legal consumers, low-income clients, and court users dependent on lawyer-controlled systems.

3259. Michael F.J. Piecuch combined with 2 or more persons or entities through president-judge authority, judicial office, courthouse influence, local court administration, local bar influence, public-service relationships, advisory-board connections, and lawyer-and-judge-controlled professional networks.

3260. Piecuch pursued the unlawful common purpose because local judicial authority, courthouse legitimacy, local court administration, public-service access, advisory-board access, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent local legal-industry control and deterred corrective competition.

3261. Piecuch committed overt acts by lending judicial legitimacy, president-judge legitimacy, courthouse legitimacy, local court-administration legitimacy, advisory legitimacy, public-service credibility, and institutional reinforcement to systems that concentrated legal access, professional credibility, public-service

opportunities, and court-connected legitimacy in incumbent lawyers and lawyer-controlled institutions.

3262. Piecuch caused actual legal damage because judicial and courthouse gatekeeping reduced legal-service competition, chilled attorney criticism, limited nonlawyer and independent assistance, restricted public-service access, reduced court-access alternatives, preserved lawyer-centered control over local legal markets, and injured Grohol and similarly situated clients.

3263. Jeffrey A. Rowe combined with 2 or more persons or entities through judicial office, magisterial-district authority, courthouse access, local legal influence, court-connected public-service participation, local bar relationships, advisory access, attorney-practice influence, and professional networks that affect legal-market legitimacy.

3264. Rowe pursued the unlawful common purpose because local judicial authority, court-connected legitimacy, local bar relationships, advisory access, attorney-practice influence, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent local legal-industry control and restricted corrective access.

3265. Rowe committed overt acts by lending magisterial-district legitimacy, courthouse legitimacy, court-connected credibility, advisory credibility, local bar credibility, public-service legitimacy, and institutional reinforcement to systems

that protected incumbent legal actors and made vulnerable clients, malpractice victims, and legal-services reformers dependent on lawyer-centered court structures.

3266. Rowe caused actual legal damage because court-connected and local professional gatekeeping reduced competition, limited alternative legal-service access, chilled future attorney criticism, suppressed court-access reform, restricted nonlawyer assistance, preserved lawyer-centered control over client-facing legal systems, and injured Grohol and the class.

3267. Jamie Saleski combined with 2 or more persons or entities through prothonotary authority, filing-system authority, docket-access authority, public-record authority, counsel-of-record records, courthouse administration, service and filing practices, and public-office structures that affect practical access to courts.

3268. Saleski pursued the unlawful common purpose because filing systems, docket systems, record access, counsel-of-record entries, courthouse administration, public-office credibility, institutional silence, substitute-provider exclusion, and preservation of court-facing active-case impressions protected incumbent lawyer-controlled systems from corrective exposure.

3269. Saleski committed overt acts by lending docket legitimacy, filing legitimacy, court-record legitimacy, counsel-of-record legitimacy, service-practice legitimacy, courthouse legitimacy, public-office credibility, and institutional reinforcement to

systems that preserved formal case-control impressions and made malpractice victims dependent on lawyer-centered access points for correction.

3270. Saleski caused actual legal damage because filing and docket gatekeeping reduced court-access competition, limited practical legal assistance, restricted nonlawyer court-navigation support, preserved lawyer-centered control over systems that malpractice victims must use to obtain relief, reduced meaningful court-access alternatives, and injured Grohol and similarly situated clients.

3271. Sholley combined with 2 or more persons or entities through lawyer status, Union–Snyder County Bar Association officer authority, secretary authority, meeting-record authority, minute practices, local bar governance, Law Day participation, Wills for Heroes participation, listserv structures, Young Lawyers Division structures, and court-connected local bar influence.

3272. Sholley pursued the unlawful common purpose because local bar governance, meeting records, minutes, listserv access, committee participation, Young Lawyers Division access, public-service programs, professional legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent local legal-industry control and punished criticism of bar leadership.

3273. Sholley committed overt acts by lending secretary authority, meeting-record legitimacy, minute legitimacy, listserv legitimacy, Young Lawyers Division

legitimacy, local bar credibility, and public-service credibility to systems that isolated Martineau, restricted equal committee participation, framed criticism as misconduct, and protected insider-controlled bar structures from accountability.

3274. Sholley caused actual legal damage because local bar and officer gatekeeping reduced public-service access, professional credibility, meeting access, committee access, Young Lawyers Division access, referral opportunities, competitive legal-service opportunities, and independent accountability options for future attorneys, malpractice victims, nonlawyer competitors, and legal-services reformers.

3275. Timothy Smith combined with 2 or more persons or entities through North Penn Legal Services senior management authority, attorney supervision, case-management systems, client communication, attorney assignments, corrective action, funding compliance, grievance responses, representation-status practices, withdrawal practices, and legal-aid institutional control.

3276. Smith pursued the unlawful common purpose because senior legal-aid authority, client-file control, representation-status control, attorney-assignment control, corrective-action control, grievance control, institutional silence, substitute-provider exclusion, and retaliation against Grohol’s legal team preserved incumbent legal-aid dominance despite missed hearings, missed deadlines, abandoned files, unclear representation status, and client harm.

3277. Smith committed overt acts by lending senior management legitimacy, supervision legitimacy, case-management legitimacy, grievance-response legitimacy, representation-status legitimacy, withdrawal-practice legitimacy, and institutional reinforcement to systems that kept vulnerable clients dependent on incumbent legal-aid providers while restricting conflict-free substitute counsel and meaningful repair.

3278. Smith caused actual legal damage because senior legal-aid gatekeeping reduced conflict-free substitute counsel, restricted legal-aid accountability, suppressed competing nonprofit legal-service capacity, limited client repair, preserved incumbent lawyer-controlled legal-aid dominance, and kept Grohol and similarly situated clients dependent on failed legal-aid structures.

3279. Snyder County combined with 2 or more persons or entities through county-government authority, public-service structures, county-connected legal systems, court-adjacent relationships, prosecutor-connected systems, advisory and coalition relationships, referral environments, and public legitimacy that affect access to legal services and legal-system accountability.

3280. Snyder County pursued the unlawful common purpose because county-connected legitimacy, prosecutor-connected systems, public-service access, court-adjacent relationships, advisory access, coalition access, referral control,

institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent local legal-industry control.

3281. Snyder County committed overt acts by lending county-government legitimacy, public-service credibility, prosecutor-connected credibility, advisory credibility, coalition credibility, referral credibility, and institutional reinforcement to systems that concentrated vulnerable-client access, public-service access, court-adjacent credibility, and legal-service opportunities in incumbent lawyer-controlled channels.

3282. Snyder County caused actual legal damage because county-connected gatekeeping reduced client choice, public-service access, referral competition, court-adjacent accountability, nonlawyer support, future attorney access, and the local systems needed to compete with incumbent lawyer-controlled providers.

3283. Snyder County STOP Coalition combined with 2 or more persons or entities through county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility affecting access to survivors, vulnerable clients, and public-service legal opportunities.

3284. Snyder County STOP Coalition pursued the unlawful common purpose because victim-service legitimacy, domestic-violence referral channels, coalition access, service-provider networks, legal-aid relationships, public-service

credibility, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer-approved service channels.

3285. Snyder County STOP Coalition committed overt acts by lending coalition legitimacy, victim-service legitimacy, domestic-violence service legitimacy, public-service credibility, legal-aid relationship credibility, referral credibility, and institutional reinforcement to systems that routed vulnerable clients through incumbent-approved legal-service channels while restricting equal access for independent and conflict-free alternatives.

3286. Snyder County STOP Coalition caused actual legal damage because coalition and referral gatekeeping reduced public-service legal competition, limited referral access, restricted conflict-free alternatives, burdened future attorney participation, reduced nonlawyer assistance, preserved incumbent legal-aid and lawyer-connected service systems from market accountability, and injured Grohol and similarly situated vulnerable clients.

3287. Sarah Stigerwalt-Egan combined with 2 or more persons or entities through lawyer status, Union–Snyder County Bar Association presidential authority, judicial-law-clerk and hearing-officer status, local bar governance, Wills for Heroes control, meeting access, listserv communications, Teams access, minute

practices, public-service legal-program access, and communications with statewide bar and veterans-service actors.

3288. Stigerwalt-Egan pursued the unlawful common purpose because local bar leadership, judicially connected status, meeting access, listserv access, public-service legal-program control, Wills for Heroes control, professional legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer-controlled service channels.

3289. Stigerwalt-Egan committed overt acts by lending presidential authority, judicially connected credibility, Wills for Heroes legitimacy, meeting legitimacy, listserv legitimacy, public-service credibility, veterans-service credibility, and institutional reinforcement to systems that excluded Martineau, restricted SLAAY, suspended Wills for Heroes when litigation threatened incumbent control, and framed protected criticism as an obstacle to public-service programming.

3290. Stigerwalt-Egan caused actual legal damage because her bar-leadership and Wills for Heroes gatekeeping reduced legal-service output, limited future attorney competition, chilled lawyer-critical advocacy, restricted public-service access, reduced referral alternatives, excluded Grohol's legal team from service channels, and preserved incumbent lawyer-controlled structures from competitive accountability.

3291. K. Michael Sullivan combined with 2 or more persons or entities through lawyer status, Union–Snyder County Bar Association authority, local bar leadership, Wills for Heroes control, pro bono committee influence, listserv communications, public-service legal-program access, local legal-system influence, and joint participation with court-connected and bar-connected actors.

3292. Sullivan pursued the unlawful common purpose because local bar leadership, pro bono-program control, Wills for Heroes control, listserv communications, public-service legitimacy, referral credibility, professional standing, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer-controlled legal-service channels.

3293. Sullivan committed overt acts by lending local bar legitimacy, pro bono legitimacy, Wills for Heroes legitimacy, program-control legitimacy, professional credibility, referral credibility, and institutional reinforcement to systems that disregarded prior planning work, restricted Martineau's participation, conditioned continued public-service planning on litigation resolution, and isolated corrective competition.

3294. Sullivan caused actual legal damage because his local bar and Wills for Heroes gatekeeping reduced client choice, restricted nonprofit legal-service competition, limited public-service legal output, chilled future attorney criticism, reduced nonlawyer assistance, diverted opportunities from Grohol's legal team and

similarly situated substitute providers, and preserved lawyer-controlled referral and program channels from market accountability.

3295. David Andrew Strouse combined with 2 or more persons or entities through lawyer status, local attorney networks, Union–Snyder County Bar Association participation, listserv participation, bar-governance participation, litigation-response participation, public-service participation, and court-connected professional structures affecting local legal-service access.

3296. Strouse pursued the unlawful common purpose because local attorney networks, bar-connected legitimacy, referral access, professional credibility, public-service access, litigation-response alignment, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent local legal-industry control and isolated corrective competition.

3297. Strouse committed overt acts by lending local lawyer legitimacy, local bar legitimacy, referral credibility, public-service credibility, professional-access credibility, litigation-response credibility, and institutional reinforcement to systems that protected incumbent lawyers, discouraged malpractice accountability, restricted public-service participation, and burdened future attorneys, nonlawyer competitors, independent advocates, and legal-services reformers.

3298. Strouse caused actual legal damage because local lawyer-network gatekeeping reduced access to referrals, public-service participation, professional

legitimacy, attorney cooperation, client channels, competitive legal-service opportunities, and independent accountability options for Grohol, malpractice victims, injured consumers, future attorneys, and nonlawyer competitors.

3299. Transitions Legal Center combined with 2 or more persons or entities through legal-services participation, pro bono relationships, victim-services relationships, domestic-violence service coordination, referral systems, court-related connections, public-service networks, and local legal-service channels affecting access to clients, survivors, victims, and legal-service opportunities.

3300. Transitions Legal Center pursued the unlawful common purpose because victim-service legitimacy, domestic-violence referral channels, public-service legal networks, legal-aid relationships, court-related connections, institutional silence, substitute-provider exclusion, and retaliation against Grohol’s legal team preserved incumbent lawyer-approved service pathways.

3301. Transitions Legal Center committed overt acts by lending victim-service legitimacy, domestic-violence service credibility, public-service credibility, pro bono credibility, legal-aid relationship credibility, referral credibility, and institutional reinforcement to systems that routed vulnerable clients through incumbent-approved legal-service channels while restricting equal access for independent, conflict-free, and corrective providers.

3302. Transitions Legal Center caused actual legal damage because victim-service and referral gatekeeping reduced provider choice, limited conflict-free alternatives, restricted future attorney and nonprofit participation, suppressed independent advocacy for vulnerable clients, reduced nonlawyer assistance, preserved incumbent legal-service channels from competitive accountability, and injured Grohol and similarly situated clients.

3303. Transitions of PA combined with 2 or more persons or entities through victim-service structures, public-service referral networks, domestic-violence service relationships, pro bono channels, legal-aid relationships, county-connected systems, court-related referral structures, and local service-provider networks affecting access to vulnerable clients, victims, survivors, and legal-service opportunities.

3304. Transitions of PA pursued the unlawful common purpose because public-service referrals, domestic-violence service relationships, victim-service legitimacy, county-connected systems, court-related referral structures, legal-aid relationships, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer-approved service channels.

3305. Transitions of PA committed overt acts by lending victim-service legitimacy, domestic-violence service credibility, public-service credibility,

county-connected credibility, court-related credibility, legal-aid relationship credibility, referral credibility, and institutional reinforcement to systems that routed vulnerable clients through incumbent-approved civil legal-service pathways while restricting independent alternatives.

3306. Transitions of PA caused actual legal damage because victim-service and public-service gatekeeping reduced provider choice, limited conflict-free legal alternatives, restricted future attorney and nonprofit participation, suppressed independent advocacy for vulnerable clients, reduced nonlawyer assistance, preserved incumbent legal-aid and public-service channels from market accountability, and injured Grohol and similarly situated vulnerable clients.

3307. David K. Trevaskis combined with 2 or more persons or entities through lawyer status, Pennsylvania Bar Association Wills for Heroes leadership, statewide pro bono authority, public-facing legal-program influence, volunteer-program influence, statewide bar credibility, and communications with bar, legal-aid, veterans-service, and public-service actors.

3308. Trevaskis pursued the unlawful common purpose because statewide bar pro bono legitimacy, Wills for Heroes legitimacy, volunteer-channel control, veterans-service access, public-service access, referral credibility, institutional silence, substitute-provider exclusion, and retaliation against Grohol’s legal team preserved incumbent lawyer-controlled service channels.

3309. Trevaskis committed overt acts by lending statewide bar legitimacy, Wills for Heroes legitimacy, volunteer-program credibility, veterans-service credibility, public-service credibility, referral credibility, and institutional reinforcement to systems that restricted substitute-provider access, narrowed public-service participation, and preserved lawyer-approved service pathways for veterans and vulnerable clients.

3310. Trevaskis caused actual legal damage because statewide pro bono and Wills for Heroes gatekeeping reduced legal-service output, limited future attorney participation, suppressed independent providers, restricted access to veterans and vulnerable clients, reduced referral alternatives, diverted opportunities from Grohol's legal team and similarly situated substitute providers, and preserved bar-controlled public-service structures from competitive accountability.

3311. Brian Ulmer combined with 2 or more persons or entities through lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation, statewide pro bono networks, bar-connected legal-service structures, public-facing legal programs, attorney networks, and communications affecting access to veterans-service and legal-service opportunities.

3312. Ulmer pursued the unlawful common purpose because statewide bar legitimacy, Wills for Heroes access, public-service access, volunteer-channel control, veterans-service access, referral credibility, institutional silence, substitute-

provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer-controlled service channels.

3313. Ulmer committed overt acts by lending statewide bar legitimacy, Wills for Heroes legitimacy, volunteer-program credibility, veterans-service credibility, public-service credibility, referral credibility, and institutional reinforcement to systems that restricted substitute-provider access, narrowed public-service participation, and preserved lawyer-approved service pathways for veterans and vulnerable clients.

3314. Ulmer caused actual legal damage because statewide pro bono and Wills for Heroes gatekeeping reduced legal-service output, limited future attorney and nonprofit participation, restricted veterans-service access, suppressed independent legal-service competition, reduced nonlawyer assistance, diverted opportunities from Grohol's legal team and similarly situated substitute providers, and preserved lawyer-controlled public-service channels from accountability.

3315. Union County combined with 2 or more persons or entities through county-government authority, public-service systems, advisory-board structures, criminal-justice structures, mental-health structures, STOP-related systems, referral environments, public legitimacy, and county-connected systems that affect access to legal services and legal-system accountability.

3316. Union County pursued the unlawful common purpose because county-connected legitimacy, prosecutor-connected systems, advisory-board access, mental-health service channels, domestic-violence service channels, public-service access, referral control, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent local legal-industry control.

3317. Union County committed overt acts by lending county-government legitimacy, advisory-board legitimacy, criminal-justice credibility, mental-health advisory credibility, STOP-related credibility, public-service credibility, referral credibility, and institutional reinforcement to systems that concentrated vulnerable-client access, public-service access, court-adjacent credibility, and legal-service opportunities in incumbent lawyer-controlled channels.

3318. Union County caused actual legal damage because county-connected gatekeeping reduced client choice, referral competition, public-service access, court-adjacent accountability, nonlawyer support, future attorney access, and the local systems needed to compete with incumbent lawyer-controlled providers.

3319. Union–Snyder County Bar Association combined with 2 or more persons or entities through local bar governance, membership control, listserv control, committee access, meeting access, minute practices, Wills for Heroes planning,

Law Day programming, Young Lawyers Division access, public-service opportunities, and local professional legitimacy.

3320. Union–Snyder County Bar Association pursued the unlawful common purpose because local bar legitimacy, meeting access, listserv access, committee access, public-service access, Young Lawyers Division access, referral credibility, local professional acceptance, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent local lawyer control.

3321. Union–Snyder County Bar Association committed overt acts by lending local bar legitimacy, membership legitimacy, meeting legitimacy, listserv legitimacy, committee legitimacy, minute legitimacy, Wills for Heroes legitimacy, Law Day legitimacy, Young Lawyers Division legitimacy, and public-service credibility to systems that excluded Martineau, restricted SLAAY, silenced criticism, suspended membership, manipulated access to meetings and committees, and protected incumbent lawyer-controlled structures from accountability.

3322. Union–Snyder County Bar Association caused actual legal damage because local bar gatekeeping reduced future attorney participation, restricted independent legal-service competition, chilled attorney criticism, limited public-service legal output, reduced referral alternatives, excluded Grohol's legal team from public-service and professional channels, impaired professional reputation and

networking, and preserved incumbent lawyer networks from meaningful market accountability.

3323. Union County Criminal Justice Advisory Board combined with 2 or more persons or entities through county-government participation, criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local institutional credibility affecting legal-service channels and public-service participation.

3324. Union County Criminal Justice Advisory Board pursued the unlawful common purpose because criminal-justice advisory legitimacy, prosecutor-connected credibility, court-adjacent access, public-service coordination, policy access, referral environments, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent local legal-industry control.

3325. Union County Criminal Justice Advisory Board committed overt acts by lending advisory-board legitimacy, criminal-justice credibility, prosecutor-connected credibility, court-connected credibility, public-service credibility, policy credibility, referral credibility, and institutional reinforcement to systems that controlled access to local legal-service channels, public-service opportunities, vulnerable-client networks, and court-adjacent accountability structures.

3326. Union County Criminal Justice Advisory Board caused actual legal damage because advisory-board and criminal-justice gatekeeping reduced public-service access, referral access, court-adjacent accountability, local legal-system competition, nonlawyer assistance, future attorney access, and the systems needed to challenge incumbent lawyer-controlled structures.

3327. Union County Mental Health Advisory Committee combined with 2 or more persons or entities through county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility affecting access to vulnerable clients and public-service legal channels.

3328. Union County Mental Health Advisory Committee pursued the unlawful common purpose because mental-health advisory legitimacy, disability-service access, public-service coordination, court-connected participation, provider-network access, referral credibility, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer-approved service channels.

3329. Union County Mental Health Advisory Committee committed overt acts by lending mental-health advisory legitimacy, disability-service credibility, provider-network credibility, court-connected credibility, public-service credibility, referral

credibility, and institutional reinforcement to systems that routed vulnerable clients through incumbent-approved legal-service channels while restricting equal access for independent and conflict-free alternatives.

3330. Union County Mental Health Advisory Committee caused actual legal damage because mental-health advisory and disability-service gatekeeping reduced client choice, restricted conflict-free alternatives, burdened future attorney participation, limited nonlawyer assistance, reduced public-service legal access, preserved lawyer-controlled legal-service channels for vulnerable clients, and injured Grohol and similarly situated clients.

3331. Union County STOP Coalition combined with 2 or more persons or entities through county-connected domestic-violence service coordination, prosecutor participation, public meetings, victim-services structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility affecting access to survivors, vulnerable clients, and public-service legal opportunities.

3332. Union County STOP Coalition pursued the unlawful common purpose because domestic-violence service legitimacy, victim-service legitimacy, prosecutor-connected access, public-service coordination, legal-aid relationships, referral credibility, institutional silence, substitute-provider exclusion, and

retaliation against Grohol's legal team preserved incumbent lawyer-approved service channels.

3333. Union County STOP Coalition committed overt acts by lending coalition legitimacy, victim-service legitimacy, domestic-violence service legitimacy, prosecutor-connected credibility, public-service credibility, legal-aid relationship credibility, referral credibility, and institutional reinforcement to systems that routed vulnerable clients through incumbent-approved legal-service channels while restricting equal access for independent and conflict-free alternatives.

3334. Union County STOP Coalition caused actual legal damage because coalition, domestic-violence, and victim-service gatekeeping reduced public-service legal competition, limited referral access, restricted conflict-free alternatives, burdened future attorney participation, reduced nonlawyer assistance, preserved incumbent legal-aid and lawyer-connected service systems from market accountability, and injured Grohol and similarly situated vulnerable clients.

3335. United States Bankruptcy Court for the Middle District of Pennsylvania combined with 2 or more persons or entities through federal judicial authority, bankruptcy jurisdiction, docket authority, hearing authority, case-management authority, sanctions-related authority, local-rule authority, attorney-practice authority, filing systems, staff communications, and bankruptcy-access structures.

3336. United States Bankruptcy Court for the Middle District of Pennsylvania pursued the unlawful common purpose because bankruptcy-court authority, federal judicial legitimacy, attorney-practice control, filing systems, sanctions exposure, court-access norms, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved lawyer-and-judge-controlled access to legal relief.

3337. United States Bankruptcy Court for the Middle District of Pennsylvania committed overt acts by lending bankruptcy-court legitimacy, federal judicial legitimacy, filing legitimacy, docket legitimacy, hearing legitimacy, attorney-practice legitimacy, sanctions-related pressure, and institutional reinforcement to systems that made debtors, homeowners, low-income litigants, malpractice victims, nonlawyer competitors, and legal-services reformers dependent on lawyer-controlled bankruptcy access.

3338. United States Bankruptcy Court for the Middle District of Pennsylvania caused actual legal damage because bankruptcy-court gatekeeping reduced competition in bankruptcy and debt-relief legal services, limited nonlawyer and independent assistance, chilled future attorneys and legal-services reformers, preserved lawyer-centered control over debt-relief markets, restricted meaningful substitute-provider access, and injured Grohol and similarly situated clients.

3339. United States Congress combined with 2 or more persons or entities through federal legislative authority, federal-court creation, federal legal-aid funding statutes, federal attorney-regulation structures, federal procedural-rule delegation, federal judicial structures, legal-services funding, and legislative decisions that preserved lawyer-centered control over legal services and attorney accountability.

3340. United States Congress pursued the unlawful common purpose because federal statutory legitimacy, federal legal-aid funding, federal-court authority, procedural-rule delegation, attorney-regulation structures, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved lawyer-controlled legal-service systems.

3341. United States Congress committed overt acts by lending federal legislative legitimacy, legal-aid funding legitimacy, federal-court legitimacy, procedural-rule legitimacy, public-service credibility, referral-system credibility, and institutional reinforcement to systems that made low-income clients, malpractice victims, future attorneys, nonlawyer competitors, and legal-services reformers dependent on incumbent lawyer-controlled structures.

3342. United States Congress caused actual legal damage because federal legislative and funding gatekeeping reduced legal-service competition, limited alternative assistance, preserved lawyer-centered gatekeeping, restricted malpractice-redress options, reduced nonlawyer assistance, and kept future

attorneys, low-income clients, and injured legal consumers dependent on lawyer-controlled institutions.

3343. United States Court of Appeals for the Third Circuit combined with 2 or more persons or entities through federal appellate authority, precedent authority, procedural authority, attorney-practice authority, disciplinary authority, filing rules, appellate access structures, judicial legitimacy, and court-controlled credibility systems.

3344. United States Court of Appeals for the Third Circuit pursued the unlawful common purpose because appellate authority, precedent control, procedural gatekeeping, attorney-practice control, judicial legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved lawyer-and-judge-controlled legal accountability systems.

3345. United States Court of Appeals for the Third Circuit committed overt acts by lending appellate legitimacy, precedent legitimacy, procedural legitimacy, attorney-practice legitimacy, disciplinary legitimacy, filing-rule legitimacy, and institutional reinforcement to systems that made malpractice victims, low-income clients, future attorneys, legal-services reformers, and nonlawyer competitors dependent on lawyer-centered appellate access and court-controlled credibility.

3346. United States Court of Appeals for the Third Circuit caused actual legal damage because appellate gatekeeping reduced competitive accountability, limited

malpractice-redress pathways, chilled future attorneys and legal-services reformers, restricted nonlawyer assistance, preserved lawyer-centered control over legal-rights enforcement, and kept Grohol and similarly situated clients dependent on closed attorney-controlled channels.

3347. United States District Court for the Middle District of Pennsylvania combined with 2 or more persons or entities through federal district-court authority, docket authority, case-management authority, filing authority, local-rule authority, sanctions authority, attorney-practice authority, judicial legitimacy, and court-access systems that affect legal-service competition and accountability.

3348. United States District Court for the Middle District of Pennsylvania pursued the unlawful common purpose because federal trial-court authority, docket control, filing systems, local rules, attorney-practice expectations, sanctions exposure, judicial legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved lawyer-controlled federal court access.

3349. United States District Court for the Middle District of Pennsylvania committed overt acts by lending federal trial-court legitimacy, docket legitimacy, filing legitimacy, case-management legitimacy, local-rule legitimacy, sanctions-related pressure, attorney-practice credibility, and institutional reinforcement to systems that made legal-aid clients, malpractice victims, future attorneys, court-

access reformers, and nonlawyer competitors dependent on lawyer-centered federal litigation structures.

3350. United States District Court for the Middle District of Pennsylvania caused actual legal damage because federal trial-court gatekeeping reduced court-access competition, limited nonlawyer and independent assistance, chilled future attorney criticism, increased dependence on licensed lawyers, preserved lawyer-centered control over rights enforcement, and kept Grohol and similarly situated clients dependent on scarce attorney-controlled channels.

3351. United States Department of Health and Human Services combined with 2 or more persons or entities through federal public-funding authority, social-service authority, legal-aid-related funding structures, public-benefits systems, civil-rights compliance structures, service-provider relationships, referral environments, and public-service legitimacy affecting access to civil legal help for vulnerable clients.

3352. United States Department of Health and Human Services pursued the unlawful common purpose because federally funded service systems, agency-connected referral legitimacy, disability-service channels, benefits-related service channels, domestic-violence and family-service channels, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved incumbent lawyer-approved civil legal-service pathways.

3353. United States Department of Health and Human Services committed overt acts by lending federal public-funding legitimacy, social-service legitimacy, benefits-system legitimacy, civil-rights-compliance legitimacy, disability-service credibility, domestic-violence service credibility, family-service credibility, referral credibility, and institutional reinforcement to systems that routed vulnerable clients through incumbent-approved legal-service channels while restricting independent, conflict-free, and nonlawyer assistance models.

3354. United States Department of Health and Human Services caused actual legal damage because federal social-service and referral gatekeeping reduced client choice, restricted conflict-free legal-service alternatives, limited independent accountability for legal-aid failures, preserved incumbent referral channels, burdened future attorneys and nonlawyer competitors, and kept vulnerable clients dependent on lawyer-controlled systems that failed them.

3355. United States Judicial Conference combined with 2 or more persons or entities through federal judicial-administration authority, policy authority, rules-related authority, court-governance influence, administrative oversight, federal court legitimacy, and institutional support for lawyer-and-judge-controlled federal court systems.

3356. United States Judicial Conference pursued the unlawful common purpose because federal judicial administration, rulemaking systems, court-governance

norms, attorney-practice standards, filing expectations, sanctions norms, judicial legitimacy, institutional silence, substitute-provider exclusion, and retaliation against Grohol's legal team preserved lawyer-and-judge-controlled federal court access.

3357. United States Judicial Conference committed overt acts by lending federal judicial-administration legitimacy, rules-related legitimacy, court-governance legitimacy, attorney-practice legitimacy, filing-practice credibility, sanctions-related credibility, and institutional reinforcement to systems that made injured legal consumers, malpractice victims, future attorneys, legal-services reformers, and nonlawyer competitors dependent on lawyer-dominated federal court processes.

3358. United States Judicial Conference caused actual legal damage because federal judicial-administration gatekeeping reduced competitive accountability, limited meaningful nonlawyer assistance, chilled court-access reform, preserved lawyer-centered litigation control, restricted malpractice-redress pathways, and kept injured legal consumers dependent on lawyer-dominated federal court processes.

3359. Defendants' civil conspiracy caused actual legal damage because Grohol lost personal property, legal claims, hearing rights, substitute-provider access, file-transfer access, referral access, corrective advocacy, and meaningful redress, and

similarly situated clients lost property, housing, benefits, claims, hearings, appellate rights, settlement leverage, substitute-provider access, and meaningful court access.

3360. Defendants' civil conspiracy caused actual legal damage to Grohol's legal team and similarly situated substitute providers because the conspiracy diverted referrals, volunteer opportunities, pro bono opportunities, contract opportunities, Wills for Heroes opportunities, veterans-service opportunities, public-service opportunities, court-access opportunities, attorney-practice opportunities, local-bar opportunities, advisory opportunities, professional opportunities, and substitute-provider opportunities away from providers who exposed legal-aid misconduct and legal-industry self-protection.

3361. Defendants are liable for civil conspiracy because each combined with 2 or more persons or entities, pursued an unlawful common purpose or used unlawful means to preserve incumbent lawyer-controlled systems, committed overt acts in furtherance of that common purpose, and caused actual legal damage to Grohol, the class, Grohol's legal team, similarly situated substitute providers, vulnerable clients, veterans, disabled veterans, and legal-service consumers.

3362. Grohol and the class are entitled to compensatory damages, consequential damages, reputational damages, lost-opportunity damages, declaratory relief, temporary injunctive relief, preliminary injunctive relief, permanent injunctive

relief, corrective-disclosure relief, neutral monitoring, client-notice protocols, hearing-notice protocols, lawful-withdrawal protocols, file-transfer protocols, substitute-provider access, conflict-free substitute-provider access, nonretaliation protections, provider-neutral referral access, public-service access review, legal-aid accountability review, court-access review, attorney-discipline review, preservation of communications and records, expedited discovery, costs, attorney's fees where authorized, and all other lawful relief.

**COUNT 28**

**Declaratory Judgment Against All Defendants**

3363. Plaintiff incorporates by reference all other paragraphs, the full timeline attached to this Complaint, and COA 629 through COA 651 from the 651-count inventory attached as exhibits.

3364. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, and professional systems that govern Plaintiff, the class, Grohol's legal team,

similarly situated substitute providers, malpractice victims, legal-aid clients, low-income litigants, disabled litigants, veterans, domestic-violence survivors, tenants, parents, workers, consumers, pro se litigants, and court users.

3365. COA 629, Case Law and Precedent Violate Legislative Vesting and Cannot Be Cited As Law: Plaintiff and the class are entitled to a declaration that Defendants may not cite, enforce, defend, or apply case law, precedent, stare decisis, common law, judicial opinions, or judge-made doctrine as binding law unless the rule being applied comes from a constitutionally valid source, because Article I vests legislative power in Congress, Article III gives courts power to decide cases and controversies, the Pennsylvania Constitution vests legislative power in the General Assembly, Pennsylvania requires laws to pass by bill, and judge-made doctrines cannot substitute for public lawmaking when Defendants use them to restrict fees, remedies, court access, malpractice accountability, legal-aid accountability, recusal, sanctions, discipline, immunity, and public remedies.

3366. COA 630, Case Law and Precedent About the Judicial System Violate Conflict-of-Interest and Bias Rules: Plaintiff and the class are entitled to a declaration that courts, judges, lawyers, bar entities, disciplinary bodies, legal-aid actors, and court-connected institutions cannot create or enforce binding precedent about their own powers, immunities, discipline, procedure, attorney fees, sanctions, recusal standards, attorney regulation, legal-aid accountability, malpractice

remedies, and court access because those actors have direct professional, financial, reputational, institutional, and market interests in the rules being made, and self-interested judicial-system precedent violates due process, equal protection, the Petition Clause, access to courts, anti-conflict principles, and the rule that no person may judge his own cause.

3367. COA 631, Case Law and Precedent Where the Courts Apply a Different, More Lenient Constitutional Standard to Actions by Courts, Judges, and Lawyers Than Other Parties Violates the Constitution and Constitute Corrupt, Deceptive, Unlawful, and Racketeering Conduct for Predicate Conspiracy Acts: Plaintiff and the class are entitled to a declaration that Defendants may not apply more lenient constitutional standards, weaker evidentiary requirements, more forgiving conflict rules, favorable presumptions, or unsupported institutional assumptions to courts, judges, lawyers, bar entities, disciplinary bodies, legal-aid actors, judicial agencies, and court-connected institutions than they apply to ordinary parties, and that judicial decisions using self-protective constitutional standards to preserve insider power, misrepresent neutrality, block accountability, restrict substitute-provider access, or defeat claims by legal-aid clients and malpractice victims violate due process, equal protection, access to courts, the Petition Clause, anti-conflict principles, and the rule that no person may judge his own cause.

3368. COA 632, The Constitution Requires Lawyer-Legislators To Recuse Themselves From Votes Regarding Judicial System: Plaintiff and the class are entitled to a declaration that lawyer legislators and JD-holding legislators have a personal, private, professional, credential-based, and institutional interest in judicial-system measures affecting courts, judges, lawyers, legal-aid systems, attorney regulation, judicial regulation, court administration, legal-service markets, legal education, bar admission, discipline, immunity, fees, procedure, and public access to courts, and therefore must disclose and recuse from voting on such measures unless constitutionally adequate public findings supported by evidence justify an exception.

3369. COA 633, The Constitution Requires Judges To Adopt Fraternization And Conflict-Of-Interest Rules At Least As Strict As Professional Sports and Must Recuse Anytime a Professional Sports Judge Would Be Prohibited From Deciding A Matter: Plaintiff and the class are entitled to a declaration that judges must adopt and follow independence, anti-fraternization, and conflict-of-interest rules at least as strict as the neutrality rules and public-integrity standards applied to professional sports officials, and that judges must recuse whenever their relationship with a lawyer, party, legal-aid provider, bar entity, disciplinary actor, court-connected institution, repeat institutional participant, former partner, professional friend, donor, political ally, local legal network, or judicial-system

actor would make a reasonable person question whether a professional sports official could fairly decide a comparable contest.

3370. COA 634, JARA Unconstitutional for Failure to Recuse: Plaintiff and the class are entitled to a declaration that JARA, Act No. 53 of 1978, is unconstitutional because lawyer legislators and JD-holding legislators had a personal or private interest in a judicial-system repeal act affecting courts, judges, attorneys, judicial procedure, legal remedies, fees, liabilities, immunities, attorney accountability, court access, and legal-service markets, yet participated in voting on it without the disclosure, recusal, independent public review, and structural safeguards required when members of a profession vote on measures that preserve or expand the profession's own power.

3371. COA 635, JARA Unconstitutional for Exceeding One Vote, One Bill, One Title Rule: Plaintiff and the class are entitled to a declaration that JARA is unconstitutional because it exceeded Pennsylvania's one-vote, one-bill, one-subject, clear-title, consideration, and reenactment safeguards by using codification and compilation language to bundle substantive repeals, judicial-system restructuring, attorney-fee changes, fee-cap changes, access-to-courts changes, judicial-procedure changes, and public-remedy changes into an omnibus act that did not clearly notify the public or separately submit each affected right, remedy, fee rule, or judicial-system change to ordinary constitutional legislation.

3372. COA 636, 1968 Amendment Unconstitutional: Plaintiff and the class are entitled to a declaration that the 1968 Pennsylvania Judiciary Article and Article V, Section 10(c) are invalid and unenforceable to the extent Defendants rely on them to justify Supreme Court control over practice and procedure, admission to the bar, practice of law, court administration, judicial-branch supervision, conduct of courts, assignment and reassignment of actions and appeals, officers serving process or enforcing court orders, and the suspension of inconsistent laws, because those materially distinct constitutional changes were bundled into one Judiciary Article vote without separate voter approval.

3373. COA 637, Declaratory Judgment Against Defendants, Law School Failure: Plaintiff and the class are entitled to a declaration that Defendants' reliance on ABA-accredited law-school completion as a public-protection justification for lawyer monopoly control, attorney licensing, legal-aid staffing, court-recognized advocacy, and exclusion of alternative providers fails because Defendants have not shown that the law-school requirement protects legal-aid clients, prevents malpractice, supplies conflict-free substitute counsel, increases rural legal access, repairs abandoned cases, protects disabled clients and veterans, or provides meaningful remedies when licensed attorneys and legal-aid providers fail clients.

3374. COA 638, Declaratory Judgment Against Defendants, Bar Exam Failure: Plaintiff and the class are entitled to a declaration that Defendants' reliance on bar-

examination passage as a public-protection justification for attorney-only legal services, court access, legal-aid staffing, and exclusion of trained nonlawyer or limited-license assistance fails because the bar examination does not measure whether lawyers will communicate with clients, attend hearings, meet deadlines, avoid conflicts, prevent malpractice, repair legal-aid failures, provide replacement counsel, or supply practical civil legal help to low-income clients, malpractice victims, disabled litigants, veterans, tenants, and other court users.

3375. COA 639, Declaratory Judgment Against Defendants, Character and Fitness Failure: Plaintiff and the class are entitled to a declaration that Defendants' reliance on moral-character and fitness screening as a public-protection justification fails because those systems give lawyer-controlled bodies gatekeeping power over market entry, speech, debt, disability, hardship, criticism, litigation history, and professional conformity without measuring whether admitted lawyers will protect clients from missed hearings, missed deadlines, abandonment, conflicts, retaliation, unclear representation status, lack of communication, legal-aid nonperformance, or lack of substitute counsel after legal-service failure.

3376. COA 640, Declaratory Judgment Against Defendants, Peer Report Failure: Plaintiff and the class are entitled to a declaration that Defendants' reliance on lawyer peer reporting, Rule 8.3, attorney self-regulation, confidential disciplinary routing, civility norms, and professional conformity as public-protection

substitutes fails because peer-report systems do not protect legal-aid clients and malpractice victims from lawyer silence, retaliation, institutional loyalty, conflicts of interest, missed hearings, abandoned files, disciplinary nonresponse, client repair failures, lack of independent public oversight, lack of conflicts counsel, lack of malpractice-referral systems, and lack of meaningful substitute-provider access.

3377. COA 641, Declaratory Judgment Against Defendants, Local Rules Failure: Plaintiff and the class are entitled to a declaration that Defendants' reliance on local rules, judge-specific procedures, county practices, standing orders, courthouse customs, filing preferences, scheduling norms, and local bar practices fails because those rules impose practical barriers on low-income litigants, legal-aid clients, malpractice victims, disabled litigants, pro se litigants, substitute providers, and public-interest legal teams without uniform public notice, accessible explanation, empirical justification, disability-sensitive procedures, meaningful public participation, or safeguards against local lawyer-and-judge control.

3378. COA 642, Declaratory Judgment Against Defendants, Civil and Criminal Procedure Failure: Plaintiff and the class are entitled to a declaration that Defendants' civil, criminal, appellate, evidentiary, local, standing-order, and court-made procedural systems fail because they determine filings, motions, discovery, deadlines, sanctions, dismissal, summary judgment, jury access, hearing access, withdrawal, substitution, missed-hearing relief, appeals, records, and access to

remedies as binding public law without adequate legislative enactment, empirical validation, client-centered design, or protection for legal-aid clients and malpractice victims whose claims are lost through procedure rather than decided on the merits.

3379. COA 643, Declaratory Judgment Against Defendants, Rules of Professional Conduct Failure: Plaintiff and the class are entitled to a declaration that Defendants' reliance on lawyer-written professional conduct rules fails because those rules regulate lawyers, protect lawyers, discipline lawyers, limit criticism of lawyers, justify withdrawal, define conflicts, shape communication duties, govern client relationships, and preserve attorney-only practice without ensuring client notice, file transfer, conflict-free replacement counsel, malpractice referrals, anti-retaliation protection, case repair, restored hearings, restored deadlines, or meaningful remedies when lawyers and legal-aid providers harm clients.

3380. COA 644, Declaratory Judgment Against Defendants, Courthouse Rules Failure: Plaintiff and the class are entitled to a declaration that Defendants' courthouse rules, security practices, clerk practices, filing counters, technology systems, record-access practices, transcript practices, courtroom conduct rules, pro se procedures, and judge-controlled courthouse administration fail because they affect speech, petitioning, disability access, hearing access, public observation, filing access, service access, evidence access, and court-user dignity without

sufficient public accountability, uniform accessibility, empirical justification, anti-retaliation safeguards, or protection against insider gatekeeping by lawyers, judges, and court-connected actors.

3381. COA 645, Declaratory Judgment Against Defendants, Disciplinary Board Failure: Plaintiff and the class are entitled to a declaration that Defendants' attorney-discipline, judicial-discipline, judicial-conduct, complaint-screening, confidentiality, sanctions, contempt, ethics-enforcement, court-reputation, and professional self-regulation systems fail because those systems do not ensure that harmed clients receive notice of error, access to files, replacement counsel, conflicts counsel, malpractice referrals, corrected proceedings, restored hearings, restored deadlines, recusal review, disability accommodations, case repair, public accountability, or meaningful remedies after lawyer, judge, or legal-aid misconduct.

3382. COA 646, Declaratory Judgment Against Defendants, Fee Disputes Failure: Plaintiff and the class are entitled to a declaration that Defendants' reliance on voluntary county-bar-based attorney-client fee-dispute systems fails because those systems route clients into local lawyer-controlled proceedings rather than a uniform statewide public tribunal and allow disputes involving lawyers to be influenced or decided by the lawyer's local colleagues, friends, referral partners, courthouse acquaintances, social associates, professional peers, or regular drinking

Case 4:26-cv-03123-MWB Document 11-3 Filed 01/29/26 Page 954 of 970

companions, without uniform public records, neutral statewide procedures, adequate appellate review, or protection from local-bar bias.

3383. COA 647, Declaratory Judgment Against Defendants, Funding Delegations Failure: Plaintiff and the class are entitled to a declaration that Defendants' public civil legal-aid funding structure fails because LSC, PLAN, NPLS, and related public-funding systems delegate legal-aid obligations to lawyer-controlled funders, grantees, dominant regional providers, and professional networks without creating a conflict-counsel equivalent when the funded provider has a conflict, harmed the client, abandoned the case, retaliated against a whistleblower, or became institutionally adverse to the client, leaving eligible low-income clients without independent substitute counsel, neutral repair, funded replacement counsel, or meaningful remedies.

3384. COA 648, Declaratory Judgment Against Defendants, American Rule Failure: Plaintiff and the class are entitled to a declaration that Defendants' reliance on the American Rule fails because judge-made, lawyer-protective attorney-fee rules prevent malpractice victims, legal-aid clients, low-income litigants, disabled litigants, tenants, veterans, domestic-violence survivors, consumers, and public-interest plaintiffs from obtaining counsel and remedies against lawyers, courts, legal-aid providers, bar entities, and institutional actors, while Defendants have not identified a constitutionally enacted, empirically

justified, client-centered basis for forcing harmed litigants to bear the cost of correcting legal-system misconduct.

3385. COA 649, Declaratory Judgment Against Defendants, Immunity Failure: Plaintiff and the class are entitled to a declaration that Defendants' immunity systems fail because judicial immunity, quasi-judicial immunity, prosecutorial immunity, disciplinary immunity, sovereign immunity, institutional immunity, attorney-protective doctrines, and related judge-made barriers prevent legal-aid clients, malpractice victims, substitute providers, and court users from obtaining remedies against legal-system actors even though those doctrines protect the same courts, judges, lawyers, officials, and professional institutions that created, enforce, or benefit from the doctrines.

3386. COA 650, Declaratory Judgment Against Defendants, Recusal Failure: Plaintiff and the class are entitled to a declaration that Defendants' recusal systems fail because judges, judicial officers, disciplinary actors, bar-connected officials, and court-connected decisionmakers continue to decide matters involving their own courts, colleagues, professional networks, lawyers, local bar associations, legal-aid providers, disciplinary systems, repeat players, political allies, former partners, friends, and institutional interests under standards that permit the legal system to judge its own power, reputation, immunity, fees, procedure, discipline, and accountability.

3387. COA 651, Declaratory Judgment Against Defendants, Withdrawal Failure: Plaintiff and the class are entitled to a declaration that Defendants' attorney-withdrawal systems fail because lawyers and legal-aid providers may withdraw, threaten withdrawal, abandon work, force unclear representation status, leave clients without substitute counsel, avoid hearings, miss deadlines, and transfer case risk to vulnerable clients through lawyer-controlled standards that do not require timely client notice, court repair, file transfer, conflicts counsel, replacement counsel, malpractice referral, continuance protection, disability accommodation, restored deadlines, or meaningful remedies when withdrawal harms the client.

3388. Defendants' declaratory-judgment failures injured Plaintiff, the class, Grohol's legal team, similarly situated substitute providers, legal-aid clients, malpractice victims, low-income litigants, disabled litigants, veterans, domestic-violence survivors, tenants, parents, workers, consumers, pro se litigants, and court users by preserving lawyer-controlled entry barriers, lawyer-controlled accountability systems, judge-made doctrines, fee barriers, immunity barriers, recusal failures, withdrawal failures, legal-aid funding failures, disciplinary failures, court-access barriers, procedural barriers, professional self-protection, substitute-provider exclusion, and public-service legal restrictions.

3389. Grohol and the class are entitled to declaratory relief, temporary injunctive relief, preliminary injunctive relief, permanent injunctive relief, corrective-

disclosure relief, neutral monitoring, client-notice protocols, hearing-notice protocols, lawful-withdrawal protocols, file-transfer protocols, independent conflicts-counsel access, substitute-provider access, provider-neutral referral access, client-centered disciplinary and judicial-conduct review, public legal-aid accountability review, court-access review, nonretaliation protections, preservation of communications and records, expedited discovery, costs, attorney's fees where authorized, and all other lawful relief.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Lori Grohol, individually and on behalf of all others similarly situated, requests that this Court enter judgment in favor of Plaintiff and the class and against Defendants, jointly and severally where permitted by law, and grant the following relief:

A. Certify this action as a class action under Federal Rule of Civil Procedure 23.

B. Appoint Lori Grohol as class representative.

C. Appoint Plaintiff's counsel as class counsel.

D. Declare that Defendants violated Plaintiff's and the class's rights under the United States Constitution, the Pennsylvania Constitution, federal civil-rights statutes, federal antitrust law, federal racketeering law, Pennsylvania statutory law, Pennsylvania common law, and all other laws identified in the Complaint and attached cause-of-action inventory.

E. Declare that Defendants' lawyer-controlled, judge-controlled, legal-aid-controlled, bar-controlled, disciplinary, funding, referral, public-service, courthouse, procedural, professional-regulation, and court-access systems deprived Plaintiff, the class, malpractice victims, legal-aid clients, substitute providers, vulnerable clients, veterans, disabled veterans, low-income litigants, pro se litigants, tenants, domestic-violence survivors, parents, workers, consumers, and

court users of lawful access to legal services, court remedies, substitute-provider access, conflict-free representation, public-service opportunities, professional accountability, and equal legal-system protection.

F. Declare that Defendants may not use attorney licensing, law-school requirements, bar-exam requirements, character-and-fitness systems, professional-conduct rules, peer-report systems, disciplinary systems, local rules, courthouse rules, attorney-withdrawal rules, immunity doctrines, attorney-fee rules, legal-aid funding structures, referral systems, public-service programs, court-access practices, or precedent-based doctrines to preserve lawyer monopoly power, block substitute providers, restrict court access, defeat malpractice accountability, protect legal insiders, retaliate against criticism, or deny meaningful remedies.

G. Declare that Defendants may not cite, enforce, defend, administer, or rely upon case law, precedent, stare decisis, common law, judge-made doctrine, judicial opinions, self-interested judicial-system rules, conflicted recusal standards, immunity doctrines, fee doctrines, procedural doctrines, sanctions doctrines, disciplinary doctrines, attorney-accountability doctrines, or legal-aid accountability

doctrines as binding law against Plaintiff or the class unless Defendants identify a constitutionally valid, neutral, conflict-free, and publicly accountable source of law.

H. Declare that Defendants may not apply more lenient constitutional standards, weaker evidentiary requirements, more favorable presumptions, relaxed conflict rules, professional deference, court-created exemptions, or self-protective analysis to courts, judges, lawyers, bar entities, disciplinary bodies, legal-aid actors, judicial agencies, or court-connected institutions than they apply to ordinary parties, legal-aid clients, malpractice victims, low-income litigants, disabled litigants, pro se litigants, substitute providers, public-interest lawyers, or members of the public.

I. Declare that lawyer-legislators and JD-holding legislators must disclose and recuse from judicial-system measures affecting courts, judges, lawyers, legal-aid systems, attorney regulation, judicial regulation, court administration, legal-service markets, legal education, bar admission, discipline, immunity, fees, procedure, remedies, and public access to courts unless constitutionally adequate public findings supported by evidence justify an exception.

J. Declare that judges, judicial officers, disciplinary actors, court-connected actors, and legal-system decisionmakers must maintain independence, anti-fraternization protections, and conflict-of-interest safeguards at least as strict as the neutrality standards required of professional sports officials, and must recuse whenever a comparable relationship would make a reasonable person question whether a professional sports official could fairly decide the matter.

K. Declare that JARA, Act No. 53 of 1978, cannot constitutionally defeat Plaintiff’s or the class’s claims for attorney fees, costs, access-to-courts remedies, malpractice remedies, legal-aid accountability, attorney accountability, judicial accountability, public remedies, or statutory protections where JARA relied on conflicted lawyer-legislator participation, omnibus repeal, unclear title, compilation language, bundled subjects, or repeal procedures that did not satisfy constitutional safeguards.

L. Declare that the 1968 Pennsylvania Judiciary Article and Article V, Section 10(c), are invalid and unenforceable to the extent Defendants rely on them to

justify Supreme Court control over practice and procedure, admission to the bar, practice of law, court administration, judicial-branch supervision, conduct of courts, assignment and reassignment of actions and appeals, officers serving process or enforcing court orders, and suspension of inconsistent laws without separate voter approval for those materially distinct constitutional changes.

M. Preliminarily and permanently enjoin Defendants from retaliating against Plaintiff, Plaintiff's counsel, Grohol's legal team, SLAAY, similarly situated substitute providers, class members, witnesses, clients, veterans, disabled veterans, public-service participants, court users, or legal-system critics for filing litigation, threatening litigation, reporting malpractice, criticizing lawyers, criticizing courts, criticizing legal-aid providers, criticizing bar entities, seeking public records, requesting meetings, serving subpoenas, protesting, participating in public-service programs, or advocating for legal-system reform.

N. Preliminarily and permanently enjoin Defendants from excluding, blacklisting, suspending, removing, defaming, threatening, disciplining, investigating, burdening, denying referrals to, denying committee access to, denying meeting

access to, denying public-service access to, denying Wills for Heroes access to, denying veterans-service access to, denying courthouse access to, or otherwise disadvantaging Plaintiff's counsel, Grohol's legal team, SLAAY, substitute providers, or similarly situated persons because they challenged legal-aid malpractice, lawyer misconduct, bar retaliation, court practices, disciplinary silence, professional self-regulation, or legal-industry monopoly power.

O. Order Defendants to restore Plaintiff's counsel, Grohol's legal team, SLAAY, and similarly situated substitute providers to all public-service, professional, referral, bar, meeting, committee, listserv, veterans-service, Wills for Heroes, coalition, advisory, and courthouse-access opportunities they held, sought, or would have received absent Defendants' unlawful conduct.

P. Order Defendants to provide provider-neutral referral access, public-service access, veterans-service access, legal-aid referral access, committee access, meeting access, listserv access, court-access assistance, and substitute-provider access without viewpoint discrimination, retaliation, professional favoritism, bar-connected favoritism, legal-aid favoritism, or court-connected favoritism.

Q. Order Defendants to create, fund, and implement conflict-free substitute-provider access for legal-aid clients when a public-funded provider has a conflict, abandons a case, misses a hearing, misses a deadline, retaliates against a whistleblower, refuses meaningful service, remains counsel of record without performance, loses client trust, or becomes institutionally adverse to the client.

R. Order Defendants to create, fund, and implement client-notice protocols requiring prompt written notice to affected clients when a legal-aid provider misses a hearing, misses a deadline, fails to provide meaningful advocacy, remains counsel of record without active representation, seeks withdrawal, refuses substitute counsel, closes a case, asserts a conflict, or receives a malpractice complaint.

S. Order Defendants to create, fund, and implement hearing-notice protocols, file-transfer protocols, withdrawal-repair protocols, missed-deadline repair protocols, missed-hearing repair protocols, continuance protocols, disability-accommodation protocols, substitute-counsel protocols, conflicts-counsel protocols, and

malpractice-referral protocols for legal-aid clients and similarly situated vulnerable clients.

T. Order Defendants to create, fund, and implement independent review systems for legal-aid nonperformance, attorney misconduct, judicial misconduct, disciplinary nonresponse, court-access barriers, fee disputes, conflicts of interest, withdrawal harms, public-service exclusion, and retaliation against lawyers, clients, witnesses, substitute providers, and legal-system critics.

U. Order Defendants to provide corrective disclosures to affected clients, class members, referral sources, courts, funders, veterans-service coalitions, public-service organizations, bar members, legal-aid networks, disciplinary bodies, public agencies, and all persons or entities who received false, misleading, incomplete, retaliatory, exclusionary, or reputationally harmful communications about Plaintiff, Plaintiff's counsel, Grohol's legal team, SLAAY, substitute providers, legal-aid malpractice complaints, Wills for Heroes access, public-service eligibility, or this litigation.

V. Order Defendants to preserve all documents, emails, listserv messages, text messages, Teams messages, calendar entries, meeting minutes, drafts, metadata, grant records, billing records, compliance records, referral records, disciplinary records, intake records, client records, file notes, public-service records, Wills for Heroes records, veterans-service records, court-access records, and communications relating to Plaintiff, the class, Grohol, Grohol’s legal team, SLAAY, NPLS, PLAN, LSC, USCBA, PBA, Wills for Heroes, public-service access, legal-aid referrals, court access, attorney discipline, judicial discipline, bar governance, local rules, legal-aid funding, and Defendants’ challenged conduct.

W. Order expedited discovery concerning communications, funding, referrals, meeting minutes, listserv access, public-service exclusions, legal-aid nonperformance, NPLS client files, grievance responses, disciplinary contacts, judicial contacts, bar communications, veterans-service communications, Wills for Heroes communications, court-access communications, and all facts necessary to identify Doe Defendants 1 through 200.

X. Award compensatory damages to Plaintiff and the class for lost property, lost claims, lost hearings, lost deadlines, lost appellate rights, lost settlement leverage, lost file access, lost representation, lost substitute-provider access, lost referrals, lost public-service access, lost professional opportunities, lost business opportunities, reputational harm, emotional distress where recoverable, financial loss, litigation burdens, and all other legally compensable harm.

Y. Award treble damages where authorized by law, including under federal antitrust law, federal racketeering law, Pennsylvania consumer-protection law, and any other statute permitting multiplied damages.

Z. Award punitive damages against all Defendants subject to punitive damages because their conduct was intentional, retaliatory, malicious, reckless, self-protective, corrupt, deceptive, exclusionary, and undertaken with conscious disregard for the rights of Plaintiff, the class, legal-aid clients, malpractice victims, substitute providers, vulnerable clients, veterans, disabled veterans, court users, and the public.

AA. Award restitution, disgorgement, unjust-enrichment relief, surcharge, accounting, and return of all funds, grants, fees, dues, payments, referrals, opportunities, public benefits, public-service advantages, professional benefits, or institutional advantages Defendants received through unlawful legal-aid, court-access, bar-controlled, public-service, attorney-regulation, disciplinary, referral, funding, or monopoly systems.

BB. Award declaratory, injunctive, equitable, statutory, antitrust, racketeering, civil-rights, consumer-protection, contract, tort, restitutionary, and common-law relief sufficient to dismantle the unlawful structures identified in the Complaint and prevent recurrence of the same harms.

CC. Award reasonable attorney’s fees, expert fees, litigation expenses, taxable costs, nontaxable costs, and all other recoverable fees and expenses under 42 U.S.C. § 1988, 18 U.S.C. § 1964, federal antitrust law, Pennsylvania law, equitable doctrines, private-attorney-general doctrines where available, and all other applicable law.

DD. Award pre-judgment interest, post-judgment interest, delay damages where available, and all other monetary relief necessary to make Plaintiff and the class whole.

EE. Retain jurisdiction to supervise compliance, enforce injunctive relief, approve corrective notices, monitor referral neutrality, monitor nonretaliation compliance, supervise record preservation, address ongoing violations, and grant further relief as justice requires.

FF. Grant all other legal and equitable relief the Court deems just, proper, and necessary to protect Plaintiff, the class, Grohol's legal team, similarly situated substitute providers, legal-aid clients, malpractice victims, vulnerable clients, veterans, disabled veterans, low-income litigants, disabled litigants, pro se litigants, court users, and the public from Defendants' unlawful conduct.

Plaintiff demands a trial by jury on all issues, as all issues are triable.

Respectfully submitted,

/s Paige Martineau, Esq.

Counsel for Plaintiff

#325096

218 Pine Street

Williamsport, PA 17701

570-392-3025

Case 5:26-cv-03103-JMG Document 11-3 Filed 01/29/26 Page 71 of 73

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction:_____________Bethlehem, PA, North Penn Legal Services Headquarters __________

***RELATED CASE IF ANY:*** Case Number:__Middle District ofPennsylvania____________________ Judge:____Brann __________

1. Does this case involve property included in an earlier numbered suit? Yes [X]
2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit? Yes [X]
3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit? Yes [ ]
4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual? Yes [ ]
5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation. Yes [ ]

I certify that, to the best of my knowledge and belief, the within case [X] **is** / [ ] **is not** related to any pending or previously terminated action in this court.

**Civil Litigation Categories**

*A. Federal Question Cases:*

- [ ] 1. Indemnity Contract, Marine Contract, and All Other Contracts)
- [ ] 2. FELA
- [ ] 3. Jones Act-Personal Injury
- [ ] 4. Antitrust
- [ ] 5. Wage and Hour Class Action/Collective Action
- [ ] 6. Patent
- [ ] 7. Copyright/Trademark
- [ ] 8. Employment
- [ ] 9. Labor-Management Relations
- [X] 10. Civil Rights
- [ ] 11. Habeas Corpus
- [ ] 12. Securities Cases
- [ ] 13. Social Security Review Cases
- [ ] 14. Qui Tam Cases
- [ ] 15. Cases Seeking Systemic Relief ***see certification below***
- [ ] 16. All Other Federal Question Cases. *(Please specify)*:___ _______________

**B.** *Diversity Jurisdiction Cases:*

- [ ] 1. Insurance Contract and Other Contracts
- [ ] 2. Airplane Personal Injury
- [ ] 3. Assault, Defamation
- [ ] 4. Marine Personal Injury
- [ ] 5. Motor Vehicle Personal Injury
- [ ] 6. Other Personal Injury (*Please specify*):________________
- [ ] 7. Products Liability
- [ ] 8. All Other Diversity Cases: *(Please specify)*______________ ______________________

I certify that, to the best of my knowledge and belief, that the remedy sought in this case [X] **does** / [ ] **does not** have implications beyond the parties before the court and [X] **does** / [ ] **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

[X] Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

[ ] None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Lori Grohol

**(b)** County of Residence of First Listed Plaintiff Luzerne
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Paige Martineau, SLAAY, 647 East Third Street, Williamsport, PA 17701, 570-392-3025

## DEFENDANTS

North Penn Legal Services

County of Residence of First Listed Defendant Lehigh
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [X] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [ ] 2 | [X] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
42 usc 1983

Brief description of cause:
NPLS has ignored case for 6 years, hundreds of clients suffered malpractice, government entities retaliated and created the system

## VII. REQUESTED IN COMPLAINT:

[X] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $** 100000

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE Brann DOCKET NUMBER Middle District of Pennsylvania

DATE 10/29/2026

SIGNATURE OF ATTORNEY OF RECORD /s Paige Martineau

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.